UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
KEMPEN INTERNATIONAL FUNDS                    }    Civil Action No.
(KEMPEN INTERNATIONAL FUNDS -                 }
MERCLIN GLOBAL EQUITY), KEMPEN                }    <u>CLASS ACTION</u>
INTERNATIONAL FUNDS (KEMPEN                   }
INTERNATIONAL FUNDS - MERCLIN                 }    COMPLAINT FOR VIOLATIONS OF THE
PATRIMONIUM), and MERCLIN                     }    FEDERAL SECURITIES LAWS
INSTITUTIONAL FUND (MERCLIN                   }
INSTITUTIONAL EQUITY FUND DBI-                }
RDT), individually and on behalf of all others }
similarly situated,                           }
                                              }
                    Plaintiff,                }
                                              }
        vs.                                   }
                                              }
SYNEOS HEALTH, INC., ALISTAIR                 }
MACDONALD, MICHELLE KEEFE, and                }    <u>DEMAND FOR JURY TRIAL</u>
JASON MEGGS,                                  }
                                              }
                    Defendants.               }
                                              }
———————————————————— x

1.      Kempen International Funds (Kempen International Funds - MercLin Global Equity) ("KIF – MercLin Global Equity"), Kempen International Funds (Kempen International Funds - MercLin Patrimonium) ("KIF – MercLin Patrimonium"), and MercLin Institutional Fund (MercLin Institutional Equity Fund DBI-RDT) ("MercLin DBI-RDT") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Syneos Health, Inc. ("Syneos" or the "Company"), Alistair Macdonald, Michelle Keefe, and Jason Meggs (collectively, "Defendants"), by and through their counsel DiCello Levitt LLP, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I.      NATURE OF THE ACTION

2.      Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Syneos between September 9, 2020 and November 3, 2022, inclusive (the "Class Period").

## II.      JURISDICTION AND VENUE

3.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.  This

---

[1]      Plaintiffs' information and belief is based on, among other things, the investigation and review conducted by and through their counsel, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings, Company press releases and conference calls, analyst and media reports about the Company, and other public filings and materials.  Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the statements that form the subject of this complaint were disseminated into this District, the securities that are the subject of this action were traded on The Nasdaq Stock Market LLC (the "NASDAQ") in this District, and several stock offerings carried out by Defendants as part of the fraudulent scheme alleged herein occurred in this District.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

6.     Plaintiff KIF – MercLin Global Equity and Plaintiff KIF – MercLin Patrimonium are a Luxembourg investment company and its respective compartments or sub-funds.  Plaintiff MIF MercLin Institutional is a Belgian SICAV with a single compartment or sub-fund.  As set forth in the accompanying certification, which is incorporated by reference herein, Plaintiffs purchased shares of Syneos common stock during the Class Period at artificially inflated prices and were damaged thereby. *See* Certifications, attached hereto.

### B.    Defendants

7.     Defendant Syneos is a multinational clinical research organization.  During the Class Period, the Company's common stock was listed on the NASDAQ and traded in an efficient market under the ticker symbol "SYNH."

8.    Defendant Alistair Macdonald ("Macdonald") served as Chief Executive Officer ("CEO") of Syneos and as a member of Company's Board of Directors (the "Board") from October 2016 until April 2022, when he resigned from both positions.  Prior to serving as the Company's CEO, Defendant Macdonald held various positions within Syneos and its predecessor company INC Research Holdings, Inc. ("INC Research"), including, *inter alia*, as its President, Chief Operating Officer, and President of Clinical Development services.  As CEO of Syneos, Macdonald was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board.  Macdonald also had approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

9.    Defendant Michelle Keefe ("Keefe") has served as member of the Board and as CEO of Syneos following the resignation of Defendant Macdonald in April 2022.  Prior to her appointment as CEO, Keefe served as President of Medical Affairs & Commercial Solutions beginning in November 2021, and as President of Commercial Solutions from December 2017 to November 2021.  As CEO of Syneos, Keefe is the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board.  Keefe also has approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly

with shareholders and market analysts through the Company's earnings calls and other market-related events.

10.     Defendant Jason Meggs ("Meggs") served as Chief Financial Officer ("CFO") of Syneos from February 2018 until his resignation from the Company in March 2023.  Prior to his role as CFO, Defendant Meggs served as Executive Vice President and CFO of Syneos's Commercial Solutions Segment.  Defendant Meggs also previously served as Executive Vice President of Oncology at Syneos from January 2017 to August 2017, and as Senior Vice President of Business Finance with the Company from 2014 to 2016.  As Syneos's CFO, Meggs was the Company's senior-most financial officer, responsible for overseeing its financial, accounting, audit, treasury, and tax functions and the development and implementation of internal financial controls.  Meggs also signed Syneos's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

11.     The defendants identified above in ¶¶8-10 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "Defendants."

12.     Each of the Individual Defendants, because of his or her senior positions within the Company, possessed the power and authority to control the contents of Syneos's quarterly and annual reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or cause them to be corrected. Throughout the Class Period (and for Macdonald, until his separation from the Company), each of the Individual Defendants, as senior executive officers of Syneos, was directly involved in the management and day-to-day operations of the Company at the highest levels and as further detailed herein, was privy to confidential and proprietary information concerning Syneos and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. The Individual Defendants had access to non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

13.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business

prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    BACKGROUND

15.     Syneos is a multinational clinical research organization that helps biopharmaceutical companies test and develop their products.  Syneos arose from the 2018 merger of INC Research and inVentiv Health, Inc. ("inVentiv Health").  The Company markets itself as an integrated "end-to-end" biopharmaceutical solutions provider, with services that span from early-phase clinical trials through the commercialization of a product.

16.     Syneos has two reportable segments: (i) Clinical Solutions; and (ii) Commercial Solutions.  The Clinical Solutions segment focuses on the clinical development of products by biopharmaceutical companies, such as patient recruitment, clinical monitoring, investigator recruitment, and conducting all aspects of a global clinical trial.  The Commercial Solutions

segment focuses on product commercialization, deployment, communications, and consulting services.

17.     During the Class Period, Syneos derived approximately 75% of its revenues from its Clinical Solutions segment, generating 2021 annual revenues of more than $4 billion. Syneos's customer base is comprised predominantly of small- to mid-sized ("SMID") biopharmaceutical companies and includes more than 800 different entities with operations located in North America, Europe, the Middle East, and Africa.

18.     As a clinical research organization, Syneos's financial success and growth prospects are predicated on securing a steady inflow of new business awards and growing its pipeline of outstanding clinical trial work. Syneos publicly discloses information regarding two operational metrics that serve as key indicators of underlying client demand and anticipated future revenues: (i) its "backlog" of business; and (ii) its reported book-to-bill ratios.

19.     Syneos defines its backlog as its anticipated future revenue based upon contract and pre-contract client commitments that are supported by written communications. As work on a project begins, revenue is recognized over the life of the project, provided the award has gone to contract. An increase in backlog will generally result in an increase in revenues over time, and thus backlog is used as an important indicator of Syneos's business performance and future expected revenue.

20.     Syneos's book-to-bill ratio is the ratio of orders received to orders completed and billed for a specified period. Generally, a book-to-bill ratio greater than one is an indication of strong demand as it signals that Syneos is receiving more new business than it is completing, while a book-to-bill ratio of less than one indicates that demand is waning. Syneos reports book-to-bill ratios by segment, and on a trailing three- and twelve-month basis.

