UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, PAUL COLVIN, and JASON MEGGS,<br><br>Defendants. | Civil Action No. 1:23-cv-08848-AS<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# Table of Contents


I. INTRODUCTION .....1

II. JURISDICTION AND VENUE .....9

III. PARTIES .....10

A. Plaintiffs .....10

B. Defendants .....11

IV. FACTUAL BACKGROUND .....17

A. Overview of Syneos' Business .....17

B. Syneos's Important Financial and Accounting Metrics .....18

C. Syneos's Competitive Gaps Rendered it Unable to Service Existing Business or Win New Business .....20

D. Syneos Unsuccessfully Attempts to Shore Up Its Competitive Gaps Through Acquisitions .....25

E. Defendants Admitted to Syneos's Product Offering Deficiencies .....29

F. Defendants Masked the Lack of New and Renewal Business by Manipulating Their Backlog Metrics and Applying Pressure to "Find" Revenue .....30

G. Syneos Senior Executives, Including the Individual Defendants and Private Equity Backers, Engaged in Massive Sales of Syneos Stock .....36

H. Without Sufficient New and Renewal Being Added to Backlog from Which to Prematurely Pull Revenue, the Company Could No Longer Obfuscate the Truth .....38

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS .....40

A. September 9, 2020 Baird Industry Conference and September 15, 2020 Prospectus .....40

B. Third Quarter 2020 Financial Results .....48

C. November 9, 2020 Credit Suisse Industry Conference, November 19 2020 Jefferies Industry Conference, and December 8, 2020 Analyst & Investor Day .....56

D. January 13, 2021 J.P. Morgan Industry Conference ....65

E. Fourth Quarter and Full Year 2020 Financial Results ....70

F. First Quarter 2021 Financial Results ....79

G. Second Quarter 2021 Financial Results ....89

H. Third Quarter 2021 Financial Results ....99

I. November 18, 2021 Jefferies Industry Conference, December 1, 2021 Evercore Industry Conference, and January 12, 2022 J.P. Morgan Industry Conference ....108

J. Fourth Quarter and Full Year 2021 Financial Results ....114

K. First Quarter 2022 Financial Results, Second Quarter 2022 Financial Results, and September 13, 2022 Baird Industry Conference ....122

L. Third Quarter 2022 Financial Results ....133

VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ....138

VII. SYNEOS'S PUBLIC STATEMENTS AND FILINGS WITH SEC OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN ....164

VIII. NO SAFE HARBOR ....169

IX. PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET ....170

X. LOSS CAUSATION/ECONOMIC LOSS ....171

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....175

COUNT II For Violation of §20(a) of the Exchange Act Against THE INDIVIDUAL Defendants ....178

PRAYER FOR RELIEF ....179

JURY DEMAND ....180

1. Kempen International Funds (Kempen International Funds - MercLin Global Equity) ("KIF – MercLin Global Equity"), Kempen International Funds (Kempen International Funds - MercLin Patrimonium) ("KIF – MercLin Patrimonium"), and MercLin Institutional Fund (MercLin Institutional Equity Fund DBI-RDT) ("MercLin DBI-RDT") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia*, their counsel and its independent investigation.[1]

## I. INTRODUCTION

2. Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Syneos between September 9, 2020 and November 3, 2022, inclusive (the "Class Period").

3. Syneos is a biopharmaceutical solutions organization providing contract research and commercial services to help biopharmaceutical companies test and develop their products.

[1] This investigation included, but was not limited to, a review and analysis of: (i) Syneos Health, Inc.'s ("Syneos" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Syneos's public conference calls and presentations; (iii) Syneos's press releases and media and research reports regarding Syneos; (iv) Syneos's stock price movement, and pricing and volume data; (v) interviews with former Syneos employees who were at the Company during the Class Period; and (vi) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained in this Complaint is ongoing, and many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiffs believe, and are informed by their interviews with former Syneos employees, that substantial additional evidentiary support exists for the allegations set forth herein and will be confirmed after a reasonable opportunity for discovery.

Syneos arose from the 2018 merger of INC Research Holdings, Inc. and inVentiv Health, Inc. ("inVentiv Health") and has grown through a number of successive acquisitions. The Company markets itself as an integrated "end-to-end" biopharmaceutical solutions provider, with services that span from early-phase clinical trials in its Clinical Solutions division through the commercialization of a product in its Commercial Solutions business unit.

4. As a clinical research organization ("CRO"), Syneos's financial success and growth prospects are predicated on securing a steady inflow of new business awards and growing its backlog of outstanding clinical trial work. Syneos publicly disclosed information regarding certain operational metrics that serve as key indicators of underlying client demand and anticipated future revenues, including: (i) its "backlog" of business awards; (ii) the Company's net new business awards; and (iii) its reported book-to-bill ratios. The backlog and book-to-bill ratio were critical metrics for analysts and investors as healthy backlog represents future revenue and a book-to-bill ratio greater than 1.0 represents a growing business where the Company is adding new business to the backlog at a faster rate than it iscompleting and monetizing existing backlog during the same period.

5. Emerging from the initial disruption caused by the COVID-19 pandemic, Defendants assured investors that the negative impacts on the Company from the pandemic had bottomed out by the second quarter of 2020 ("Q2 2020") and that Syneos had quickly entered a recovery period that was proving a boon for business. Indeed, by September 9, 2020, the start of the Class Period, Defendant Macdonald assured investors that the Company "remain[s] well positioned to accelerate growth [in Clinical Solutions] as the recovery continues" and "expect[s] strong growth in both our segments in 2021."

6. Thereafter and throughout the Class Period, Defendants emphasized Syneos's backlog metrics, and claimed that Syneos's business was booming, and through its technological advantages, innovative and integrated expertise, recent acquisitions, and superior talent was competing for and winning new business as the Company surged out of the pandemic. For example, in November 2020, Defendant Jason Meggs represented that Syneos was achieving tremendous growth based on "record" customer order flows and that Syneos's new business "pipeline," was "on top of what's already record pipelines and communications and consulting coming into the quarter." Similarly, in April 2021, Syneos executives continued to highlight Syneos's purportedly "strong demand," reporting a "record ending backlog" of expected business and high book-to-bill ratios, indicating to investors that the Company was experiencing robust growth.

7. But things were not as Defendants portrayed them to be. In truth, the INC Research and inVentiv Health merger that created Syneos had been a disaster and by 2020 the combined Company was plagued by known, but undisclosed, long-standing quality, technological, cultural, and operational problems causing customers to pull significant amounts of business away from Syneos; Syneos was simply unable to compete. Defendants knew, and discussed at monthly Executive Leadership Team ("ELT") meetings, that Syneos was unable to provide the service its customers required, and it was suffering as a result: "***Data doesn't reflect client situations***." "***Further meaningful drill-down is not currently possible due to data limitations***." "***The data here in Syneos system is not the source of truth***." Citing these failures, a number of large customers had placed Syneos on "hold" and would not make future business "available to Syneos" until it addressed its lack of a "***quality culture***" and ongoing "***migration[s] inhibiting teams ability to be audit-ready***," cured its "***delivery failures***," and "***earned back trust***."

8. The conclusions were stark: Despite what Defendants were telling the market, they knew Syneos's quality issues and data limitations were having a devastating – but undisclosed – impact on its clinical business and the Company's Clinical Solutions segment was neither healthy nor growing. Syneos had shown that it was unable to successfully compete for new business or retain renewal customers who were aware of Syneos's quality and service failures. And, by late 2020, Defendants were well aware that as a consequence of these failures, the Clinical Solutions segment was experiencing negative growth.

9. Yet, despite persistent quality shortcomings and service failures plaguing the clinical business and hampering that segment's growth, Syneos and the Individual Defendants falsely told investors and the market that Syneos was experiencing record growth. Defendants reported that the Company's Clinical Operations segment was achieving or exceeding its targets, while falsely generating backlog, net new business, and book-to-bill metrics.

10. Syneos altered its cost estimates and manipulated cost-of-completion thresholds to inflate its backlog, net new business awards, and book-to-bill ratios. When contracts were terminated, such as when two large oncology clinical trials were cancelled in early 2021, Defendants declined to remove business from the backlog to avoid the negative impact the removal would have on the Company's reported performance metrics. Defendants also improperly included in backlog a $100 million bonus award to be awarded upon successfully completing eight clinical trials over a number of years. The Company kept the potential $100 million bonus in backlog even though the Clinical team failed to achieve the first milestone required in the first year of the contract to earn the bonus. Further still, Defendants included in backlog three to four years of business value from functional service provider ("FSP") agreements, including on contracts that

never came to fruition, even though Defendants falsely assured investors they would only include the first year of the value in backlog.

11. The Company's inability to compete and win new and repeat business was well-known and routinely discussed within Syneos. The entire sales organization was required to report their numbers on a weekly basis, received weekly email updates tracking sales to target, and had weekly Monday sales calls that analyzed their tracking to target metrics. As a result, the sales organization knew where the Company was in terms of tracking to target. In each quarter from January 2020 through May 2022, the Company was a couple hundred-million-dollars short of its target. But regardless of the size of the gap, miraculously, Syneos always made it up and hit their target each month and each quarter.

12. Defendant Meggs performed this miracle through a culture of fear. When he was brought certain figures indicating a shortfall, he simply said "No" until he received the numbers he wanted. And when the clinical group was short of its revenue targets, Defendant Paul Colvin went so far as to send an email to all business unit Chief Financial Officers ("CFOs"_ instructing them to "find it." And find it they did.

13. From September 9, 2020 through November 3, 2022, Defendants falsely portrayed to investors and the market that the Company was securing new and renewal business to refill the backlog and falsely engineered the Company's new business metrics and favorable results. Defendants used these manipulations to hide from investors the Company's critical quality failures in clinical trials. By booking overstated or nonexistent business awards into backlog, manipulating expenses, and pulling future business into the current period, Defendants falsely portrayed Syneos's Clinical Operations segment as thriving when exactly the opposite was true. While hiding their manipulations and the Company's critical failures in its clinical unit from investors,

Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021.

14. Defendants and other executives took full advantage and dumped over $19 million worth of their own Syneos shares during the Class Period at prices artificially inflated by their false and misleading statements and omissions. Defendant Macdonald alone sold 142,586 shares for proceeds of more than $11.4 million. Syneos's private equity sponsors and largest shareholders who had representatives on the Company's Board of Directors, Thomas Lee Partners and Advent International, unloaded more than $3 billion worth of Syneos stock through a series of five registered public stock offerings and share repurchase agreements with Syneos within a nine-month period.

15. The Company's pervasive qualitative and technological failures decimated its ability to compete for and secure legitimate and organic new and renewal business to refill its backlog. Therefore, the Company began to run out of ways in which to engineer favorable backlog, net new business awards, and book-to-bill ratios. And at the same time, the Company came under increasing pressure from investors and analysts to explain the composition of its backlog, questioning the percentage of the Company's backlog that was attributable to reimbursable expenses on which the Company would earn no margin.

16. On February 17, 2022, having already taken advantage of Syneos's inflated stock price, Defendants announced deeply disappointing financial results for the fourth quarter of 2021 and finally reported reimbursable expenses separately from its backlog, revealing for the first time that the portion of the Company's backlog attributable to zero margin reimbursable out-of-pocket expenses was 36%. Even worse, the Company revealed that huge portions of its reimbursable expenses previously reported as revenue were uncollectable. Syneos explained that the post-

pandemic shift in service delivery, with more remote work, would "have a lasting impact on our revenue profile." Analysts were justifiably shocked, and Jefferies estimated that Syneos removed $850-$950 million in pass-through revenue, recognizing "that the magnitude of mgt's overestimation means that ***Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)***." Believing this would be the worst of it, analyst commented that Syneos was "Ripping Off the Reimb Expense Bandaid."

17. But this was not the worst of it, and while the Company's February 17, 2022 announcement was bad, Defendants failed to fully disclose the magnitude by which they had overstated its clinical metrics or the underlying competitive and service failures plaguing the clinical business. And without coming clean to investors, on April 29, 2022, the same day Syneos reported disappointing first quarter of 2022 ("Q1 2022") results and after collecting over $11 million in illicit selling proceeds, Defendant Macdonald abruptly resigned as Chief Financial Officer ("CEO").

18. Yet even after the disappointing Q1 2022 results and Defendant Macdonald's departure, Defendants continue to obfuscate the full truth. On June 6, 2022, Defendant Michelle Keefe, who assumed the CEO position following Macdonald's departure, answered questions at an analyst conference and assured investors that the Company's small-to mid-size customer pipeline was strong and that she had not seen anything that "makes us think that we're not going to continue to be the market leader there," despite analyst concerns about the Company's business slowing.

19. On August 2, 2022, Syneos reported its second quarter of 2022 ("Q2 2022") financial results which revealed a substantial deterioration in the Company's business disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly

34%. On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, a decline of nearly $14 per share, or over 17%, on above-average trading volume of 3.2 million shares traded. But again, Defendants failed to fully reveal the magnitude of the chaos in its clinical unit and the full extent of the resulting consequences.

20. On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses. During an industry conference held later that day, Defendant Keefe continued to hide their internal problems plaguing the clinical unit and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to small- to mid-sized ("SMID") clients who were just delaying contract awards. On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volume. Defendants, however, still failed to reveal the full extent of their previous false statements regarding the strength of the Clinical Operations Segment.

21. Finally on November 4, 2022, Syneos reported worsening quarterly financial results, which revealed the dramatic deterioration of its business and client demand, culminating in a reported $182 million in clinical net new business awards during the quarter and an "unprecedented" Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the expected amount (an 87% year-over-year decline). Defendant Keefe admitted that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions, and she

subsequently admitted that while they had taken recent "steps . . . to address the post-revenue SMID cohort," they lacked the technological offerings to "be more competitive."

22. Securities analysts were shocked by the results. One analyst referred to Syneos's abysmally low book-to-bill ratios, stating: "***We've never seen that happen***." He pointedly challenged Defendants' claim that Syneos was not experiencing significant cancellations as "***frankly hard to believe*** . . . given that pass-through bookings were negative and ***overall bookings were basically 1/10 of what you would expect*** over the last few quarters or what we should have expected."

23. As a result of these revelations, the price of Syneos stock plummeted from $47.81 per share on November 3, 2022, to trade below $23.00 per share on November 4, 2022, down more than 77% from the Class Period high, causing Plaintiffs and the Class to suffer billions of dollars in losses and economic damages.

## II. JURISDICTION AND VENUE

24. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

25. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

26. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the statements that form the subject of this complaint were disseminated into this District, Defendants conduct substantial business in this District, the securities that are the subject of this action were traded on The Nasdaq Stock Market LLC (the "NASDAQ") in this District, and several public stock offerings carried out by Defendants as part

of the fraudulent scheme alleged herein occurred in this District.[2] Furthermore, the underwriters of these public stock offerings, including Goldman Sach & Co. LLC, Morgan Stanley, and BofA Securities, are headquartered in this District.

27. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

28. Lead Plaintiff KIF – MercLin Global Equity and Plaintiff KIF – MercLin Patrimonium are a Luxembourg investment company with its respective compartments or sub-funds. Lead Plaintiff MercLin DBI-RDT is a Belgian SICAV with a single compartment or sub-fund. As set forth in the accompanying certification, which is incorporated by reference herein, Lead Plaintiffs purchased shares of Syneos common stock during the Class Period at artificially inflated prices and were damaged thereby. *See* Certifications, ECF 8-1.

[2] These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 at-the-market public offering of more than 8 million Syneos sold to underwriters for the offering at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 at-the-market public offering of nearly 11 million Syneos sold to underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price.

**B. Defendants**

29. Defendant Syneos is a multinational clinical research organization. Syneos maintains offices in this District at 200 Vesey Street, 39th and 40th Floor, New York, NY 10281. At all relevant times throughout the Class Period, the Company's common stock was listed on the NASDAQ and traded in an efficient market under the ticker symbol "SYNH." As of February 9, 2023, Syneos had over 103 million shares of common stock outstanding.

30. Defendant Alistair Macdonald served as CEO") of Syneos and as a member of Company's Board of Directors (the "Board") from October 2016 until April 2022, when he abruptly resigned from both positions. Prior to serving as the Company's CEO, Defendant Macdonald held various positions within Syneos and its predecessor company INC Research, including, *inter alia*, as its President, Chief Operating Officer ("COO"), and President of Clinical Development services.

(a) As CEO of Syneos, Macdonald was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Macdonald also had approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events. Additionally, Macdonald was a member of Syneos' Executive Leadership Team.

(b) As CEO and a member of the Board, Macdonald was responsible for directing Syneos's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Macdonald repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Macdonald assert

that he was not aware of, Syneos's clinical business unit, including the clinical unit's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Macdonald received over $16 million in total compensation. And, during the Class Period as set forth in ¶¶279-80, Macdonald sold more than 142,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $11 million.

31. Defendant Michelle Keefe has served as member of the Board and as CEO of Syneos following the resignation of Defendant Macdonald since April 2022. Prior to her appointment as CEO, Keefe served as President of Medical Affairs & Commercial Solutions beginning in November 2021, and as President of Commercial Solutions from December 2017 to November 2021. Keefe also was a member of Syneos' Executive Leadership Team.

(a) As CEO of Syneos, Keefe is the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Keefe also has approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the SOX affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CEO and President of Medical Affairs & Commercial Solutions, Keefe was responsible for directing Syneos's commercial business and business development, the Syneos One program, the Company's public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Keefe repeatedly held herself out as knowledgeable about, and at no time during the Class Period did Keefe assert that she was not

aware of, Syneos's clinical business unit, including the clinical unit's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Keefe received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶293, Keefe sold more than 18,000 shares of her Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of nearly $1.4 million.

32. Defendant Jason Meggs served as CFO of Syneos from February 2018 until his resignation from the Company in March 2023. Prior to his role as CFO, Defendant Meggs served as Executive Vice President and CFO of Syneos's Commercial Solutions Segment. Defendant Meggs also previously served as Executive Vice President of Oncology at Syneos from January 2017 to August 2017, and as Senior Vice President of Business Finance with the Company from 2014 to 2016. According to a January 9, 2023 press release, Meggs was an "integral member of the Executive Leadership Team" during the Class Period.

(a) As Syneos's CFO, Meggs was the Company's senior-most financial officer, responsible for overseeing its financial, accounting, audit, treasury, and tax functions and the development and implementation of internal financial controls. Meggs also signed Syneos's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CFO, Meggs was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Meggs

repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Meggs assert that he was not aware of, Syneos's clinical business unit, including the clinical unit's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Meggs received over $5 million in total compensation. And, during the Class Period as set forth in ¶¶286-87, Meggs sold more than 39,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $3 million.

33. Defendant Paul Colvin served as President, Clinical Solutions of Syneos from December 2018 – November 2021. In November 2021, Colvin was appointed Chief Business Officer ("CBO") of Syneos, a role that he served until June 30, 2022, before his departure from Syneos in August 2022. Colvin also served on Syneos' Executive Leadership Team.

(a) As Syneos's CBO, Colvin was responsible for driving the growth strategy for Syneos Health. According to the Company's website, Colvin "[led] the company's Customer Engagement and Business/Market Development portfolio across the enterprise; [l]everage[d] the corporate strategy to create and institutionalize innovative solutions for customers and ensure[d] the voice of the customer is at the center of Syneos Health across the product development and commercialization continuum." As President, Clinical Solutions, Colvin was responsible for "driving growth and performance for the Company's industry-leading Clinical Solutions capabilities," delivering models for conducting clinical trials, "driv[ing] therapeutic alignment," "driving deep customer relationships" and driving "customer network/roster."

(b) As CBO and President, Clinical Solutions Colvin was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts

and investors, Colvin repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Colvin assert that he was not aware of, Syneos's clinical business unit, including the clinical unit's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Colvin received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶298, Colvin sold nearly 8,500 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $630,000.

34. The Defendants identified above in ¶¶30-33 are collectively referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "Defendants."

35. Each of the Individual Defendants, because of their respective senior positions within the Company, possessed the power and authority to control the contents of Syneos's quarterly and annual reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Throughout the Class Period (and for Macdonald, until his separation from the Company), each of the Individual Defendants, as senior executive officers of Syneos, was directly involved in the management and day-to-day operations of the Company at the highest levels and as further detailed herein, was privy to confidential and proprietary information concerning Syneos and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, was aware

of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. *See*, *e.g.*, ¶¶111, 141, 153, 177, 192, 212, 231, 260-61.

36. Each of the Individual Defendants had access to non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

37. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV. FACTUAL BACKGROUND

### A. Overview of Syneos' Business

39. Syneos has two reportable segments: (i) Clinical Solutions (the former INC Research); and (ii) Commercial Solutions (the former inVentiv Health). The Clinical Solutions segment focuses on the clinical development of products by biopharmaceutical companies, such as patient recruitment, clinical monitoring, investigator recruitment, and conducting all aspects of a global clinical trial. Syneos's Clinical Solutions can be delivered on a full-service project (known as full service offering or "FSO"), on a functional or resource basis (known as functional service provider or FSP), or through a hybrid approach. The Commercial Solutions segment focuses on product commercialization, deployment, communications, and consulting services.

40. During the Class Period, Syneos derived approximately 75% of its revenues from its Clinical Solutions segment, generating 2021 annual revenues of more than $4 billion. Syneos's customer base is comprised predominantly of SMID biopharmaceutical companies and includes more than 800 different entities with operations located in North America, Europe, the Middle East, and Africa.

### B. Syneos's Important Financial and Accounting Metrics

41. As a CRO, Syneos's financial success and growth prospects are predicated on securing a steady inflow of new business awards, growing its pipeline of outstanding clinical trial work, and servicing and monetizing its existing backlog.

42. Securities analysts and investors monitor pipeline metrics, backlog, book-to-bill ratios, and new business awards, as well as reimbursable expenses. Syneos defines its backlog as its anticipated future revenue based upon contract and pre-contract client commitments that are supported by written communications. As work on a project begins, revenue is recognized over the life of the project, provided the award has gone to contract and Syneos is hitting performance and percentage of completion targets. An increase in backlog will generally result in an increase in revenues over time, and thus backlog is used as an important indicator of Syneos's business performance and future expected revenue.

43. Syneos's book-to-bill ratio is the ratio of new business won during the period to business completed and billed for during that same period. Generally, a book-to-bill ratio greater than 1.0 is an indication of healthy backlog growth as it signals that Syneos is winning more new business than it is completing, while a book-to-bill ratio of less than 1.0 indicates that demand is waning.

44. Another important financial and accounting metric for investors and analysts is Syneos's reimbursable out-of-pocket expenses, which are included within backlog. Syneos incurs and is reimbursed for certain costs, including fees paid to principal investigators and for other out-of-pocket costs (such as travel expenses for clinical monitors and sales representatives). The Company includes these costs in total operating expenses, and the related reimbursements in revenue. In 2020, reimbursable out-of-pocket expenses accounted for more than $4.5 billion, or approximately 42% of Syneos's total backlog. Ostensibly margin neutral, anticipated

reimbursable out-of-pocket expenses serve as another important indicator of demand for the Company's services and thus its overall business performance.

45. Like many companies, Syneos experienced disruptions because of the COVID-19 pandemic. Some existing clinical trials were delayed due to restrictions that limited the ability of Syneos's staff to physically access investigative sites and conduct clinical monitoring work. There were also delays in patient enrollment and in the startup of new customer projects, all of which temporarily impacted the Company's ability to fulfill its backlog orders. In particular, the Company experienced a decline in reimbursable revenues beginning in 2020, as on-site visits that generate reimbursable expenses became less common.

46. As a result, Syneos withdrew financial guidance for fiscal year 2020 and purported to impose various cost management initiatives to try to mitigate the financial fallout of the delayed clinical trial work. These cost initiatives, among other things, included certain temporary compensation adjustments, hiring restrictions, staffing reductions, voluntary and involuntary employee furloughs, reductions in third-party costs, and other initiatives. Syneos also attempted to implement remote monitoring services to allow access to clinical sites where physical access had been restricted because of the COVID-19 pandemic.

47. Emerging from the pandemic disruptions, Defendants assured investors that Syneos had escaped COVID unscathed and claimed that Syneos had not experienced any "meaningful cancellations" of existing contracts, indicating that COVID-delayed business under existing contracts in the backlog would create a tailwind in late 2020 and 2021.

48. Thereafter and throughout the Class Period, Defendants emphasized their performance metrics, claimed that Syneos's business was booming, and through its purported technological advantages, recent acquisitions, and superior talent was competing for and winning

new business. During a November 2020 industry conference presentation, Defendant Meggs represented that Syneos was experiencing "record" customer order flows and that Syneos's new business "pipeline," "on top of what's already record pipelines and communications and consulting coming into the quarter," was "really start[ing] to shape up nicely heading into quarter 4 and into 2021." Similarly, during an April 2021 conference call, Syneos executives continued to highlight the purportedly "strong demand" for Syneos's services and reported a "record ending backlog" of expected business and high book-to-bill ratios, indicating to investors that the Company's robust growth trends would continue.

49. But Syneos's resurgence was a lie and falsely engineered by Defendants. Indeed, unbeknownst to the investing public, but known to and concealed by Defendants, Syneos was plagued by undisclosed, long-standing quality, technological, and cultural problems that caused clients to cancel in droves and refuse to resign. Syneos's inability to deliver the clinical and project management services demanded by its clients was seriously impacting the Company and its pipeline of potential new awards and its backlog of awards already reported to investors. According to an internal presentation provided to the ELT in January 2021, of which Defendants Macdonald, Meggs, Keefe, and Colvin were members, these problems began in 2020. Contrary to what Defendants were telling the market, the Company's Clinical Solutions business was neither healthy nor strong nor growing because clients were pulling significant amounts of business away from Syneos. As a result, for fiscal year 2021, the Company expected a ***decline*** in growth.

### C. Syneos's Competitive Gaps Rendered it Unable to Service Existing Business or Win New Business

50. Despite their Class Period statements to the contrary, Defendants have admitted that during the Class Period Syneos was plagued by "competitive gaps" with respect to technology and client offerings.

51. Defendants knew about these gaps from the time of the 2018 merger and by no later than mid-2020 knew the Company's technology shortcomings were hurting business. By November 2020, the Company was forecasting negative growth across its business and had already begun a comprehensive review of its Clinical Solutions business to determine why its clients were pulling work from the Company. The results of that review – and the serious problems facing the Company – were being discussed at the highest levels of the Company. In its review, the Company identified the problems plaguing its Clinical Services segment, examined their impact on the Company's revenue and growth rate, made a number of key findings and recommendations, listed the areas for change, and examined the Company's progress in addressing these issues against its plan of action (which had apparently already been adopted).

