**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, PAUL COLVIN, and JASON MEGGS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 1:23-cv-08848-AS<br><br>    ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
<u>THEIR MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

BRIAN T. FRAWLEY
BENJAMIN R. WALKER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:   (212) 558-4000

*Attorneys for Defendants Syneos Health, Inc.,
Alistair Macdonald, Michelle Keefe, Paul Colvin
and Jason Meggs*

December 20, 2023

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS ..........................................3

      A.     The Parties ......................................................................................................3

      B.     The Company's Financial Reporting During the Class Period..............................4

      C.     The Company Confronts the COVID-19 Pandemic ....................................................5

      D.     Syneos Has a Strong Year in 2021 .......................................................................7

      E.     Syneos Promptly Discloses Disappointing Developments in 2022.........................8

      F.     Plaintiffs' Claims .........................................................................................10

ARGUMENT..................................................................................................................11

I.     THE COMPLAINT FAILS BASIC PLEADING REQUIREMENTS.............................12

II.    PLAINTIFFS PLEAD NO ACTIONABLE MISSTATEMENT OR OMISSION ..........13

      A.     Plaintiffs Allege No Misstatement of Present Fact.................................................13

      B.     The Challenged Statements Are Not Actionable. ..................................................14

      C.     Plaintiffs Do Not Allege Particularized Facts Demonstrating That Any Challenged Statement Was False or Misleading ...................................................17

      D.     Syneos Had No Duty to Disclose Any Additional Facts Under SEC Rules..........21

III.   PLAINTIFFS FAIL TO PLEAD PARTICULARIZED FACTS GIVING RISE TO THE REQUISITE "STRONG INFERENCE" OF SCIENTER. ...............................22

      A.     Plaintiffs Plead No Cognizable Motive for Defendants to Commit Fraud............22

      B.     Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness........................24

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams* v. *Kinder-Morgan*, *Inc.*,
340 F.3d 1083 (10th Cir. 2003) .........................................................................................18

*Afr.* v. *Jianpu Tech. Inc.*,
2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022).....................................................................17

*Altayyar* v. *Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...........................................................................14, 16

*Anschutz Corp.* v. *Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012).................................................................................................11

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..............................................................................................1, 11

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)..............................................................................23, 25

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 F. App'x 32 (2d Cir. 2012) ...................................................................................2, 12, 13

*Born* v. *Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021).................................................................................2, 13

*In re Centerline Holdings Co. Sec. Litig.*,
613 F. Supp. 2d 394 (S.D.N.Y. 2009).................................................................................22

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................................14

*City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021).................................................................................24

*City of Sterling Heights Police & Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)...................................................................................16

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .....................................................................21

*Davis* v. *Anderson*,
718 F. App'x 420 (7th Cir. 2017) .......................................................................................12

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023)....................................................................................23

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................................22

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006).................................................................................16

*Frankfurt-Trust Inv. Luxemburg AG* v. *United Tech. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018).................................................................................25

*Gagnon* v. *Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019).................................................................................23

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................18, 19

*Hassan* v. *Bos. Beer Co., Inc.*,
    2023 WL 8110940 (2d Cir. Nov. 22, 2023).........................................................................16

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)...............................................................................................21

*IBEW Loc. Union No. 58 Pensions Tr. Fund & Annuity Fund* v. *Royal Bank of
    Scotland Grp., PLC*,
    783 F. 3d 383 (2d Cir. 2015)..............................................................................................16

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................................22, 25

*Lau* v. *Opera Ltd.*,
    527 F. Supp. 3d 537 (S.D.N.Y. 2021).................................................................................16

*Lipow* v. *Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015).................................................................................25

*Long-Miao* v. *Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020).................................................................................18

*Lopez* v. *Ctpartners Exec. Search, Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)...................................................................................15

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)...............................................................................17, 24

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)............................................................................17, 23

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)........................................................................................11, 18, 24

*Nygard* v. *Bacon*,
2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021).........................................................................12

*In re Optionable Sec. Litig.*,
577 F. Supp. 2d 681 (S.D.N.Y. 2008)....................................................................................17

*Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) ........................................................................12

*In re PXRE Grp., Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................................24

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004)...................................................................................................16

*Rothstein* v. *UBS AG*,
708 F.3d 268 (2d Cir. 2013)...................................................................................................11

*In re ShengdaTech, Inc. Sec. Litig.*,
2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014).........................................................................25

*Shetty* v. *Trivago N.V.*,
796 F. App'x 31 (2d Cir. 2019) ..............................................................................................21

*Singh* v. *Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019).....................................................................................................11

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020).....................................................................................23

*Steamfitters Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019).....................................................................................15

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund* v.
*Olo Inc.*,
2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023)..........................................................................15

*Teachers' Ret. Sys. of LA* v. *Hunter*,
477 F.3d 162 (4th Cir. 2007) .................................................................................................24

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................1, 3, 11, 22

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016)...................................................................................................11

*TufAmerica, Inc.* v. *Diamond*,
    968 F. Supp. 2d 588 (S.D.N.Y. 2013)...................................................................................19, 20

*Tung* v. *Bristol-Myers Squibb Co.*,
    412 F. Supp. 3d 453 (S.D.N.Y. 2019)..........................................................................................23

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ....................................................................................................24

*Wandel* v. *Gao*,
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)..........................................................................................21

**Statutes**

Private Securities Litigation Reform Act of 1995,
    15 U.S.C. §§ 78u-4 & 78u-5 ............................................................................... *passim*

Securities Exchange Act of 1934,
    15 U.S.C. §§ 78j(b) & 78t(a) ............................................................................... *passim*

**Other Authorities**

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ........................................................................................11

Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ................................................................21

Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ................................................................21

Fed. R. Civ. P. 8..........................................................................................................................1, 12

Fed. R. Civ. P. 9(b) ........................................................................................................................11

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| Class Period | Putative class period of September 9, 2020 through November 3, 2022 |
| Complaint or AC | Amended Complaint for Violation of the Federal Securities Laws (ECF No. 35) |
| CW | Confidential Witness |
| GCS | Global Client Solutions |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78qq |
| Individual Defendants | Alistair Macdonald, Michelle Keefe, Paul Colvin, and Jason Meggs |
| Item 105 | Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 |
| Item 303 | Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 |
| PSLRA | Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 |
| Rule 8 | Fed. R. Civ. P. 8 |
| Rule 9(b) | Fed. R. Civ. P. 9(b) |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. § 240.1b-5 |
| SEC | U.S. Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) |
| Section 20(a) | Section 10(b) of the Exchange Act, 15 U.S.C. § 78t(a) |
| SMID | Small to mid-sized |
| Syneos or the Company | Syneos Health, Inc. |

Syneos Health, Inc. ("Syneos" or the "Company") and the Individual Defendants (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint ("Complaint" or "AC") asserting claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act.

