UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), Individually and on Behalf of All Others Similarly Situated,

                Plaintiffs,

     vs.

SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, PAUL COLVIN, and JASON MEGGS,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:23-cv-08848-AS

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

———————————————————— x

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY OF THE FRAUD .............................................................................3

III.  LEGAL STANDARD ............................................................................................6

IV.   ARGUMENT..........................................................................................................7

    A.   Defendants' Materially Misleading Statements and Omissions Are Actionable ..........7

        1.   The Complaint Adequately Alleges Falsity......................................................9

        2.   Defendants' Statements Are Not Protected Forward-Looking Statements.........................................................................................11

        3.   The Complaint Sets Forth Sufficient Facts Which Provide an Adequate Basis to Believe Defendants' Statements Are False ......................12

        4.   Internal Syneos Documents Also Support Plaintiffs' Securities Fraud Allegations ................................................................................14

        5.   Statements Defendants Identify as Puffery or Corporate Optimism Are Actionable .........................................................................16

        6.   Admissions by Syneos Executives Further Support Plaintiffs' Scienter and Falsity Allegations.................................................................18

    B.   Defendants Had an Independent Duty to Disclose the Known Quality and Technology Issues Impacting Syneos's Ability to Perform ......................................18

    C.   Plaintiffs Allege a Cogent and Compelling Inference of Scienter ............................19

        1.   Defendants Sanctioned Numerous Practices Designed to Mask the Loss of New Business .................................................................20

        2.   Defendants' Own Statements, Their Roles in the Business, and the Magnitude of the Fraud Buttress Plaintiffs' Scienter Allegations..................21

        3.   Defendants Cannot Brush Aside the Same Particularized Allegations the Second Circuit Has Found Probative of Scienter..................................22

        4.   The Magnitude of Defendants' Insider Trading Supports Scienter .............23

V.    CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ...................................................................................13

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ........................................................................20

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
   19 F.4th 145 (2d Cir. 2021) ........................................................................................14

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)...........................................................................................6

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)............................................................18

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ......................................................................................11

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)...........................................................................17

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) .....................................................................................7

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..............................................................8

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004),
   *aff'd*, 165 F. App'x 928 (2d Cir. 2006)......................................................................10

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
   701 F. Supp. 2d 506 (S.D.N.Y. 2010)..........................................................................21

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   957 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................................2

*Ciy of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................16, 17

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020)............................................................................7

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)........................................................................20

*In re Coty Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...........................................................19

*Dahhan v. OvaScience, Inc.*,
   321 F. Supp. 3d 247 (D. Mass. 2018) .......................................................................13

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   _ F. Supp. 3d _, 2023 WL 2682905
   (E.D.N.Y. Mar. 29, 2023) .........................................................................................19

*Emps.' Ret. Sys. of Gov. of the V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).....................................................................................25

*Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018),
   *aff'd*, 779 F. App'x 69 (2d Cir. 2019)................................................................22, 23

*Freudenberg v. E\*Trade Financial Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................21

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)........................................................24, 25

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009)........................................................................24

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) .....................................................................................17

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................................................14

*Hall v Child.'s Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008).......................................................................17

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................................................2

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006).........................................................................9

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)......................................................................................18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015).......................................................................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...................................................................................................6

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................................12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .......................................................................21, 25

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)......................................................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)........................................................................... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)..........................................................13, 21, 22

*Ollila v. Babcock & Wilson Enters., Inc.*,
    2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ................................................11, 12, 17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................................17, 18

*In re Pareteum Sec. Litig.*,
    2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021).......................................................22

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)....................................................................13

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..........................................................9

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)................................................................................23, 24

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009)....................................................................10

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. 2016)......................................................................21

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).............................................................................6, 7, 25

*Shetty v. Trivago N.V.*,
    796 F. App'x 31 (2d Cir. 2019) .............................................................................19

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   417 F. Supp. 3d 379 (S.D.N.Y. 2019)...............................................................25

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999)...............................................................23, 24, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).............................................................................6, 23

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)...........................................................15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)...............................................................16, 17

*U.S. S.E.C. v. Syron*,
   934 F. Supp. 2d 609 (S.D.N.Y. 2013)...............................................................15

*In re Vivendi S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...............................................................11, 12

*Wandel v. Gao*,
   590 F. Supp. 3d 630 (S.D.N.Y. 2022)...............................................................19

*In re Xerox Corp. Sec. Litig.*,
   165 F. Supp. 2d 208 (D. Conn. 2001)...............................................................23

*In re XL Fleet Corp. Sec. Litig.*,
   2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)...........................................................17

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §78j(b).............................................................................................6
   §78u-4.........................................................................................6, 12, 13

Federal Rules of Civil Procedure
   Rule 9(b) ...........................................................................................6
   Rule 12(b)(6).........................................................................................6

17 C.F.R.
   §229.303............................................................................................18
   §229.303(b)(2)(ii) ..................................................................................18
   §240.10b-5(b).........................................................................................6

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF Nos. 46-47) ("Motion" or "MTD").[1]

## I.    INTRODUCTION

Throughout the Class Period, Defendants engaged in a fraud which gave investors the false impression that Syneos was continuing to secure a steady inflow of new business awards, was growing its backlog, and had a book-to-bill ratio greater than 1.0, representing that the Company was healthy and adding new business to its backlog at a rate faster than it was monetizing existing backlog. Defendants falsely convinced the markets that, as Syneos emerged from the initial COVID-19 disruption, the negative impacts on the Company had bottomed out by the second quarter of 2020 and Syneos had quickly entered a recovery period that was proving a boon for its business. Thereafter and throughout the Class Period, Defendants emphasized Syneos's record performance metrics (*i.e.*, backlog, net new business awards, and book-to-bill ratio), claimed that business was booming, and through its technology advantages, innovative and integrated expertise, recent acquisitions, and superior talent, assured investors that the Company was winning new business as the Company surged out of the pandemic.

