UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
KEMPEN INTERNATIONAL FUNDS       :   Civil Action No. 1:23-cv-08848-AS
(KEMPEN INTERNATIONAL FUNDS -    :
MERCLIN GLOBAL EQUITY), KEMPEN   :   SECOND AMENDED COMPLAINT FOR
INTERNATIONAL FUNDS (KEMPEN      :   VIOLATIONS OF THE FEDERAL
INTERNATIONAL FUNDS - MERCLIN    :   SECURITIES LAWS
PATRIMONIUM), and MERCLIN        :
INSTITUTIONAL FUND (MERCLIN      :
INSTITUTIONAL EQUITY FUND DBI-   :
RDT), Individually and on Behalf of All Others :
Similarly Situated,              :
                                 :
                 Plaintiff,      :   DEMAND FOR JURY TRIAL
                                 :
        vs.                      :
                                 :
SYNEOS HEALTH, INC., ALISTAIR    :
MACDONALD, MICHELLE KEEFE, PAUL  :
COLVIN, and JASON MEGGS,         :
                                 :
                 Defendants.     :
———————————————————— x

# Table of Contents

I.    INTRODUCTION ....................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................10

III.  PARTIES ...............................................................................................................11

      A.    Lead Plaintiffs ...........................................................................................11

      B.    Defendants .................................................................................................11

IV.   FACTUAL BACKGROUND ...............................................................................17

      A.    Overview of Syneos's Business .................................................................17

      B.    Syneos's Important Financial and Accounting Metrics .............................18

      C.    Defendants Portrayed Syneos as Healthy and Growing as It Emerged from
            the Pandemic .............................................................................................22

      D.    Syneos Was Plagued by Workforce Turmoil and a Toxic Culture .......................31

      E.    Defendants Masked the Lack of New and Renewal Business by
            Manipulating Their Backlog Metrics and Applying Pressure to "Find"
            Revenue .....................................................................................................33

      F.    Without Sufficient New and Renewal Business Being Added to Backlog
            from Which to Prematurely Pull Awards, the Company Could No Longer
            Obfuscate the Truth ...................................................................................41

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND MATERIAL OMISSIONS ...........................................................................43

      A.    Materially False and Misleading Statements Regarding the Company's
            Emergence from COVID-19 .......................................................................43

      B.    Materially False and Misleading Statements Regarding the Company's
            Workforce, Workplace Culture, and Capabilities to Run Clinical Trials ............49

      C.    Materially False and Misleading Statements Regarding the Company's
            Success and Engagement with Customers .....................................................56

      D.    Materially False and Misleading Statements Regarding the Company's
            Reported Performance Metrics Including Backlog, New Business Awards,
            Book-to-Bill Ratio and Reimbursable Expenses ..................................................69

1.     Materially False and Misleading Statements Issued During Q3 2020 ................................................................69

2.     Materially False and Misleading Statements Issued During Q4 and Year End 2020 ...........................................................76

3.     Materially False and Misleading Statements Issued During Q1 2021 ................................................................82

4.     Materially False and Misleading Statements Issued During Q2 2021 ................................................................86

5.     Materially False and Misleading Statements Issued During Q3 2021 ................................................................91

E.    Defendants' False and Misleading Statements in the Prospectus Statements ..............................................................96

VI.   AFTER LIQUIDATING THEIR SYNEOS HOLDINGS, DEFENDANTS' SCHEME SLOWLY UNRAVELS ........................................97

A.    Fourth Quarter and Full Year 2021 Financial Results ...........................97

B.    Defendants Continued to Make False and Misleading Statements as Their Scheme Slowly Unraveled ...............................................104

C.    The Truth Is Revealed ...............................................114

VII.  ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ..........................119

VIII. SYNEOS'S PUBLIC STATEMENTS AND FILINGS WITH THE SEC OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN ...........................................................148

IX.   NO SAFE HARBOR ...............................................152

X.    PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET .....................153

XI.   LOSS CAUSATION/ECONOMIC LOSS ....................................155

XII.  CLASS ACTION ALLEGATIONS .......................................156

XIII. COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ......................................................158

XIV. COUNT II For Violation of §20(a) of the Exchange Act Against the Individual Defendants ........................................................161

XV.  PRAYER FOR RELIEF ..............................................163

XVI.    JURY DEMAND ................................................................................................163

Kempen International Funds (Kempen International Funds - MercLin Global Equity) ("KIF – MercLin Global Equity"), Kempen International Funds (Kempen International Funds - MercLin Patrimonium) ("KIF – MercLin Patrimonium"), and MercLin Institutional Fund (MercLin Institutional Equity Fund DBI-RDT) ("MercLin DBI-RDT") (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based upon, *inter alia*, their counsel and their independent investigation.[1]

## I.    INTRODUCTION

1.    Lead Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Syneos between September 9, 2020 and November 3, 2022, inclusive (the "Class Period").

2.    Syneos is a biopharmaceutical solutions organization providing contract research and commercial services to help biopharmaceutical companies test and develop their products.

---

[1]    This investigation included, but was not limited to, a review and analysis of: (i) Syneos Health, Inc.'s ("Syneos" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Syneos's public conference calls and presentations; (iii) Syneos's press releases and media, and research reports regarding Syneos; (iv) pricing and volume data for Syneos's common stock; (v) interviews with former Syneos employees who were at the Company during the Class Period (defined below); (vi) internal Syneos documents; and (vii) other publicly available material and data identified herein.  Counsel's investigation into the factual allegations contained in this Complaint is ongoing, and many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control.  Lead Plaintiffs believe, and are informed by their interviews with former Syneos employees, that substantial additional evidentiary support exists for the allegations set forth herein and will be confirmed after a reasonable opportunity for discovery.

Syneos arose from the 2018 merger of INC Research Holdings, Inc. ("INC Research") and inVentiv Health, Inc. ("inVentiv Health") and grew through a number of successive acquisitions. The Company marketed itself as an integrated "end-to-end" biopharmaceutical solutions provider, with services that spanned from early-phase clinical trials in its Clinical Solutions division ("Clinical Solutions segment" or "clinical segment") through the commercialization of a product in its Commercial Solutions business unit.

3.      As a contract research organization ("CRO"), Syneos's financial success and growth prospects were predicated on securing a steady inflow of new business awards and growing its backlog of outstanding clinical trial work.  Syneos publicly disclosed information regarding certain operational metrics that served as key indicators of underlying client demand and anticipated future revenue, including: (i) its "backlog" of business awards; (ii) the Company's net new business awards; and (iii) its reported book-to-bill ratios.  The backlog and book-to-bill ratio were critical metrics for analysts and investors as healthy backlog represented future revenue and a book-to-bill ratio greater than 1.0x represented a growing business where the Company was adding new business to the backlog at a faster rate than it was completing and monetizing existing backlog during the same period.

4.      Emerging from the initial disruption caused by the COVID-19 pandemic, Defendants assured investors that the negative impacts on the Company from the pandemic had bottomed out by the second quarter of 2020 ("Q2 2020") and that Syneos had quickly entered a recovery period that was proving a boon for business.  Indeed, by September 9, 2020, the start of the Class Period, Defendant Alistair Macdonald assured investors that the Company "remain[s] well positioned to accelerate growth [in Clinical Solutions] as the recovery continues" and "expect[s] strong growth in both of our segments in 2021."

- 2 -

5.      Thereafter and throughout the Class Period, Defendants emphasized Syneos's backlog, book-to-bill ratio, and net new business awards ("performance metrics") and claimed that Syneos's business was booming.  Further, Defendants highlighted that because of Syneos's technological advantages, innovative and integrated expertise, recent acquisitions, and superior talent and culture, Syneos was competing for and winning new business as the Company surged out of the pandemic.  For example, in November 2020, Defendant Jason Meggs, Syneos's Chief Financial Officer ("CFO"), told investors that Syneos was achieving tremendous growth based on "record" customer order flows and that Syneos's new business "pipeline," was "on top of what's already record pipelines and communications and consulting coming into the quarter."  Similarly, in April 2021, Syneos executives continued to highlight Syneos's purportedly "strong demand," reporting a "record ending backlog" of expected business and high book-to-bill ratios, promising investors that the Company was experiencing robust growth.

6.      Things were not as Defendants portrayed them to be, however, and in reality, Syneos was plagued by known, but undisclosed, long-standing quality, technological, cultural, and operational problems causing customers to pull significant business from Syneos.  Due to the Company's pervasive problems, Syneos was unable to compete.  Defendants were well aware of the dire situation as Syneos's problems and inability to provide the services its customers required were discussed at monthly Executive Leadership Team ("ELT") meetings: "***Data doesn't reflect client situations***."  "***Further meaningful drill-down is not currently possible due to data limitations***."  "***The data here in Syneos system is not the source of truth***."  Citing the Company's many failures, a number of large customers had placed Syneos on "hold" and would not make future business "available to Syneos" until it addressed its lack of a "***quality culture***" and ongoing

"*migration[s] inhibiting teams ability to be audit-ready*," cured its "*delivery failures*," and "*earned back trust*."

7.     The ELT observations regarding the devastating quality and data issues were stark: Despite what Defendants were telling the market, they knew Syneos's quality issues and data limitations were having a devastating – but undisclosed – impact on the Company's Clinical Solutions segment.   Defendants also knew that the Company's clinical segment was neither healthy nor growing.   Syneos had shown that it was unable to successfully compete for new business or retain renewal customers who were aware of Syneos's quality and service failures. And, by late 2020, Defendants were well aware that as a consequence of these failures, the Clinical Solutions segment was experiencing negative growth.

8.     Yet, despite persistent quality shortcomings and service failures plaguing the clinical segment and hampering that segment's growth, Syneos and the Individual Defendants (defined below) falsely told investors and the market that Syneos was experiencing record growth. In addition, Defendants falsely reported that the Company's clinical segment was achieving or exceeding its targets.

9.     To achieve the false performance metrics Defendants reported, Syneos took steps to inflate its backlog and manipulate net new business awards and book-to-bill ratios.   When contracts were terminated, such as when two large $25 million oncology clinical trials were cancelled in early 2021, Defendants refused – over the objection of the oncology business unit's CFO – to remove awards from the backlog to avoid the negative impact the removal would have on the Company's reported performance metrics.   Specifically, at the end of 2019, Defendants entered into a $300 million annual multi-year contract with GlaxoSmithKline ("GSK"). Defendants continued to include the entirety of the annual $300 million GSK contract value in

backlog each year despite never receiving more than $20 million in contract revenue during any year. Defendants also improperly included a $100 million bonus award in the Company's backlog even though the bonus was supposed to be earned after eight clinical trials were successfully completed. Syneos, however, kept the contingent $100 million bonus in backlog even though the Clinical team failed to achieve the first milestone required in the first year of the contract. Additionally, and in furtherance of their scheme, Defendants included three to four years of business value from functional service provider ("FSP") agreements in backlog, including taking credit for contracts that never came to fruition, even though Defendants falsely assured investors they would only include the first year of the contract award value in backlog.[2]

10.    The Company's inability to compete and win new and repeat business was well-known and routinely discussed within Syneos. The entire sales organization was required to report its numbers on a weekly basis, received weekly email updates tracking sales to target metrics, and had weekly Monday sales calls to discuss and review their results. As a result, the sales organization knew where the Company was in terms of tracking actual awards to target numbers. Every quarter from January 2020 through May 2022, the Company was hundreds of millions of dollars short of achieving its targets. Despite the enormous gap, however, Syneos always hit its target each month and each quarter.

11.    Defendant Meggs orchestrated this miracle, in part, by fostering and promoting a culture of fear. If Meggs received results indicating a shortfall, he simply said "No" until Syneos employees brought him the numbers he wanted. When the clinical group fell short of achieving its revenue targets, even after the business units went through layers of internal reviews and

---

[2]    FSP refers to a functional service provide agreement, where a pharmaceutical company agrees to allow multiple CROs, like Syneos, to provide services.

meetings to confirm their results, Defendant Paul Colvin demanded different results and better award numbers and even went so far as to send an email to all business unit CFOs instructing them to "find it."  And find it they did.

12.    From September 9, 2020 through November 3, 2022, Defendants falsely portrayed to investors and the market that the Company was securing new and renewal business to refill the backlog and falsely engineered the Company's new business metrics to achieve favorable results. Defendants used these deceptive and illegal tactics to hide the Company's critical quality failures in clinical trials from investors.  By booking overstated or nonexistent business awards in backlog, manipulating expenses, and pulling future business into the current period, Defendants falsely portrayed Syneos's Clinical Solutions segment as thriving when exactly the opposite was true. While hiding their accounting manipulations and the Company's critical failures in its clinical segment from investors, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021.

13.    Defendants and other executives took full advantage of the resulting inflated stock price and dumped over $19 million worth of their own Syneos shares during the Class Period at prices artificially inflated by their false and misleading statements and omissions.  Defendant Macdonald alone sold 142,586 shares for proceeds of more than $11.4 million.  Thomas Lee Partners and Advent International – Syneos's private equity sponsors and largest shareholders, who had representatives on the Company's Board of Directors – unloaded more than $3 billion worth of Syneos stock through a series of five registered public stock offerings and share repurchase agreements with Syneos within a nine-month period.

14.    The Company's pervasive qualitative and technological failures decimated its ability to compete for and secure legitimate and organic new and renewal business to refill its

backlog.  Therefore, the Company began to run out of ways in which to engineer favorable backlog, net new business awards, and book-to-bill ratios.

15.    On February 17, 2022, having already taken advantage of Syneos's inflated stock price by dumping the majority of their personal Syneos stock holding at all-time highs, Defendants announced deeply disappointing financial results for the fourth quarter of 2021 ("Q4 2021") and finally reported reimbursable expenses separate from backlog, revealing for the first time that the portion of the Company's backlog attributable to zero margin reimbursable out-of-pocket expenses was 36%.  Even worse, the Company revealed that huge portions of its reimbursable expenses previously reported as revenue were uncollectable.  Syneos stated that the post-pandemic shift in service delivery, with more remote work, would "have a lasting impact on our revenue profile." Analysts were justifiably shocked, and Jefferies estimated that Syneos removed $850-$950 million in pass-through revenue, recognizing "that the magnitude of mgt's overestimation means that *Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)*."  One analyst commented that Syneos was "Ripping Off the Reimb Expense Bandaid."

16.    Unfortunately, this was just the tip of the iceberg, and while the Company's February 17, 2022 announcement was bad, Defendants failed to fully disclose the magnitude by which they had overstated Syneos's clinical metrics and continued to hide the underlying competitive and service failures plaguing the clinical segment.  Suddenly thereafter, on April 29, 2022, the same day Syneos reported disappointing first quarter of 2022 ("Q1 2022") results and after collecting over $11 million in illicit selling proceeds, Defendant Macdonald abruptly resigned as Chief Financial Officer ("CEO").

17.    Even after disappointing Q1 2022 results and Defendant Macdonald's abrupt departure, Defendants continued to obfuscate the full truth.  On June 6, 2022, Defendant Michelle

Keefe, who assumed the CEO position following Macdonald's departure, answered questions at an analyst conference and assured investors that the Company's small- to mid-sized ("SMID") customer pipeline was strong and that she had not seen anything that "makes us think that we're not going to continue to be the market leader there," despite analyst concerns about the Company's business slowing.

18.     Thereafter, on August 2, 2022, Syneos reported its second quarter of 2022 ("Q2 2022") financial results which revealed a substantial deterioration in the Company's business disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34%.  On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, a decline of nearly $14 per share, or over 17%, on above-average trading volume of 3.2 million shares traded.  However, Defendants still failed to fully disclose the magnitude of the chaos in the Company's clinical segment and the severity of the resulting consequences.

19.     On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses.  During an industry conference held later that day, Defendant Keefe continued to hide the internal problems plaguing the clinical segment and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were just delaying contract awards.  On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average

trading volume. Defendants, however, continued to fail to disclose the full extent of their previous false statements regarding the strength of the Clinical Solutions segment.

20.    Finally on November 4, 2022, Syneos reported worsening quarterly financial results, which revealed the drastic deterioration of its business and client demand, culminating in a reported $182 million in clinical net new business awards during the quarter and an "unprecedented" Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the expected amount (an 87% year-over-year decline). Defendant Keefe admitted that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions, and she subsequently admitted that while they had taken recent "steps . . . to address the post-revenue SMID cohort," they lacked the technological offerings to "be more competitive."

21.    Securities analysts were shocked by the results. One analyst referred to Syneos's abysmally low book-to-bill ratios, stating: "***We've never seen that happen***." He pointedly challenged Defendants' claim that Syneos was not experiencing significant cancellations as "***frankly hard to believe*** . . . given that pass-through bookings were negative and ***overall bookings were basically 1/10 of what you would expect*** over the last few quarters or what we should have expected."

22.    As a result of these revelations, the price of Syneos stock plummeted from $47.81 per share on November 3, 2022, to trade below $23.00 per share on November 4, 2022, down more than 77% from the Class Period high, causing Lead Plaintiffs and the Class to suffer billions of dollars in losses and economic damages.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

25.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the statements that form the subject of this Complaint were disseminated into this District, Defendants conduct substantial business in this District, the securities that are the subject of this action were traded on The Nasdaq Stock Market LLC (the "NASDAQ") in this District, and several public stock offerings carried out by Defendants as part of the fraudulent scheme alleged herein occurred in this District.[3]  Furthermore, the underwriters of these public stock offerings, including Goldman Sach & Co. LLC, Morgan Stanley, and BofA Securities, are headquartered in this District.

26.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

---

[3]    These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 at-the-market ("ATM") public offering of more than 8 million Syneos sold to underwriters for the offering at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 ATM public offering of nearly 11 million Syneos sold to underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price.

to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

27.    Lead Plaintiff KIF – MercLin Global Equity and Lead Plaintiff KIF – MercLin Patrimonium are a Luxembourg investment company with its respective compartments or sub-funds.  Lead Plaintiff MercLin DBI-RDT is a Belgian SICAV with a single compartment or sub-fund.  As set forth in the accompanying certification, which is incorporated by reference herein, Lead Plaintiffs purchased shares of Syneos common stock during the Class Period at artificially inflated prices and were damaged thereby.  *See* Certifications, ECF No. 8-1.

### B.    Defendants

28.    Defendant Syneos is a multinational clinical research organization.  Syneos maintains offices in this District at 200 Vesey Street, 39th and 40th Floor, New York, NY 10281. At all relevant times throughout the Class Period, the Company's common stock was listed on the NASDAQ and traded in an efficient market under the ticker symbol "SYNH."  As of February 9, 2023, Syneos had over 103 million shares of common stock outstanding.

29.    Defendant Alistair Macdonald served as CEO of Syneos and as a member of Company's Board of Directors (the "Board") from October 2016 until April 2022, when he abruptly resigned from both positions.  Prior to serving as the Company's CEO, Defendant Macdonald held various positions within Syneos and its predecessor company INC Research, including, *inter alia*, as its President, Chief Operating Officer ("COO"), and President of Clinical Development services.

(a)    As CEO of Syneos, Macdonald was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for

communicating with the Board.  Macdonald also had approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.  Additionally, Macdonald was a member of Syneos's Executive Leadership Team.

(b)     As CEO and a member of the Board, Macdonald was responsible for directing Syneos's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Macdonald repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Macdonald assert that he was not aware of, Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c)     In 2020 and 2021, Macdonald received over $16 million in total compensation.  And, during the Class Period as set forth in ¶¶277-283, Macdonald sold more than 142,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $11 million.

30.     Defendant Michelle Keefe has served as member of the Board and as CEO of Syneos following the resignation of Defendant Macdonald since April 2022.  Prior to her appointment as CEO, Keefe served as President of Medical Affairs beginning in November 2021, and as President of Commercial Solutions from December 2017 to November 2021.  Keefe was also a member of Syneos's Executive Leadership Team.

(a)     As CEO of Syneos, Keefe is the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating

with the Board.  Keefe also has approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the SOX affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b)      As CEO and President of Medical Affairs & Commercial Solutions, Keefe was responsible for directing Syneos's commercial business and business development, the Syneos One program, the Company's public statements, and financial and business affairs.  Specifically, during conference calls with analysts and investors, Keefe repeatedly held herself out as knowledgeable about, and at no time during the Class Period did Keefe assert that she was not aware of, Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c)      In 2020 and 2021, Keefe received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶¶291-296, Keefe sold more than 18,000 shares of her Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of nearly $1.4 million.

31.      Defendant Jason Meggs served as CFO of Syneos from February 2018 until his resignation from the Company in March 2023.  Prior to his role as CFO, Defendant Meggs served as Executive Vice President and CFO of Syneos's Commercial Solutions Segment.  Defendant Meggs also previously served as Executive Vice President of Oncology at Syneos from January 2017 to August 2017, and as Senior Vice President of Business Finance with the Company from 2014 to 2016.  According to a January 9, 2023 press release, Meggs was an "'integral member of the Executive Leadership Team'" during the Class Period.

(a)     As Syneos's CFO, Meggs was the Company's senior-most financial officer, responsible for overseeing its financial, accounting, audit, treasury, and tax functions and the development and implementation of internal financial controls.  Meggs also signed Syneos's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b)     As CFO, Meggs was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs.  Specifically, during conference calls with analysts and investors, Meggs repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Meggs assert that he was not aware of, Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c)     In 2020 and 2021, Meggs received over $5 million in total compensation. And, during the Class Period as set forth in ¶¶284-290, Meggs sold more than 39,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $3 million.

32.     Defendant Paul Colvin served as President, Clinical Solutions of Syneos from December 2018 until November 2021.  In November 2021, Colvin was appointed Chief Business Officer ("CBO") of Syneos, a role that he served until June 30, 2022, before his departure from Syneos in August 2022.  Colvin also served on Syneos's Executive Leadership Team.

(a)     As Syneos's CBO, Colvin was responsible for driving the growth strategy for Syneos Health.  According to the Company's website, Colvin "[led] the company's Customer

Engagement and Business/Market Development portfolio across the enterprise; [l]everage[d] the corporate strategy to create and institutionalize innovative solutions for customers and ensure[d] the voice of the customer is at the center of Syneos Health across the product development and commercialization continuum."  As President, Clinical Solutions, Colvin was responsible for "driving growth and performance for the Company's industry-leading Clinical Solutions capabilities," delivering models for conducting clinical trials, "driv[ing] therapeutic alignment," "driving deep customer relationships" and driving "customer network/roster."

(b)    As CBO and President, Clinical Solutions, Colvin was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs.  Specifically, during conference calls with analysts and investors, Colvin repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Colvin assert that he was not aware of, Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c)    In 2020 and 2021, Colvin received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶¶297-299, Colvin sold nearly 8,500 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $630,000.

33.    The Defendants identified above in ¶¶29-33 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "Defendants."

34.    Each of the Individual Defendants, because of his or her respective senior position within the Company, possessed the power and authority to control the contents of Syneos's

quarterly and annual reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Throughout the Class Period (and for Macdonald, until his separation from the Company), each of the Individual Defendants, as senior executive officers of Syneos, was directly involved in the management and day-to-day operations of the Company at the highest levels and as further detailed herein, was privy to confidential and proprietary information concerning Syneos and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. *See*, *e.g.*, ¶¶245-275.

35.    Each of the Individual Defendants had access to non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

36.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    FACTUAL BACKGROUND

### A.    Overview of Syneos's Business

38.    Syneos had two reportable segments: (i) Clinical Solutions (the former INC Research); and (ii) Commercial Solutions (the former inVentiv).  The Clinical Solutions segment focused on the clinical development of products by biopharmaceutical companies, such as patient

recruitment, clinical monitoring, investigator recruitment, and conducting all aspects of a global clinical trial.  Syneos's Clinical Solutions could be delivered on a full-service project (known as full service offering or "FSO"), on a functional or resource basis (known as functional service provider or "FSP"), or through a hybrid approach.  The Commercial Solutions segment focused on product commercialization, deployment, communications, and consulting services.

39.     During the Class Period, Syneos derived approximately 75% of its revenues from its Clinical Solutions segment, reporting 2021 annual revenues of more than $4 billion.  Syneos's customer base was comprised predominantly of SMID biopharmaceutical companies with operations throughout North America, Europe, the Middle East, and Africa.

**B.     Syneos's Important Financial and Accounting Metrics**

40.     As a CRO, Syneos's financial success and growth prospects were predicated on securing a steady inflow of new business awards, growing its pipeline of clinical trial work, and servicing and monetizing its existing backlog.

41.     Securities analysts and investors closely monitored Syneos's performance metrics including, backlog, book-to-bill ratios, new business awards, as well as reimbursable expenses. These key factors were crucial to understanding Syneos's business and helped the market assess whether the Company was healthy and growing.  Syneos defined its backlog as anticipated future revenue based upon contract and pre-contract client commitments that were supported by written communications.  As an award went to contract and work on a project began, revenue was recognized over the life of the project, provided Syneos met performance and percentage-of-completion targets.  An increase in backlog would generally result in an increase in revenue over time.  As such, backlog was an important indicator for investors of Syneos's business performance and future expected revenue.

42.     Syneos's book-to-bill ratio was the ratio of new business won or added to the backlog[4] in a current period (the numerator) as compared to business completed and billed for during that same period (the denominator).  Generally, a book-to-bill ratio greater than 1.0x was an indication of healthy backlog growth as it signaled that Syneos was winning more new business than it was completing, while a book-to-bill ratio of less than 1.0x indicated that demand was waning.

43.     Securities analysts and investors also closely monitored Syneos's reimbursable out-of-pocket expenses, which were included within reported backlog.  Syneos incurred and was reimbursed for certain costs, including fees paid to principal investigators and for other out-of-pocket costs (such as travel expenses for clinical monitors and project managers).  The Company included these costs in total operating expenses, and the related reimbursements in revenue. Ostensibly margin neutral, anticipated reimbursable out-of-pocket expenses served as an indicator of demand for the Company's services and thus it was an important metric to gauge the Company's health and overall business performance.

44.     The materiality of Defendants' manipulations to Syneos's performance metrics is evidenced by securities analysts' intense focus on Syneos's book-to-bill ratio, a critical metric for a CRO.  Indeed, the CFO of Syneos's predecessor, INC Research, once stated "[o]ftentimes, people focus in on book to bill as the most important metric in our industry."  During the Class Period, Defendants told investors that a consistently high book-to-bill ratio was evidence of strong growth.  For example, on November 18, 2021 Defendant Macdonald highlighted the "consistency and the scale of our book-to-bill that's driving . . . growth."  In February 2021, Jefferies commented

---

[4]     Defendants assured investors that Syneos included only one year of a contract's award value in backlog at any time, such that backlog was purported to represent new business signed in a quarter and additional value from existing awards properly added to backlog.  ¶150.

on the Company's "impressive" and consistent book-to-bill ratios in the Clinical segment, stating "BtBs topping 1.4x in 4 of the past 5 quarters set a solid backdrop for growth for a segment that dipped 3% organically in '20."

45.    Notably, adjustments to Syneos's backlog metrics, such as reimbursable expenses, could cause large swings in the Company's book-to-bill ratios.  For example, on October 29, 2020, Syneos reported a Clinical book-to-bill ratio of 1.2x for the quarter, with Defendant Macdonald telling investors "[o]ur net awards were impacted by a backlog adjustment, reflecting changes in our expectations for reimbursable expenses," and Meggs stating that "Clinical Solutions revenue was lower . . . due to lower-than-anticipated reimbursable expenses."