21.     Included within Syneos's reported revenues are reimbursable out-of-pocket expenses.  These revenues consist of reimbursements that Syneos receives from customers for certain costs incurred in connection with the delivery of its services, including, for example, fees paid to principal investigators, travel costs, and sales representatives.  Reimbursable out-of-pocket expenses comprise a significant amount of Syneos's revenue and backlog of new business.  For example, in 2020, reimbursable out-of-pocket expenses accounted for more than $4.5 billion, or approximately 42% of Syneos's total backlog.  Although ostensibly margin neutral, the amount of anticipated reimbursable expenses reflected in Syneos's backlog serves as an important indicator of demand for the Company's services and thus its overall business performance.

22.     Beginning in March 2020, Syneos, like many companies, experienced disruptions because of the COVID-19 pandemic.  Some existing clinical trials were delayed due to restrictions that limited the ability of Syneos's staff to physically access investigative sites and conduct clinical monitoring work.  Syneos also experienced certain delays in patient enrollment and in the startup of new customer projects, all of which temporarily impacted the Company's ability to fulfill its backlog orders.  In particular, the Company experienced a decline in reimbursable revenues in 2020, as the type of on-site visits that generate reimbursable expenses became less common.

23.     As a result, Syneos withdrew financial guidance for fiscal year 2020 and imposed various cost management initiatives to try to mitigate the financial fallout of the delayed clinical trial work.  These cost initiatives, among other things, included certain temporary compensation adjustments, hiring restrictions, staffing reductions, voluntary and involuntary employee furloughs, reductions in third-party costs, and other initiatives.  Syneos also implemented remote monitoring services to allow access to clinical sites where physical access had been restricted because of the COVID-19 pandemic.

24.     After these initial disruptions, Defendants claimed that negative impacts from the COVID-19 pandemic had bottomed out by the second quarter of 2020 and that Syneos had quickly entered a recovery period that was proving a boon for business.  Speaking during an August 6, 2020, earnings call for the second quarter of 2020, Defendant Macdonald stated: "We saw improvement in the operating environment throughout the second quarter, following its low in April and have seen that momentum continue through the month of July."  He continued: "[W]e remain well positioned to accelerate growth [in Clinical Solutions] as the recovery continues" and "expect strong growth in both our segments in 2021."  During the same call, Defendant Meggs stated that Syneos expected to "continue to see progress as we move through quarter three," with "things being relatively normal in the quarter four."  Defendants further claimed that Syneos had not experienced any "meaningful cancellations" of existing contracts, indicating that delayed performance under existing contracts would create a tailwind in late 2020 and 2021.

25.     During the Class Period, Defendants claimed that Syneos's business was booming as the Company lapped weak pandemic-era results.  In addition, the biopharmaceutical sector experienced a historically favorable funding and business environment, as high equity prices, government stimulus, and health research spurred by the COVID-19 pandemic fueled clinical drug development.  For example, during a November 2020 industry conference presentation, Defendant Meggs represented that Syneos was poised for growth based on "record" customer order flows and that Syneos's new business "pipeline," "on top of what's already record pipelines and communications and consulting coming into the quarter," "really starts to shape up nicely heading into quarter 4 and into 2021."  Similarly, during an April 2021 conference call, Syneos executives continued to highlight the purportedly "strong demand" for Syneos's services.  On the call, Defendant Meggs stated that the Company's reimbursables revenue category was expected to grow

beyond pre-pandemic levels and accelerate over the balance of the year.  Syneos reported a "record ending backlog" of expected business and high book-to-bill ratios, indicating to investors that the Company's robust growth trends would continue.

26.    Unbeknownst to investors, however, these and similar statements made by Defendants during the Class Period were materially false and misleading when made.  Syneos's business development capabilities had been critically impaired by recent workforce reductions and leadership and operational changes, as well as labor force turmoil caused by the COVID-19 pandemic.  In addition, the Company had struggled to integrate inVentiv Health and INC Research, leading to a bloated and confused organizational structure that was further complicated by subsequent acquisitions such as the December 2020 acquisitions of Illingworth Research Group and SHCR Holdings Corporation ("Synteract"), the September 2021 acquisition of StudyKIK Corporation, and the December 2021 acquisition of RxDataScience, Inc.  The rapid growth and increased complexity of Syneos had left the Company unable to timely respond to its clients' needs, to provide effective service across its full suite of promised product offerings, or to efficiently work across its various product and service groups.  The increased prevalence of remote monitoring and decentralized clinical trials in the wake of the COVID-19 pandemic compounded these problems, as Syneos lagged its peers in providing remote clinical capabilities and was struggling to catch up to its peers in this new business environment.  As a result, Syneos was failing to effectively perform under its existing contracts, ultimately causing Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals.  Moreover, the Company's reimbursable revenue stream had been fundamentally diminished by the COVID-19 pandemic as its customers persisted in seeking remote work and limiting the number of on-site clinical trials.  Consequently, Syneos's backlog had been artificially inflated by hundreds of millions of dollars

in reimbursable experiences that would never be received by the Company, which created the false impression that Syneos was enjoying robust client demand when in fact its business was floundering.

27.    As a result of Defendants' Class Period misrepresentations, the price of Syneos stock soared, reaching all-time highs of more than $100 per share by December 2021.  Seeking to take advantage of this artificial price inflation, Syneos held a series of five registered public stock offerings within a nine-month period, allowing its private equity backers and largest shareholders, Thomas Lee Partners and Advent International, to unload more than $3 billion worth of Syneos stock.   Unusually, Syneos purchased more than 2 million shares directly from the selling stockholders in the transactions, providing artificial price support to Syneos stock.  The Individual Defendants also dumped over $16 million worth of their own Syneos shares at artificially inflated prices during the Class Period, including more than $11.4 million sold by Defendant Macdonald alone.

28.    Then, on February 17, 2022, Syneos announced deeply disappointing financial results for the fourth quarter of 2021.  Despite Defendants' prior claims that reimbursable revenues would undergo "strong growth" and "accelerat[e]," Syneos's revealed reimbursable revenues would in fact likely never recover to pre-pandemic levels.  As a result, the Company set apart $3.9 billion from its backlog of expected new business and reported alarmingly low book-to-bill ratios. Subsequently, on April 29, 2022, the Company announced the abrupt departure of Defendant Macdonald as CEO of the Company.  Defendant Meggs would follow his departure less than a year later.  Syneos would go on to report worsening quarterly financial results, revealing a sudden and dramatic deterioration of its business and client demand.  For example, on November 4, 2022, Syneos reported a Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the amount

anticipated by some analysts, with several calling the disappointing results "unprecedented." Syneos received just $182 million in clinical net new business awards during the quarter, representing an 87% year-over-year decline and nearly $1 billion below the amount expected by some analysts. On a related earnings call, new CEO Defendant Keefe revealed that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions. As detailed herein, during a subsequent investor call Defendant Keefe indicated the issues extended even further back in time, although the problems were not previously disclosed to investors and contradicted Defendants' Class Period statements.

29.     As a result of these revelations, the price of Syneos stock declined to trade below $23 per share, down more than 77% from the Class Period high, causing Plaintiffs and the Class to suffer hundreds of millions of dollars in losses and economic damages.

## V.    DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

30.     The Class Period begins on September 9, 2020. On that day, Defendants Macdonald and Meggs presented at an industry conference sponsored by Robert W. Baird & Co. Inc. During the presentation, Macdonald stated that Syneos was beginning to enjoy "pent-up demand" as on-site clinical activations had returned to pre-COVID-19 levels, stating in pertinent part as follows:

> The most important – well, the most interesting stat for me on the clinical side is site activations.
>
> So *we're actually back to where we were pre-COVID levels* and *we track this metric very closely, internally* because it's the metric that shows, it's like the end of the start-up period. So once you get through site activation, sites open, ready to engage and enroll. So *we're actually back to, if not slightly ahead of where we were pre-COVID* which to me shows maybe the start of that catch-up of some of the pent-up demand. And of course, that's a leading indicator for getting back into enrollment and things like that.