52. The January 2021 internal presentation to members of the Executive Leadership Team containing the results of that review laid out in dollars the Company's actual gross awards for fiscal year 2020 and projected awards for fiscal year 2021. Revenues for each year were broken down by its top 20 and 21-50 accounts, with separate sub-entries for large pharma clients, such as AbbVie, Amgen, Pfizer and Eli Lilly. According to the presentation, the Company knew its SMID business was in dire condition and knew it was cratering: Defendants expected a ***negative year-over-year awards growth rate*** of -23.3% across its clinical and commercial business and ***-23.5% for its clinical business*** in 2021. And measured against 2019, the Company's 2021 awards were expected to decline by 15% in contrast to the 10% growth target. Across all top 50 accounts, the Company expected a decline in awards of -0.2% for its clinical and commercial segments and -2.7% for its clinical segment, which is the core of its business despite telling investors and the market that Syneos's business was growing.

## GCS FY21 Gross Awards Targets

| Client | FY20 Actuals ($M) | | | FY 21 Budget ($M) | | | Growth Rates (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | FY21 vs FY20 (%) | | | 19 - 21 |
| | TOTAL | Clinical | Commercial | Total | Clinical | Commercial | Total | Clinical | Commercial | CAGR (%) |
| Abbvie | 189.0 | 158.0 | 31.0 | 163.4 | 140.0 | 23.4 | -13.5% | -11.4% | -24.5% | 7.9% |
| Amgen Inc. | 48.2 | 2.4 | 45.8 | 71.2 | 12.0 | 59.2 | 47.7% | 400.0% | 29.3% | 17.5% |
| AstraZeneca | 28.0 | 23.7 | 4.3 | 18.5 | 15.0 | 3.5 | -34.1% | -36.7% | -19.7% | -23.4% |
| Celgene + BMS | 560.8 | 536.2 | 24.6 | 508.5 | 475.0 | 33.5 | -9.3% | -11.4% | 36.2% | 1.3% |
| Eli Lilly and Co. | 174.7 | 118.7 | 56.0 | 118.2 | 60.0 | 58.2 | -32.3% | -49.5% | 3.9% | 44.3% |
| GlaxoSmithKline (w/ Tesaro) | 206.3 | 72.4 | 133.9 | 402.1 | 235.0 | 167.1 | 94.9% | 224.6% | 24.8% | 46.6% |
| Johnson & Johnson | 194.8 | 10.3 | 184.5 | 223.2 | 35.0 | 188.2 | 14.6% | 239.8% | 2.0% | 25.8% |
| Novartis AG | 85.0 | 52.7 | 32.3 | 99.6 | 70.0 | 29.6 | 17.1% | 32.8% | -8.5% | 11.8% |
| Pfizer Inc. | 314.7 | 293.2 | 21.5 | 275.6 | 250.0 | 25.6 | -12.4% | -14.7% | 19.1% | 30.9% |
| Regeneron | 58.2 | 46.9 | 11.3 | 86.7 | 80.0 | 6.7 | 49.0% | 70.6% | -40.7% | 309.2% |
| Roche | 104.4 | 93.1 | 11.3 | 115.8 | 105.0 | 10.8 | 10.9% | 12.8% | -4.7% | 11.8% |
| **Top 20 Accounts** (11 covered by GCS) | **1,964.1** | **1,407.6** | **556.5** | **2,082.7** | **1,477.0** | **605.7** | **6.0%** | **4.9%** | **8.8%** | **20.2%** |
| Alkermes | 51.2 | 50.9 | 0.3 | 50.3 | 50.0 | 0.3 | -1.8% | -1.8% | -12.7% | 14.2% |
| Daiichi Sankyo | 291.8 | 283.7 | 8.1 | 247.7 | 240.0 | 7.7 | -15.1% | -15.4% | -4.9% | -7.4% |
| Otsuka | 131.1 | 129.2 | 1.9 | 71.0 | 70.0 | 1.0 | -45.8% | -45.8% | -47.4% | -38.8% |
| Incyte | 131.6 | 131.0 | 0.6 | 95.5 | 95.0 | 0.5 | -27.4% | -27.5% | -10.5% | -13.2% |
| **21 -50 20 Accounts** (4 covered by GCS) | **605.7** | **594.8** | **10.9** | **464.5** | **455.0** | **9.5** | **-23.3%** | **-23.5%** | **-12.8%** | **-15.1%** |
| Intercept (SMID Top 250) | 17.6 | 9.8 | 7.8 | 33.9 | 25.0 | 8.9 | 92.8% | 155.1% | 14.5% | -15.1% |
| **Actuals / Budget Target** | **2,587.4** | **2,012.2** | **575.2** | **2,581.1** | **1,957.0** | **624.1** | **-0.2%** | **-2.7%** | **8.5%** | **10.0%** |

Syneos. Health

© 2020 All rights reserved | For Syneos Health® us

53. As the Executive Leadership Team discussed during the monthly ELT meetings, as of December 1, 2020, many of the Company's key accounts were in serious jeopardy. At the account level, all but two of its top accounts needed "CAPAs" also known as corrective and preventive actions. "Most (14 out of [the top] 16) accounts have overdue actions" and "10 [of the top 16] accounts have critical actions overdue." Three of Syneos' biggest customers had placed the Company on some form of "hold," meaning that it was not able to receive any new clinical business, and one client was "at risk." These four clients alone were collectively responsible for nearly $500 million of awards to Syneos in 2020, while the 14 accounts with overdue actions represented more than a billion dollars of awards in 2020 (roughly the same amount by which Syneos would miss its clinical revenue numbers in third quarter of 2022 ("Q3 2022"). Widespread

problems were also present at the business unit level, as "[a]ll BUs [12 in total] have . . . ***overdue actions***." And eight of those units had "critical" overdue actions.

**Total Open**

**456**

## Key Findings
Open, Overdue and Critical CAPAs by Account and by BU

**ACCOUNT-LEVEL**

| GCS Accounts | Total Open | Total Open (Critical) | Total Overdue | Total Overdue (Critical) |
|---|---|---|---|---|
| AbbVie (Soft Hold)^ | 56 | 11 | 13 | 2 |
| Alkermes | 20 | 6 | 7 | 5 |
| Amgen | | | | |
| AstraZeneca (Hold)^^ | 3 | | 3 | |
| BMS | 21 | 1 | 8 | 1 |
| Daiichi Sankyo | 10 | | 7 | |
| GSK | 46 | | 5 | |
| Incyte | 5 | 3 | 3 | 2 |
| Intercept | 66 | 9 | 24 | 5 |
| J&J | 3 | | 1 | |
| Lilly (At Risk)* | 36 | 11 | 15 | 4 |
| Novartis | | | | |
| Otsuka | 20 | 11 | 9 | 4 |
| Pfizer* | 89 | 4 | 17 | 2 |
| Regeneron (Soft Hold)*** | 49 | 10 | 15 | 2 |
| Roche | 32 | 15 | 4 | 3 |
| Grand Total | 456 | 81 | 131 | 30 |

**BU-LEVEL**

| BU | Total Open | Total Open (Critical) | Total Overdue | Total Overdue (Critical) |
|---|---|---|---|---|
| CNS | 40 | 15 | 11 | 6 |
| General Medicine | 129 | 25 | 51 | 11 |
| Oncology | 80 | 6 | 21 | 3 |
| SSU | 5 | | 2 | |
| CDS | 27 | 16 | 7 | 5 |
| Early Phase | 15 | | 5 | |
| RWLP | 19 | 11 | 6 | |
| BMS BU | 14 | 1 | 2 | 1 |
| Pfizer BU** | 88 | 4 | 16 | 2 |
| BT | 4 | | 1 | |
| Corporate Services | 13 | 2 | 7 | 1 |
| Global Ops - CAPSS | 22 | 1 | 2 | 1 |
| Grand Total | 456 | 81 | 131 | 30 |

- **Pfizer** quality data is currently maintained in the Pfizer quality system. The data here in Syneos system is not the source of truth.
- ^**AbbVie** Recurring audit findings in Clinical and RWLP Call center finding related to Inappropriate Disclosure
- ^^**AZ** Biometrics issue (submission to EMA failed to include data)
- ****Lilly** Multiple eCOA issues in Dermira program

© 2020 All rights reserved | For Syneos

54. Syneos's business development capabilities had been critically impaired by recent workforce reductions, leadership and operational changes, and labor force turmoil. Contrary to Defendants' Class Period statements about the Company's great work environment and strengths as an employer, Syneos maintained and perpetuated a toxic culture which contributed to high turnover and exacerbated the Company's critical quality failures.

55. Former President of Clinical Solutions, Paul Colvin and former Director of Business Development, Becky Brown, created serious issues within the Company leading to a

huge turnover of Project Managers, particularly within Clinical, which resulted in a further deterioration of Syneos's quality.

56. Even as Syneos brought on otherwise qualified people, they were "thrown to the wolves" as soon as they started working at the Company, were not trained, and were given "zero guidance." They were, however, still expected to meet deadlines. The high turnover on projects resulted in a lack of continuity, delays and quality issues, which, in turn, led to a loss of business.

57. Syneos was unable to retain analysts because of the poor management and the lack of training and support led to horrible turnover across the board, including Project Managers and CRAs (Clinical Research Associates).

58. Almost two years later, after the end of the Class Period, on November 4, 2022, Defendant Keefe admitted that Syneos's operations had been experiencing undisclosed turmoil over the preceding 18 months as a result of its inability to provide the clinical trial services its clients demanded. ¶¶241-45-. And Keefe admitted that the Company had failed to timely implement a technology-enhanced delivery model for its customers. ¶244. Specifically, Keefe stated that Syneos's "SMID customers are clear that they want Syneos . . . to deliver therapeutic insights but with enhanced agility," and to that end Syneos was still "working to reduce the complexity of our full-service operating model [and] streamline our organization and processes" in order to provide "an efficient and effective delivery model supported by . . . technology enhancements." *Id.* Keefe's stunning admission that Syneos's SMID customers were not renewing its business with Syneos and delaying award decisions stands in stark contrast to Defendant Macdonald's, and even Keefe's own statements during the Class Period that Syneos was dominating a "really hot" SMID market that was "getting hotter and hotter," and that Syneos's SMID customer base was strong and growing. Throughout the Class Period, Defendants knew of

and wrestled with their competitive and technological shortcoming, but they failed to disclose them to investors.

### D. Syneos Unsuccessfully Attempts to Shore Up Its Competitive Gaps Through Acquisitions

59. In addition, the Company struggled to integrate inVentiv Health and INC Research, leading to a bloated and confused organizational structure further complicated by the subsequent acquisitions Illingworth Research Group ("Illingworth") and SHCR Holdings Corporation ("Synteract") in December 2020. For example, Syneos never had a centralized network to combine the accounting systems of inVentiv Health, INC Research, and other acquired companies. By 2021, the Company had 11 separate accounts receivable systems and nine accounts payable systems. This made invoicing and paying bills for customers a logistical nightmare. Similarly, the Company had no centralized network for communicating via email between its worldwide locations. As a result, Syneos's rapid corporate growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems. Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities, and the Company had failed to adapt to changing business demands. Indeed, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers, with some customers voicing their unhappiness with the deal prior to closing.

60. In addition to not creating a network for its own finance department, during the Class Period, Syneos lacked an integrated client portal to allow clients to access their data and

performance metrics on their projects. Such a portal was a basic feature that other CROs offered to their clients and without one Syneos was required to manually create reports and then send them to the Company's clients by email. Therefore, instead of clients being able to instantly access vital data from their clinical trials, they would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors offered instantaneously via an online portal clients could access remotely.

61. Syneos's lack of such a portal, among other qualitative reasons, hindered Syneos's ability to win new business, causing would-be repeat customers to be reluctant to work with Syneos on future engagements. Indeed, after being acquired by Syneos, Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal. And at least one pharmaceutical client indicated it would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. That client complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone.

62. Plagued by serious quality issues and critical technological shortcomings, Syneos lagged its peers in providing remote clinical capabilities and was struggling to catch up to its peers in this new business environment. As a result, Syneos was failing to effectively perform under its existing contracts, ultimately causing Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals. Moreover, the Company's reimbursable revenue stream had been fundamentally diminished as customers persisted in seeking remote work and limiting the number of on-site clinical trials. Consequently, Syneos's backlog had been artificially inflated by hundreds of millions of dollars in reimbursable expenses that Defendants knew would never be realized, which created the false impression that Syneos was enjoying robust client demand when in fact its backlog was inflated and its business was floundering.

63. And although one of the Company's Class Period initiatives was technology and the implementation of a portal was a primary focus – Defendant Macdonald was the executive sponsor of the portal initiative – only in Q1 2022 did Syneos finally takes steps to remedy their technological failures, when they launched Clinical Reimagined. By the end of the Class Period, however, the Company had still not launched an integrated client portal.[3] As Keefe admitted after the Class Period, "Syneos needed to "improv[e]" its technological offerings in order to "be more competitive." ¶249.

64. The lack of an integrated client data portal was only one of Syneos's technological shortcomings causing poor quality services and leading to a loss of substantial business. And while Defendants held themselves out as "innovative" and emphasized the Company's ability to "deliver[] deeper strategic insights and integrated expertise," ¶124, by late 2020 and continuing throughout the Class Period, they knew that Syneos's inability to deliver quality clinical services was adversely impacting the Company's ability to win new and renewal business awards. The Company's quality failures were routinely discussed by Syneos senior management, including during monthly ELT meetings (of which Defendants Macdonald, Meggs, Keefe, and Colvin were members). The ELT meetings were used to plan, facilitate, and review the status of Syneos's strategic initiatives, and to discuss other topics such as HR and IT. By November 2020, the Company, as part of the ELT meetings, began a comprehensive review of its Clinical Solutions business to determine why its clients were pulling work from the Company. The results of that

[3] On January 11, 2023, months after the end of the Class Period, Defendant Keefe stated that Syneos "***now*** ha[s] dashboards that give people real time updates on how they're performing against their projects. Our customers are getting real time feedback. And so we really are excited about the improvement there." Keefe noted that the dashboards were part of "Clinical Reimagined," which was the Company's post-Covid "tech-enabled operating model," that "streamlines [the] organization and processes while adding advanced technology and data solutions to improve visibility, decision support and insight generation."

review – and the serious problems facing the Company – were being discussed at the highest levels of the Company.

65. Indeed, during a January 28, 2021, monthly ELT meeting, Syneos's Senior Director of Corporate Strategy presented a PowerPoint presentation to the Executive Leadership Team that identified the critical quality issues and highlighted "Open, Overdue and Critical CAPAs [Corrective and Preventive Actions]." That presentation contained data integrity warnings:

- "***Data doesn't reflect client situations.***"
- "Clinical Monitoring and Project Management topics (esp. Site Monitoring and Vendor Management) account for most overdue and overdue-critical actions"
- "***Further meaningful drill-down is not currently possible due to data limitations***."
- "***The data here in Syneos system is not the source of truth***."

66. Syneos's quality issues and data limitations were having devastating – but undisclosed – consequences on its clinical business. For example, AbbVie had placed a "hold" on its FSO clinical business with Syneos due to quality issues, noting that Syneos suffers from the lack of a "quality culture; issues in TMF due to ongoing Veeva migration inhibiting teams ability to be audit-ready." Regeneron had also placed Syneos on "hold" and would not make its "Phase III" pipeline "available to Syneos" "until [it] earned back trust." The Senior Director of Corporate Strategy warned the ELT that Syneos "MUST demonstrate delivery failures are behind us." But Syneos's delivery failures and critical data and quality issues were not behind it. Across all top 50 accounts, the Company expected a negative growth rate of -0.2% across its clinical and commercial business and -2.7% for its clinical, which is the core of its business. The Company's SMID business, in particular, was being hit hard by the lack of new awards.

67. The situation was clear: contrary to what Defendants were telling investors, the Company's Clinical Solutions business was neither healthy nor growing and the consequences were dire.

**E. Defendants Admitted to Syneos's Product Offering Deficiencies**

68. After the Class Period, Defendants publicly admitted to Syneos's inadequate technological offerings. On December 1, 2022, Keefe admitted that Syneos had needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Keefe stated that "Clinical Reimagined," one of the Company's recent "steps in place to address the post-revenue SMID cohort" had "taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace." ¶249. Keefe further stated that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market." In response to a concern about the Company's "sudden reduction in . . . win rate," Keefe lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was "on the right track to be competitive," after the "roll[] out" of the "new model," *i.e.*, the recently-implemented Clinical Reimagined. Keefe later reiterated this sentiment, commenting that she felt like a "broken record."

69. On February 16, 2023, COO Michael Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these capabilities, which Syneos lacked throughout the Class Period, would allow clients to "g[e]t a really good benefit from now having good data visualization, seeing into their projects, and being able to see the modeling out of various new things, like site activations, enrollment and data." The same day, Keefe admitted that the Company was now in

the process of "transforming our clinical operating model," in order to "clos[e] competitive gaps," stating that "[f]oundational to these improvements have been investment and accelerated development of clinical development tools and data applications, ranging from statistical modeling for site performance and enrollment to use of AI machine learning to better detect risks and issues." ¶250. In response to an analyst question concerning "obvious signs of share loss," Keefe conceded that "we understand the position we're in, and we know we have to improve our RFP volume. We have to improve our win rates . . . we need to convert the more high-value opportunities. So we know those are the things we need to do, to stay competitive in the marketplace."

70. Keefe further acknowledged that Syneos was just "***beginning*** to see the very early returns on our operating model and business development investments" noting that "we still have work to do to improve our overall win rate amongst SMID customers."

### F. Defendants Masked the Lack of New and Renewal Business by Manipulating Their Backlog Metrics and Applying Pressure to "Find" Revenue

71. As the Company was struggling to attract and win new business, top executives, including Defendants, began looking for ways to keep the Company's numbers up, to buy themselves enough time to dump tens of millions of dollars in Syneos common stock before they had to disclose the Company's problems to the market. In each quarter from January 2020 through May 2022, Syneos was several hundred million dollars short of its revenue target. In one e-mail to all business unit CFOs, sent on or around August 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "find it."

72. To "find" the revenue necessary to fill the hole, the Company manipulated and inflated its performance metrics, including its backlog, and prematurely recognized revenue. This was accomplished in several ways. Also, when contracts were cancelled, amounts in the backlog

would not be removed. For example, two large oncology clinical trials were cancelled in early 2021. When the business unit CFO Mike Donovan tried to have these trials removed from the backlog, higher-ups refused, due to concern about the negative impact on the Company's book-to-bill ratio.

73. Similarly, during the Class Period, Syneos entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years. The entire value of these contracts was hundreds of millions of dollars, and if Syneos achieved certain milestones on-time in all of the clinical trials, then Syneos could receive a $100 million bonus. Syneos missed the first milestone in the first clinical trial but still accounted for the potential $100 million bonus in backlog. Syneos even went so far as to amend the language in the contract so that the auditors would support the recognition of the bonus in the backlog even though the amended language did not change the requirements under the contract.

74. Syneos's FSP contracts can have five-year terms. And while Syneos assured investors and the market that it would only book to backlog one year of authorizations, Syneos routinely took two to three years authorization value from its FSP agreements after business unit CFOs were ordered to "find it." In other situations, even worse, Syneos took authorizations and booked to backlog projects that never came to fruition. This practice of taking authorizations far out into the future or before approval – ordered by Defendants Meggs and Colvin – allowed the Company to pull-in backlog at the end of each quarter, to improperly inflate projected revenue.

75. Syneos also manipulated change orders that were additional amounts added to contracts or clinical trials because the scope of work had changed, and would increase the total revenue value of the contract. These orders required separate agreements and sign offs by the sponsor. Another way in which Syneos inflated backlog was by including change orders even

when customers had not agreed to or signed a change order. For example, Syneos would treat a $2 million change order as finalized without a customer signature and the additional $2 million would be added to backlog.

76. Reimbursable expenses (also called "indirect costs" or "pass-through costs") were also used to inflate the backlog. Indirect costs for a given clinical trial were estimated by Syneos, which were oftentimes inflated and entered directly into the backlog. If actual costs are lower than the Company's estimates, they should be removed from backlog. For example, if Syneos estimated $2 million in indirect costs on a given clinical trial but realized only $1 million in revenue, then the other $1 million should be removed from backlog; this is revenue that will never be realized. Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have an adverse impact on the book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President of Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Ooncology) knew of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on the book-to-bill ratios. And Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Oncology) discussed these practices and the impact this would have on the Company and warned that the practices could amount to fraud. Fillman and Moore were specifically warned that Syneos's actions with respect to reimbursable expenses could amount to fraud. To accommodate these practices, Syneos had a practice by which they would extend the month-end close until the numbers had reached certain pre-determined amounts.

77. Syneos's efforts to "find" revenue continued through late 2022, just before Defendants disclosed to the market that its pipeline had shrunk by 90%.

78. At the end of Q3 2022, a Project Director was directed via email to add more monitoring visits on the calendar for the study. Monitoring visits are revenue for Syneos because the company is paid when a clinical research associate at Syneos goes to a site. The Director objected to adding visits to the calendar because there was no need to do any more visits for the study at that time. The Director, however, was instructed to set up the visits anyway because Syneos needed to show the revenue.

79. After that, the same Project Director was told by senior leadership to issue a $1.6 million invoice for a milestone that was related to cleaning patient data. The Project Director did not want to issue the invoice because the work had not been fully completed and Syneos would not be able to prove that all the data had been cleaned.

80. The Project Director wrote a message in Teams objecting to issuing the invoice for meeting the data cleaning milestone because their team could not prove that the data had been cleaned for those two patients. The Director was instructed to raise the invoice anyway. Even though the Director thought this was fraudulent billing and Syneos was lying to the client, the Director was told by leadership they wanted to show the revenue from the invoice in the current year. The Director was further told that the data would be cleaned by the time the client paid the invoice. The message exchange between the Director and leadership regarding the $1.6 million invoice may no longer appear on Syneos's Microsoft Teams Software because Syneos set Teams to delete messages after three days because the Company was afraid the messages could be used against them if there were ever any legal actions filed against the Company.

81. Indeed, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric. The Executive Vice President of Operations, Head of Commercial Michelle Keefe, the Head of Sales, and all of the sales representatives participated in these Monday calls and Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers with the Head of Sales and Operations. The entire sales organization knew where the Company was in terms of tracking to target, and regardless of the size of the gap, Syneos always made it up.

82. One way in which Syneos made up for gaps to target was by manipulating the way in which it recognized such revenue. Although Syneos publicly claimed to employ a conservative revenue-recognition policy, Syneos took advantage and manipulated these rules to inflate and improperly recognize revenue in a couple of ways. First, the Company did not estimate costs correctly and, while the costs were front-end loaded because the enrollment period was the most costly and time-consuming part of most trials, the underestimation of costs resulted in revenue being recognized on an expedited basis or early in the clinical trial. For example, in a clinical trial expected to take five years to complete with expected revenues of $10 million, Syneos would forecast the costs to complete the trial, *e.g.*, $6 million in costs. Costs expended are used to assess how far along the clinical trial is, as opposed to the amount of time that has passed, and milestones or percentage completion is determined by the expenses incurred. As such, using the example above if $2 million in costs have already been incurred then the trial is 33% complete and 33% of the revenue can be recognized. However, in many instances, Syneos "overburned," meaning it went over its estimated costs, and the costs would ultimately need to be reassessed. The Company reassessed and then estimated the new costs to total $8 million, instead of the previous $6 million

cost estimate. If $4 million in costs were already expended and the Company had therefore recognized 66% of the $10 million in total revenue, the reassessment of costs at $8 million would suggest that only 50% of revenue had been earned. In that example, $1.6 million in revenue should be reversed. However, Syneos would recognize when beneficial but not reverse when it was reassessed. Instead, a plan would be put in motion to justify the costs already expended by, for example, by lowering cost estimates going forward, even though this was not realistic.

83. Through these efforts, the Company was able to "find" hundreds of millions of dollars of revenue, and suddenly the Company hit its targets after being behind its numbers as the quarter was wrapping up. Over time, this contract caused Syneos' backlog, book-to-bill and net new business awards to be overstated.

84. Numerous high-level managers voiced objections to these efforts to expedite revenue recognition and change cost estimates. For example, between September 2020 and April 2022, one Senior Director sent e-mails expressing her discomfort with the Company's revenue numbers. The same director also noted her discomfort with certain financials in SOX certifications (which were signed by Defendants Macdonald, Keefe, and Meggs). Ultimately, this director, under duress, had to agree to numbers with which they were uncomfortable.

85. One business unit CFO similarly resisted signing off or certifying month-end numbers for his business unit and warned superiors many times against how the Company was recognizing revenue and recording backlog and predicted that it could not be sustained. This CFO had one on one discussions with the Clinical CFO, Jennifer Fillman, who reported to Meggs and the Business Unit CFO, Victoria Moore, in which the CFO warned Fillman and Moore that the Company's practices could amount to fraud.

86. Undeterred, Company executives shrugged off warnings from business unit CFOs and pressed on, hoping that new business, particularly on the commercial side, would fill the gap. Rather than reversing the revenue, the Company doubled down on its practices, which continued until the Company had no choice but to disclose the struggles of its clinical segment to the market.

### G. Syneos Senior Executives, Including the Individual Defendants and Private Equity Backers, Engaged in Massive Sales of Syneos Stock

87. By concealing the truth, Syneos insiders were able to unload their common stock while trading at all-time highs. As detailed further below (*see* ¶¶277-306), Company insiders – including Defendants Macdonald, Meggs, Keefe, and Colvin – collected $19 million dollars in illicit stock sales executed at artificially inflated prices. Virtually every high-level insider with significant Syneos holdings liquidated all nearly all of their entire Syneos common stock holdings, in stark contrast to their pre-Class Period trading.

88. For their part, Syneos's private equity backers, TH Lee and Advent, dumped millions of Syneos shares and collected in excess of $3 billion.

89. In May 2010, TH Lee had acquired inVentiv Health for $1.1 billion, one of Syneos's predecessor companies. Thereafter, Advent International purchased a 50% stake in inVentiv Health in 2016. Since then, the TH Lee and Advent had near-continuous Board representation at Syneos until they liquidated their Syneos holdings through a series of offerings at artificially inflated prices. TH Lee representatives, Joshua Nelson and Todd Abbrecht, served on the Syneos Board of Directors from before the Class Period until June 2021 and October 2022, respectively. Similarly, Advent representatives, John Maldonado and Thomas Allen, served on the Syneos Board of Directors from before the Class Period until June 2021 and November 2021, respectively.

90. Moreover, TH Lee and Advent emphasize the active involvement they have in the management of the companies in which they invest. As members of Syneos' board, TH Lee and Advent helped shape Syneos' operations and communicated with Company executives, including Macdonald, Meggs, and Keefe, on a frequent basis. According to TH Lee's website, "During its partnership with THL, Syneos was able to build an end-to-end suite of services through M&A, upgrade its sales effectiveness and improve operational efficiency."