## PRELIMINARY STATEMENT

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc*. v. *Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007). In precisely the sort of blunderbuss pleading ruled out by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs' 365-paragraph Complaint seeks to transform post-pandemic business setbacks and alleged management missteps into securities fraud. Plaintiffs offer no challenge to the accuracy of even one Syneos financial statement, or anything Defendants ever said about Syneos' historical financial performance. Rather, to the extent any misstatement theory can be discerned from Plaintiffs' disjointed Complaint, they allege securities fraud claims premised entirely on rhetoric-laden commentary regarding Defendants' prognostications about Syneos' future business pipeline and optimism about the future success of its business strategies. The "PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (cleaned up). Plaintiffs here plead neither.

*First*, rather than set out particularized facts establishing each element of their claims—as the PSLRA requires—the Complaint is a meandering, incoherent mess. It does not even satisfy the most basic pleading standards of Rule 8, much less the more demanding requirements of the PSLRA. Plaintiffs seek to mask the deficiencies in their factual and legal theories through the sheer girth of their pleading, which impermissibly "consists in large part of large block

quotations with italicized text, followed by a passage" offering "a bullet-point list (running over a page) of 'true facts,' which were then known . . . or recklessly disregarded." *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012). Even worse than the pleading found fatally defective in *Bahash*, Plaintiffs here ask this Court to piece their claims together from hundreds of paragraphs of bloated, repetitive, disconnected, irrelevant, and confusing allegations, including dozens of lengthy quotations from various public statements over a 26-month period that Plaintiffs assert were false or misleading for the same vague reasons purportedly (but not actually) particularized elsewhere in the Complaint. "Plaintiffs' failure to plead fraud with the requisite particularity is a fatal flaw that marks their entire Complaint and inhibits Plaintiffs from successfully alleging either falsity or scienter." *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 479 (S.D.N.Y. 2021).

*Second*, even if the Court were inclined to parse through Plaintiffs' prolix Complaint in search of a cognizable securities fraud claim, it would not find one. Read charitably, the Complaint alleges that, for over two years (during the COVID-19 pandemic), Defendants failed to volunteer self-criticism about emerging operational problems when accurately reporting historical financial results amid upbeat statements about growth and rosy prognostications of continued success. Plaintiffs cannot transform these oral comments—most of which concern Syneos' reported "backlog," which the Complaint admits is a projection of "anticipated future revenue" from expected business in the pipeline (AC ¶¶ 4, 42), and similar metrics—into misstatements for a host of reasons, including that (i) Syneos' actual statements are not shown to have been inaccurate when made, (ii) the challenged statements are inactionable projections and puffery, and (iii) Plaintiffs' attempt to allege some factual discrepancy relies on unsubstantiated references to unidentified former employees who supposedly disagreed with management and mischaracterizations of documents purloined from Syneos, none of which pleads a misstatement

in compliance with the PSLRA.

*Third*, the Complaint fails to plead particularized allegations supporting a strong inference of scienter, which the Supreme Court has held must include facts demonstrating a "cogent" and "compelling" inference of fraud. *Tellabs*, 551 U.S. at 323–24. Plaintiffs point to the Individual Defendants' sales of Company stock during the class period as purportedly evidencing a motive to defraud, but courts routinely reject such allegations in the absence of suspicious trading activity that Plaintiffs do not and cannot plead here. And Plaintiffs' assertion that the Individual Defendants were aware of specific information contradicting their public statements is rooted in the same flawed allegations supposedly emanating from Plaintiffs' mysterious "confidential witnesses," most of which is not alleged to have been delivered to the speaker of any challenged statement. That is not enough under the PSLRA.

In short, the Complaint paints a fanciful picture of an implausibly long-running deceptive scheme that finds no support in any well-pled allegations of the Complaint and bears no relation to reality. In truth, in four of the first six quarters of the putative class period, Syneos grew revenues as projected, and substantially exceeded its reported guidance. When Syneos' business weakened in 2022, it disclosed that weakness, and twice reduced its reported financial guidance. This case has nothing to do with misstatements or fraud. It should be dismissed.

## FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS

### A.    The Parties

Syneos is a leading biopharmaceutical solutions company. (AC ¶ 3.) Its operations are divided into two segments, Clinical Solutions and Commercial Solutions. (AC ¶ 3.) The focus of the Complaint is the Clinical Solutions business, which offers global services for the clinical development of diagnostics, drugs, biologics, devices, and digital therapeutics. (Ex. 36 at 70.)[1]

---

[1] Citations to "Ex. __" refer to exhibits to the accompanying Declaration of Benjamin R. Walker.

-3-

Alistair Macdonald served as CEO of Syneos from October 2016 until April 2022.  (AC ¶ 30.)  Michelle Keefe served as CEO from April 2022 until October 2023.  (AC ¶ 31.)  Jason Meggs was CFO of Syneos from February 2018 until March 2023.  (AC ¶ 32.)  Paul Colvin was President of Clinical Solutions from December 2018 until November 2021, when he was appointed Chief Business Officer of Syneos, a role he held until June 30, 2022.  (AC ¶ 33.)

Plaintiffs are Luxembourgish and Belgian investment companies that allegedly purchased shares of Syneos common stock during the putative class period of September 9, 2020 through November 3, 2022 (the "Class Period").  (AC ¶ 2.)

### B.      The Company's Financial Reporting During the Class Period

Like all public companies, Syneos periodically reported a number of standard financial metrics during the Class Period,[2] including, for example, its revenue, net income, cash flows, and earnings.  (Ex. 15 at 74–91.)   The Company also periodically issued revenue and earnings guidance.  (*E.g.*, Ex. 28 at 3; Ex. 38 at 4.)  In addition to these core financial results, Syneos also reported other less common operating metrics, which are the focus of the Complaint.

One such metric is the Company's "backlog," which consists of "anticipated future revenue from new business awards that either have not started, or that are in process and have not been completed."  (Ex. 15 at 35, 73; *see* AC ¶ 42.)  Backlog converts to future revenue as work is undertaken and Syneos is paid.  (*Id.*)

Another metric Syneos reported is its "reimbursable out-of-pocket expenses," which consists of anticipated future costs that Syneos expects to incur and to be reimbursed by its customers, including fees paid to contractors and staff in connection with future clinical studies.  (AC ¶ 45.)   Syneos included these costs in its total operating expenses, and the related reimbursements ultimately were considered revenue.  (*Id.*)   But until Syneos received the

---

[2] On September 28, 2023, Syneos became a private company.

reimbursements, its traditional, fully disclosed practice has been to include the expenses in backlog, since they are anticipated revenues the Company has not yet received.  (AC ¶ 44.)