Exactly the opposite was true. As Defendants knew, including from discussions during their monthly ELT meetings, customers were pulling significant business away from the Company and declining to re-sign with Syneos because it was unable to provide the services its customers required. Instead of disclosing these problems as they were obligated to do given their repeated emphasis on the Company's performance metrics, such as backlog, net new business awards, and the book-to-bill ratio, Defendants engaged in a fraud to convince investors that business was surging. Defendants'

---

[1] All factual allegations are taken from ECF No. 35 (the "Complaint"), and are cited as "¶__" or "¶¶__." Defined terms have the meaning set forth in the Complaint. All citations and footnotes are omitted and emphasis is added unless otherwise noted.

fraud caused Syneos's stock price to hit all-time highs during the Class Period which then allowed insiders to reap tens of millions in illicit insider trading proceeds, while the Company's largest sponsors dumped over $3 billion in stock via five public offerings during the Class Period. And, after nearly all of their shares available to trade were sold, Defendants either resigned or admitted that the Company's performance metrics were artificially inflated and Syneos had long been plagued by debilitating quality, technological, and operational issues.

In their Motion, Defendants ignore the Complaint's particularized allegations identifying their false statements made during the Class Period, explaining why those statements are false, and detailing their conscious recklessness. *See* Pls.' App. A.[2] Defendants disregard allegations and statements they cannot contest (*see, e.g.*, Pls.' App. B), dispute facts that must be accepted as true, and set forth their own version of the facts which they assert should replace Plaintiffs' well-pleaded allegations. In fact, Defendants present an innocent version of their actions yet entirely ignore the Complaints' allegations that Defendants leveraged their culture of fear to manipulate performance metrics and make up millions in backlog shortfalls in each quarter during the Class Period.[3] In the end, the Company was forced to slash backlog and report new business awards that were 10% of what they had conditioned the market to expect.

Each of Defendants' arguments fails. Defendants' Motion should be denied.

---

[2] "Pls.' App. __" refers to Plaintiffs' Appendices, filed concurrently herewith.

[3] Defendants' alternative narrative and their "Appendix C" (*see* ECF No. 47-4) filed in support of their Motion are "improper" attempts to "dispute facts stated in a well-pleaded complaint," by arguing the "truth" of referenced documents. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (highlighting the "concerning pattern in securities cases" of defendants' "use of extrinsic documents to resolve competing theories against the complaint [that] risks premature dismissals of plausible claims that may turn out to be valid after discovery"). With respect to uncited portions of documents integral to a fraud complaint, a court may assess such documents ""'to determine **what** statements [they] contained" – but "**again not for the truth of the matters asserted**."'" *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 289 (S.D.N.Y. 2013) (emphasis in original).

## II.    SUMMARY OF THE FRAUD

This case focuses on Syneos's flagship Clinical Solutions division. The well-pleaded facts demonstrate that Defendants falsely assured investors and omitted material information the Company was obligated to disclose: that the Company was securing a steady inflow of new business awards and growing its backlog of outstanding clinical awards when the opposite was true.

Throughout the Class Period, Syneos discussed at length the performance metrics that served as key indicators of underlying client demand and anticipated future revenues, including: (i) "backlog" of business awards; (ii) net new business awards; and (iii) reported book-to-bill ratios. For example, Defendants made false statements highlighting the Company's record "SMID" performance, strong gross awards growth, record backlog, robust pipelines, and book-to-bill ratios between 1.20x and 1.40x. ¶¶109-110, 113. Defendants repeated these and similar statements regarding the Company's critical performance metrics throughout the Class Period. *E.g.*, ¶¶140, 145, 175-176, 190, 195.

But things were not as Defendants portrayed them to be. What they did not disclose was that the INC Research Holdings, Inc. and inVentiv Health merger that created Syneos had been a disaster. ¶59. By 2020, the combined Company was plagued by known, but undisclosed, quality, technological, cultural, and operational problems such that Syneos was unable to compete for new business or retain renewal customers who were aware of Syneos's quality and service failures. ¶¶50-70. Defendants knew that Syneos's quality issues and data limitations were having a devastating and undisclosed impact on its clinical business which was neither healthy nor growing and was instead experiencing negative growth. ¶¶252-253.

To mask this negative growth, Defendants took action to inflate the Company's backlog by at least $500 million and manipulate its performance metrics by, for example: (i) refusing to remove cancelled business from backlog (¶¶72, 267); (ii) accounting for already-forfeited contractual bonuses (¶73); (iii) including awards in backlog that went far beyond the one-year restriction in violation of

their "conservative" methodology (¶¶74, 82, 184, 266); (iv) treating change orders as "finalized" before customers had agreed to or signed them (¶¶75, 268); (v) refusing to remove reimbursable costs from backlog even after actual trial costs came in lower than projected (¶¶76, 94-95); (vi) directing staff to calendar unnecessary monitoring visits to create the false appearance the project was generating revenue (¶78); (vii) issuing invoices before work was fully completed (¶¶79, 270); and (viii) manipulating expense and cost projections to justify recognizing more revenue than had been earned (¶¶82, 269, 271). And, despite persistent quality shortcomings and service failures plaguing the clinical business and hampering that segment's growth, Defendants falsely told investors that Syneos was experiencing record growth. Defendants reported that the Clinical Solutions division was achieving or exceeding its targets, while falsely generating false performance metrics. *E.g.*, ¶48.

In total, the Complaint provides a sufficient basis for believing that Defendants' statements were knowingly false and misleading. The Complaint's falsity allegations are supported by detailed reference to internal documents (¶¶51-53, 65-66); admissions by Syneos's top executives, including by the Individual Defendants (¶¶58, 63, 68-70, 241-245, 248-250); and commentary from securities analysts expressing skepticism concerning the veracity of Defendants' statements. ¶¶95, 246, 314. The Complaint's falsity allegations are also supported by information from former Syneos employees who corroborate one another and explain how Syneos altered its cost estimates and manipulated cost-of-completion thresholds to inflate its performance metrics. ¶¶59-64, 71-86, 266-276.

The Complaint's allegations also demonstrate Defendants' conscious misbehavior. ¶¶251-306. Defendants knew that Syneos's clinical business was neither healthy nor growing because a comprehensive review of the clinical business was initiated as top clients were pulling work from the Company. ¶¶52-53, 65-66. For example, Defendants knew from a January 2021 ELT presentation that three large clients had put Syneos business awards on "hold," with nearly all of the rest of its top accounts (worth $1 billion annually) in jeopardy, and Syneos was unable to secure new business until

it addressed its lack of a "quality culture," cured its "delivery failures," and "earned back trust." ¶¶7, 53, 66. From the January 2021 presentation, members of the ELT knew that the Company's SMID clinical and commercial business awards would **decline 23.3%**. ¶52.