46.    Explaining why reimbursable expenses were lower, Meggs stated the reduction "was driven by reduced investigator and travel expenses.  These expenses were impacted as more of our site visit activity continued to be remote and patient enrollment recovers more slowly than anticipated."  Defendant Macdonald told investors:

> Outside of the backlog adjustment, for reimbursable out-of-pocket expenses, we have experienced no meaningful cancellation activity as a consequence of COVID-19.  However, we continue to see operational delays in studies created by the resurgence of COVID cases.  This has resulted in a high utilization of remote monitoring and slower-than-expected patient enrollment compared to our original expectations for this stage of the recovery.

47.    During the question-and-answer portion of Syneos's earnings call on October 29, 2020, the very first question from analysts fixated on Syneos's adjustment to reimbursable expenses and its impact on the clinical segment; which queried: "just to start on the reimbursable travel since it obviously seems to be causing some noise for you . . . more than expected this quarter.  I just wanted to understand this a little bit better."  In response, Defendant Meggs assured investors that "if you just take out the backlog adjustment, our book-to-bill in the quarter in clinical would have been north of 1.4, again.  So it was a good quarter."  Later in the call, a second analyst

asked for further clarification surrounding the Company's book-to-bill calculation. Securities analysts asked about the backlog adjustment *again* during a November 19, 2020 Jefferies conference, where Defendant Meggs told investors Syneos was being "conservative" with its backlog calculations and that there was "no question" reimbursable expense revenue would "come back up to some extent."

48.     In reports published after the Company's October 29, 2020 earnings call, analysts noted that the Company's backlog adjustment, reducing reimbursable expenses by approximately $170 million, had a significant impact on the Company's book-to-bill ratio. For example, on October 30, 2020, Jefferies reported that the backlog adjustment caused Syneos's book-to-bill ratio to lag its peers, stating: "***Book-to-bill of 1.20x looked optically weak, but flips to >1.4x excluding a backlog adjustment (also on lower PTs), which is a figure in the neighborhood of peers' BtB***." Jefferies listed the Company's book-to-bill ratio (both with, and without the backlog adjustment) and clinical net new business among the "Key Stats" for Syneos. Similarly, an October 29, 2020 William Blair report stated "***Clinical bookings in the quarter, we think, gave investors pause***. The company noted that had it not reduced backlog related to lower expected reimbursements, the book-to-bill would have been 1.4 or better in the quarter," adding that ***"the lower reimbursements assumed in backlog represent[ed] a roughly $170 million hit***." A separate William Blair report published on the same day stated, "[a] trailing-12-month book-to-bill of 1.41 in clinical, as well as 18% growth in backlog, gives us reasonable confidence in the outlook for the clinical business moving forward."

49.     In February 2022, Defendants shocked the market by revealing that $3.8 billion in the Company's backlog was comprised of reimbursable costs. Furthermore, despite previously telling investors there was "no question" reimbursable expenses would recover to some extent,

Defendants wrote-off up to $950 million in reimbursable expenses that the Company would never collect.  By waiting until February 2022 to make these disclosures, Defendants were able to consistently report healthy book-to-bill ratios, creating the illusion of strong growth and keeping Syneos's stock price high enough to sell billions of dollars' worth of Syneos stock on the open market and through public offerings.  Indeed, after consistently reporting book-to-bill ratios above 1.0x throughout the Class Period, Syneos reported clinical book-to-bill ratios below 1.0x for five of six quarters between Q4 2021 and the first quarter of 2023 ("Q1 2023"), the last quarter before Syneos went private.[5]

### C.    Defendants Portrayed Syneos as Healthy and Growing as It Emerged from the Pandemic

50.    Like many companies, Syneos experienced disruptions because of the COVID-19 pandemic.  As a result, Syneos withdrew financial guidance for fiscal year 2020 and purported to impose various cost management initiatives to mitigate the financial fallout of delayed clinical trial work.  Some existing clinical trials were delayed due to restrictions that limited the ability of Syneos's staff to physically access investigative sites and conduct clinical monitoring work.  There were also delays in patient enrollment and in the startup of new customer projects, all of which temporarily impacted the Company's ability to fulfill its backlog orders.  In particular, the Company experienced a decline in reimbursable revenues beginning in 2020, as on-site visits that generated reimbursable expenses became less common.  Syneos attempted to implement remote monitoring services to allow access to clinical sites where physical access had been restricted because of the COVID-19 pandemic.

---

[5]    Syneos reported clinical book-to-bill ratios of 0.34x in Q4 2021, 1.22x in Q1 2022, 0.92x in Q2 2022, 0.18x in Q3 2022, 0.46x in Q4 2022, and 0.70x in Q1 2023.

51.     The Company's private equity sponsors, TH Lee and Advent, and Defendants were desperate to convince the market that Syneos had escaped the COVID-19 pandemic unscathed so that they could exit their personal investment and dump billions of dollars' worth of Syneos stock at high prices.   To achieve this, Defendants claimed that Syneos had not experienced any "meaningful cancellations" of existing contracts, and that existing contracts in the Company's backlog would create a tailwind in late 2020 and 2021.

52.     Thereafter and throughout the Class Period, Defendants emphasized that Syneos's performance metrics, such as a growing backlog, new business awards, and multiple quarters of a book-to-bill ratio over 1.0x for the Clinical Solutions segment, demonstrated that Syneos's business was booming.   Defendants falsely told investors that Syneos's advanced technology, superior workforce, and strong corporate culture gave it competitive advantages which uniquely positioned the Company to successfully compete for and win new business.   Unfortunately for investors, the rosy story of Syneos's resurgence was a lie engineered by Defendants so that TH Lee and Advent could dump billions of dollars of their Syneos stock, and so Defendants could sell millions of dollars of their personal holdings.

53.     Concealing the truth, Syneos insiders liquidated their holdings of Syneos common stock at all-time high prices inflated by their scheme.   As detailed further below (*see* ¶¶277-299, 306-310), Company insiders – including Defendants Macdonald, Meggs, Keefe, and Colvin – collected $19.2 million dollars in illicit insider trading proceeds on sales executed at artificially inflated prices.   The Individual Defendants and virtually every high-level insider with significant Syneos holdings liquidated the bulk of their tradable Syneos common stock holdings, in stark contrast to their pre-Class Period trading.   In addition, Syneos's private equity sponsors, TH Lee and Advent, dumped millions of Syneos shares and collected in excess of $3 billion.   Through a

series of five public stock offerings and Syneos stock repurchases agreements between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37.85 million shares for $3.04 billion in proceeds at prices as high as $81.20 per share. These outsized insider sales occurred in rapid succession over a period of just nine months and allowed TH Lee and Advent to exit their entire equity stakes in the Company.

54.     At the same time, Defendants and senior insiders were dumping billions of dollars in Syneos stock while unbeknownst to the investing public, Syneos was plagued by undisclosed, long-standing quality, technological, and cultural problems that caused clients to cancel in droves and refuse to re-sign. Syneos's inability to deliver the clinical and project management services demanded by its clients seriously impacted the Company and its pipeline of potential new awards and its backlog of awards already reported to investors.

55.     In 2020, contrary to what Defendants were telling the market, the Company's Clinical Solutions segment was neither healthy nor strong nor growing. Clients were pulling significant amounts of business away from Syneos because the Company's clinical trial's business offerings were woefully inadequate and suffered from severe anti-competitive deficiencies.

56.     Defendants knew about these deficiencies from the time of the 2018 merger and by early 2020, knew the Company's technology shortcomings were hurting business. In fact, by early 2020, Defendants were well aware that Syneos's quality problems and inability to deliver usable clinical trial data had a devastating impact on the Company's ability to sign new business and to re-sign existing customers. Syneos's quality problems impacted its relationship with its large pharma clients, some of the world's largest pharmaceutical companies. In July 2019, in an email to investment bank Jefferies, Syneos acknowledged that its business was not sustainable, with the intent to find a buyer for the Company or take it private. Between 2017 and 2019, at least two of

its large pharma clients, Bristol Myers Squibb and GSK – who had functional service provider ("FSP") and full service agreements ("FSA") with Syneos – refused to give the Company new awards until they were satisfied that the clinical issues and service failures had been addressed. In 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a hold on all of its work with Syneos. Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data (¶60), and Syneos's relationship with GSK, with which it had signed a new agreement in early 2020, was strained to the point that Syneos could only obtain less than 10% of the FSP work it had contracted to provide beginning in 2020. In early 2021, AstraZeneca stopped using Syneos entirely.

57.     By November 2020, the Company privately forecasted negative growth across its business and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company. The results of that review – and the serious problems facing the Company – were being discussed at the highest levels of the Company. In its review, the Company identified the problems plaguing its Clinical Solutions segment, examined their impact on the Company's revenue and growth rate, made a number of key findings and recommendations, listed the areas for change, and examined the Company's progress in addressing these issues against its plan of action adopted in late 2020.

58.     The results of the Clinical Solutions business review were provided to Syneos's ELT, of which Defendants Macdonald, Meggs, Keefe and Colvin were members, in an internal presentation in January 2021. That ELT presentation laid out in dollars the Company's actual gross awards for fiscal year 2020 and projected awards for fiscal year 2021. Revenues for each year were broken down by its top 20 and 21-50 accounts, with separate sub-entries for large pharma clients, such as AbbVie, Amgen, AstraZeneca, Eli Lilly, GSK, and Pfizer. The January

2021 ELT presentation made clear that the Company forecasted an approximate 16%-23% decline excluding two-years of award value from the uncollectable GSK contract. Because the Company was hundreds of millions of dollars short of its awards target for 2021, as shown in the January 2021 ELT presentation, Defendants included $400 million in award value for that customer in the 2021 backlog.

59. In addition, according to the presentation, the Company knew its work with SMID customers was cratering: Defendants expected a ***negative year-over-year awards growth rate*** of -23.3% across its clinical and commercial business and ***-23.5% for its clinical business*** in 2021. And measured against 2019, the Company's 2021 awards were expected to decline by 15% in contrast to the 10% growth target. Across all top 50 accounts, even with the $400 million GSK addition to backlog, the Company expected a decline in awards of -0.2% for its clinical and commercial segments and -2.7% for its clinical segment, which was the core of its business, despite telling investors and the market that Syneos's business was growing.

# GCS FY21 Gross Awards Targets

| Client | FY20 Actuals ($M) | | | FY 21 Budget ($M) | | | Growth Rates (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | FY21 vs FY20 (%) | | | 19 - 21 |
| | TOTAL | Clinical | Commercial | Total | Clinical | Commercial | Total | Clinical | Commercial | CAGR (%) |
| Abbvie | 189.0 | 158.0 | 31.0 | 163.4 | 140.0 | 23.4 | -13.5% | -11.4% | -24.5% | 7.9% |
| Amgen Inc. | 48.2 | 2.4 | 45.8 | 71.2 | 12.0 | 59.2 | 47.7% | 400.0% | 29.3% | 17.5% |
| AstraZeneca | 28.0 | 23.7 | 4.3 | 18.5 | 15.0 | 3.5 | -34.1% | -36.7% | -19.7% | -23.4% |
| Celgene + BMS | 560.8 | 536.2 | 24.6 | 508.5 | 475.0 | 33.5 | -9.3% | -11.4% | 36.2% | 1.3% |
| Eli Lilly and Co. | 174.7 | 118.7 | 56.0 | 118.2 | 60.0 | 58.2 | -32.3% | -49.5% | 3.9% | 44.3% |
| GlaxoSmithKline (w/ Tesaro) | 206.3 | 72.4 | 133.9 | 402.1 | 235.0 | 167.1 | 94.9% | 224.6% | 24.8% | 46.6% |
| Johnson & Johnson | 194.8 | 10.3 | 184.5 | 223.2 | 35.0 | 188.2 | 14.6% | 239.8% | 2.0% | 25.8% |
| Novartis AG | 85.0 | 52.7 | 32.3 | 99.6 | 70.0 | 29.6 | 17.1% | 32.8% | -8.5% | 11.8% |
| Pfizer Inc. | 314.7 | 293.2 | 21.5 | 275.6 | 250.0 | 25.6 | -12.4% | -14.7% | 19.1% | 30.9% |
| Regeneron | 58.2 | 46.9 | 11.3 | 86.7 | 80.0 | 6.7 | 49.0% | 70.6% | -40.7% | 309.2% |
| Roche | 104.4 | 93.1 | 11.3 | 115.8 | 105.0 | 10.8 | 10.9% | 12.8% | -4.7% | 11.8% |
| **Top 20 Accounts** (11 covered by GCS) | **1,964.1** | **1,407.6** | **556.5** | **2,082.7** | **1,477.0** | **605.7** | **6.0%** | **4.9%** | **8.8%** | **20.2%** |
| Alkermes | 51.2 | 50.9 | 0.3 | 50.3 | 50.0 | 0.3 | -1.8% | -1.8% | -12.7% | 14.2% |
| Daiichi Sankyo | 291.8 | 283.7 | 8.1 | 247.7 | 240.0 | 7.7 | -15.1% | -15.4% | -4.9% | -7.4% |
| Otsuka | 131.1 | 129.2 | 1.9 | 71.0 | 70.0 | 1.0 | -45.8% | -45.8% | -47.4% | -38.8% |
| Incyte | 131.6 | 131.0 | 0.6 | 95.5 | 95.0 | 0.5 | -27.4% | -27.5% | -10.5% | -13.2% |
| **21 -50 20 Accounts** (4 covered by GCS) | **605.7** | **594.8** | **10.9** | **464.5** | **455.0** | **9.5** | **-23.3%** | **-23.5%** | **-12.8%** | **-15.1%** |
| Intercept (SMID Top 250) | 17.6 | 9.8 | 7.8 | 33.9 | 25.0 | 8.9 | 92.8% | 155.1% | 14.5% | -15.1% |
| **Actuals / Budget Target** | **2,587.4** | **2,012.2** | **575.2** | **2,581.1** | **1,957.0** | **624.1** | **-0.2%** | **-2.7%** | **8.5%** | **10.0%** |

Syneos Health

© 2020 All rights reserved | For Syneos Health® us

60.     As the Executive Leadership Team discussed during the monthly ELT meetings, as of December 1, 2020, many of the Company's key accounts were in serious jeopardy with several others having already stopped awarding new business to Syneos.  At the account level, all but two of its top accounts needed "CAPAs" also known as corrective and preventive actions.  "14 out of [the top] 16 accounts have overdue actions" and "10 [of the top 16] accounts have critical actions overdue."  Three of Syneos's biggest customers had placed the Company on some form of "hold," meaning that it was not able to receive any new clinical business, and one client was "at risk."  For example, the presentation informed the ELT that Syneos's clients AbbVie and AstraZeneca had a hold on giving the Company more work.  As to AstraZeneca, the presentation noted that Syneos's biometric submission to the European Medical Agency had failed to include data.  Syneos's four largest clients alone were collectively responsible for nearly $500 million of awards to Syneos in

2020, while the 14 accounts with overdue actions represented more than a billion dollars of awards in 2020.  To make matters worse, the "Key Findings" presented to the ELT in the January presentation noted, as to Syneos's largest customer: "Pfizer quality data is currently maintained in the Pfizer quality system.  The data here in Syneos system is not the source of truth."  Pfizer became so concerned with the quality of Syneos's services that it needed to provide oversight on the clinical work it had previously awarded to Syneos, and Pfizer appointed directors from their own company to oversee Syneos's work.

# Executive Summary

## KEY FINDINGS

- Site Issues and Monitoring continue to be the most frequent category for Quality Issues and Audit/Inspection findings but if we consider only those non-compliances for which Syneos Health has direct responsibility, the most frequent category is Mgt of Essential Documents

- Several accounts are either on hold or showing concerning quality signals.  Reasons are not always reflected in the data trends

- As of Dec 1st 2020 GCS accounts have **456 open** QI CAPAs, Audit CAPAs – **131 are overdue** including **30 critical**

  – **14 out of 16 accounts** have **overdue** actions; **10 accounts** have **critical** actions overdue

  – **All BUs** have **overdue** actions; **8 BUs** have **critical** actions **overdue**

  – Main **sources** contributing to **overdue CAPAs**: Site Findings, Sponsor Audits, Vendor-related QIs

- Existing **data and systems** have **limitations** for **effective governance**



# Key Findings
## Open, Overdue and Critical CAPAs by Account and by BU

**Total Open**
**456**

### ACCOUNT-LEVEL

| GCS Accounts | Total Open | Total Open (Critical) | Total Over due | Total Overdue (Critical) |
|---|---|---|---|---|
| AbbVie (Soft Hold)^ | 56 | 11 | 13 | 2 |
| Alkermes | 20 | 6 | 7 | 5 |
| Amgen | | | | |
| AstraZeneca (Hold)^^ | 3 | | 3 | |
| BMS | 21 | 1 | 8 | 1 |
| Daiichi Sankyo | 10 | | 7 | |
| GSK | 46 | | 5 | |
| Incyte | 5 | 3 | 3 | 2 |
| Intercept | 66 | 9 | 24 | 5 |
| J&J | 3 | | 1 | |
| Lilly (At Risk)* | 36 | 11 | 15 | 4 |
| Novartis | | | | |
| Otsuka | 20 | 11 | 9 | 4 |
| Pfizer* | 89 | 4 | 17 | 2 |
| Regeneron (Soft Hold)*** | 49 | 10 | 15 | 2 |
| Roche | 32 | 15 | 4 | 3 |
| Grand Total | 456 | 81 | 131 | 30 |

### BU-LEVEL

| BU | Total Open | Total Open (Critical) | Total Overdue | Total Overdue (Critical) |
|---|---|---|---|---|
| CNS | 40 | 15 | 11 | 6 |
| General Medicine | 129 | 25 | 51 | 11 |
| Oncology | 80 | 6 | 21 | 3 |
| SSU | 5 | | 2 | |
| CDS | 27 | 16 | 7 | 5 |
| Early Phase | 15 | | 5 | |
| RWLP | 19 | 11 | 6 | |
| BMS BU | 14 | 1 | 2 | 1 |
| Pfizer BU** | 88 | 4 | 16 | 2 |
| BT | 4 | | 1 | |
| Corporate Services | 13 | 2 | 7 | 1 |
| Global Ops - CAPSS | 22 | 1 | 2 | 1 |
| Grand Total | 456 | 81 | 131 | 30 |

- **Pfizer** quality data is currently maintained in the Pfizer quality system. The data here in Syneos system is not the source of truth.
- ^**AbbVie** Recurring audit findings in Clinical and RWLP Call center finding related to Inappropriate Disclosure
- ^^**AZ** Biometrics issue (submission to EMA failed to include data)
- **Lilly** Multiple eCOA issues in Dermira program

© 2020 All rights reserved | For Syneos

61.    Defendants' statements during the Class Period that Syneos's technology was a competitive advantage were blatantly false when made because in truth, the Company operated at a severe disadvantage.  Syneos failed to invest in the very technology needed to conduct clinical trials, collect usable data from those trials, and provide that data to its customers.  Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities.  In short, the Company failed to adapt to changing business demands and lacked the necessary tools including robust data management systems.  The Clinical Trial Management System used at Syneos was InForm, which was a generic system that did not allow for any client customization.  The increased prevalence of

- 29 -

remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems.

62.    Incredibly, Syneos also lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business. Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials. Such a portal was a basic feature other CROs offered to their clients. Without a portal, Syneos was forced to manually create reports on generic spreadsheets and then email them to clients. Instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal clients could access remotely. Defendants were well aware how important a client portal was to Syneos's future success. In fact, one of the Company's critical initiatives during the Class Period was technology, and the implementation of a portal was the primary focus. Defendant Macdonald was the executive sponsor of the portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos finally launch "Clinical Reimagined," the initiative to develop a portal. By the end of the Class Period, however, the Company had still not launched an integrated client portal.

63.    Defendants were also aware that Syneos failed to invest in technology infrastructure following the inVentiv and INC Research merger which formed the Company in 2018. For example, Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed by 2021, the Company had 11 separate accounts receivable systems and nine accounts payable systems. This made invoicing and paying bills for customers a logistical nightmare. Similarly, the Company had no centralized network for

communicating via email between its worldwide locations. As a result, Syneos's rapid acquisitional corporate growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups.

        **D.**      **Syneos Was Plagued by Workforce Turmoil and a Toxic Culture**

64.     In addition to the technology gaps and lack of investment in infrastructure, Syneos's operations were critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture. Contrary to Defendants' Class Period statements about the Company's great work environment and strengths as an employer, Syneos maintained and perpetuated a bullying workplace which contributed to high turnover and a lack of clinical trial continuity critical to producing quality data.

65.     Former President of Clinical Solutions, Paul Colvin, and former Director of Business Development, Becky Brown, created serious issues within the Company leading to a huge turnover of Project Managers within the Clinical Solutions segment, as they were responsible for supervising data analysts and Clinical Research Associates ("CRAs"). Even as Syneos brought on otherwise qualified people, they were "thrown to the wolves" as soon as they started working at the Company, were not trained, and were given "zero guidance." They were, however, still expected to meet deadlines and forced to work extreme hours. Despite these demands, Syneos still lacked adequate personnel to conduct clinical trials.

66.     Syneos was unable to retain analysts because poor management and the lack of training and support led to horrible turnover across the board, including Project Managers and CRAs. The high turnover on projects snowballed into more problems causing a lack of continuity, delays in responding to clients in a timely fashion, and data quality issues, all of which led to a loss of business. Customers of all sizes complained their projects lacked adequate staffing, and

with insufficient staffing devoted to conducting clinical trials, Syneos lost customers in droves and ruined the Company's reputation in the process.

67.    Predictably, Syneos's technology shortcomings such as the lack of a client portal, lack of tools to conduct clinical trials, inadequate staffing, and the toxic work environment, which prevented the Company from producing quality clinical trial data, hindered Syneos's ability to win new business.  These problems also caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel.  Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues.  For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems.  Clients further complained that the manual reports received from Syneos, instead of accessing the data via a portal, had to be redone.

68.    Plagued by critical technological shortcomings and a severe lack of personnel which led to overwhelming quality problems, Syneos lagged its peers in providing remote clinical capabilities and struggled to catch up to its peers in the new business environment.  As a result, Syneos failed to effectively perform under its existing contracts, ultimately causing Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals.

69.    The ELT was informed and well aware that Syneos's quality issues and data limitations were having devastating consequences on the Company's clinical segment.  The January 2021 ELT presentation, for example, noted that AbbVie had placed a "hold" on its FSP clinical business with Syneos due to quality issues, and noted that Syneos suffered from a lack of a "quality culture."  Another customer, Regeneron, had also placed Syneos on "hold" and would not make its "Phase III" pipeline "available to Syneos" "until [it] earned back trust."  The Senior

Director of Corporate Strategy warned the ELT that Syneos "MUST demonstrate delivery failures are behind us."  But Syneos's delivery failures and critical data and quality issues were not behind it.

70.    Contrary to what Defendants were telling investors, the Company's Clinical Solutions segment was neither healthy nor growing and the consequences were dire.

**E.    Defendants Masked the Lack of New and Renewal Business by Manipulating Their Backlog Metrics and Applying Pressure to "Find" Revenue**

71.    Because Syneos's clinical trial business was floundering, and the Company was struggling to attract and win new business, Defendants embarked on a scheme to falsely inflate the Company's performance metrics to buy themselves enough time to dump billions of dollars in Syneos common stock.  In each quarter from January 2020 through May 2022, Syneos was several hundred million dollars short of its backlog, new business award, and revenue targets.  In order to make it appear that Syneos's clinical business was growing, when it was not, Defendants put tremendous pressure on employees to "find" numbers to fill the gaps and meet the targets.  At Syneos, because of the pressure, bullying tactics, and tone from the top, orders to find it were tantamount to instructions to fake it.

72.    To "find" the bookings to fill the backlog, "find" new business and fill revenue holes, and achieve book-to-bill ratios greater than 1.0x to show the business was growing, the Company manipulated and inflated its performance metrics, including its backlog, and prematurely recognized revenue.  This was accomplished in several ways.

73.    Syneos violated its own stated policy for booking backlog and revenue from enormous contracts with large pharmaceutical companies known as FSP contracts that can have 5-year terms.  To "find" the sales necessary to fill the backlog hole, the Company manipulated and inflated backlog by including $300 million for an FSP contract entered into with GSK in late 2019

in backlog that Syneos shared with another CRO and which generated only $20 million in actual revenue per year during the Class Period.  And while Syneos assured investors and the market that it would only book to backlog one year of authorizations, Syneos routinely took three to four years' authorization value from its FSP agreements, like the GSK agreement, because finance department employees were bullied to "find it."

74.    Defendants inflated backlog and manipulated the Company's book-to-bill ratios by including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog.  By abusing this policy, Syneos took authorizations and booked to backlog projects that were never documented and never came to fruition.  Syneos engaged in this practice by taking authorizations far out into the future or before approval at the orders of Defendants Meggs and Colvin so that the Company could achieve backlog, new business targets, and a book-to-bill ratio greater than 1.0x.

75.    Syneos also manipulated change orders without proper documentation to inflate backlog.  Change orders were additional revenue amounts added to contracts or clinical trials because the scope of work had changed.  These orders would increase the total revenue value of the contract but required separate agreements approved by the customers.  Defendants further inflated backlog by including change orders even when customers had not agreed to or signed a change order.  For example, Syneos would treat a $2 million change order as finalized and added to backlog even before a customer was aware of the increase to the contract and without a customer signature or approval.

76.    Another example of backlog being inflated during the Class Period after employees were ordered to find it occurred when Syneos entered into a large agreement with a big pharma

company to conduct eight clinical trials over a number of years.  The entire value of those contracts was hundreds of millions of dollars.  Those contracts provided that Syneos could earn a $100 million bonus if certain milestones were met during the course of the contract.  Even though Syneos missed the first milestone in year one of the contract, Defendants included the $100 million bonus in backlog.

77.    Also, when contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.  For example, two large oncology clinical trials worth $25 million each were cancelled in early 2021.  When the business unit CFO Mike Donovan tried to have these trials removed from the backlog, he was overruled by his superiors.  They were concerned that removing the cancelled awards from backlog would decrease the Company's book-to-bill ratio.  And on more than one occasion, the Company backdated contracts signed after the end of the quarter to make sure the award value was placed in the previous quarter.

78.    Defendants' efforts to bully employees in the finance department to manipulate backlog and inflate the Company's performance metrics reached a boiling point in the second quarter of 2021 ("Q2 2021").  In an email to all business unit CFOs on July 10, 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "find it."  Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to "find" revenue was tantamount to an instruction to fake it.  Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance department completed, which Defendants routinely used to pressure

Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period.

79.    Defendant Colvin's July 2021 email demonstrates the extraordinary measures utilized when Defendants were desperate to achieve targets. Colvin attended the month-end meeting at the end of the second quarter in June 2021, during which the monthly and quarterly revenue and backlog figures derived from the multi-layer financial review were discussed. Determining that the revenue figures were insufficient, despite the multi-level review used to derive and confirm the accuracy of those figures, Defendant Colvin and Brown pressured the business units and finance professionals on the call, well after the quarter close, to change project progress targets and cost estimates to prematurely generate additional awards revenue. Despite all of that review, Colvin sent the July 10, 2021 email on a Saturday, ten days after the close of the quarter, and admonished all business units that they were "still a long way off target," and directed them to "work with your CFOs" to hit "the following targets as improvements to where we were end of [yesterday]" and find more than $12 million in additional revenue:

| "Company A" | $2 million |
|---|---|
| "Company B" | $1 million |
| Central Nervous System ("CNS") | $2 million |
| Oncology | $2 million |
| Gen MED | $2 million |
| Synteract | $500,000 |
| Tara Fitzgerald, President, Clinical Development | $1 million |
| Maria Fotiu, Exec, V.P., Decentralized Solutions | $1 million |
| Nick Kenny, Chief Science Officer | $1 million |

80.    Defendant Colvin did not offer any suggestions or places for the business unit CFOs to try to locate the missing numbers even though each business unit had already completed a weeks-long process to find additional revenue. Bekki Brown, Victoria Moore, and Kaitlyn

Stadiem had already held monthly finance meetings to discuss month-end revenue and financials, which were attended by senior members of (i) the Project Financial Management group and (ii) the finance group for each business unit before the end of Q2 2021 (June 30, 2021). Furthermore, these meetings themselves followed four earlier levels of review within the business units to evaluate each active project within Syneos. These four reviews included the following for each project: (i) meetings among the Project Financial Analysts and Project Analysts to evaluate and calculate costs and estimates of completion; (ii) which were then presented to, discussed with, and ultimately approved by a Senior Director; (iii) who then met with the business unit CFO, who reviewed and approved these calculations and figures. Therefore, by not offering any suggestions, the astonished recipients of Defendant Colvin's "find it" email understood their marching orders to be "fake it."