You can't enroll a patient unless the site's activated.  So we're starting to catch up on that.

31.     On October 28, 2020, Syneos issued a release announcing an agreement to acquire Synteract – a full-service clinical research organization with a focus in the emerging biopharma segment.  The release stated that "Syneos Health continues to experience strong SMID demand with double digit year-over-year pipeline growth."

32.     On October 29, 2020, Syneos filed a Form 8-K announcing its financial results for the quarter ended September 30, 2020 (the "Q3 2020 Release").  The Q3 2020 Release stated that Syneos's Clinical Solutions segment had achieved net new business awards of $995 million, representing a book-to-bill ratio of 1.20x, during the quarter.  The Q3 2020 Release also stated that Syneos had generated $1.099 billion in revenue during the quarter with an ending backlog of $9.783 billion.  The release quoted Macdonald as stating, in pertinent part, the following:

> "We delivered strong sequential revenue growth with profit outperformance in the third quarter.  Our differentiated model continues to resonate with customers and our value proposition is further strengthened with our agreement to acquire Synteract . . . .  As we look ahead to 2021 and beyond, we're building a strong foundation for growth, coming off a quarter with record backlog, high market demand and robust pipelines."

33.     That same day, Syneos filed its quarterly report on Form 10-Q for the quarter ended September 30, 2020, which was signed by Defendants Macdonald and Meggs.  The Form 10-Q contained the financial information provided in the Q3 2020 Release.  *See* ¶32.

34.     Also on October 29, 2020, Defendants Macdonald and Meggs hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the third quarter of 2020.  During his prepared remarks, Macdonald touted Syneos's "record quarter" of new business, stating: "Gross awards remained very strong including a record quarter of awards from our small-to-mid size customer segment."  Macdonald continued: "Our Clinical pipeline

remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter."

35.    On November 9, 2020, Defendant Meggs presented at Credit Suisse's industry conference.  In response to an analyst question regarding client demand, Meggs reassured investors that the Company was experiencing "robust" demand across both its clinical and commercial business segments, stating in pertinent part as follows:

> Yes.  I mean the – our pipelines remain robust, right, right across the business in clinical and commercial.  The SMID RFP flow, as you mentioned, was a record in quarter 3 for us on the back of biotech funding.  I guess everyone probably looked at the October biotech funding results now in another strong month.  So that contribution, we believe, will continue.  We don't tend to talk about specific RFP flow metrics intra-quarter because it just depends on what month and where you are.  So pipelines look good.  RFP flow continues to be sound.  We're looking at that biotech index as something that will continue to provide a tailwind across the business.   And then if you put those large COVID launches into commercial, on top of what's already record pipelines and communications and consulting coming into the quarter, the pipeline really starts to shape up nicely heading into quarter 4 and into 2021.

36.    On November 19, 2020, defendants Macdonald and Meggs presented at a Jeffries LLC industry conference.  During the presentation, Macdonald highlighted the purportedly strong demand environment being enjoyed by Syneos, stating in pertinent part as follows:

> And what we're seeing at the moment, I think, specifically, for the demand environment is very encouraging on the SMID side, a very strong flow on the RFP front.  We're adding Synteract to that.  I'm sure you'll ask us about that a little bit later.  And I think more significantly for us, we're starting to see the large farmers warm back up.  They were – they'd pulled themselves kind of into a period of inactivity at the height of COVID round 1, and I think that has eased off through Q3 and has continued to ease through Q4.  So nice strong demand environment, both large pharma and that SMID space we've always played in.  So we're very encouraged with that.
>
> I think there's a little bit of catch-up starting to get released from organizations where they had the hiatus in the middle of the year in terms of RFPs.  Having said that, I think the RFP environment for us has been pretty strong all year, and we've closed out pretty well.  I mean, Q3 was probably the hardest one as we went through kind of a bit of recovery, but nice strong environment right now.  And I think that sets us up really nicely for 2021 as well.

37.     On December 8, 2020, Defendants Macdonald, Meggs, and Keefe hosted an analyst and investor day.  During his prepared remarks, Macdonald represented that Syneos expected to achieve "robust revenue growth" over the next three years.  Specifically, Macdonald announced revenue guidance for fiscal years 2022 and 2023 of "between 7% and 10%" growth each year. Meggs similarly stated that Syneos had "the backlog, pipelines, and customer relationships" to "accelerat[e] execution and growth over the next several years" and the Company was "positioned for sustainable growth and margin expansion."

38.     Throughout their presentation, Defendants claimed that Syneos had successfully integrated recent acquisitions and was effectively streamlining operations across the Company's diverse product offerings, purportedly illustrated by the Company's comprehensive Syneos One offering and strategic "value creation plan."  For example, Macdonald stated that Syneos was "at the forefront of this market shift to an agile, highly communicative, insights-driven, integrated product development approach" and highlighted the Company's "agile and integrated commercial team."  Macdonald similarly stated that Syneos was effectively "integrating solutions" and "removing silos" between various phases of the product lifecycle and across expertise.  Meggs meanwhile stated that the Company's "collaborative approach across the business is resonating with our customers" and part of a "value creation plan" that "provides the financial road map for growth."  Meggs continued: "[I]t is not just a strategy, but a disciplined plan of execution that guides the focus, capital allocation, and incentive compensation of the company."

39.     On December 10, 2020, Syneos issued a release announcing the Company's acquisition of Synteract.  The release quoted Defendant Macdonald, who emphasized the purportedly strong demand environment, stating that "'[w]ith Synteract, we are answering the

strong demand we are seeing in the small- to mid-sized space, fueled by near all-time high funding.'"

40.    On February 18, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended December 31, 2020 (the "Q4 2020 Release"). The Q4 2020 Release stated that Syneos's Clinical Solutions segment had achieved net new business awards of $1.299 billion, representing a book-to-bill ratio of 1.52x, during the quarter. The Q4 2020 Release also stated that Syneos had generated $1.14 billion in revenue during the quarter with an ending backlog of $10.951 billion.

41.    That same day, Syneos filed its annual report on Form 10-K for the year ended December 31, 2020, which was signed by defendants Macdonald and Meggs. The Form 10-K contained the financial information provided in the Q4 2020 Release. *See* ¶43.

42.    Also on February 18, 2021, Defendants Macdonald, Meggs, and Keefe hosted a conference call with investors and analysts to discuss the Company's financial and operational results for the fourth quarter of 2020. During his prepared remarks, Macdonald highlighted the Company's "strong sales performance in the quarter, which capped off a record year of award, our growing portfolio of innovative and integrated product development solution continues to resonate with customers of all sizes." Macdonald continued: "We expect strong growth in both our segments in 2021, which will become most apparent from the second quarter onwards, primarily driven by the robust new awards added to our backlog since late 2019 beginning to ramp, along with our COVID vaccine trials." Macdonald further represented that Syneos's "robust backlog now exceeds $10 billion, providing us with a consistent revenue pipeline and highlighting our confidence in the long term strength of our business."

43.    On April 29, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Release"). The Q1 2021 Release stated that Syneos's Clinical Solutions segment had achieved net new business awards of $1.216 billion, representing a book-to-bill ratio of 1.30x, during the quarter. The Q1 2021 Release also stated that Syneos had generated $1.209 billion in revenue during the quarter with an ending backlog of $11.218 billion. Defendant Macdonald was quoted in the Q1 2021 Release stating: "'Our integrated product development model, purpose-built to drive greater success for customers, continues to fuel robust backlog growth while delivering on the key drivers of our Value Creation Plan.'"