91. Through a series of five offerings between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37,851,676 shares for $3.04 billion in proceeds at prices as high as $81.20 per share. These outsized insider sales occurred in rapid succession over a period of just nine months, through a series of five public stock offerings, and Syneos stock repurchase agreements, enabling Thomas Lee Partners and Advent International to exit their equity stakes in the Company. These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 at-the-market public offering of more than 8 million Syneos sold to underwriters for the offering at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 at-the-market public offering of nearly 11 million Syneos sold to underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price. Unusually, in support of this scheme the Company purchased more than 2 million shares directly from the selling stockholders in the offerings, thereby providing additional artificial price support to Syneos stock. Capitalizing

on this artificial inflation, the Individual Defendants dumped over $16 million worth of Syneos shares at artificially inflated prices during the Class Period, including $11.4 million sold by Macdonald alone.

### H. Without Sufficient New and Renewal Being Added to Backlog from Which to Prematurely Pull Revenue, the Company Could No Longer Obfuscate the Truth

92. Before Keefe was named CEO, there were internal discussions and disagreements within Syneos on whether to report reimbursable expenses and Defendant Keefe was not keen on reporting such figures. This eventually caught up to Syneos as investors questioned what percentage of the Company's pipeline consisted of reimbursable expenses and Syneos was forced to admit a huge portion, $3.6 billion in fact, of such expenses sitting in backlog could not be collected.

93. On February 17, 2022, Syneos announced deeply disappointing financial results for the fourth quarter of 2021 ("4Q 2021"). Despite Defendants' prior claims that reimbursable revenues would undergo "strong growth" and "accelerat[e]," Syneos's revealed reimbursable revenues would in fact likely never recover to pre-pandemic levels. Defendants revealed that 36% of the Company's backlog was reimbursable expenses. As a result, the Company set apart $3.6 billion from its backlog of expected new business and reported alarmingly low book-to-bill ratios.

94. Syneos also told investors that it "adjusted" its "expectations for reimbursable expenses, which impacted our total book-to-bill, net awards and backlog metrics." Syneos stated this adjustment was due to an increase in remote work and this phenomenon would "have a lasting impact on our revenue profile." Including reimbursable expenses, the Company reported $357.1 million in net new business awards in the 4Q 2021. Excluding reimbursable expenses Syneos reported $895.5 million in new business awards for the same period. Accordingly, net new business awards for Clinical Solutions was ***negative*** $538.4 million ($895.5 million minus $357.1

million), demonstrating that Syneos's backlog was inflated by over $500 million through the inclusion of reimbursable expenses.

95. Securities analysts picked up on the Company's adjustment to reimbursable expenses. For example, Jefferies issued a report on February 17, 2022, noting that Syneos was "Ripping Off the Reimb Expense Bandaid" with a "~538M reduction of reimb expense." Outside of quarterly bookings in the 4Q 2021, Syneos did not quantify the total impact of its backlog adjustment. However, Jefferies issued a report on February 18, 2022, estimating Syneos removed $850-$950 million in pass-through revenue, stating that "it is important to recognize that the magnitude of mgt's overestimation means that Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)."

96. After this disclosure, four of Syneos' top executives left the Company. Defendant Macdonald, who served for about six years as the Company's CEO, abruptly retired in April 2022. Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline. Four months later, in August 2022, Defendant Colvin, President of the troubled Clinical Solutions segment, also left, following the execution of a separation agreement and non-disclosure agreement with Syneos. In January 2023, Syneos announced a "Chief Financial Officer transition," through which Defendant Meggs would leave the Company. Defendant Keefe, who temporarily succeeded Macdonald as CEO, departed the Company in October 2023.

97. As the Company's known and persistent qualitative and technological failure and its inability to compete for and attract new business, particularly with repeat customers who were acutely aware of the Company's failures, caught up with them, the Company was unable to fill its pipeline with new business and, as a result, was unable to continue engaging in its revenue-

recognition practices and backlog manipulations. Eventually, as explained further below, the Company ran out of backlog from which to pull revenue and had to disclose its virtually non-existent pipeline to the market, causing Syneos's stock price to crash.

98. On November 4, 2022, Syneos reported a Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the amount anticipated by some analysts, with several calling the disappointing results "unprecedented." Syneos received just $182 million in clinical net new business awards during the quarter, representing an 87% year-over-year decline and nearly $1 billion below the amount expected by some analysts. On a related earnings call, new CEO Defendant Keefe revealed that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions. As detailed herein, during a subsequent investor call Defendant Keefe indicated the issues extended even further back in time, although the problems were not previously disclosed to investors and contradicted Defendants' Class Period statements.

99. As a result of these revelations, the price of Syneos stock declined to trade below $23 per share, down more than 77% from the Class Period high, causing Plaintiffs and the Class to suffer billions of dollars in losses and economic damages.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

### A. September 9, 2020 Baird Industry Conference and September 15, 2020 Prospectus

100. On September 9, 2020, Defendants Macdonald and Meggs appeared and presented at an industry conference sponsored by Robert W. Baird & Co. Inc. During the presentation Macdonald stated that Syneos was beginning to enjoy "pent-up demand," stating in pertinent part as follows:

> And really, we've been positioning the organization over the last few years to drive accelerated revenue and margin growth. ***Now clinical bookings momentum has been very good over the last several quarters, posting high market-leading book-to-bills over that period. Backlog growth as of the end of Q2 at 14.8%***. We're very pleased with that, obviously. And ***with net awards growth driving at 10% year-over-year growth, it put us in a very strong position***.
>
> We're in a very strong market. ***Our position in that market is growing and strengthening. The strategy that we have seems to be resonating very strongly with customers across all sectors***. ***So we see the engagement in that growth, not just in the SMID sector where we traditionally grew up, but also now that we're in that large pharma sector, and we'll touch on that in a moment as well***.

101. During the September 9, 2020 conference, Defendant Macdonald also stated that: "[W]hat we've seen is that biotech funding index is starting to manifest itself in a ***very strong SMID pipeline***," "***the pipeline is good***," and "***I think healthy pipeline is out there. I think that we're very lucky to be in an industry that's pretty robust***."

102. During the same September 9, 2020 conference, Defendants Macdonald and Meggs used slides as part of their presentation. One slide titled "Positioned for Accelerated Revenue and Margin Growth: Syneos Health Investment Highlights," stated that "***Clinical Bookings Momentum [was] Driving Visibility into Growth***," and that Syneos had "***Three consecutive quarters of greater than 1.40x Clinical book-to-bill***," "***14.8% ending backlog growth as of June 30, 2020***" and "***Three consecutive quarters of greater than 10% year-over-year net awards growth***."

## Positioned for Accelerated Revenue and Margin Growth

Syneos Health Investment Highlights

| | |
|---|---|
| ***Clinical Bookings Momentum Driving Visibility into Growth*** | ▪ Three consecutive quarters of greater than 1.40x Clinical book-to-bill<br>▪ **14.8% ending backlog growth** as of June 30, 2020<br>▪ Three consecutive quarters of greater than 10% year-over-year net awards growth |
| ***Commercial Capabilities Drive Differentiation & Growth*** | ▪ Syneos One represents the only end to end solution in the market. **Awarded $1.4B of estimated potential value**<br>▪ **Two long-term partnership wins** and Syneos One® momentum to drive future acceleration of revenue growth<br>▪ Commercial capabilities influence Clinical business we are winning |
| ***Leadership Position in High-Growth SMID / Biotech*** | ▪ Strong SMID franchise with long history of leadership within CRO space<br>▪ Commercial penetration into SMID customers rapidly gaining traction<br>▪ **>10% total revenue growth YTD 2020 within SMID customer base** |
| ***Successfully Penetrating Large Pharma*** | ▪ Secured **three strategic Clinical partnerships with Top 30 Pharma** in 2018 and 2019<br>▪ FSP360 combining with Full Service to deliver large scale hybrid services<br>▪ Top 20 Clinical backlog mix accelerated to nearly 30% as of June 30, driving high visibility into future growth |
| ***Strong Financial Performance and Margin Accretion*** | ▪ Organic revenue growth in FY 2019 outpaced market growth **in both segments**<br>▪ **30–50 bps annual margin expansion from $100M – $125M of *ForwardBound* savings** including operating leverage<br>▪ **Targeting 2.5x – 3.0x net leverage** by the end of 2021 with significant covenant cushion |

Syneos Health 4

103. On September 15, 2020, Syneos filed a Prospectus with the SEC (the "September 2020 Prospectus") in connection with the Company's public stock offering of 7 million shares priced at $59.75 per share. The September 2020 Prospectus incorporated by reference Syneos's Q2 2020 Form 10-Q filed on August 6, 2020. The Q2 2020 Form 10-Q stated that Syneos had net new business awards of $5,796.6 million for the 12 months ended June 30, 2020. The Q2 2020 Form 10-Q also stated that Syneos had Clinical Solutions segment net new business awards of $4,567.1 million for the 12 months ended June 30, 2020. Furthermore, the Q2 2020 Form 10-Q stated that the Company's total backlog was $9,607 million, growing 13.6% compared to the same period in 2019, and the Clinical Solutions backlog was $8,997.3 million, with backlog growth of 14.8% compared to the same period in 2019.

104. In the second quarter of 2020 ("Q2 2020") Form 10-Q's Management Discussion & Analysis, Defendants described the Company's backlog and new business awards, as follows:

**New Business Awards and Backlog**

We add new business awards to backlog when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider, provided that:

- collection of the **award value is probable**;
- the project or projects are expected to commence within a certain period of time from the end of the quarter in which the award was granted;
- project contingencies such as the outcome of other clinical trials, funding approvals, or other events, are not anticipated to prevent the project or projects from commencing in accordance with the expected timeline;
- the customer has entered or intends to enter into a comprehensive contract as soon as practicable; and
- for awards related to deployment solutions and functional service provider offerings, a ***maximum of twelve months*** of services are included in the award value.

In addition, ***we continually evaluate our backlog to determine if any of the previously awarded work is no longer expected to be performed, regardless of whether we have received formal cancellation notice from the customer. If we determine that any previously awarded work is no longer probable of being performed, we remove the value from our backlog based on the risk of cancellation***. We recognize revenue from these awards as services are performed, provided we have entered into a contract with the customer.

We report new business awards for our Clinical Solutions and Commercial Solutions segments on a trailing twelve months ("TTM") basis. Our total backlog represents backlog for our Clinical Solutions segment and the deployment solutions offering within our Commercial Solutions segment. We do not report backlog for the remaining service offerings in the Commercial Solutions segment.

**Backlog**

***Our backlog consists of anticipated future revenue from business awards that either have not started, or that are in process and have not been completed. Our backlog also reflects any cancellation or adjustment activity related to these awards***. The average duration of our contracts will fluctuate from period to period based on the contracts comprising our backlog at any given time. The majority of our contracts contain early termination provisions that typically require notice periods ranging from 30 to 90 days . . . .

105. Defendants' statements on September 9, 2020 and September 15, 2020 (¶¶100-101), including that (i) "Clinical Bookings Momentum [was] Driving Visibility into Growth" (¶102); (ii) Syneos had enjoyed "***[t]hree consecutive quarters of greater than 1.40 Clinical book-to-bill***," "***14.8% ending backlog growth*** as of June 30, 2020," and "***Three consecutive quarters of greater than 10% year-over-year net awards***" (¶102); (iii) "***clinical bookings momentum has been very good over the last several quarters***" (¶100); (iv) the Company was enjoying a "***very strong SMID pipeline***" (¶101);(v) "***Our position in that market is growing and strengthening. The strategy that we have seems to be resonating very strongly with customers across all sectors***" (¶100); (iv) statements concerning the manner in which the Company accounts for and manages its new business awards and backlog (¶104); and (vii) statements regarding Syneos's second quarter ("Q2") net new business awards and backlog metrics (¶103) were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52, 53, 58, 666. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59.

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they

were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including INC research and inVentiv, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶58).

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, and toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported

backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69, 70.

106. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in

meeting customer needs and to execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

107. Defendants' statements on September 9, 2020 and September 15, 2020 (¶¶100-04), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**B. Third Quarter 2020 Financial Results**

108. On October 29, 2020, Syneos issued a press release and filed a Form 8-K with the SEC, announcing it had agreed to acquire Synteract "a full-service CRO" focused primarily on "pre-revenue companies." The press release also touted the demand for Syneos's services, stating "***Syneos Health continues to experience strong SMID demand with double digit year-over-year pipeline growth***."

109. On October 29, 2020, Syneos issued a press release and filed a Form 8-K with the SEC announcing its financial results for the quarter ended September 30, 2020 (the "Q3 2020 Release"). The Q3 2020 Release stated:

> ***Net new business awards were $1,206.3 million and $5,892.1 million*** for the three and twelve months ended September 30, 2020, representing a ***book-to-bill ratio of 1.10x and 1.31x***, respectively. ***Clinical Solutions net new business awards were $995.0 million and $4,711.3 million*** for the three and twelve months ended September 30, 2020, representing a ***book-to-bill ratio of 1.20x and 1.41x,*** respectively. . . . These ***net new business awards contributed to an ending backlog of $9,783.0 million*** as of September 30, 2020, ***consisting of $9,196.3 million for Clinical Solutions . . . .***

110. The Q3 2020 Release also announced, "***Clinical Solutions backlog growth of 18.2% compared to the same period in 2019***." The Q3 2020 Release quoted Macdonald as stating, in pertinent part:

> "***We delivered strong sequential revenue growth with profit outperformance in the third quarter. Our differentiated model continues to resonate with customers and our value proposition is further strengthened with our agreement to acquire Synteract*** . . . . As we look ahead to 2021 and beyond, we're building a strong foundation for growth, ***coming off a quarter with record backlog, high market demand and robust pipelines***."

111. That same day, Syneos filed with the SEC its quarterly report on Form 10-Q for Q3 2020 (the "Q3 2020 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. The Q3 2020 Form 10-Q stated that Syneos had net new business awards of $5,892.1 million for the 12 months ended September 30, 2020. The Q3 2020 Form 10-Q also stated that Syneos had Clinical Solutions segment net new business awards of $4,711.3 million for the 12 months ended September 30, 2020. Furthermore, the Q3 2020 Form 10-Q stated that the Company's total backlog was $9,783 million, growing 16.8% compared to the same period in 2019, and the Clinical Solutions backlog was $9,196.3 million, with growth of 18.2% compared to the same period in 2019.

112. The Q3 2020 Form 10-Q's Management Discussion & Analysis repeated the description of the Company's backlog and new business awards that appeared in the Company's Q2 2020 Form 10-Q set forth in ¶104.

113. Also on October 29, 2020, and following the release of the Company's Q3 2020 financial results, Defendants Macdonald, Meggs, and Colvin hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the 3Q 2020. During his prepared remarks, Macdonald emphasized Syneos's "record quarter" of new business, stating: "***Gross awards remain very strong, including a record quarter of awards in our small- to mid-***

***sized customer segment***." Macdonald continued: "***Our Clinical pipeline remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter***." Macdonald further touted the Company's "robust backlog" and presented "key highlights from the quarter":

> We continue to deliver on our strategy and remain confident in the long-term strength of our business, ***given our robust backlog and differentiated model***. ***We expect strong growth in both of our segments in 2021***, despite recent increases in COVID-19 cases slowing the pace of recovery.
>
> * * *
>
> Now I'll turn to key highlights from the quarter. First, we closed Q3 ***with solid net new business awards, including Clinical Solutions year-over-year growth of 16.9%, resulting in book-to-bill ratios of 1.2x for Clinical Solutions and 1.1x for our total organization***. This brings us to ***$5.9 billion of net awards and an aggregate book-to-bill ratio of 1.31x for the trailing 12-month period. For our Clinical business, this builds a strong position for accelerating revenue growth with 20.4% growth in net awards for the trailing 12-month period and year-over-year backlog growth improving to 18.2%***.
>
> * * *
>
> ***Clinical Solutions also delivered a solid third quarter of net awards, growing 16.9% compared to last year. Gross awards remain very strong, including a record quarter of awards in our small -to-mid-sized customer segment***. . . .
>
> ***. . . This brings Clinical net awards to $4.7 billion for the trailing 12-month period, increasing our book-to-bill ratio for the same period to 1.41x. Our Clinical pipeline remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter***.

114. During the Q3 2020 call, Defendant Meggs also addressed investors and analysts, presenting the Company's financial position and stated:

> Given the COVID-19 ***headwinds***, ***we had a strong quarter across our operating and financial metrics, including gross awards, backlog growth, profitability and cash flow demonstrating how our unique value proposition continues to resonate with our customers and our team continues to execute***.

115. During the Q3 2020 call Defendants Meggs and Macdonald addressed questions on reimbursable expenses and bookings:

**[Question]**:] [J]ust to start on the reimbursable travel since it obviously seems to be causing some noise for you and others more than expected this quarter. I just wanted to understand this a little bit better. So you mentioned the 400 basis point headwind for the quarter. How does that compare to 2Q? And then what's assumed as far as this headwind in the 4Q guide? And then, I guess, similarly, ***anything you can share around what that impact was on the revised reimbursable travel in the bookings number***?

* * *

**[Meggs]**:] When you think about the backlog and the adjustment in clinical, we – ***if you just take out the backlog*** adjustment***, our book-to-bill in the quarter in clinical would have been north of 1.4, again. So it was a good quarter, and we feel good about the bookings that we had***.

* * *

**[Macdonald]**:] ***And that sector [SMID] was really hot for us in Q3***. I mean it's kind of a ***record pipe in the SMID, record sales in the SMID for Q3, and we just see that segment getting hotter and hotter. So been*** able ***to land Synteract, having a good cultural fit and relationship with their executive team already***.

116. Also during the Q3 2020 conference call, Macdonald continued to emphasize the Company's success with SMID customers, stating "***we had a huge production from SMID customers, and it's pretty much a regular-looking quarter*** with the COVID overlay on top."

117. Defendants' statements on October 29, 2020 (¶¶108-116), including that Syneos was "experience[ing] strong SMID demand" (¶108); "Clinical Solutions backlog growth of 18.2%" (¶110), "record backlog, high market demand and robust pipelines" (¶110); "resonate with customers and our value proposition is further strengthened with our agreement to acquire Synteract" (¶110); the manner in which the Company accounts for and manages its new business awards and backlog (¶113-115); the "really hot" SMID sector that generated "record sales in the SMID for Q3" (¶115); "we had a huge production from SMID customers" (¶116); and regarding Syneos's Q3 2020 net new business awards, book-to-bill ratios, and backlog metrics (¶113-15), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following

adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Far from deriving "strength" from its "differentiated model" (¶113), Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52-53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business

from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58-59.

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶54-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." ¶58;

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment (¶¶54-57), and inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above. ¶¶52, 58-59;

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82-83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable

out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69-70.

118. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

119. Defendants' statements on October 29, 2020 (¶¶108-116), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### C. November 9, 2020 Credit Suisse Industry Conference, November 19 2020 Jefferies Industry Conference, and December 8, 2020 Analyst & Investor Day

120. On November 9, 2020, Defendant Meggs presented at Credit Suisse's industry conference for investors and analysts. In response to an analyst question regarding client demand, Meggs reassured investors that the Company was experiencing "robust" demand, stating: "***our pipelines remain robust, right, right across the business in clinical and commercial. The SMID RFP flow, as you mentioned, was a record in quarter 3 for us on the back of biotech funding***," adding that "***pipelines look good. RFP flow continues to be sound***," and "***the pipeline really starts to shape up nicely heading into quarter 4 and into 2021***."

121. On November 19, 2020, Defendants Macdonald and Meggs presented at a Jefferies LLC industry conference with investors and analysts. During the presentation, Macdonald highlighted the purportedly strong demand environment being enjoyed by Syneos, stating: "And ***what we're seeing at the moment***, I think, specifically, ***for the demand environment is very encouraging on the SMID side, a very strong flow on the RFP front***," adding that there was a "***nice strong demand environment, both large pharma and that SMID space*** we've always played in. So we're very encouraged with that." Macdonald further stated that "I think ***the RFP environment for us has been pretty strong all year, and we've closed out pretty well***. I mean, Q3 was probably the hardest one as we went through kind of a bit of recovery, but ***nice strong environment right now***. ***And I think that sets us up really nicely for 2021 as well***."

122. During the November 2020 Jefferies conference, Defendant Meggs addressed analysts' questions about the Company's bookings, backlog, and the impact of the Company's adjustments made to reimbursable expenses:

> **[Question**:] In your third quarter report – Jason, this one might be for you – you guys reflected some adjustments to your pass-through estimates, flowed that through your bookings in 2Q and shaded down the – averaged down your book-to-

> bill a little bit. Maybe you could talk through what – kind of what precipitated that change in estimate around the pass-through side and the magnitude of the impact to your bookings?
>
> **[Meggs**:] Yes. Thanks, Dave. ***So we always try to be as balanced on our backlog when we're looking at future*** forecasting***, et cetera right, in terms of risk adjustments and what do we think is actually going to happen for each study, almost conservative in a lot of ways, I would say***. . . .
>
> And as we looked at how studies in the existing portfolio were behaving and the conversations we were having around future remote levels as well as the bids, and what we were doing in terms of new bids, and how the remote versus on-site was going, we said, Look, we think this is actually going to be a ***permanent*** impact to the studies. And what is that impact on the backlog? And we took that out of the backlog in the quarter, ***which we still had a good book-to-bill, relative to last year in quarter 3, right? And had we not done that, we would have posted another sort of low 1.4s in the quarter. So we were – I think we're around 1.2.***
>
> ***So that's what we were seeing, why we did it, and the impact. And as we look to the future, right, the pass-throughs will come back up to some extent as a proportion of total revenue, no question, from the Q2 and Q3 level***.

123. On December 1, 2020 Syneos filed a Prospectus with the SEC (the "December 2020 Prospectus") in connection with the Company's public stock offering of 6 million shares priced at $61.90 per share. The December 2020 Prospectus incorporated by reference Syneos's Q2 2020 Form 10-Q and Q3 2020 Form 10-Q, which contained the misrepresentations discussed above. ¶¶104.

124. On December 7, 2020, Syneos issued a press release, also filed with the SEC on Form 8-K, in which it highlighted its upcoming Investor Day presentation. In the press release, Defendant Macdonald was quoted as stating: "'***Our innovative product development model provides opportunities to drive accelerated growth across a wide range of customers, delivering deeper strategic insights and integrated expertise*** . . . .'"

125. On December 8, 2020, Defendants Macdonald, Meggs, Keefe, and Colvin hosted an Analyst & Investor Day. During his prepared remarks, Macdonald represented that Syneos expected to achieve "***robust revenue growth***" over the next three years. Specifically, Macdonald

announced revenue guidance for fiscal years 2022 and 2023 of "***between 7% and 10%***" growth each year. Meggs similarly stated that Syneos had "***the backlog, pipelines, and customer relationships***" to "***accelerat[e] execution and growth over the next several years***" and the Company was "***positioned for sustainable growth and margin expansion***."

126. Throughout their presentation, Defendants claimed that Syneos had successfully integrated recent acquisitions and was effectively streamlining operations across the Company's diverse product offerings, purportedly illustrated by the Company's comprehensive Syneos One offering and strategic "value creation plan." For example, Defendant Macdonald stated that Syneos was "***at the forefront of this market shift to an agile, highly communicative, insights-driven, integrated product development approach***." Macdonald similarly stated that Syneos was effectively "***integrating solutions***" and "***removing silos***" between various phases of the product lifecycle and across expertise. Defendant Meggs meanwhile stated that the Company's "***collaborative approach across the business is resonating with our customers***" and part of a "***value creation plan***" ***that*** "***provides the financial road map for growth***."

127. During the presentation, Defendant Macdonald emphasized the Syneos has a "culture" that was a "key differentiator" which was driving "customer success:"

> We're very proud of our recent recognition by Forbes Magazine listing us as the best employer, highest amongst biopharmaceutical outsourcing organizations. Importantly, this award was based on independent surveys of our employees and truly reflects how our employees feel about what we're building together.
>
> * * *
>
> ***We see our culture continuing to be a key differentiator in helping to attract and retain top talent, which in turn drives*** innovation ***and customer success***.

128. During the December 8, 2020 Analyst and Investor Day, Defendant Colvin also addressed investors and analysts, highlighting new customer relationships, stating: "***Within***

***clinical we've secured four new large pharma relationships, including renewing our relationship with Pfizer. We've driven a very strong clinical trailing 12-month book-to-bill of 1.41 times, producing year-over-year backlog growth of over 18%***." Colvin also discussed the Company's clinical backlog on December 8, 2020, highlighting Syneos's backlog growth, strong pipeline and legacy strength with SMID customers, stating:

> ***We have year-over-year clinical backlog growth of over 30% for the Top 50 pharma customers as of the end of third quarter***. We manage these large pharma relationships with our Global Client Solutions executives who are tasked with targeting new partnerships in addition to expanding these existing partnerships. ***We're very excited about our strong pipeline of additional opportunities***. We currently have three partnerships driving over a $150 million of annual revenue and ***we expect to continue expanding this group of key customers***.
>
> ***. . . While we're growing our share in large pharma, our legacy strength is in the small to mid-sized or SMID segment where we continue to enjoy an overweighed position relative to our total market share***.
>
> * * *
>
> For the third quarter, ***we experienced record awards and RFP flow for the SMID segment*** and our unique Syneos One product offering continues to resonate strongly and help us to drive for this growth. ***Our end-to-end model can uniquely serve SMID customers, helping them to realize the full value of their compounds in the commercial marketplace via market access, commercial strategy and branding, enabling them to best optimize their clinical development program. It's important to understand the strength of the market that Synteract plays in and the strategic rationale for our combination***.

129. During the Company's December 8, 2020 Analyst and Investor Day, Defendant Meggs also emphasized the Company's "backlog, pipelines, and customer relationships," and further claimed Syneos had a "competitive advantage," stating:

> We have built a strong foundation for growth and we're focused on accelerating execution and growth over the next several years and ***we have the backlog, pipelines, and customer relationships to do so***.
>
> ***We believe that Syneos Health is positioned for sustainable growth*** and margin expansion. ***Our model, people, and culture are our competitive advantage***.

130. On December 10, 2020, Syneos issued a release announcing the Company's acquisition of Synteract. The release quoted Defendant Macdonald, who emphasized the purportedly strong demand environment, stating that "'***[w]ith Synteract, we are answering the strong demand we are seeing in the small- to mid-sized space, fueled by near all-time high funding***.'"