Throughout the Class Period, the Company repeatedly emphasized the uncertainty of its backlog projections.   For example, in its annual SEC filings, Syneos warned in bold and italicized text:  "***Our backlog might not be indicative of our future revenues, and we might not realize all of the anticipated future revenue reflected in our backlog.***"  (Ex. 15 at 35; Ex. 36 at 36.)  Syneos repeated this refrain in its quarterly filings.  (*E.g.*, Ex. 1 at 30; Ex. 6 at 30; Ex. 20 at 28; Ex. 27 at 29; Ex. 31 at 30; Ex. 41 at 27; Ex. 44 at 27.)  Syneos further warned:  "We believe that our backlog and net new business awards might not be consistent indicators of future revenue," and that projects included in backlog "may be canceled or delayed by the customer or regulatory authorities."  (Ex. 15 at 73; Ex. 36 at 72; Ex. 1 at 30; Ex. 6 at 30; Ex. 20 at 28; Ex. 27 at 29; Ex. 31 at 30; Ex. 41 at 27; Ex. 44 at 27.)  Syneos also made clear in its filings that, when a project is canceled, Syneos has "no contractual right to the full amount of the future revenue reflected in our backlog," and that backlog therefore "might not be indicative of our future revenues."  (Ex. 15 at 35; Ex. 36 at 36–37.)  Accordingly, Syneos underscored that "an increase in backlog at a particular point in time does not necessarily correspond directly to an increase in revenues during any particular period, or at all."  (*Id.*)

C.      The Company Confronts the COVID-19 Pandemic

Like "many" other businesses—large and small—Syneos "experienced disruptions" from the COVID-19 pandemic.  (AC ¶¶ 45–46.)  Among other things, public health measures implemented to curb the pandemic delayed clinical trials and prevented Syneos employees from accessing investigative sites and conducting on-site clinical monitoring.  (AC ¶ 45.)  Lifestyle changes ushered in by the pandemic, such as remote work, also had lasting impacts on Syneos' business.  (AC ¶ 16.)  Patient enrollment inevitably slowed, as did customer projects.  (AC ¶ 45.)

-5-

One initially unexpected but later enduring effect of the pandemic was a reduction in Syneos' reimbursable expenses.  As social-distancing requirements were implemented, the majority of clinical trials, which were conducted in-person pre-pandemic, moved to a virtual format.  (AC ¶ 45; Ex. 37 at 5.)  Even after social distancing requirements were relaxed, many trials continued to be administered virtually.  (*Id.*)  As these temporary changes gained some permanence, certain future projected revenue streams incident to administering the trials, such as for "field team visits" by Syneos employees, would be less than planned.  (Ex. 15 at 71–75.)

From the very beginning of the Class Period, Syneos informed investors that reductions in reimbursable out-of-pocket expenses were negatively impacting its revenues.  For example, in a third quarter 2020 earnings call on October 29, 2020, Mr. Macdonald explained that "[t]otal revenue for the quarter was below our guidance solely due to the slower recovery in reimbursable out-of-pocket expenses," which Mr. Macdonald explained "was driven by an increase in virtual operations and a slower recovery in patient enrollment."  (Ex. 5 at 2.)  Syneos also continually reiterated that backlog has "been and we expect will continue to be affected by the broad effects of the COVID-19 pandemic on the global economy and major financial markets."  (Ex. 15 at 73; Ex. 36 at 72; Ex. 1 at 30; Ex. 6 at 30; Ex. 20 at 28; Ex. 27 at 29; Ex. 31 at 30; Ex. 41 at 27; Ex. 44 at 27.)

Syneos took a number of steps to adapt to and manage these disruptions, including by instituting remote monitoring services to allow virtual access to clinical sites, along with certain cost containment initiatives.  (AC ¶ 46.)  As a result of these and other steps Syneos was taking, it was hopeful that the pandemic's effects would be limited and that its "impacts" would be "temporary."  (Ex. 1 at 28.)  Syneos made clear, however, that some impacts might be longer-lasting, warning that "[o]ur full service studies as well as our functional service provider offering have been impacted, and we expect them to continue to be impacted," including because of

"temporary or permanent closures and reduced capacity of businesses that utilize our services or facilities we use to conduct our business during the pandemic." (*Id.*) Despite these challenges, due to the steps the Company was taking to mitigate them, Syneos was cautiously optimistic that it could weather the pandemic's storm. And, at least for a time, Syneos did weather the storm. Like other businesses, the Company withdrew its financial guidance for fiscal year 2020 due to the pandemic (AC ¶ 46; Ex. 7 at 5; Ex. 17 at 3), but it ultimately ended 2020 with 5.6% year-over-year growth and met its updated guidance (Ex. 7 at 5; Ex. 17 at 3).

### D.    Syneos Has a Strong Year in 2021

Despite the Complaint's rhetoric about false promises of growth, Syneos continued to grow in 2021. In November 2021, Syneos announced it exceeded its earnings guidance for the first three quarters of the year, reporting company-wide increases in revenue between 15.7% and 17.2% compared to the same period in 2020, and Clinical Solutions growth of between 18.1% and 19.8% compared to the same period in 2020. (Ex. 32 at 2.) The Company ultimately achieved year-over-year growth of 18%, matching its earnings guidance for 2021. (Ex. 38 at 2.) But Syneos cautioned that, although the Company was performing well, it still faced various challenges and weaknesses. For example, Syneos explained during an earnings call in April 2021 that reimbursable expenses continued to be a concern as Syneos "work[s] through the COVID recovery." (Ex. 19 at 13.) In November 2021, during an industry conference, Mr. Macdonald responded to an analyst question asking why the "21 to 50" cohort of Syneos' top clients "appears to have stalled out," explaining that this group of businesses "tend[s] to be a little more cyclical" because the businesses have "a much smaller customer base" that can "fluctuate." (Ex. 33 at 3.) Mr. Macdonald also explained that Syneos was looking for ways to "catalyze" the business and "add innovation," such as by investing in more technology, which Mr. Macdonald admitted is "more difficult." (*Id.* at 5–6.)