The Complaint's scienter allegations do not stop with the January 2021 ELT meeting and presentation. The detailed allegations demonstrate Defendants' knowing and active participation in hiding the Company's problems and inflating its backlog and other performance metrics important to investors. Defendants were warned by high-level managers that inflating backlog "could amount to fraud," yet they persisted in manipulating their performance metrics and demanded that employees "find" revenue. ¶¶71-86, 265-276.

The Complaint additionally sets forth that while hiding their manipulations and the Company's critical failures from investors, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021. ¶13. The Individual Defendants and other insiders took full advantage and dumped over $19 million worth of their own Syneos shares during the Class Period at prices artificially inflated by their false and misleading statements and omissions. ¶¶277-306. Defendant Macdonald alone sold 142,586 shares for proceeds of more than $11.4 million. ¶279. Syneos's private equity sponsors and largest shareholders who had representatives on the Company's Board of Directors, Thomas Lee Partners and Advent International, unloaded more than $3 billion worth of Syneos stock through a series of five registered public stock offerings and share repurchase agreements. ¶¶90-91.

At the end of the Class Period, on November 4, 2022, and thereafter, Defendants made stunning admissions regarding Syneos's actual financial results. ¶¶241-245, 248-250. For example, on that day, Syneos reported worsening quarterly financial results, which revealed the dramatic deterioration of its business and client demand, culminating in a reported $182 million in clinical net new business awards during the quarter, an "unprecedented" 87% year-over-year decline and one-

tenth the amount expected by analysts, resulting in a Clinical Solutions book-to-bill ratio of just 0.18x, which was "a long way away from" the market's expectation of 1.15x. ¶¶241, 246, 314. Defendant Keefe admitted that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions, and she subsequently admitted that while they had taken recent "steps . . . to address the post-revenue SMID cohort," they lacked the technological offerings to "be more competitive." ¶¶21, 68, 249.

Securities analysts were shocked. ¶¶246, 314. One analyst referred to Syneos's abysmally low book-to-bill ratios, stating: "We've never seen that happen." ¶22. Another pointedly challenged Defendants' claim that Syneos was not experiencing significant cancellations as "frankly hard to believe . . . given that pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected." *Id.*

Investors were left holding the bag. As a result of the revelation of the fraud, Syneos stock plummeted $23 per share, a decline of 77% from its Class Period high. ¶23.

## III.    LEGAL STANDARD

To state a claim for securities fraud under §10(b) of the Exchange Act and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

On a Rule 12(b)(6) motion, courts must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309-10 (2007). Courts must also "draw[] all reasonable inferences in favor of plaintiffs." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001). "'[F]act-specific question[s] cannot be resolved on the

pleadings.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Federal Rule

of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "do not

require the pleading of detailed evidentiary matter in securities litigation." *Scholastic*, 252 F.3d at 72.

Rather, an "alleged fraud need only be ***plausible*** based on the complaint; it need not be more likely

than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d

Cir. 2015) (emphasis in original).

## IV.    ARGUMENT

### A.    Defendants' Materially Misleading Statements and Omissions Are Actionable

To state the circumstances of fraud with particularity, the complaint must "'"(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent."'" *Novak v.

Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Plaintiffs have done so here.[4] *See generally* Pls. App. A.

For example, throughout the Class Period, Defendants positively (but falsely) emphasized

Syneos's backlog, net new business, book-to-bill metrics, business prospects, and operational results,

celebrated the Company's record growth, and told investors that Syneos was competing for and

winning new business resulting in tremendous growth based on "record" customer order flows.

¶¶100-104, 108-116, 120-130, 134-135, 139-147, 152-167, 172-185, 190-198, 202-205, 209-215, 220-

227, 235-236. Defendants consistently discussed with analysts and investors the strength of the

---

[4] Defendants' citation to *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), and criticism of the Complaint's format is misplaced. "The Amended Complaint is far from the 280-page complaint in *Bahash* where the lengthy quotations and canned allegations made any analysis a Sisyphean task." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (although "not a model of clarity, it identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading"). Pls.' App. A; *see also* ¶105.

Company's SMID performance, backlog, and other related metrics each quarter and year-end during the Class Period. ¶¶109, 139, 152, 175, 230.

Yet, while Defendants were reporting highly positive but false performance metrics, (*e.g.*, ¶¶102, 109, 128, 152), purportedly grounded in the Company's "balanced," "conservative," and extremely specific backlog criteria (¶¶104, 122, 184), Defendants had inflated backlog by at least $500 million and manipulated its book-to-bill ratios by, for example, including in backlog new awards before contracts or change orders were signed, underestimating cost, refusing to remove cancelled awards, and stuffing backlog with three to four years of business value. ¶¶72-85.

In addition, contrary to Defendants' assertions that Syneos was "at the forefront of this market shift to an agile, highly communicative, insights-driven, integrated product development approach" (¶126), the Company was plagued by known, but undisclosed, long-standing quality, technological, cultural, and operational problems rendering Syneos unable to provide the service its customers required and causing customers to pull significant amounts of business away from Syneos. ¶¶7, 50-70. As a result, Syneos's reputation as a competent and reliable Contract Research Organization had been severely damaged in the marketplace, causing the Company's net new business awards and win rates to severely decline. ¶¶49-70. And, by late 2020, as Defendants were celebrating the Company's performance metrics, they were well aware that the clinical business was experiencing negative growth. ¶¶49, 51-53, 58, 64-66.

With these allegations, Defendants' misstatements and omissions are actionable. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) ("Linking future success to present and past performance does not render statements immune from liability."); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (misstatements and omissions adequately pleaded where defendants represented that its project was "meeting its milestones without delay" while failing to disclose "'systematic problems'" at its facility).