81.    Defendants also ordered reimbursable expenses (also called "indirect costs" or "pass-through costs") to be used to inflate backlog. Indirect costs for a given clinical trial were estimated by Syneos and entered directly into the backlog. If actual costs were lower than the Company's estimates, they should have been removed from backlog. For example, if Syneos estimated $2 million in indirect costs on a given clinical trial but realized only $1 million in revenue, then the other $1 million should have been removed from backlog as the $1 million constituted revenue that would never be realized. Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have had an adverse impact on the book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President of Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Oncology) knew of the reluctance to remove the inflated reimbursable expenses from backlog and

the impact on the book-to-bill ratios.  And Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Oncology) discussed these practices and the impact this would have on the Company and Donovan warned that the practices could amount to fraud.  Fillman and Moore were specifically warned that Syneos's actions with respect to reimbursable expenses could amount to fraud.  To accommodate these practices and achieve the numbers they wanted, Syneos had a practice in which it would extend the month-end close until the numbers had reached certain pre-determined amounts.  To increase reimbursable expenses to thereby increase backlog, Defendants ordered the finance department to make manual journal entries on projects.

82.     Syneos's efforts to "find" revenue continued through late 2022, just before Defendants disclosed to the market that its pipeline had shrunk by 90%.

83.     At the end of the third quarter of 2022 ("Q3 2022"), a Project Director was directed via email to add more monitoring visits on the calendar for the study.  Monitoring visits were revenue for Syneos because the Company was paid when a clinical research associate at Syneos visited a site.  The Director objected to adding visits to the calendar because there was no need to do any more visits for the study at that time.  The Director, however, was instructed to set up the visits anyway because Syneos needed to show the revenue.

84.     Indeed, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric.  The Executive Vice President of Operations, the Head of Commercial (Keefe), the Head of Sales, and all of the sales representatives participated in these Monday calls and Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations.  The entire

sales organization knew where the Company was in terms of tracking to target, and regardless of the size of the gap, Syneos always made it up.

85.    In addition to manipulating the Company's reported performance metrics such as backlog, new business awards, and the book-to-bill ratio, Defendants also pressured employees to manipulate the way in which the Company recognized revenue.  Although Syneos publicly claimed to employ a conservative revenue-recognition policy, Defendants ordered employees to improperly recognize revenue in a couple of ways.  First, the Company would inappropriately lower cost estimates in order to increase revenue recognition under a percentage-of-completion clinical trial contract.  The underestimation of costs would result in revenue being recognized on an expedited basis or early in the clinical trial.

86.    For example, in a clinical trial expected to take five years to complete with expected revenues of $10 million, Syneos would forecast the costs to complete the trial, *e.g.*, $6 million in costs.  Costs expended are used to assess how far along the clinical trial is, as opposed to the amount of time that has passed, and milestones or percentage completion is determined by the expenses incurred.  As such, using the example above if $2 million in costs were incurred then the trial would be considered 33% complete and 33% of the revenue (or $3.3 million) could be recognized.  Defendants put pressure on employees to underestimate the costs and determine that only $4 million in costs were necessary to complete the trial instead of the original $6 million.  Lowering the cost estimate in this example – so that 50% of the costs were incurred – would allow Syneos to increase the revenue recognized from $3.3 million to $5 million.

87.    In many instances, if Syneos "overburned," where actual costs or estimated costs increased, Syneos would not reverse recognized revenue.  In this example, if the Company estimated the new costs to total $8 million, instead of the previous $6 million cost estimate, and if

$4 million in costs were already expended, the Company had only earned 50% of the revenue. If, however, the Company had previously recognized 66% of the $10 million in total revenue (under the original cost estimate), $1.6 million in previously recognized revenue should be reversed. However, Syneos would recognize revenue when beneficial but not reverse revenue when it was reassessed. Instead, a plan would be put in motion to justify the costs already expended, for example, by lowering cost estimates going forward, even though the trial had just overburned.

88.    Through these efforts, the Company was able to "find" hundreds of millions of dollars of revenue every quarter, and suddenly the Company hit its targets after being behind in achieving its numbers as the quarter was wrapping up. Over time, this conduct caused Syneos's backlog, book-to-bill, and net new business awards to be overstated.

89.    Numerous high-level managers voiced objections to these efforts to expedite revenue recognition and change cost estimates. For example, between September 2020 and April 2022, one Senior Director sent emails expressing her discomfort with the Company's revenue numbers. The same Senior Director also noted her discomfort with certain financials in SOX certifications (which were signed by Defendants Macdonald, Keefe, and Meggs). Ultimately, this Senior Director, under duress, had to agree to numbers with which she was uncomfortable.

90.    One business unit CFO similarly resisted signing off on or certifying month-end numbers for his business unit, warning superiors many times against how the Company was recognizing revenue and recording backlog and predicting that it could not be sustained. This CFO had one-on-one discussions with the Clinical CFO, Jennifer Fillman, who reported to Meggs and the Business Unit CFO, Victoria Moore, in which the CFO warned Fillman and Moore that the Company's practices could amount to fraud.

91.     Undeterred, Company executives shrugged off warnings from business unit CFOs and continued inflating backlog, new business awards, the book-to-bill ratio and revenue.

### F.     Without Sufficient New and Renewal Business Being Added to Backlog from Which to Prematurely Pull Awards, the Company Could No Longer Obfuscate the Truth

92.     On February 17, 2022, Syneos announced deeply disappointing financial results for the fourth quarter of 2021 ("Q4 2021").  Despite Defendants' prior claims that reimbursable revenues would undergo "strong growth" and "accelerat[e]," Syneos revealed that reimbursable revenues would in fact likely never recover to pre-pandemic levels.  Defendants revealed that 36% of the Company's backlog was reimbursable expenses.  Even more surprising, Defendants revealed that between $850-$950 million in reimbursable expenses they maintained in the Company's backlog would never be collected.

93.     Syneos also told investors that it "adjusted" its "expectations for reimbursable expenses, which impacted our total book-to-bill, net awards and backlog metrics."  Syneos stated this adjustment was due to an increase in remote work and this phenomenon would "have a lasting impact on our revenue profile."  Including reimbursable expenses, the Company reported $357.1 million in net new business awards in Q4 2021 – a stunning decline of close to $1 billion from the previous quarter.

94.     Securities analysts picked up on the Company's adjustment to reimbursable expenses.  Jefferies issued a report on February 18, 2022, calculating that Syneos removed between $850-$950 million in pass-through revenue, stating that "it is important to recognize that the magnitude of mgt's overestimation means that Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)."

95.     After this disclosure, four of Syneos's top executives left the Company.  Defendant Macdonald, who served for about six years as the Company's CEO, abruptly announced his

- 41 -

retirement in April 2022. Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline. Four months later, in August 2022, Defendant Colvin, President of the troubled Clinical Solutions segment, also left. In January 2023, Syneos announced a "Chief Financial Officer Transition," through which Defendant Meggs would leave the Company. Defendant Keefe, who temporarily succeeded Macdonald as CEO, departed the Company in October 2023.

96.    As the Company's known and pervasive qualitative and technological failures and its inability to compete for and attract new business, particularly with repeat customers who were acutely aware of the Company's failures, caught up with them, the Company was unable to fill its pipeline with new business and, as a result, was unable to continue engaging in its revenue-recognition practices and backlog manipulations. Eventually, as explained further below, the Company ran out of backlog from which to pull revenue and had to disclose its virtually non-existent pipeline to the market, causing Syneos's stock price to crash.

97.    On November 4, 2022, Syneos reported a Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the amount anticipated by some analysts, with several calling the disappointing results "unprecedented." Syneos received just $182 million in clinical net new business awards during the quarter, representing an 87% year-over-year decline and nearly $1 billion below the amount expected by some analysts. On a related earnings call, Defendant Keefe, now Syneos's CEO, revealed that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions. As detailed herein, during a subsequent investor call, Defendant Keefe indicated the known issues extended even further back in time, although the

problems were not previously disclosed to investors and contradicted Defendants' Class Period statements.

98.    As a result of these revelations, the price of Syneos stock declined to trade below $23 per share, down more than 77% from the Class Period high, causing Lead Plaintiffs and the Class to suffer billions of dollars in losses and economic damages.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

99.    Throughout the Class Period, Defendants made materially false and misleading statements in furtherance of their scheme to falsely portray the Company as healthy and growing, including material misrepresentations and omissions concerning: (1) Syneos's emergence from the COVID-19 pandemic; (2) Syneos's workforce, workplace culture, and capabilities to run clinical trials; (3) Syneos's success and engagement with customers of all sizes in the Clinical Solutions division; (4) Syneos's reported performance metrics including backlog, new business awards, book-to-bill ratios, and reimbursable expenses for the Clinical Solutions segment, the Company's stated methodology Syneos used to recognize and account for reported New Business Awards and Backlog, and false statements that violate Item 303 of Regulation S-K, contained in Syneos's Forms 10-Q and 10-K issued during the Class Period; and (5) Syneos's Registration Statements and Prospectuses used to conduct public offering and facilitate the Company's stock repurchase program which incorporated the false statements contained in the Company's Forms 10-Q and 10-K.

### A.    Materially False and Misleading Statements Regarding the Company's Emergence from COVID-19

100.    Desperate to portray Syneos's clinical business as a healthy and growing Company and demonstrate that its business performance was not adversely impacted by the COVID-19 pandemic, Defendants engaged in a scheme to falsely assure investors that the Company was

emerging from the pandemic in a stronger position when exactly the opposite was true.  For example, on October 29, 2020, during Syneos's conference call to discuss the Company's third quarter of 2020 ("Q3 2020") financial results, Defendants Macdonald and Meggs addressed securities analysts' concerns about COVID's "impact" on Syneos's reimbursable expenses and bookings:

> **[Macdonald:]** Outside of the backlog adjustment, for reimbursable out-of-pocket expenses, *we have experienced no meaningful cancellation activity as a consequence of COVID-19.*
>
> \*      \*      \*
>
> [**Meggs:**] When you think about the backlog and the adjustment in clinical, we – *if you just take out the backlog* adjustment, *our book-to-bill in the quarter in clinical would have been north of 1.4, again.  So it was a good quarter, and we feel good about the bookings that we had*.

101.    Later during the same call, Meggs further assured investors and analysts of the strength of Syneos's clinical business:

> Given the COVID-19 *headwinds, we had a strong quarter across our operating and financial metrics, including gross awards, backlog growth, profitability and cash flow demonstrating how our unique value proposition continues to resonate with our customers and our team continues to execute*.

102.    Thereafter and throughout the fall of 2020, Defendants attended multiple roadshow and industry conferences to promote Syneos's business and condition the market for several public offerings and stock repurchases Syneos conducted to help its private-equity sponsors liquidate their Syneos stock holdings.  During those presentations, Defendants emphasized that Syneos's demand environment, despite the pandemic, was very strong.  For example, at a November 19, 2020 Jefferies LLC industry conference, Defendants Macdonald and Meggs addressed investors and analysts.  Macdonald stated:

> I think *the RFP environment for us has been pretty strong all year*, and *we've closed out pretty well*.  I mean, Q3 was probably the hardest one as we went through

kind of a bit of recovery, but ***nice strong environment right now***.  And I think that ***sets us up really nicely for 2021*** as well.

103.    On December 8, 2020, Defendants Macdonald, Meggs, Keefe, and Colvin hosted an Analyst and Investor Day.  During his prepared remarks, Macdonald represented that Syneos expected to achieve "***robust revenue growth***" over the next three years.  Specifically, Macdonald announced revenue guidance for fiscal years 2022 and 2023 of "***between 7% and 10%***" growth each year.  Defendant Meggs similarly stated that Syneos had "***the backlog, pipelines and customer relationships***" to "***accelerat[e] execution and growth over the next several years***," and the Company was "***positioned for sustainable growth and margin expansion***."

104.    Later, on January 13, 2021, Defendants Macdonald and Meggs addressed investors and analysts at the JP Morgan 39th Annual Healthcare Virtual Conference, during which Macdonald underscored the Company's new business awards and backlog growth, including through the Company's acquisition of Synteract, stating:

> ***We have increased the number of strategic awards in the top 30 since this time last year, up to four, and we're very happy with that.  And then you'll see there that over 30% year-on-year backlog growth for us in that top 50, which shows that the accounts that we penetrated are turning into revenue*** generation.  ***We've gone through bookings growth and now we're starting to see that billings growth come through the model as those projects stand up and start up***.
>
> Obviously, a little bit delayed because of COVID, ***but . . . we feel good engagement from those customers, we have good position with them, we've worked out how we deliver for them, and I think that's a very promising start to a much larger penetration in the large pharma sector***.

105.    Lastly, on April 29, 2021, Defendants Macdonald, Meggs, Keefe, and Colvin hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the first quarter of 2021 ("Q1 2021").  During the call, Macdonald highlighted the "strong demand" that Syneos was purportedly experiencing and that the clinical segment was "well positioned for accelerated revenue growth" in 2021, citing the Company's

"record ending backlog" and "record pipeline of new opportunities." Macdonald also claimed that Syneos was enjoying demand far above pre-COVID-19 levels stating, for example, that "[b]y mid-April, the new patient enrollment rates and new site activations were trending at approximately 150% of pre-COVID levels," which he represented would "increase our backlog conversion and accelerate year-over-year Clinical Solutions revenue growth for the balance of this year."

106.    Defendants' statements detailed above (¶¶100-105) were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a)    Desperate to portray the Company as growing its pipeline of new business so that Defendants and the private-equity sponsors could sell millions of shares of stock, Defendants engineered a fake resurgence of the Company out of the COVID-19 pandemic. Unbeknownst to investors, but known to and concealed by Defendants, Syneos was plagued by undisclosed, long-standing quality, technological, and cultural problems that caused clients to cancel in droves and refuse to re-sign. Syneos's inability to deliver the clinical and project management services demanded by its clients was seriously impacting the Company and its pipeline of potential new awards and backlog of awards reported to investors. The Company was not competitive and the Syneos workforce was significantly understaffed and operating in a toxic work environment that negatively impacted the Company's ability to retain key personnel and, in turn, generate quality clinical trial data. ¶¶54-70;

(b)    Defendants were aware their statements that Syneos had emerged from the COVID-19 pandemic unscathed were false and misleading when made because by late 2020 and continuing throughout the Class Period, they knew that Syneos's inability to deliver quality clinical services was adversely impacting the Company's ability to win new and renewal business awards. The Company's technology shortcomings were hurting business and by beginning of the Class

Period, the Company's ELT had already begun a comprehensive review of its Clinical Solutions business to determine why its clients were pulling work from the Company. The Company's quality failures were routinely discussed by Syneos senior management, including during monthly ELT meetings (of which Defendants Macdonald, Meggs, Keefe, and Colvin were members). The ELT meetings were used to plan, facilitate, and review the status of Syneos's strategic initiatives, and to discuss other topics such as HR and IT. The results of the fall 2020 ELT review – and the significant and severe problems facing the Company – were being discussed at the highest levels of the Company. ¶57;

(c)    Indeed, during a January 28, 2021 monthly ELT meeting, Syneos's Senior Director of Corporate Strategy presented a PowerPoint presentation to the Executive Leadership Team that identified the critical quality issues and highlighted "Open, Overdue and Critical CAPAs [Corrective and Preventive Actions]" seriously affecting Syneos's largest customers. That presentation contained data integrity warnings impacting large pharma customers:

- "***Data doesn't reflect client situations***."

- "Clinical Monitoring and Project Management topics (esp. Site Monitoring and Vendor Management) account for most overdue and overdue-critical actions."

- "***Further meaningful drill-down is not currently possible due to data limitations***."

- "***The data here in Syneos system is not the source of truth***." ¶¶6, 60.

(d)    From their participation in the ELT and the January 2021 presentation, Defendants knew that Syneos's quality issues and data limitations were having devastating – but undisclosed – consequences on its clinical business. For example, AstraZeneca had placed a "hold" on its clinical business with Syneos due to quality issues. The January 2021 ELT presentation also noted that Syneos suffered from the lack of a "quality culture" and that AbbVie

and Regeneron had also placed Syneos on "hold."  Regeneron decided not to make its "Phase III" pipeline "available to Syneos" "until [it] earned back trust."  The Senior Director of Corporate Strategy warned the ELT that Syneos "MUST demonstrate delivery failures are behind us."  But Syneos's delivery failures and critical data and quality issues were not behind it.  Across its top accounts, even including the $400 million from the GSK contract the Company knew it would not collect, the Company expected a negative growth rate of -0.2% across its clinical and commercial business and -2.7% for its clinical, which was the core of its business.  ¶59;

(e)     Defendants knew that Syneos did not offer unique value that resonated with its customers because the Company failed to invest in the technology necessary to customize clinical trial data for its customers and lacked a client portal.  In addition, Syneos's services were negatively impacted and impaired by workforce reductions, leadership and operational changes, labor force turmoil, and the toxic workplace culture fostered by Defendant Colvin and former Director of Business Development, Becky Brown.  The severe staffing shortages, lack of training and guidance, and horrible working hours caused massive workforce turnover which further degraded the Company's ability to service its clinical trial customers.  Ultimately, Syneos's failure to effectively perform under its existing contracts caused Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals.  ¶¶54-70;

(f)     In addition to affecting its relationship with its large pharma customers mentioned above, the January 2021 ELT presentation informed Defendants that the Company's business with SMID customers was declining.  Defendants expected a **_negative year-over-year awards growth rate_** of -23.3% across its clinical and commercial business and **_-23.5% for its clinical business_** in 2021.  ¶59; and

(g)    Because Syneos's clinical trial business was floundering, and the Company was struggling to attract and win new business, Defendants ordered finance department and clinical project employees to artificially inflate the Company's performance metrics. In Q3 2020, the fourth quarter of 2020 ("Q4 2020"), and Q1 2021, Defendants used bullying tactics to coerce Syneos employees to "find" numbers to fill backlog, new business awards, and revenue targets. These performance metrics were inflated using the manipulations – overbooking FSP contract revenue, including new awards without signed contracts or adequate documentation, manipulating change orders to increase revenue without authorization, improperly booking milestone bonuses, refusing to reduce backlog from cancelled contracts or where collection was not probable, and manipulating costs to complete, as described above. ¶¶78-80.

107.    Defendants' statements on October 29, November 19 and December 8, 2020, and on January 13 and April 29, 2021 (¶¶100-105), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**B.    Materially False and Misleading Statements Regarding the Company's Workforce, Workplace Culture, and Capabilities to Run Clinical Trials**

108.    As part of Defendants' scheme to falsely portray the Company as healthy and growing, Defendants assured investors that Syneos's competitive advantage was its "***model, people, and culture***."

109.    For example, when the Class Period began on September 9, 2020, Defendants falsely assured investors that Syneos possessed a competitive advantage when Defendants Macdonald and Meggs addressed analysts and investors at an industry conference sponsored by Robert W. Baird & Co., Inc. While emphasizing that Syneos was experiencing "pent-up demand"

as evidenced by their reported high market-leading book-to-bill ratios over the last few years,

Defendant Macdonald stated:

> We're in a very strong market. ***Our position in that market is growing and strengthening. The strategy that we have seems to be resonating very strongly with customers across all sectors. So we see the engagement and that growth, not just in the SMID sector where we traditionally grew up, but also now that we're in that large pharma sector, and we'll touch on that in a moment as well***.

110.    On December 7, 2020, Syneos issued a press release to announce and highlight its

upcoming Investor Day presentation in which Defendant Macdonald stated:

> "***Our innovative product development model provides opportunities to drive accelerated growth across a wide range of customers, delivering deeper strategic insights and integrated expertise . . . .***"

111.    During the Analyst and Investor Day on December 8, 2020, Defendants claimed

that Syneos was "***at the forefront of this market shift to an agile, highly communicative, insights-driven, integrated product development approach***."  And Defendant Meggs confirmed that the

Company's "***collaborative approach across the business is resonating with our customers***" and

part of a "***value creation plan***" that "***provides the financial road map for growth***."  Defendant

Macdonald further emphasized that Syneos's "culture" was a "key differentiator" driving

"customer success":

> We're very proud of our recent recognition by Forbes Magazine listing us as a Best Employer, highest amongst biopharmaceutical outsourcing organizations. Importantly, this award was based on independent surveys of our employees and ***truly reflects how our employees feel about what we're building together***.
>
> *        *        *
>
> ***We see our culture continuing to be a key differentiator in helping to attract and retain top talent, which, in turn, drives innovation and customer success***.

112.    During the Analyst and Investor Day conference, Defendant Meggs also

emphasized the Company's "backlog, pipelines, and customer relationships," and further claimed

Syneos had a "competitive advantage," stating:

We have built a strong foundation for growth and we're focused on accelerating execution and growth over the next several years and *we have the backlog, pipelines, and customer relationships to do so*.

*We believe that Syneos Health is positioned for sustainable growth* and margin expansion. *Our model, people, and culture are our competitive advantage*.

113.    Defendants statements detailed above on September 9, December 7, and December 8, 2020 made to investors while Syneos was marketing the Company's public offerings, that the Company's strategy was resonating with its customers (¶¶109-112), that Syneos had an innovative product development model, that Syneos's corporate culture was driving customer success and that the Company's model, people, and culture were its competitive advantages were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading.  As Defendants knew or recklessly disregarded:

(a)    Syneos's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual obligations with its customers.  By the fall of 2020, many of the Company's key accounts were in serious jeopardy because of the Company's inability to produce quality clinical trial data.  As noted above, the ELT review which began in November 2020, determined that the Company's relationship with its large pharma customers was plagued by serious quality issues.  Because the Company could not produce quality clinical trial data, large pharma customers had put Syneos on hold and were refusing to give Syneos work pursuant to massive FSP contracts entered into with the Company.  ¶¶54-70; and

(b)    These quality issues and the toxic workplace culture which contributed to high turnover and exacerbated the Company's critical quality failures directly contradict Defendants statements during the December 8, 2020 Analyst and Investor Day conference about

the Company's great work environment and strengths as an employer.  In addition, Syneos's staffing shortages and inability to retain critical clinical trial employees belie Defendant Macdonald's statements that the Company's culture was a key differentiator that helped Syneos retain top talent and drive customer success.  ¶¶54-70.

114.    Throughout 2021, Defendants continued to make false and misleading statements and material omissions regarding the Company's purported superior technology, enhanced processes, and abilities to conduct clinical trials.  On January 13, 2021, Defendants Macdonald and Meggs addressed investors and analysts at the JP Morgan 39th Annual Healthcare Virtual Conference, and Macdonald highlighted that Syneos was "at the forefront" of "*a need and desire from our customers to see more innovation from service providers like Syneos Health*." Macdonald further highlighted the Company's ability to "deliver decentralized trials," and "capabilities to bring technology and . . . new capabilities to customer delivery," stating:

> ***They're all critical in our mind for the continued differentiation of Syneos Health against competitors*** in what is becoming a more and more complex market. ***And I think that favors the*** larger ***CROs with the capabilities to bring technology and new service lines, new capabilities to customer delivery, to project designs. And I think that really helps us resonate in the market***.

115.    MacDonald further stated that the Company's superior capabilities, which had "helped a lot of customers navigate through the COVID experience by being able to move them very seamlessly, very painlessly to a digital, a more remote approach, both in clinical and commercial," were responsible for the Company's 18% backlog growth and strong sales with both SMID and large customers.

116.    On April 29, 2021, during a conference call with investors to discuss the Company's Q1 2021 financial results, Defendant Macdonald highlighted the "***strong demand***" Syneos was purportedly experiencing and that it would allow Syneos to achieve backlog conversion and accelerate year-over-year revenue growth.  During that call, an analyst described

the ramp-up of site activations as "pretty remarkable" and inquired whether Syneos had sufficient staffing to meet this demand and maintain such an elevated pace.  In response, Defendant Macdonald stated "***yes, definitely, we can sustain it and grow it, actually***."  Macdonald also pointed to Syneos's "***enhanced processes***," "***more horsepower***," and "***more automated and more streamlined***" processes as reasons why the Company was able to effectively execute despite the demanding environment.

117.    On November 3, 2021, Syneos held a conference call, hosted by Defendants Macdonald, Meggs, Keefe, and Colvin, to discuss the Company's financial results for the third quarter of 2021 (the "Q3 2021 Earnings Call").  Defendant Macdonald emphasized the Company's "strong" results and highlighted its "robust year-over-year growth" and a "demand environment" that was "very healthy with strong pipelines."  Defendant Macdonald further highlighted the Company's strong growth in the quarter, stating:

> ***Clinical solutions revenue grew 23.9%*** compared to the third quarter of 2020.  ***Our organic growth was driven by our full-service portfolio, including the continuing ramp-up in our larger pharma relationships, particularly in oncology as they gain full scale and efficiency***.

118.    Defendant Macdonald addressed a question from Citi analyst Patrick Donnelly concerning the "visibility" and "confidence level" the Company had with respect to 2022:

> [**Macdonald**:] So yes, I think where we sit right now, ***good kind of backlog visibility through the whole year with both the backlog that's coming through from clinical.  We mentioned that we're winning a lot of oncology work. Obviously, that sets up for a long view of the pipe of the backlog, so you got a lot more visibility with that***.

119.    A few weeks later, on December 1, 2021, Defendants Meggs presented at the Fourth Annual Evercore ISI HealthCONx Virtual Conference, during which he emphasized the "demand environment" for Syneos's services including oncology, stating:

> Well, we've just – we've won – if you think back to when we started talking about our large pharma partnerships that we've won in 2018, 2019, et cetera, a lot

of those were oncology-focused, ***and you're starting to see that backlog build and come through and the projects lengthen*** and there with large pharma tends to be larger Phase IIIs, and those take a longer period to run, et cetera. So it extends out your burn rate. And then legacy businesses were really good in early phase oncology. And that has been something that we've always been really good at and continue and that's a lot of what comes through from a SMID perspective when we're in that early phase oncology realm.

> ***So both areas, we're really strong at now. We have good customer relationships, good capabilities, good pipelines, and that's just resulting in that business becoming a larger piece of our portfolio***.