44.    That same day, Syneos filed its quarterly report on Form 10-Q for the quarter ended March 31, 2021, which was signed by Defendants Macdonald and Meggs. The Company's Form 10-Q contained the financial information provided in the Q1 2021 Release. *See* ¶43.

45.    Also on April 29, 2021, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter of 2021. During the call, Macdonald highlighted the "strong demand" that Syneos was purportedly experiencing. Macdonald also highlighted Syneos's Clinical Solutions segment, which he explained was "well positioned for accelerated revenue growth" in 2021, citing the Company's "record ending backlog" and "record pipeline of new opportunities."

46.    During his prepared remarks, Defendant Macdonald also pointed to the "continued recovery in reimbursable expenses." Defendant Meggs echoed this theme, affirming that reimbursable revenue would undergo "strong growth" in the Clinical Solutions segment and on "the commercial side, it's going to be strong as well, rebounding pretty quickly in quarter 2 and then accelerating in quarter 3 and 4."

47.    During the call, defendant Macdonald also claimed that Syneos was enjoying demand far above pre-COVID-19 levels stating, for example, that "[b]y mid-April, the new patient enrollment rates and new site activations were trending at approximately 150% of pre-COVID levels," which he represented would "increase our backlog conversion and accelerate year-over-year Clinical Solutions revenue growth for the balance of this year."

48.    An analyst described the ramp-up of site activations as "pretty remarkable" and inquired whether Syneos had sufficient staffing to meet this demand and maintain such an elevated pace.  In response, Defendant Macdonald stated "yes, definitely, we can sustain it and grow it, actually."  Macdonald also pointed to Syneos's "enhanced processes," "more horsepower," and "more automated and more streamlined" processes as reasons why the Company was able to effectively execute despite the increased demand environment.

49.    On June 9, 2021, Defendant Meggs presented at a Goldman Sachs industry conference sponsored.   During the presentation, Meggs updated investors regarding the Company's patient enrollment and site activation metrics, stating that "patient enrollment . . . [was] at 150% pre-COVID levels" and "site activations" – "a precursor to enrollment, have continued to be north of 100% as well."   Analysts again inquired about the Company's ability to scale its operations to meet the inflow of new business.  In response, Meggs represented that Syneos was not facing any operational "bottlenecks" and stated that "in the main, no.  By and large, no. . . . [N]othing that's insurmountable at this point in terms of trying to move customers' projects forward."   During the call, Meggs also emphasized Syneos's growth trajectory, including the purported return of substantial reimbursable revenues, stating in pertinent part as follows:

> We've – if you look back at our backlog growth, Bob, and when it started getting into the double-digit growth, it was late '19, early 2020 for us.  And all – most of that work, right, got delayed during start-up because of COVID in 2020.  So now we're starting to see those trials move forward.  And we've talked about

the operational metrics that tend to be the precursor to that when you think of activations and enrollment and the things that we've talked about.

And then we've got Synteract and Illingworth in the portfolio now.  So looking at their awards in 2020, their performance of sales in quarter 1, they're ramping as well.  And then overall reimbursables will be coming back, right, when you think about year-over-year and frankly, sequentially as well.  So that's the clinical side of things, right?  And it's the normal portfolio, I would put that right across all the business.  But our strategic accounts, the large pharma accounts we've been building backlog are now starting to drive revenue, and that's what we're seeing in there.

\*    \*    \*

So both businesses, good backlog growth.  Both businesses, good trailing 12-month book-to-bills.  Both businesses, good pipelines, RFP flows, right?  These are the things that we see that's encouraging for us.

50.    On August 9, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended June 30, 2021 (the "Q2 2021 Release").  The Q2 2021 Release stated that the Company's Clinical Solutions segment had achieved net new business awards of $1.436 billion, representing a book-to-bill ratio of 1.45x, during the quarter.  The Q2 2021 Release also stated that Syneos had generated $1.283 billion in revenue during the quarter with an ending backlog of $11.685 billion.  Defendant Macdonald was quoted in the release highlighting the Company's robust growth trends, stating in pertinent part as follows:

"During the second quarter we exceeded the midpoint of our guidance across all financial metrics, with both Clinical and Commercial achieving double-digit growth year-over-year as we continue to emerge from the COVID-19 pandemic . . . .  Both segments delivered another quarter of strong awards, powering record backlog levels and fueling our robust growth expectations over the balance of 2021.  Our unique strategy continues to resonate in the market, with our integrated product offerings and commercial expertise improving engagement across sites, patients and HCPs, while accelerating performance and increasing participant diversity."

51.    That same day, Syneos filed its quarterly report on Form 10-Q for the quarter ended June 30, 2021, which was signed by defendants Macdonald and Meggs.  The Form 10-Q contained the financial information provided in the Q2 2021 Release.  *See* ¶50.

52.     Also on August 9, 2021, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the second quarter of 2021.  During his opening remarks, Macdonald told investors that Syneos was experiencing accelerating growth, stating in pertinent part as follows:

> We continue to recover from the impacts of COVID-19, as our total company sequential revenue growth strengthened and year-over-year revenue growth accelerated to 26.6% compared to the second quarter of 2020.  Clinical Solutions revenue grew 31.1% compared to the second quarter of 2020, driven by accelerating startup of both non-COVID and COVID clinical projects and contributions from our 2020 acquisitions.
>
> Our clinical team also closed a record quarter of net awards that were fueled in part by continued strength in this mid-segment.  These awards also included three large-scale FSP 360 wins where we are replacing existing providers, demonstrating the competitiveness, scale, and flexibility of our solutions.  Under our awards policy for FSP services, we only included 12 months of services in our bookings even though each agreement represented an initial term of at least three years.
>
> The remainder provides further fuel for growth in addition to our reported backlog.  Driven by these strong sales, record ending backlog that is up 21.5%, and a robust pipeline of new opportunities, [C]linical [S]olutions remains well-positioned for strong revenue growth in the second half of 2021 and beyond.

53.     During the call, Defendant Meggs raised Syneos's 2021 revenue guidance "primarily due to higher reimbursable expenses," stating in pertinent part as follows:

> We now expect full year 2021 revenue in the range of $5.18 billion to $5.3 billion, representing growth of 17.3% to 20%, an increase of $15 million at the midpoint primarily due to higher reimbursable expenses.
>
> This growth includes an estimated contribution from acquisitions of 540 basis points to 580 basis points and a headwind from our 2020 divestitures of approximately 110 basis points, both of which are unchanged.  We are narrowing our expected range of total adjusted EBITDA to $750 million to $780 million.  This continues to reflect an adjusted EBITDA margin of 14.5% to 14.7%, up 30 basis points from 2020 at the midpoint, which now incorporates a higher mix of reimbursable expenses compared to our original expectations.

54.     On November 3, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended September 30, 2021 (the "Q3 2021 Release").  The Q3 2021 Release

stated that Syneos's Clinical Solutions segment had achieved net new business awards of $1.354 billion, representing a book-to-bill ratio of 1.30x, during the quarter. The Q3 2021 Release also stated that Syneos had generated $1.348 billion in revenue during the quarter with an ending backlog of $12.014 billion.

55.    That same day, Syneos filed its quarterly report on Form 10-Q for the quarter ended September 30, 2021, which was signed by Defendants Macdonald and Meggs. The Form 10-Q contained and further disseminated the financial information provided in the Q3 2021. *See* ¶54.