131. Defendants' statements on November 9, 2020, November 19, 2020, December 1, 2020, and December 8, 2020, and December 10, 2020 (¶¶120-130), including that the Company's "***robust revenue growth***" (¶125); that the Company was "***positioned for sustainable growth and margin expansion***" (¶125); that Syneos was "***at the forefront of this market shift to an agile, highly communicative, insights-driven, integrated product development approach***" (¶126); that the "***SMID RFP flow . . . was a record in quarter 3 for us***" and the Company's "***robust***" "***pipelines look good***" (¶128); that the Synteract acquisition was an "'***answer [] [to] the strong demand we are seeing in the small- to mid-sized space, fueled by near all-time high funding***'" the manner in which the Company accounts for and manages its new business awards and backlog (¶130); and regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics (¶128), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, contrary to

Defendant Meggs assurances that "customer relationships" would "accelerat[e] execution and growth over the next several years" (¶129), by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." ¶¶53, 58;

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. Indeed, far from Syneos's "'product development model'" being "'innovative,'" "'provid[ing] opportunities to drive accelerated growth across a wide range of customers,'" or "'delivering deeper strategic insights and integrated expertise,'" as clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability t fulfill its contractual obligations. ¶¶59-63. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. In fact, contrary to Defendant Macdonald's assurance that "culture continuing to be a key differentiator in helping to attract and retain top talent, which in turn drives innovation and customer success" (¶127) and Defendant Meggs's declaration that "Our model, people, and culture are our competitive advantage" (¶129), the Company's toxic work culture and workforce turmoil, caused in part by Defendants Colvin's and Meggs' directive to find backlog at all costs (*e.g.*, "find it" (¶171)) to the exclusion of producing quality clinical solution services (¶¶49-70), contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." ¶58.

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, and toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as – contrary to Defendant Meggs's assurances that "balanced on our backlog when we're looking at future forecasting, et cetera right, in terms of risk adjustments and what do we think is actually going to happen for each study, almost conservative in a lot of ways, I would say" (¶122) – Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83.

As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86;

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69, 70; and

132. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

133. Defendants' statements on November 9, 2020, November 19, 2020, December 1, 2020, December 8, 2020, and December 10, 2020 (¶¶120-130), which were false and misleading

when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**D. January 13, 2021 J.P. Morgan Industry Conference**

134. On January 13, 2021, Defendants Macdonald and Meggs addressed investors and analysts at the JP Morgan 39th Annual Healthcare Virtual Conference. Defendant Macdonald highlighted the Company's ability to "deliver decentralized trials," and "capabilities to bring technology and . . . new capabilities to customer delivery," stating:

> And as we move forward, I think what we're seeing is a need and desire from our customers to see more ***innovation*** from ***service suppliers*** like Syneos Health. ***We're at the forefront of that***. . . . So Illingworth is an example of that. We completed that acquisition in Q4. Happy to add that to the arsenal that we have here at Syneos Health and a ***big step forward for us in being able to deliver decentralized trials and to take regular trials through a decentralization process to be able to take the trial to the patient in their own home, taking down the burden, and enabling us to modernize the approach as we go***.
>
> ***They're all critical in our mind for the continued differentiation of Syneos Health against competitors*** in what is becoming a more and more complex market. ***And I think that favors the*** larger ***CROs with the capabilities to bring technology and new service lines, new capabilities to customer delivery, to project designs. And I think that really helps us resonate in the market***.

135. During the same J.P. Morgan conference, Defendant Macdonald underscored the Company's new business awards and backlog growth, including through the Company's acquisition of Synteract, stating:

> ***We have increased the number of strategic awards in the top 30 since this time last year, up to four, and we're very happy with that. And then you'll see there that over 30% year-on-year backlog growth for us in that top 50, which shows that the accounts that we penetrated are turning into revenue*** generation. ***We've gone through bookings growth and now we're starting to see that billings growth come through the model as those projects stand up and start up***. Obviously, a little bit delayed because of COVID, ***but we feel good engagement from those customers, we have good position with them, we've worked out how we deliver all them, and I think that's a very promising start to a much larger penetration in the large pharma sector***.

* * *

> In the meantime, we don't ignore the SMID. ***We made the investment in Synteract, continue to help us fuel*** that ***growth in a very hot end of the market, particularly within this SMID market, a hotter end of that market as well***.
>
> * * *
>
> On the right-hand side there, we talked a little bit about Synteract. We're keeping that as a stand-alone business unit to really engage the emerging biotech. We've got off to a great start with that. ***The employees from Synteract have been fantastic. They've settled in very quickly, and we're seeing good performance from them from day one. So we're very pleased with that. It enables us to engage a different customer in the SMID space***.
>
> * * *
>
> ***We have a strong backlog growth in both sectors of the business, clinical at 18%*** . . . . We're very pleased with that. Obviously, some of that is work that got pushed to the right from 2020. But as we go through the year, ***we have had great sales, we've had strong pipelines, and we've been able to secure great positions, not just with large pharma, but also in that SMID sector. We've helped a lot of customers navigate through the COVID experience by being able to move them very seamlessly, very painlessly to a digital, more remote approach, both in clinical and commercial. . . . We have enhanced our SMID position with the acquisition of Synteract. As I said before, we already have the leading position in that space. We are very keen on that space. We see it as a great growth driver for the future***.

136. Defendants' statements on January 13, 2021 (¶¶134-35), including that the Company is "***at the forefront***" of its customers' "***need and desire . . . to see more innovation***" (¶134); that the integration of the Company's acquisitions that are "***help[ing] . . . fuel . . . growth in a very hot . . . SMID market***" (¶135); and the Company's ability to "***deliver decentralized trials***" and the "***continued differentiation of Syneos Health against competitors . . . really helps us resonate in the market***" (¶134); and regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics (¶135); were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52-53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58-59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶34-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." ¶58;

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions

such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above. ¶¶52, 58-59;

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82-83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the

Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69-70.

137. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

138. Defendants' statements on January 13, 2021 (¶¶134-35), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**E. Fourth Quarter and Full Year 2020 Financial Results**

139. On February 18, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter and year ended December 31, 2020 (the "Q4 2020 Release"). The Q4 2020 Release emphasized "Clinical Solutions segment net new business awards," book-to-bill ratios, and backlog growth as follows:

> ***Clinical Solutions segment net new business awards of $1,299.3 million and $4,698.7 million for the three and twelve months ended December 31, 2020, representing book-to-bill ratios of 1.52x and 1.42x, respectively, and year-over-year backlog growth of 24.6% as of December 31, 2020.***
>
> *  *  *
>
> ***These net new business awards contributed to an ending backlog of $10,951.1 million as of December 31, 2020, consisting of $10,239.5 million for Clinical Solutions and $711.6 million for the Deployment Solutions offering within Commercial Solutions***.

140. Defendant Macdonald was quoted in the February 18, 2021 Q4 2020 Release, stating:

> "***We delivered another quarter of strong awards performance, along with sequential revenue growth and robust profitability in the fourth quarter. Our innovative solutions,*** including Kinetic***, continue to resonate with customers and we further strengthened our differentiated model with our acquisitions of Synteract, enhancing our SMID footprint, and Illingworth Research Group, further enabling our in-home capability for Decentralized Solutions . . . We remain confident in the long-term strength of our business given our record backlog, which we expect to fuel strong growth in both segments for the full year 2021***."

141. Also on February 18, 2021, Syneos filed its annual report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"), which was signed by Defendants Macdonald and Meggs. In the 2020 Form 10-K's Management Discussion & Analysis, Defendants described the Company's backlog and new business awards, as follows:

> **New Business Awards and Backlog**
>
> We add new business awards to backlog when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider, provided that:
>
> - ***collection*** of the ***award value is probable***;
> - the project or projects are expected to commence within a certain period of time from the end of the quarter in which the award was granted;

- project contingencies such as the outcome of other clinical trials, funding approvals, or other events, are not anticipated to prevent the project or projects from commencing in accordance with the expected timeline;
- the customer has entered or intends to enter into a comprehensive contract as soon as practicable; and
- for awards related to deployment solutions and functional service provider offerings, a ***maximum of twelve months of services are included in the award value***.

In addition, ***we*** continually ***evaluate our backlog to determine if any of the previously awarded work is no longer expected to be performed, regardless of whether we have received formal cancellation notice from the customer. If we determine that any previously awarded work is no longer probable of being performed, we remove the value from our backlog based on the risk of cancellation***. We recognize revenue from these awards as services are performed, provided we have received proper authorization from the customer.

We report new business awards for our Clinical Solutions and Commercial Solutions segments as well as backlog for our Clinical Solutions segment and the deployment solutions offering within our Commercial ***Solutions*** segment. We do not report backlog for the remaining service offerings in the Commercial Solutions segment.

***Backlog***

***Our backlog consists of anticipated future revenue from new business awards that either have not started, or that are in process and have not been completed. Our backlog also reflects any cancellation or adjustment activity related to these awards***. The average duration of our contracts will fluctuate from period to period based on the contracts comprising our backlog at any given time. The majority of our contracts contain early termination provisions that typically require notice periods ranging from 30 to 90 days.

142. Furthermore, the 2020 Form 10-K highlighted the Company's Clinical Solutions segment net new business awards of $4,698.7 million for the 12 months ended December 31, 2020. The 2020 Form 10-K also stated that Syneos had an ending backlog of $10,951.1 million as of December 31, 2020, consisting of $10,239.5 million for Clinical Solutions, representing growth of 23% and 24.6%, respectively, compared to the same period in 2019.

143. The 2020 Form 10-K further emphasized the Company's expansive customer base, Syneos's "leading position for serving customers across the" SMID category, and highlighted the strong SMID demand Syneos experienced in 2020:

> [O]ur customer base is geographically diverse with well-established relationships in the United States, Europe, and Asia. ***We have several customers with whom we have achieved "preferred provider" or strategic alliance relationships. We define these customers as relationships from which we generate significant revenue and where we have executed master service agreements in addition to regularly scheduled strategy meetings to discuss the status of our relationship, and for which we serve as a preferred supplier of services. We believe these relationships provide us enhanced opportunities for more business***, although they are not a guarantee of future business. With the acquisition (the "Synteract Acquisition") of SHCR Holdings Corporation ("Synteract"), a company with a leading reputation among emerging biopharmaceutical companies, ***we have also enhanced our leading position for serving customers across the small to mid-sized ("SMID") category, further diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment. We continue to experience strong SMID demand, as evidenced by double-digit growth in our request-for-proposal volumes in 2020 as compared to 2019***.

144. Later that day, on February 18, 2021, Defendants Macdonald, Meggs, Keefe, and Colvin hosted a conference call with investors and analysts to discuss the Company's financial and operational results for the fourth quarter of 2020. During his prepared remarks, Macdonald highlighted the Company's "strong sales performance in the quarter, ***which caps off a record year of award, our growing portfolio of innovative and integrated product development solutions continues to resonate with customers of all sizes***."

145. In the slide presentation that accompanied Defendants' February 18, 2021, conference call presentation to investors and analysts, Syneos stated the Company was "***Building momentum***" with "***$5.9B of total TTM [Trailing Twelve Months] net awards and 1.33x TTM book-to-bill***," "***$4.7B of Clinical TTM net awards and 1.42x TTM book-to-bill***," "***Clinical Solutions ending backlog growth of 24.6% as of December 31, 2020***," and "***Clinical Solutions record backlog of $10.2B and Deployment Solutions record backlog of $0.7B***."

## Non-GAAP Financial Results

| $M (except per share data) | Three months ended December 31, 2019 | 2020 | % Change | Twelve months ended December 31, 2019 | 2020 | % Change |
|---|---|---|---|---|---|---|
| Adjusted revenue[1] | $ 1,214.5 | $ 1,140.0 | (6.1%) | $ 4,682.2 | $ 4,415.8 | (5.7%) |
| Adjusted EBITDA | 188.6 | 194.8 | 3.3% | 645.2 | 633.6 | (1.8%) |
| *Adjusted EBITDA margin*[2] | *15.5%* | *17.1%* | *+160 bps* | *13.8%* | *14.3%* | *+50 bps* |
| Adjusted diluted EPS | $ 1.03 | $ 1.11 | 7.8% | $ 3.23 | $ 3.41 | 5.6% |

**Highlights:**

- Building momentum: $5.9B of total TTM net awards and 1.33x TTM book-to-bill
  - $4.7B of Clinical TTM net awards and 1.42x TTM book-to-bill
  - $1.2B of Commercial TTM net awards and 1.05x TTM book-to-bill
- Clinical Solutions ending backlog growth of 24.6% as of December 31, 2020
- Clinical Solutions record backlog of $10.2B and Deployment Solutions record backlog of $0.7B
- Record Full Year Cash Flow from Operations of $425.5M

1. Figures in the 2020 periods represent GAAP revenue. Excluding a $10.1M and $6.3M foreign currency exchange rate benefit during the three and twelve months ended December 31, 2020, respectively, adjusted revenue growth was (7.0%) and (5.8%) at constant currency compared to the same periods in the prior year.
2. Adjusted EBITDA margin is defined as Adjusted EBITDA divided by Adjusted Revenue.

Syneos. Health

For a reconciliation of the presented financial measures, please reference slides 10 – 14 in the Appendix of this presentation.

4

146. The February 18, 2021 Company Presentation also included a slide highlighting the Company's book-to-bill ratio over the past several quarters:

## Book-to-Bill and Backlog Burn Rate

**Clinical Solutions**

| $M | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|
| TTM Clinical Solutions net new business awards[1] | $ 4,148.0 | $ 4,451.3 | $ 4,567.1 | $ 4,711.3 | $ 4,698.7 |
| TTM Clinical Solutions adjusted revenue[2] | 3,428.0 | 3,496.2 | 3,391.9 | 3,352.1 | 3,306.7 |
| **TTM Clinical Solutions book-to-bill ratio[3]** | **1.21 x** | **1.27 x** | **1.35 x** | **1.41 x** | **1.42 x** |

| $M | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|
| Clinical Solutions adjusted revenue | $ 900.9 | $ 874.8 | $ 747.2 | $ 829.2 | $ 855.6 |
| Clinical Solutions beginning backlog | 7,781.8 | 8,220.0 | 8,549.4 | 8,997.3 | 9,196.3 |
| **Clinical Solutions backlog burn rate[4]** | **11.6%** | **10.6%** | **8.7%** | **9.2%** | **9.3%** |

**Commercial Solutions**

| $M | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|
| TTM Commercial Solutions net new business awards[1] | $ 1,305.6 | $ 1,273.4 | $ 1,229.5 | $ 1,180.8 | $ 1,164.4 |
| TTM Commercial Solutions revenue | 1,254.2 | 1,228.7 | 1,178.0 | 1,138.3 | 1,109.0 |
| **TTM Commercial Solutions book-to-bill ratio[3]** | **1.04 x** | **1.04 x** | **1.04 x** | **1.04 x** | **1.05 x** |

1. We recognize new business awards when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider. For additional information on new business awards, please refer to Item 7 in our Annual Report on Form 10-K for the twelve months ended December 31, 2020.
2. For a reconciliation of GAAP revenue by segment to Non-GAAP adjusted revenue by quarter, please reference slide 11 in the Appendix of this presentation.
3. TTM book-to-bill represents TTM net new business awards divided by TTM adjusted revenue or TTM revenue, as applicable.
4. Backlog burn is calculated as the quarterly segment adjusted revenue divided by the respective quarter's beginning backlog.

Syneos. Health

10

147. On March 1, 2021 Syneos filed a Prospectus with the SEC (the "March 2021 Prospectus") in connection with the Company's public stock offering of over 8 million shares priced at $74.95 per share. The March 2021 Prospectus incorporated by reference Syneos's 2020 Form 10-K, which contained the misrepresentations discussed above. ¶¶141-43.

148. Defendants' statements on February 18, 2021 and March 1, 2021 (¶¶139-146), including that "'***We delivered another quarter of strong awards performance, along with sequential revenue growth and robust profitability in the fourth quarter***.'" (¶140); "'***Our innovative solutions,*** including Kinetic, ***continue to resonate with customers and we further strengthened our differentiated model with our acquisitions of Synteract, enhancing our SMID footprint, and Illingworth Research Group, further enabling our in-home capability for Decentralized Solutions***'" (¶140); "'***We remain confident in the long-term strength of our business given our record backlog, which we expect to fuel strong growth in both segments for the full year 2021***.'" (¶140); the manner in which the Company accounts for and manages its new business awards and backlog (¶141); and regarding Syneos's fourth quarter ("Q4") and full year 2020 net new business awards, book-to-bill ratios, and backlog metrics (¶141), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020

and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." ¶¶53, 66;

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52-53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 56-59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's

toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶47-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57 Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." ¶58;

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment (¶¶59-70), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57,59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58-59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by,

for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-65;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82-83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86.; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69-70.

149. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

150. Defendants' statements February 18, 2021 and March 1, 2021 (¶¶139-47), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

151. Defendants, taking advantage of Syneos's artificially inflated stock price, sold more than 84,000 shares of Syneos common stock for proceeds exceeding $6.3 million in January, February, and March 2021. ¶¶280, 287, 293, 298.

**F. First Quarter 2021 Financial Results**

152. On April 29, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Release"). The Q1 2021 Release stated that Syneos had "***Net new business awards of $1,548.8 million and $5,880.1 million for*** the three and twelve months ended March 31, 2021, representing ***book-to-bill ratios of 1.28x and 1.32x, respectively***." The Q1 2021 Release also stated that the "***Clinical Solutions segment net***

***new business awards of $1,215.5 million and $4,720.1 million*** for the three and twelve months ended March 31, 2021, representing ***book-to-bill ratios of 1.30x and 1.39x, respectively,*** and year-over-year ***backlog growth of 22.5% as of March 31, 2021***." The Q1 2021 Release also stated that the Company's "***net new business awards contributed to an ending backlog of $11,218.0 million*** as of March 31, 2021, ***consisting of $10,509.9 million for Clinical Solution***." Defendant Macdonald was quoted in the Q1 2021 Release, stating: "'***Our integrated product development model, purpose-built to drive greater success for customers, continues to fuel robust backlog growth while delivering on the key drivers of our Value Creation Plan***.'"

153. That same day, April 29, 2021, Syneos filed its quarterly report on Form 10-Q for the Q1 2021 ("Q1 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. The Company's Q1 2021 Form 10-Q highlighted the Company's Clinical Solutions segment net new business awards of $4,720.1 million and total net new business awards of $5,880.1 million for the 12 months ended March 31, 2021. The Q1 2021 Form 10-Q also stated that Syneos had an ending backlog of $11,218.0 million as of March 31, 2021, consisting of $10,509.9 million for Clinical Solutions, representing growth of 21.4% and 22.5%, respectively, compared to the same period in 2020.

154. In the Q1 2021 Form 10-Q's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards that appeared in the Company's Q2 2020 Form 10-Q set forth in ¶104.

155. Also on April 29, 2021, Defendants Macdonald, Meggs, Keefe, and Colvin hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter of 2021 ("Q1 2021")s. During the call, Macdonald highlighted the "***strong demand***" that Syneos was purportedly experiencing. Macdonald also highlighted

Syneos's Clinical Solutions segment, which he explained was "***well positioned for accelerated revenue growth***" in 2021, citing the Company's "***record ending backlog***" and "***record pipeline of new opportunities***."

156. During his prepared remarks, Defendant Macdonald also pointed to the "***continued recovery in reimbursable expenses***." Defendant Meggs echoed this theme, affirming that reimbursable revenue would undergo "***strong growth***" in the Clinical Solutions segment.

157. During the call, Defendant Macdonald also claimed that Syneos was enjoying demand far above pre-COVID-19 levels stating, for example, that "[b]y mid-April, the new patient enrollment rates and new site activations were trending at approximately 150% of pre-COVID levels," which he represented would "***increase our backlog conversion and accelerate year-over-year Clinical Solutions revenue growth for the balance of this year***."

158. An analyst described the ramp-up of site activations as "pretty remarkable" and inquired whether Syneos had sufficient staffing to meet this demand and maintain such an elevated pace. In response, Defendant Macdonald stated "***yes, definitely, we can sustain it and grow it, actually***." Macdonald also pointed to Syneos's "***enhanced processes***," "***more horsepower***," and "***more automated and more streamlined***" processes as reasons why the Company was able to effectively execute despite the increased demand environment.

159. During the April 29, 2021 Q1 2022 conference call, Defendant Macdonald stated "***We had another strong quarter of gross awards across both segments, and our integrated product offerings continue to fuel strong backlog growth***." In addition, Defendant Macdonald repeated the "key highlights" regarding the Company's performance from the Q1 2021 Release.

160. During the same conference call, Defendant Macdonald continued to highlight the Company's "strong demand," stating "***Our clinical team also delivered a record quarter of gross awards, further demonstrating the strong demand we are experiencing***."

161. During the April 29, 2021 investor conference call, Defendant Macdonald addressed a question from Robert Jones, a Goldman Sachs analyst, concerning the Company's "pipeline reprioritization" and book-to-bill metrics:

> **[Question**:] [L]ooking at the math, it does look like these reprioritizations or cancellations obviously drove the net bookings lower than expected. So just anything more you could give there? Was this a large change within 1 client? Was it from several? Any commonalities in therapeutic areas? Just wanted to try to get a better understanding of the impact in the quarter between gross and net bookings.
>
> . . . **[Answer**:] Yes, it's a couple of customers on the larger side, one in oncology with reprioritized – well, ***I think some of them are a delay in the delivery of the – of that program. So actually just pushes a couple of projects out of our awards window. So rather than starting within the next 12 months, they're pushing further back, so we have to take them out due to our bookings policy. So they will come back in at a later stage in 2021 as awards*** . . .
>
> * * *
>
> ***It's just a couple of customers doing it, quite sizable, though, one of them. So I think we would have been at record probably book-to-bills if these haven't happened. So it's a very strong environment. I think 1.3x pretty good book-to-bill anyway. And on top of that, we would have had extra juice in the tank. So unfortunate for us that, that happens, but that's the nature of our business, right***?"

162. During the same April 29, 2021 call, Macdonald stated that the "***demand environment is strong, good. I think we have record RFPs in clinical***" when asked about "general market dynamics" and what the Company was seeing in terms of "site accessibility, RFP flow, study start-up, [and] enrollment time lines."

163. During the same call, Defendant Macdonald further addressed a question about the Company's "improved" backlog stating:

> **[Question**:] [O]n the improved backlog . . . Is that just around the pent-up clinical trial demand coming back? And what's ***your*** line of sight into how quickly that plays out? So like it sounds like you're pretty confident in accelerating growth into 2Q. So just around the improved backlog burn there.
>
> **[Answer**:] Yes. So some of it. I mean, if you remember, Q4, it seems so long ago, we had a 1.5-plus book-to-bill. I can't remember the exact number, 1.55, somewhere around that. ***So throwing the 1.3 on top of that in Q1 feels good to me. Those projects that we've won, starting to get into start-up from the Q4 awards in Q2, plus you've got revenue that's still unlocking from the work that was pushed backwards out of 2020. So you've got that work coming back. You've got demand coming out of the market that we're taking share on. We've got new recruits coming through, so we're able to burn that revenue off pretty well***.
>
> ***So yes, I'm very confident where we're sitting, looking at what we've got in terms of backlog and the coverage that we have through to the end of the year. We're off to a good start. We beat where we thought we were going to be and very optimistic about the rest of the year and out into 2022***.

164. Defendant Meggs also discussed the Company's financial results during the April 29, 2021 investor conference call:

> ***If you just kind of strip everything out, both businesses year-over-year, excluding reimbursable expenses, were growing in the first quarter in sort of mid-single digits. And then as you look to quarter 2, you start to see the clinical business really rebound strongly given the year-over-year compare as well as all the things Alistair outlined relative to study start-up metrics . . . .***

165. Later during the April 29, 2021 investor call, Defendant Meggs responded to a question concerning the "pacing of reimbursable revenues," stating "***at least on the clinical side, we'll see strong growth in the indirect as well***," confirming, "***I don't see anything wrong with the demand environment***."

166. Defendants' April 29, 2021 conference call was accompanied by a presentation that highlighted the Company's book-to-bill ratio over the past several quarters:

## Book-to-Bill and Backlog Burn Rate

**Clinical Solutions**

| $M | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|
| TTM Clinical Solutions net new business awards[1] | $ 4,482.2 | $ 4,596.4 | $ 4,739.6 | $ 4,735.1 | $ 4,720.1 |
| TTM Clinical Solutions adjusted revenue[2] | 3,525.0 | 3,422.3 | 3,383.9 | 3,339.5 | 3,394.9 |
| **TTM Clinical Solutions book-to-bill ratio[3]** | **1.27 x** | **1.34 x** | **1.40 x** | **1.42 x** | **1.39 x** |

| $M | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|
| Clinical Solutions revenue | $ 882.5 | $ 755.8 | $ 837.2 | $ 863.9 | $ 938.0 |
| Clinical Solutions beginning backlog | 8,251.0 | 8,578.9 | 9,023.2 | 9,222.4 | 10,270.5 |
| **Clinical Solutions backlog burn rate[4]** | **10.7%** | **8.8%** | **9.3%** | **9.4%** | **9.1%** |

**Commercial Solutions**

| $M | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|
| TTM Commercial Solutions net new business awards[1] | $ 1,242.5 | $ 1,200.2 | $ 1,152.5 | $ 1,128.0 | $ 1,160.0 |
| TTM Commercial Solutions revenue | 1,200.0 | 1,147.7 | 1,106.4 | 1,076.3 | 1,066.3 |
| **TTM Commercial Solutions book-to-bill ratio[3]** | **1.04 x** | **1.05 x** | **1.04 x** | **1.05 x** | **1.09 x** |

**Note:** Segment revenue, backlog, and net new business awards have been recast to reflect the move of Regulatory and Operations Consulting from Commercial Solutions to Clinical Solutions.

1. We recognize new business awards when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider. For additional information on new business awards, please refer to Item 2 in our Quarterly Report on Form 10-Q for the three months ended March 31, 2021.
2. For a reconciliation of GAAP revenue by segment to Non-GAAP adjusted revenue by quarter, please reference slides 11 – 12 in the Appendix of this presentation.
3. TTM book-to-bill represents TTM net new business awards divided by TTM adjusted revenue or TTM revenue, as applicable.
4. Backlog burn is calculated as the quarterly segment adjusted revenue divided by the respective quarter's beginning backlog.

Syneos. Health

10

167. On May 3, 2021 Syneos filed a Prospectus with the SEC (the "May 2021 Prospectus") in connection with the Company's public stock offering of more than 8 million shares priced at $81.04 per share. The May 2021 Prospectus incorporated by reference Syneos's 2020 Form 10-K and Q1 2021 Form 10-Q, which contained the misrepresentations discussed above. ¶¶141-43, 153-54.