-7-

More generally, Syneos routinely warned investors during the Class Period about the risks of problems arising from adaptations to its operations, including the risk, which it emphasized in bold and italicized text, that "***[i]f we do not keep pace with rapid technological change, our services may become less competitive or obsolete***." (Ex. 15 at 57.) Syneos also made clear that "[c]ontinued efficient operation of our business requires that we implement standardized global business processes and evolve our information systems to enable this implementation, especially in the course of integrating acquired businesses into our company." (*Id.* at 42.) If Syneos failed to "effectively manage the implementation of new information systems or upgrades and adapt to new processes designed into these new or upgraded systems in a timely and cost-effective manner," it warned investors that this failure "may result in disruption to our business and negatively affect our operations." (*Id.*)

### E.     Syneos Promptly Discloses Disappointing Developments in 2022

As the pandemic's effects lingered into early 2022, Syneos recognized its expected return to pre-COVID norms was at risk. During a conference in January 2022, Mr. Macdonald disclosed that "we see a reduction potentially in reimbursables" due to "more remote work." (Ex. 35 at 7.) Mr. Macdonald also disclosed that, while the Company was still projecting clinical revenue growth in 2022, it expected that growth "to be at the lower end" of its estimated range of 7% to 10%, primarily because of "lower-than-anticipated reimbursable expenses as our COVID recovery experience continues to evolve." (*Id.* at 8.) Mr. Macdonald emphasized that "[we] now [] anticipate our reimbursable expense growth to be lower than originally expected." (*Id.*)

Then, on February 17, 2022, Syneos announced its full year 2021 financial results, informing investors that, although company-wide revenue increased 20.5% year-over-year, net new business awards for Clinical Solutions, including reimbursable out-of-pocket expenses, experienced a year-over-year decline. (Ex. 38 at 1.) Syneos explained that the use of remote

clinical trials was proving more durable than previously anticipated, which had led Syneos to "adjust[]" its "future expectations for reimbursable expenses." (*Id.* at 2–3; *see also* Ex. 37 at 2, 5.)  Consequently, Syneos at the same time reduced its reimbursable expense expectation by about $538 million and broke out reimbursable expenses from the rest of its backlog numbers so that investors could have "improve[d] [] visibility into these trends." (*Id.* at 2.)

Despite these challenges, Syneos reported that it was "continu[ing] to experience strong [small to mid-sized customer ("SMID")] demand" (Ex. 36 at 13), and made a number of vague and hopeful statements about its future business prospects. (*Id.*)  Syneos underscored, however, that it believed reimbursable expenses as a percentage of revenue would "remain lower." (*Id.* at 71.)  On February 17, 2022, following all of these disclosures, the price of Syneos common stock, which was trading at $83.37 per share the day before, declined to $79.36.  (AC ¶ 216.)

On August 2, 2022, Syneos announced its second quarter results, reporting that revenue had increased between 6.1% and 8.3%, but noting that "[r]evenue was below the midpoint of the Company's guidance due to lower reimbursable expenses in Clinical Solutions and the impacts of foreign exchange." (Ex. 45 at 2.)  The Company also reported that, including reimbursable expenses, its Clinical Solutions backlog had experienced a year-over-year decline of 34.2% and that its book-to-bill ratio had fallen substantially. (*Id*. at 1.)  The Company reduced its reported full-year 2022 revenue and earnings guidance by 3.6% and 2.3%, respectively, noting that projected revenues faced an "estimated net headwind of 460 basis points [*i.e.*, 4.6%] from reimbursable expenses." (Ex. 43 at 7.)  The Company attributed its lower than expected quarterly results and reduced guidance to a decline in reimbursable expenses and delays in new award decisions. (*Id.* at 2.)  Syneos explained it would "continue to invest" in "technology" and "innovative solutions," and pursue its "[C]linical [R]eimagined" initiative to redesign the company's organizational structure, systems, and seek avenues to "fuel growth." (*Id.* at 3.)

On November 4, 2022, Syneos announced its third quarter results, disclosing that "[t]otal company year-over-year revenue contracted by 0.9% for the third quarter, compared to the prior year" and that, "[i]n Clinical Solutions, revenue declined 3.5%, primarily related to reimbursable expenses and the impact of foreign exchange."  (Ex. 48 at 3.)   Syneos explained that it "experienced more significant headwinds . . . than anticipated during the third quarter," which led to "results that were well below our expectations and frankly unacceptable."  (*Id.*)  Syneos *again* reduced its revenue and earnings guidance for 2022 due in part to "an estimated net headwind of 370 basis points [3.7%] from reimbursable expenses."  (*Id.* at 6.)

Syneos said that these developments took the Company by "surprise," attributing them in part to "delays in award decisions from SMID customers at a higher volume in September than we experienced in June."  (*Id.* at 4, 8.)  Management also opined that, in September, Syneos had begun having trouble attracting "repeat business," and suggested that "our clinical operating model had begun to lose its traditional strengths of agility and leadership engagement."  (*Id.* at 4.)  Syneos committed to "accelerating Clinical Reimagined and enhancing our business development activities to increase our share of new business opportunities."  (*Id.*)

On November 4, Syneos common stock, which was already trading at a relatively low price of $47.81 on November 3, closed at $25.70.  (AC ¶ 247.)

### F.      Plaintiffs' Claims

Without claiming that Defendants misstated any of Syneos' reported revenue or earnings figures, and despite Defendants' consistent warnings that its backlog numbers were projections susceptible to uncertainty, Plaintiffs nonetheless allege that every financial report and commentary during the Class Period was false or misleading in violation of Section 10(b) because each disclosed purportedly inflated backlog (and related metrics) and touted the Company's growth without noting its "long-standing quality, technological, cultural, and

operational problems."[3] (AC ¶ 7.)

## ARGUMENT

"To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (cleaned up). While well-pled factual allegations are accepted as true, this Court "is not required to credit conclusory allegations or legal conclusions couched as factual allegations," *Rothstein* v. *UBS AG*, 708 F.3d 268, 270 (2d Cir. 2013), and may consider the full contents of documents referenced in the Complaint, *Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

Plaintiffs' fraud allegations are subject to heightened pleading standards. Rule 9(b) requires Plaintiffs to specify the time, place, and contents of each misrepresentation, and "explain why the statements were fraudulent." *Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA likewise requires Plaintiffs to allege with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and these particularized facts must "giv[e] rise to a strong inference that the defendant acted with the required state of mind," *id.* § 78u-4(b)(2)(A). The PSLRA thus "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313. Plaintiffs allege neither, and "the PSLRA requires courts to dismiss complaints that fail to meet the pleading requirements" in the statute. *Novak* v. *Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

---

[3] Having failed to plead a primary violation of the federal securities laws, Plaintiffs have failed to plead control person liability under Section 20(a). *See ATSI*, 493 F.3d at 108. The Section 20(a) claim is not further addressed here.