### 1.    The Complaint Adequately Alleges Falsity

Although Defendants concede that Syneos's specific backlog criteria is "described in extraordinary detail," they nonetheless challenge the Complaint's related falsity allegations as attacking the (i) non-actionable exercise of judgment and (ii) non-actionable forward-looking statements about revenue predictions. MTD at 14. Defendants are wrong.

The Complaint alleges in detail how Defendants repeatedly and intentionally violated their own "conservative" backlog methodology (¶¶104, 122, 184) to artificially inflate the Company's performance metrics and to generate the appearance that the Company was healthy and growing when exactly the opposite was true. ¶¶71-86. Defendants were well aware of how important these performance metrics – backlog, net new business awards, and the book-to-bill ratio – were to investors and falsely stressed these metrics during each quarterly and year-end conference call with securities analysts throughout the Class Period. *See, e.g.*, ¶¶108-111, 139, 142, 145. Where a defendant "'puts the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."'" *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020). Having chosen to speak about Syneos's performance metrics during each earnings call, Defendants were duty-bound to not misspeak and disclose material information which undercut their statements. And even "the lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one 'has a duty to be both accurate and complete.'" *Lapin*, 506 F. Supp. 2d at 237 (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)).

Defendants run but cannot escape from the Complaint's detailed allegations describing how Syneos generated and reported false performance metrics. For example, while business awards were

to be included in backlog only when "collection of the award value is probable" (¶141), Defendants directed or were complicit in retaining businesses awards in backlog even after the contracts were terminated or when collection of the business award value was not probable. ¶¶265-276. Similarly, despite the clear restriction that only "a **maximum of twelve months** of services" can be included in the award value added to backlog (¶141), Defendants improperly included in backlog at least two to three years of future value from its FSP awards (¶266). Further, while Defendants assured investors that "**[o]ur backlog also reflects any cancellation or adjustment activity related to these awards**" (¶141), they refused to remove from backlog cancelled or terminated business, including two large oncology projects cancelled in early 2021, over the objection of the oncology group CFO. ¶267.

Defendants' citation to *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006), for the proposition that the securities laws do not provide a "cause of action for the review of management practices" is misplaced. MTD at 14. First, Plaintiffs do not challenge what might otherwise be considered a simple business decision. *See, e.g.*, ¶¶104, 105(f). Defendants knowingly issued false statements and omitted material information about practices that were detrimentally impacting the Company's operations, backlog, and other related metrics, in violation of their own stated backlog procedures. *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 531-32 (S.D.N.Y. 2009) (statements "were fraudulent because they failed to reveal that the Company had . . . violat[ed] . . . its internal hedging policy"). Second, *Citigroup* is distinguishable because Defendants' failure to adhere to the Company's specific backlog criteria "was intended to deceive **its own** shareholders, not investors in the securities of other companies." *Sadia*, 643 F. Supp. 2d at 532 (emphasis in original).

### 2. Defendants' Statements Are Not Protected Forward-Looking Statements

Defendants assert that "***[m]ost***" of the challenged statements are immune from liability as they are either forward-looking or statements of opinion. MTD at 15-17. This argument fails because Plaintiffs have alleged misrepresentations of present and historical facts.

Defendants ignore the voluminous detailed allegations regarding Defendants' statements of present and historical fact. *See, e.g.*, *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (defendants are liable for their knowingly false and present-tense statements). For example, much of what Defendants challenge as "forward-looking" are the announcement of the Company's current period financial and operational results, reporting on backlog, net new business awards, and book-to-bill ratios. MTD at 2, 4, 14 & n.4, 15. Current and historical operational and performance financial metrics such as backlog are not "forward-looking." *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018) (statements concerning backlog were "out of the safe harbor entirely"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 990 (9th Cir. 2008) (statements concerning backlog were not forward-looking). Furthermore, Defendants' commentary on those results and the then-current state of the business are similarly not "forward-looking." *See* ECF No. 47-2 ("Defs.' App. A") at 2-5, 9-10 (challenging, *e.g.*, ¶108 ("Syneos Health ***continues to experience*** strong SMID demand"); ¶113 ("we closed Q3 with solid net new business awards"); ¶114 ("***we had a strong quarter*** across our operating and financial metrics, including . . . ***backlog growth***"); ¶121 ("what we're seeing at the moment"); ¶176 ("Clinical and Commercial . . . ***delivered*** another quarter of strong awards, ***powering record backlog levels***"); ¶191 ("Our . . . teams again achieved double-digit growth fueled by strong demand . . . as demonstrated by our robust awards and backlog.")).

Even if portions of Defendants' false statements contain forward-looking ***elements***, "'[a] mixed present/future statement is not entitled to the safe harbor with respect to the part of the

statement that refers to the present.'" *Vivendi*, 838 F.3d at 245-49 ("It is clear that at least some of the statements that Vivendi identifies as forward-looking contain present representations . . . .").

Lastly, any purported "warnings" that accompanied Defendants' misstatements concerning the conversion of backlog into revenue are insufficient to shield them from liability. Defendants' ostensible cautionary language and any other accompanying warnings were insufficiently meaningful, and Defendants had actual knowledge that their statements were false and misleading. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Vivendi,* 838 F.3d at 245 (forward-looking statements are not protected if "'made with actual knowledge'" of falsity). Additionally, missing from these "warnings" was the disclosure that Defendants had already inflated Syneos's backlog and related metrics in violation of the Company's specific backlog criteria and Defendants **knew** that the reported backlog included at least $500 million of uncollectible (¶¶93-95), cancelled (¶72), and prematurely or otherwise improperly recorded award value (¶¶73-75, 78-80, 82-86), which Defendants knew would never convert into revenue. ¶62. *See Jinkosolar*, 761 F.3d at 251 ("'Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'"). *See also Ollila*, 2018 WL 792069, at *5 (risk warnings that backlog "'may not be a reliable indicator of future revenues or earnings'" did not immunize backlog misstatements because "backlog had already been adversely affected").