120.    Defendants' statements on (i) January 13, 2021, that Syneos was on the forefront of innovation demanded by its clients, that Syneos differentiated itself from competitors through technology which allowed it to bring new capabilities to its customers and helped customers navigate through COVID by bringing them to a digital remote approach (¶114); (ii) April 29, 2021, that Syneos was able to ramp up site activations necessary in light of increasing demand because of Syneos's "***enhanced processes***," "***more horsepower***," and "***more automated and more streamlined***" processes (¶116); and (iii) November 3 and December 1, 2021, that Syneos was ramping up and winning a "***lot of oncology work***" from "large pharma" (¶117-119) were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. As Defendants knew or recklessly disregarded:

(a)    As noted above, Syneos did not differentiate itself from its competitors and was in fact operating at severe competitive disadvantages because it did not possess state-of-the-art software to customize clinical trial data for its customers or even provide customers with a client portal. ¶62;

(b)    Therefore, Syneos did not help navigate its customers through COVID-19 with a more digital approach and did not possess enhanced and more automated processes as claimed. In fact, exactly the opposite was true. Without a portal, Syneos was required to manually create reports and then email them to clients. Instead of providing clients with instant access to

their vital clinical trials data in a customized format, clients were subject to delays of multiple days or even weeks to get access to data that was often filled with errors in a simple spreadsheet. Compared to other CRO competitors who provided data instantaneously via an online portal which clients could access remotely, Syneos was not offering enhanced processes.  In addition, Syneos's personnel shortages and lack of training oftentimes resulted in clients experiencing further delays to obtain their requested data and such data was full of errors.  ¶¶62, 67;

(c)     As noted above, the ELT was informed in January 2021 of serious quality problems plaguing the Company.   In fact, data quality problems impacted the Company's relationship with its largest customer, Pfizer, who would not even allow its quality data to be stored at Syneos because "The data here in Syneos system is not the source of truth."  ¶60; and

(d)     Defendants were further aware that their statements that the Company was "winning" a lot of oncology work were false and misleading and failed to disclose that the Company manipulated and inflated its performance metrics, including its backlog, and prematurely recognized revenue to "find" necessary revenue to fill short falls to plan.  As discussed, this was accomplished in several ways including the refusal to remove awards from backlog when the contracts were cancelled or payment was not probable.  This is exactly what happened in Q1 2021 when two $25 million oncology contracts were cancelled.  When the oncology business unit CFO Mike Donovan tried to have these trials removed from the backlog, higher-ups refused because removing the contracts would decrease the Company's book-to-bill ratio.  ¶77.  To falsely portray the Company's clinical segment business was growing, when it was not, Defendants emphasized that the book-to-bill ratio was greater than 1.0x even though, cancelled contracts like these two oncology contracts were not removed from backlog, the numerator in the book-to-bill ratio.

121.    Defendants' statements on September 9 and December 7 and 8, 2020, and on January 13, April 29, November 3, and December 1, 2021 (¶¶114-119), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### C.    Materially False and Misleading Statements Regarding the Company's Success and Engagement with Customers

122.    Having celebrated the Company's emergence from COVID and the competitive advantages it enjoyed because of its "***model, people, and culture***," Defendants highlighted Syneos's success with large pharmaceutical customers such as Pfizer and SMID customers.  In conjunction with their assurances that Syneos was well-positioned post-COVID and had the products, technology, employees, and culture to grow the clinical business, Defendants emphasized that Syneos was experiencing great success with not only its core SMID customers but also with its large pharmaceutical customers.

123.    For example, as the Class Period starts on September 9, 2020, Defendants Macdonald and Meggs presented at the Baird Industry conference, and Macdonald stated as follows:

> We're in a very strong market.  ***Our position in that market is growing and strengthening.  The strategy that we have seems to be resonating very strongly with customers across all sectors.  So we see that engagement and that growth, not just in the SMID sector where we traditionally grew up, but also now that we're in that large pharma sector, and we'll touch on that in a moment as well***.

124.    As part of their presentation, Defendants Macdonald and Meggs used slides to highlight that Syneos was experiencing a strong SMID pipeline, was "Positioned for Accelerated Revenue and Margin Growth: Syneos Health Investment Highlights," had a "***Leadership Position in High-Growth SMID/Biotech***," and was "***Successfully Penetrating Large Pharma***."

## Positioned for Accelerated Revenue and Margin Growth

Syneos Health Investment Highlights

| | |
|---|---|
| *Clinical Bookings Momentum Driving Visibility into Growth* | • Three consecutive quarters of greater than 1.40x Clinical book-to-bill<br>• **14.8% ending backlog growth** as of June 30, 2020<br>• Three consecutive quarters of greater than 10% year-over-year net awards growth |
| *Commercial Capabilities Drive Differentiation & Growth* | • Syneos One represents the only end to end solution in the market. **Awarded $1.4B of estimated potential value**<br>• **Two long-term partnership wins** and Syneos One® momentum to drive future acceleration of revenue growth<br>• Commercial capabilities influence Clinical business we are winning |
| *Leadership Position in High-Growth SMID / Biotech* | • Strong SMID franchise with long history of leadership within CRO space<br>• Commercial penetration into SMID customers rapidly gaining traction<br>• **>10% total revenue growth YTD 2020 within SMID customer base** |
| *Successfully Penetrating Large Pharma* | • Secured **three strategic Clinical partnerships with Top 30 Pharma** in 2018 and 2019<br>• FSP360 combining with Full Service to deliver large scale hybrid services<br>• Top 20 Clinical backlog mix accelerated to nearly 30% as of June 30, driving high visibility into future growth |
| *Strong Financial Performance and Margin Accretion* | • Organic revenue growth in FY 2019 outpaced market growth **in both segments**<br>• **30–50 bps annual margin expansion from $100M – $125M of** *ForwardBound* **savings** including operating leverage<br>• **Targeting 2.5x – 3.0x net leverage** by the end of 2021 with significant covenant cushion |

Syneos Health

4

125.    On October 29, 2020, during a conference call to discuss the Company's Q3 2020 financial results, Macdonald emphasized Syneos's "record quarter" of new business, stating: "***Gross awards remain very strong, including a record quarter of awards in our small- to mid-sized customer segment***." Defendant Macdonald also addressed analysts' concerns during the call whether the COVID-19 pandemic was adversely impacting Syneos's revenue from traveling to customer locations. Macdonald stated:

> ***And that sector [SMID] was really hot for us in Q3****.* I mean it's kind of a ***record pipe in the SMID, record sales in the SMID for Q3, and we just see that segment getting hotter and hotter. So been*** able ***to land Synteract, having a good cultural fit and relationship with their executive team already****.*

126.    During the November 19, 2020 Jefferies LLC industry conference, Defendants Macdonald and Meggs addressed investors and analysts and Macdonald described that what they were "seeing at the moment . . . ***for the demand environment is very encouraging on the SMID side***," adding that there was a "***nice strong demand environment, both large pharma and that SMID space we've always played in. So we're very encouraged with that***."

127.    During the Company's December 8, 2020 Analyst and Investor Day conference, Defendant Colvin addressed investors and analysts and highlighted their new business, stating: "***Within clinical, we've secured 4 new large pharma relationships, including renewing our relationship with Pfizer***."  Colvin also celebrated the Company's clinical backlog growth, strong pipeline, and legacy strength with SMID customers, stating:

> ***We have year-over-year clinical backlog growth of over 30% for the top 50 pharma customers as of the end of third quarter***.  We manage these large pharma relationships with our Global Client Solutions executives who are tasked with targeting new partnerships in addition to expanding these existing partnerships.
>
> ***We're very excited about our strong pipeline of additional opportunities***. We currently have 3 partnerships driving over a $150 million of annual revenue, and ***we expect to continue expanding this group of key customers. . . . While we're growing our share in large pharma, our legacy strength is in the small to midsized, or SMID, segment where we continue to enjoy an overweighted position relative to our total market share***.

128.    Defendants' statements in the fall of 2020 when they were attending roadshow presentations and conferences with investors to market and promote Syneos's public offerings, during which they told investors that the Company's position in the market was growing with high-growth SMID customers, and that the Company was "successfully penetrating large pharma" customers, that the SMID market was "getting hotter and hotter," that the upcoming Synteract acquisition would help with SMID customers (¶125), and that the demand environment as reflected in backlog growth for both SMID and large pharma customers demonstrated that Syneos was growing its business (¶127), were all false and misleading and omitted material information Defendants were obligated to disclose.  As Defendants knew or recklessly disregarded:

(a)    Unfortunately for investors, the rosy story of Syneos's resurgence was a lie engineered by Defendants so that private equity sponsors, TH Lee and Advent, who both had seats on Syneos's Board, could dump billions of dollars of their Syneos stock and Defendants could sell millions of dollars of their personal holdings.  ¶53.  Unbeknownst to the investing public but

known or recklessly disregarded by Defendants, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and therefore negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors. Furthermore, the undisclosed, long-standing quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work. ¶¶54-70;

(b)    Further, Syneos's strategy was not resonating with its customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. Syneos lacked a client portal, standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously. The Company's toxic work environment, lack of guidance and training, and bullying atmosphere contributed to high employee turnover and resulting workforce shortages. Such shortages made it impossible for the Company to have clinical trial employee continuity critical to producing quality data. All customers including large pharma and SMID complained that workforce shortages caused customers to experience huge delays in obtaining data and even a response from Syneos. These problems led to a massive loss of business and caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel. Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues. For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone. ¶67;

(c)    Defendants MacDonald, Meggs, Keefe, and Colvin, as members of the Company's ELT and responsible for Clinical Solutions operations and finance functions, were well aware that the only way the Company was able to show backlog growth and consistently report book-to-bill ratios over 1.0x given the problems plaguing the Company's clinical segment, was by artificially inflating the Company's backlog as described in ¶¶71-91;

(d)    Defendant Colvin, as a member of the Company's ELT and head of Clinical Solutions, was aware that the statement he made during the December 8, 2020 Analyst and Investor Day conference, that the Company achieved "clinical backlog growth of over 30% for the Top 50 pharma customers," (¶127), was false and misleading and omitted material information when made because by December 2020, the Company forecasted an approximate 16%-23% decline for Clinical Solutions until $600 million from the GSK contract award was included. Because the Company was hundreds of millions of dollars short of its 2021 awards target for 2021, by December 2020, Defendants included $400 million in award value for that account in the 2021 backlog. Defendant Colvin – as head of Syneos's Clinical Solutions segment – oversaw these efforts to inflate backlog with the GSK awards even though the Company lacked the basis to put the full award in backlog. ¶¶9, 58, 59. As members of the ELT, Defendants were further aware that the Company's clinical business was cratering. For its top 21-50 accounts, Defendants expected a *negative year-over-year awards growth rate* of *-23.5% for its clinical business* in 2021. And measured against 2019, the Company's 2021 awards were expected to decline by 15%, in contrast to the 10% growth target. By December 2020, even with the $400 million GSK award inflating backlog, the Company expected a decline in awards of -0.2% for its clinical and commercial segments and -2.7% for its core clinical segment, despite telling investors and the market that Syneos's business was growing. ¶¶9, 58-59; and

(e)    Defendant Colvin's December 8, 2020 statements to support Syneos's stock price while marketing and promoting the Company's public offerings also omitted information obligated to be disclosed – that Syneos's large pharma customers were impacted by severe quality issues.  As the Executive Leadership Team discussed during their monthly ELT meetings, as of December 1, 2020, many of the Company's key accounts were in serious jeopardy.  At the account level, all but two of its top accounts required "CAPAs," also known as corrective and preventive actions.  "14 out of [the top] 16 accounts have overdue actions" and "10 [of the top 16] accounts have critical actions overdue."  Three of Syneos's biggest customers had placed the Company on some form of "hold," meaning that it was not able to receive any new clinical business, and one client was "at risk."

129.    Defendants' statements on September 9, October 9, November 19, and December 8, 2020 (¶¶123-127), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

130.    Throughout 2021, Defendants continued to highlight the Company's success with its "large pharma" and core SMID customers and relentlessly told investors that their recent Synteract acquisition had enhanced the Company's SMID position.

131.    For example, during the January 13, 2021 JP Morgan 39th Annual Healthcare Virtual Conference, where Defendant Macdonald reported 30% year-on-year backlog growth in the top 50 accounts, he also stated:

> In the meantime, we don't ignore the SMID. ***We made the investment in Synteract, continue to help us fuel*** that ***growth in a very hot end of the market, particularly within the SMID market, a hotter end of that market as well***.

\*        \*        \*

On the right-hand side there, we talked a little bit about Synteract. We're keeping that as a stand-alone business unit to really engage the emerging biotech. We've got off to a great start with that. ***The employees from Synteract have been fantastic. They've settled in very quickly, and we're seeing good performance from them from day 1. So we're very pleased with that. It enables us to engage a different customer in the SMID space***.

*        *        *

***We have enhanced our SMID position with the acquisition of Synteract. As I said before, we already have the leading position in that space. We are very keen on that space. We see it as a great growth driver for the future***.

132.    On February 18, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter and year ended December 31, 2020 (the "Q4 2020 Release"). Defendant Macdonald was quoted in the February 18, 2021 Q4 2020 Release, stating:

***[W]e delivered another quarter of strong awards performance, along with sequential revenue growth and robust profitability in the fourth quarter. Our innovative solutions***, including Kinetic, ***continue to resonate with customers*** and ***we further strengthened our differentiated model*** with our acquisitions of Synteract, enhancing our SMID footprint, and Illingworth Research Group, further enabling our in-home capability for Decentralized Solutions . . . ***We remain confident in the long-term strength of our business given our record backlog, which we expect to fuel strong growth in both segments for the full year 2021***."

133.    On February 18, 2021, Syneos filed its 2020 Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"), which was signed by Defendants Macdonald and Meggs. In the 2020 Form 10-K's Management Discussion and Analysis, Defendants described that with the Company's Synteract acquisition:

***[W]e have also enhanced our leading position for serving customers across the small to mid-sized ("SMID") category, further diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment. We continue to experience strong SMID demand, as evidenced by double-digit growth in our request-for-proposal volumes in 2020 as compared to 2019***.[6]

---

[6]    Defendants repeated these statements on February 17, 2022, in Syneos's 2021 Form 10-K for the year ended December 31, 2021 ("2021 Form 10-K"), which was signed by Defendants

134.    Defendants' statements on January 13, 2021, during the JP Morgan conference, on February 18, 2022, in the Form 8-K announcing Q4 2020 results, in the Form 10-K for 2020, that the Synteract acquisition enhanced Syneos SMID category, that the employees of Synteract have been fantastic and settled in quickly and were performing well were false and misleading when made and omitted material information Defendants, were required to disclose.  As Defendants knew or recklessly disregarded:

(a)    Syneos struggled to integrate the Synteract acquisition and from a customer relations standpoint was a disaster from the beginning.  Immediately from the day the acquisition closed, Synteract started hemorrhaging employees who had no interest in working for a large CRO of Syneos's size;

(b)    In addition, Syneos's inability to respond to clients' needs in a timely fashion and provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups, had a severe negative impact on Synteract clients after the acquisition.  The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems. Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities, and the Company had failed to adapt to changing business demands.  Syneos's lack of an integrated client

---

Macdonald and Meggs.  The 2021 Form 10-K similarly championed the Synteract acquisition stating:

> Our 2020 acquisition of Synteract **further enhanced our leading position** for serving customers across the SMID category, diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment.  We **continue to experience strong SMID demand, as evidenced by double-digit growth** in our request-for-proposal volumes in 2021 as compared to 2020.

portal to allow clients to access their data and performance metrics on their projects was another reason Syneos lost Synteract customers in droves. Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal. Indeed, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers, with some customers voicing their unhappiness with the deal prior to closing; and

(c)    As noted above, Defendants were aware of the negative impact that Syneos's technology issues were having on the business. In fact, although one of the Company's Class Period initiatives was technology and the implementation of a portal was a primary focus – Defendant Macdonald was the executive sponsor of the portal initiative – only in Q1 2022 did Syneos finally takes steps to remedy their technological failures, when they launched Clinical Reimagined. By the end of the Class Period, however, the Company had still not launched an integrated client portal. ¶62.[7]

135.   Defendants' statements on January 13 and February 18, 2021 (¶¶131-133), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

136.   Defendants continued to make false and misleading statements regarding Syneos's success and engagement with its "large pharma" and SMID customers throughout the Class Period.

---

[7]     On January 11, 2023, months after the end of the Class Period, Defendant Keefe stated that Syneos "*now* ha[s] dashboards that give people real time updates on how they're performing against their projects. Our customers are getting real-time feedback. And so we really are excited about the improvement there." Keefe noted that the dashboards were part of "[C]linical [R]eimagined," which was the Company's post-Covid "tech-enabled operating model," that "streamlines [the] organization and processes while adding advanced technology and data solutions to improve visibility, decision support and insight generation."

During an August 9, 2021 conference call with analysts and investors, Defendants Macdonald, Meggs, Keefe, and Colvin discussed the Company's financial performance for Q2 2021 and in response to analyst questions about the demand for Syneos's services and the growth in the Company's clinical segment, Defendant Macdonald stated:

> *We had great SMID performance in sales in quarter 4 and quarter 1, again, in quarter 2. That's starting to pull through into revenue as well in the back half. And so looking at growth there in the low to mid-20s, right, when you look at the clinic growth*. So that's how we're looking at it by segment, *really pleased with it*.

137.    In response to a request by a Credit Suisse analyst to "speak to the nature of the clinical net awards in the quarter in terms of what you saw from maybe a therapeutic in our customer perspective? *Is there anything surprising or unusual to call out other than those 3 large[] [awards]*?"  Defendant Macdonald dismissed his concerns, stating:

> Not really.  I think a pretty well-balanced quarter.  *We got a lot of strength in the SMID.  We're the leader in the SMID sector.  So we expect that, but I think that's particularly strong for us this time.  Good FSP awards*, as we mentioned, like you say, and a good contribution from large pharma.

138.    Also, during the Q2 2021 Earnings Call, securities analysts inquired about the demand environment for Syneos's services.  For example, the Jefferies analyst asked about "general recovery on things like site access and RFP flow . . . what do you see in there?  And then what are you assuming also in kind of the back half in terms of continued normalization on that front?"  In response, Defendant Macdonald stated: "*I mean I think we are seeing a very robust environment from all sectors, both clinical, commercial, SMID and large in both sectors as well. So a good, healthy environment*."

139.    On September 15, 2021, Defendant Macdonald attended an industry conference hosted by Robert W. Baird & Co., Inc., and addressed questions about "Second quarter bookings" in the Company's clinical segment.  Defendant Macdonald stated: "*we have a very good SMID mix in the business, and we continue to have that.  Despite the fact we have really good backlog*

*growth in clinical from top 20. Those are going to be the drivers as we move into 2022 and*

*2023*."

140.    In addition, during the Q3 2021 Earnings Call on November 3, 2021, Defendant

Macdonald highlighted the Company's strong growth in the quarter stating:

> "***Our clinical team also closed another strong quarter of awards, particularly in
> the SMID segment. Driven by these strong sales, record ending backlog that is
> up 22.3% year-over-year and a record pipeline of new opportunities, Clinical
> Solutions remains well positioned for robust revenue growth into 2022 and
> beyond***."

141.    Furthermore, in response to a follow-up question from Donnelly asking about

request for proposal ("RFP") "flows," Defendant Macdonald referenced "***the flow that we're***

***seeing***," "***strong across the board, both large pharma and SMID***," stating:

> We, I think, have ***the most compelling SMID offering in the market, and it's a
> healthy part of the market***.

142.    On November 18, 2021, Defendant Macdonald attended and presented at the 2021

Jefferies London Virtual Healthcare Conference, during which he addressed questions about the

Company's win rate and how it has changed over "about the last 5-ish years":

> **Macdonald**: *[T]he win rate for us* has ***been very strong in both sectors. You've
> seen, I think, an improvement overall over the last few years of the consistency
> and the scale of our book-to-bill that's driving the growth in the company. We're
> particularly pleased with the win rates that we see across the SMID and ensuring
> that we're very compelling there***.

143.    Defendant Macdonald's statements on (i) August 9, 2021, during the Q2 2021

conference call with analysts that Syneos had great SMID performance in Q4 2020, and in Q1

2021 and Q2 2021, and that Syneos was a leader in the SMID sector and had a good contribution

from large pharma in that quarter (¶¶136-138), (ii) September 15, 2021, at the Baird industry

conference that Syneos had good backlog growth in clinical from the Company's top 20 customers,

(¶139) (iii) November 3, 2021, during the Q3 2021 Earnings Call with analysts that Syneos's

backlog growth in the SMID sector ensured that "Clinical Solutions remains well positioned for robust revenue growth into 2022 and that Syneos had the most "compelling SMID offering," (¶¶140-141), and (iv) November 18, 2021, during the Jefferies London Virtual Healthcare Conference that investors had "seen, I think, an improvement overall over the last few years of the consistency and the scale of our book-to-bill that's driving the growth in the company," (¶142), were false and misleading when made and omitted material information.  As Defendants knew or recklessly disregarded:

(a)    Unbeknownst to the investing public but known or recklessly disregarded by Defendants, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and therefore negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors.  Furthermore, the undisclosed, long-standing quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work.  ¶¶54-70;

(b)    Syneos's SMID offering was not the most compelling product because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. Syneos lacked a client portal, standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously.  ¶¶62, 64-70;

(c)    Syneos's Q2 2021 was a disaster and the Company inflated its performance metrics including backlog and thereby the all-important book-to-bill ratio by bullying employees in the finance department to manipulate backlog and inflate the Company's performance metrics. In an email to all business unit CFOs on July 10, 2021, Defendant Colvin, who was the head of

the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "find it." Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to "find" revenue was tantamount to an instruction to fake it. Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance department completed which Defendants routinely used to pressure Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period. As explained above, employees in the finance department were astonished by the blatant nature of Defendant Colvin's instructions to "find it." ¶¶78-80; and

(d)    And, as members of the Company's ELT, Defendants were aware that Syneos's 2021 backlog growth was inflated by hundreds of millions of dollars in 2021 because the Company had included in backlog $600 million in awards over two years from an FSP contract with GSK where collection was not probable (¶¶8, 58-59), included a contingent $100 million bonus in backlog despite not achieving necessary milestones to earn it (¶9), refused to remove $50 million from backlog for two $25 million oncology contracts that were cancelled in early 2021 (¶77), included awards in backlog for projects underway for 6-18 months that were cancelled by customers (¶67), and maintained $850-$950 million of reimbursable expenses in backlog that Syneos knew it would never collect. ¶¶92, 94.

144.    Defendants' statements on August 9, September 15, November 3, and November 18, 2021 (¶¶136-142), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**D.    Materially False and Misleading Statements Regarding the Company's Reported Performance Metrics Including Backlog, New Business Awards, Book-to-Bill Ratio and Reimbursable Expenses**

145.    At each quarter throughout the Class Period, Defendants reported Syneos's performance metrics, including its backlog, new business awards, and book-to-bill ratio.  These statements (described below in §V.D.1-5.) were materially false and misleading when made as Defendants knew or recklessly disregarded that because the Company was struggling to attract and win new business, Defendants did not and could not achieve performance metrics consistent with a growing and healthy CRO.  As a result, top executives, including Defendants, began looking for ways to prop up the Company's performance metrics and results consistent with a growing and healthy CRO.  Defendants were desperate to prop up Syneos's stock price and buy themselves enough time so that Defendants and the Company's private equity sponsors could unload billions of dollars of Syneos stock before they had to reveal the Company's problems to the market.

**1.    Materially False and Misleading Statements Issued During Q3 2020**

146.    On September 9, 2020, during Defendants' presentation at the Baird industry conference, Macdonald stated that Syneos was beginning to enjoy "pent-up demand," stating in pertinent part as follows:

> *Now clinical bookings momentum has been very good over the last several quarters, posting high market-leading book-to-bills over that period.  Backlog growth as of the end of Q2 at 14.8%. . . .  And with net awards growth driving at 10% year-over-year growth, it put us in a very strong position*.

147.    On October 29, 2020, Syneos announced financial results for the quarter ended September 30, 2020, and filed a Form 8-K ("Q3 2020 Release"), followed by its Form 10-Q for the same period ("Q3 2020 Form 10-Q"), which was signed by Defendants Macdonald and Meggs.

These filings reported the Company's results and performance metrics for the quarter ended September 30, 2020[8]:

| Q3 2020 ($m) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $829.2 | $9,783.3 | $9,196.3 | $995.0 | $4,711.3 | 1.20x | 1.41x | 18.2% |

148.    The Q3 2020 Release stated:

   *Net new business awards were $1,206.3 million and $5,892.1 million* for the three and twelve months ended September 30, 2020, representing a *book-to-bill ratio of 1.10x and 1.31x*, respectively. *Clinical Solutions net new business awards were $995.0 million and $4,711.3 million* for the three and twelve months ended September 30, 2020, representing a *book-to-bill ratio of 1.20x and 1.41x*, respectively. . . . These *net new business awards contributed to an ending backlog of $9,783.0 million* as of September 30, 2020, *consisting of $9,196.3 million for Clinical Solutions* . . . .

149.    The Q3 2020 Release also announced, "*Clinical Solutions backlog growth of 18.2% compared to the same period in 2019*" and quoted Macdonald as stating: "'As we look ahead to 2021 and beyond, we're building a strong foundation for growth, *coming off a quarter with record backlog, high market demand and robust pipelines*.'"

150.    In each of the Company's Forms 10-Q and 10-K issued throughout the Class Period, Defendants described the methodology Syneos used to recognize and account for "New Business Awards and Backlog."   In Syneos's Q3 2020 Form 10-Q, Defendants described the Company's "New Business Awards and Backlog" methodology as follows:

---

[8]    Each of the metrics in the chart were reported in the Q3 2020 Release.  The Q3 2020 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth.

**New Business Awards and Backlog**

We add new business awards to backlog when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider, provided that:

- collection of the ***award value is probable***;

- the project or projects are expected to commence within a certain period of time from the end of the quarter in which the award was granted;

- project contingencies such as the outcome of other clinical trials, funding approvals, or other events, are not anticipated to prevent the project or projects from commencing in accordance with the expected timeline;

- the customer has entered or intends to enter into a comprehensive contract as soon as practicable; and

- for awards related to deployment solutions and functional service provider offerings, a ***maximum of twelve months*** of services are included in the award value.

In addition, ***we continually evaluate our backlog to determine if any of the previously awarded work is no longer expected to be performed, regardless of whether we have received formal cancellation notice from the customer. If we determine that any previously awarded work is no longer probable of being performed, we remove the value from our backlog based on the risk of cancellation***. We recognize revenue from these awards as services are performed, provided we have entered into a contract with the customer.

We report new business awards for our Clinical Solutions and Commercial Solutions segments on a trailing twelve months ("TTM") basis. Our total backlog represents backlog for our Clinical Solutions segment and the deployment solutions offering within our Commercial Solutions segment. We do not report backlog for the remaining service offerings in the Commercial Solutions segment.

**Backlog**

***Our backlog consists of anticipated future revenue from business awards that either have not started, or that are in process and have not been completed. Our backlog also reflects any cancellation or adjustment activity related to these awards***. The average duration of our contracts will fluctuate from period to period based on the contracts comprising our backlog at any given time. The majority of our contracts contain early termination provisions that typically require notice periods ranging from 30 to 90 days.

151.    Also on October 29, 2020, Defendants Macdonald, Meggs, and Colvin hosted a conference call with analysts and investors to discuss the Company's financial and operational results for the Q3 2020.  During the conference call, Defendant Macdonald stated that:

> Now I'll turn to key highlights from the quarter.  First, we closed Q3 **with solid net new business awards**, including **Clinical Solutions year-over-year growth of 16.9%**, resulting in **book-to-bill ratios of 1.2x for Clinical Solutions . . .** and 1.1x for our total organization.  This brings us to **$5.9 billion of net awards and an aggregate book-to-bill ratio of 1.31x for the trailing 12-month period.  For our Clinical business, this builds a strong position for accelerating revenue growth with 20.4% growth in net awards for the trailing 12-month period and year-over-year backlog growth improving to 18.2%**.
>
> *         *         *
>
> **Clinical Solutions also delivered a solid third quarter of net awards, growing 16.9% compared to last year.  Gross awards remain very strong, including a record quarter of awards in our small- to-mid-sized customer segment**. . . .
>
> **. . . This brings Clinical net awards to $4.7 billion for the trailing 12-month period, increasing our book-to-bill ratio for the same period to 1.41x.  Our Clinical pipeline remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter**.