56.    Also on November 3, 2021, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2021. During the call, Macdonald highlighted Syneos's favorable growth trajectory, which he claimed was surpassing prior estimates, stating in pertinent part as follows:

> Both clinical and commercial continued their robust year-over-year growth in the quarter, and we now anticipate 2022 revenue growth rates above the midpoint we outlined during our Investor Event in December 2020. The demand environment remains very healthy with strong pipelines ahead of us across our business in terms of RFPs, relationship discussions, new drug approvals, and demand for our innovative models based around the Syneos One approach.
>
> *          *          *
>
> Our organic growth was driven by our full service portfolio including the continuing ramp-up in our larger pharma relationships particularly in oncology as they gain full scale and efficiency. This was accompanied by rapid growth in our real world and life science businesses. Our clinical team also closed another strong quarter of awards particularly in the SMID segment. Driven by these strong sales record ending backlog that is up 22.3% year-over-year and a record pipeline of new opportunities, [C]linical [S]olutions remains well positioned for robust revenue growth into 2022 and beyond.

57.    The statements referenced in ¶¶30-56 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them as follows:

(a)      that Syneos's business development capabilities and prospects had been materially impaired by workforce reductions and leadership and operational changes, as well as labor force turmoil caused by the COVID-19 pandemic;

(b)      that Syneos had struggled to integrate recent acquisitions and its various product teams, failed to execute on contracts effectively, and had been unable to respond with agility to its clients' needs, causing the Company to suffer from a bloated and confused organizational structure, impairing the Company's ability to provide comprehensive or effective customer engagement across its product portfolio, and causing the Company to lose significant business;

(c)      that Syneos was suffering from acute competitive disadvantages as clinical trials moved to remote monitoring and decentralized administration, as the Company lacked the tools possessed by some of its rivals to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities, and the Company had failed to adapt to changing business demands in the wake of the COVID-19 pandemic;

(d)      that Syneos's backlog, book-to-bill ratios, and net new business awards had been artificially inflated by more than $500 million through the inclusion of reimbursable expenses that the Company would never collect;

(e)      that, as a result of (a)-(d) above, Syneos was struggling to execute on its existing contracts and to agilely respond to its client needs, causing the Company to suffer client dissatisfaction across its client base; and

(f)      that, as a result of (a)-(e) above, Syneos was exposed to a material undisclosed risk that the Company would lose customers, be unable to grow its client base or win significant contract renewals, and cede market share to its rivals.

58.     In addition, throughout the Class Period, Syneos's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105(a)-(b) ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Syneos] speculative or risky" and an explanation of "how [the] risk affect[ed] [Syneos]."  Defendants' failure to disclose that Syneos was suffering from impaired business development capabilities, acute competitive disadvantages, integration issues, declining reimbursable expenses, an inability to agilely meet client needs and execute existing contracts, and from an erosion of new business violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.  Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

59.     Then, on February 17, 2022, Syneos filed a release on Form 8-K disclosing the Company's financial results for the fourth quarter and full year results for 2021 (the "Q4 2021 Release").  In direct contradiction to the Company's prior claim that reimbursable expenses would recover and accelerate in 2022, the Q4 2021 Release revealed that reimbursable expenses would "remain lower relative to pre-pandemic levels."  As a result, Syneos segregated reimbursable expenses from "certain key operating metrics," revealing that $3.8 billion of the Company's Clinical Solutions backlog (36%) was comprised of reimbursable expenses and providing an

alarmingly low book-to-bill ratio of just 0.34x in the segment when such expenses were included.

On the corresponding conference call, Meggs provided additional information regarding the

inability of Syneos to collect reimbursable expenses, stating in pertinent part as follows:

> Since the start of the COVID-19 pandemic, we have experienced lower reimbursable expenses as remote monitoring and other DCT approaches have become a more prevalent part of our clinical trials.

> This decrease in reimbursable expenses is primarily due to items such as lower travel expenses for our staff, due to sustained levels of remote monitoring, investigator meetings remaining virtual and reduced costs for [study] medications. We are at the forefront of this transition with our customers and sites, and given the long-term benefits it provides, we expect this trend to continue.

> As such, we have proactively adjusted our ending backlog to reflect our expectation of reduced reimbursable expenses going forward, mirroring what we are seeing across our existing portfolio as well as in our new awards.

60.     The Q4 2021 Release stated that Syneos's Clinical Solutions segment had achieved

net new business awards of $895.5 million excluding reimbursable expenses, representing a book-

to-bill ratio of 1.26x, during the quarter.  The Q4 2021 Release also stated that Syneos had

generated $1.373 billion in revenue during the quarter with an ending backlog of $7.46 billion

excluding reimbursable expenses.  Defendant Macdonald was quoted in the release as highlighting

the Company's purportedly excellent execution across its business, stating in pertinent part as

follows:

> "Strong fundamentals and execution across our business, combined with innovative, integrated clinical and commercial capabilities enabled by data and technology, drove robust earnings and cash flow growth in the fourth quarter and full year 2021 . . . .  The market for our services remains strong, driven in part by customer adoption of our unique product development strategy, new drug approvals and biotech funding.  In 2022, we expect robust growth propelled by recent acquisitions, uptake for our Syneos One and Medical Affairs offerings, and continued execution of our Value Creation Plan."

61.     That same day, Syneos filed its annual report on Form 10-K for the year ended December 31, 2021, which was signed by defendants Macdonald and Meggs.  The Form 10-K contained the financial information provided in the Q4 2021 Release.  *See* ¶¶ 59-60.

62.     Also on February 17, 2022, Defendants Macdonald and Meggs hosted a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter of 2021.  During his prepared remarks, Meggs downplayed the significance of the erosion in Syneos's reimbursable expenses and claimed that overall client demand remained unchanged, stating: "These adjustments only impact our outlook for reimbursable expenses, not our view of underlying demand or profitability.  We therefore, remain confident in our expectations for strong growth and profitability in 2022."  Macdonald similarly reassured investors that "[t]he demand environment remains healthy, both in terms of macro market dynamics and robust new business pipelines across our organization."  Macdonald continued: "Importantly, we remain confident in our expectations for low-double-digit clinical revenue growth for 2022, excluding the impact of reimbursable expenses along with continued margin expansion."

63.     On this news, the price of Syneos common stock fell from $83.37 per share on February 16, 2022 to $79.36 per share on February 17, 2022, a decline of more than $4 per share, or nearly 5%, on above-average trading volume of approximately 1.8 million shares traded.  However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

64.     On April 29, 2022, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended March 31, 2022 (the "Q1 2022 Release").  The Q1 2022 Release stated that Syneos's Clinical Solutions segment had achieved net new business awards of nearly

$913 million excluding reimbursable expenses, representing a book-to-bill ratio of 1.32x, during the quarter.  The Q1 2022 Release also stated that Syneos had generated $1.336 billion in revenue during the quarter with an ending backlog of $7.666 billion excluding reimbursable expenses. Macdonald was quoted in the release as stating: "'Strong fundamentals and execution, powered by innovative data and technology insights drove robust earnings and profitability growth in the first quarter.'"  Macdonald also stated that the Company expected "'continued growth propelled by customer adoption of our integrated solutions'" and "'recent acquisitions.'"

65.    That same day, Syneos filed on Form 10-Q a quarterly report for the quarter ended March 31, 2022, which was signed by Defendants Macdonald and Meggs.  The Form 10-Q contained the financial information provided in the Q1 2022 Release.  *See* ¶64.