168. Defendants' statements on April 29, 2021 and May 3, 2021 (¶¶152-67), including that "'Our integrated product development model, purpose-built to drive greater success for customers, continues to fuel robust backlog growth while delivering on the key drivers of our Value Creation Plan'" (¶152); that the Company enjoyed a "record ending backlog" and "record pipeline of new opportunities" (¶155); that Syneos possessed and was effectively executing with its "enhanced processes," "more horsepower," and "more automated and more streamlined" processes (¶158); that the Company's "integrated product offerings continue to fuel strong backlog growth" (¶159); that the "clinical team also delivered a record quarter of gross awards" (¶160); the

manner in which the Company accounts for and manages its new business awards and backlog (¶154); and regarding Syneos's Q1 2021 net new business awards, book-to-bill ratios, and backlog metrics (¶153); were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63);

and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's inability to fulfill its contractual obligations. ¶¶52, 53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently

work across its various product and service groups. ¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶58);

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment (¶¶49-70), and inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter

percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69, 70.

169. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

170. Defendants' statements on April 29, 2021 and May 3, 2021 (¶¶155-67), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

171. Defendants took advantage of Syneos's artificially inflated stock price, and sold nearly 50,000 shares of Syneos common stock for proceeds exceeding $4 million in April and June 2021. ¶¶280, 287, 293.

**G. Second Quarter 2021 Financial Results**

172. On June 2, 2021, Defendants Macdonald and Meggs addressed investors and analysts at the Jefferies 2021 Virtual Healthcare Conference on behalf of Syneos. During the conference, Defendant Macdonald highlighted the Company's ability to "accelerate customer outcomes and customer success," stating:

> We're starting to see the end-to-end product development model that we have, which is really powered by the fact that we can do the full clinical research and the full commercialization, starting to hum along together. ***And what we've seen from that is our ability to accelerate customer outcomes and customer success*** by compressing the dead space between activities and making – building in commercialization, requirements, materials, data into the clinical trials as we design them and deploy them.

173. Also on June 2, 2021 Syneos filed a Prospectus with the SEC (the "June 2021 Prospectus") in connection with the Company's public stock offering of nearly 11 million shares priced at $81.20 per share. The June 2021 Prospectus incorporated by reference Syneos's 2020 Form 10-K and Q1 2021 Form 10-Q, which contained the misrepresentations discussed above. ¶¶141-43, 153-54.

174. On June 9, 2021, Defendant Meggs presented at the Goldman Sachs 42nd Annual Global Healthcare Virtual Conference on behalf of Syneos. During the call, a Goldman Sachs analyst asked about the demand environment, leading to the following exchange:

> **[Question**:] [Y]ou kind of alluded to this, but obviously, need to ask it just around the demand environment. I think the data that everybody tracks would still be pointing to kind of record levels of funding and with that, record levels of R&D and innovation and new trials and new drugs. A little harder to see that end market during COVID for obvious reasons. How would you characterize the RFP environment for non-COVID work as you start to really reengage on a more normal level with your biopharma constituents?
>
> **[Meggs**:] ***Yes, I mean the RFP flow environment, Bob, is as strong as we've seen it, right? I mean it really started moving in a really healthy clip in February, March and has continued to be really strong we look at it sequentially*** and ***year-over-year. And we've talked about we had a record pipe coming into quarter 2 and the RFP flow continues to be strong. And really, that's right across the customer segments that we have in terms of how we think about our top 20 and then 21 to 50 in small to mid. So it's been strong right across the business***.

175. On August 9, 2021, Syneos issued a press release, which was also filed with the SEC on Form 8-K, announcing its financial results for the quarter ended June 30, 2021 ("Q2 2021 Release"). The Q2 2021 Release announced the "Highlights" from the quarter:

- Second quarter revenue of $1,282.6 million, increased 6.1% sequentially and 26.6% year-over-year.
- ***Clinical Solutions net new business awards of $1,436.2 million for the second quarter, representing year-over-year growth of 21.2% and a book-to-bill ratio of 1.45x, and $4,971.5 million for the trailing twelve months, representing year-over-year growth of 8.2% and a book-to-bill ratio of 1.37x.***

* * *

- ***Year-over-year ending backlog growth of 21.5% in Clinical Solutions*** and 17.8% in Deployment Solutions as of June 30, 2021.
- GAAP net income of $41.9 million increased from $3.9 million in the second quarter of 2020.
- Adjusted EBITDA of $174.6 million increased 47.1% year-over-year.
- GAAP diluted earnings per share of $0.40 increased from $0.04 in the second quarter of 2020.
- Adjusted diluted earnings per share of $0.97 increased 67.2% year-over-year.

- Updated full year 2021 guidance.

176. Defendant Macdonald was quoted in the Q2 2021 Release emphasizing the Company's "strong awards," "record backlog" and "robust growth," stating:

> "During the second quarter we exceeded the midpoint of our guidance across all financial metrics, ***with both Clinical and Commercial achieving double-digit growth year-over-year*** as we continue to emerge from the COVID-19 pandemic . . . . ***Both segments delivered another quarter of strong awards, powering record backlog levels and fueling our robust growth expectations over the balance of 2021***. Our unique strategy continues to resonate in the market, with our integrated product offerings and commercial expertise improving engagement across sites, patients and HCPs, while accelerating performance and increasing participant diversity."

177. That same day, Syneos filed its quarterly report on Form 10-Q for the quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. The Form Q2 2021 Form 10-Q highlighted the Company's Clinical Solutions segment net new business awards of $4,971.5 million and total net new business awards of $6,228.9 million for the 12 months ended June 30, 2021. The Q2 2021 Form 10-Q also stated that Syneos had an ending backlog of $11,685.3 million as of June 30, 2021, consisting of $10,966.9 million for Clinical Solutions, representing growth of 21.3% and 21.5%, respectively, compared to the same period in 2020.

178. In the Q2 2021 Form 10-Q's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards, which appeared in the Company's Q2 2020 Form 10-Q. ¶104.

179. Also on August 9, 2021, Syneos held a conference call with analysts and investors during which Defendant Macdonald, Meggs, Keefe, and Colvin discussed the Company's second quarter of 2021 ("Q2 2021") financial performance. During the call, Defendant Macdonald addressed a question concerning "customer behavior," the Company's bookings and backlogs, and

whether "***clients are still pushing things out or things being kind of acted on a little more near-term***?"

> **[Macdonald**:] Yeah. Good question. ***I think we didn't see any of that really in Q2***. You naturally get things that move around the end of the quarter, ***but nothing out of the ordinary. And I think we've seen a continued kind of return to what we'd expected – that we'd always expect to see kind of pre-COVID with the activity from SMID customers being very strong activity from large pharma customers being more normal, if you like, where decisions being made, projects coming through and getting into the clinic***.
>
> So as you see, ***we had a great bookings quarter. Very strong in clinical*** and commercial, very strong in Syneos One, very strong in full-service commercial as well. ***So really, we're pretty pleased with all those*** sectors. ***We've got good, robust pipelines as you go into Q3 and very pleased with the demand environment that we're sitting***. And I think the innovation that we're bringing to customers in terms of integrating products and selling doing more cross-selling, et cetera as well as the full end-to-end Syneos One has put us in a really strong position.

180. During the Q2 2021 Earnings Call, Defendant Macdonald told investors Syneos only included 12 months of services in its bookings, stating:

> Under our awards policy for FSP services, ***we only included 12 months of services in our bookings***, even though each agreement represented an initial term of at least 3 years. The remainder provides further fuel for growth in addition to our reported backlog. ***Driven by these strong sales, record ending backlog that is up 21.5% and a robust pipeline of new opportunities, Clinical Solutions remains well positioned for strong revenue growth in the second half of 2021 and beyond***.

181. During the Q2 2021 Earnings Call, securities analysts inquired about the demand environment for Syneos's services. For example, the Jefferies analyst asked about "general recovery on things like site access and RFP flow . . . what do you see in there? And then what are you assuming also kind of the back half in terms of continued normalization on that front?" In response, Defendant Macdonald stated, "***I mean I think we are seeing a very robust environment from all sectors, both clinical, commercial, SMID and large in both sectors as well. So a good, healthy environment***." Defendant Colvin added that:

> ***[W]e continue to see really strong and it's been – it's really across all segments at this point and FSP and full-service***. So from my perspective, I think ***that's***

> ***going to continue on, especially as we've looked at our partnerships and as we*** look***, continue to expand there***. We've had this quarter a couple of new partnerships that we brought into the fold. ***We think those will continue to add volume as we go into the back half of this year and into '22***.

182. During the Q2 2021 Earnings Call, the Evercore analyst asked Defendants to "provide just a little bit more breakdown on the revenue between – in the third quarter in terms of how you're thinking about it between clinical and commercial" also asking "***if you could help us break out some of the numbers that you said regarding pass-throughs and acquisitions and divestitures, just so that all those things are clear between clinical and commercial***." In response, Defendant Macdonald stated:

> ***Clinical side, really seeing good performance there as well as COVID continues to recover***. We talked a little bit about the COVID trials and how they're standing up the vaccine trial. That will continue into the back half although we did peak as we thought we would likely in quarter 2 on those COVID trials or the vaccine trials. But the other large relationships we have are continuing to stand up and the projects are growing. We're trying to catch those up as best we can from COVID. ***We had great SMID performance in sales in quarter 4 and quarter 1, again, in quarter 2. That's starting to pull through into revenue as well in the back half. And so looking at growth there in the low to mid-20s right, when you look at the clinic growth***. So that's how we're looking at it by segment, ***really pleased with it***.

183. Also during the call, the Credit Suisse analyst asked "can you speak to the nature of the clinical net awards in the quarter in terms of what you saw from maybe a therapeutic in our customer perspective? ***Is there anything surprising or unusual to call out other than those 3 large[] [awards]***?" In response, Defendant Macdonald stated:

> Not really. I think a pretty well-balanced quarter. ***We got a lot of strength in the SMID. We're the leader in the SMID sector. So we expect that, but I think that's particularly strong for us this time. Good FSP awards***, as we mentioned, like you say, and a good contribution from large pharma.

184. On September 15, 2021, Defendant Macdonald attended an industry conference hosted by Robert W. Baird & Co., Inc., and addressed questions about "Second quarter bookings" in the Company's clinical segment:

> **[Question**:] ***Let's focus on clinical for a bit***. Second quarter bookings, I think it was a record by over $100 million. Book-to-bill the last few quarters, averaging over at 1.4. . . . ***Is there something wrong holding back revenue growth compared to reports of 35% to 55% among some of your peers this quarter. Talk to us a little bit about that revenue growth, and how you see that playing out over the next 12 months? And remind people the reasons why maybe on a pure constant dollar organic basis, you were at the – 20% is nothing to sneeze at, but why you were at the lower end this quarter***?
>
> * * *
>
> **[Macdonald**:] ***So we won a lot of work last year that sits' well in our backlog for the next few years, will help us drive growth through '20 – through the near future***.
>
> ***And then when we look at book-***to***-bill, I mean I appreciate your comments about bookings, but we also still have that conservative approach around FSPs***. . . .
>
> So we have a ***different approach***. We feel it's ***the right approach to do it more progressively***. ***We had a quarter at a time as we go***. And ***we take that slow and steady approach***. So book-to-bill is one thing, revenue pacing and conversion is another. But the real difference between – when you're looking at Syneos, you're seeing a CRO that's doing pretty much its regular work with a thin overlay of COVID work, mainly treatment work. When you're looking at some of the other numbers, it's got COVID vaccine trials in it, but also the COVID lab work. And if you look at where COVID labs are, just regular testing as well as central lab work, that revenue is massive. ***We don't have to recover from that. So our growth will continue at pace***. And we're pretty happy with where we sit in terms of what the mix of our backlog is and the position that we're in.

185. Also during the September 15, 2021 Baird Conference, Defendant Meggs touted the Company's business mix and backlog growth, stating "***we have a very good SMID mix in the business, and we continue to have that. Despite the fact we have really good backlog growth in clinical from top 20. Those are going to be the drivers as we move into 2022 and 2023***."

186. Defendants' statements on June 2, 2021, June 9, 2021, August 9, 2021 and September 15, 2021 (¶¶172-185), including that: the Company "***had a great bookings quarter. Very strong in clinical***" (¶179); "***[was] seeing a very robust environment from all sectors, both clinical, commercial, SMID and large in both sectors as well. So a good, healthy environment***"

(¶181); "***Clinical . . . achieving double-digit growth year-over-year as we continue to emerge from the COVID-19 pandemic . . . delivered another quarter of strong awards, powering record backlog levels and fueling our robust growth expectations over the balance of 2021***" (¶176); that the Company enjoyed "***great SMID performance in sales in quarter 4 and quarter 1, again, in quarter 2. That's starting to pull through into revenue as well in the back half***" (¶182); that Syneos's "***really good backlog growth in clinical from top 20 . . . are going to be the drivers as we move into 2022 and 2023***" (¶185); "for FSP services, we only included 12 months of services in our bookkeeping" (¶180); that the Company "***won a lot of [clinical] work last year that sits well in our backlog for the next few years, will help us drive growth through '20 – through the near future***" (¶184); the manner in which the Company accounts for and manages its new business awards and backlog (¶180); and regarding Syneos's Q2 2021 net new business awards, book-to-bill ratios, and backlog metrics (¶¶180, 184), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) Contrary to Defendants' assurances in (¶¶172-185), the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality

culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 58);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52, 53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality

clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶¶59, 249, 149-70).

(e) Syneos's quality and service failures (¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment, and inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by,

for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking (¶¶72-85), and contrary to Defendants' confirmation that they employ a "progressive," "steady," and "conservative approach around FSPs" (¶184);

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94, 95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶69, 70.

187. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

188. Defendants' statements on June 2, 2021, June 9, 2021, August 9, 2021, and September 15, 2021 (¶¶172-185), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

189. Defendants, taking advantage of Syneos's artificially inflated stock price, sold more than 40,923 shares of Syneos common stock for proceeds exceeding $3.6 million in July and August 2021. ¶¶280, 287, 293.

**H. Third Quarter 2021 Financial Results**

190. On November 3, 2021, Syneos issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's financial results for the quarter ended September 30, 2021 (the "Q3 2021 Release"). Defendants described the "Highlights" for the quarter to include:

- Third quarter revenue of $1,348.2 million increased 22.7% year-over-year.

- ***Clinical Solutions net new business awards of $1,353.8 million for the third quarter, representing year-over-year growth of 35.0% and a book-to-bill ratio of 1.30x, and $5,322.2 million for the trailing twelve months, representing year-over-year growth of 12.3% and a book-to-bill ratio of 1.39x***.

* * *

- ***Year-over-year ending backlog growth of 22.3% in Clinical Solutions*** and 24.9% in Deployment Solutions as of September 30, ***2021***.

- GAAP net income of $78.2 million increased from $63.4 million in the third quarter of 2020.

- Adjusted EBITDA of $202.6 million increased 10.8% year-over-year.

- GAAP diluted earnings per share of $0.75 increased from $0.60 in the third quarter of 2020.

- Adjusted diluted earnings per share of $1.22 increased 17.3% year-over-year.

- Closed the acquisition of StudyKIK, a leading technology-enabled clinical trial recruitment and retention company.

191. Defendant Macdonald was quoted in the Q3 2021 Release stating:

> "We delivered another strong quarter of results demonstrating the strength of our differentiated product development strategy and continued momentum in the market, exceeding the midpoint of our guidance across all financial metrics . . . . ***Our Clinical and Commercial teams again achieved double-digit growth fueled by strong demand for our innovative, integrated solutions, as demonstrated by our robust awards and backlog***. We also recently closed our acquisitions of StudyKIK, a clinical trial recruitment and retention company, and RxDataScience, a data analytics, data management and Artificial Intelligence company. These acquisitions will further enable Syneos Health to deliver new tech-enabled, insights-powered capabilities to customers helping us achieve our goal of shortening the distance from lab to life."

192. That same day, Syneos filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2021 ("Q3 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. The Q3 2021 Form 10-Q highlighted the Company's Clinical Solutions segment net

new business awards of $5,322.2 million and total net new business awards of $6,653.3 million for the twelve months ended September 30, 2021. The Q3 2021 Form 10-Q also stated that Syneos had an ending backlog of $12,014.2 million as of September 30, 2021, consisting of $11,281.4 million for Clinical Solutions, representing growth of 22.5% and 21.3%, respectively, compared to the same period in 2020.

193. In the Q3 2021 Form 10-Q's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards, which appeared in the Company's Q2 2020 Form 10-Q. *See* ¶104.

194. Later that day, on November 3, 2021, Syneos held a conference call to discuss the Company's financial results for Q3 2021 (the "Q3 2021 Earnings Call"). Defendants Macdonald, Meggs, Keefe, and Colvin presented on behalf of Syneos. Defendant Macdonald emphasized the Company's "strong" results in the quarter and discussed "key highlights," which included "robust year-over-year growth" and a "demand environment" that was "very healthy with strong pipelines":

> I am delighted to report another quarter of strong results, demonstrating the enthusiastic customer response to our differentiated product development strategy and our continued market momentum. We again exceeded the midpoint of our guidance across all financial metrics for the quarter. ***Our integrated offerings, those where we work across the product life cycle, fueled strong awards and backlog growth in both segments during this quarter. Both clinical and commercial continued their robust year-over-year growth in the quarter, and we now anticipate 2022 revenue growth rates above the midpoint we outlined during our investor event in December 2020.***
>
> ***The demand*** environment ***remains very healthy with strong pipelines ahead of us across our business in terms of RFPs, relationship discussions***, new drug approvals and demand for our innovative models based around the Syneos One approach.
>
> Now for the 3 key highlights from the quarter. First, ***overall net awards grew by 35.1% year-over-year. This performance drove third quarter book-to-bill ratios of 1.30x for Clinical Solutions and 0.89x for Commercial Solutions,***

> ***resulting in robust TTM book-to-bill ratios of 1.39x for clinical*** and 1.16x for commercial.

195. Macdonald further highlighted the Company's strong growth in the quarter during the Q3 2021 Earnings Call, stating:

> ***Clinical solutions revenue grew 23.9%*** compared to the third quarter of 2020. ***Our organic growth was driven by our full-service portfolio, including the continuing ramp-up in our larger pharma relationships, particularly in oncology as they gain full scale and efficiency. This was accompanied by rapid growth in our real-world and late-phase businesses. Our clinical team also closed another strong quarter of awards, particularly in the SMID segment. Driven by these strong sales, record ending backlog that is up 22.3% year-over-year and a record pipeline of new opportunities, Clinical Solutions remains well positioned for robust revenue growth into 2022 and beyond***.

196. During the Q3 2021 Earnings Call, Defendant Meggs also discussed the Company's financial performance:

> Our total revenue for the third quarter of 2021 was $1.35 billion, up 22.7% and 22% in constant currency compared to the third quarter of 2020, which was impacted by the COVID-19 pandemic. ***Our Clinical Solutions revenue for the third quarter was $1.04 billion, up 23.9% or 23.1% in constant currency compared to the third quarter of 2020. These increases were driven by growth in our full-service portfolio, including higher reimbursable expenses, the ramp in our larger pharma relationships and strength in our real-world and late-phase business***.

197. During the Q3 2021 Earnings Call, Defendant Macdonald addressed a question from Citi analyst Donnelly concerning the "visibility" and "confidence level" the Company has with respect to 2022:

> **[Macdonald**:] So yes, I think where we sit right now, ***good kind of backlog visibility through the whole year with*** both ***the – backlog that's coming through from clinical. We mentioned that we're winning a lot of oncology work. Obviously, that sets up for a long view of the pipe of the backlog, so you got a lot more visibility with that***.
>
> * * *
>
> ***So I think in 2021, more than 50% of the products that have been approved are going to market with the SMID owner still in the seat. And obviously***, the Syneos One model and the integrated commercial solution that we have is a very good

> model for those folks to take those products through to the market. So I think we see all that.
>
> ***We also see very strong pipelines in terms of RFPs, discussions we're having with customers, work that's coming our way in terms of FSP***. So it's really a nice setup right across the business. We're seeing it accelerate. And I think ***we just have a better look at 2022 in a healthier picture than we would normally see at this point***. So we're happy to let that confidence come through a little bit in bringing the guide up a little touch for 2020.

198. In response to a follow-up question from Donnelly asking about RFP "flows," Defendant Macdonald stated:

> ***I think the flow that we're seeing, RFP is strong across the board, both large pharma and SMID***. We've been really working on strategies to drive more penetration into the large pharma. That was one of the imperatives of the merger rights get that scale to get into large pharma, where that scale is important. So we're seeing that. We, I think, have ***the most compelling SMID offering in the market, and it's a healthy part of the market***. There's fluctuations always in the biotech funding index, but the SMID customers who got lot of cash on hand, and we don't see that as an issue as we go forward. ***And certainly, from the pipe that we see, that is certainly not an issue that they see either. So I think that setup is good***.

199. Defendants' statements on November 3, 2021 (¶¶190-98), including that (i) "***Clinical** . . . **again achieved double-digit growth fueled by strong demand for our innovative, integrated solutions, as demonstrated by our robust awards and backlog***" (¶191), (ii) "Our ***integrated offerings***, those where we work across the product life cycle, ***fueled strong awards and backlog growth*** in both segments during this quarter. Both clinical and commercial continued their robust year-over-year growth in the quarter . . ." (¶194), (iii) the clinical "demand environment remains very ***healthy with strong pipelines ahead of us*** across our business in terms of RFPs, relationship discussions," (¶194), (iv) "***Clinical solutions revenue grew 23.9%** . . . **organic growth was driven by our full-service portfolio***, including the continuing ramp-up in our larger pharma relationships, particularly in oncology as they gain full scale and efficiency" (¶195), (v) "Driven by these ***strong sales, record ending backlog*** that is up 22.3% year-over-year and a record pipeline of new opportunities, Clinical Solutions remains ***well positioned for robust***

***revenue growth*** into 2022 and beyond" (¶195), (vi) "where we sit right now, ***good kind of backlog visibility*** through the whole year with both the – ***backlog that's coming through from clinical***" (¶197), (vii) the manner in which the Company accounts for and manages its new business awards and backlog (¶¶194-97), and (viii) regarding Syneos's Q3 2021 net new business awards, book-to-bill ratios, and backlog metrics (¶192), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) Contrary to Defendants' assurances in (¶¶190-98), the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Far from having "***the most compelling SMID offering in the market***" (¶198), Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the

critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52-53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58-59.

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶58);

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, and toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58-59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three

to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82-83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate."

200. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business,

violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

201. Defendants' statements on November 3, 2021 (¶¶190-98), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### I. November 18, 2021 Jefferies Industry Conference, December 1, 2021 Evercore Industry Conference, and January 12, 2022 J.P. Morgan Industry Conference

202. On November 18, 2021, Defendant Macdonald attended and presented at the 2021 Jefferies London Virtual Healthcare Conference, during which he addressed questions about the Company's win rate:

> **[Question**:] Maybe thinking about the last 5-ish years, 4 to 5 years since the inVentiv, could you talk about how your win rate is changing? And if you care to – within those three cohorts would be interesting. . . .
>
> **. . . [Answer**:] ***[T]he win rate for us*** has ***been very strong in both sectors. You've seen, I think, an improvement overall over the last few years of the consistency and the scale of our book-to-bill that's driving the growth in the company. We're particularly pleased with the win rates that we see across the SMID and ensuring that we're very compelling there***.

203. On December 1, 2021, Syneos presented at the Fourth Annual Evercore ISI HealthCONx Virtual Conference, during which Defendant Meggs emphasized the "demand environment" for Syneos's services, stating:

> ***And you see some of that in our numbers with our book-to-bill in both businesses on clinical being at 1.39 at the end of September and being at 1.16, both on a trailing 12-month basis for commercial. So it continues to be strong. Pipelines at or near record levels, RFP flows good, really good across all***

> ***customer segments. So end of the day, feel good about the demand environment at this time***.

204. During the same conference, Defendant Meggs spoke about the Company's strong oncology capabilities, addressing the Company's backlog, stating:

> Well we've just – we've won – if you think back to when we started talking about our large pharma partnerships that we've won in 2018, 2019, et cetera, a lot of those were oncology-focused, ***and you're starting to see that backlog build and come through and the projects lengthen*** and there with large pharma tends to be larger Phase IIIs, and those take a longer period to run, et cetera. So it extends out your burn rate. And then legacy businesses were really good in early phase oncology. And that has been something that we've always been really good at and continue and that's a lot of what comes through from a SMID perspective when we're in that early phase oncology realm.
>
> ***So both areas, we're really strong at now. We have good customer relationships, good capabilities, good pipelines, and that's just resulting in that business becoming a larger piece of our portfolio***. And that is resulting in the weighted average study period extending out. And we're also seeing that go into Asia and Europe, where a lot of large pharma customers want to go.

205. On January 12, 2022, at the J.P. Morgan 40th Annual Healthcare Conference 2022, Defendant Macdonald talked about the Company's "very healthy" growth, stating:

> So if you move ahead to Slide 5, where is all that effort, where does all that work led [sic] us? ***And I think you'll see on the next slide here, the setup of the organization, really 77% of our revenue now comes from clinical, the rest from commercial. 19.8% year-to-date revenue growth, 22.3% ending growth, very healthy, very balanced across SMID and large pharma and the ne[x]t 12 months – trailing 12 months [book to bill] in the 1.39, very strong, very aggressive, very consistent***. And I think we've done a good job with that.

206. Defendants' statements on November 18, 2021, December 1, 2021, and January 12, 2022 (¶¶202-205), including that: (i) the Company's "***win rate for us has been very strong*** in both sectors. You've seen, I think, an improvement overall over the last few years of the consistency and the scale of our ***book-to-bill that's driving the growth*** in the company. We're particularly pleased with the ***win rates that we see across the SMID*** and ensuring that we're very compelling there" (¶202); (ii) "***we're really strong at now. We have good customer relationships, good***

***capabilities, good pipelines, and that's just resulting in that business becoming a larger piece of our portfolio***" (¶204); (iii) "***77% of our revenue now comes from clinical . . . 19.8% year-to-date revenue growth, 22.3% ending growth, very healthy, very balanced across SMID and large pharma . . . trailing 12 months [book to bill] in the 1.39, very strong, very aggressive, very consistent***" (¶205); and (iv) regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics (¶202), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) Contrary to Defendants' assurances in (¶¶172-185), the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 58);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-

19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52, 53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶¶59, 249);

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment, and inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59, 66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three

to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94, 95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate."

207. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business,

violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

208. Defendants' statements on November 18, 2021, December 1, 2021, and January 12, 2022 (¶¶202-205), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**J. Fourth Quarter and Full Year 2021 Financial Results**

209. Then, on February 17, 2022, Syneos filed a release on Form 8-K disclosing the Company's financial results for the fourth quarter and full year results for 2021 (the "Q4 2021 Release"). In direct contradiction to the Company's prior claim that reimbursable expenses would recover and accelerate in 2022, the Q4 2021 Release revealed that reimbursable expenses would "remain lower relative to pre-pandemic levels." As a result, Syneos segregated reimbursable expenses from "certain key operating metrics," revealing that $3.8 billion of the Company's Clinical Solutions backlog (36%) was comprised of reimbursable expenses and providing an alarmingly low book-to-bill ratio of just 0.34x in the segment when such expenses were included. On the corresponding conference call, Meggs provided additional information regarding the inability of Syneos to collect reimbursable expenses, stating in pertinent part as follows:

> Since the start of the COVID-19 pandemic, we have experienced lower reimbursable expenses as remote monitoring and other DCT approaches have become a more prevalent part of our clinical trials. This decrease in reimbursable expenses is primarily due to items such as lower travel interest for our staff, due to sustained levels of remote monitoring, investigator meetings remaining virtual and reduce costs for study medications.

We are at the forefront of this transition with our customers and sites and given the long-term benefits it provides, we expect this trend to continue. As such, we have proactively adjusted our ending backlog to reflect our expectation of reduced reimbursable expenses going forward, mirroring what we are seeing across our existing portfolio as well as in our new awards.

210. The Q4 2021 Release also provided "Highlights" for the quarter:

- Fourth quarter revenue of $1,373.4 million increased 20.5% year-over-year.

***Clinical Solutions net new business awards and book-to-bill*** ratios:

  - ***Including reimbursable out-of-pocket expenses, $357.1 million for the fourth quarter, a year-over-year decline of 72.9% and a book-to-bill ratio of 0.34x, and $4,362.6 million for the trailing twelve months, a year-over-year decline of 7.9% and a book-to-bill ratio of 1.09x***.

  - ***Excluding reimbursable out-of-pocket expenses, $895.5 million for the fourth quarter, a year-over-year decline of 1.5% and a book-to-bill ratio of 1.26x, and $3,579.5 million for the trailing twelve months, year-over-year growth of 17.5% and a book-to-bill ratio of 1.34x***.

* * *

***Year-over-year ending backlog*** growth:

  - ***Including reimbursable out-of-pocket expenses, 2.9% in Clinical Solutions and 20.9% in Deployment Solutions as of December 31, 2021***.

  - ***Excluding reimbursable out-of-pocket expenses, 15.4% in Clinical Solutions and 25.8% in Deployment Solutions as of December 31, 2021***.

- GAAP net income of $76.0 million decreased 17.3% from $91.9 million in the fourth quarter of 2020.

- Adjusted EBITDA of $237.0 million increased 21.6% year-over-year.

- GAAP diluted earnings per share of $0.72 decreased 17.2% from $0.87 in the fourth quarter of 2020.

- Adjusted diluted earnings per share of $1.48 increased 33.3% year-over-year.

- Announced Full Year 2022 guidance.

211. Defendant Macdonald was quoted in the Q4 2021 Earnings Release and emphasized the Company's "[s]trong" quarter, adding that the "market for our services remains strong:"

> "***Strong fundamentals and execution across our business, combined with innovative, integrated clinical and commercial capabilities enabled by data and technology, drove robust earnings and cash flow growth in the fourth quarter and full year 2021 . . . The market for our services remains strong***, driven in part by customer adoption of our unique product development strategy, new drug approvals and biotech funding."

212. On February 17, 2022, Syneos filed with the SEC its annual report for the fiscal year ended December 31, 2021, on Form 10-K ("2021 Form 10-K"), which was signed by Defendants Macdonald and Meggs. In the 2021 Form 10-k's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards, which appeared in the Company's 2020 Form 10-K. ¶141.

213. Furthermore, the 2021 Form 10-K highlighted the Company's Clinical Solutions segment net new business awards of $4,362.6 million and total net new business awards of $5,732.7 million for the 12 months ended December 31, 2021. The 2021 Form 10-K also stated that Syneos had an ending backlog of $11,427.6 million as of December 31, 2021, consisting of $10,567.3 million for Clinical Solutions, representing growth of 2.9% and 4.1%, respectively, compared to the same period in 2020.

214. The 2021 Form 10-K also described Syneos's "'preferred provider'" customers, championed Syneos's "***leading position for serving customers across the SMID category***," and highlighted "strong SMID demand, as evidenced by double-digit growth in our request-for-proposal volumes in 2021 as compared to 2020":

> We have several customers with whom we have achieved "preferred provider" or strategic alliance relationships. We define these customers as relationships from which we generate significant revenue and where we have executed master service agreements in addition to regularly scheduled strategy meetings to discuss the status

> of our relationship, and for which we serve as a preferred supplier of services. We have also entered into strategic agreements with small to mid-sized ("SMID") biopharmaceutical companies to develop their full portfolio of products from early clinical development through commercialization. We believe these relationships provide us enhanced opportunities for more business, although they are not a guarantee of future business. ***Our 2020 acquisition of Synteract further enhanced our leading position for serving customers across the SMID category, diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment. We continue to experience strong SMID demand, as evidenced by double-digit growth in our request-for-proposal volumes in 2021 as compared to 2020***.

215. On February 17, 2022, Syneos held a conference call with analysts and investors to discuss the Company's earnings for the fourth quarter and full year 2021 (the Q4 2021 Earnings Call"). Defendants Macdonald and Meggs presented on behalf of Syneos. During the Q4 2021 Earnings Call, Defendant Meggs downplayed the significance of the erosion in Syneos's reimbursable expenses and claimed that overall client demand remained unchanged, stating: "***These adjustments only impact our outlook for reimbursable expenses, not our view of underlying demand or profitability. We, therefore, remain confident in our expectations for strong growth and profitability in 2022***." Macdonald similarly reassured investors that "***[t]he demand environment remains healthy, both in terms of macro market dynamics and robust new business pipelines across our organization***." Macdonald continued: "Importantly, we remain confident in our expectations for low-double-digit clinical revenue growth for 2022, excluding the impact of reimbursable expenses, along with continued margin expansion."

216. On this news, the price of Syneos common stock fell from $83.37 per share on February 16, 2022 to $79.36 per share on February 17, 2022, a decline of more than $4 per share, or nearly 5%, on above-average trading volume of approximately 1.8 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

217. Despite revealing that reimbursable expenses would "remain lower," Defendants' statements on February 17, 2022 (¶209), including that: (i) "***We continue to experience strong SMID demand, as evidenced by double-digit growth in our request-for-proposal volumes***" (¶214); (ii) "***adjustments only impact our outlook for reimbursable expenses, not our view of underlying demand or profitability***" (¶215); (iii) Syneos still enjoyed its "***leading position for serving customers across the SMID category***" (¶214); the (iv) "***acquisition of Synteract further enhanced our leading position for serving customers across the SMID category, diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment***; (¶214) and (v) regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics (¶210), were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) Contrary to Defendants' assurances in (¶¶209-215), the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶4-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52-53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58-59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they

were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶58);

(e) Syneos's quality and service failures ((¶¶49-70), workforce retention problems, organizational and leadership problems and, toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58-89);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or

undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-95. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83. As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate." ¶¶69-70.

218. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos

was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business, violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

219. Defendants' statements on February 17, 2022 (¶¶210-15), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### K. First Quarter 2022 Financial Results, Second Quarter 2022 Financial Results, and September 13, 2022 Baird Industry Conference

220. On April 29, 2022, Syneos issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's financial results for the quarter ended March 31, 2022 ("Q1 2022 Earnings Release"). The Q1 2022 Earnings Release provided "Highlights" for the quarter:

- Revenue for the first quarter of $1,336.3 million increased 10.5% on a reported basis and 11.7% on a constant currency basis year-over-year.
- ***Clinical Solutions*** net ***new business awards and book-to-bill ratios***:
  - ***Including reimbursable out-of-pocket expenses, $1,241.9 million for the first quarter, year-over-year growth of 1.6% and a book-to-bill ratio of 1.22x, and $4,392.9 million for the trailing twelve months, a year-over-year decline of 7.1% and a book-to-bill ratio of 1.07x***.
  - ***Excluding reimbursable out-of-pocket expenses, $912.7 million for the first quarter, year-over-year growth of 20.3% and a book-to-bill ratio of 1.32x, and $3,743.4 million for the trailing twelve months, year-over-year growth of 22.6% and a book-to-bill ratio of 1.37x***.

* * *

- Year-over-year ending backlog growth:

  - ***Including reimbursable out-of-pocket expenses, 2.5% in Clinical Solutions and 21.7% in Deployment Solutions as of March 31, 2022***.

  - ***Excluding reimbursable out-of-pocket expenses, 16.6% in Clinical Solutions and 26.4% in Deployment Solutions as of March 31, 2022***.

  - GAAP net income of $46.2 million increased 19.2% from $38.7 million in the first quarter of 2021.

  - Adjusted EBITDA of $173.6 million increased 14.9% year-over-year.

  - GAAP diluted earnings per share of $0.44 increased 18.9% from $0.37 in the first quarter of 2021.

  - Adjusted diluted earnings per share of $1.01 increased 27.8% year-over-year.

- Updated full year 2022 guidance.

221. Defendant Macdonald was quoted in the Q1 2022 Earnings Press Release stating:

> "***Strong fundamentals and execution***, powered by innovative data and technology insights drove robust earnings and profitability growth in the first quarter . . . . Our product development expertise is enabling us to deliver against our strategy and accelerate customer success. ***We expect continued growth*** propelled by customer adoption of our integrated solutions, recent acquisitions, and comprehensive Syneos One and Medical Affairs offerings."

222. Also on April 29, 2022, Syneos filed a current report on Form 8-K announcing Defendant Macdonald's departure from Syneos effective July 1, 2022, naming Defendant Keefe as Macdonald's successor. The Form 8-K stated in relevant part:

> On April 28, 2022, the Board of Directors (the "Board") of Syneos Health, Inc. (the "Company") appointed Michelle Keefe as the Company's Chief Executive Officer and as a Class I director, each effective as of April 29, 2022 (the "Effective Date"), succeeding Alistair Macdonald, who resigned from both positions as of the Effective Date. Also as of the Effective Date, Michael Brooks was appointed to serve as the Company's Chief Operating Officer.

* * *

> In connection with Mr. Macdonald's resignation, he will serve as an advisor to the Board and CEO through the end of March 2023. Mr. Macdonald will become a consultant to the Company effective July 1, 2022. The ***Company*** (or a subsidiary) and Mr. Macdonald entered into (i) an agreement memorializing the terms of his continued employment as an advisor, including continued vesting of certain Company equity awards (the "Separation Agreement") and (ii) a Consulting Agreement (the "Consulting Agreement") that provides for a fixed fee of £150 per hour and continued vesting of certain Company equity awards held by him during the 12-month consulting period, as well as customary restrictive covenants.

223. On April 29, 2022, Syneos also filed with the SEC its quarterly report for the quarter ended March 31, 2022, on Form 10-Q ("Q1 2022 Form 10-Q"). The Q1 2022 Form 10-Q highlighted the Company's Clinical Solutions segment net new business awards of $4,392.9 million and total net new business awards of $5,792.5 million for the 12 months ended March 31, 2022. The Q1 2022 Form 10-Q also stated that Syneos had an ending backlog of $11,634.1 million as of September 30, 2021, consisting of $10,772.3 million for Clinical Solutions, representing growth of 2.5% and 3.7%, respectively, compared to the same period in 2021.

224. In the Q1 2022 Form 10-Q's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards, which appeared in the Company's Q2 2020 Form 10-Q. *See* ¶104.

225. Later that day, on April 29, 2022, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts to discuss the Company's financial and operational results for Q1 2022. During his prepared remarks, Macdonald stated that Syneos continued to enjoy robust demand, stating in pertinent part as follows:

> ***Demand for our high-value solutions from development through commercialization remains healthy with robust new business pipelines across our organization. We continue to see sustained strong demand across all customer segments, including SMID customers, where RFP flow year-to-date exceeds the strong levels of 2021 and are well above pre-COVID levels. In addition, we are seeing more opportunities for preferred provider relationships with larger pharma customers as the impacts of the pandemic subside. This continued strong awards and backlog growth positions us for sustained long-term growth. We***

> ***remain confident in the growth we have previously outlined for 2023 as we execute on our value-creation plan***.

226. Later in the call, Defendant Macdonald represented that the Company was not experiencing significant cancellations or delays among its customer base, successfully engaging with customers, and delivering the Company's comprehensive product offerings, stating in pertinent part as follows:

> ***We see that is still pretty strong. It's moving along. We have good engagement with customers***, I think the fact that we're able to take those customers with a very different model now with Syneos One ***wrapped*** around it, the ability to go end to end. And we look at the private funding in the biotech space, the big equity houses putting money to work through their biotech, et cetera.
>
> * * *
>
> ***But for us, those channels combined are healthy. I think they're showing good growth against where we've been in the past even when we look back at 2021, which had a lot of the COVID catch-up in it, we're seeing the pipeline is equivalent to that. So we're not concerned by that. Add to that the fact that we're breaking in more and more to the large pharma, getting new relationships there, adding anchor tenants to the backlog through that. It's a very healthy picture for us. So funding environment, fine; good engagement with the customers. We're not seeing that as an issue at all***.

227. On June 8, 2022, Syneos presented at the Jefferies LLC 2022 Global Healthcare Conference held in New York, New York. During the conference, Steven Couche, a securities analyst at Jefferies, inquired about the Company's SMID clients, asking "If the funding environment remains muted, what steps can you take as an organization to protect yourself from any sort of flow-through to demand?" In response, Defendants Keefe and Meggs stated:

> **[Keefe**:] ***So we have spent the last couple of weeks really looking at that closely. I think the number 1 thing we're doing is diversifying to large pharma, right? I think that is absolutely going to be a great protective mechanism***. But we have looked at our exposure to what we would call pre-revenue biotech. And our exposure is low, right? It's about 13% of our backlog. But when you actually look at that makeup, it's single digits that would rely on the capital markets, right? The – about half of them are already very well funded from private, like a Blackstone or a vein [ph]. So it is a small amount.

> But we have – I'll let Jason tell you the analysis he did, ***but the punchline on the analysis***, and I'll let Jason give you the details, is that ***if there was a protracted issue with biotech funding over 3, 4, 5 quarters, what would that mean to our growth in Clinical? Because this is a Clinical-specific thing. Our growth in Clinical, we believe would still be mid-single digits next year. But I'll let Jason give you a little more color on how he has looked at it***?
>
> **[Meggs**:] Yes. Thanks, Michelle. So we really – I mean, more and more of the conversations getting into just global economic impacts, right? Versus just a biotech funding discussion. ***So what we're really looking at is if we were to see, for whatever reason, elevated cancellations, lower SMID awards, non-pre revenue biotech or just core SMID, lower order delays, whatever it might be because of the economic situation. What would it look like if our book-to-bills were below 1, 2 for 3 or 4 quarters or our burn rate were to extend out given delays over where it is for 2022.***
>
> And as Michelle said, when you look at a book-to-bill of 1 or 1:1 over 3 or 4 quarters or the backlog burn rate extending, you get into that mid-single digit versus the 7% to 10% growth that we put out there for 2023. ***But right now, based on what we've seen, right, whether it's the pipeline of opportunities, it's the awards that we have and the backlog growth that we have year-to-date, which is 16-plus percent. We just don't see it. So we're still comfortable with 7% to 10%, but it would be mid-single digits if we had that sustain from here impact***.

228. Defendants' statements on April 29, 2022 and June 8, 2022 (¶¶220-22, 223-27), including that: (i) "Demand for our high-value solutions from development through commercialization remains healthy with robust new business pipelines across our organization" (¶225); (ii) "Strong fundamentals and execution, powered by innovative data and technology insights drove robust earnings and profitability growth in the first quarter" (¶221); (iii) based on what we've seen . . . whether it's the pipeline of opportunities, it's the awards that we have and the backlog growth that we have year-to-date, which is 16-plus percent … we're still comfortable with 7% to 10%" growth (¶227); (iv) Syneos would still experience "mid-single digits" growth even if the Company suffered from "elevated cancellations, lower SMID awards non-pre revenue biotech or just core SMID, lower order delays, whatever it might be because of the economic situation" and (v) regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics (¶220, 223, 224), continued to be materially false and/or misleading when made

and omitted to disclose material facts necessary to make the statements made not misleading. Defendants failed to disclose the following adverse facts pertaining to the Company's business, operations, financial condition, and financial performance, which were known to Defendants or recklessly disregarded by them as follows:

(a) Contrary to Defendants' assurances in (¶¶221, 225-27), the Company's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers, as described above (¶¶49-70). Indeed, by mid-2020 and continuing through the Class Period, Syneos's known and persistent qualitative issues were having devastating consequences on its clinical business, clients were placing Syneos business on "hold" due to Syneos's lack of a "quality culture," and would not make additional business available to the Company until it cured its "delivery failures," and "earned back trust." (¶¶53, 66);

(b) Syneos was suffering from acute competitive disadvantages, including with respect to technology, that prevented the Company from winning new business and retaining existing customers. As clinical trials moved to remote monitoring and decentralized administration: (i) Syneos failed to adapt to changing business demands in the wake of the COVID-19 and lacked the critical tools necessary to successfully run remote and decentralized trials, such as certain data visualization, statistical modeling capabilities, and the client data portal Defendant Macdonald had sponsored but never delivered (¶¶49-70); (ii) Syneos failed to timely implement a technology-enhanced delivery model that its customers demanded (*i.e.*, a client portal) (¶¶59-63); and Syneos's existing operating model was ladened with complexities, redundancies, and layers of unnecessary work for its customers (¶59), all of which led to Syneos's inability to respond with

agility to its clients' needs and impaired the Company's ability to fulfill its contractual obligations. ¶¶52, 53, 58, 66. As a result, Syneos lost existing business and was unable to secure new post-revenue and renewal SMID business from customers, who were acutely aware of the Company's quality issues and data limitations. ¶¶52, 58, 59;

(c) Syneos's performance capabilities had been materially impaired by workforce problems and high turnover stemming from leadership failings, operational changes, a toxic culture, and labor force turmoil which impacted the Company's ability to properly service its clinical customers and produce quality clinical data, maintain relationships with current customers, and generate and secure new business opportunities. ¶¶54-57, 59-66. The Company's toxic work culture and workforce turmoil was caused in part by Defendants Colvin's and Meggs's directive to find backlog at all costs (*e.g.*, "find it" (¶71)) to the exclusion of producing quality clinical solution services (¶¶49-70), and contributed to high turnover, exacerbating the Company's critical quality failures. ¶¶54-57. Even as Syneos brought on otherwise qualified people, they were unable to retain project managers because of the poor management, lack of training, "zero guidance" and improper focus on building backlog. ¶56. The lack of support and training led to horrible turnover across the Board, including with critical Project Managers and CRAs (Clinical Research Associates), as described above. ¶¶57;

(d) Syneos struggled to integrate acquisitions made before and during the Class Period, including Synteract, leading to a bloated and confused organizational structure. Syneos's rapid growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups. ¶¶59. For example, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos

lost approximately 30%-40% of Synteract customers. Indeed, after the Class Period, Defendant Keefe admitted Syneos had not "consistently integrated," "technology" and "acquisitions," impacting Syneos's ability to "be competitive." (¶58);

(e) Syneos's quality and service failures (¶¶49-70), workforce retention problems, organizational and leadership problems, toxic work environment (¶¶54-57), inability to respond to customers' needs and expectations and inability to offer technology-based solutions such as a client portal (¶¶59-70), and inability to provide its customers with quality clinical trial data (¶¶54-57, 59,-66) were causing the Company to lose significant business and fail to secure new business, as described above (¶¶52, 58, 59);

(f) the Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratios by, for example, (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶72-85;

(g) Defendants artificially inflated Syneos's reported backlog by at least $500 million by including in backlog revenue, including reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶94-85. Defendants manipulated estimated costs to alter percentage-of-completion targets and overestimate future revenues from long-term contracts including reimbursable expense figures which were entered directly into backlog. ¶¶76, 82, 83.

As a result, the Company's reported backlog, net new business awards, and book-to-bill ratios were all overstated. Furthermore, Syneos failed to properly reduce backlog including reimbursable out-of-pocket expenses as contacts were delayed or canceled, because doing so would adversely impact the Company's net new business awards and book-to-bill ratios. ¶¶83-86; and

(h) As a result of ¶¶49-70 above, Syneos's reputation as a competent and reliable Contract Research Organization was severely damaged in the marketplace causing the Company's net new business awards and win rates to severely decline. Indeed, in February 2023, months after the end of the Class Period, Defendant Keefe admitted that Syneos needed to "improve [its] win rates," confirming that the Company "still" had "work to do to improve [its] overall win rate."

229. Defendant Meggs, taking advantage of Syneos's artificially inflated stock price, sold 7,500 shares of Syneos common stock for proceeds of almost $550,000 in July 2022. ¶298.

230. Then, on August 2, 2022, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended June 30, 2022 (the "Q2 2022 Release"). The Q2 2022 Release revealed substantial deterioration in the Company's business, disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34% including reimbursable expenses and 15% excluding reimbursable expenses, reflecting book-to-bill ratios of 0.94x and 1.29x, respectively. In addition, the Q2 2022 Release revealed that Syneos would not achieve even its lowered expectations for reimbursable revenues for the year, causing the Company to slash expected 2022 revenues by $185 million at the midpoint.

231. The Q2 2022 Release stated that Syneos was still on track to achieve 2022 revenues within a range of $5.44 billion to $5.54 billion. The Q2 2022 Release also stated that Syneos had achieved a book-to-bill ratio of 0.94x including reimbursable expenses and 1.29x excluding

reimbursable expenses, respectively. The Q2 2022 Release also stated that Syneos had a quarter-ending backlog in its Clinical Solutions segment of $6.98 billion excluding reimbursable expenses.

232. That same day, Syneos filed a quarterly report on Form 10-Q for the quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q"), which was signed by Defendants Keefe and Meggs. The Q2 2022 Form 10-Qhighlighted the Company's Clinical Solutions segment net new business awards of $5,301.8 million and total net new business awards of $3,901.5 million for the twelve months ended June 30, 2022. The Q2 2022 Form 10-Q also stated that Syneos had an ending backlog of $11,456.0 million as of June 30, 2022, consisting of $10,634.4 million for Clinical Solutions, representing declines of 2% and 3.1%, respectively, compared to the same period in 2021.

233. In the Q2 2022 Form 10-Q's Management Discussion & Analysis, Defendants repeated the description of the Company's backlog and new business awards, which appeared in the Company's Q2 2020 Form 10-Q. *See* ¶104.

234. On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, ***a decline of nearly $14 per share***, or ***over 17%***, on above-average trading volume of 3.2 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues.

235. Also on August 2, 2022, Defendants Keefe, Meggs, and Michael Brooks, Syneos's COO hosted a conference call with analysts to discuss the Company's financial and operational results for Q2 2022. During the call, Keefe reassured investors that "***[m]arket demand is healthy***" and that management remained "confident" in their ability "***to drive clinical growth***," which

Meggs reinforced: "***As Michelle [Keefe] said, healthy pipelines, good backlog growth, healthy end market***."

> "***Market demand is healthy, and our pipeline of opportunities remains comparable to 2021. Specific to our clinical SMID portfolio, our total pipeline of opportunities is up double digits compared to 2021, and we had record net awards during Q4 '21 and Q1 '22***."

236. The statements referenced in ¶¶230-33 above were materially false and/or misleading when made because they failed to disclose the adverse facts pertaining to the Company's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them, as detailed in ¶¶49-86, *supra*.

237. On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses.

238. That same day, on September 13, 2022, Defendants Keefe and Meggs attended and addressed investors and analysts at the Baird 2022 Global Healthcare Conference. During the conference, Defendants Keefe downplayed the delays in near-term awards and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were delaying contract awards.

239. Syneos was exposed to material undisclosed risks and adverse trends that had resulted in, and would continue to result in, the loss of existing business and a failure to secure new post-revenue and renewal SMID business. And Defendants' failure to disclose that Syneos was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, declining reimbursable expenses, an inability to be agile in meeting customer needs and execute on existing contracts, and from an erosion of new business,

violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in Syneos speculative or risky.

240. On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volumes of approximately 1.7 million shares traded on September 12 and 2 million shares traded on September 14. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues as detailed in ¶¶49-70, *supra*.

**L. Third Quarter 2022 Financial Results**

241. Then, on November 4, 2022, Syneos released its financial results for the quarter ended September 30, 2021 (the "Q3 2022 Earnings Release"), revealing that Syneos's book-to-bill ratios had plummeted far below even the reduced figures provided in September 2022. Specifically, its Clinical Solutions segment had achieved net new business awards of $182 million including reimbursable expenses – ***a startling year-over-year decline of 86.5%*** – and a book-to-bill ratio of just 0.18x for the quarter, which was just one-tenth of the expected new business growth. And the Company's Clinical Solutions backlog plummeted 13.6% year-over-year to just $9.747 billion including reimbursable expenses, or by 2.5% year-over-year to $6.44 billion excluding reimbursable expenses. Syneos also slashed its anticipated 2022 revenues by $160 million.

242. On November 4, 2022, Syneos Health conducted a conference call with securities analysts to discuss the devasting results for third quarter of 2022 ("Q3 2022") reported by the Company. Although Defendants were well aware throughout the Class Period of the undisclosed turmoil wreaking havoc on Syneos's operations and financial performance, Defendants disclosed to investors for the first time that underlying demand issues that were "specific to Syneos" caused the Company's win rate to plummet. Defendant Keefe revealed for the first time that "a number of leadership and organizational changes within strategic business development over the last 18 months" caused Syneos's operations to experience undisclosed turmoil. As a result, Defendant Keefe revealed that not only had the Company's win rate declined but also that Syneos was unable to convert its bloated backlog to revenue that existing customers were delaying decisions to retain Syneos. Even worse, Defendant Keefe revealed that the Company's request for proposal ("RFP") process had slowed significantly and that existing customers for whom Syneos has already completed work including clinical trials were not willing to re-sign with the Company.

243. During the November 4, 2022 conference call, Defendant Keefe revealed for the first time what insiders at the Company had known since before the beginning of the Class Period that the horrendous quality problems plaguing the Syneos's ability to deliver on its clinical operation model to produce outstanding clinical trials data damaged the Company's reputation with its hallmark SMID customers. Defendant Keefe admitted that these problems negatively impacted the Company's ability to win repeat business. Defendant Keefe further admitted that the Company's book-to-bill ratio was one-tenth the size from a year prior. As to customer delays, Defendant Keefe also admitted that the Company did not have visibility as to when those delays could be repaired such that the Company would realize revenue.