## I.      THE COMPLAINT FAILS BASIC PLEADING REQUIREMENTS.

Under Rule 8, a complaint "must contain" a "short and plain statement of the claim," and "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). Plaintiffs' 180-page, 365-paragraph Complaint is in no sense "short" or "plain"; and its allegations are definitely not "simple, concise, and direct." It "suffers from extreme logorrhea." *Davis* v. *Anderson*, 718 F. App'x 420, 423 (7th Cir. 2017). Courts routinely dismiss such "long-winded, unclear, or conclusory" complaints due to the "unjustified burden on the court and the party who must respond to it." *Nygard* v. *Bacon*, 2021 WL 3721347, at \*7 (S.D.N.Y. Aug. 20, 2021).

More importantly, the length of the Complaint seeks only to divert attention from Plaintiffs' failure to plead relevant, particularized facts establishing the falsity of *each* challenged statement, and *each* Defendant's fraudulent intent in respect of that statement, as the PSLRA requires. The Complaint regurgitates excerpts of Company SEC filings, earnings call transcripts, and other public statements (no less than 47 public documents in total), "italicizes them within long block quotes, and then, after each one, repeats a copy-and-pasted list of omissions." *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at \*6 (S.D.N.Y. Sept. 12, 2022). Plaintiffs say each statement is misleading for more or less the same eight reasons spread across multiple pages "articulated in its standard formulation (and it is anyone's guess as to which of the [eight] is most apt), [but] each attempt fails to explain with sufficient specificity why or how the statement is false or misleading." *Plymouth Cnty. Ret. Ass'n* v. *Array Techs., Inc.*, 2023 WL 3569068, at \*9 (S.D.N.Y. May 19, 2023); (*see, e.g.*, AC ¶¶ 117, 131, 136, 148, 168, 186, 199, 206, 216, 228.) Second Circuit "precedents require a more detailed demonstration than the conclusory assertions Plaintiffs aver." *Id.*

In *Bahash*, the Second Circuit ruled that the same pleading tactic deployed here violates the PSLRA. As in *Bahash*, the Complaint here "consists in large part of large block quotations

with italicized text, followed by a passage" offering "a bullet-point list (running over a page) of 'true facts.'" 506 F. App'x at 38.  This "does not comport with [the Second Circuit's] exhortation that plaintiffs *must demonstrate with specificity why and how each statement* is materially false or misleading."  *Id.* (emphasis added); *see Born*, 521 F. Supp. 3d at 477–78 ("lengthy block quotes followed by pro forma reasons why the statements quoted" are purportedly fraudulent "fails to state a claim because it is insufficiently particular under the PSLRA").  The Complaint should be dismissed on this basis alone.

## II.    PLAINTIFFS PLEAD NO ACTIONABLE MISSTATEMENT OR OMISSION.

Even if the Court were to look past Plaintiffs' fundamental pleading failure, the Court still should dismiss the Complaint because Plaintiffs have not plausibly alleged with particularity any actionable statements of fact, or that any such statements were false or misleading.

### A.    Plaintiffs Allege No Misstatement of Present Fact.

Most, if not all, of Plaintiffs' misstatement theory is composed of quotes from Syneos' statements about its most recent financial results that Plaintiffs pronounce "were materially false and/or misleading" ***only*** because they supposedly at the same time "failed to disclose [other] . . . adverse facts pertaining to the" Company's business and operations.  (AC ¶¶ 117, 131, 136, 148, 168, 186, 199, 206, 216, 228.)  In *Bahash*, the Second Circuit "easily rejected" a similar claim contending that "the overly positive statements describing those numbers were misleading in light of the concealed manner in which they were achieved."  506 F. App'x at 35, 38.  The Second Circuit flatly rejected an argument that the company's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model."  *Id.* at 38.  In short, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."  *Id.* at 39.

The remainder of Plaintiffs' Complaint consists of challenges to the composition of

Syneos' reported "backlog" and the judgments Syneos made in including or excluding anticipated future business in its backlog. (*See* Appx. A at 2–17.) While these challenges to Syneos' projections are deficient on their face for the reasons set forth below, they also establish no *misstatement* of *fact*. Syneos described in extraordinary detail the manner in which it calculated its backlog, and the criteria used for including or excluding any potential future business in its backlog and similar metrics.[4] (AC ¶ 104.) Whether or not that methodology accurately predicted Syneos' future revenues cannot give rise to a misstatement of fact. In *Altayyar* v. *Etsy, Inc.*, 242 F. Supp. 3d 161, 179 (E.D.N.Y. 2017), for example, the court rejected a claim that the company's revenues and profits "were false and misleading because the reported numbers were based on a platform that was 'heavily made up of large-scale counterfeiters and sellers infringing on property rights.'" The court ruled that this theory alleges no misstatement because "the defendants explained their methodology and supplied the plaintiffs with all the information they needed to assess the reported financial results." *Id.* Here, Syneos explained its backlog and project award/cancellation methodologies, and any disagreement Plaintiffs may have with the manner in which Syneos in practice employed those methodologies asserts no misstatement. The securities laws afford no "cause of action for the review of management practices." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).

**B.     The Challenged Statements Are Not Actionable.**

***Forward-Looking Statements.*** Under the PSLRA, 15 U.S.C. § 78u-5(c), a "forward-looking statement" cannot form the basis of a securities fraud claim so long as it "is identified [as

---

[4] The Complaint is also littered with references to the Company's reported "book-to-bill ratio" and "net new business awards" for particular periods (*see id.*), which are different presentations of similar data. "Book-to-bill ratio" is a fraction comparing (a) new projected revenue added to backlog to (b) revenues earned and removed from backlog (AC ¶ 43). "Net new business awards" is the difference between projected future revenues from new business awarded less projected revenues from prior awards canceled in a given period. (*See* Ex. 15 at 73.)

such] and accompanied by meaningful cautionary language." *Lopez* v. *Ctpartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016). The PSLRA defines "forward-looking statement" to include "a statement containing a projection of revenues" or "earnings"; "a statement of the plans and objectives of management for future operations"; or "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(C).