### 3. The Complaint Sets Forth Sufficient Facts Which Provide an Adequate Basis to Believe Defendants' Statements Are False

Defendants assert that the Court should disregard the Complaint's detailed allegations because Plaintiffs did not describe sources with enough particularity or provide "all facts" that form the basis of their claims. MTD at 17-19, 25. However, "neither Second Circuit precedent nor the language of the PSLRA requires plaintiffs to reveal anonymous sources at the pleading stage," and courts have remarked that "requiring plaintiffs to identify the sources of their factual allegations would, in effect,

compel them to plead evidence in their complaint, thereby undoing the principle of notice pleading that underlies the Federal Rules of Civil Procedure." *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 477-79 (S.D.N.Y. 2004). Indeed, the Second Circuit has stated that the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity **sufficient** facts to support those beliefs." *Novak*, 216 F.3d at 313-14 (emphasis in original).[5]

Courts within the Second Circuit hold that "*Novak* should not be read to require that securities fraud complaints identify documentary or personal sources." *See Philip*, 383 F. Supp. 2d at 478. Under the broader approach, "the court looks to whether the factual allegations, considered in the whole, 'provide an adequate basis for believing that the defendants' statements were false,' without adding the requirement that the complaint identify the source of the factual allegations," which "recognizes . . . that requiring disclosure of sources in all securities fraud complaints is too restrictive a response to the PSLRA's particularity requirement." *See id.* at 479.[6]

The Complaint is replete with allegations that, on the whole, provide a sufficient basis for believing that Defendants' statements were false and misleading. The Complaint's allegations include: detailed internal documents (¶¶51-53, 65-66); admissions by Syneos's top executives, including the Individual Defendants themselves (¶¶58, 63, 68-70, 241-245, 248-250); commentary from securities analysts expressing skepticism concerning the veracity of Defendants' statements (¶¶95, 246, 314);

---

[5] *See also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("Judicial gloss requiring the allegation of the sources, either documentary or personal, of all facts alleged is in our view too restrictive a response to the requirement of pleading facts with particularity" adding that the "PSLRA did not . . . purport to move up the trial to the pleadings stage").

[6] Furthermore, witness accounts are not necessary to plead securities fraud, including indicia of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("this Court is aware of no authority requiring confidential witness allegations"); *see also Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 256 (D. Mass. 2018) ("no particular types of indicia of scienter are required").

detailed information from former Syneos employees, several of whom corroborate one another (¶¶54-57, 59-64, 71-86, 253, 266-276); and allegations concerning billions of dollars in insider trading prior to the disclosure of the true state of affairs at Syneos (¶¶277-306). *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 358-59 (S.D.N.Y. 2003) (noting that, "the cumulative effective of . . . evidence is important" and "the sheer volume of . . . corroboration" including through, among other things, "many confidential sources who all say the same thing" and "admissions by insiders" can "obviate[] the need for absolute particularity"); *see also Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 n.3 (2d Cir. 2021) ("Because the other facts alleged in the complaint sufficiently plead material misstatements and omissions, we need not consider whether the district court's treatment of the confidential witness's statements was correct."). Indeed, even Defendants' cherry-picked evidence filed in connection with their motion to dismiss corroborates the Complaint's allegations. *See* ¶71; ECF No. 48-61 (email from Defendant Colvin to certain Syneos employees stating that "we are still a long way off target" in the days before needing to "finalize [the] forecast" asking the employees to "work with your CFOs" to change certain figures and that Colvin "know[s] we can find it").

      **4.**     **Internal Syneos Documents Also Support Plaintiffs' Securities Fraud Allegations**

Rather than grapple with Plaintiffs' actual allegations, Defendants in some instances mischaracterize the Complaint and in other instances ignore the allegations outright. For example, while Defendants say Plaintiffs' "mischaracterize" the January 2021 ELT presentation, slides from which are embedded in the Complaint, Defendants fail to address the portions of the presentation which confirm that Defendants knew of the myriad customer and operational issues affecting their clinical business, including that: (i) Syneos's top customers had already pulled new business; (ii) 14 customers (out of Syneos's 16 top accounts), representing more than a billion dollars of awards in

2020, were in jeopardy; and (iii) Syneos's new business awards were neither growing nor healthy, but were expected to decline, including by more than 23% in its SMID business. ¶52.[7]

Defendants quibble with the significance of the presentation's reference to a **negative 23.5%** growth rate, arguing that it concerns "just four clients." MTD at 19. But the January 2021 presentation lists its SMID "20 Accounts" in the same line as the -23.5% growth rate. ¶52. At the motion to dismiss stage, Plaintiffs' plausible interpretation of the document controls. *See U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 627 n.4 (S.D.N.Y. 2013) ("'[T]he court may not choose among plausible interpretations of . . . documents – if a trier of fact could agree with plaintiffs' interpretation . . . the motion to dismiss must be denied."); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017) (because "Plaintiff's reading . . . [was] plausible, at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation . . . is correct").

Defendants' argument that "Syneos grew revenues in 2021" misses the point. MTD at 20. Plaintiffs do not allege that Syneos's revenue numbers themselves were misstated; instead they allege that Defendants made false disclosures about Syneos's backlog, net new business awards, and the book-to-bill ratios used by investors and analysts to measure the Company's performance and assess the current health of the business.

Furthermore, Defendant Colvin's July 2021 email to certain Syneos employees submitted in connection with Defendants' Motion (ECF No. 48-61) actually supports Plaintiffs' claims. In the email, Colvin acknowledges "we are still a long way off target," right before needing to "finalize [the] forecast," asking the employees to "work with your CFOs" to change certain figures and that Colvin "know[s] we can find it." *Id.* This corroborates the Complaint's allegations that Syneos made up

---

[7] Rather than address these detailed facts from the January 2021 ELT presentation, Defendants meekly challenge the presentation's origin. MTD at 20 n.6. Defendants, however, must accept the Complaint's factual allegations as true, including the information known to the ELT.

shortfalls that were "a long way off target" through last minute financial engineering. *See, e.g.*, ¶71.[8]

### 5.    Statements Defendants Identify as Puffery or Corporate Optimism Are Actionable

Defendants assert that certain of their misstatements are inactionable "puffery."[9] MTD at 16-17. Defendants' contention that cherry-picked excerpts (¶¶135, 226) are puffery ignores the fact that context is important. "[A] statement that may be puffery in one context is not puffery where it reassures investors as to specific risks." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022). For example, Defendants contend that the emphasized portion of the following statement is "puffery" while ignoring the "record backlog" and "strong growth" statements.