152.    Defendant Meggs also spoke and answered questions on reimbursable expenses and bookings:

> [**Question**:] [J]ust to start on the reimbursable travel since it obviously seems to be causing some noise for you and others more than expected this quarter.  I just wanted to understand this a little bit better.  So you mentioned the 400 basis point headwind for the quarter.  How does that compare to 2Q?  And then what's assumed as far as this headwind in the 4Q guide?  And then, I guess, similarly, **anything you can share around what that impact was on the revised reimbursable travel in the bookings number**?
>
> *         *         *
>
> [**Meggs**:] When you think about the backlog and the adjustment in clinical, we – **if you just take out the backlog** adjustment**, our book-to-bill in the quarter in clinical would have been north of 1.4, again.  So it was a good quarter, and we feel good about the bookings that we had**."

- 72 -

### a.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

153.    Defendants' statements regarding Syneos's Q3 2020 performance metrics detailed above (¶¶146-149, 151-152) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business awards, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric.  Defendants (i) included new business awards in backlog before contracts were signed or where a "written commitment" for an award was either not in place or was too vague or indefinite to be reliably added to backlog, (ii) included new or increased awards and reimbursable expenses in backlog before change orders were agreed upon by sponsors, (iii) manipulated costs to increase reported backlog, (iv) failed to remove cancelled and uncollectable awards from backlog, and (v) contrary to its stated "New Business Awards and Backlog" methodology, Syneos inflated its backlog and performance metrics by including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking.  ¶¶71-91.  By Q3 2020, Defendants had artificially inflated Syneos's reported backlog by as much as $210 million by including in backlog revenue the Company knew it would never collect from GSK.  Indeed, after signing an FPO contract with GSK in late 2019, Syneos booked $300 million in backlog each year knowing that Syneos was just one of the providers on the contract that had generated no more than $20 million in annual revenue for Syneos from the contract.  ¶¶9, 58-59;

(b)    By Q3 2020, Defendants had artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect.  Defendants also manipulated estimated costs to alter the percentage-of-completion target, but in

order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog. ¶¶71-91;

(c)    Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

(d)    As a result of the above manipulations, Syneos's net new business was overstated by at least $210 million and the actual book-to-bill ratio was approximately 0.95x, not the reported 1.20x.

### b. Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics

154.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q3 2020 Form 10-Q (¶¶147, 150), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. By choosing to report the Company's performance metrics and the New Business Awards and Backlog methodology in the Q3 2020 Release and Q3 2020 Form 10-Q, Defendants were duty bound under Item 303 to disclose the known trends or uncertainties regarding the clinical segment's sales and manipulations of backlog and performance metrics. As explained above, in Syneos's Q3 2020 Release and Q3 2020 Form 10-Q (¶¶147-149), Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each

month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses to hit percentage-of-completion targets without removing costs from backlog, and reported false clinical backlog, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. *See* ¶¶71-91.

155.    Defendants also omitted from Syneos's Q3 2020 Form 10-Q that the Company's clinical segment was plagued by long-standing quality, technological, and cultural problems that was causing clients to cancel in droves and refuse to re-sign.  During the Class Period, the Company's Clinical Solutions business was neither healthy nor strong nor growing because clients were pulling significant amounts of business away from Syneos.  The Company's technology shortcomings were hurting business because Syneos was not investing in the necessary infrastructure to maintain pace with its competitors and offer products and services demanded by its customers.  The Company suffered from a toxic workplace environment that made it impossible for Syneos to retain top employees and to adequately train employees for and staff vital functions.  The technology failures and workplace turmoil combined ensured that Syneos could not provide its clients with quality clinical trial data, the most important function in the Clinical Solutions segment responsible for over 75% of the Company's revenue. ¶¶54-70.

156.    Defendants further violated Item 303 because they did not disclose the Company's trend to violate the New Business Awards and Backlog methodology set forth in the Q3 2020 Form 10-Q.  The reason was simple:  The Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated Syneos's book-to-bill ratios by (i) including new awards in backlog before contracts were signed or where a purported "written commitment" for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before

change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled or delayed awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶71-91. Furthermore, Defendants artificially inflated Syneos's reported backlog by including in backlog reimbursable out-of-pocket expenses, that the Company knew it would never collect. ¶¶81, 85-88. Defendants failed to disclose the known trend to not properly reduce backlog including reimbursable out-of-pocket expenses as contracts were delayed or cancelled, because doing so would adversely impact the Company's new business awards and book-to-bill ratios. ¶77.

157. Defendants' statements during Q3 2020 on September 9 and October 29, 2020 (¶¶146-152), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

## 2. Materially False and Misleading Statements Issued During Q4 and Year End 2020

158. On November 19, 2020, during the Jefferies LLC industry conference with investors and analysts, Defendant Meggs addressed analyst questions about reimbursable expenses stating:

> [**Question**:] In your third quarter report – Jason, this one might be for you – you guys reflected some adjustments to your pass-through estimates, flowed that through your bookings in 2Q and shaded down the – averaged down your book-to-bill a little bit. Maybe you could talk through what – kind of what precipitated that change in estimate around the pass-through side and the magnitude of the impact to your bookings?
>
> [**Meggs**:] Yes. Thanks, Dave. *So we always try to be as balanced on our backlog when we're looking at future forecasting, et cetera, right, in terms of risk adjustments and what do we think is actually going to happen for each study, almost conservative in a lot of ways, I would say* . . . .

- 76 -

And as we looked at how studies in the existing portfolio were behaving and the conversations we were having around future remote levels as well as the bids, and what we were doing in terms of new bids, and how the remote versus on-site was going, we said, Look, we think this is actually going to be a ***permanent*** impact to the studies. And what is that impact on the backlog? And we took that out of the backlog in the quarter, ***which we still had a good book-to-bill, relative to last year in quarter 3, right? And had we not done that, we would have posted another sort of low 1.4s in the quarter. So we were – I think we're around 1.2***.

> ***So that's what we were seeing, why we did it, and the impact. And as we look to the future, right, the pass-throughs will come back up to some extent as a proportion of total revenue, no question, from the Q2 and Q3 level***.

159. When Defendant Meggs spoke about reimbursable expenses during the Jefferies industry conference, his statements were false and misleading when made. Syneos was not conservative in its use of reimbursable expenses in backlog. Rather, reimbursable expenses (also called "indirect costs" or "pass-through costs") were used to inflate the backlog. Indirect costs for a given clinical trial were estimated by Syneos, which were oftentimes inflated and entered directly into the backlog. If actual costs were lower than the Company's estimates, they should have been removed from backlog. Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have an adverse impact on the reported book-to-bill ratio. ¶¶81, 85-88. Therefore, Syneos was not conservative in its treatment of backlog as stated by Defendant Meggs.

160. On February 18, 2021, Syneos filed its Form 8-K Q4 2020 Release, followed by its 2020 Form 10-K, which was signed by Defendants Macdonald and Meggs. These filings reported the Company's results and performance metrics for the quarter and year ended December 31, 2020[9]:

---

[9]     Each of the metrics in the chart were reported in the Q4 2020 Release. The 2020 Form 10-K reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth.

| Q4 and FY 2020 ($m) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $855.6 | $10,951.1 | $10,239.5 | $1,299.3 | $4,698.7 | 1.52x | 1.42x | 24.6% |

161.     In the 2020 Form 10-K's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology that appeared in the Company's Q3 2020 Form 10-Q set forth in ¶150.

162.     That same day, Defendants Macdonald, Meggs, Keefe, and Colvin hosted a conference call with investors and analysts to discuss the Company's financial and operational results for Q4 2020.  The Q4 2020 Release emphasized "Clinical Solutions segment net new business awards," book-to-bill ratios, and backlog growth as follows:

> **Clinical Solutions segment net new business awards of $1,299.3 million and $4,698.7 million for the three and twelve months ended December 31, 2020, representing book-to-bill ratios of 1.52x and 1.42x, respectively, and year-over-year backlog growth of 24.6% as of December 31, 2020**.

*     *     *

> **These net new business awards contributed to an ending backlog of $10,951.1 million as of December 31, 2020, consisting of $10,239.5 million for Clinical Solutions and $711.6 million for the Deployment Solutions offering within Commercial Solutions**.

163.     During the conference call on February 18, 2021 to discuss Q4 2020 results, Defendants used slides to emphasize net new award, Syneos's 1.33x book-to-bill ratio and "Clinical Solutions ending backlog growth of 24.6% as of December 31, 2020."



164.    The February 18, 2021 conference call presentation also included a slide highlighting the Company's book-to-bill ratio steadily growing from 1.2x to 1.42x over the previous five quarters:

## Book-to-Bill and Backlog Burn Rate

**Clinical Solutions**

| $M | | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|---|
| TTM Clinical Solutions net new business awards[1] | $ | 4,148.0 | $ 4,451.3 | $ 4,567.1 | $ 4,711.3 | $ 4,698.7 |
| TTM Clinical Solutions adjusted revenue[2] | | 3,428.0 | 3,496.2 | 3,391.9 | 3,352.1 | 3,306.7 |
| **TTM Clinical Solutions book-to-bill ratio**[3] | | **1.21 x** | **1.27 x** | **1.35 x** | **1.41 x** | **1.42 x** |

| $M | | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|---|
| Clinical Solutions adjusted revenue | $ | 900.9 | $ 874.8 | $ 747.2 | $ 829.2 | $ 855.6 |
| Clinical Solutions beginning backlog | | 7,781.8 | 8,220.0 | 8,549.4 | 8,997.3 | 9,196.3 |
| **Clinical Solutions backlog burn rate**[4] | | **11.6%** | **10.6%** | **8.7%** | **9.2%** | **9.3%** |

**Commercial Solutions**

| $M | | Q4 19 | Q1 20 | Q2 20 | Q3 20 | Q4 20 |
|---|---|---|---|---|---|---|
| TTM Commercial Solutions net new business awards[1] | $ | 1,305.6 | $ 1,273.4 | $ 1,229.5 | $ 1,180.8 | $ 1,164.4 |
| TTM Commercial Solutions revenue | | 1,254.2 | 1,228.7 | 1,178.0 | 1,138.3 | 1,109.0 |
| **TTM Commercial Solutions book-to-bill ratio**[3] | | **1.04 x** | **1.04 x** | **1.04 x** | **1.04 x** | **1.05 x** |

1.  We recognize new business awards when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider. For additional information on new business awards, please refer to Item 7 in our Annual Report on Form 10-K for the twelve months ended December 31, 2020.
2.  For a reconciliation of GAAP revenue by segment to Non-GAAP adjusted revenue by quarter, please reference slide 11 in the Appendix of this presentation.
3.  TTM book-to-bill represents TTM net new business awards divided by TTM adjusted revenue or TTM revenue, as applicable.
4.  Backlog burn is calculated as the quarterly segment adjusted revenue divided by the respective quarter's beginning backlog.

Syneos Health

10

### a. Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

165.    Defendants' statements concerning Q4 2020 described above (¶¶160-164) were materially false and misleading when made.  Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above.  ¶¶71-91.  By Q4 2020, Defendants had artificially inflated Syneos's reported backlog by as much as $280 million by including in backlog award value that the Company knew it would never collect, including from the GSK contract;

(b)    By Q4 2020, Defendants also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶81.  Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing Defendants were reluctant to remove those costs from backlog and by Q4 2020 reimbursable expenses were inflated by between $212-$237 million.  ¶¶85-88;

(c)    Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.  And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

(d)    As a result of the above manipulations, Syneos's net new business was overstated by at least $280 million and actual book-to-bill ratio was approximately 1.19x, not the reported 1.52x.

**b.    Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics**

166.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's 2020 Form 10-K (¶160), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q4 2020 Release and 2020 Form 10-K, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's 2020 Form 10-K Syneos's trend to violate its New Business Awards and Backlog methodology.

167.    Defendants' statements on November 19, 2020 and February 18, 2021 (¶¶158, 160-164), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 3.    Materially False and Misleading Statements Issued During Q1 2021

168.    On April 29, 2021, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Release") and filed a Form 8-K (the "Q1 2021 Release"), followed by its quarterly report on Form 10-Q for the Q1 2021 ("Q1 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs.  These filings reported the Company's results and performance metrics for the quarter ended March 31, 2021[10]:

| Q1 2021 ($m) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $938.0 | $11,218.0 | $10,509.9 | $1,215.5 | $4,720.1 | 1.30x | 1.39x | 22.5% |

169.    The Q1 2021 Release stated that Syneos had "***Net new business awards of $1,548.8 million and $5,880.1 million for*** the three and twelve months ended March 31, 2021, representing ***book-to-bill ratios of 1.28x and 1.32x, respectively***."  The Q1 2021 Release also stated that the "***Clinical Solutions segment net new business awards of $1,215.5 million and $4,720.1 million*** for the three and twelve months ended March 31, 2021, representing ***book-to-bill ratios of 1.30x and 1.39x, respectively,*** and year-over-year ***backlog growth of 22.5% as of March 31, 2021***."  The Q1 2021 Release also stated that the Company's "***net new business awards contributed to an ending backlog of $11,218.0 million*** as of March 31, 2021, ***consisting of $10,509.9 million for Clinical Solution***."

---

[10]    Each of the metrics in the chart were reported in the Q1 2021 Release.  The Q1 2021 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth.

170.    In the Q1 2021 Form 10-Q's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology that appeared in the Company's Q3 2020 Form 10-Q set forth in ¶150.

171.    On April 29, 2021, Macdonald, Meggs, Keefe, and Colvin hosted a conference call with analysts and investors to discuss the Company's financial and operational results for Q1 2021. During the call, Defendant Macdonald highlighted Syneos's Clinical Solutions segment, which he explained was "*well positioned for accelerated revenue growth*" in 2021, citing the Company's "*record ending backlog*" and "*record pipeline of new opportunities*." During his prepared remarks, Defendant Macdonald also pointed to the "*continued recovery in reimbursable expenses*." Defendant Meggs echoed this theme, affirming that reimbursable revenue would undergo "*strong growth*" in the Clinical Solutions segment.

172.    Defendants also used slides during the conference call that highlighted the Company's book-to-bill ratio over the past several quarters:

## Book-to-Bill and Backlog Burn Rate

### Clinical Solutions

| $M | | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|---|
| TTM Clinical Solutions net new business awards[1] | $ | 4,482.2 $ | 4,596.4 $ | 4,739.6 $ | 4,735.1 $ | 4,720.1 |
| TTM Clinical Solutions adjusted revenue[2] | | 3,525.0 | 3,422.3 | 3,383.9 | 3,339.5 | 3,394.9 |
| **TTM Clinical Solutions book-to-bill ratio[3]** | | **1.27 x** | **1.34 x** | **1.40 x** | **1.42 x** | **1.39 x** |

| $M | | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|---|
| Clinical Solutions revenue | $ | 882.5 $ | 755.8 $ | 837.2 $ | 863.9 $ | 938.0 |
| Clinical Solutions beginning backlog | | 8,251.0 | 8,578.9 | 9,023.2 | 9,222.4 | 10,270.5 |
| **Clinical Solutions backlog burn rate[4]** | | **10.7%** | **8.8%** | **9.3%** | **9.4%** | **9.1%** |

### Commercial Solutions

| $M | | Q1 20 | Q2 20 | Q3 20 | Q4 20 | Q1 21 |
|---|---|---|---|---|---|---|
| TTM Commercial Solutions net new business awards[1] | $ | 1,242.5 $ | 1,200.2 $ | 1,152.5 $ | 1,128.0 $ | 1,160.0 |
| TTM Commercial Solutions revenue | | 1,200.0 | 1,147.7 | 1,106.4 | 1,076.3 | 1,066.3 |
| **TTM Commercial Solutions book-to-bill ratio[3]** | | **1.04 x** | **1.05 x** | **1.04 x** | **1.05 x** | **1.09 x** |

**Note:** Segment revenue, backlog, and net new business awards have been recast to reflect the move of Regulatory and Operations Consulting from Commercial Solutions to Clinical Solutions.
1. We recognize new business awards when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider. For additional information on new business awards, please refer to Item 2 in our Quarterly Report on Form 10-Q for the three months ended March 31, 2021.
2. For a reconciliation of GAAP revenue by segment to Non-GAAP adjusted revenue by quarter, please reference slides 11 – 12 in the Appendix of this presentation.
3. TTM book-to-bill represents TTM net new business awards divided by TTM adjusted revenue or TTM revenue, as applicable.
4. Backlog burn is calculated as the quarterly segment adjusted revenue divided by the respective quarter's beginning backlog.

Syneos Health

10

- 83 -

### a.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

173.    Defendants' statements detailed above (¶¶168-172) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above.  ¶¶71-91.  By Q1 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $400 million by including in backlog revenue that the Company knew it would never collect, including $350 million from the GSK contract.  ¶¶9, 58-59.  And although two $25 million oncology contracts were cancelled in Q1 2021, Defendants insisted on maintaining the $50 million award value of those contracts in backlog.  ¶77;

(b)    By Q1 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect.  ¶81.  Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by Q1 2021 reimbursable expenses were inflated by between $425-$474 million.  ¶¶85-88;

(c)    Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to

accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

(d)     As a result of the above manipulations, Syneos's net new business was overstated by at least $400 million and actual book-to-bill ratio was approximately 0.87x, not the reported 1.30x.

**b.     Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics**

174.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q1 2021 Form 10-Q (¶168), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading. As explained above, in Syneos's Q1 2021 Release and Q1 2021 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. In addition, Defendants violated Item 303 by failing to disclose in the Company's Q1 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology.

175.    Defendants' statements on April 29, 2021 (¶¶168-172), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 4.    Materially False and Misleading Statements Issued During Q2 2021

176.    On August 9, 2021, Syneos issued a press release, which was also filed with the SEC on Form 8-K, announcing its financial results for the quarter ended June 30, 2021 ("Q2 2021 Release") and filed a Form 8-K ("Q2 2021 Release"), followed by its quarterly report on Form 10-Q for the quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. These filings reported the Company's results and performance metrics for the quarter ended June 30, 2021: [11]

| Q2 2021 ($m) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $991.1 | $11,685.3 | $10,966.9 | $1,436.2 | $4,971.5 | 1.45x | 1.37x | 21.5% |

177.    The Q2 2021 Release announced the "Highlights" from the quarter which emphasized that:

- Second quarter revenue of $1,282.6 million, increased 6.1% sequentially and 26.6% year-over-year.

- ***Clinical Solutions net new business awards of $1,436.2 million for the second quarter, representing year-over-year growth of 21.2% and a book-to-bill ratio of 1.45x, and $4,971.5 million for the trailing twelve months, representing year-over-year growth of 8.2% and a book-to-bill ratio of 1.37x.***

---

[11]    Each of the metrics in the chart were reported in the Q2 2021 Release. The Q2 2021 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth.

*      *      *

- ***Year-over-year ending backlog growth of 21.5% in Clinical Solutions . . . .***

178.    Defendant Macdonald was quoted in the Q2 2021 Release emphasizing the Company's "strong awards," "record backlog" and "robust growth," stating:

> "During the second quarter we exceeded the midpoint of our guidance across all financial metrics, ***with both Clinical and Commercial achieving double-digit growth year-over-year*** as we continue to emerge from the COVID-19 pandemic . . . . ***Both segments delivered another quarter of strong awards, powering record backlog levels and fueling our robust growth expectations over the balance of 2021***.

179.    In the Q2 2021 Form 10-Q's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology that appeared in the Company's Q3 2020 Form 10-Q set forth in ¶150.

180.    That same day, on August 9, 2021, Defendant Macdonald, Meggs, Keefe, and Colvin hosted a conference call with analysts and investors to discuss the Company's Q2 2021 financial results.    During the call Defendant Macdonald addressed a question concerning "customer behavior," the Company's bookings and backlogs, and whether "***clients are still pushing things out or things being kind of acted on a little more near-term***?"

> [**Macdonald**:] Yes, good question. ***I think we didn't see any of that really in Q2***.  You naturally get things that move around the end of the quarter, ***but nothing out of the ordinary.  And I think we've seen a continued kind of return to what we'd expected – that we'd always expect to see kind of pre-COVID with the activity from SMID customers being very strong activity from large pharma customers being more normal, if you like, where decisions being made, projects coming through and getting into the clinic***.
>
> So as you see, ***we had a great bookings quarter***.

181.    Also, during the Q2 2021 earnings call, Defendants discussed and described the Company's application of the methodology with analysts and investors.  Defendant Macdonald explained that Syneos included only 12 months of an FSP contract in Syneos's bookings, stating:

Under our awards policy for FSP services, *we only included 12 months of services in our bookings*, even though each agreement represented an initial term of at least 3 years.  The remainder provides further fuel for growth in addition to our reported backlog.  *Driven by these strong sales, record ending backlog that is up 21.5% and a robust pipeline of new opportunities, Clinical Solutions remains well positioned for strong revenue growth in the second half of 2021 and beyond*.

### a.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

182.    Defendants' statements regarding Q2 2021 detailed above (¶¶176-181) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metrics, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above.  ¶¶71-91.  For instance, Syneos inflated its backlog and performance metrics by including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking.  ¶73.  This tactic belies the Company's stated methodology and Macdonald's statement that "for FSP services, we only included 12 months of services in our bookings."  ¶181.  By Q2 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $470 million by including in backlog award value that the Company knew it would never collect, including $420 million from the GSK contract and $50 million from the two cancelled oncology contracts.  ¶¶9, 58, 59, 77;

(b)    By Q2 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect.  ¶81.  Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by Q2 2021, reimbursable expenses were inflated by between $637-$711 million.  (¶¶85-88);

(c)     Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.   And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog;

(d)     Syneos's Q2 2021 was a disaster and the Company inflated its performance metrics including backlog and thereby the all-important book-to-bill ratio by bullying employees in the finance department to manipulate backlog and inflate the Company's performance metrics. In an email to all business unit CFOs on July 10, 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "find it."   Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to "find" revenue was tantamount to an instruction to fake it. Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance department completed which Defendants routinely used to pressure Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period.   As explained above, employees in the finance department were astonished by the blatant nature of Defendant Colvin's instructions to "find it."  ¶¶78-80; and

(e)     As a result of the above manipulations, Syneos's net new business was overstated by at least $470 million and the book-to-bill ratio was approximately 0.97x, not the reported 1.45x.

**b.     Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics**

183.     By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q2 2021 Form 10-Q (¶176), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q2 2021 Release and Q2 2021 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q2 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology.

184.     Defendants' statements on August 9, 2021 (¶¶176-181), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 5.    Materially False and Misleading Statements Issued During Q3 2021

185.    On September 15, 2021, during the Baird industry conference, Defendant Macdonald again addressed the methodology, highlighting Syneos's "conservative approach" as compared to its competitors' approach.

> [**Question**:] ***Let's focus on clinical for a bit***. Second quarter bookings, I think it was a record by over $100 million. Book-to-bill the last few quarters, averaging over at 1.4.
>
> \*    \*    \*
>
> On the flip side, everybody is asking is Syneos behind the 8 ball. Is there something wrong holding back revenue growth compared to reports of 35% to 55% among some of your peers this quarter. Talk to us a little bit about that revenue growth, and how you see that playing out over the next 12 months? And remind people the reasons why maybe on a pure constant dollar organic basis, you were at the – 20% is nothing to sneeze at, but why you were at the lower end this quarter?
>
> \*    \*    \*
>
> [**Macdonald**:] So we won a lot of work last year that sits well in our backlog for the next few years, will help us drive growth through '20 – through the near future.
>
> And then when we look at book-to-bill, I mean I appreciate your comments about bookings***, but we also still have that conservative approach around FSPs***. ***We won 3 massive FSPs in Q2. And we booked the first year of each one of them. And most of our competitors booked the whole lot.***
>
> \*    \*    \*
>
> So we have a ***different approach***. We feel it's ***the right approach to do it more progressively***. ***We had a quarter at a time as we go***. And ***we take that slow and steady approach***.

186.    On November 3, 2021, Syneos issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's financial results for the quarter ended September 30, 2021, and filed a Form 8-K (the "Q3 2021 Release"), followed by its quarterly report on Form 10-Q for the third quarter ended September 30, 2021 ("Q3 2021 Form 10-Q"), which was signed

by Defendants Macdonald and Meggs.  These filings reported the Company's results and performance metrics for the quarter ended September 30, 2021: [12]

| Q3 2021 ($m) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $1,037.4 | $12,014.2 | $11,281.4 | $1,353.8 | $5,322.2 | 1.30x | 1.39x | 22.3% |

187.    The Q3 2021 Release described the "Highlights" for the quarter to include:

- Third quarter revenue of $1,348.2 million increased 22.7% year-over-year.

- *Clinical Solutions net new business awards of $1,353.8 million for the third quarter, representing year-over-year growth of 35.0% and a book-to-bill ratio of 1.30x, and $5,322.2 million for the trailing twelve months, representing year-over-year growth of 12.3% and a book-to-bill ratio of 1.39x.*

                    *        *        *

- *Year-over-year ending backlog growth of 22.3% in Clinical Solutions* and 24.9% in Deployment Solutions as of September 30, *2021*.

188.    Defendant Macdonald was quoted in the Q3 2021 Release stating:

"We delivered another strong quarter of results demonstrating the strength of our differentiated product development strategy and continued momentum in the market, exceeding the midpoint of our guidance across all financial metrics . . . . *Our Clinical and Commercial teams again achieved double-digit growth fueled by strong demand for our innovative, integrated solutions, as demonstrated by our robust awards and backlog*.

---

[12]    Each of the metrics in the chart were reported in the Q3 2021 Release.  The Q3 2021 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth.

189.    In the Q3 2021 Form 10-Q's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology that appeared in the Company's Q3 2020 Form 10-Q set forth in ¶150.

190.    On November 3, 2021, Defendants Macdonald, Meggs, Keefe, and Colvin hosted a conference call with analysts and investors to discuss the Company's Q3 2021 financial results during which Defendant Macdonald emphasized the Company's "strong" results in the quarter and discussed "key highlights," which included:

> Now for the 3 key highlights from the quarter.  First, **overall net awards grew by 35.1% year-over-year.  This performance drove third quarter book-to-bill ratios of 1.30x for Clinical Solutions and 0.89x for Commercial Solutions, resulting in robust TTM book-to-bill ratios of 1.39x for clinical** and 1.16x for commercial.

> \*       \*       \*

> **Driven by these strong sales, record ending backlog that is up 22.3% year-over-year and a record pipeline of new opportunities, Clinical Solutions remains well positioned for robust revenue growth into 2022 and beyond**.

191.    During the Q3 2021 earnings call, Defendant Meggs also discussed the Company's financial performance:

> Our total revenue for the third quarter of 2021 was $1.35 billion, up 22.7% and 22% in constant currency compared to the third quarter of 2020, which was impacted by the COVID-19 pandemic.  **Our Clinical Solutions revenue for the third quarter was $1.04 billion, up 23.9% or 23.1% in constant currency compared to the third quarter of 2020.  These increases were driven by growth in our full-service portfolio, including higher reimbursable expenses, the ramp in our larger pharma relationships and strength in our real-world and late-phase business**.