66.    Also on April 29, 2022, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2022.  During his prepared remarks, Macdonald stated that Syneos continued to enjoy robust demand, stating in pertinent part as follows:

> *Demand for our high value solutions from development through commercialization remains healthy*, with robust new business pipelines across our organization.  We *continued to see sustained strong demand* across all customer segments, including SMID customers where RFP flow year-to-date exceeds the strong levels of 2021 and are well above pre-COVID levels.  In addition, *we are seeing more opportunities for preferred provider relationships with larger pharma customers as the impacts of the pandemic subside*.  This continued strong awards and backlog growth positions us for sustained long-term growth.  We remain confident in the growth we have previously outlined for 2023 as we execute on our value creation plan.

67.    Later in the call, Defendant Macdonald represented that the Company was not experiencing significant cancellations or delays among its customer base, successfully engaging with customers, and delivering the Company's comprehensive product offerings, stating in pertinent part as follows:

We see that it's still pretty strong.  It's moving along, we have good engagement with customers.  I think the fact that we're able to take those customers a very different model now with – since Syneos One wrapped around it, the ability to go end-to-end and we look at the private funding in the biotech space.

But the big equity houses putting money to work through their biotech, et cetera . . . .

\*       \*       \*

But thrilled, those channels combined are healthy.  I think they're showing good growth against where we've been in the past, even when we look back at 2021, which had a lot of the COVID catch-up [in] it where seemed with pipelines equivalent to that.

So we're not concerned by that.  Add to that the fact that we're breaking in more and more to the large pharma, getting new relationships there, adding anchor tenants to the backlog through that, it's a very healthy picture for us.  So funding environment fine, good engagement with the customers, we're not seeing that as an issue at all.

68.    Defendant Keefe further stated that Syneos was "hitting on all cylinders on this integrated value proposition."  Keefe similarly stated that "[w]hat we're seeing is that our value proposition, our integrated value proposition is resonating beautifully with customers."  She also stated that Syneos was winning clients because of the success of its integrated offerings, stating in pertinent part as follows:

And this really goes to the why we're a different kind of company.  The way we think about these opportunities from an integrated perspective and getting our best talents, regardless of which business units they fit in to work together to really deliver an exceptional differentiated offer to our customers. . . .

So the integration between the businesses is there and customers really are responding to the way we approach them with these innovative, integrated solutions.

69.    Also on April 29, 2022, Syneos filed a current report on Form 8-K which revealed that Defendant Macdonald was abruptly resigning.

70.    On June 6, 2022, Defendant Keefe presented at an industry conference sponsored by William Blair as Syneos's newly appointed CEO.  In response to an analyst question, Defendant

Keefe stated that Syneos's demand and pipeline remained strong despite a slowdown in the capital markets for biotech funding, stating in pertinent part as follows:

> We're very excited about the – all the indicators that we have in our organization. So let me just give you some key points that I think would be helpful.
>
> Our SMID pipeline is up double digits over last year– in 2021, right? So it is growing significantly, right? So the pipeline looks good. We have not seen anything that makes us think that we're not going to continue to be the market leader there.
>
> Obviously, we're going to watch it closely. We've done a lot of assessment. Jason has done a phenomenal job of kind of taking what we have, right? We know that right now, we have about 13% to 14% of our backlog is in [pre-]revenue companies. But when you look at those that probably aren't as well funded as you would perfectly like them to be, it's single digits.
>
> It's not material for us in regards to our backlog. And we just have not seen outsized cancellations or anything like that in regards to what we're seeing with our own customers right now. Jason has had his team run some different scenarios, like if different things happened, right? If it really did become sustained over time.

71. The statements referenced in ¶¶61-68 and 70 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them as follows:

(a)    that Syneos's business development capabilities had been materially impaired by workforce reductions and leadership and operational changes, as well as labor force turmoil caused by the COVID-19 pandemic;

(b)    that Syneos had struggled to integrate recent acquisitions and its various product teams, failed to execute on contracts effectively, and had been unable to respond with agility to its clients' needs, causing the Company to suffer from a bloated and confused organizational structure, impairing the Company's ability to provide comprehensive or effective

customer engagement across its product portfolio, and causing the Company to lose significant business;

(c)    that Syneos was suffering from acute competitive disadvantages as clinical trials moved to remote monitoring and decentralized administration, as the Company lacked the tools possessed by some of its rivals to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities, and the Company had failed to adapt to changing business demands in the wake of the COVID-19 pandemic;

(d)    that Syneos's backlog, book-to-bill ratios, and net new business awards had been artificially inflated by more than $500 million through the inclusion of reimbursable expenses that the Company would never collect;

(e)    that, as a result of (a)-(d) above, Syneos was struggling to execute on its existing contracts and to agilely respond to its client needs, causing the Company to suffer client dissatisfaction across its client base; and

(f)    as a result of (a)-(e) above, Syneos was losing customers, failing to grow its client base or win significant contract renewals, and ceding market share to its rivals.

72.    Defendants' failure to disclose that Syneos was suffering from impaired business development capabilities, acute competitive disadvantages, integration issues, declining reimbursable expenses, an inability to agilely meet client needs and execute existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.  Furthermore, Defendants' failure violated Item 105 because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

73.     Then, on August 2, 2022, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended June 30, 2022 (the "Q2 2022 Release").  The Q2 2022 Release revealed substantial deterioration in the Company's business, disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34% including reimbursable expenses and 15% excluding reimbursable expenses, reflecting book-to-bill ratios of 0.94x and 1.29x, respectively.  In addition, the Q2 2022 Release revealed that Syneos would not achieve even its lowered expectations for reimbursable revenues for the year, causing the Company to slash expected 2022 revenues by $185 million at the midpoint.

74.     The Q2 2022 Release stated that Syneos was still on track to achieve 2022 revenues within a range of $5.44 billion to $5.54 billion.  The Q2 2022 Release also stated that Syneos had achieved a book-to-bill ratio of 0.94x including reimbursable expenses and 1.29x excluding reimbursable expenses, respectively.  The Q2 2022 Release also stated that Syneos had a quarter-ending backlog in its Clinical Solutions segment of $6.98 billion excluding reimbursable expenses.

75.     That same day, Syneos filed a quarterly report on Form 10-Q for the quarter ended June 30, 2022, which was signed by Defendants Keefe and Meggs.  The Form 10-Q contained the financial information provided in the Q2 2022 Release.  *See* ¶¶73-74.

76.     On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, a decline of nearly $14 per share, or over 17%, on above-average trading volume of 3.2 million shares traded.  However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

77.     Also on August 2, 2022, Defendants Keefe and Meggs hosted a conference call with analysts to discuss the Company's financial and operational results for the second quarter of

2022.  During the call, Keefe reassured investors that "[m]arket demand is healthy" and that management remained "confident" about their ability "to drive clinical growth."  In response to a question from an analyst regarding potential softening demand, Keefe responded in pertinent part: "We're not seeing anything that is making us concerned from a macro environment perspective." Meggs added: "I don't see anything right now that would change sort of that timing.  As Michelle said, healthy pipelines, good backlog growth, healthy end market . . . ."

78.     The statements referenced in ¶¶73-75, 77 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them, as detailed in ¶71, *supra*.

79.     On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses.  During an industry conference held later that day, Defendant Keefe attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were delaying contract awards.

80.     On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volumes of approximately 1.7 million shares traded on September 12 and 2 million shares traded on September 14.  However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues as detailed in ¶71, *supra*.

81.    Then, on November 4, 2022, Syneos issued a release disclosing the Company's financial results for the third quarter of 2022.  Syneos revealed that its book-to-bill ratios had plummeted below even the reduced figures provided in September 2022.  Specifically, Syneos stated that its Clinical Solutions segment had achieved net new business awards of $182 million including reimbursable expenses – a startling year-over-year decline of 86.5% – and a book-to-bill ratio of just 0.18x for the quarter, which was just one-tenth of the new business growth expected by some analysts.  Excluding reimbursable expenses, Syneos generated just $208 million in net new business awards, representing a paltry 0.30x book-to-bill ratio.  The backlog in the Company's Clinical Solutions plummeted 13.6% year-over-year to just $9.747 billion including reimbursable expenses, or by 2.5% year-over-year to $6.44 billion excluding reimbursable expenses.  Syneos also slashed its anticipated 2022 revenues by $160 million at the midpoint to range of just $5.3 billion to $5.36 billion.