244. During the November 4, 2022 conference call, Defendant Keefe further admitted that the Company had failed to timely implement a technology-enhanced delivery model that its customers demanded. Specifically, Keefe stated that Syneos's "SMID customers are clear that they want Syneos . . . to deliver therapeutic insights, but with enhanced agility," and to that end Syneos was "working to reduce the complexity of our full-service operating model [and] streamline our organization and processes" in order to provide "an efficient and effective delivery model supported by . . . technology enhancements." However, as Keefe "put it plainly, it has been more extensive and taken longer than we expected" and "[a]s a result, we did not evolve our business development capabilities to fully leverage our integrated solutions or effectively engage our customers within the current competitive environment." Keefe added that Syneos was still "strengthening our approach . . . to design the best delivery strategy for each customer opportunity, enabled by technology and shared insights." Michael Brooks, Syneos's Chief Development Officer, added that Syneos was "removing redundancies and layers within the organization that . . . historically had gotten in the way of exceptional delivery."

245. Keefe further clarified that poor results and lower revenue were not just caused by delays in decisions, but were driven by a "reduction in awards from post revenue SMID" as well as "a reduction in our normal ***repeat*** business awards" which "were down probably somewhere between 30% and 50%." And she further admitted that awards losses for repeat business were caused by Syneos's lack of agility and failure to "***integrat[e] all the great capabilities we've developed and acquired over the last 12 to 18 months, consistently into our good defenses and our relationships with those customers***."

246. Analysts reacted with shock at the results and skepticism at the purported explanations. One analyst referring to Syneos's dreadfully low book-to-bill ratios, stated: "We've

never seen that happen." Another complained "I don't even know where to start with this," stating that management's claim that Syneos was not experiencing significant cancellations was "frankly hard to believe . . . given that pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected . . . it just doesn't feel reasonable." Analysts continued to react negatively in subsequent written reports. For example, Barclays called Syneos's disclosures "very disappointing," citing a "miss across the board" and Mizuho stated the results were "worse than expected."

247. On this news, the price of Syneos common stock fell from $47.81 per share on November 3, 2022, to $25.70 per share on November 4, 2022, a decline of more than $22 per share, or 46%, on abnormally high trading volumes of 7.4 million shares traded.

248. Then, on December 1, 2022, Defendant Keefe presented at the Evercore ISI HealthCONx Conference and made further post-Class Period admissions regarding the undisclosed turmoil that affected Syneos's operations throughout the Class Period. During that conference, Defendant Keefe answered numerous questions from the Evercore securities analyst Elizabeth Anderson and provided information about the problems at Syneos. Defendant Keefe admitted that Syneos was plagued by its failure to deliver quality clinical trials and had lost its ability to engage with its hallmark SMID customers because of leadership and organizational changes that severed the ties between leadership and business development. As a result, Syneos lost its ability engage with existing customers and its win rate with these customers plummeted. In addition, due to ongoing quality problems and the resulting reputational damage, Defendant Keefe admitted that existing customers decision delays skyrocketed.

249. During the December 1, 2022, Evercore conference Keefe admitted that Syneos needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Keefe

stated that "Clinical Reimagined," was one of the Company's "steps in place to address the post-revenue SMID cohort." However, Keefe stated "it's taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace." Keefe further stated that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market." In response to a question concerning the Company's "sudden reduction in . . . win rate," Keefe deflected and lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was "on the right track to be competitive," after the "roll[] out" of the "new model," *i.e.*, Clinical Reimagined. Keefe reiterated this sentiment later in the call, commenting that she felt like a "broken record," stating "Clinical Reimagined is really on the right track to help us be more competitive for sure."

250. Further still, on February 16, 2023, COO Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these capabilities, which Syneos lacked throughout the Class Period, allowed clients to "g[e]t a really good benefit from now having good data visualization, seeing into their projects and being able to see the modeling out of various new things, like site activations, enrollment and data." The same day, Keefe admitted that the Company was in the process of "transforming our clinical operating model," in order to "clos[e] competitive gaps," stating that "[f]oundational to these improvements have been investment and accelerated development of clinical development tools and data applications, ranging from statistical modeling for site performance and enrollment to use of AI machine learning to better detect risks and issues."

In response to a question from Eric Coldwell, an analyst at Baird, concerning "obvious signs of share loss," Keefe stated that "we understand the position we're in, and we know we have to improve our RFP volume. We have to improve our win rates . . . we need to convert the more high-value opportunities. So we know those are the things we need to do, to stay competitive in the marketplace."

## VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

251. As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such false and misleading statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws.

252. ***Defendants Were Aware of Information Contradicting Their Statements to Investors***. The Individual Defendants served as the Company's CEO (Macdonald and Keefe) and CFO (Meggs) or as President of Syneos's Clinical Solutions segment (Colvin). ¶¶30-34. Because of their high-ranking positions with the Company, they were responsible for, and remained well-informed of, issues critical to the Company's success.

253. The Individual Defendants were each provided with statements and other information alleged herein to be false and misleading or omitted material information prior to its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected, as follows:

(a) Defendants Macdonald, Meggs, Keefe, and Colvin, the most senior members of the Executive Leadership Team, were present at monthly ELT Meetings during which

Syneos's inability to provide quality services, utilize critical technological tools, clinical as well as workforce turnover issues, were discussed. ¶¶7, 30-34, 53, 64-66. The purpose of these meetings was to plan, facilitate, and review the status of the Company's strategic initiatives. ¶64. For example, as explained above (¶¶7, 49, 52-53, 64-66), the Individual Defendants were each members of the ELT and attended monthly ELT meetings, including a January 2021 meeting where they were provided with and discussed a PowerPoint presentation belying the accuracy of their statements about the health of Syneos's Clinical Solutions business.[4] Among other things, the presentation indicated that by the end of 2020 and into 2021, numerous clients had put Syneos business awards on "hold," and Syneos was unable to secure new business until it addressed its lack of a "quality culture," cured its "delivery failures" and "earned back trust." ¶¶7, 66. Defendants knew that Syneos was at risk of losing other clients due to its inability to deliver the clinical monitoring and project management services it promised to provide. Aware of these issues as early as November 2020, the Company had already identified its quality control problems and developed a plan of action in an effort to stem the flow of business elsewhere. *Id.* And despite this plan, Defendants knew they were projecting negative year-over-year growth in fiscal year 2021 for Syneos's Clinical Solutions segment.

(b) Additionally, Macdonald, Meggs, and Colvin were told by other Syneos executives that dissatisfied clients were pulling projects out of the Syneos pipeline as a reaction to quality issues with existing projects. *See* ¶¶7, 49, 51, 64. At least one senior executive, the Senior Vice President of Corporate Quality, made Macdonald and Colvin aware of these issues.

---

[4] Jon Olefson also served on Syneos's Executive Leadership Team. During the Class Period, he sold 13,440 shares of Syneos common stock for $1,068,648 in proceeds.

254. Also as explained above (¶¶21, 50, 58, 63, 68-70, 24three to four5, 248-50), after the Class Period, Defendants admitted that they knew of the undisclosed problems complained-of herein and that they had existed throughout the Class Period.

255. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading and omitted such information. ¶¶30-34, 64-66. As a result, each of the Defendants is responsible for the accuracy of Syneos corporate statements and is therefore responsible and liable for the misrepresentations in and omission from such statements.

256. ***Defendants' Public Statements Confirm that They Had Visibility Into the Performance of Syneos's Clinical Solutions Segment***. Syneos's problems impacted the most important issues facing the Company and were the focus of senior Syneos management, including the Individual Defendants.

257. The Individual Defendants each confirmed that they had a clear view of the demand for Syneos's Clinical Solutions services, and the performance of this segment, in conference calls with investors during the Class Period. ¶¶58, 126, 244-45. For example, on a November 3, 2021 earnings call (¶197), an analyst for Citigroup asked Macdonald and Meggs to talk about the "visibility" into the Company's revenue pipeline. Macdonald responded by saying that he had "good" visibility into the backlog coming through clinical "the whole year," and then went on to discuss how "strong" the Company's pipeline was due to the number of RFP discussions with customers and the amount of work "coming [the company's] way." *Id*.

258. Consistent with statements confirming their familiarity with the clinical solutions business, the Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding Syneos's competitive position, client demand environment, contract execution, employee retention and performance, and the integration of Syneos's various acquisitions and diverse product teams. *E.g.*, ¶¶58, 100, 110, 113, 115, 124, 126, 128, 135, 14three to four4, 152, 159, 166, 176, 179, 191, 197, 211, 214, 221, 244-45. On industry and earnings conference calls during the Class Period, the Individual Defendants made numerous statements demonstrating their involvement in and knowledge of the same. *See id*. During almost every conference call Syneos hosted or attended during the Class Period, Macdonald, Meggs, Keefe, and/or Colvin spoke to investors about Syneos's sales activity and the various metrics it used to measure demand, backlog, net new current business awards, bookings, book-to-bill ratios, and RFP flow, the conservative manner in which it books FSP backlog, and reported its contribution to Syneos' financial results and outlook. *E.g.*, 48, 100-02, 113-16, 120-22, 134-35, 144-45, 155-66, 172-74, 179-85, 194, 202-05, 215, 225-27.

259. Macdonald spoke frequently about the demand for Syneos's Clinical Solutions services, telling investors that they have "good pipelines" (¶204);" with net awards growth at 10% year-over-year growth, it outs us in a very strong position." (¶100). Syneos was enjoying "pent-up demand," leading to "very good" "clinical bookings momentum . . .over the last several quarters," "high market leading book-to-bills over that period," and "backlog growth" (¶¶100, 163); "[o]ur position in that market is growing and strengthening. The strategy that we have seems to be resonating very strongly with customers across all sectors" (¶100); "Gross awards remained very strong, including a record quarter of awards from our small to mid-sized customer segment." (¶113); "Our Clinical pipeline remains robust across customer segments, fueled by double-digit

growth in SMID RFP flow year-to-date, including a record third quarter." (¶113); "what we're seeing at the moment, I think, specifically, for the demand environment is very encouraging on the SMID side, a very strong flow on the RFP front" (¶121); and "continued recovery in reimbursable expenses" (¶156). Macdonald also signed SOX certifications in which he attested that the significant information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him. *E.g.*, 30(a).

260. Meggs, as CFO of Syneos until March 2023, likewise spoke frequently about the demand for Syneos's Clinical Solutions services on conference calls with investors. For example, Meggs told investors that "we had a strong quarter across our operating and financial metrics, including gross awards, backlog growth, profitability and cash flow" (¶114); "When you think about the backlog and the adjustment in clinical, we – if you just take out the backlog adjustment, our book-to-bill in the quarter in clinical would have been north of 1.4, again. So it was a good quarter, and we feel good about the bookings that we had." (¶115); "our pipelines remain robust, right, right across the business in clinical and commercial. The SMID RFP flow, as you mentioned, was a record in quarter 3 for us on the back of biotech funding." (¶120); "So pipelines look good. RFP flow continues to be sound." (¶120, 174); "So nice strong demand environment, both large pharma and that SMID space we've always played in." (¶121); "as you look to quarter 2, you start to see the clinical business really rebound strongly given the year-over-year compare as well as all the things Alistair outlined relative to study start-up metrics . . ." (¶164); and "the RFP flow environment, Bob, is as strong as we've seen it, right? . . . [i]t really started moving in a really healthy clip in February, March has continued to be really strong we look at it sequentially and

year-over-year . . . we had a record pipe coming into quarter two, and the RFP flow continues to be strong. And really, that's right across the customer segments that we have in terms of how we think about our top 20 and then 21 to 50 small to mid. So it's been strong right across the business." (¶174). Meggs also signed SOX certifications in which he attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him. ¶32(a).

261. Keefe, as President of Medical Affairs until April 2022, CEO from April 2022 to October 2023, and a senior member of the Executive Leadership Team throughout the Class Period, also spoke frequently about the demand for Syneos' Clinical Solutions services: "'market demand is healthy'" (¶234); and "'our pipeline of opportunities remains comparable to 2021. Specific to our clinical SMID portfolio, our total pipeline of opportunities is up double digits compared to 2021, and we had record net awards during Q4 '21 and Q1 '22.'" (¶234. Additionally, Keefe signed SOX certifications in which she attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," she had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to her. ¶31(a).

262. Colvin, who as the President of Clinical Solutions was the leader of the Clinical business unit until September 2022, also spoke frequently about the demand for Syneos's Clinical Solutions services: "We've driven a very strong clinical trailing 12-month book-to-bill of 1.41 times, producing year-over-year backlog growth of over 18%" (¶128); "We have year-over-year

clinical backlog growth of over 30% for the Top 50 pharma customers as of the end of third quarter" (¶128); and "For the third quarter, we experienced record awards and RFP flow for the SMID segment . . . ." (¶128).

263. In light of these positive statements about Syneos to the market on topics that were material to Syneos investors, it was incumbent on Macdonald, Meggs, Keefe, and Colvin to ensure they understood the true and full facts concerning the topics on which they spoke. Either they possessed the knowledge of the Syneos Clinical Solutions business they claimed to have, in which case they knew their statements were false, misleading, or omitted material information, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless. Indeed, in order to speak so knowledgeably regarding Syneos's demand for its clinical services backlog, new business awards, bookings, book-to-bill ratios, and FRP flow and investors and analysts' interest therein receiving updates and briefings on the status and progress of such studies, and by performing their own due diligence, by attending ELT and other senior management meetings and presentations, by reading research reports and otherwise preparing for conference and earnings calls.

264. ***The Alleged Fraud Relates to Syneos' Core Business, Its Ability to Compete for and Win New Business, and Its Critical Revenue and Backlog Metrics***. Syneos primarily provides contract research and commercial services to pharmaceutical and biotechnology companies that utilizes outsourced clinical drug and medical device development and commercialization services. In its annual reports, Syneos describes its "Principal Business" as the provision of end-to-end biopharmaceutical outsourcing solutions through two segments: Clinical Solutions and Commercial Solutions. The fraud alleged herein directly concerns the operational results and financial health of its Clinical Solutions segment, which, according to the Company's

SEC filings, generates the vast majority of the Company's revenues. For the year ended December 31, 2020, Syneos derived 75% of its revenue ($3.31 billion) from its Clinical Solutions segment. For the year ended December 31, 2021, Syneos derived 77% ($4.01 billion) of its revenue from its Clinical Solutions segment. Moreover, the Company's Clinical Solutions business helps drive revenue on the Commercial Solutions side, as the Company is able to carry its relationships from its clinical programs over and into commercial sales. The Individual Defendants knew, or were deliberately reckless in not knowing, about the true nature of the Clinical Solutions Business units operational results and financial health.

265. ***The Individual Defendants Knew that Backlog Had Been Inflated and Reported Reimbursable Revenue Metrics Were Manipulated***. To hide the Company's crippling operational deficiencies and continuing to falsely portray Syneos's clinical business as growing and healthy, the Individual Defendants knowingly reported manipulated reimbursable out-out-pocket expenses and backlog metrics.

266. First, the Individual Defendants directed or were complicit in including a backlog award value far beyond the 12 month "maximum" they assured investors they were doing. Syneos was taking authorizations from projects that never came to fruition; they were taking at least two years, if not three years of authorization value from its FSP agreements. And as Syneos needed to "grow" the backlog in subsequent months or quarters, they would continue to pull in future award value from increasingly distant periods. This practice of taking authorizations far out into the future – which Meggs knew about – allowed the Company to pull future award value into the current backlog at the end of each quarter to improperly inflate projected revenue.

267. Second, the Individual Defendants directed or were complicit in retaining businesses awards in backlog even after the contracts were terminated or when collection of the

business award value was not probable. For example, when two large oncology clinical trials were cancelled in early 2021, the CFO of the oncology business unit tried to have these trials removed from the backlog. But higher-ups refused, due to the negative impact the removal would have on the Company's book-to-bill ratio. Similarly, during the Class Period, Syneos entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years. The entire value of these contracts was hundreds of millions of dollars, and if Syneos achieved certain milestones on time in all of the clinical trials then Syneos could receive a $100 million bonus. Syneos missed the first milestone in the first clinical trial but still accounted for the potential $100 million bonus in backlog. Syneos even went so far as to amend the language in the contract so that the auditors would support the recognition of the bonus in the backlog even though the amended language did not change the requirements under the contract. Similarly, in November or December 2022, Syneos's senior leadership asked an employee to issue a $1.6 million invoice, over her explicit objection, for a milestone related to cleaning patient data, despite the fact that the work had not been completed and Syneos would not be able to prove the data had been cleaned.

268. Defendants also inflated backlog by increasing the award value by including change order, even though the customer had not agreed or signed on to the change order. Nevertheless, Syneos would treat a $2 million change order as finalized without a customer signature and not only would the additional $2 million be added to backlog but it would also increase revenue recognition; if the previous contract amount was $10 million and there was 80% of costs incurred then Syneos would now record revenue on 80% of a $12 million contract instead of 80% of $10 million contract.

269. Third, the Individual Defendants directed or were complicit in the manipulation and overstatement of reimbursable out-of-pocket expenses. For example, if Syneos estimated $2

million in indirect costs on a given clinical trial but realized only $1 million in revenue, then the other $1 million should be removed from backlog; this is revenue that will never be realized. Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have an adverse impact on the book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO) were involved in and/or aware of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on book-to-bill ratio. After the month-end close, these individuals and the business unit CFOs met with Meggs to present the consolidated financials. Fillman, Moore, and Donovan discussed these practices and the impact this would have on the Company, warning that the practices could amount to fraud. To accommodate these practices, Syneos had a practice by which they would extend the month-end close until the numbers had reached certain pre-determined amounts.

270. For example, in Q3 2022, Syneos directed one employee, through email, to add additional monitoring visits on the calendar for a study, which would generate additional reimbursable revenue for Syneos because the Company is paid when a CRA goes to a site. The employee objected to adding visits to the calendar because there was no need to do any more visits for the study. However, she was told to set up the visits anyway because Syneos was scrambling to get more revenue around this time.

271. The Company also did not estimate costs accurately and, while the costs were front-end loaded because the enrollment period was the most costly and time-consuming part of most trials, the underestimation of costs resulted in revenue being recognized on an expedited basis or earlier in the clinical trial. For example, in a clinical trial expected to take five years to complete

with expected revenues of $10 million, Syneos would forecast the costs to complete the trial, *e.g.*, $6 million in costs. Costs expended are used to assess how far along the clinical trial is, as opposed to the amount of time that has passed, and milestones or percentage completion is determined by the expenses incurred. As such, using the example above if $2 million in costs have already been incurred then the trial is 33% complete and 33% of the revenue can be recognized. However, in many instances, Syneos "overburned," meaning it went over its estimated costs, and the costs would ultimately need to be reassessed. If the Company reassessed and then estimated the new costs to total $8 million, instead of the previous $6 million cost estimate. If $4 million in costs were already expended and the Company had therefore recognized 66% of the $10 million in total revenue, the reassessment of costs at $8 million would suggest that only 50% of revenue had been earned. In that example, $1.6 million in revenue should be reversed. However, Syneos would recognize when beneficial but not reverse when it was reassessed. Instead, Defendants would implement a plan to justify to the customer the costs already expended by, for example, assuring the client that they would supposedly save costs going forward, even though this was not realistic.

272. The manipulation of the reimbursable expenses and backlog was not a secret within Syneos. For example, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric. The Executive Vice President of Operations, Head of Commercial, Defendant Keefe, Head of Sales, and all of the sales representatives participated in these Monday calls. The Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers with the Head of Sales and Operations. The entire sales organization knew where the Company was in terms of tracking to target, and in each of the quarters from at least January 2020 through May 2022, there would be at

least a couple hundred-million-dollar shortfall – often between $400 and $500 million – to make their revenue target. Regardless of the size of the gap, Syneos always made it up.

273. And the Individual Defendants directed these efforts. In one e-mail to all business unit CFOs, sent on or around August 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "***find it***." When Meggs was brought certain figures indicating a shortfall, he simply said "No" until he received the numbers he wanted.

274. Similarly, at monthly meetings to discuss month-end financials, Bekki Brown directed members of project teams to change estimates to completion on clinical trials in order to recognize more revenue. These revenue totals were then consolidated and presented to Defendant Meggs. Brown would then issue directors to find more revenue in various ways to increase revenues before the end of the quarter or year.

275. Numerous high-level managers voiced objections to these efforts to expedite revenue recognition and change cost estimates. For example, between September 2020 and April 2022, one Senior Director sent e-mails expressing her discomfort with the Company's revenue numbers. The same director also noted her discomfort with certain financials in SOX certifications (which were signed by Defendants Macdonald, Keefe and Meggs). Ultimately, this director, under duress, had to agree to numbers with which they were uncomfortable.

276. One business unit CFO similarly resisted signing off or certifying month-end numbers for his business unit and warned superiors many times against how the Company was recognizing revenue and recording backlog and predicted that it could not be sustained. This CFO had one-on-one discussions with the Clinical CFO, Jennifer Fillman, who reported to Meggs, and

the Business Unit CFO, Victoria Moore, in which the CFO warned Fillman and Moore that the Company's practices could amount to fraud.

277. ***The Individual Defendants and Other Insiders Capitalized on Syneos's Inflated Stock Price to Unload Tens of Millions of Dollars' Worth of Syneos Stock***. The Individual Defendants and Company insiders also had the motive and opportunity to commit fraud. While the price of Syneos common stock was artificially inflated, Company insiders, including each of the Individual Defendants and Syneos's largest shareholders and private equity backers, Thomas Lee Partners and Advent International, collectively dumped more than $3 billion in Syneos stock at elevated prices artificially inflated by the fraud alleged herein – a sudden and dramatic contrast to their pre-Class Period trading practices.

278. ***Defendant Macdonald Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Macdonald entered the Class Period with a balance of 171,506 shares of Syneos common stock and the right to acquire tens of thousands of additional shares at substantially below market by way of restricted stock units ("RSUs"). According to a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, dated April 16, 2020, the Company reported that Macdonald had beneficial ownership of 185,973 shares of Syneos common stock as of March 30, 2020. Between March 30, 2020 and the start of the Class Period, Macdonald reduced his position by 14,467 shares.

279. During the Class Period, Defendant Macdonald sold more than 142,000 of his personal Syneos shares at prices as high as $89.90 per share, for gross proceeds in excess of $11.4 million. These sales were highly suspicious in timing and amount and out of line with his prior trading practices. In particular, between January 2019 and August 2020, Defendant Macdonald slightly increased his holdings of shares in the Company.

280. Defendant Macdonald's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Alistair Macdonald | 12/22/2020 | 1,200 | $70.02 | $84,024 |
| Alistair Macdonald | 12/23/2020 | 300 | $70.52 | $21,156 |
| Alistair Macdonald | 2/1/2021 | 13,044 | $75.17 | $980,517 |
| Alistair Macdonald | 2/1/2021 | 51,175 | $75.84 | $3,881,112 |
| Alistair Macdonald | 2/2/2021 | 278 | $77.11 | $21,437 |
| Alistair Macdonald | 4/1/2021 | 13,720 | $77.61 | $1,064,809 |
| Alistair Macdonald | 4/1/2021 | 673 | $76.11 | $51,222 |
| Alistair Macdonald | 4/1/2021 | 3,005 | $77.92 | $234,150 |
| Alistair Macdonald | 4/9/2021 | 14,039 | $80.00 | $1,123,120 |
| Alistair Macdonald | 6/1/2021 | 4,889 | $88.20 | $431,210 |
| Alistair Macdonald | 8/2/2021 | 4,710 | $89.90 | $423,429 |
| Alistair Macdonald | 8/3/2021 | 7,032 | $88.49 | $622,262 |
| Alistair Macdonald | 8/3/2021 | 28,521 | $87.83 | $2,504,999 |
| **Total** | | **142,586** | | **$11,443,447** |

281. Defendant Macdonald's trading during the Class Period varied dramatically from his pre-Class Period trading history. In the two-year period leading up to the Class Period, Defendant Macdonald collected $3,946,487 in proceeds from sales of Syneos common stock – meaning that Defendant Macdonald's $11.44 million in proceeds tripled during the comparable pre-Class Period.

282. Moreover, virtually all of Defendant Macdonald's sales during the Class Period were executed pursuant to a 10b5-1 trading plan that was entered into – and strategically amended – to take advantage of an inflated stock price or insider information. On November 30, 2020, two months into the Class Period (and only six months after adopting his previous trading plan), Defendant Macdonald adopted a new trading plan. In the following nine months, Defendant Macdonald dramatically increased the liquidation of his position, selling 142,586 shares of Syneos common stock for $11.44 million in proceeds.

283. As demonstrated by the chart below, Defendant Macdonald's sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements. By the time he was done, Macdonald had liquidated 83% of his holdings of Syneos common stock. Then, suddenly on April 29, 2022, after selling $11.44 million in stock and before truth was revealed regarding Syneos's actual operational metrics, Defendant Macdonald resigned as CEO. Defendant Macdonald's sale of his Syneos stock stopped just a few months before Syneos's revealed to the market that revenue would likely not recover to pre-pandemic levels and that the Company had eliminated $950 million in prior pass-through revenues.

284. In 2021, Defendant Macdonald earned $1,114,884 in salary in his role as CEO. In 2020, he earned $909,255 – for a total of $2,024,139 during these two years. Thus, Defendant Macdonald's insider sales proceeds ($11.4 million) represent 5.65 times as much as Macdonald earned in salary during this time.



285. ***Defendant Meggs Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Meggs entered the Class Period with a balance of 35,278 shares of Syneos common stock and the right to acquire 16,918 additional shares at substantially below market by way of RSUs.

286. During the Class Period, Defendant Meggs also sold significant amounts of his shares of Syneos common stock. He sold nearly 40,000 shares, for $3.2 million in gross proceeds, while he was in possession of material, non-public information regarding the truth about Syneos's financial health.

287. Defendant Meggs's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Jason Meggs | 11/24/2020 | 1,938 | $67.00 | $129,846 |
| Jason Meggs | 11/27/2020 | 4,062 | $67.00 | $272,154 |
| Jason Meggs | 1/6/2021 | 5,552 | $72.00 | $399,744 |
| Jason Meggs | 4/15/2021 | 6,000 | $84.00 | $504,000 |
| Jason Meggs | 6/30/2021 | 4,668 | $90.00 | $420,120 |
| Jason Meggs | 7/6/2021 | 660 | $90.00 | $59,400 |
| Jason Meggs | 9/3/2021 | 9,223 | $95.00 | $876,185 |
| Jason Meggs | 7/18/2022 | 7,500 | $72.81 | $546,075 |
| **Total** | | **39,603** | | **$3,207,524** |

288. Defendant Meggs's trading behavior in the two-year period before the Class Period stands in stark contrast to his trading during the Class Period. In the comparable pre-Class Period, Defendant Meggs aggressively ***increased*** his position in Syneos by purchasing 7,205 shares (at a cost of $282,794) of common stock on the open market. However, during the Class Period, Defendant Meggs aggressively ***decreased*** his position, selling more than $3.2 million of Syneos' common stock.