Most of the statements challenged in the Complaint plainly meet this definition. Statements about the Company's backlog, book-to-bill ratio, and net new business awards are inherently forward-looking. (*See supra* at 2, 4, 14 n.4.) Indeed, Plaintiffs' primary complaint is that Syneos erroneously "estimated costs . . . and overestimate[d] future revenues." (*E.g.*, AC ¶ 105(g), 117(g).) And the Complaint is full of other statements about Syneos management's expectations regarding future opportunities and growth. (*See*, *e.g.*, AC ¶ 125 ("Macdonald represented that Syneos expected to achieve 'robust revenue growth' over the next three years."); *see also* Appx. A at 2-17 (listing forward-looking statements alleged in Complaint)); *Steamfitters Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 362 (S.D.N.Y. 2019) (statements that "momentum" and "growth" would "continue" are forward-looking). Each of those statements was identified as forward-looking and accompanied by "meaningful cautionary language." *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund* v. *Olo Inc.*, 2023 WL 8287681, at *7 (S.D.N.Y. Nov. 30, 2023) (warning that "[o]ur rapid growth may not be sustainable and depends on our ability to attract new customers" was meaningful cautionary language). For example, statements about the Company's backlog were couched in warnings that "backlog might not be indicative of our future revenues, and we might not realize all of the anticipated future revenue reflected in our backlog," and that "the rate at which our backlog converts to revenue may vary over time." (*See also* Appx. B (listing Defendants' cautionary statements).) Accordingly, Plaintiffs cannot base their claims on any of these

-15-

statements.

***Puffery and Vague Statements of Corporate Optimism.***    Many of the remaining statements are not actionable because they are classic puffery or otherwise incapable of inspiring reasonable reliance.  For example, the Complaint relies on statements referencing the Company's status as a "market leader," describing its business as "robust," and pointing to its "culture" as a "key differentiator" for "customer success."  (AC ¶¶ 18, 113, 126–27; *see also* Appx. A at 18–22 (listing other puffery statements alleged in Complaint).)  Such statements are clearly inactionable puffery.  *See Lau* v. *Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021) (claim to be "a market leader" is "no more than puffery"); *City of Sterling Heights Police & Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022) ("strong culture and discipline" "fall[s] comfortably within . . . non-actionable puffery"); *Altayyar*, 731 F. App'x at 38 ("We cancel transactions if fraud is detected" is puffery).

The Complaint also relies on countless "vaguely positive" statements about the Company's business and growth prospects that are also not actionable.  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 286 (S.D.N.Y. 2006).  For example, the Complaint points to statements that Syneos was "well positioned to accelerate growth" and "confident in the long-term strength of our business."  (AC ¶¶ 5, 140; *see also* Appx. A 23–32 (listing additional statements).)  "Statements of general corporate optimism, such as these, do not give rise to securities violations."  *IBEW Loc. Union No. 58 Pensions Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC,* 783 F. 3d 383, 392 (2d Cir. 2015); *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future.").  Courts routinely hold that statements similar to those at issue here are not actionable for that reason.  *See*, *e.g.*, *Hassan* v. *Bos. Beer Co., Inc.*, 2023 WL 8110940, at \*3 (2d Cir. Nov. 22, 2023) (company "still confident" in its "ability to grow

significantly"); *Afr.* v. *Jianpu Tech. Inc.*, 2022 WL 4537973, at *7 (S.D.N.Y. Sept. 28, 2022) (company anticipates "growth for the rest of the year").

### C.    Plaintiffs Do Not Allege Particularized Facts Demonstrating That Any Challenged Statement Was False or Misleading.

Under the PSLRA, Plaintiffs "must do more than simply assert that a statement is false— they must *demonstrate with specificity why* that is so." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis added). The Complaint here fails to do so.

***Unsourced Allegations.***    The vast majority of Plaintiffs' allegations supposedly demonstrating the alleged falsity of the challenged statements simply assert undisclosed "facts" that Plaintiffs claim were known within the Company at unspecified times during the Class Period, without referencing any sources or otherwise providing any explanation as to how or why the event or occurrence supposedly existed before the time of any statement, or the basis for Plaintiffs' claim that was the case. To cite one example among a great many, the Complaint makes the following sweeping allegation, without further explanation: "In each quarter from January 2020 through May 2022, the Company was a couple hundred-million-dollars [*sic*] short of its [backlog] target. But regardless of the size of the gap, miraculously, Syneos always made it up and hit their target each month and each quarter." (AC ¶ 11; *see also* Appx. A at 33–45 (listing all unsourced allegations in the Complaint).)

Such wildly conclusory allegations are insufficient. For one, Plaintiffs nowhere explain any tie between Syneos' internal "targets" and its reported financial results. Indeed, Syneos routinely exceeded its publicly disclosed guidance until mid-2022. Moreover, these unsourced allegations do not comport with the PSLRA, which requires such "information and belief" averments to comply with "§ 78u–4(b)(1)'s particularity requirement." *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 136 n.16 (D. Conn. 2007); *see In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 691 (S.D.N.Y. 2008). To be credited, such allegations must "state with particularity ***all***

*facts* on which [the] belief is formed," § 78u–4(b)(1) (emphasis added), which may "come from either of two sources—people or documents—and the complaint must specifically refer to one of them," *Adams* v. *Kinder-Morgan*, *Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (emphasis added); *see also Novak*, 216 F.3d at 314 ("[A] complaint can meet the [PSLRA] pleading requirement . . . by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."). Plaintiffs' allegations point to neither.

***Allegations Ascribed to Confidential Witnesses Should be Disregarded.*** The Complaint seeks to lend some credibility to Plaintiffs' speculation by contending that the allegations rest on counsel's "investigation" that supposedly included "interviews" of an unspecified number of "former Syneos employees" (AC ¶ 1 n.1), and some Complaint allegations appear to refer to information purportedly learned from those employees (*see*, *e.g.*, AC ¶¶ 78–80). These "confidential witness" ("CW") allegations get Plaintiffs no closer to pleading a cognizable claim.