> "We delivered another quarter of strong awards performance, along with sequential revenue growth and robust profitability in the fourth quarter. ***Our innovative solutions, including Kinetic, continue to resonate with customers and we further strengthened our differentiated model with our acquisitions of Synteract, enhancing our SMID footprint, and Illingworth Research Group, further enabling our in-home capability for Decentralized Solutions . . .*** We remain confident in the long-term strength of our business given our record backlog, which we expect to fuel strong growth in both segments for the full year 2021."

¶140. *See Novak*, 216 F.3d at 315 (statements that defendants' inventory was "'in good shape'" and "'under control'" were not puffery because "they allegedly knew that the contrary was true"). Other cherry-picked excerpts Defendants contend are "puffery" provide context to the substantive misstatement (*e.g.*, ¶¶176, 179, 194) or are not puffery at all. *E.g.*, ¶140 ("given our record backlog . . . we expect to fuel strong growth in both segment . . ."); ¶191("Our Clinical . . . teams again achieved

---

[8] Defendants' argument that the email only concerns "$10 million, not hundreds of millions of dollars" shows exactly why discovery is needed. It cannot be known whether Defendants' cherry-picked email is the one referenced in the Complaint, and a singular email (without knowing how many similar directives Colvin issued in July or August 2021) does not disprove the Complaint's myriad of other well-pleaded allegations.

[9] Materiality is inherently fact-specific and is "rarely a basis for dismissal on the pleadings." *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012).

double-digit growth . . . as demonstrated by our robust awards and backlog.").[10] *See also* Pls.' App. C.

Similarly, Defendants' argument that many of their statements concerning purportedly "'high market demand and robust pipelines'" and a "'robust backlog'" are inactionable because they are "vaguely positive" statements also fails. MTD at 16-17; Defs.' App. A at 23-32. Courts routinely find similar statements to be actionable. *See, e.g., Ollila*, 2018 WL 792069, at *4 (sustaining statements concerning a "'strong backlog' [that] was providing momentum and growth going forward," where "defendants were aware of significant, undisclosed problems and delays").[11] Furthermore, when the fraud was revealed, Syneos's share price plummeted, several of Syneos's senior executives departed, and analysts were shocked and questioned Defendants' explanations. ¶¶314-315.[12]

Additionally, Defendants' assertions that certain statements are inactionable "opinion[s]" also fail because those statements were "'objectively false and disbelieved by the defendant at the time it was expressed.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 728 (S.D.N.Y. 2015) (discussing standard under *Omnicare*). Since these statements supported the illusion that Syneos's clinical business was healthy and growing, while Defendants knew the exact opposite was true, they are actionable. *See*

---

[10] Moreover, the fact that many of the challenged statements were made directly to securities analysts support their materiality. *Turquoise Hill*, 625 F. Supp. 3d at 223. *See, e.g.*, ¶¶115, 158, 183, 226. Such statements "take on an entirely different meaning altogether" and become "representation[s] that a 'reasonable investor could rely on . . . as reflective of the true state of affairs.'" *Turquoise Hill*, 625 F. Supp. 3d at 223.

[11] *See also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (statements that sales were healthy went beyond mere optimism by "'provid[ing] a concrete description of the past and present state of the pipeline'"); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *4 (S.D.N.Y. Feb. 17, 2022) (statements concerning "'strong demand momentum'" and "'sales pipeline and revenue figures were misleading'").

[12] *See Lockheed*, 875 F. Supp. 2d at 368 (that "analysts were clearly surprised and disappointed after the misstatements were corrected, and that the share price declined by almost 10%" shows materiality); *Hall v Child.'s Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (executive departures support materiality).

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015) ("if the real facts are otherwise, but not provided, the opinion statement will mislead by omission").

### 6. Admissions by Syneos Executives Further Support Plaintiffs' Scienter and Falsity Allegations

In passing, Defendants suggest that there is nothing to be gleaned from their admissions. MTD at 19-20. But Defendants' admissions are damning. After Defendants revealed "unprecedented" new business awards ***nearly 90% below*** market expectations and a ***14% reduction*** in backlog (¶¶241-246), Syneos admitted that structural and operational problems had plagued the clinical business since at least 2019, resulting in a failure to win new business. *See* ¶¶58, 94-95, 244-245, 248-250.

These and other admissions corroborate the experiences of former Syneos employees (¶¶54-57, 59-64, 71-86), and are consistent with the substance of Defendants' monthly ELT meetings and the January 2021 ELT presentation. ¶¶52-53, 65-66. Defendants' admissions support Plaintiffs' fraud allegations.[13] *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (post-class period statements combined with witness "observations" supported securities fraud claims).

### B. Defendants Had an Independent Duty to Disclose the Known Quality and Technology Issues Impacting Syneos's Ability to Perform

Separately, defendants had a duty to disclose under Item 303 of Regulation S-K 17 C.F.R. §229.303. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011). Under Item 303, Defendants were required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii).

---

[13] While Defendants now claim they were "'surprise[d]'" by the "'very recent[]'" negative developments, MTD at 10, 21, securities analysts found this sentiment to be "frankly hard to believe," and not "reasonable," especially considering the magnitude by which Syneos's business deteriorated. ¶314.

Syneos's inability to deliver quality clinical services and deliver on its contractual obligations to its clients were clearly material to investors and had already materialized. Defendants knew that Syneos's top clients were placing new business on "hold," and that future business would not be available to Syneos "until [it] earned back trust." ¶¶52-54, 66, 309-310. *See In re Dentsply Sirona, Inc. Sec. Litig.*, _ F. Supp. 3d _, 2023 WL 2682905, at *20 (E.D.N.Y. Mar. 29, 2023) (sustaining Item 303 claims, finding material defendants' failure to disclose "insufficient . . . demand," and "uncertainty relating to a relationship with an important customer . . . which was in jeopardy"). These allegations are far different than the allegations in the cases cited by Defendants. *See Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) (alleged trend emerged too contemporaneously with the SEC filings at issue); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016) (knowledge allegations not supported with meeting dates, attendees, and discussion topics); *Wandel v. Gao*, 590 F. Supp. 3d 630, 643 (S.D.N.Y. 2022) (defendant could not have known of a "trend" at COVID-19's outset).