192.    On December 1, 2021, Syneos presented at the Fourth Annual Evercore ISI HealthCONx Virtual Conference, during which Defendant Meggs emphasized the "demand environment" for Syneos's services, stating:

> **And you see some of that in our numbers with our book-to-bill in both businesses on clinical being at 1.39 at the end of September and being at 1.16, both on a trailing 12-month basis for commercial.  So it continues to be strong.**

*Pipelines at or near record levels, RFP flows good, really good across all customer segments. So end of the day, feel good about the demand environment at this time*.

### a.  Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

193.    Defendants' statements in Q3 2021 detailed above (¶¶185-192) were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above at ¶¶71-91. For instance, contrary to Defendant Macdonald's assurance that "we also still have that conservative approach around FSPs . . . we booked the first year . . . our competitors book the whole lot" (¶185), in truth, Defendants routinely included three to four years of award value in backlog rather than the 12 months of value Syneos represented it was taking. (¶73). Indeed, after signing an FSP contract with GSK in late 2019, Defendants booked $300 million in backlog each year knowing that Syneos was just one of the providers on the contract which had generated no more than $20 million in annual revenue for Syneos from the contract. ¶¶9, 58, 59. And although two $25 million oncology contracts were cancelled in Q1 2021, Defendants insisted on maintaining the award value of those contracts in backlog. ¶77. Further, Defendants also improperly included a contingent $100 million bonus award in the Company's backlog even though the Clinical team failed to achieve the first milestone required in the first year of the contract. ¶9. As such, by Q3 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $640 million by including in backlog revenue that the Company knew it would never collect;

(b)      By Q3 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect.  ¶81.  Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by the end of Q3 2021 reimbursable expenses were inflated by between $850-$950 million (¶¶85-88);

(c)      Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.  And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog;  and

(d)      As a result of the above manipulations, Syneos's net new business was overstated by at least $640 million and the actual book-to-bill ratio was approximately 0.69x, not the reported 1.30x.

### b.    Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics

194.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q3 2021 Form 10-Q (¶186), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their

statements misleading. As explained above, in Syneos's Q3 2021 Release and Q3 2021 Form 10-Q Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. In addition, Defendants violated Item 303 by failing to disclose in the Company's Q3 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology.

195. Defendants' statements on September 15, November 3, and December 1, 2021 (¶¶185-192), which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**E.    Defendants' False and Misleading Statements in the Prospectus Statements**

196. In addition, in connection with Defendants' and other insiders' efforts to shed their Syneos shares at prices artificially inflated by their materially false and misleading statements and omissions, Defendants caused Syneos to issue Prospectus statements related to the public offerings of more than 33 million shares of Syneos common stock. Each Prospectus incorporated prior Syneos SEC filings, which contained the false and misleading performance metrics such as the Company's Forms 10-Q and 10-K. The list of Registration Statement and Prospectuses that incorporated the Syneos SEC filings is as follows:

- Form S-3 Registration Statement and December 3, 2020 Prospectus Supplement ("December 2020 Prospectus") filed in connection with the Company's public stock offering of 6 million shares priced at $61.90 per

share, incorporating by reference Syneos's Q3 2020 Form 10-Q. *See* §V.D.1.

- Form S-3 Registration Statement and March 1, 2021 Prospectus Supplement ("March 2021 Prospectus") filed in connection with the Company's public stock offering of over 8 million shares priced at $74.95 per share, incorporating by reference Syneos's 2020 Form 10-K. *See* §V.D.2.

- Form S-3 Registration Statement and May 3, 2021 Prospectus Supplement ("May 2021 Prospectus") filed in connection with the Company's public stock offering of more than 8 million shares priced at $81.04 per share, incorporating by reference Syneos's 2020 Form 10-K and Q1 2021 Form 10-Q. *See* §V.D.2-3.

- Form S-3 Registration Statement and June 2, 2021 Prospectus Supplement ("June 2021 Prospectus") filed in connection with the Company's public stock offering of nearly 11 million shares priced at $81.20 per share, incorporating by reference Syneos's 2020 Form 10-K and Q1 2021 Form 10-Q. *See* §V.D.2-3.

## VI. AFTER LIQUIDATING THEIR SYNEOS HOLDINGS, DEFENDANTS' SCHEME SLOWLY UNRAVELS

### A. Fourth Quarter and Full Year 2021 Financial Results

197.    Having inflated backlog, manipulated the Company's performance metrics, and falsely portrayed Syneos as healthy and growing for almost two years while Defendants and other insiders liquidated more than 38 million shares of Syneos common stock for proceeds of more $3.19 billion, and with Macdonald soon to be exiting the Company, Defendants' scheme slowly began to unravel as the effects of their long-running manipulations were revealed.

198.    On February 17, 2022, Syneos filed its Form 8-K reporting the Company's financial results for the fourth quarter and full year results for 2021 (the "Q4 2021 Release"). Contrary to the Company's prior claims that reimbursable expenses would recover and accelerate in 2022, Defendants now revealed that reimbursable expenses would "remain lower relative to pre-pandemic levels." And after segregating reimbursable expenses from "certain key operating metrics," Defendants, for the first time, revealed that a staggering $3.8 billion of the Company's

Clinical Solutions backlog, or 36%, was comprised of zero-margin, reimbursable expenses resulting in an alarmingly low book-to-bill ratio of just 0.34x in the segment when such expenses were included.

199.    The Q4 2021 Release also provided "Highlights" for the quarter:

- Fourth quarter revenue of $1,373.4 million increased 20.5% year-over-year.

- ***Clinical Solutions net new business awards and book-to-bill*** ratios:

    o  ***Including reimbursable out-of-pocket expenses, $357.1 million for the fourth quarter, a year-over-year decline of 72.9% and a book-to-bill ratio of 0.34x, and $4,362.6 million for the trailing twelve months, a year-over-year decline of 7.9% and a book-to-bill ratio of 1.09x.***

    o  ***Excluding reimbursable out-of-pocket expenses, $895.5 million for the fourth quarter, a year-over-year decline of 1.5% and a book-to-bill ratio of 1.26x, and $3,579.5 million for the trailing twelve months, year-over-year growth of 17.5% and a book-to-bill ratio of 1.34x.***

                    *        *        *

- ***Year-over-year ending backlog*** growth:

    o  ***Including reimbursable out-of-pocket expenses, 2.9% in Clinical Solutions and 20.9% in Deployment Solutions as of December 31, 2021.***

    o  ***Excluding reimbursable out-of-pocket expenses, 15.4% in Clinical Solutions and 25.8% in Deployment Solutions as of December 31, 2021.***

                    *        *        *

200.    Continuing to hide the pervasive quality problems that had plagued Syneos's clinical business throughout the Class Period leading to a loss of business and customer defections, Defendant Macdonald, who was quoted in the earnings release, nevertheless emphasized the Company's "'[s]trong'" quarter, adding that the "'market for our services remains strong'":

> "***Strong fundamentals and execution across our business, combined with innovative, integrated clinical and commercial capabilities enabled by data and technology, drove robust earnings and cash flow growth in the fourth quarter and full year 2021 . . . The market for our services remains strong***, driven in part

by customer adoption of our unique product development strategy, new drug approvals and biotech funding."

201.    That same day, Syneos filed its annual report for the fiscal year ended December 31, 2021, the 2021 Form 10-K, which was signed by Defendants Macdonald and Meggs.  In the 2021 Form 10-K's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology, which appeared in the Company's Q3 2020 Form 10-Q.  ¶150.

202.    Furthermore, the 2021 Form 10-K highlighted the Company's Clinical Solutions segment net new business awards of $4,362.6 million and total net new business awards of $5,732.7 million for the 12 months ended December 31, 2021.  The 2021 Form 10-K also stated that Syneos had an ending backlog of $11,427.6 million as of December 31, 2021, consisting of $10,567.3 million for Clinical Solutions, representing growth of 2.9% and 4.1%, respectively, compared to the same period in 2020.

203.    Certain of the financial metrics reported in Syneos's Q4 2021 Release and 2021 Form 10-K are summarized in the chart below:

| Q4 and FY 2021 ($m) (*including* reimbursable expenses)[13] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $1,042.5 | $11,427.6 | $10,567.3 | $357.1 | $4,362.6 | 0.34x | 1.09x | 2.9% |
| Q4 and FY 2021 ($m) (*excluding* reimbursable expenses) | | | | | | | |
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| N/A | $7,459.6 | $6,771.7 | $895.5 | $3,579.5 | 1.26x | 1.34x | 15.4% |

204.    Later that day, Defendants Macdonald and Meggs hosted a conference call with analysts and investors to discuss the Company's fourth quarter and full year 2021 results.  During the call, Meggs discussed the Company's massive write-down of reimbursable expenses from backlog and described Syneos's inability to collect reimbursable expenses.  Giving the same excuse Defendants gave for the Company's October 2020 pandemic-related $170 million adjustment of reimbursable expenses – that the adjustments and anticipated reduction in reimbursable expenses were "driven by lower travel expenses and an increased mix of remote site visits" (¶46) – Meggs stated:

> Since the start of the COVID-19 pandemic, we have experienced lower reimbursable expenses as remote monitoring and other DCT approaches have become a more prevalent part of our clinical trials.  This decrease in reimbursable expenses is primarily due to items such as lower travel interest for our staff, due to sustained levels of remote monitoring, investigator meetings remaining virtual and reduce cost for study medications.
>
> We are at the forefront of this transition with our customers and sites and given the long-term benefits it provides, we expect this trend to continue.  As such,

---

[13]    Each of the metrics in the chart were reported in the Q4 2021 Release.  The 2021 Form 10-K reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

we have proactively adjusted our ending backlog to reflect our expectation of reduced reimbursable expenses going forward, mirroring what we are seeing across our existing portfolio as well as in our new awards.

205.    Defendant Meggs then downplayed the significance of the erosion in Syneos's reimbursable expenses and claimed that overall client demand remained unchanged, stating: "*These adjustments only impact our outlook for reimbursable expenses, not our view of underlying demand or profitability.  We, therefore, remain confident in our expectations for strong growth and profitability in 2022*."

206.    Macdonald similarly reassured investors that "*[t]he demand environment remains healthy, both in terms of macro market dynamics and robust new business pipelines across our organization*."  Macdonald continued: "Importantly, we remain confident in our expectations for *low double-digit clinical revenue growth for 2022*, excluding the impact of reimbursable expenses, along with continued margin expansion."

207.    On this news, the price of Syneos common stock fell from $83.37 per share on February 16, 2022, to $79.36 per share on February 17, 2022, a decline of more than $4 per share, or nearly 5%, on above-average trading volume of approximately 1.8 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

### a.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

208.    Despite admitting that its reimbursable expenses and zero margin backlog was inflated by $850-950 million and acknowledging that reimbursable expenses would "remain lower," Defendants' statements on February 17, 2022 (¶¶198-206), including that: (i) "*We continue to experience strong SMID demand, as evidenced by double-digit growth in our*

*request-for-proposal volumes*"; (ii) "*adjustments only impact our outlook for reimbursable expenses, not our view of underlying demand or profitability*"; (iii) Syneos still enjoyed its "*leading position for serving customers across the . . . SMID category*"; the (iv) "*acquisition of Synteract further enhanced our leading position for serving customers across the SMID category, diversifying our customer base and expanding support to the high-growth emerging biopharmaceutical segment*"; and (v) regarding Syneos's reported net new business awards, book-to-bill ratios, and backlog metrics, were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading.  As Defendants knew or recklessly disregarded:

(a)     The Company's reported backlog, net new business metrics, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations descried above at ¶¶71-91.  By Q4 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $710 million by including in backlog revenue that the Company knew it would never collect, including $560 million from the GSK contract, $50 million from the two cancelled oncology contracts, and the contingent $100 million milestone bonus;

(b)     By Q4 2021, Defendants had artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶81.  And when Defendants removed approximately $850-$900 million in reimbursable expenses from backlog, revealing that they had carried that amount on backlog knowing it would never be collected, they falsely told investors that the removal was primarily caused by a change of business, the exact excuse provided to investors in October 2020 when Syneos erased approximately $170

million in reimbursable expenses from backlog due to the same change in business as Syneos emerged from the pandemic.  ¶46;

       (c)     Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.  And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

       (d)     As a result of the above manipulations, Syneos's net new business was overstated by at least $710 and its actual book-to-bill ratio was approximately -0.33x, not the reported 0.34x.

### b. Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics

209.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's 2021 Form 10-K (¶¶201-203), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q4 2021 Release and 2021 Form 10-K, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to

hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's 2021 Form 10-K Syneos's trend to violate its New Business Awards and Backlog methodology.

### B.    Defendants Continued to Make False and Misleading Statements as Their Scheme Slowly Unraveled

210.    Over the next several months, Defendants continued to hide the fact that they had and were continuing to manipulate the Company's clinical backlog and performance metrics.  And while Syneos had removed $850-$950 billion in zero-margin, reimbursable expenses from backlog in Q4 2021, Syneos's backlog, including its non-reimbursable clinical backlog, remained inflated.

211.    On April 29, 2022, Syneos issued its Form 8-K, announcing the Company's financial results for the quarter ended March 31, 2022 ("Q1 2022 Earnings Release").  The Q1 2022 Earnings Release provided "Highlights" for the quarter:

- Revenue for the first quarter of $1,336.3 million increased 10.5% on a reported basis and 11.7% on a constant currency basis year-over-year.

- *Clinical Solutions* net *new business awards and book-to-bill ratios*:

  - *Including reimbursable out-of-pocket expenses, $1,241.9 million for the first quarter, year-over-year growth of 1.6% and a book-to-bill ratio of 1.22x, and $4,392.9 million for the trailing twelve months, a year-over-year decline of 7.1% and a book-to-bill ratio of 1.07x.*

  - *Excluding reimbursable out-of-pocket expenses, $912.7 million for the first quarter, year-over-year growth of 20.3% and a book-to-bill ratio of 1.32x, and $3,743.4 million for the trailing twelve months, year-over-year growth of 22.6% and a book-to-bill ratio of 1.37x.*

    *         *         *

- Year-over-year ending backlog growth:

- ***Including reimbursable out-of-pocket expenses, 2.5% in Clinical Solutions and 21.7% in Deployment Solutions as of March 31, 2022.***

- ***Excluding reimbursable out-of-pocket expenses, 16.6% in Clinical Solutions and 26.4% in Deployment Solutions as of March 31, 2022.***

\*      \*      \*

212.    Defendant Macdonald was quoted in the Q1 2022 Earnings Release stating:

"***Strong fundamentals and execution***, powered by innovative data and technology insights drove robust earnings and profitability growth in the first quarter . . . .  Our product development expertise is enabling us to deliver against our strategy and accelerate customer success.  ***We expect continued growth*** propelled by customer adoption of our integrated solutions, recent acquisitions, and comprehensive Syneos One and Medical Affairs offerings."

213.    On April 29, 2022, Syneos also filed its Form 10-Q for the quarter ended March 31, 2022, the "Q1 2022 Form 10-Q."  The Q1 2022 Form 10-Q highlighted the Company's Clinical Solutions segment net new business awards of $4,392.9 million and total net new business awards of $5,792.5 million for the 12 months ended March 31, 2022.  The Q1 2022 Form 10-Q also stated that Syneos had an ending backlog of $11,634.1 million as of September 30, 2021, consisting of $10,772.3 million for Clinical Solutions, representing growth of 2.5% and 3.7%, respectively, compared to the same period in 2021.

214.    Certain of the financial metrics reported in Syneos's Q1 2022 Release and Q1 2022 Form 10-Q are summarized in the chart below:

- 105 -

| Q1 2022 ($m) (*including* reimbursable expenses)[14] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $1,018.4 | $11,634.1 | $10,772.3 | $1,241.9 | $4,392.9 | 1.22x | 1.07x | 2.5% |
| Q1 2022 ($m) (*excluding* reimbursable expenses) | | | | | | | |
| Clinical Revenue | Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| N/A | $7,666.3 | $6,977.5 | $912.7 | $3,743.4 | 1.32x | 1.37x | 16.6% |

215.    In the Company's Q1 2022 Form 10-Q's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology, which appeared in the Company's Q3 2020 Form 10-Q. *See* ¶150.

216.    Later that day, on April 29, 2022, Defendants Macdonald, Meggs, and Keefe hosted a conference call with analysts to discuss the Company's financial and operational results for Q1 2022.  During his prepared remarks, Macdonald stated that Syneos continued to enjoy robust demand, stating in pertinent part as follows:

> *Demand for our high-value solutions from development through commercialization remains healthy with robust new business pipelines across our organization.  We continue to see sustained strong demand across all customer segments, including SMID customers, where RFP flow year-to-date exceeds the strong levels of 2021 and are well above pre-COVID levels.  In addition, we are seeing more opportunities for preferred provider relationships with larger pharma customers as the impacts of the pandemic subside.  This continued strong awards and backlog growth positions us for sustained long-term growth.  We remain confident in the growth we have previously outlined for 2023 as we execute on our value-creation plan.*

---

[14]    Each of the metrics in the chart were reported in the Q1 2022 Release.  The Q1 2022 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

217.    Later in the call, Defendant Macdonald represented that the Company was not experiencing significant cancellations or delays among its customer base, successfully engaging with customers, and delivering the Company's comprehensive product offerings, stating in pertinent part as follows:

> **We see that is still pretty strong.  It's moving along.  We have good engagement with customers**, I think the fact that we're able to take those customers with a very different model now with Syneos One **wrapped** around it, the ability to go end to end.  And we look at the private funding in the biotech space, the big equity houses putting money to work through their biotech, et cetera.

> \*       \*       \*

> **But for us, those channels combined are healthy.  I think they're showing good growth against where we've been in the past even when we look back at 2021, which had a lot of the COVID catch-up in it, we're seeing the pipeline is equivalent to that.  So we're not concerned by that.  Add to that the fact that we're breaking in more and more to large pharma, getting new relationships there, adding anchor tenants to the backlog through that.  It's a very healthy picture for us.  So funding environment, fine; good engagement with the customers. We're not seeing that as an issue at all**.

218.    Also on April 29, 2022, Syneos announced Defendant Macdonald's abrupt departure from Syneos effective July 1, 2022, naming Defendant Keefe as Macdonald's successor.

219.    On June 8, 2022, Syneos presented at the Jefferies LLC 2022 Global Healthcare Conference held in New York, New York.  During the conference, Steven Couche, a securities analyst at Jefferies, inquired about the Company's SMID clients, asking: "If the funding environment remains muted, what steps can you take as an organization to protect yourself from any sort of flow-through to demand?"  In response, Defendants Meggs stated: "**But right now, based on what we've seen, right, whether it's the pipeline of opportunities, it's the awards that we have and the backlog growth that we have year-to-date, which is 16-plus percent**."

### a.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

220.    Defendants' statements on April 29, 2022 (¶¶211-217) and June 8, 2022 (¶219) were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading.   As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above at ¶¶71-91.  By Q1 2022, Defendants had artificially inflated Syneos's reported backlog by as much as $780 million by including in backlog revenue that the Company knew it would never collect, including $630 million from the GSK contract, $50 million from the two cancelled oncology contracts, and the contingent $100 million milestone bonus.  ¶¶9, 58, 59;

(b)    Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.   And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

(c)     As a result of the above manipulations, Syneos's net new business was overstated by at least $780 million and its book-to-bill ratio was approximately 0.45x, not the reported 1.22x.

**b.      Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics**

221.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q1 2022 Form 10-Q (¶213), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q1 2022 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q1 2022 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology.

222.    Then, on August 2, 2022, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended June 30, 2022 (the "Q2 2022 Release").  The Q2 2022 Release revealed substantial additional deterioration in the Company's business, disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34%

including reimbursable expenses and 15% excluding reimbursable expenses, reflecting book-to-bill ratios of 0.94x and 1.29x, respectively.

223.    The Q2 2022 Release also revealed that Syneos would not achieve even its lowered expectations for reimbursable revenues for the year, causing the Company to slash expected 2022 revenues by $185 million at the midpoint.

224.    Syneos confirmed that it was still on track to achieve 2022 revenues within a range of $5.44 billion to $5.54 billion and that Syneos had achieved a book-to-bill ratio of 0.94x including reimbursable expenses and 1.29x excluding reimbursable expenses, respectively.  The Q2 2022 Release also stated that Syneos had a quarter-ending backlog in its Clinical Solutions segment of $6.98 billion excluding reimbursable expenses.

225.    That same day, Syneos filed a quarterly report on Form 10-Q for the quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q"), which was signed by Defendants Keefe and Meggs. The Q2 2022 Form 10-Q highlighted the Company's Clinical Solutions segment net new business awards of $5,301.8 million and total net new business awards of $3,901.5 million for the 12 months ended June 30, 2022.  The Q2 2022 Form 10-Q also stated that Syneos had an ending backlog of $11,456.0 million as of June 30, 2022, consisting of $10,634.4 million for Clinical Solutions, representing declines of 2% and 3.1%, respectively, compared to the same period in 2021.

226.    Certain of the financial metrics reported in Syneos's Q2 2022 Release and Q2 2022 Form 10-Q are summarized in the chart below:

| Q2 2022 ($m) (*including* reimbursable expenses)[15] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Clinical Revenue** | **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $1,025.7 | $11,456.0 | $10,634.4 | $947.4 | $3,901.5 | 0.92x | 0.94x | (3.1%) |
| Q2 2022 ($m) (*excluding* reimbursable expenses) | | | | | | | |
| **Clinical Revenue** | **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| N/A | $7,638.5 | $6,980.2 | $758.5 | $3,608.6 | 1.06x | 1.29x | 12.1% |

227.    In the Q2 2022 Form 10-Q's Management Discussion and Analysis, Defendants repeated the description of the Company's "New Business Awards and Backlog" methodology, which appeared in the Company's Q3 2020 Form 10-Q.  *See* ¶150.

228.    On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, ***a decline of nearly $14 per share***, or ***over 17%***, on above-average trading volume of 3.2 million shares traded.  However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues.

229.    Also on August 2, 2022, Keefe, now elevated to the role of CEO, along with Meggs and Michael Brooks, Syneos's COO, hosted a conference call with analysts to discuss the Company's financial and operational results for Q2 2022.  During the call, Keefe reassured investors that "***[m]arket demand is healthy***" and that management remained "confident" in their

---

[15]    Each of the metrics in the chart were reported in the Q2 2022 Release.  The Q2 2022 Form 10-Q reported clinical revenue, backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

ability "*to drive clinical growth*," which Meggs reinforced: "*As Michelle [Keefe] said, healthy pipelines, good backlog growth, healthy end market*."

> *Market demand is healthy, and our pipeline of opportunities remains comparable to 2021.  Specific to our clinical SMID portfolio, our total pipeline of opportunities is up double digits compared to 2021, and we had record net awards during Q4 '21 and Q1 '22.*

230.    On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses.

231.    That same day, on September 13, 2022, Defendants Keefe and Meggs attended and addressed investors and analysts at the Baird 2022 Global Healthcare Conference.  During the conference, Defendants Keefe downplayed the delays in near-term awards and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were delaying contract awards.

232.    On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volumes of approximately 1.7 million shares traded on September 12 and 2 million shares traded on September 14.  However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

> ### c.    Defendants Knew or Recklessly Disregarded that Their Statements Were Materially False and Misleading

233.    Defendants' statements on August 2, 2022 (¶229) and September 13, 2022 (¶¶230-231) were materially false and/or misleading when made and omitted to disclose material facts

necessary to make the statements made not misleading. As Defendants knew or recklessly disregarded:

(a)    The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above. ¶¶71-91. By Q2 2022, Defendants had artificially inflated Syneos's reported backlog by as much as $850 million by including in backlog revenue that the Company knew it would never collect, including $700 million from the GSK contract, $50 million from two cancelled oncology contracts, and the contingent $100 million performance bonus Syneos would never collect. ¶¶9, 58-59, 77;

(b)    Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and

(c)    As a result of the above manipulations, Syneos's net new business was overstated by at least $850 million and its book-to-bill ratio was approximately 0.095x, not the reported 0.92x.

**d.    Defendants Violated Item 303 of Regulation S-K by Failing to Disclose Known Trends about Syneos's Business and Performance Metrics**

234.    By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q2 2022 Form 10-Q (¶¶225-227), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q2 2022 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q2 2022 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology.

**C.    The Truth Is Revealed**

235.    Finally, on November 4, 2022, Syneos released its financial results for the quarter ended September 30, 2021 (the "Q3 2022 Earnings Release"), revealing that Syneos's book-to-bill ratios had plummeted far below even the reduced figures provided in September 2022. Specifically, Defendants reported that the Company's Clinical Solutions segment had achieved net new business awards of just $182 million including reimbursable expenses – *a startling year-over-year decline of 86.5%* – and a book-to-bill ratio of just 0.18x for the quarter, which was just one-tenth of the expected new business growth.  And the Company's Clinical Solutions backlog

plummeted 13.6% year-over-year to just $9.747 billion including reimbursable expenses, or by 2.5% year-over-year to $6.44 billion excluding reimbursable expenses.  Syneos also slashed its anticipated 2022 revenues by $160 million.

236.    On November 4, 2022, Defendants hosted a conference call with securities analysts to discuss the devasting results for Q3 2022 reported by the Company.  Although Defendants were, throughout the Class Period, aware of the undisclosed turmoil wreaking havoc on Syneos's operations and financial performance (¶¶54-70), Defendants finally disclosed to investors that underlying demand issues that were "specific to Syneos" caused the Company's win rate to plummet.  Defendant Keefe revealed for the first time that "a number of leadership and organizational changes within strategic business development over the last 18 months" caused Syneos's operations to experience undisclosed turmoil.  As a result, Defendant Keefe admitted that not only had the Company's win rate declined but also that Syneos was unable to convert its bloated backlog to revenue because existing customers had delayed decisions to retain Syneos.  Even worse, Defendant Keefe revealed that the Company's RFP process had slowed significantly and that existing customers for whom Syneos had already completed work were unwilling to re-sign with the Company.

237.    Defendant Keefe further admitted what insiders at the Company had known since before the beginning of the Class Period: that the longstanding and pervasive quality problems plaguing the Syneos's ability to deliver on its clinical operation model to produce outstanding clinical trials data damaged the Company's reputation with its hallmark SMID customers.  Defendant Keefe admitted that these problems had negatively impacted the Company's ability to win repeat business.  Defendant Keefe further admitted that the Company's book-to-bill ratio was one-tenth the size from a year prior.  As to customer delays, Defendant Keefe also admitted that

the Company did not have visibility as to when those delays could be repaired such that the Company would realize revenue.

238.    Continuing, Defendant Keefe also confirmed that – contrary to their prior assurances that Syneos was a technology leader, the Company had failed to timely implement a technology-enhanced delivery model that its customers demanded.  Specifically, Keefe stated that Syneos's "SMID customers are clear that they want Syneos . . . to deliver therapeutic insights, but with enhanced agility," and to that end Syneos was "working to reduce the complexity of our full-service operating model [and] streamline our organization and processes" to provide "an efficient and effective delivery model supported by . . . technology enhancement[s]."  However, as Keefe "put it plainly, it has been more extensive and taken longer than we expected" and "[a]s a result, we did not evolve our business development capabilities to fully leverage our integrated solutions or effectively engage our customers within the current competitive environment."  Keefe added that Syneos was still "strengthening our approach . . . to design the best delivery strategy for each customer opportunity, enabled by technology and shared insights."  Michael Brooks, Syneos's Chief Development Officer, added that Syneos was "removing redundancies and layers within the organization that . . . historically had gotten in the way of exceptional delivery."