82.    During the corresponding conference call, Defendant Keefe revealed that, contrary to prior representations regarding macroeconomic factors, the Company's underlying demand issues were "specific to Syneos" which had caused the Company's win rate to decline.  Keefe further revealed that Syneos's operations had been experiencing undisclosed turmoil over the preceding 18 months as a result of leadership changes, execution issues, staffing challenges, and the inability to effectively integrate the Company's recent acquisitions.  Despite Defendants' prior Class Period assurances to the contrary, Defendant Keefe disclosed that Syneos had struggled to successfully integrate its various product teams, failed to execute on contracts effectively, and been unable to respond with agility to its clients' needs, ultimately causing the Company to lose significant business.

83.     Analysts reacted with shock at the results.  During the call, one analyst referring to Syneos's dreadfully low book-to-bill ratios, stated: "[W]e've never seen that happen."  Another analyst on the call stated that management's claim that Syneos was not experiencing significant cancellations was "frankly hard to believe . . . given the pass through bookings were negative and overall bookings were basically one-tenth of what you would expect, over the last few quarters or what we should have expected . . . it just doesn't feel reasonable."  Analysts continued to react negatively in subsequent written reports.  For example, Barclays called Syneos's disclosures "very disappointing," citing a "miss across the board" and Mizuho stated the results were "worse than expected."

84.     On this news, the price of Syneos common stock fell from $47.81 per share on November 3, 2022, to $25.70 per share on November 4, 2022, a decline of more than $22 per share, or 46%, on abnormally high trading volumes of 7.4 million shares traded.

85.     On December 1, 2022, Defendant Keefe presented at the Evercore ISI HealthCONx Conference, during which she provided additional information about the problems at Syneos, stating in pertinent part as follows:

> I think the – then it makes you ask the question like what were the challenges driven by it, right?  So then we said, okay, what happened?  So as we've shared in the earnings, we talked about our loss of historic agility and leadership engagement and our clinical operating model.  We talked about the disruption in strategic business development driven by leadership and organizational changes that we've made over the last 18 months that, frankly, kept us from fully leveraging our integrated solutions or effectively engaging in customers in a very competitive market and traditionally the way we would previously.
>
> *     *     *
>
> And so the key things that I heard from these customers and my team has heard from the customers are, from a BD perspective, we have not leveraged our full capabilities to design and deliver like the optimal strategy for each new customer opportunities.  So you've heard us talk about we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can.  Obviously we bought the things we bought because we believe they're

differentiated, right?  And so we got that as feedback, that we didn't kind of leverage our whole breadth of capabilities to be competitive in a very competitive market.

They all say the same thing upfront, which I think is a really important thing that we want to make sure we continue to focus on is that they really appreciate our therapeutic expertise.  I think that's kind of the landmark of this organization . . . even when we were INC Research and inVentiv [ph] Health CROs, there was always a real appreciation for therapeutic expertise, and so we can't lose that.  We have to continue to focus on that.  But we did not have as consistent of customer engagement that was kind of our hallmark as an organization with these particular customers, right?  INC grew up with SMID, and we didn't have as consistent of a customer engagement focus as we should have in these customers based on their feedback.  It – frankly, that lack of engagement at a consistent level has resulted in the results that we got.

And so we did have some senior leadership, VP [ph] turnover, we talked about that.  I think it's – and we've been very focused as well because we do think this is important, having that operational leadership.  As you know, part of Clinical Reimagine is making sure our senior leadership and project teams are closer together, working together on behalf of the customer.  So making sure that operational leadership is tied very tightly to the business development team to make sure that the customer engagement level is high.

86.    As a result of these revelations, the price of Syneos stock ultimately declined to a low of less than $23 per share, more than 77% below the Class Period high, causing plaintiffs and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

87.    As set forth above and further below, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that their statements and omissions above were materially false and misleading when made.  Defendants knowingly participated in the issuance and dissemination of such statements and documents as primary violations of the federal securities laws.

88.    First, the fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

89.    Second, the Individual Defendants served (or are serving) as the CEO and CFO of Syneos.  Because of their positions with the Company, they were responsible for, and remained well informed of, issues critical to the Company's success.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of Syneos corporate statements and is therefore responsible and liable for the representations contained therein.

90.    Defendants have also acknowledged that the undisclosed problems complained-of herein existed throughout the Class Period.  During a December 2022 conference call, Defendant Keefe pointed to the Company's inability to integrate inVentiv and INC Research as responsible for the Company's struggles:

> We put 2 CROs together five years ago and had tremendous growth over the last five years.  And probably you can always play Monday morning quarterback, you look back down and you say we just made things more complicated than it needed to be, right?

91.    During that same call, Defendant Keefe stated that Michael Brooks had been named Chief Development Officer in July 2021 to address problems that had not been previously revealed to investors:

And so the thing I think that's really important is what are we doing about [the problems], right? That's the most important thing, which is that we have been making – we have made some leadership changes, and I think it's really important that, if everybody recalls, Michael Brooks was brought in to run Clinical . . . .

92.     These statements were consistent with Defendant Keefe's November 2022 acknowledgment that the problems had persisted in part due to "a number of leadership and organizational changes within strategic business development over the last 18 months." Defendants' own statements thus strongly indicate that the undisclosed issues existed throughout the Class Period and were well known, or at the very least recklessly disregarded, by Defendants.

93.     The problems also impacted the most important issues facing the Company that were the focus of Syneos management, including the Individual Defendants. The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding Syneos's client demand environment, contract execution, employee retention and performance, and the integration of Syneos's various acquisitions and diverse product teams.

94.     Third, the departures of key executives at Syneos are further indicative of scienter. Defendant Macdonald left is position as CEO in April 2022, just after Syneos announced deeply disappointing financial results and before it went on to report worsening results. Defendant Meggs left less than one year later.

95.     Fourth, the Individual Defendants engaged in substantial insider stock sales during the Class Period, the timing of which provides additional evidence in support of an inference of scienter. Defendants' insider sales are suspicious because Defendants realized substantial financial benefits while they and the Company were concealing and misrepresenting the truth about Syneos's financial health and operational deficiencies.

96.     Defendants and Company insiders also had the motive and opportunity to commit fraud. While the price of Syneos common stock was artificially inflated, Company insiders,

including each of the Individual Defendants and Syneos's largest shareholders and private equity

backers, Thomas Lee Partners and Advent International, collectively dumped more than $3 billion

in Syneos stock at elevated prices.  These outsized insider sales occurred in rapid succession over

a period of just nine months, primarily through a series of five public stock offerings, enabling

Thomas Lee Partners and Advent International to exit their equity stakes in the Company.  These

offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per

share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December

2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public

offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000

shares sold directly to the Company at the public offering price; (iv) a May 2021 at-the-market

public offering of more than 8 million Syneos sold to underwriters for the offering at $81.04 per

share and a private offering of 400,000 shares sold directly to the Company at the public offering

price; and (v) a June 2021 at-the-market public offering of nearly 11 million Syneos sold to

underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold

directly to the Company at the public offering price.  Unusually, in support of this scheme the

Company purchased more than 2 million shares directly from the selling stockholders in the

offerings, thereby providing additional artificial price support to Syneos stock.  Capitalizing on

this artificial inflation, the Individual Defendants sold over $16 million worth of Syneos stock at

fraud-inflated prices during the Class Period, as reflected in the following charts:

97.    Defendant Macdonald sold more than 142,000 of his personal Syneos shares at

prices as high as $89.90 per share, for gross proceeds in excess of $11.4 million, during the Class

period.  These sales were highly suspicious in timing and amount and out of line with his prior

trading practices.  In particular, between January 2019 and August 2020, Defendant Macdonald slightly increased his holdings of shares in the Company.