289. Further, Defendant Meggs's sales were often on the heels of the adoption of new or amended trading plans. In a the 18-month period during which he liquidated nearly his entire

Syneos position through a series of eight stock sales, Defendant Meggs adopted at least four 10b5-1 trading plans. In one instance, Defendant Meggs adopted a new plan on February 26, 2021 and then within two months, sold 6,000 shares for $504,000 in proceeds. One month later, he adopted another plan and within six weeks had sold another block of Syneos stock for $420,000 in illicit trading proceeds. Within the next 10 weeks, Meggs sold almost 10,000 shares for proceeds of $935,000. By the time he was done, Defendant Meggs had liquidated nearly 80% his holdings of Syneos common stock.

290. As reflected by the chart below, Defendant Meggs's sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements.

291. Defendant Meggs's proceeds from the sale of his Syneos stock ($3.2 million) represented 2.78 times as much as his earned salary during the same time. Defendant Meggs earned $600,000 and $549,836 in salary in 2021 and 2020, respectively, in his role as CFO, for a total of $1,149,836.




292. ***Defendant Keefe Sold Syneos Shares at Prices Inflated By the Alleged Fraud.*** Defendant Keefe entered the Class Period with a balance of 10,986 shares of Syneos common stock and the right to acquire another 10,425 of additional shares at substantially below market by way of RSUs.

293. During the Class Period, Defendant Keefe also sold significant amounts of her Syneos shares, as reflected below:

| **Defendant** | **Trade Date** | **Shares** | **Price** | **Gross Proceeds** |
|---|---|---|---|---|
| Michelle Keefe | 11/17/2020 | 800 | $62.65 | $50,120 |
| Michelle Keefe | 11/18/2020 | 856 | $65.00 | $55,640 |
| Michelle Keefe | 1/25/2021 | 4,000 | $75.68 | $302,720 |
| Michelle Keefe | 3/31/2021 | 2,000 | $78.00 | $156,000 |
| Michelle Keefe | 4/15/2021 | 2,736 | $82.00 | $224,352 |
| Michelle Keefe | 7/18/2021 | 8,333 | $72.81 | $606,726 |
| **Total** | | **18,725** | | **$1,395,558** |

294. Defendant Keefe's trading behavior in the two-year period before the Class Period stands in stark contrast to her trading during the Class Period. In the comparable pre-Class Period, Defendant Keefe sold 4,000 shares for a total of $238,665 in proceeds in the open market. During the Class Period, Defendant Keefe sold nearly $1.4 million of Syneos' stock – a nearly six-fold increase.

295. Like Defendant Meggs, Defendant Keefe frequently adopted new 10b5-1 trading plans during the Class Period and followed each new plan with substantial stock sales. During the two-year Class Period, Keefe adopted at least four trading plans. For example, following adoption of a plan on November 24, 2020, Keefe unloaded 4,000 shares for $302,720 in proceeds. One month later, Keefe adopted another new plan, which was followed by the sale of 4,736 shares for $380,352 in proceeds. Her largest sale of stock during the Class Period – 8,333 shares for $606,726 in proceeds occurred on month after the adoption of the fourth plan. By the time she was done, Keefe had liquidated all or nearly all of her holdings of Syneos common stock.

296. As reflected in the chart below, Defendant Keefe's sales were perfectly timed to take advantage of the period during which Syneos' stock was artificially inflated due to Defendants' misstatements.




297. As the Company President, Defendant Keefe earned $567,000 in 2021 and $522,270 in 2020, for a total of $1,089,270. The proceeds from Defendant Keefe's sales of her Syneos stock represented 1.28 times what she earned in salary during the same time.

298. ***Defendant Colvin Sold Syneos Shares at Prices Inflated By the Alleged Fraud***. Defendant Colvin became the President of Clinical Solutions at Syneos in December 2018 and then Chief Business Officer shortly afterwards. As CBO, he was responsible for driving Syneos' global growth strategy across the clinical to commercial continuum. During the Class Period, Defendant Colvin sold 8,486 shares of Syneos common stock for $634,922 in proceeds – all or virtually all of the Syneos common stock he held entering the Class Period. Defendant Colvin did not have any open market purchases of Syneos common stock during the Class Period.

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Paul Colvin | 02/01/2021 | 8,486 | $74.82 | $634,922 |
| **Total** | | **8,486** | | **$634,922** |

299. Defendant Colvin's trading was a complete reversal from his pre-Class Period trading activity, when he was ***acquiring*** shares. Notably, Colvin did not have a single open market sale of Syneos shares in the two-year period leading up to the Class Period.

300. As reflected in the chart below, Defendant Colvin's liquidation of his Syneos common stock was timed to take advantage of the period during which Syneos' stock was artificially inflated due to Defendants' misstatements.




301. The illicit trading proceeds realized by all the Individual Defendants from their Class Period stock sales during the Class Period were significant relative to their ordinary compensation.

302. ***Other High-Level Syneos Insiders Dumped Billions of Dollars' Worth of Syneos Shares at Prices Inflated by the Alleged Fraud***. The Individual Defendants were not the only insiders dumping their Syneos stock before the reality of the Company's operational and financial condition became known to the market; other insiders in a departure from their previous trading histories, were selling significant amounts of Syneos stock.

303. As noted above, through a series of five offerings between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37,851,676 shares for $3.044 billion in proceeds. These outsized insider sales occurred in rapid succession over a period of just nine months, through a series of five public stock offerings, enabling Thomas Lee Partners and Advent International to exit their equity stakes in the Company.

304. The proceeds generated by these sales collectively, and the proceeds from the June 2021 sale individually, were far in excess of the proceeds collected by TH Lee and Advent in the two-year period leading up to the Class Period, during which TH Lee collected proceeds of $213,034,642. Advent International did not have any sales in the comparable period before the class began. Neither TH Lee nor Advent International made any purchases of Syneos common stock during the Class Period. Thus, their trading patterns changed significantly during the Class Period.

305. In addition to these sales by former members of Syneos's Board of Directors and Company sponsors, at least three other Syneos executives collectively sold 20,134 shares of Syneos common stock for roughly $1.49 million in proceeds.

(a) Michael L. Brooks served as the Company's Chief Development Officer and Global Head of Clinical Development from July 2021 to April 2022. In April 2022, he was elevated to Chief Operating Officer. In these roles, he was responsible for overseeing the

Company's operations, realizing strategy execution across the Company's clinical to commercial solutions divisions, and leading the company's customer engagement and market development portfolio. During the Class Period, Brooks sold 4,692 shares of Syneos common stock for $361,242 in proceeds. Brooks did not have any open market purchases of Syneos common stock during this period.

(b) Linda A. Harty was a director at Syneos from March 2017 to February 2023. Entering the Class Period, Harty had a balance of 11,432 shares of Syneos common stock and the right to acquire another 2,803 additional shares by way of RSUs. During the Class Period, she sold 11,432 shares of Syneos for proceeds of $959,058 – virtually all of the Syneos common stock she held. Harty did not have any open market purchases of Syneos common stock during this period. Harty did not sell any stock in the two-year period leading up to the Class Period.

(c) Donna Kralowetz was appointed as Senior Vice President, Finance of the Company as the Company's Chief Accounting Officer and designated as the principal accounting officer of the Company in January 2021. She joined the Company in May 2019 as Vice President. During the Class Period, Ms. Kralowetz sold 3,652 shares of Syneos stock for $300,398 in proceeds. Kralowetz did not have any open market purchases of Syneos common stock during this period, and the stock she sold comprised more than half of her holdings.

306. As with the Individual Defendants, these individuals' trades were made pursuant to trading plans that were adopted (or amended) during the Class Period, and their sales often occurred just weeks after the plan was adopted. Also, as with the Individual Defendants, their timing of these individuals' stock sales was impeccable, with their sales occurring while the share price was at all-time highs and before the big drop in share price following the release of Syneos' 2Q financial results in early August 2022.

307. ***The Individual Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Compensation and Bonus Awards***. The Individual Defendants were financially motivated to misrepresent the Company's financial performance and maintain Syneos's inflated stock price. As a product of Defendants' misrepresentations, the Individual Defendants collectively received over $30 million in compensation in 2020-2021, which was heavily weighted on stock awards and other incentive compensation, such as bonuses.

308. According to the Company's proxy statements issued during the Class Period, the main elements of Syneos's executive compensation package consisted of: (1) a base salary; (2) cash incentive awards; and (3) long-term incentive compensation, *i.e.*, stock awards. The long-term incentive granted the Individual Defendants stock options, including performance-based restricted stock units ("PRSUs") and time-based restricted stock units ("RSUs"). PSRUs granted in 2019-2021 were calculated based on the achievement of certain financial metrics over a three-year period, including Adjusted Earnings Per Share (for each individual year) and Return on Invested Capital (for the entire three-year period).

309. Further highlighting the link between Company performance and executive compensation, with respect to long-term compensation, the Company's 2022 Proxy Statement noted that "2021 target award values were somewhat increased from the prior year to recognize the preservation of stockholder value throughout the pandemic during 2020." Syneos's cash incentive awards were similarly based on the Company's financial performance, as discussed below. Accordingly, the Individual Defendants' compensation was heavily dependent on Syneos's financial performance.

310. Indeed, according to the Company's proxy statements, Syneos's "incentive compensation opportunity" was "weighted more heavily than base salary. Accordingly, "***a***

***significant portion of our executives' compensation is at risk***." To illustrate this point, Defendant Macdonald earned about $2 million in salary in 2020-2021, yet he received annual stock awards and other incentive compensation totaling nearly $14 million during the same time period, comprising 86% of his total compensation. Defendant Meggs similarly earned approximately $1.1 million in salary in 2020-2021, yet he received stock awards and other incentive compensation totaling nearly $4 million during the same time period, or 77% of his total compensation. Defendants Meggs and Colvin saw 75% of their compensation in 2020-2021 tied to stock and incentives.

311. The table below summarizes Defendants Macdonald, Meggs, Keefe, and Colvin's total compensation for 2020-2021.

| **Individual Defendants' Compensation 2020-2021** | | | | | |
|---|---|---|---|---|---|
| **Name** | **Salary** | **Bonus**[5] | **Stock Awards** | **All Other Compensation** | **Total** |
| Macdonald | $2,024,139 | $636,000 | $13,208,054 | $273,270 | $16,141,463 |
| Meggs | $1,149,836 | $210,000 | $3,738,184 | $17,072 | $5,115,092 |
| Keefe | $1,089,270 | $198,450 | $3,211,828 | $21,511 | $4,521,059 |
| Colvin | $1,089,270 | $198,450 | $3,211,828 | $22,109 | $4,521,657 |

312. ***The Sheer Magnitude of the Loss in Syneos' Pipeline Supports a Strong Inference of Scienter***. Syneos' November 2022 disclosure that its bookings had plunged year-

[5] This includes discretionary bonuses equivalent to 50% of Syneos's Management Incentive Plan ("MIP") targets for each executive. The MIP provides for the payment of cash bonuses dependent upon achievement of predetermined corporate financial performance targets. According to the company's 2021 Proxy Statement, for the fiscal year 2020, "[w] hile performance on our financial metrics fell below threshold [*i.e.*, the MIP target], the Compensation and Management Development Committee rewarded management's solid and steady response to the COVID-19 pandemic. This result also provided alignment with stockholder gains during the year."

over-year, driven by a lack of demand in its Clinical Solutions business, further supports a strong inference of scienter. To put this drop in perspective, Syneos reported net new business awards of $1.3 billion in the third quarter of the previous year and $995 million in 2020 – both of which were quarters affected by the restrictions put in place during the COVID pandemic. Thus, Syneos's $182 million in clinical net new business awards reported for Q3 2022 represented a $1.1 billion – or 87% – drop from the previous year.

313. Given the massive plunge of new business awards, the inference can be drawn that Syneos' quality and turnover problems in its Clinical Solutions business that led to these events existed, and were known by Defendants, during the Class Period.

314. This inference is bolstered by commentary from securities analysts after the truth was revealed. For example, during the Company's November 4, 2022 earnings call, a Baird analyst stated that the Company's explanation for its financial performance was "***frankly hard to believe*** . . . given that pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected. So I mean, can you really say cancellations were 3%, 4%, 5% of backlog, something like that? I mean, ***it just doesn't feel reasonable***." Evercore ISI issued a report on November 4, 2022 stating "Post today's print, we are stepping to the sidelines. While we never like to downgrade post a print like this, ***we remain broadly flummoxed by the trajectory of the business and how much it shifted during the month of September***." William Blair issued a report on November 7, 2022 commenting on the Company's "***Unprecedented Decline in Clinical Bookings***," stating "the company's clinical book-to-bill ratio under ASC 606 (including pass-through items) was an unprecedentedly low 0.18 times, a long way away from our 1.15 times target. Clinical net new business awards were $182.2 million in the quarter, representing a ***drastic year-over-year decline*** of 87% and

coming in $984 million below our target." Barclays issued a report stating that it had "[n]ever seen bookings come in at 0.3x (ex-reimburse)" adding that "[w]e do not know what happens to growth when you book 1/10th of the business you have been doing, and if mgmt's implied 4Q guide of down 6% at the midpoint is enough." In another report issued on November 4, 2022, Barclays stated "[t]he biggest concern among investors is going to be Clinical bookings, as ***we have not seen a number this low since 2015*** when the business was INC Research and this level of bookings was growing 25%." In a report issued November 6, 2022, Barclays stated "The biggest question from investors and ourselves was, "'***what happened***?'"

315. The abrupt departures of four of the most senior Syneos executives, including Defendants Macdonald, Meggs, Keefe, and Colvin, also provide an inference of scienter. After the February 17, 2022 disclosure that 36% of Syneos's backlog was uncollectible reimbursable expenses, Defendant Macdonald, who served for about six years as the Company's CEO, abruptly retired in April 2022. Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline. Four months later, in August 2022, Defendant Colvin, head of the disastrous Clinical Solutions segment, also left. In January 2023, Syneos announced a "Chief Financial Officer transition," through which Defendant Meggs would exit the Company. Defendant Keefe, who succeeded Macdonald as CEO departed the Company in October 2023.

## VII. SYNEOS'S PUBLIC STATEMENTS AND FILINGS WITH SEC OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN

316. Under Item 303 (17 C.F.R. §229.303), Syneos's quarterly and annual reports filed with the SEC were required to: "Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 303 of SEC Regulation S-K, 17 C.F.R.

§229.303(b)(2)(ii). The "discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations." 17 C.F.R. §229.303(a).

317. The Company was also required to provide Item 303 disclosures of "trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii).

318. Further, Item 303 requires disclosures concerning the Company's "Critical accounting estimates."[6] Indeed, Item 303 required that Syneos:

> Provide qualitative and quantitative information necessary to understand the estimation uncertainty and the impact the critical accounting estimate has had or is reasonably likely to have on financial condition or results of operations . . . . This information should include why each critical accounting estimate is subject to uncertainty and . . . how much each estimate and/or assumption has changed over a relevant period, and the sensitivity of the reported amount to the methods, assumptions and estimates underlying its calculation.

319. The SEC has emphasized that Item 303 "requires not only a 'discussion' but also an 'analysis' of known material trends," and that disclosure is "necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of

[6] "Critical accounting estimates are those estimates made in accordance with generally accepted accounting principles that involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on the financial condition or results of operations of the registrant." 17 C.F.R. §229.303(b)(3).

future results." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75056-01, 75061-62 (Dec. 29, 2003).

320. While "[f]inancial measures generally are the starting point in ascertaining these key variables and other factors," "financial measures often tell only part of how a company manages its business. Therefore, when preparing MD&A, companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required." "Examples of such other factors, depending on the circumstances of a particular company, can include . . . backlog, trends in bookings and employee turnover rates." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75056-01, 75059-60 (Dec. 29, 2003).

321. During the Class Period, Syneos reported on its quarterly and annual backlog metrics, and specifically reported the backlog for its Clinical Solutions business unit.

| **Clinical Solutions Backlog (in millions)** | |
|---|---|
| Q3 2020 | $9,196.30 |
| Q4 2020 | $10,239.50 |
| Q1 2021 | $10,509.90 |
| Q2 2021 | $10,966.90 |
| Q3 2021 | $11,281.40 |
| Q4 2021 | $10,567.30 |
| Q1 2022 | $10,772.30 |
| Q2 2022 | $10,634.40 |
| Q3 2022 | $9,746.70 |

322. As set forth above, the Company withheld Item 303 disclosures from investors throughout the Class Period, including that Syneos lacked the ability to deliver quality clinical services and generate useful and accurate data from its clinical trials, was severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver

on the contractual obligations required under agreements with its customers, and lacked the tools and technological resources to compete for and secure new post-revenue or renewal business. *See, e.g.*, ¶¶49-70.

323. For example, as described above (¶¶53, 66), the Company failed to disclose to investors that its pervasive and persistent quality issues were so obvious and concerning to clients that Syneos business was placed on "hold," future business would not be available to Syneos "until [it] earned back trust." Defendants also failed to disclose that Syneos was also plagued by "***recurring issues***" across its five top "Quality Issues and Audit/Inspection" categories:

- (1) "Site Management/Monitoring,"
- (2) "Inappropriate Disclosure,"
- (3) "Management of Investigational/Medicinal Product/Drug Accountability,"
- (4) "Management of Essential/Regulatory Documentation," and
- (5) "Computer Systems Validation/Information Technology."

324. Also missing from Syneos's MD&A was a discussion and analysis concerning the impact its inability to offer technology-based solutions demanded by its customers, such as a client data portal, was having on its ability to win new business and service existing customers. ¶¶55-63, 65 ("Data doesn't reflect client situations"), ¶65 ("Further meaningful drill-down is not currently possible due to data limitations."), ¶65 ("The data here in Syneos system is not the source of truth.").

325. Further, Syneos failed to fully integrate recent acquisitions and its various product teams and had been unable to respond with agility to its clients' needs, all of which impaired the Company's ability to provide comprehensive or effective customer engagement across its product

portfolio and led to Syneos losing post-revenue business and renewal business from existing customers. ¶52, 58-59.

326. These poor-quality trends and technological deficiencies, which Defendants failed to disclose, prevented Syneos from competing for new post-revenue and renewal business and had impact of Syneos's win-rate and backlog metrics. In fact, as was discussed at monthly ELT Meetings, the ongoing trends, events, or uncertainties concerning these accounts were reasonably likely to have – and were in fact then having a material effect on the Company's financial condition, operational situation, and results of operations. ¶¶52-53. Syneos was required to provide robust quantified and narrative disclosures of the expected impacts these trends were having on the Company's backlog and results of operations and its patchwork, generic and wholly insufficient commentary on what it told investors were the relevant existing trends throughout the Class Period fails its obligation under Item 303.

327. In addition, and as discussed above, while the internal technological and competitive trends at Syneos were having a materially negative impact on the Company's backlog and operational situation (¶¶49-70), Syneos was routinely engaging in monthly and quarterly activities to inflate its backlog metrics and mask declining win-rates and backlog metrics (¶¶72-85), a trend, event, or uncertainty that was known to Syneos and was reasonably likely to have material effects on the Company's financial condition or results of operations. Contrary to the requirements of Regulation S-K, Syneos failed to disclose the material impact of this known trend, event, or uncertainty on current and future revenues within its required MD&A sections of its Form 10-K for the fiscal year 2020 and 2021, and its Form 10-Q from Q3 2020 through Q3 2022.

328. Syneos was explicitly required to disclose the impact and identify the intermediate effects of its routine actions to inflate or otherwise manipulate its backlog, including by describing the reasons underlying these effects.

329. As the Class Period came to a close, Defendants began to slowly reveal that the Company's backlog had been overstated and Syneos had been plagued by impaired business development and operational capabilities, acute qualitative and competitive disadvantages, integration issues, backlog and expenses manipulations, and an inability to meet contractual customer obligations.

## VIII. NO SAFE HARBOR

330. Syneos's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

331. Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Syneos who knew that the forward-looking statement was false. None of the historic or present tense statements Defendants made was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts

Defendants made expressly related to or stated to be dependent on those historic or present tense statements when made.

## IX. PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET

332. Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine. At all during the Class Period, the market for Syneos common stock was an efficient market for the following reasons, among others:

- Syneos common stock met the listing requirements, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
- According to the Company's Form 10-K for the fiscal year ended December 31, 2022, Syneos had over 103 million shares outstanding as of February 9, 2023;
- As a regulated issuer, Syneos filed periodic public reports with the SEC;
- Syneos regularly and publicly communicated with investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as through the internet and communications with the financial press and other similar reporting services;
- Syneos was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and
- Unexpected material news about Syneos was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

333. In addition, and as a result of the foregoing, the market for Syneos common stock promptly digested current information regarding Syneos from all publicly available sources and reflected such information in the price of Syneos common stock. Under these circumstances, all purchasers of Syneos common stock during the Class Period suffered similar injury through their purchase of Syneos common stock at artificially inflated prices and the presumption of reliance applies. The material misstatements and omissions alleged herein would induce a reasonable

investor to misjudge the value of Syneos stock, and without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired Syneos stock between the time Defendants misrepresented and/or failed to disclose material facts about the overstated backlog and the Company's qualitative, technological, and competitive disadvantages, integration issues, and inability to satisfy contractual obligations, at the time the true facts were disclosed. Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Syneos common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

334. Plaintiffs and the Class are also entitled to a presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon, in significant part, omissions of material fact for which there was a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding Syneos's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## X. LOSS CAUSATION/ECONOMIC LOSS

335. Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. ¶¶100-250. The material misrepresentations and omissions

included issues concerning, among other things, the Company's inability to generate useful and accurate data, and implement a technology-enhanced delivery mode. ¶¶49-70.

336. During the Class Period, as detailed herein, Defendants schemed to deceive investors and the market, and engaged in a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on members of the Class who purchased Syneos stock by misrepresenting and omitting material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. ¶¶72-85, 277-306.

337. When Defendants' prior misrepresentations and omissions were disclosed or otherwise revealed to the market, beginning on February 17, 2022, and further revealed on August 1, 2022, September 13, 2022, and November 4, 2022, Syneos's stock price declined significantly, as the prior inflation was removed from the price of the Company's common stock. As a result of their purchases of Syneos common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

338. Defendants' false and misleading statements and omissions, identified herein at ¶¶100-250, had the intended effect and caused Syneos's stock to trade at artificially inflated levels throughout the Class Period.

339. As a direct result of the disclosures on February 17, 2022, August 2, 2022, September 13, 2022, and November 4, 2022, Syneos's stock price suffered significant declines. For example, from February 16, 2022 through the next trading day on February 17, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $4.01 per share, or nearly 5%. Between August 1, 2022 and August 2, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $13.94 per share, or 17.6%. Between September 12, 2022 and September 14, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $10.69 per share,

or nearly 17%. Finally, between November 3, 2022 and November 4, 2022, the price of Syneos common stock traded on the NASDAQ fell $22.11 per share, or 46.2%.

340. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Syneos's stock. It also was foreseeable to Defendants that the revelation of the truth concerning the Company's backlog, including that the Company was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, backlog and expense manipulations, and inability to meet customer needs would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

**CLASS ACTION ALLEGATIONS**

341. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the common stock of Syneos during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of Syneos, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

342. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Syneos common stock was actively traded on the NASDAQ, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through

appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. During the Class Period, there were more than 104 million shares of Syneos common stock outstanding and the average daily trading volume was over 780,000 shares. Record owners and other members of the Class may be identified from records maintained by Syneos or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

343. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

344. Whether the federal securities laws were violated by Defendants' acts, omissions and common scheme to defraud as alleged herein;

345. Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the Company's backlog, net new business awards, and book-to-bill ratios, as well as the Company's inability to retain and compete for and secure new post-revenue and renewal business; and

346. To what extent the members of the Class have sustained damages and the proper measure of damages.

347. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

348. Plaintiffs will adequately protect the interests of the Class and have retained counsel who is experienced in securities and class action litigation. Plaintiffs have no interests which conflict with those of the Class.

349. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

## FOR VIOLATION OF §10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

350. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated by the SEC thereunder (17 C.F.R. §240.10b-5).

351. During the Class Period, Syneos, through its officers, management and agents, including Macdonald, Keefe, Meggs, and Colvin made, disseminated, approved or were responsible for the statements specified in ¶¶100-250, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

352. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

353. Defendants and the Company's officers, management, and agents, directly and indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 in that they, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange:

(a) employed devices, schemes and artifices to defraud;

(b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

354. Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Syneos common stock during the Class Period.

355. Syneos is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements

made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

356. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business.

357. The allegations above establish a strong inference that Syneos, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business. By concealing these material facts from investors, Syneos's share price was artificially inflated during the Class Period.

358. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the Company's: (i) backlog, net new business

awards, and book-to-bill ratios; (ii) quality, technology, data, and turnover problems; and (iii) inability to retain and compete for and secure new and renewal business, thus artificially inflating the price of Syneos's common stock.

359. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Syneos common stock. Plaintiffs and the Class would not have purchased Syneos common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

360. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

**COUNT II**

**FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS**

361. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

362. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act. 15 U.S.C. §78t(a). During their tenures as officers and/or directors of Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage. in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

363. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operational and the performance of its Clinical Solutions segment, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants Macdonald, Keefe, and Meggs participated in interviews and conference calls with investors and analysts, and/or prepared and approved the Company's public statements, SEC filings and press releases, described herein at ¶¶100-250, alleged by Plaintiffs to be misleading.

364. In particular, the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular conduct, statements, and omissions giving rise to the securities violations as alleged herein and exercised the same. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

365. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: November 17, 2023

s/ HENRY ROSEN

HENRY ROSEN
Patrick W. Daniels (admitted *pro hac vice*)
Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven Jodlowski (admitted *pro hac vice*)
Caroline M. Robert (admitted *pro hac vice*)
Hani Y. Farah (*admitted pro hac vice*)
**DICELLO LEVITT LLP**
4747 Executive Drive, Second Floor
San Diego, CA 92121
Tel.: 619-923-3939
pwdaniels@dicellolevitt.com
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
cmrobert@dicellolevitt.com
hfarah@dicellolevitt.com

Greg G. Gutzler
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: 646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC 20036
Tel.: 202-975-2288
rpierce@dicellolevitt.com

*Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 17, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

S/ HENRY ROSEN
HENRY ROSEN

DiCELLO LEVITT
4747 Executive Dr., Suite 240
San Diego, CA 92121
Telephone: 619/963-2406
E-mail: hrosen@dicellolevitt.com