"[C]ourts generally have not credited the statements of CWs who are insufficiently described or whose descriptions do not suggest that they had been in [a] position to know the facts attributed to them." *Long-Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 798–99 (S.D.N.Y. 2020); *see also Novak*, 216 F.3d at 314 (CWs must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Here, Plaintiffs' CWs are not just "insufficiently described"; they are barely described at all. Plaintiffs do not even specify how many CWs they are relying upon, much less specify "what aspect of [the Company] or its management [each CW] was involved in, what [each CW's] job duties entailed, [and] what kind of access [each CW] had." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011). Plaintiffs only refer vaguely to "one employee," "Syneos executives," a "Project Director," a "Senior Director," a "Senior Vice President of Corporate Quality," and a "business unit CFO." (AC ¶¶ 76, 78–80, 84, 270, 275–

76, 253(b).)  That is the extent of Plaintiffs' "description," which is not even close to enough to enable the Court to assess the CW allegations.  *See*, *e.g.*, *Glaser*, 772 F. Supp. 2d at 595 (disregarding allegations attributed to an otherwise undescribed former "senior executive").[5]

*Mischaracterized Documents.*  Plaintiffs also attempt to conjure some falsity theory by reference to two internal Company documents.  They grossly mischaracterize both.  *See TufAmerica, Inc.* v. *Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (where "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true").

*First*, most notably, the Complaint makes heavy use of what it describes as "an internal presentation provided to the [Syneos Executive Leadership Team] in January 2021."  (AC ¶ 49; *see also id.* ¶¶ 7, 52–53, 64–66, 253(a), 263, 326.)  Plaintiffs claim this point-in-time presentation shows—and that the Individual Defendants knew—that, throughout the Class Period, clients were "cancel[ling] in droves" and "pulling significant amounts of business away from Syneos" (AC ¶ 49), and that, contrary to their public forecasting, "Defendants expected a *negative year-over-year awards growth rate* of -23.3% across its clinical and commercial business and *-23.5% for its clinical business* in 2021."  (AC ¶ 52 (emphasis in original).)

These are blatant misrepresentations of the document's contents.  It does ***not*** say that Defendants expected negative growth (of 23% or otherwise) in 2021 (or any other year).  As is apparent even from the truncated reproduction of one slide contained in the Complaint, the 23% numbers refer to *just four clients* out of *hundreds*.  (*See* AC ¶ 52.)  Moreover, on its face, the

---

[5] The allegations that appear to be sourced from CWs are also hopelessly vague.  For example, the Complaint alleges that "other Syneos executives" (*i.e.*, ***not*** the CWs) told some Individual Defendants that unnamed "clients were pulling projects out of the Syneos pipeline" (AC ¶ 253(b)), but Plaintiffs conspicuously omit, among other things, *when* this information was communicated, *how many* clients (in number or revenues), *whether* the "pulling" actually occurred, and *how* doing so rendered some Syneos statement false.

entire presentation concerned only "GCS," or "Global Client Solutions," which is one client team that manages the Company's relationships with just 16 clients.  (*Id.*)  And, while the Complaint alleges that the undisclosed adverse developments related primarily to SMID clients, GCS covered 15 of Syneos' 50 *largest* clients, and just *one* SMID client out of hundreds.  (*Id.*) The presentation entirely contradicts, rather than supports, the premises for which it is cited, much less provides such support throughout the Class Period.[6]  Plaintiffs' premise is also peculiar; Syneos grew revenues in 2021 and exceeded its full-year guidance (*supra* at 7–8).

*Second*, Plaintiffs attempt to support their assertion that Syneos inflated its backlog by hundreds of millions of dollars throughout the two-year Class Period by repeated reference to a single "August 2021" email in which one Individual Defendant supposedly told his subordinates to "find" additional backlog to include in the projection.  (AC ¶ 71; *see also id.* ¶¶ 12, 72, 74, 77, 82–83, 273.)  Again, the document says no such thing.  It reflects nothing more than ordinary management efforts at future expense reduction.  (*See* Ex. 61 ("I need to ask all to work with your CFOs as discussed and review the positive programs to find more efficiencies or reduce future overburns. . . . I know we can find it.").)  "Find it" does not mean "fake it."  And the email relates only to about ***$10 million***, ***not hundreds of millions of dollars*** in each of eight quarters.

***Supposed "Admissions."***  The Complaint also attempts to reverse engineer evidence of fraud from various statements that Defendants made in hindsight after the Class Period, which Plaintiffs allege amount to "admissions" that Defendants "knew of and wrestled with their competitive and technological shortcoming [*sic*], but [] failed to disclose them to investors"

---

[6] Plaintiffs do not allege from where or from whom they procured the presentation excerpted in the Complaint, nor do they justify their publication of this obviously highly confidential document that nowhere supports their claims.  Syneos will address, at an appropriate time, any inducement by Plaintiffs and their counsel of breaches of confidentiality obligations and fiduciary duties by former Syneos employees.  Syneos would be pleased to submit the full presentation to the Court under seal or with other protections of its clients' confidences.

during the Class Period. (AC ¶¶ 58, 68–70, 254.) Plaintiffs' characterizations are again entirely unsupported by the documents cited. There is nothing in any of these post-Class Period statements even approaching an admission of fraud or remotely suggesting foreknowledge of problems destined to generate negative financial developments. To the contrary, Defendants expressed "surprise" at the "very recent[]" turn of events that led to the disappointing third quarter 2022 results at the end of the Class Period. (*See supra* at 10; *see also* Appx. C.)

### D.    Syneos Had No Duty to Disclose Any Additional Facts Under SEC Rules.

Items 303 and 105 of SEC Regulation S-K are of no help to Plaintiffs. (AC ¶¶ 316–29.) Item 303 requires an issuer to "[d]escribe any known trends or uncertainties" that the company reasonably expects will "have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs' assertion that Syneos suffered "qualitative and competitive disadvantages" or business setbacks in the wake of COVID establishes no trend, much less one "known" to Syneos at the time of any statement. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016); *Wandel* v. *Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022) (Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty"). Moreover, Plaintiffs describe these as historical events, but nowhere explain how they would be material to Syneos' "continuing operations." *See Shetty* v. *Trivago N.V.*, 796 F. App'x 31, 33–34 (2d Cir. 2019).

Plaintiffs' reference to Item 105, which requires disclosure of "the material factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105, is even further afield. The Company's disclosures specifically warned of the potential negative developments that Plaintiffs allege were concealed. (*See* Appx. B.) And this theory fails along with Plaintiffs' Item 303 theory. *See Hutchison* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011) (alleged omission did not violate (what is now) Item 105 for the same reasons

-21-

that it was not reasonably likely to be material under Item 303).

## III.    PLAINTIFFS FAIL TO PLEAD PARTICULARIZED FACTS GIVING RISE TO THE REQUISITE "STRONG INFERENCE" OF SCIENTER.

Under the PSLRA, Plaintiffs must, "with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  To do so, Plaintiffs must plead "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  For an inference of scienter to be "strong," the Supreme Court has ruled that "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Id*. at 323.  Where, as here, a "plausible, nonculpable explanation[]" is more likely than fraud, Plaintiffs have failed to establish scienter.  *Id.* at 324.