## C.    Plaintiffs Allege a Cogent and Compelling Inference of Scienter

Plaintiffs allege the Defendants knew that Syneos's clinical business was neither heathy nor growing because they were specifically advised that Syneos's top clients were pulling work from the Company. ¶¶51-54, 64-66. By mid-2020, Defendants knew that the Company's shortcomings were hurting business and they had already begun a comprehensive review of the clinical solutions business to determine why its clients were pulling business from the Company. ¶51. As the Complaint alleges, "the Individual Defendants were each members of the ELT and attended monthly ELT meetings, including a January 2021 meeting where they were provided with and discussed a PowerPoint presentation belying the accuracy of their statements about the health of Syneos's Clinical Solutions business." ¶¶49, 51-52, 64, 252-253. The January 2021 ELT presentation specifically informed Defendants that three large clients had put Syneos business awards on "hold," with nearly all of the rest of its top accounts (worth $1 billion annually) in jeopardy, and Syneos was unable to secure new

business until it addressed its lack of a "quality culture," cured its "delivery failures," and "earned back trust." ¶¶7, 53, 66. As a result, the presentation concluded, the Company's SMID clinical and commercial business awards would decline 23.3%. *Id.*

Courts in this Circuit have repeatedly found that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308, *see id.* at 311-12 (finding repeated statements that inventory levels were under control or giving false explanations for inventory growth, despite knowing the true reasons for rising inventory levels, sufficient to plead scienter); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (upholding scienter based on meetings where defendants "received . . . monthly sales projection and monthly inventory reports"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d, 629, 637 (S.D.N.Y. 2010) (upholding scienter where "executives reviewed specific reports that should have alerted them to the problems they later allegedly misrepresented").

### 1. Defendants Sanctioned Numerous Practices Designed to Mask the Loss of New Business

Defendants were not just aware of the Company's problems; they also sanctioned and directed efforts to hide those problems and inflate backlog metrics, allowing them and other insiders to unload billions of dollars of their Syneos stock. ¶¶265-306. As explained above, while being warned by high-level managers that doing so "could amount to fraud," Defendants manipulated their backlog and performance metrics designed to create the appearance of revenue generating projects and demanded that employees "find" revenue to support those metrics. ¶¶71-86, 265-276. Defendants' intentional and deliberate recklessness sufficiently establishes scienter. *Novak*, 216 F.3d at 311 (refusing to mark down inventory they knew to be "'worthless,'" "'obsolete,'" and "'unsalable,'" defendants acted "'intentionally and deliberately'"). "Such 'allegations alone are enough to satisfy the pleading

requirement for scienter.'" *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).

### 2. Defendants' Own Statements, Their Roles in the Business, and the Magnitude of the Fraud Buttress Plaintiffs' Scienter Allegations

Because the Individual Defendants were specifically told about the Company's problems before speaking to the market, there is no need to infer scienter. ¶253. Still, Plaintiffs' scienter allegations are buttressed by the Individual Defendants' own representations, their senior roles within the Company, and the core nature of the clinical solutions business. Defendants Macdonald and Meggs, for example, spoke about their "visibility" into the Company's pipeline. ¶257. *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*14 (S.D.N.Y. 2016) (upholding scienter allegations where defendants told investors that they had "'visibility in the inventories'"). And each of the Individual Defendants repeatedly held themselves out as knowledgeable about Syneos's competitive position, client demand environment, contract execution, employee retention and performance, and the integration of Syneos's various acquisitions and diverse product teams. *E.g.*, ¶¶58, 100, 110, 113, 115, 124, 126, 128, 135, 144, 152, 159, 166, 176, 179, 191, 197, 211, 214, 221, 244-245.

Defendants also repeatedly engaged with investors and analysts on these issues. ¶¶256-263. *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order) (scienter alleged where, among other allegations, "inventory levels . . . w[ere] key to measuring Celestica's financial performance and w[ere] a subject about which investors and analysts often inquired"); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter alleged where defendants "told the investing public that they monitored the value of their portfolio").

Moreover, the magnitude of the alleged fraud, in conjunction with the fact that the fraud involved the Company's core operations, provides further support for a strong inference of scienter. *See, e.g.*, *Lexmark*, 367 F. Supp. 3d at 38 (allegation that "EMEA channel accounted for 35% of revenue

for the printer and cartridge division that comprised 83% of Lexmark's business and was its "'primary profit engine' . . . moves the needle in Plaintiffs' favor"). The magnitude of the alleged fraud here is startling by any measure: bookings were one-tenth of the market expectations, a near $1 billion miss. ¶¶22, 77, 98, 264, 312-314. *Lexmark*, 367 F. Supp. 3d at 38 ("the magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by Lexmark and its executives"). Finally, the abrupt departures of four of the most senior Syneos executives further supports the Complaint's scienter allegations. *See, e.g.*, ¶315; *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("timing" of "resignations, in relation to the magnitude of corrections" of financial statements "also can be a strong inference of scienter") (collecting cases).

### 3. Defendants Cannot Brush Aside the Same Particularized Allegations the Second Circuit Has Found Probative of Scienter

Defendants urge this Court to ignore Plaintiffs' allegations because they are purportedly generalized and "unsourced." MTD at 25. But Plaintiffs' allegations are not the type of "general[ized] allegations" addressed in Defendants' authorities; Plaintiffs explain who knew what, when they learned it, and how. *Compare* ¶¶52-86 and ¶253 *with* MTD at 24-25 (citing cases). Unlike in *Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019), cited by Defendants, Plaintiffs allege that the adverse information was, in fact, shared with the Individual Defendants, and that the Individual Defendants were involved in and sanctioned practices to inflate revenue in order to hide the drop in new business awards. *See, e.g.*, ¶¶49, 51-54, 71, 74; *see also* ¶66 (the Individual Defendants' monthly ELT meetings and presentations); ¶81 (Keefe's weekly emails and sales calls).