239.    Keefe further clarified that poor results and lower revenue were not just caused by delays in decisions but were driven by a "reduction in awards from post revenue SMID" as well as "a reduction in our normal *repeat* business awards" which "were down probably somewhere between 30% and 50%."  Keefe explained that the loss of existing awards and repeat business were caused by Syneos's lack of agility and failure to "*integrat[e] all the great capabilities we've developed and acquired over the last 12 to 18 months, consistently into our good defenses and our relationships with those customers*."

- 116 -

240.    Analysts were shocked and justifiably skeptical of Defendants' purported explanations.  One analyst, referring to Syneos's dreadfully low book-to-bill ratios, challenged: "*We've never seen that happen*."  Another complained: "I don't even know where to start with this," stating that management's dubious claim that Syneos was not experiencing significant cancellations was "*frankly hard to believe* . . . given that *pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected* . . . *it just doesn't feel reasonable*."  Analysts continued to react negatively in subsequent written reports.  For example, Barclays called Syneos's disclosures "very disappointing," citing a "miss across the board" and Mizuho stated the results were "worse than expected."

241.    On this news, the price of Syneos common stock fell from $47.81 per share on November 3, 2022, to $25.70 per share on November 4, 2022, a decline of more than $22 per share, or 46%, on abnormally high trading volumes of 7.4 million shares traded.

242.    Then, on December 1, 2022, Defendant Keefe presented at the Evercore ISI HealthCONx Conference and made further post-Class Period admissions regarding the undisclosed turmoil that affected Syneos's operations throughout the Class Period.  During that conference, Defendant Keefe answered numerous questions from Evercore securities analyst Elizabeth Anderson and provided information about the problems at Syneos.  Contrary to Defendants' Class Period statements that Syneos's "*enhanced processes*," "*more horsepower*," and "*more automated and more streamlined*" processes were enabling the Company to effectively execute to achieve backlog conversion and accelerate year-over-year revenue growth (¶116), Defendant Keefe admitted that Syneos had been plagued by its failure to deliver quality clinical trials and had lost its ability to engage with its hallmark SMID customers because of leadership

and organizational changes that severed the ties between leadership and business development. As a result, its win rate with these customers plummeted. In addition, due to ongoing quality problems and the resulting reputational damage, Defendant Keefe admitted that existing customer decision delays skyrocketed, stating "we had a *significantly lower win rate* on the opportunities with the post-revenue SMID customers that were decided in Q3. And then we did have decision delays that were 3x to 4x higher than we experienced in Q2, primarily with the *post-revenue SMID customers*."

243.     Keefe also admitted that, contrary to Defendants' earlier Class Period statements that the Company's "capabilities to bring technology . . . to project designs" "really helps us resonate in the market" (¶114), Syneos had needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Keefe stated that "Clinical Reimagined" was one of the Company's "steps in place to address the post-revenue SMID cohort." However, Keefe stated "it's taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace." Keefe further stated that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market." In response to a question concerning the Company's "sudden reduction in . . . win rate," Keefe deflected and lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was "on the right track to be competitive," after the "roll[] out" of the "new model," *i.e.*, Clinical Reimagined. Keefe reiterated this sentiment later in the call, commenting that she felt like a "broken record," stating "Clinical Reimagined is really on the right track to help us be more competitive for sure."

244.    Further still, on February 16, 2023, COO Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these new capabilities, which Syneos had lacked throughout the Class Period, allowed clients to "g[e]t a really good benefit from now having good data visualization, seeing into the projects and being able to see the modeling out of various new things, like site activations, enrollment and data."   The same day, Keefe admitted that the Company was in the process of "transforming our clinical operating model" to "clos[e] competitive gaps," stating that "[f]oundational to these improvements have been investment and accelerated development of clinical development tools and data applications, ranging from statistical modeling for site performance and enrollment to use of AI machine learning to better detect risks and issues."   In response to a question from Eric Coldwell, an analyst at Baird, concerning "obvious signs of share loss," Keefe stated that "we understand the position we're in, and we know we have to improve our RFP volume.  We have to improve our win rates . . . we need to convert the more high-value opportunities.  So we know those are the things we need to do, to stay competitive in the marketplace."

## VII.    ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

245.    As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such false and misleading statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws.

246.    Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading and omitted such information.  As a result, each of the Defendants was responsible for the accuracy of Syneos corporate statements and is therefore responsible and liable for the misrepresentations in and omission from such statements.

247.    ***Defendants Were Aware of Information Contradicting Their Statements to Investors***.  The Individual Defendants served as the Company's CEO (initially Macdonald, and thereafter Keefe), CFO (Meggs), or as President of Syneos's Clinical Solutions segment (Colvin). ¶¶29-33.  Because of their high-ranking positions with the Company, they were responsible for, and remained well-informed of, issues critical to the Company's success, including the Company's critical performance metrics.

248.    The Individual Defendants were each provided with statements and other information alleged herein to be false and misleading or omitted material information prior to its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected, as follows:

249.    Defendants Macdonald, Meggs, Keefe, and Colvin – the most senior members of the Executive Leadership Team – were present at monthly ELT Meetings during which Syneos's inability to provide quality services and utilize critical technological tools, and clinical workforce turnover issues, were discussed.  The purpose of these meetings was to plan, facilitate, and review the status of the Company's strategic initiatives.  For example, the Individual Defendants attended a January 2021 ELT meeting where they were provided with and discussed a PowerPoint

presentation belying the accuracy of their public statements about the health of Syneos's Clinical Solutions segment. ¶¶58-60. Among other things, the presentation indicated that by the end of 2020 and into 2021, numerous clients had put Syneos business awards on "hold" and Syneos was unable to secure new business until it addressed its lack of a "quality culture," cured its "delivery failures," and "earned back trust." ¶¶7, 69. Defendants knew that Syneos was at risk of losing other clients due to its inability to deliver the clinical monitoring and project management services it promised to provide. Aware of these issues as early as November 2020, the Company had already identified its quality control problems and developed a plan of action in an effort to stem the flow of business elsewhere. ¶¶57-60. And despite this plan, Defendants knew they were projecting negative year-over-year growth in fiscal year 2021 for Syneos's Clinical Solutions segment.

250. Additionally, Macdonald, Meggs, and Colvin were told by other Syneos executives that dissatisfied clients had stopped awarding Syneos new business as a reaction to the Company's severe quality issues preventing Syneos from delivering accurate clinical trial data on time and in a useful format. *See* ¶¶67, 69. The Senior Vice President of Corporate Quality made Macdonald and Colvin aware of these issues.

251. Also as explained above, after the Class Period, Defendant Keefe and other Company executives admitted that they knew of the undisclosed problems described herein for at least 18 months and that the issues had persisted throughout the Class Period. ¶¶20, 97, 236.

252. On December 1, 2022, Defendant Keefe admitted that Syneos had needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Defendant Keefe stated that the corporate initiative to upgrade Syneos's technology offering to customers, including a client portal critical to customers, was still not in place after the Class Period. She

stated: "Clinical Reimagined," one of the Company's recent "steps in place to address the post-revenue SMID cohort" had "taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace."  ¶¶20, 243, 252. Defendant Keefe further stated that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market."  ¶252.  In response to a concern about the Company's "sudden reduction in . . . win rate," Keefe lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was "on the right track to be competitive," after the "roll[] out" of the "new model," *i.e.*, the recently-implemented Clinical Reimagined.  *Id.*

253.    On February 16, 2023, COO Michael Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these capabilities, which Syneos lacked throughout the Class Period, would allow clients to "g[e]t a really good benefit from now having good data visualization, seeing into the projects, and being able to see the modeling out of various new things, like site activations, enrollment and data."  ¶253.

254.    The same day, Defendant Keefe admitted that the Company was now in the process of "transforming our clinical operating model," in order to "clos[e] competitive gaps."  In response to an analyst question concerning "obvious signs of share loss," Keefe conceded that "we understand the position we're in, and we know we have to improve our RFP volume.  We have to improve our win rates . . . we need to convert the more high-value opportunities.  So we know those are the things we need to do, to stay competitive in the marketplace."  ¶253.

255.    ***Defendants' Public Statements Confirm That They Had Visibility Into the Performance of Syneos's Clinical Solutions Segment***.  Syneos's problems impacted the most important issues facing the Company and were the focus of senior Syneos management, including the Individual Defendants.

256.    The Individual Defendants each confirmed that they had a clear view of the demand for Syneos's Clinical Solutions services, and the performance of this segment, in conference calls with investors during the Class Period.  ¶¶111, 118, 238-39.  For example, on a November 3, 2021 earnings call (¶118), an analyst for Citigroup asked Defendants Macdonald and Meggs to talk about the "visibility" into the Company's revenue pipeline.  Macdonald responded by saying that he had "good" visibility into the backlog coming through clinical "the whole year," and then went on to discuss how "strong" the Company's pipeline was due to the number of RFP discussions with customers and the amount of work "coming [the Company's] way."  *Id*.

257.    Consistent with statements confirming their familiarity with the clinical solutions business, the Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding Syneos's competitive position, client demand environment, contract execution, employee retention and performance, and the integration of Syneos's various acquisitions and diverse product teams.  *E.g.*, ¶¶100-104, 109-112, 114-119, 123-127, 136-142, 151-152, 158, 162-164, 171-172, 180-181, 185, 188, 190-192, 205-206, 216-217.  On industry and earnings conference calls during the Class Period, the Individual Defendants made numerous statements demonstrating their involvement in and knowledge of the same.  *See id*.  During almost every conference call Syneos hosted or attended during the Class Period, Macdonald, Meggs, Keefe, and/or Colvin spoke to investors about Syneos's sales activity and the various performance metrics such as backlog, net new business awards, bookings, book-to-bill ratios, and the

conservative manner in which Syneos supposedly only booked one year of FSP contract revenue into backlog, and how each of these performance metrics contributed to Syneos's financial results. *Id*.

258.     Defendant Macdonald spoke frequently about the demand for Syneos's Clinical Solutions services and the Company's critical performance metrics.  He told investors that: (i) Syneos had "good pipelines" (¶119); (ii) Syneos had "net awards growth driving at 10% year-over-year growth [and] it puts us in a very strong position" (¶146); (iii) Syneos was enjoying "pent-up demand" (¶109); (iv) Syneos's "position in that market is growing and strengthening.  The strategy that we have seems to be resonating very strongly with customers across all sectors" (*id*.); (v) Syneos's "[g]ross awards remain very strong, including a record quarter of awards from our small-to mid-sized customer segment." (¶125); (vi) "Our Clinical pipeline remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter." (¶151); and (vii) "continued recovery in reimbursable expenses."  ¶171. Macdonald also signed SOX certifications in which he attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.  *E.g.*, ¶29.

259.     Defendant Meggs, Syneos's CFO, spoke frequently about the demand for Syneos's clinical services and the critical performance metrics on conference calls with investors.  For example, Meggs told investors that: (i) "we had a strong quarter across our operating and financial metrics, including gross awards, backlog growth, profitability and cash flow" (¶101); (ii) "When you think about the backlog and the adjustment in clinical, we – if you just take out the backlog

adjustment, our book-to-bill in the quarter in clinical would have been north of 1.4, again" (¶100); and (iii) the "record" customer order flows and pipeline (¶5). Meggs also signed SOX certifications in which he attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him. ¶31.

260.    Defendant Keefe was President of Medical Affairs and President of Commercial Solutions until April 2022, CEO from April 2022 to October 2023, and a senior member of the ELT throughout the Class Period. She also spoke frequently about the Company's critical performance metrics and the demand for Syneos's clinical services and told investors that: "market demand is healthy" (¶229); and "[Syneos's] pipeline of opportunities remains comparable to 2021. Specific to our clinical SMID portfolio, our total pipeline of opportunities is up double digits compared to 2021, and we had record net awards during Q4 '21 and Q1 '22." (*id.*). Additionally, Keefe signed SOX certifications in which she attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and she had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to her. ¶30.

261.    Defendant Colvin, who as the President of Clinical Solutions was the leader of the clinical segment until September 2022, also spoke frequently about the Company's critical performance metrics and the demand for Syneos's clinical services and told investors that: "We

have year-over-year clinical backlog growth of over 30% for the top 50 pharma customers as of the end of third quarter"  ¶127.

262.    In light of Defendants' positive statements about Syneos to the market on topics that were material to Syneos investors, it was incumbent on Defendants Macdonald, Meggs, Keefe, and Colvin to ensure they understood the true and full facts concerning the topics on which they spoke.  Either they possessed the knowledge of the Clinical Solutions segment they claimed to have, in which case they knew their statements were false, misleading, or omitted material information, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless.  Indeed, in order to speak so knowledgeably regarding the demand for Syneos's clinical services, backlog, new business awards, and book-to-bill ratios, and to respond to investors and analysts' interest about such topics, Defendants had to receive updates and briefings on the status and progress of the Company's performance metrics and perform their own due diligence, by attending ELT and other senior management meetings and presentations, reading research reports, and otherwise preparing for conference and earnings calls.

263.    ***The Alleged Fraud Relates to Syneos's Core Business, Its Ability to Compete for and Win New Business, and Its Critical Performance and Backlog Metrics***.  Syneos primarily provides contract research and commercial services to pharmaceutical and biotechnology companies that require clinical drug and medical device development and commercialization services.  In its annual reports, Syneos describes its "Principal Business" as the provision of end-to-end biopharmaceutical outsourcing solutions through two segments: Clinical Solutions and Commercial Solutions.  The fraud alleged herein directly concerns the operational results and financial health of its Clinical Solutions segment, which, according to the Company's SEC filings, generates the vast majority of the Company's revenues.  Indeed, for the year ended December 31,

2020, Syneos derived 75% of its revenue ($3.31 billion), and for the year ended December 31, 2021, Syneos derived 77% ($4.01 billion) of its revenue from its Clinical Solutions segment. Moreover, the Company's Clinical Solutions business helps drive revenue on the Commercial Solutions side, as the Company is able to carry its relationships from its clinical programs over and into commercial sales. Thus, the Individual Defendants knew, or were deliberately reckless in not knowing, about the true nature and performance of the Clinical Solutions segment's operational results and financial health. *See* ¶¶40-49.

264. ***The Individual Defendants Knew that Backlog Had Been Inflated and Reported Performance Metrics Were Manipulated***. To hide the Company's crippling operational deficiencies, the Individual Defendants knowingly manipulated Syneos's reported performance metrics to falsely portray the Company's clinical business as healthy and growing.

265. First, the Individual Defendants directed FSP contract values to be included in backlog despite the Company's stated methodology allowing only 12 months of award value from those contracts to be added to backlog. In addition, Syneos was taking authorizations from projects that never came to fruition and kept award value in backlog from cancelled contracts. And as Syneos needed to "grow" the backlog in subsequent months or quarters, they would continue to pull in additional future award value from increasingly distant periods. This practice of taking authorizations from far out into the future – which Defendants were aware of – allowed the Company to pull future award value into the current backlog at the end of each quarter to improperly inflate backlog, new business awards, the book-to-bill ratio, and projected revenue.

266. Second, the Individual Defendants directed or were complicit in retaining businesses awards in backlog after awards were cancelled or when collection of the business award value was not probable. For example, in late 2019, GSK signed an FSP agreement with Syneos

where the Company had partnered with another clinical research organization. For this particular deal, Syneos booked the entire $300 million worth of award value in backlog each year even though Syneos never received more than $20 million per year in actual work. ¶¶9, 73. When two large oncology clinical trials were cancelled in early 2021, the CFO of the oncology business unit tried to have these awards removed from the backlog. But higher-ups refused, due to the negative impact the removal would have on the Company's backlog and book-to-bill ratio. ¶77. In similar fashion, Syneos booked to backlog an enormous bonus that Syneos was unlikely to collect. During the Class Period, Syneos entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years. The entire value of these contracts was hundreds of millions of dollars, and if Syneos achieved certain milestones on time in all of the clinical trials then Syneos could receive a $100 million bonus. Syneos missed the very first milestone in the first clinical trial but included and maintained the entire contingent $100 million bonus in backlog. ¶76.

267. Defendants also inflated backlog by increasing the award value by including change orders, even though the customer had not agreed to or signed on to the change order. Nevertheless, Syneos would, *e.g.*, treat a $2 million change order as finalized without a customer signature and not only would the additional $2 million be added to backlog but Defendants would maintain existing percentage of completion metrics; if the previous contract was for $10 million and 80% of costs had been incurred, Syneos would maintain the 80% completion milestone and apply it to the "new" $12 million contract.

268. Third, the Individual Defendants directed or were complicit in the manipulation and overstatement of reimbursable out-of-pocket expenses. For example, if Syneos estimated $2 million in reimbursable costs on a given clinical trial but generated only $1 million in reimbursable

revenue, then the other $1 million should be removed from backlog; this is revenue that will never be realized. Syneos was reluctant to remove the inflated reimbursable costs from backlog because doing so would adversely impact the Company's book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO) were involved in and/or aware of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on book-to-bill ratio. After the month-end close, these individuals and the business unit CFOs met with Defendant Meggs to present the consolidated financials. Fillman, Moore, and Donovan discussed these practices and the impact this would have on the Company, and Donovan warned that these practices could amount to fraud. To accommodate these practices, Syneos had a practice by which it would extend the month-end close until the numbers had reached certain pre-determined amounts.

269.    For example, in Q3 2022, Syneos directed one Project Director, through email, to add additional monitoring visits on the calendar for a study, which would generate additional reimbursable revenue for Syneos because the Company is paid when a Clinical Research Associate goes to a site. The Project Director objected to adding visits to the calendar because there was no need to do any more visits for the study. However, she was told to set up the visits anyway because Syneos was scrambling to generate more revenue around this time.

270.    Defendants' manipulation of reimbursable expenses and backlog was not a secret within Syneos. For example, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric. The Executive Vice President of

Operations, the Head of Commercial, Defendant Keefe, the Head of Sales, and all of the sales representatives participated in these Monday calls. Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations and the entire sales organization knew where the Company was in terms of tracking to target. In each of the quarters from at least January 2020 through May 2022, there was always a shortfall of at least a couple hundred-million-dollars – often between $400 and $500 million – to make their revenue target. Regardless of the size of the gap, Syneos always made it up.

271.    Directives to find additional revenue were often delivered during meetings with executives to discuss clinical segment financials, organized by therapeutic area (with additional meetings for large clients like Pfizer and Bristol Myers Squibb), and accompanied by pressure from Defendant Colvin and Brown to change targets and cost estimates to hit performance metrics and prematurely generate revenue without affecting backlog. These meetings were held monthly and led by Becki Brown, the Executive Vice President of Operations, and attended by Kaitlyn Stadiem and Victoria Moore, who reported directly to Defendant Meggs. Defendant Colvin personally attended several of these meetings.

272.    At these meetings, the finance team was told how much they were off target and how much revenue they needed to "find." Bekki Brown directed members of project teams to change estimates to completion on clinical trials in order to recognize revenue earlier. These revenue totals were then consolidated and presented to Defendant Meggs. Even though the revenue numbers had already been reviewed and approved at many levels, including a review by the project financial analysts and managers, and even though the month or quarter should have already closed, Brown would then issue directives to find more revenue in various ways to increase

revenues for the quarter or year.  Efforts to manipulate backlog and prematurely recognize revenue occurred every month from the start of the class period until at least April 2022.

273.    Other times the directives were handed down through calls or emails.  For example, in one email to all business unit CFOs, sent on July 10, 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was not making its revenue projections and directed the CFOs to "***find it***."  ¶¶78-80.  When Defendant Meggs was brought certain figures indicating a shortfall, he simply said "No" until he received the numbers he wanted.  ¶11.

274.    Numerous high-level managers, including business unit CFOs, voiced objections to these efforts to manipulate backlog, expedite revenue recognition, and change cost estimates and ultimately left the Company because they felt they could not justify these practices.  For example, between September 2020 and April 2022, one Senior Director sent emails expressing her discomfort with the Company's revenue numbers.  The same Senior Director also noted her discomfort with certain financials in SOX certifications (which were signed by Defendants Macdonald, Keefe, and Meggs).  Ultimately, this Senior Director, under duress, had to agree to numbers with which he or she was uncomfortable.

275.    One business unit CFO similarly resisted signing off or certifying month-end numbers for his business unit and warned superiors many times against how the Company was recognizing revenue and recording backlog and predicted that it could not be sustained.  This CFO had one-on-one discussions with the Clinical CFO, Jennifer Fillman, who reported to Defendant Meggs and the Business Unit CFO, Victoria Moore, in which the CFO warned Fillman and Moore that the Company's practices could amount to fraud.

276.    ***The Individual Defendants and Other Insiders Capitalized on Syneos's Inflated Stock Price to Unload Billions of Dollars' Worth of Syneos Stock***.  The Individual Defendants

and Company insiders also had the motive and opportunity to commit fraud.[16]  While the price of Syneos common stock was artificially inflated, Company insiders, including each of the Individual Defendants and Syneos's largest shareholders and private equity sponsors, Thomas Lee Partners and Advent International, collectively dumped more than $3 billion in Syneos stock at elevated prices artificially inflated by the fraud alleged herein – a sudden and dramatic contrast to their pre-Class Period trading practices.

277.    ***Defendant Macdonald Sold Syneos Shares at Prices Inflated by the Alleged Fraud***.  Defendant Macdonald entered the Class Period with 171,506 shares of Syneos common stock available to trade and the right to acquire tens of thousands of additional shares at prices substantially below then-current market prices by way of restricted stock units ("RSUs").  According to the Company's April 16, 2020 Proxy Statement, Macdonald reported beneficial ownership over 185,973 shares of Syneos common stock as of March 30, 2020.  Between March 30, 2020 and the start of the Class Period, Macdonald reduced his position by 14,467 shares.

278.    Thereafter, during the Class Period, Defendant Macdonald sold more than 142,000 of his personal Syneos shares at prices as high as $89.90 per share, for proceeds in excess of $11.4 million.  These sales were highly suspicious in timing and amount and out of line with his prior trading practices.  In particular, between January 2019 and August 2020, Macdonald slightly increased his holdings of shares in the Company.

279.    Defendant Macdonald's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Alistair Macdonald | 12/22/2020 | 1,200 | $70.02 | $84,024 |

---

[16]    Jon Olefson also served on Syneos's Executive Leadership Team.  During the Class Period, he sold 13,440 shares of Syneos common stock at inflated prices for proceeds of $1,068,648.

| Alistair Macdonald | 12/23/2020 | 300 | $70.52 | $21,156 |
| Alistair Macdonald | 2/1/2021 | 13,044 | $75.17 | $980,517 |
| Alistair Macdonald | 2/1/2021 | 51,175 | $75.84 | $3,881,112 |
| Alistair Macdonald | 2/2/2021 | 278 | $77.11 | $21,437 |
| Alistair Macdonald | 4/1/2021 | 13,720 | $77.61 | $1,064,809 |
| Alistair Macdonald | 4/1/2021 | 673 | $76.11 | $51,222 |
| Alistair Macdonald | 4/1/2021 | 3,005 | $77.92 | $234,150 |
| Alistair Macdonald | 4/9/2021 | 14,039 | $80.00 | $1,123,120 |
| Alistair Macdonald | 6/1/2021 | 4,889 | $88.20 | $431,210 |
| Alistair Macdonald | 8/2/2021 | 4,710 | $89.90 | $423,429 |
| Alistair Macdonald | 8/3/2021 | 7,032 | $88.49 | $622,262 |
| Alistair Macdonald | 8/3/2021 | 28,521 | $87.83 | $2,504,999 |
| **Total** | | **142,586** | | **$11,443,447** |

280.    Defendant Macdonald's trading during the Class Period varied dramatically from his pre-Class Period trading history.  In the two-year period leading up to the Class Period, Macdonald collected trading proceeds of $3.94 million from sales of Syneos common stock – meaning that Macdonald's $11.44 million in proceeds tripled during the comparable pre-Class Period.

281.    Moreover, virtually all of Defendant Macdonald's sales during the Class Period were executed pursuant to a 10b5-1 trading plan that was entered into – and strategically amended – to take advantage of the Company's inflated stock price and his material non-public information. On November 30, 2020, two months into the Class Period (and only six months after adopting his previous trading plan), Macdonald adopted a new trading plan.  Over the course of the following nine months, Macdonald dramatically accelerated the liquidation of his position, selling 142,586 shares of Syneos common stock for $11.44 million in proceeds.

282.    As demonstrated in the chart below, Defendant Macdonald's sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements.  By the time he was done, Macdonald had liquidated at least 53% of

his holdings of Syneos common stock.[17]  Then, suddenly on April 29, 2022, after selling $11.44 million in stock and before truth was revealed regarding Syneos's actual operational metrics, Defendant Macdonald abruptly announced his resignation as CEO.  Macdonald's sale of his Syneos stock stopped just a few months before Syneos revealed to the market that revenue would likely not recover to pre-pandemic levels and that the Company had eliminated $850-$950 million in uncollectible, pass-through revenues.

283.    As CEO, Defendant Macdonald earned $909,255 and $1,114,884 in salary in 2020 and 2021, respectively, for a total of $2,024,139.  Thus, Macdonald's insider sales proceeds ($11.4 million) represents more than 5.6 times as much as Macdonald earned in salary during this time.



---

[17]    The ownership figures alleged herein for the Individual Defendants and other insiders are drawn from available holdings reported by the Company in its April 16, 2020 Proxy Statement and subsequently filed Forms 4, which report purchases and sales of a Company's equity securities by insiders.

284. ***Defendant Meggs Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Meggs entered the Class Period with 35,278 shares of Syneos common stock available to trade, and the right to acquire 16,918 additional shares at prices substantially below then-current market prices by way of RSUs.

285. During the Class Period, Defendant Meggs sold significant amounts of his tradeable shares of Syneos common stock. He sold nearly 40,000 shares, for $3.2 million in gross proceeds while he was in possession of material, non-public information regarding the truth about Syneos's financial and operational health.

286. Defendant Meggs's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Jason Meggs | 11/24/2020 | 1,938 | $67.00 | $129,846 |
| Jason Meggs | 11/27/2020 | 4,062 | $67.00 | $272,154 |
| Jason Meggs | 1/6/2021 | 5,552 | $72.00 | $399,744 |
| Jason Meggs | 4/15/2021 | 6,000 | $84.00 | $504,000 |
| Jason Meggs | 6/30/2021 | 4,668 | $90.00 | $420,120 |
| Jason Meggs | 7/6/2021 | 660 | $90.00 | $59,400 |
| Jason Meggs | 9/3/2021 | 9,223 | $95.00 | $876,185 |
| Jason Meggs | 7/18/2022 | 7,500 | $72.81 | $546,075 |
| **Total** | | **39,603** | | **$3,207,524** |

287. Defendant Meggs's trading activity in the two-year period before the Class Period stands in stark contrast to his trading during the Class Period. In the comparable pre-Class Period, Meggs aggressively ***increased*** his position in Syneos by purchasing 7,205 shares (at a cost of $282,794) on the open market. However, during the Class Period, Meggs aggressively ***decreased*** his position, dumping more than $3.2 million worth of Syneos's common stock.

288. Further, Defendant Meggs's sales were often on the heels of the adoption of new or amended trading plans. In the 18-month period during which he liquidated nearly his entire Syneos position through a series of eight sales, Meggs adopted at least four 10b5-1 trading plans.

In one instance, Meggs adopted a new plan on February 26, 2021 – weeks after attending the January 2021 ELT meeting – and over the next two months sold 6,000 shares for proceeds of $504,000. One month later, Meggs adopted another plan and within six weeks had sold another block of Syneos shares for proceeds of $420,000. Over the following 10 weeks, Meggs sold almost 10,000 additional shares for proceeds of $935,000. By the time he stopped selling, Meggs had liquidated 80% of his Syneos stock holdings.