98.    Defendant Macdonald's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Alistair Macdonald | 12/22/2020 | 1,200 | $70.02 | $84,024 |
| Alistair Macdonald | 12/23/2020 | 300 | $70.52 | $21,156 |
| Alistair Macdonald | 2/1/2021 | 13,044 | $75.17 | $980,517 |
| Alistair Macdonald | 2/1/2021 | 51,175 | $75.84 | $3,881,112 |
| Alistair Macdonald | 2/2/2021 | 278 | $77.11 | $21,437 |
| Alistair Macdonald | 4/1/2021 | 13,720 | $77.61 | $1,064,809 |
| Alistair Macdonald | 4/1/2021 | 673 | $76.11 | $51,222 |
| Alistair Macdonald | 4/1/2021 | 3,005 | $77.92 | $234,150 |
| Alistair Macdonald | 4/9/2021 | 14,039 | $80.00 | $1,123,120 |
| Alistair Macdonald | 6/1/2021 | 4,889 | $88.20 | $431,210 |
| Alistair Macdonald | 8/2/2021 | 4,710 | $89.90 | $423,429 |
| Alistair Macdonald | 8/3/2021 | 7,032 | $88.49 | $622,262 |
| Alistair Macdonald | 8/3/2021 | 28,521 | $87.83 | $2,504,999 |
| **Total** | | **142,586** | | **$11,443,447** |

99.    Defendant Meggs also sold significant amounts of his shares of Syneos common stock during the Class Period.  He sold nearly 40,000 shares, for $3.2 million in gross proceeds, while he was in possession of material, non-public information regarding the truth about Syneos's financial health.  As with Macdonald, Defendant Meggs' pattern of sales was in contrast to his pre-Class Period sales, where he increased his holdings of Syneos shares.

100.    Defendant Meggs' insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Jason Meggs | 11/24/2020 | 1,938 | $67.00 | $129,846 |
| Jason Meggs | 11/27/2020 | 4,062 | $67.00 | $272,154 |
| Jason Meggs | 1/6/2021 | 5,552 | $72.00 | $399,744 |
| Jason Meggs | 4/15/2021 | 6,000 | $84.00 | $504,000 |

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Jason Meggs | 6/30/2021 | 4,668 | $90.00 | $420,120 |
| Jason Meggs | 7/6/2021 | 660 | $90.00 | $59,400 |
| Jason Meggs | 9/3/2021 | 9,223 | $95.00 | $876,185 |
| Jason Meggs | 7/18/2022 | 7,500 | $72.81 | $546,075 |
| **Total** | | **39,063** | | **$3,207,524** |

101.    Defendant Keefe also sold significant amounts of her Syneos shares during the Class Period, as reflected below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Michelle Keefe | 11/17/2020 | 800 | $62.65 | $50,120 |
| Michelle Keefe | 11/18/2020 | 856 | $65.00 | $55,640 |
| Michelle Keefe | 1/25/2021 | 4,000 | $75.68 | $302,720 |
| Michelle Keefe | 3/31/2021 | 2,000 | $78.00 | $156,000 |
| Michelle Keefe | 4/15/2021 | 2,736 | $82.00 | $224,352 |
| Michelle Keefe | 7/18/2021 | 8,333 | $72.81 | $606,726 |
| **Total** | | **18,725** | | **$1,395,558** |

102.    Finally, during the Class Period, Defendants filed statements under the Sarbanes-Oxley Act of 2002, through which they certified that the accompanying financial statements and disclosures fairly presented, in all material respects, the operations and financial condition of the Company.  These certifications signed by the Defendants provide a strong inference of scienter.

**VII.    NO SAFE HARBOR**

103.    Syneos's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

104.    Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Syneos who knew that the forward-looking statement was false.  None of the historic or present tense statements Defendants made was  an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts Defendants made expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII.  APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

105.    At all relevant times, the market for Syneos common stock was an efficient market for the following reasons, among others:

(a)    Syneos stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    according to the Company's Form 10-K for the fiscal year ended December 31, 2022, Syneos had over 103 million shares outstanding as of February 9, 2023;

(c)    as a regulated issuer, Syneos filed periodic public reports with the SEC;

(d)    Syneos regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Syneos was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

106.    As a result of the foregoing, the market for Syneos common stock promptly digested current information regarding Syneos from publicly available sources and reflected such information in the price of Syneos common stock.  Under these circumstances, all purchasers of Syneos common stock during the Class Period suffered similar injury through their purchases of Syneos common stock at artificially inflated prices, and a presumption of reliance applies.

107.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Syneos's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

108.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on Class Period purchasers of Syneos common stock by misrepresenting the value of the Company's business and prospects in the Company's operations.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein.

As a result of their purchases of Syneos common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## X.    CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Syneos during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

110.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Syneos common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Syneos or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the Exchange Act was violated by Defendants as alleged herein;

      (b)    whether statements made by Defendants misrepresented material facts about the business and operations of Syneos; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

114.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### FOR VIOLATION OF §10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

115.    Plaintiffs incorporate ¶¶1-114 by reference.

116.    During the Class Period, Defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

      (a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

118.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Syneos common stock.  Plaintiffs and the Class would not have purchased Syneos common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT
### AGAINST ALL DEFENDANTS

119.    Plaintiffs incorporates ¶¶1-118 by reference.

120.    Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff[2] and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

DATED:  October 8, 2023

s/ Greg G. Gutzler
Greg G. Gutzler
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY  10017
Tel.:  646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
Tel.:  312-214-7900
alevitt@dicellolevitt.com

---

[2]    On September 25, 2023, within 60 days of notice of the first-filed action, Plaintiffs filed a motion for appointment as lead plaintiff.  On October 6, 2023, counsel for named plaintiff in the related first-filed action *United Ass'n of Plumbers & Pipefitters, et al. v. Syneos Health, Inc., et al.*, No. 1:23-cv-06548-AS (filed July 27, 2023), filed a notice of dismissal pursuant to Rule 41(A)(1)(a), with full knowledge of the consequences of doing so and without regard to any potential prejudice to the class they had previously sought to represent.

Patrick W. Daniels (*pro hac vice* forthcoming)
Brian O. O'Mara (*pro hac vice* forthcoming)
Steven Jodlowski (*pro hac vice* forthcoming)
Caroline M. Robert
Hani Y. Farah (*pro hac vice* forthcoming)
**DiCELLO LEVITT LLP**
4747 Executive Drive, Second Floor
San Diego, CA  92121
Tel.:  619-923-3939
pwdaniels@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
cmrobert@dicellolevitt.com
hfarah@dicellolevitt.com

Bruce Bernstein
Roxana Pierce (*pro hac vice* forthcoming)
**DiCELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC  20036
Tel.:  202-975-2288
bbernstein@dicellolevitt.com
rpierce@dicellolevitt.com

*Counsel for Plaintiffs Kempen International Funds (Kempen International Funds - MercLin Global Equity), Kempen International Funds (Kempen International Funds - MercLin Patrimonium), and MercLin Institutional Fund (MercLin Institutional Equity Fund DBI-RDT) and Proposed Counsel for the Class*