### A.    Plaintiffs Plead No Cognizable Motive for Defendants to Commit Fraud.

Pleading "motive and opportunity" requires particularized allegations of a "concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The Complaint alleges that the Individual Defendants acted to protect their jobs and "[c]ollect millions in compensation and bonus awards."  (AC ¶¶ 307–11.)  But the law is clear that this is not enough.  *Id.*; *see In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 401 (S.D.N.Y. 2009) ("[M]otives of compensation and job security—which are generally possessed by most corporate directors and officers—have been held not to be sufficient to give rise to an inference of fraudulent intent for the purposes of Section 10(b).").

The Complaint primarily relies on allegations that the Individual Defendants sold

-22-

Company stock during the Class Period at purportedly inflated prices. (AC ¶¶ 277–301.) But the "mere fact that insider stock sales occurred" does not suffice. *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020). Plaintiffs must plead that the Individual Defendants' transactions were "unusual" or "suspicious." *Id.* They do not do so.

Plaintiffs paint a misleading picture of the Individual Defendants' trading activity by focusing exclusively on their stock *sales*. By "fail[ing] to account for the Individual Defendants' stock *acquisitions*" during the Class Period, the Complaint cannot plausibly allege that the Individual Defendants' trades were suspicious. *Malin*, 499 F. Supp. 2d at 152 (emphasis added). Viewed in the full context of all of the Individual Defendants' transactions over the Class Period, none of them sold a significant portion of their Syneos stock holdings. (*See* Appx. D.) In fact, two Individual Defendants actually *increased* their holdings, which is "wholly inconsistent with fraudulent intent." *Tung* v. *Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 460 (S.D.N.Y. 2019)*.* Ms. Keefe ended the Class Period with nearly 22,000 more shares than at the start of the Class Period, and Mr. Colvin held nearly 2,000 more shares*.* (*See* Appx. D. at 1, 3–4.)[7]

Plaintiffs do not allege any other relevant characterization of suspicious trading. *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 772–73 (S.D.N.Y. 2019). The sales were "not clustered" at the end of the Class Period, "when insiders theoretically would have rushed to cash out before the fraud was revealed," but instead occurred months—in some cases more than a year—before the end of the Class Period. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444–45 (S.D.N.Y.

---

[7] Although Mr. Macdonald and Mr. Meggs held fewer shares at the end of the Class Period than they did at the beginning, their holdings (including common stock and restricted stock units) declined by a mere 6.9% and 24%. (*See* Appx. D. at 6–8, 10–12.) This is well within the range that courts have deemed insufficient to establish suspicious trading, *see Malin*, 499 F. Supp. 2d at 153 (courts have declined to find scienter where defendants reduced holdings by up to 80%), especially where, as here, other Individual Defendants increased their holdings, *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 175 (S.D.N.Y. 2023) (fact that two defendants' shareholdings "increased during the class period" "weigh[s] against inferring scienter").

2005).  Mr. Colvin's final sale was a full *21 months* before the end of the Class Period, and Mr. Macdonald's last sale was *15 months* before.  (*See* Appx. D at 1, 8.)[8]  And Plaintiffs do not at all allege any viable misstatement during 2021 when the bulk of the trading occurred.

In addition, because the Individual Defendants' stock sales were made pursuant to non-discretionary 10b5-1 trading plans, the sales "do not give rise to a strong inference of scienter." *Lululemon*, 14 F. Supp. 3d at 585.  Plaintiffs speculate the trading plans were entered into "strategically" to "take advantage of an inflated stock price."  (AC ¶ 282.)  But the trades all occurred at wildly variant prices as low as $62.65 (AC ¶ 293), and at an average price of $78.90, a full *$25.28 lower* than the Class Period high of $104.18 (AC ¶ 23; Ex. 36 at 64).  Plaintiffs have thus failed to allege the trades were "made at a time . . . that suggests [the Individual Defendants were] maximizing personal benefit."  *City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*, 565 F. Supp. 3d 478, 487 (S.D.N.Y. 2021).

### B.    Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness.

To plead circumstantial evidence of conscious misbehavior or recklessness, Plaintiffs must allege particularized facts establishing "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphases in original).  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at 309.  Moreover, because Plaintiffs have failed to plead a motive to defraud, "the strength of the circumstantial

---

[8] Plaintiffs allege a lengthy Class Period of almost 26 months, which "weakens any inference of scienter that could be drawn from the timing of defendants' trades." *Teachers' Ret. Sys. of LA* v. *Hunter*, 477 F.3d 162, 185 (4th Cir. 2007).  To the contrary, the long Class Period "strengthens a competing inference," *id.*, that Plaintiffs intended "to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period," *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002).

allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142.

To try to satisfy this burden, the Complaint relies on the same defective unsourced allegations, conclusory pronouncements of information supposedly provided by confidential witnesses, mischaracterized documents, and mischaracterized post-Class Period statements that Plaintiffs rely on to allege falsity. Those allegations are insufficient for the same reasons (*see supra* at II.C), as well as for the additional reason that most of the unsourced and confidential witness information is not even alleged to have been shared with any of the Individual Defendants. *See Frankfurt-Trust Inv. Luxemburg AG* v. *United Tech. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (no inference of scienter where it was "not alleged with particularity" how specific contradictory information was "reported up the chain" to individual defendants).

The Complaint's remaining scienter allegations can be swiftly rejected. Plaintiffs' assertions that the Individual Defendants must have known of contradictory information by virtue of their senior roles (AC ¶¶ 256–63) or involvement in the Company's "core business" (AC ¶ 264) are plainly insufficient as "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight," *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015); *see In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014) ("[G]eneral allegations regarding a defendant's involvement in the 'core operations' of a business cannot serve as an independent basis for scienter."). And the mere fact that the Individual Defendants left the Company (AC ¶ 315) likewise does not give rise to an inference of scienter. *BISYS*, 397 F. Supp. 2d at 446–47 ("In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud.").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:    New York, New York      Respectfully submitted,
           December 20, 2023

*/s/ Brian T. Frawley*
Brian T. Frawley
Benjamin R. Walker
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
frawleyb@sullcrom.com
walkerb@sullcrom.com

*Attorneys for Defendants Syneos Health, Inc., Alistair Macdonald, Michelle Keefe, Paul Colvin and Jason Meggs*

-26-