Even worse, while Defendants grouse over the true severity of the projected growth rate erosion reflected in the January 2021 ELT presentation, they ignore the remainder of the presentation describing a crumbling clinical business, which shows the falsity of their performance metric statements and establishes their reckless disregard and actual knowledge that their statements were

- 22 -

false.  Defendants cannot hide from other evidence in the presentation, including that four of Syneos's largest clients with awards worth nearly $500 million had placed their clinical business on hold or the account was at risk, and accounts with $1 billion in award value had overdue actions. ¶53.[14]

### 4. The Magnitude of Defendants' Insider Trading Supports Scienter

Plaintiffs also pleaded motive and opportunity, which is sufficient to show scienter. *See Tellabs*, 551 U.S. at 325. In the Second Circuit, insider trading at a suspicious time or in an unusual amount is indicative of scienter. The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit. *Novak*, 216 F.3d at 307-08. Defendants' trades were unusual in both timing and amount, providing strong indicia of scienter. *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000). Between November 2020 (when the ELT began discussing and receiving updates regarding Syneos's negative growth and pervasive quality and service problems) and July 2022, the Individual Defendants sold 209,000 shares reaping $16.7 million in proceeds. ¶¶279-301. Sales of this magnitude support an inference of scienter. *See Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that selling 175,000 shares for $3.5 million, or about 40% of holdings, was sufficient to establish motive). Macdonald's and Meggs's insider sales proceeds represented 5.65 and 2.78 times as much as they respectively earned in salary during this time. ¶¶284, 291. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 222 (D. Conn. 2001) (allegation that total amount of stock sold by defendant insiders was more than twice the aggregate of the collective annual compensation for the individual defendants supported scienter). Further, Keefe and Colvin sold nearly all of their available Syneos shares (¶¶292-293, 298-299), while Meggs sold 80%

---

[14] Having access to the entirety of Syneos's internal documents, the best "evidence" Defendants can muster to (improperly) attempt to refute Plaintiffs well-pleaded allegations is an e-mail that only corroborates Plaintiffs' scienter and falsity allegations and lends further credibility to Plaintiffs' investigation. *See supra*, IV.A.3.

of his shares (¶289) and Macdonald sold 83% of his shares (¶283). *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9-*11 (S.D.N.Y. Aug. 8, 2012) (that four of seven defendants sold 50% of holdings and two of the remaining three defendants sold over 25% of their shares was indicative of scienter).[15]

Moreover, Defendants' trading during the Class Period varied dramatically from their pre-Class Period trading. Meggs's and Colvin's trading patterns completely reversed after the fraud began, as they both moved from increasing their positions to heavily selling off their holdings. ¶¶288, 294. Macdonald's Class Period sales tripled (¶281), while Keefe's sales increased six-fold (¶294). *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) ("'the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information'").

The Individual Defendants point out that their trades were not exclusively clustered at the very end of the Class Period, as if they knew precisely when the stock price would drop. But timing is an indicia of fraud where sales occur shortly after defendants allegedly learn undisclosed adverse information or made false statements, *see Stevelman*, 174 F.3d at 86, and here Defendants' selling commenced in earnest shortly after learning of the damning information contained in the ELT presentation created in November 2020. *Compare* ¶¶280, 287, 293, 298 *with* ¶¶52-53, 65-66. Within a single quarter, Defendants had sold $9 million of personal stock. ¶¶283-284, 290-291, 296, 300. Defendants' focus on the end of the Class Period makes little sense here as "the statements that continued to be made after the sales that followed the earlier statements could well be probative of an

---

[15] Defendants' argument that they acquired Syneos stock during the Class Period is based on including their unvested RSU grants. But all or nearly all of their "acquired" stock was not acquired through open-market purchases, but rather by restricted, zero-dollar stock grants that did not vest until after the Class Period ended.  When evaluating stock sales, only shares available for sale are probative of scienter; one cannot sell shares that they do not yet possess. *Rothman*, 220 F.3d at 94 (only "'[t]aking into account [defendant's] vested options'").

intent to keep the stock price high in order to avoid detection of the alleged fraud." *See Stevelman*, 174 F.3d at 86.

Defendants' argument that their sales were made pursuant to 10b-5 plans is misplaced. MTD at 24. "Where 10b5-1 trading plans are entered into during the class period," *see* ¶¶282, 289, 295, 306, "they 'are not a cognizable defense to scienter allegations on a motion to dismiss.'" *China Auto.*, 2012 WL 3205062, at *9; *Emps.' Ret. Sys. of Gov. of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015). Macdonald began selling three weeks after amending his trading plan during the Class Period. ¶¶280-281. Meggs's and Keefe's trading, in similarly irregular amounts, followed on the heels of frequently amended trading plans. ¶¶287-289, 293-295.

Incredibly, Defendants also ignore the $3 billion in insider selling by its private equity sponsors, TH Lee and Advent, who held four Board seats. They further ignore the broad-based selloff by other high-level Syneos insiders, who sold large percentages of their Syneos holdings for millions of dollars. ¶¶14, 302-305. *See Stevelman*, 174 F.3d at 85 (finding "'inference of bad faith and scienter'" where defendant and "several other insiders unloaded large positions"); *see also Scholastic*, 252 F.3d 63 at 75 ("'number of insiders selling'" is relevant to scienter).

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant any portion of the motion, Plaintiffs respectfully request leave to amend. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415-16 (S.D.N.Y. 2019).

DATED:  January 19, 2024

s/ Henry Rosen
HENRY ROSEN

Patrick W. Daniels (admitted *pro hac vice*)
Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven Jodlowski (admitted *pro hac vice*)
Caroline M. Robert (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
**DiCELLO LEVITT LLP**
4747 Executive Drive, Second Floor
San Diego, CA  92121
Tel.:  619-923-3939
pwdaniels@dicellolevitt.com
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
cmrobert@dicellolevitt.com
hfarah@dicellolevitt.com

Greg G. Gutzler
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY  10017
Tel.:  646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
Tel.:  312-214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DiCELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC  20036
Tel.:  202-975-2288
rpierce@dicellolevitt.com

*Counsel for Lead Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 19, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

    S/ HENRY ROSEN    
HENRY ROSEN

DiCELLO LEVITT LLP
4747 Executive Dr., Suite 240
San Diego, CA 92121
Telephone: 619/963-2406
E-mail: hrosen@dicellolevitt.com