289. As reflected in the chart below, Defendant Meggs's sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements.

290. Defendant Meggs's proceeds from the Class Period sale of his Syneos stock ($3.2 million) represented 2.78 times as much as his earned salary during the same time. In his role as CFO, Meggs earned $600,000 and $549,836 in salary in 2021 and 2020, respectively, for a total of $1,149,836.



291.    ***Defendant Keefe Sold Syneos Shares at Prices Inflated by the Alleged Fraud***.
Defendant Keefe entered the Class Period with 10,986 tradeable shares of Syneos common stock
and the right to acquire an additional 10,425 shares at prices substantially below the then-current
market price by way of RSUs.

292.    During the Class Period, Defendant Keefe also sold significant amounts of her
Syneos shares, as reflected below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Michelle Keefe | 11/17/2020 | 800 | $62.65 | $50,120 |
| Michelle Keefe | 11/18/2020 | 856 | $65.00 | $55,640 |
| Michelle Keefe | 1/25/2021 | 4,000 | $75.68 | $302,720 |
| Michelle Keefe | 3/31/2021 | 2,000 | $78.00 | $156,000 |
| Michelle Keefe | 4/15/2021 | 2,736 | $82.00 | $224,352 |
| Michelle Keefe | 7/18/2021 | 8,333 | $72.81 | $606,726 |
| **Total** | | **18,725** | | **$1,395,558** |

- 137 -

293.    Defendant Keefe's trading behavior in the two-year period before the Class Period stands in stark contrast to her trading during the Class Period. In the comparable pre-Class Period, Keefe sold 4,000 shares for proceeds of $238,665. During the Class Period, Keefe sold nearly $1.4 million worth of Syneos's stock – nearly a six-fold increase.

294.    Like Defendant Meggs, Defendant Keefe frequently adopted new 10b5-1 trading plans during the Class Period and followed each new plan with substantial stock sales. During the two-year Class Period, Keefe adopted or amended her trading plans at least four times. For example, following adoption of a plan on November 24, 2020, Keefe unloaded 4,000 shares for $302,720 in proceeds. One month later, Keefe adopted a new plan, followed by the sale of 4,736 shares for proceeds of $380,352. Her largest sale of stock during the Class Period – 8,333 shares for $606,726 in proceeds – occurred one month after the adoption of the fourth plan. By the time she was done, Keefe had liquidated nearly all of her holdings of Syneos common stock.

295.    As reflected in the chart below, Defendant Keefe's sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements.



296.    As the Company President, Defendant Keefe earned $567,000 in 2021 and $522,270 in 2020, for a total of $1,089,270.  The proceeds from Defendant Keefe's sales of her Syneos stock represented 1.28 times what she earned in salary during the same time.

297.    ***Defendant Colvin Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Colvin became the President of Clinical Solutions at Syneos in December 2018 and then Chief Business Officer shortly afterwards.  As CBO, he was responsible for driving Syneos's global growth strategy across the clinical to commercial continuum.  During the Class Period, Defendant Colvin sold 8,486 shares of Syneos common stock for $634,922 in proceeds – all or virtually all of the Syneos common stock he held entering the Class Period.  Defendant Colvin did not have any open market purchases of Syneos common stock during the Class Period.

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|-----------|-----------|--------|-------|----------------|
| Paul Colvin | 02/01/2021 | 8,486 | $74.82 | $634,922 |
| **Total** | | **8,486** | | **$634,922** |

298.    Defendant Colvin's trading was a complete reversal from his pre-Class Period trading activity, when he was ***acquiring*** shares.  Notably, Colvin did not have a single open market sale of Syneos shares in the two-year period leading up to the Class Period.

299.    As reflected in the chart below, Defendant Colvin's liquidation of his Syneos common stock was timed to take advantage of the period during which Syneos's stock was artificially inflated due to Defendants' misstatements.



300.    The illicit trading proceeds realized by all the Individual Defendants from their Class Period stock sales during the Class Period were significant relative to their ordinary compensation.

301.    ***High-Level Syneos Insiders Dumped Billions of Dollars' Worth of Syneos Shares at Prices Inflated by the Alleged Fraud***.  The Individual Defendants were not the only insiders dumping their Syneos stock before the true nature of the Company's operational and financial condition became known to the market; other insiders, in a departure from their previous trading histories, were selling significant amounts of Syneos stock.

302.    In May 2010, TH Lee had acquired inVentiv for $1.1 billion, one of Syneos's predecessor companies.  Thereafter, Advent purchased a 50% stake in inVentiv in 2016.  Since then, the TH Lee and Advent had near-continuous Board representation at Syneos until they liquidated their Syneos holdings through a series of offerings at artificially inflated prices.  TH Lee representatives, Joshua Nelson and Todd Abbrecht, served on the Syneos Board of Directors from before the Class Period until June 2021 and October 2022, respectively.  Similarly, Advent representatives, John Maldonado and Thomas Allen, served on the Syneos Board of Directors from before the Class Period until June 2021 and November 2021, respectively.

303.    Moreover, TH Lee and Advent emphasize the active involvement they have in the management of the companies in which they invest.  As members of Syneos's Board, TH Lee and Advent helped shape Syneos's operations and communicated with Company executives, including Macdonald, Meggs, and Keefe, on a frequent basis.  According to TH Lee's website, "During its partnership with THL, Syneos was able to build an end-to-end suite of services through M&A, upgrade its sales effectiveness and improve operational efficiency."

304.    Through a series of five offerings between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37,851,676 shares for proceeds of $3.04 billion at prices as high as $81.20 per share.  These outsized insider sales occurred in rapid succession over a period of just nine months, through a series of five public stock offerings, and Syneos stock repurchase

agreements, enabling Thomas Lee Partners and Advent International to exit their equity stakes in the Company.  These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 ATM public offering of more than 8 million Syneos sold to underwriters for the offering at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 ATM public offering of nearly 11 million Syneos sold to underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price.  Unusually, in support of this scheme the Company purchased more than two million shares directly from the selling stockholders in the offerings, thereby providing additional artificial price support to Syneos stock.  Capitalizing on this artificial inflation, the Individual Defendants dumped over $16 million worth of Syneos shares at artificially inflated prices during the Class Period, including $11.4 million sold by Macdonald alone.

305.    The proceeds generated by these sales collectively, and the proceeds from the June 2021 sale individually, were far in excess of the proceeds collected by TH Lee and Advent in the two-year period leading up to the Class Period, during which TH Lee collected proceeds of $213,034,642.  Advent did not have any sales in the comparable period before the Class Period began.  Neither TH Lee nor Advent made any purchases of Syneos common stock during the Class Period.  Thus, their trading patterns changed significantly during the Class Period.

- 142 -

306.    In addition to these sales by former members of Syneos's Board of Directors and Company sponsors, at least three other Syneos executives collectively sold 20,134 shares of Syneos common stock for roughly $1.49 million in proceeds.

307.    Michael L. Brooks served as the Company's Chief Development Officer and Global Head of Clinical Development from July 2021 to April 2022.  In April 2022, he was elevated to COO.  In these roles, he was responsible for overseeing the Company's operations, realizing strategy execution across the Company's clinical to commercial solutions divisions, and leading the Company's customer engagement and market development portfolio.  During the Class Period, Brooks sold 4,692 shares of Syneos common stock for $361,242 in proceeds.  Brooks did not have any open market purchases of Syneos common stock during this period.

308.    Linda A. Harty was a director at Syneos from March 2017 to February 2023. Entering the Class Period, Harty had a balance of 11,432 shares of Syneos common stock and the right to acquire another 2,803 additional shares by way of RSUs.  During the Class Period, she sold 11,432 shares of Syneos for proceeds of $959,058 – virtually all of the Syneos common stock she held.  Harty did not have any open-market purchases of Syneos common stock during this period.  Harty did not sell any stock in the two-year period leading up to the Class Period.

309.    Donna Kralowetz was appointed as Senior Vice President, Finance of the Company as the Company's Chief Accounting Officer and designated as the principal accounting officer of the Company in January 2021.  She joined the Company in May 2019 as Vice President.  During the Class Period, Kralowetz sold 3,652 shares of Syneos stock for $300,398 in proceeds. Kralowetz did not have any open market purchases of Syneos common stock during this period, and the stock she sold comprised more than half of her holdings.

310.    As with the Individual Defendants, these individuals' trades were made pursuant to trading plans that were adopted (or amended) during the Class Period, and their sales often occurred just weeks after the plan was adopted.  Also, as with the Individual Defendants, their timing of these individuals' stock sales was impeccable, with their sales occurring while the share price was at all-time highs and before the big drop in share price following the release of Syneos's second quarter financial results in early August 2022.

311.    ***The Individual Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Compensation and Bonus Awards***.  The Individual Defendants were financially motivated to misrepresent the Company's financial performance and maintain Syneos's inflated stock price.  As a product of Defendants' misrepresentations, the Individual Defendants collectively received over $30 million in compensation in 2020-2021, which was heavily weighted on stock awards and other incentive compensation, such as bonuses.

312.    According to the Company's proxy statements issued during the Class Period, the main elements of Syneos's executive compensation package consisted of: (1) a base salary; (2) cash incentive awards; and (3) long-term incentive compensation, *i.e.*, stock awards.  The long-term incentive granted the Individual Defendants stock options, including performance-based restricted stock units ("PRSUs") and time-based RSUs.  PSRUs granted in 2019-2021 were calculated based on the achievement of certain financial metrics over a three-year period, including Adjusted Earnings per Share (for each individual year) and Return on Invested Capital (for the entire three-year period).

313.    Further highlighting the link between Company performance and executive compensation, with respect to long-term compensation, the Company's 2022 Proxy Statement noted that "2021 target award values were somewhat increased from the prior year to recognize

the preservation of stockholder value throughout the pandemic during 2020." Syneos's cash incentive awards were similarly based on the Company's financial performance, as discussed below. Accordingly, the Individual Defendants' compensation was heavily dependent on Syneos's financial performance.

314.   Indeed, according to the Company's proxy statements, Syneos's "incentive compensation opportunity" was "weighted more heavily than base salary. Accordingly, "*a significant portion of our executives' compensation is at risk*." To illustrate this point, Defendant Macdonald earned about $2 million in salary in 2020-2021, yet he received annual stock awards and other incentive compensation totaling nearly $14 million during the same time period, comprising 86% of his total compensation. Defendant Meggs similarly earned approximately $1.1 million in salary in 2020-2021, yet he received stock awards and other incentive compensation totaling nearly $4 million during the same time period, or 77% of his total compensation. Defendants Meggs and Colvin saw 75% of their compensation in 2020-2021 tied to stock and incentives.

315.   The table below summarizes Defendants Macdonald, Meggs, Keefe, and Colvin's total compensation for 2020-2021.

| Individual Defendants' Compensation 2020-2021 | | | | | |
|---|---|---|---|---|---|
| Name | Salary | Bonus[18] | Stock Awards | All Other Compensation | Total |
| Macdonald | $2,024,139 | $636,000 | $13,208,054 | $273,270 | $16,141,463 |
| Meggs | $1,149,836 | $210,000 | $3,738,184 | $17,072 | $5,115,092 |
| Keefe | $1,089,270 | $198,450 | $3,211,828 | $21,511 | $4,521,059 |
| Colvin | $1,089,270 | $198,450 | $3,211,828 | $22,109 | $4,521,657 |

---

[18]    This includes discretionary bonuses equivalent to 50% of Syneos's Management Incentive Plan ("MIP") targets for each executive. The MIP provides for the payment of cash bonuses dependent upon achievement of predetermined corporate financial performance targets. According to the Company's 2021 Proxy Statement, for the fiscal year 2020, "[w]hile performance on our financial metrics fell below threshold [*i.e.*, the MIP target], the Compensation and Management Development Committee rewarded management's solid and steady response to the

316.    ***The Sheer Magnitude of the Loss in Syneos's Pipeline Supports a Strong Inference of Scienter***.  Syneos's November 2022 disclosure that its bookings had plunged year-over-year, driven by a lack of demand in its Clinical Solutions business, further supports a strong inference of scienter.  To put this drop in perspective, Syneos reported net new business awards of $1.3 billion in the third quarter of the previous year and $995 million in 2020 – both of which were quarters affected by the restrictions put in place during the COVID pandemic.  Thus, Syneos's $182 million in clinical net new business awards reported for Q3 2022 represented a drop of $1.1 billion (or 87%) from the previous year.

317.    Given the massive plunge of new business awards, the inference can be drawn that Syneos's quality and turnover problems in its Clinical Solutions business that led to these events existed, and were known by Defendants, during the Class Period.

318.    This inference is bolstered by commentary from securities analysts after the truth was revealed.  For example, during the Company's November 4, 2022 earnings call, a Baird analyst stated that the Company's explanation for its financial performance was "***frankly hard to believe*** . . . given that pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected.  So I mean, can you really say cancellations were 3%, 4%, 5% of backlog, something like that?  I mean, ***it just doesn't feel reasonable***."  Baird published an analyst report the same day stating "Bookings [were] Far Below [the] Lowest End of Bad Preannounce, Bracing for Impact."  The report further stated that "***Some of these numbers strain credulity***."  Evercore ISI issued a report on November 4, 2022 stating: "Post today's print, we are stepping to the sidelines.  While we never like to

_____

COVID-19 pandemic.  This result also provided alignment with stockholder gains during the year."

downgrade post a print like this, ***we remain broadly flummoxed by the trajectory of the business and how much it shifted during the month of September***."   William Blair issued a report on November 7, 2022 commenting on the Company's "***Unprecedented Decline in Clinical Bookings***," stating "the company's clinical book-to-bill ratio under ASC 606 (including pass-through items) was an unprecedentedly low 0.18 times, a long way away from our 1.15 times target.  Clinical net new business awards were $182.2 million in the quarter, representing a ***drastic year-over-year decline*** of 87% and coming in $984 million below our target."  Barclays issued a report stating that it had "[n]ever seen bookings come in at 0.3x (ex-reimburse)" adding that "[w]e do not know what happens to growth when you book 1/10th of the business you have been doing, and if mgmt's implied 4Q guide of down 6% at the midpoint is enough."  In another report issued on November 4, 2022, Barclays stated "[t]he biggest concern among investors is going to be Clinical bookings, as ***we have not seen a number this low since 2015*** when the business was INC Research and this level of bookings was growing 25%."  In a report issued November 6, 2022, Barclays stated "The biggest question from investors and ourselves was, '***what happened***?'" Looking back on the Company's disastrous announcement, Baird published a report on May 2, 2023 stating "3Q22's Clinical net book-to-bill of 0.18x (and 0.46x in 4Q22) ***signal an extended operational turnaround is needed for the segment***."

319.    The abrupt departures of four of the most senior Syneos executives, including Defendants Macdonald, Meggs, Keefe, and Colvin, also provide an inference of scienter.  After the February 17, 2022 disclosure that 36% of Syneos's backlog was uncollectible reimbursable expenses, Defendant Macdonald, who served for about six years as the Company's CEO, abruptly retired in April 2022.  Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline.  Four months later, in August 2022, Defendant

Colvin, head of the disastrous Clinical Solutions segment, also left.  In January 2023, Syneos announced a "Chief Financial Officer Transition," through which Defendant Meggs would exit the Company.[19]  Defendant Keefe, who succeeded Macdonald as CEO departed the Company in October 2023.

## VIII.   SYNEOS'S PUBLIC STATEMENTS AND FILINGS WITH THE SEC OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN

320.    Under Item 303 (17 C.F.R. §229.303), Syneos's quarterly and annual reports filed with the SEC were required to: "Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii).  The "discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations."  17 C.F.R. §229.303(a).

321.    The Company was also required to provide Item 303 disclosures of "trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii).

---

[19]     On January 9, 2023 Evercore ISI published a report stating Meggs's departure "is not surprising given the operational and financial troubles [Syneos] has seen over the past year."

322.    Further, Item 303 requires disclosures concerning the Company's "Critical accounting estimates."[20]  Indeed, Item 303 required that Syneos:

> Provide qualitative and quantitative information necessary to understand the estimation uncertainty and the impact the critical accounting estimate has had or is reasonably likely to have on financial condition or results of operations . . . .  This information should include why each critical accounting estimate is subject to uncertainty and . . . how much each estimate and/or assumption has changed over a relevant period, and the sensitivity of the reported amount to the methods, assumptions and estimates underlying its calculation.

323.    The SEC has emphasized that Item 303 "requires not only a 'discussion' but also an 'analysis' of known material trends," and that disclosure is "necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results."  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75056-01, 75061-62 (Dec. 29, 2003).

324.    While "[f]inancial measures generally are the starting point in ascertaining these key variables and other factors," "financial measures often tell only part of how a company manages its business.  Therefore, when preparing MD&A, companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required."  "Examples of such other factors, depending on the circumstances of a particular company, can include . . . backlog, trends in bookings and employee turnover rates."  Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75056-01, 75059-60 (Dec. 29, 2003).

---

[20]    "Critical accounting estimates are those estimates made in accordance with generally accepted accounting principles that involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on the financial condition or results of operations of the registrant."  17 C.F.R. §229.303(b)(3).

325.    During the Class Period, Syneos reported on its quarterly and annual backlog metrics, and specifically reported the backlog for its Clinical Solutions business unit.

| Clinical Solutions Backlog (in millions) | |
|---|---|
| Q3 2020 | $9,196.30 |
| Q4 2020 | $10,239.50 |
| Q1 2021 | $10,509.90 |
| Q2 2021 | $10,966.90 |
| Q3 2021 | $11,281.40 |
| Q4 2021 | $10,567.30 |
| Q1 2022 | $10,772.30 |
| Q2 2022 | $10,634.40 |
| Q3 2022 | $9,746.70 |

326.    As set forth above, the Company withheld Item 303 disclosures from investors throughout the Class Period, including that Syneos lacked the ability to deliver quality clinical services and generate useful and accurate data from its clinical trials, was severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on the contractual obligations required under agreements with its customers, and lacked the tools and technological resources to compete for and secure new post-revenue or renewal business. *See, e.g.*, ¶¶56-69.

327.    For example, as described above (¶¶56, 59-60, 69), the Company failed to disclose to investors that its pervasive and persistent quality issues were so obvious and concerning to clients that Syneos business was placed on "hold," and future business would not be available to Syneos "until [it] earned back trust."  Defendants also failed to disclose that Syneos was also plagued by "***recurring issues***" across its five top "Quality Issues and Audit/Inspection" categories:

- (1) "Site Management/Monitoring,"

- (2) "Inappropriate Disclosure,"

- (3) "Management of Investigational Medicinal Product/Drug Accountability,"

- (4) "Management of Essential/Regulatory Documentation," and

- (5) "Computer Systems Validation/Information Technology."

328.    Also missing from Syneos's Management Discussion and Analysis was a discussion and analysis concerning the impact its inability to offer technology-based solutions demanded by its customers, such as a client data portal, was having on its ability to win new business and service existing customers. ¶¶6, 56-69 ("Data doesn't reflect client situations"), ¶6 ("Further meaningful drill-down is not currently possible due to data limitations."), *id*. ("The data here in Syneos system is not the source of truth.").

329.    Further, Syneos failed to fully integrate recent acquisitions and its various product teams and had been unable to respond with agility to its clients' needs, all of which impaired the Company's ability to provide comprehensive or effective customer engagement across its product portfolio and led to Syneos losing post-revenue business and renewal business from existing customers. ¶¶56-69.

330.    These poor-quality trends and technological deficiencies, which Defendants failed to disclose, prevented Syneos from competing for new post-revenue and renewal business and had impact of Syneos's win rate and backlog metrics. In fact, as was discussed at monthly ELT Meetings, the ongoing trends, events, or uncertainties concerning these accounts were reasonably likely to have – and were in fact then having – a material effect on the Company's financial condition, operational situation, and results of operations. ¶¶58-60, 69. Syneos was required to provide robust quantified and narrative disclosures of the expected impacts these trends were having on the Company's backlog, and results of operations and its patchwork, generic, and wholly insufficient commentary on what it told investors were the relevant existing trends throughout the Class Period fail its obligation under Item 303.

331.    In addition, and as discussed above, while the internal technological and competitive trends at Syneos were having a materially negative impact on the Company's backlog and operational situation, Syneos was routinely engaging in monthly and quarterly activities to inflate its backlog metrics and mask declining win rates and backlog metrics (¶¶71-91), a trend, event, or uncertainty that was known to Syneos and was reasonably likely to have material effects on the Company's financial condition or results of operations.  Contrary to the requirements of Regulation S-K, Syneos failed to disclose the material impact of this known trend, event, or uncertainty on current and future revenues within its required Management Discussion and Analysis sections of its Form 10-K for the fiscal year 2020 and 2021, and its Forms 10-Q from Q3 2020 through Q3 2022.

332.    Syneos was explicitly required to disclose the impact and identify the intermediate effects of its routine actions to inflate or otherwise manipulate its backlog, including by describing the reasons underlying these effects.

333.    As the Class Period came to a close, Defendants began to slowly reveal that the Company's backlog had been overstated and Syneos had been plagued by impaired business development and operational capabilities, acute qualitative and competitive disadvantages, integration issues, backlog and expenses manipulations, and an inability to meet contractual customer obligations.

## IX.    NO SAFE HARBOR

334.    Syneos's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"),

including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

335.    Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Syneos who knew that the forward-looking statement was false.  None of the historic or present tense statements Defendants made was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as it was not stated to be such assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts Defendants made expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET

336.    Lead Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine.  At all times during the Class Period, the market for Syneos common stock was an efficient market for the following reasons, among others:

- Syneos common stock met the listing requirements, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- According to the Company's Form 10-K for the fiscal year ended December 31, 2022, Syneos had over 103 million shares outstanding as of February 9, 2023;

- As a regulated issuer, Syneos filed periodic public reports with the SEC;

- Syneos regularly and publicly communicated with investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures, such as through the internet and communications with the financial press and other similar reporting services;

- Syneos was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

- Unexpected material news about Syneos was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

337.    In addition, and as a result of the foregoing, the market for Syneos common stock promptly digested current information regarding Syneos from all publicly available sources and reflected such information in the price of Syneos common stock. Under these circumstances, all purchasers of Syneos common stock during the Class Period suffered similar injury through their purchase of Syneos common stock at artificially inflated prices and the presumption of reliance applies. The material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Syneos stock, and without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and other members of the Class purchased or acquired Syneos stock between the time Defendants misrepresented and/or failed to disclose material facts about the overstated backlog and the Company's qualitative, technological, and competitive disadvantages, integration issues, and inability to satisfy contractual obligations, at the time the true facts were disclosed. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Syneos common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

338.    Lead Plaintiffs and the Class are also entitled to a presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon, in significant part, omissions of material fact for which there was a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding Syneos's business,

operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

339.    Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. §V. The material misrepresentations and omissions included issues concerning, among other things, the Company's inability to generate useful and accurate data, and implement a technology-enhanced delivery mode. *E.g.*, ¶¶113-114.

340.    During the Class Period, as detailed herein, Defendants schemed to deceive investors and the market, and engaged in a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on members of the Class who purchased Syneos stock by misrepresenting and omitting material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. §V.

341.    When Defendants' prior misrepresentations and omissions were disclosed or otherwise revealed to the market, beginning on February 17, 2022, and further revealed on August 1, 2022, September 13, 2022, and November 4, 2022, Syneos's stock price declined significantly, as the prior inflation was removed from the price of the Company's common stock. As a result of their purchases of Syneos common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

342. Defendants' false and misleading statements and omissions, identified herein at §V, had the intended effect and caused Syneos's stock to trade at artificially inflated levels throughout the Class Period.

343. As a direct result of the disclosures on February 17, 2022, August 2, 2022, September 13, 2022, and November 4, 2022, Syneos's stock price suffered significant declines. For example, from February 16, 2022 through the next trading day on February 17, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $4.01 per share, or nearly 5%. Between August 1, 2022 and August 2, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $13.94 per share, or 17.6%. Between September 12, 2022 and September 14, 2022, the price of Syneos common stock traded on the NASDAQ dropped by $10.69 per share, or nearly 17%. Finally, between November 3, 2022 and November 4, 2022, the price of Syneos common stock traded on the NASDAQ fell $22.11 per share, or 46.2%.

344. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Syneos's stock. It also was foreseeable to Defendants that the revelation of the truth concerning the Company's backlog, including that the Company was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, backlog and expense manipulations, and inability to meet customer needs would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## XII. CLASS ACTION ALLEGATIONS

345. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased

or otherwise acquired the common stock of Syneos during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of Syneos, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

346.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Syneos common stock was actively traded on the NASDAQ, one of the largest stock exchanges in the world.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.  During the Class Period, there were more than 104 million shares of Syneos common stock outstanding, and the average daily trading volume was over 780,000 shares.  Record owners and other members of the Class may be identified from records maintained by Syneos or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

347.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts, omissions, and common scheme to defraud as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the Company's backlog, net new

business awards, and book-to-bill ratios, as well as the Company's inability to retain and compete for and secure new post-revenue and renewal business; and to what extent the members of the Class have sustained damages and the proper measure of damages.

348.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

349.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in securities and class action litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

350.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### XIII.   COUNT I
### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

351.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated by the SEC thereunder (17 C.F.R. §240.10b-5).

352.    During the Class Period, Syneos, through its officers, management, and agents, including Macdonald, Keefe, Meggs, and Colvin made, disseminated, approved, or were responsible for the statements specified in ¶¶99-126, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

353. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

354. Defendants and the Company's officers, management, and agents, directly and indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 in that they, by the use of means and instrumentalities of interstate commerce, the mail, and/or the facilities of a national securities exchange:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

355.    Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Syneos common stock during the Class Period.

356.    Syneos is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

357.    Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business.

358.    The allegations above establish a strong inference that Syneos, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about: (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's

inability to retain and compete for and secure new and renewal business. By concealing these material facts from investors, Syneos's share price was artificially inflated during the Class Period.

359.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business, thus artificially inflating the price of Syneos's common stock.

360.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Syneos common stock. Lead Plaintiffs and the Class would not have purchased Syneos common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

361.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

### XIV.    COUNT II
### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

362.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

363.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of §20(a) of the Exchange Act. 15 U.S.C. §78t(a). During their tenures

- 161 -

as officers and/or directors of Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

364.    By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operation and the performance of its Clinical Solutions segment, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendants Macdonald, Keefe, and Meggs participated in interviews and conference calls with investors and analysts, and/or prepared and approved the Company's public statements, SEC filings, and press releases, described herein at ¶¶29-33, 100-234, alleged by Lead Plaintiffs to be misleading.

365.    In particular, the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular conduct, statements, and omissions giving rise to the securities violations as alleged herein and exercised the same. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

366.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable, injunctive, or other and further relief as the Court may deem just and proper.

## XVI.    JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  May 20, 2024

s/ HENRY ROSEN
_____
HENRY ROSEN

Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven Jodlowski (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA 92121
Tel.: 619-923-3939
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
hfarah@dicellolevitt.com

Greg G. Gutzler
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel.: 646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
Tel.: 312-214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC 20036
Tel.: 202-975-2288
rpierce@dicellolevitt.com

*Counsel for Lead Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on May 20, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

_____ s/ HENRY ROSEN _____
HENRY ROSEN

**DiCELLO LEVITT**
4747 Executive Drive, Suite 240
San Diego, CA 92121
Telephone: 619-963-2406
Email: hrosen@dicellolevitt.com
