**APPENDIX A**

| UNSOURCED ALLEGATIONS |
| --- |
| SAC ¶¶ 6–12, 14, 16–18, 35, 51–52, 54–57, 61–82, 84–88, 91, 96, 100, 106, 113–14, 120, 128, 134, 143, 145, 153–56, 159, 165–66, 173–74, 182–83, 193–94, 197, 208–10, 220–21, 233–34, 237, 249–50, 264–68, 270–73, 326, 329–31, 335, 340, 357 |

| UNSOURCED ALLEGATIONS |
|---|
| "Things were not as Defendants portrayed them to be, however, and in reality, Syneos was plagued by known, but undisclosed, long-standing quality, technological, cultural, and operational problems causing customers to pull significant business from Syneos.  Due to the Company's pervasive problems, Syneos was unable to compete.  Defendants were well aware of the dire situation as Syneos's problems and inability to provide the services its customers required were discussed at monthly Executive Leadership Team ('ELT') meetings . . . ."  (SAC ¶ 6.) |
| "The ELT observations regarding the devastating quality and data issues were stark: Despite what Defendants were telling the market, they knew Syneos's quality issues and data limitations were having a devastating – but undisclosed – impact on the Company's Clinical Solutions segment.  Defendants also knew that the Company's clinical segment was neither healthy nor growing.  Syneos had shown that it was unable to successfully compete for new business or retain renewal customers who were aware of Syneos's quality and service failures.  And, by late 2020, Defendants were well aware that as a consequence of these failures, the Clinical Solutions segment was experiencing negative growth."  (SAC ¶ 7.) |
| "Yet, despite persistent quality shortcomings and service failures plaguing the clinical segment and hampering that segment's growth, Syneos and the Individual Defendants (defined below) falsely told investors and the market that Syneos was experiencing record growth.  In addition, Defendants falsely reported that the Company's clinical segment was achieving or exceeding its targets."  (SAC ¶ 8.) |
| "To achieve the false performance metrics Defendants reported, Syneos took steps to inflate its backlog and manipulate net new business awards and book-to-bill ratios.  When contracts were terminated, such as when two large $25 million oncology clinical trials were cancelled in early 2021, Defendants refused – over the objection of the oncology business unit's CFO – to remove awards from the backlog to avoid the negative impact the removal would have on the Company's reported performance metrics.  Specifically, at the end of 2019, Defendants entered into a $300 million annual multi-year contract with GlaxoSmithKline ('GSK').  Defendants continued to include the entirety of the annual $300 million GSK contract value in backlog each year despite never receiving more than $20 million in contract revenue during any year.  Defendants also improperly included a $100 million bonus award in the Company's backlog even though the bonus was supposed to be earned after eight clinical trials were successfully completed.  Syneos, however, kept the contingent $100 million bonus in backlog even though the Clinical team failed to achieve the first milestone required in the first year of the contract.  Additionally, and in furtherance of their scheme, Defendants included three to four years of business value from functional service provider ('FSP') agreements in backlog, including taking credit for contracts that never came to fruition, even though Defendants falsely assured investors they would only include the first year of the contract award value in backlog."  (SAC ¶ 9.) |

| UNSOURCED ALLEGATIONS |
|---|
| "The Company's inability to compete and win new and repeat business was well-known and routinely discussed within Syneos. The entire sales organization was required to report its numbers on a weekly basis, received weekly email updates tracking sales to target metrics, and had weekly Monday sales calls to discuss and review their results. As a result, the sales organization knew where the Company was in terms of tracking actual awards to target numbers. Every quarter from January 2020 through May 2022, the Company was hundreds of millions of dollars short of achieving its targets. Despite the enormous gap, however, Syneos always hit its target each month and each quarter." (SAC ¶ 10.) |
| "Defendant Meggs orchestrated this miracle, in part, by fostering and promoting a culture of fear. If Meggs received results indicating a shortfall, he simply said 'No' until Syneos employees brought him the numbers he wanted. When the clinical group fell short of achieving its revenue targets, even after the business units went through layers of internal reviews and meetings to confirm their results, Defendant Paul Colvin demanded different results and better award numbers . . . ." (SAC ¶ 11.) |
| "From September 9, 2020 through November 3, 2022, Defendants falsely portrayed to investors and the market that the Company was securing new and renewal business to refill the backlog and falsely engineered the Company's new business metrics to achieve favorable results. Defendants used these deceptive and illegal tactics to hide the Company's critical quality failures in clinical trials from investors. By booking overstated or nonexistent business awards in backlog, manipulating expenses, and pulling future business into the current period, Defendants falsely portrayed Syneos's Clinical Solutions segment as thriving when exactly the opposite was true. While hiding their accounting manipulations and the Company's critical failures in its clinical segment from investors, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021." (SAC ¶ 12.) |
| "The Company's pervasive qualitative and technological failures decimated its ability to compete for and secure legitimate and organic new and renewal business to refill its backlog. Therefore, the Company began to run out of ways in which to engineer favorable backlog, net new business awards, and book-to-bill ratios." (SAC ¶ 14.) |
| "Unfortunately, this was just the tip of the iceberg, and while the Company's February 17, 2022 announcement was bad, Defendants failed to fully disclose the magnitude by which they had overstated Syneos's clinical metrics and continued to hide the underlying competitive and service failures plaguing the clinical segment." (SAC ¶ 16.) |
| "Even after disappointing Q1 2022 results and Defendant Macdonald's abrupt departure, Defendants continued to obfuscate the full truth." (SAC ¶ 17.) |

| UNSOURCED ALLEGATIONS |
|---|
| "However, Defendants still failed to fully disclose the magnitude of the chaos in the Company's clinical segment and the severity of the resulting consequences." (SAC ¶ 18.) |
| "Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading." (SAC ¶ 35.) |
| "The Company's private equity sponsors, TH Lee and Advent, and Defendants were desperate to convince the market that Syneos had escaped the COVID-19 pandemic unscathed so that they could exit their personal investment and dump billions of dollars' worth of Syneos stock at high prices." (SAC ¶ 51.) |
| "Defendants falsely told investors that Syneos's advanced technology, superior workforce, and strong corporate culture gave it competitive advantages which uniquely positioned the Company to successfully compete for and win new business. Unfortunately for investors, the rosy story of Syneos's resurgence was a lie engineered by Defendants so that TH Lee and Advent could dump billions of dollars of their Syneos stock, and so Defendants could sell millions of dollars of their personal holdings." (SAC ¶ 52.) |
| "At the same time, Defendants and senior insiders were dumping billions of dollars in Syneos stock while unbeknownst to the investing public, Syneos was plagued by undisclosed, long-standing quality, technological, and cultural problems that caused clients to cancel in droves and refuse to re-sign. Syneos's inability to deliver the clinical and project management services demanded by its clients seriously impacted the Company and its pipeline of potential new awards and its backlog of awards already reported to investors." (SAC ¶ 54.) |
| "In 2020, contrary to what Defendants were telling the market, the Company's Clinical Solutions segment was neither healthy nor strong nor growing. Clients were pulling significant amounts of business away from Syneos because the Company's clinical trial's business offerings were woefully inadequate and suffered from severe anti-competitive deficiencies." (SAC ¶ 55.) |
| "Defendants knew about these deficiencies from the time of the 2018 merger and by early 2020, knew the Company's technology shortcomings were hurting business. In fact, by early 2020, Defendants were well aware that Syneos's quality problems and inability to deliver usable clinical trial data had a devastating impact on the Company's ability to sign new business and to re-sign existing customers. Syneos's quality problems impacted its relationship with its large pharma clients, some of the world's largest |

| UNSOURCED ALLEGATIONS |
|---|
| pharmaceutical companies.  In July 2019, in an email to investment bank Jefferies, Syneos acknowledged that its business was not sustainable, with the intent to find a buyer for the Company or take it private.  Between 2017 and 2019, at least two of its large pharma clients, Bristol Myers Squibb and GSK – who had functional service provider ('FSP') and full service agreements ('FSA') with Syneos – refused to give the Company new awards until they were satisfied that the clinical issues and service failures had been addressed.  In 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a hold on all of its work with Syneos.  Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data (¶ 60), and Syneos's relationship with GSK, with which it had signed a new agreement in early 2020, was strained to the point that Syneos could only obtain less than 10% of the FSP work it had contracted to provide beginning in 2020.  In early 2021, AstraZeneca stopped using Syneos entirely." (SAC ¶ 56.) |
| "By November 2020, the Company privately forecasted negative growth across its business and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company.  The results of that review – and the serious problems facing the Company – were being discussed at the highest levels of the Company.  In its review, the Company identified the problems plaguing its Clinical Solutions segment, examined their impact on the Company's revenue and growth rate, made a number of key findings and recommendations, listed the areas for change, and examined the Company's progress in addressing these issues against its plan of action adopted in late 2020."  (SAC ¶ 57.) |
| "Defendants' statements during the Class Period that Syneos's technology was a competitive advantage were blatantly false when made because in truth, the Company operated at a severe disadvantage.  Syneos failed to invest in the very technology needed to conduct clinical trials, collect usable data from those trials, and provide that data to its customers.  Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities.  In short, the Company failed to adapt to changing business demands and lacked the necessary tools including robust data management systems.  The Clinical Trial Management System used at Syneos was InForm, which was a generic system that did not allow for any client customization.  The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems."  (SAC ¶ 61.) |
| "Incredibly, Syneos also lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.  Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials.  Such a portal was a basic feature other CROs offered to their clients.  Without a portal, Syneos was forced to manually create reports on generic spreadsheets and then email them to clients.  Instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal clients could access remotely.  Defendants |

| UNSOURCED ALLEGATIONS |
|---|
| were well aware how important a client portal was to Syneos's future success.  In fact, one of the Company's critical initiatives during the Class Period was technology, and the implementation of a portal was the primary focus.  Defendant Macdonald was the executive sponsor of the portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos finally launch 'Clinical Reimagined,' the initiative to develop a portal.  By the end of the Class Period, however, the Company had still not launched an integrated client portal." (SAC ¶ 62.) |
| "Defendants were also aware that Syneos failed to invest in technology infrastructure following the inVentiv and INC Research merger which formed the Company in 2018.  For example, Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies.  Indeed by 2021, the Company had 11 separate accounts receivable systems and nine accounts payable systems.  This made invoicing and paying bills for customers a logistical nightmare.  Similarly, the Company had no centralized network for communicating via email between its worldwide locations.  As a result, Syneos's rapid acquisitional corporate growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups." (SAC ¶ 63.) |
| "In addition to the technology gaps and lack of investment in infrastructure, Syneos's operations were critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture.  Contrary to Defendants' Class Period statements about the Company's great work environment and strengths as an employer, Syneos maintained and perpetuated a bullying workplace which contributed to high turnover and a lack of clinical trial continuity critical to producing quality data." (SAC ¶ 64.) |
| "Former President of Clinical Solutions, Paul Colvin, and former Director of Business Development, Becky Brown, created serious issues within the Company leading to a huge turnover of Project Managers within the Clinical Solutions segment, as they were responsible for supervising data analysts and Clinical Research Associates ('CRAs').  Even as Syneos brought on otherwise qualified people, they were 'thrown to the wolves' as soon as they started working at the Company, were not trained, and were given 'zero guidance.'  They were, however, still expected to meet deadlines and forced to work extreme hours.  Despite these demands, Syneos still lacked adequate personnel to conduct clinical trials." (SAC ¶ 65.) |
| "Syneos was unable to retain analysts because poor management and the lack of training and support led to horrible turnover across the board, including Project Managers and CRAs.  The high turnover on projects snowballed into more problems causing a lack of continuity, delays in responding to clients in a timely fashion, and data quality issues, all of which led to a loss of business.  Customers |

| UNSOURCED ALLEGATIONS |
|---|
| of all sizes complained their projects lacked adequate staffing, and with insufficient staffing devoted to conducting clinical trials, Syneos lost customers in droves and ruined the Company's reputation in the process." (SAC ¶ 66.) |
| "Predictably, Syneos's technology shortcomings such as the lack of a client portal, lack of tools to conduct clinical trials, inadequate staffing, and the toxic work environment, which prevented the Company from producing quality clinical trial data, hindered Syneos's ability to win new business.  These problems also caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel.  Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues.  For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems.  Clients further complained that the manual reports received from Syneos, instead of accessing the data via a portal, had to be redone." (SAC ¶ 67.) |
| "Plagued by critical technological shortcomings and a severe lack of personnel which led to overwhelming quality problems, Syneos lagged its peers in providing remote clinical capabilities and struggled to catch up to its peers in the new business environment.  As a result, Syneos failed to effectively perform under its existing contracts, ultimately causing Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals." (SAC ¶ 68.) |
| "But Syneos's delivery failures and critical data and quality issues were not behind it." (SAC ¶ 69.) |
| "Contrary to what Defendants were telling investors, the Company's Clinical Solutions segment was neither healthy nor growing and the consequences were dire." (SAC ¶ 70.) |
| "Because Syneos's clinical trial business was floundering, and the Company was struggling to attract and win new business, Defendants embarked on a scheme to falsely inflate the Company's performance metrics to buy themselves enough time to dump billions of dollars in Syneos common stock.  In each quarter from January 2020 through May 2022, Syneos was several hundred million dollars short of its backlog, new business award, and revenue targets.  In order to make it appear that Syneos's clinical business was growing, when it was not, Defendants put tremendous pressure on employees to 'find' numbers to fill the gaps and meet the targets.  At Syneos, because of the pressure, bullying tactics, and tone from the top, orders to find it were tantamount to instructions to fake it." (SAC ¶ 71.) |

| UNSOURCED ALLEGATIONS |
|---|
| "To 'find' the bookings to fill the backlog, 'find' new business and fill revenue holes, and achieve book-to-bill ratios greater than 1.0x to show the business was growing, the Company manipulated and inflated its performance metrics, including its backlog, and prematurely recognized revenue. This was accomplished in several ways." (SAC ¶ 72.) |
| "Syneos violated its own stated policy for booking backlog and revenue from enormous contracts with large pharmaceutical companies known as FSP contracts that can have 5-year terms. To 'find' the sales necessary to fill the backlog hole, the Company manipulated and inflated backlog by including $300 million for an FSP contract entered into with GSK in late 2019 in backlog that Syneos shared with another CRO and which generated only $20 million in actual revenue per year during the Class Period. And while Syneos assured investors and the market that it would only book to backlog one year of authorizations, Syneos routinely took three to four years' authorization value from its FSP agreements, like the GSK agreement, because finance department employees were bullied to 'find it.'" (SAC ¶ 73.) |
| "Defendants inflated backlog and manipulated the Company's book-to-bill ratios by including new awards in backlog before contracts were signed or where a purported 'written commitment' for an award was either not in place or was too vague or undefined to be reliably added to backlog. By abusing this policy, Syneos took authorizations and booked to backlog projects that were never documented and never came to fruition. Syneos engaged in this practice by taking authorizations far out into the future or before approval at the orders of Defendants Meggs and Colvin so that the Company could achieve backlog, new business targets, and a book-to-bill ratio greater than 1.0x." (SAC ¶ 74.) |
| "Syneos also manipulated change orders without proper documentation to inflate backlog. Change orders were additional revenue amounts added to contracts or clinical trials because the scope of work had changed. These orders would increase the total revenue value of the contract but required separate agreements approved by the customers. Defendants further inflated backlog by including change orders even when customers had not agreed to or signed a change order. For example, Syneos would treat a $2 million change order as finalized and added to backlog even before a customer was aware of the increase to the contract and without a customer signature or approval." (SAC ¶ 75.) |
| "Another example of backlog being inflated during the Class Period after employees were ordered to find it occurred when Syneos entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years. The entire value of those contracts was hundreds of millions of dollars. Those contracts provided that Syneos could earn a $100 million bonus if certain milestones were met during the course of the contract. Even though Syneos missed the first milestone in year one of the contract, Defendants included the $100 million bonus in backlog." (SAC ¶ 76.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Also, when contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.  For example, two large oncology clinical trials worth $25 million each were cancelled in early 2021. When the business unit CFO Mike Donovan tried to have these trials removed from the backlog, he was overruled by his superiors. They were concerned that removing the cancelled awards from backlog would decrease the Company's book-to-bill ratio.  And on more than one occasion, the Company backdated contracts signed after the end of the quarter to make sure the award value was placed in the previous quarter."  (SAC ¶ 77.) |
| "Defendants' efforts to bully employees in the finance department to manipulate backlog and inflate the Company's performance metrics reached a boiling point in the second quarter of 2021 ('Q2 2021'). . . . Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to 'find' revenue was tantamount to an instruction to fake it.  Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance department completed, which Defendants routinely used to pressure Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period."  (SAC ¶ 78.) |
| "Defendant Colvin's July 2021 email demonstrates the extraordinary measures utilized when Defendants were desperate to achieve targets.  Colvin attended the month-end meeting at the end of the second quarter in June 2021, during which the monthly and quarterly revenue and backlog figures derived from the multi-layer financial review were discussed.  Determining that the revenue figures were insufficient, despite the multi-level review used to derive and confirm the accuracy of those figures, Defendant Colvin and Brown pressured the business units and finance professionals on the call, well after the quarter close, to change project progress targets and cost estimates to prematurely generate additional awards revenue."  (SAC ¶ 79.) |
| "Defendant Colvin did not offer any suggestions or places for the business unit CFOs to try to locate the missing numbers even though each business unit had already completed a weeks-long process to find additional revenue.  Bekki Brown, Victoria Moore, and Kaitlyn Stadiem had already held monthly finance meetings to discuss month-end revenue and financials, which were attended by senior members of (i) the Project Financial Management group and (ii) the finance group for each business unit before the end of Q2 2021 (June 30, 2021).  Furthermore, these meetings themselves followed four earlier levels of review within the business units to evaluate each active project within Syneos.  These four reviews included the following for each project: (i) meetings among the Project Financial Analysts and Project Analysts to evaluate and calculate costs and estimates of completion; (ii) which were then presented to, discussed with, and ultimately approved by a Senior Director; (iii) who then met with the business unit CFO, who reviewed and approved these calculations and figures.  Therefore, by not offering any suggestions, the astonished recipients of Defendant Colvin's 'find it' email understood their marching orders to be 'fake it.'"  (SAC ¶ 80.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Defendants also ordered reimbursable expenses (also called 'indirect costs' or 'pass-through costs') to be used to inflate backlog. Indirect costs for a given clinical trial were estimated by Syneos and entered directly into the backlog.  If actual costs were lower than the Company's estimates, they should have been removed from backlog.  For example, if Syneos estimated $2 million in indirect costs on a given clinical trial but realized only $1 million in revenue, then the other $1 million should have been removed from backlog as the $1 million constituted revenue that would never be realized.  Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have had an adverse impact on the book-to-bill ratio.  Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President of Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Oncology) knew of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on the book-to-bill ratios.  And Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO for Oncology) discussed these practices and the impact this would have on the Company and Donovan warned that the practices could amount to fraud.  Fillman and Moore were specifically warned that Syneos's actions with respect to reimbursable expenses could amount to fraud.  To accommodate these practices and achieve the numbers they wanted, Syneos had a practice in which it would extend the month-end close until the numbers had reached certain pre-determined amounts.  To increase reimbursable expenses to thereby increase backlog, Defendants ordered the finance department to make manual journal entries on projects." (SAC ¶ 81.) |
| "Syneos's efforts to 'find' revenue continued through late 2022, just before Defendants disclosed to the market that its pipeline had shrunk by 90%." (SAC ¶ 82.) |
| "Indeed, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric.  The Executive Vice President of Operations, the Head of Commercial (Keefe), the Head of Sales, and all of the sales representatives participated in these Monday calls and Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations.  The entire sales organization knew where the Company was in terms of tracking to target, and regardless of the size of the gap, Syneos always made it up." (SAC ¶ 84.) |
| "In addition to manipulating the Company's reported performance metrics such as backlog, new business awards, and the book-to-bill ratio, Defendants also pressured employees to manipulate the way in which the Company recognized revenue.  Although Syneos publicly claimed to employ a conservative revenue-recognition policy, Defendants ordered employees to improperly recognize revenue in a couple of ways.  First, the Company would inappropriately lower cost estimates in order to increase revenue recognition |

| UNSOURCED ALLEGATIONS |
|---|
| under a percentage-of-completion clinical trial contract.  The underestimation of costs would result in revenue being recognized on an expedited basis or early in the clinical trial."  (SAC ¶ 85.) |
| "For example, in a clinical trial expected to take five years to complete with expected revenues of $10 million, Syneos would forecast the costs to complete the trial, e.g., $6 million in costs.  Costs expended are used to assess how far along the clinical trial is, as opposed to the amount of time that has passed, and milestones or percentage completion is determined by the expenses incurred.  As such, using the example above if $2 million in costs were incurred then the trial would be considered 33% complete and 33% of the revenue (or $3.3 million) could be recognized.  Defendants put pressure on employees to underestimate the costs and determine that only $4 million in costs were necessary to complete the trial instead of the original $6 million.  Lowering the cost estimate in this example – so that 50% of the costs were incurred – would allow Syneos to increase the revenue recognized from $3.3 million to $5 million."  (SAC ¶ 86.) |
| "In many instances, if Syneos 'overburned,' where actual costs or estimated costs increased, Syneos would not reverse recognized revenue.  In this example, if the Company estimated the new costs to total $8 million, instead of the previous $6 million cost estimate, and if $4 million in costs were already expended, the Company had only earned 50% of the revenue.  If, however, the Company had previously recognized 66% of the $10 million in total revenue (under the original cost estimate), $1.6 million in previously recognized revenue should be reversed.  However, Syneos would recognize revenue when beneficial but not reverse revenue when it was reassessed.  Instead, a plan would be put in motion to justify the costs already expended, for example, by lowering cost estimates going forward, even though the trial had just overburned."  (SAC ¶ 87.) |
| "Through these efforts, the Company was able to 'find' hundreds of millions of dollars of revenue every quarter, and suddenly the Company hit its targets after being behind in achieving its numbers as the quarter was wrapping up.  Over time, this conduct caused Syneos's backlog, book-to-bill, and net new business awards to be overstated."  (SAC ¶ 88.) |
| "Undeterred, Company executives shrugged off warnings from business unit CFOs and continued inflating backlog, new business awards, the book-to-bill ratio and revenue."  (SAC ¶ 91.) |
| "As the Company's known and pervasive qualitative and technological failures and its inability to compete for and attract new business, particularly with repeat customers who were acutely aware of the Company's failures, caught up with them, the Company was unable to fill its pipeline with new business and, as a result, was unable to continue engaging in its revenue-recognition practices |

| UNSOURCED ALLEGATIONS |
|---|
| and backlog manipulations. Eventually, as explained further below, the Company ran out of backlog from which to pull revenue and had to disclose its virtually non-existent pipeline to the market, causing Syneos's stock price to crash." (SAC ¶ 96.) |
| "Desperate to portray Syneos's clinical business as a healthy and growing Company and demonstrate that its business performance was not adversely impacted by the COVID-19 pandemic, Defendants engaged in a scheme to falsely assure investors that the Company was emerging from the pandemic in a stronger position when exactly the opposite was true." (SAC ¶ 100.) |
| "Defendants' statements detailed above (¶¶ 100-105) were materially false and misleading when made. As Defendants knew or recklessly disregarded:<br><br>106(a) Desperate to portray the Company as growing its pipeline of new business so that Defendants and the private-equity sponsors could sell millions of shares of stock, Defendants engineered a fake resurgence of the Company out of the COVID-19 pandemic. Unbeknownst to investors, but known to and concealed by Defendants, Syneos was plagued by undisclosed, long-standing quality, technological, and cultural problems that caused clients to cancel in droves and refuse to re-sign. Syneos's inability to deliver the clinical and project management services demanded by its clients was seriously impacting the Company and its pipeline of potential new awards and backlog of awards reported to investors. The Company was not competitive and the Syneos workforce was significantly understaffed and operating in a toxic work environment that negatively impacted the Company's ability to retain key personnel and, in turn, generate quality clinical trial data. ¶¶ 54-70;<br><br>106(b) Defendants were aware their statements that Syneos had emerged from the COVID-19 pandemic unscathed were false and misleading when made because by late 2020 and continuing throughout the Class Period, they knew that Syneos's inability to deliver quality clinical services was adversely impacting the Company's ability to win new and renewal business awards. The Company's technology shortcomings were hurting business and by beginning of the Class Period, the Company's ELT had already begun a comprehensive review of its Clinical Solutions business to determine why its clients were pulling work from the Company. The Company's quality failures were routinely discussed by Syneos senior management, including during monthly ELT meetings (of which Defendants Macdonald, Meggs, Keefe, and Colvin were members). The ELT meetings were used to plan, facilitate, and review the status of Syneos's strategic initiatives, and to discuss other topics such as HR and IT. The results of the fall 2020 ELT review – and the significant and severe problems facing the Company – were being discussed at the highest levels of the Company. ¶ 57;<br><br>106(d) From their participation in the ELT and the January 2021 presentation, Defendants knew that Syneos's quality issues and data limitations were having devastating – but undisclosed – consequences on its clinical business. For example, AstraZeneca had placed a 'hold' on its clinical business with Syneos due to quality issues. . . .But Syneos's delivery failures and critical data and |

| UNSOURCED ALLEGATIONS |
| --- |
| quality issues were not behind it.  Across its top accounts, even including the $400 million from the GSK contract the Company knew it would not collect, the Company expected a negative growth rate of -0.2% across its clinical and commercial business and -2.7% for its clinical, which was the core of its business.  ¶59;<br><br>106(e) Defendants knew that Syneos did not offer unique value that resonated with its customers because the Company failed to invest in the technology necessary to customize clinical trial data for its customers and lacked a client portal.  In addition, Syneos's services were negatively impacted and impaired by workforce reductions, leadership and operational changes, labor force turmoil, and the toxic workplace culture fostered by Defendant Colvin and former Director of Business Development, Becky Brown.  The severe staffing shortages, lack of training and guidance, and horrible working hours caused massive workforce turnover which further degraded the Company's ability to service its clinical trial customers.  Ultimately, Syneos's failure to effectively perform under its existing contracts caused Syneos to lose new business, fail to secure contract renewals, and cede market share to its rivals.  ¶¶ 54-70;<br><br>106(f) In addition to affecting its relationship with its large pharma customers mentioned above, the January 2021 ELT presentation informed Defendants that the Company's business with SMID customers was declining.  Defendants expected a negative year-over-year awards growth rate of -23.3% across its clinical and commercial business and -23.5% for its clinical business in 2021.  ¶59; and<br><br>106(g) Because Syneos's clinical trial business was floundering, and the Company was struggling to attract and win new business, Defendants ordered finance department and clinical project employees to artificially inflate the Company's performance metrics.  In Q3 2020, the fourth quarter of 2020 ('Q4 2020'), and Q1 2021, Defendants used bullying tactics to coerce Syneos employees to 'find' numbers to fill backlog, new business awards, and revenue targets.  These performance metrics were inflated using the manipulations – overbooking FSP contract revenue, including new awards without signed contracts or adequate documentation, manipulating change orders to increase revenue without authorization, improperly booking milestone bonuses, refusing to reduce backlog from cancelled contracts or where collection was not probable, and manipulating costs to complete, as described above.  ¶¶ 78-80."  (SAC ¶ 106.) |
| "Defendants statements (*sic*) detailed above on September 9, December 7, and December 8, 2020 made to investors while Syneos was marketing the Company's public offerings, that the Company's strategy was resonating with its customers (¶¶ 109-112), that Syneos had an innovative product development model, that Syneos's corporate culture was driving customer success and that the Company's model, people, and culture were its competitive advantages were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading.  As Defendants knew or recklessly disregarded:<br><br>113(a) Syneos's business operations, including its ability to generate useful and accurate data for its customers' clinical trials, were severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on its contractual |

| UNSOURCED ALLEGATIONS |
|---|
| obligations with its customers.  By the fall of 2020, many of the Company's key accounts were in serious jeopardy because of the Company's inability to produce quality clinical trial data.  As noted above, the ELT review which began in November 2020, determined that the Company's relationship with its large pharma customers was plagued by serious quality issues.  Because the Company could not produce quality clinical trial data, large pharma customers had put Syneos on hold and were refusing to give Syneos work pursuant to massive FSP contracts entered into with the Company.  ¶¶ 54-70; and<br><br>113(b) These quality issues and the toxic workplace culture which contributed to high turnover and exacerbated the Company's critical quality failures directly contradict Defendants statements (*sic*) during the December 8, 2020 Analyst and Investor Day conference about the Company's great work environment and strengths as an employer.  In addition, Syneos's staffing shortages and inability to retain critical clinical trial employees belie Defendant Macdonald's statements that the Company's culture was a key differentiator that helped Syneos retain top talent and drive customer success.  ¶¶ 54-70."  (SAC ¶ 113.) |
| "Throughout 2021, Defendants continued to make false and misleading statements and material omissions regarding the Company's purported superior technology, enhanced processes, and abilities to conduct clinical trials."  (SAC ¶ 114.) |
| "Defendants' statements on (i) January 13, 2021, that Syneos was on the forefront of innovation demanded by its clients, that Syneos differentiated itself from competitors through technology which allowed it to bring new capabilities to its customers and helped customers navigate through COVID by bringing them to a digital remote approach (¶ 114); (ii) April 29, 2021, that Syneos was able to ramp up site activations necessary in light of increasing demand because of Syneos's 'enhanced processes,' 'more horsepower,' and 'more automated and more streamlined' processes (¶ 116); and (iii) November 3 and December 1, 2021, that Syneos was ramping up and winning a 'lot of oncology work' from 'large pharma' (¶ 117-119) were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading.  As Defendants knew or recklessly disregarded:<br><br>120(a) As noted above, Syneos did not differentiate itself from its competitors and was in fact operating at severe competitive disadvantages because it did not possess state-of-the-art software to customize clinical trial data for its customers or even provide customers with a client portal.  ¶ 62;<br><br>120(b) Therefore, Syneos did not help navigate its customers through COVID-19 with a more digital approach and did not possess enhanced and more automated processes as claimed.  In fact, exactly the opposite was true.  Without a portal, Syneos was required to manually create reports and then email them to clients.  Instead of providing clients with instant access to their vital clinical trials data in a customized format, clients were subject to delays of multiple days or even weeks to get access to data that was often filled with errors in a simple spreadsheet.  Compared to other CRO competitors who provided data instantaneously via an online portal which |

| UNSOURCED ALLEGATIONS |
|---|
| clients could access remotely, Syneos was not offering enhanced processes.  In addition, Syneos's personnel shortages and lack of training oftentimes resulted in clients experiencing further delays to obtain their requested data and such data was full of errors.  ¶¶ 62, 67;<br><br>…<br><br>120 (d) Defendants were further aware that their statements that the Company was 'winning' a lot of oncology work were false and misleading and failed to disclose that the Company manipulated and inflated its performance metrics, including its backlog, and prematurely recognized revenue to 'find' necessary revenue to fill short falls to plan.  As discussed, this was accomplished in several ways including the refusal to remove awards from backlog when the contracts were cancelled or payment was not probable.  This is exactly what happened in Q1 2021 when two $25 million oncology contracts were cancelled.  When the oncology business unit CFO Mike Donovan tried to have these trials removed from the backlog, higher-ups refused because removing the contracts would decrease the Company's book-to-bill ratio.  ¶ 77.  To falsely portray the Company's clinical segment business was growing, when it was not, Defendants emphasized that the book-to-bill ratio was greater than 1.0x even though, cancelled contracts like these two oncology contracts were not removed from backlog, the numerator in the book-to-bill ratio." (SAC ¶ 120.) |
| "Defendants' statements in the fall of 2020 when they were attending roadshow presentations and conferences with investors to market and promote Syneos's public offerings, during which they told investors that the Company's position in the market was growing with high-growth SMID customers, and that the Company was 'successfully penetrating large pharma' customers, that the SMID market was 'getting hotter and hotter,' that the upcoming Synteract acquisition would help with SMID customers (¶ 125), and that the demand environment as reflected in backlog growth for both SMID and large pharma customers demonstrated that Syneos was growing its business (¶ 127), were all false and misleading and omitted material information Defendants were obligated to disclose.  As Defendants knew or recklessly disregarded:<br><br>128(a) Unfortunately for investors, the rosy story of Syneos's resurgence was a lie engineered by Defendants so that private equity sponsors, TH Lee and Advent, who both had seats on Syneos's Board, could dump billions of dollars of their Syneos stock and Defendants could sell millions of dollars of their personal holdings.  ¶ 53.  Unbeknownst to the investing public but known or recklessly disregarded by Defendants, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and therefore negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors.  Furthermore, the undisclosed, long-standing |

| UNSOURCED ALLEGATIONS |
|---|

quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work.  ¶¶ 54-70;

128(b) Further, Syneos's strategy was not resonating with its customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture.  Syneos lacked a client portal, standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously.  The Company's toxic work environment, lack of guidance and training, and bullying atmosphere contributed to high employee turnover and resulting workforce shortages.  Such shortages made it impossible for the Company to have clinical trial employee continuity critical to producing quality data.  All customers including large pharma and SMID complained that workforce shortages caused customers to experience huge delays in obtaining data and even a response from Syneos.  These problems led to a massive loss of business and caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel.  Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues.  For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems.  Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone.  ¶ 67;

128(c) Defendants MacDonald, Meggs, Keefe, and Colvin, as members of the Company's ELT and responsible for Clinical Solutions operations and finance functions, were well aware that the only way the Company was able to show backlog growth and consistently report book-to-bill ratios over 1.0x given the problems plaguing the Company's clinical segment, was by artificially inflating the Company's backlog as described in ¶¶ 71-91;

128(d) Defendant Colvin, as a member of the Company's ELT and head of Clinical Solutions, was aware that the statement he made during the December 8, 2020 Analyst and Investor Day conference, that the Company achieved "clinical backlog growth of over 30% for the Top 50 pharma customers," (¶ 127), was false and misleading and omitted material information when made because by December 2020, the Company forecasted an approximate 16%-23% decline for Clinical Solutions until $600 million from the GSK contract award was included.  Because the Company was hundreds of millions of dollars short of its 2021 awards target for 2021, by December 2020, Defendants included $400 million in award value for that account in the 2021 backlog.  Defendant Colvin – as head of Syneos's Clinical Solutions segment – oversaw these efforts to inflate backlog with the GSK awards even though the Company lacked the basis to put the full award in backlog.  ¶¶ 9, 58, 59.  As members of the ELT, Defendants were further aware that the Company's clinical business was cratering. …; and

| UNSOURCED ALLEGATIONS |
|---|
| 128(e) Defendant Colvin's December 8, 2020 statements to support Syneos's stock price while marketing and promoting the Company's public offerings also omitted information obligated to be disclosed – that Syneos's large pharma customers were impacted by severe quality issues.  As the Executive Leadership Team discussed during their monthly ELT meetings, as of December 1, 2020, many of the Company's key accounts were in serious jeopardy. . . ."  (SAC ¶ 128.) |
| "Defendants' statements on January 13, 2021, during the JP Morgan conference, on February 18, 2022, in the Form 8-K announcing Q4 2020 results, in the Form 10-K for 2020, that the Synteract acquisition enhanced Syneos SMID category, that the employees of Synteract have been fantastic and settled in quickly and were performing well were false and misleading when made and omitted material information Defendants, were required to disclose.  As Defendants knew or recklessly disregarded:<br><br>134(a) Syneos struggled to integrate the Synteract acquisition and from a customer relations standpoint was a disaster from the beginning.  Immediately from the day the acquisition closed, Synteract started hemorrhaging employees who had no interest in working for a large CRO of Syneos's size;<br><br>134(b) In addition, Syneos's inability to respond to clients' needs in a timely fashion and provide effective service across its full suite of promised product offerings, or efficiently work across its various product and service groups, had a severe negative impact on Synteract clients after the acquisition.  The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems.  Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities, and the Company had failed to adapt to changing business demands.  Syneos's lack of an integrated client portal to allow clients to access their data and performance metrics on their projects was another reason Syneos lost Synteract customers in droves.  Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal.  Indeed, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal Syneos lost approximately 30%-40% of Synteract customers, with some customers voicing their unhappiness with the deal prior to closing; and<br><br>134(c) As noted above, Defendants were aware of the negative impact that Syneos's technology issues were having on the business.  In fact, although one of the Company's Class Period initiatives was technology and the implementation of a portal was a primary focus – Defendant Macdonald was the executive sponsor of the portal initiative – only in Q1 2022 did Syneos finally takes steps to remedy their technological failures, when they launched Clinical Reimagined.  By the end of the Class Period, however, the Company had still not launched an integrated client portal.  ¶ 62."  (SAC ¶ 134.) |

| UNSOURCED ALLEGATIONS |
|---|

"Defendant Macdonald's statements on (i) August 9, 2021, during the Q2 2021 conference call with analysts that Syneos had great SMID performance in Q4 2020, and in Q1 2021 and Q2 2021, and that Syneos was a leader in the SMID sector and had a good contribution from large pharma in that quarter (¶¶ 136-138), (ii) September 15, 2021, at the Baird industry conference that Syneos had good backlog growth in clinical from the Company's top 20 customers, (¶139) (iii) November 3, 2021, during the Q3 2021 Earnings Call with analysts that Syneos's backlog growth in the SMID sector ensured that 'Clinical Solutions remains well positioned for robust revenue growth into 2022 and that Syneos had the most 'compelling SMID offering,' (¶¶ 140-141), and (iv) November 18, 2021, during the Jefferies London Virtual Healthcare Conference that investors had 'seen, I think, an improvement overall over the last few years of the consistency and the scale of our book-to-bill that's driving the growth in the company,' (¶142), were false and misleading when made and omitted material information. As Defendants knew or recklessly disregarded:

143(a) Unbeknownst to the investing public but known or recklessly disregarded by Defendants, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and therefore negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors. Furthermore, the undisclosed, long-standing quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work. ¶¶ 54-70;

143(b) Syneos's SMID offering was not the most compelling product because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. Syneos lacked a client portal, standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously. ¶¶ 62, 64-70;

143(c) Syneos's Q2 2021 was a disaster and the Company inflated its performance metrics including backlog and thereby the all-important book-to-bill ratio by bullying employees in the finance department to manipulate backlog and inflate the Company's performance metrics. . . . Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to 'find' revenue was tantamount to an instruction to fake it. Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance department completed which Defendants routinely used to pressure Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period. As explained above, employees in the finance department were astonished by the blatant nature of Defendant Colvin's instructions to 'find it.' ¶¶ 78-80; and

143(d) And, as members of the Company's ELT, Defendants were aware that Syneos's 2021 backlog growth was inflated by hundreds of millions of dollars in 2021 because the Company had included in backlog $600 million in awards over two years from an FSP

| UNSOURCED ALLEGATIONS |
|---|
| contract with GSK where collection was not probable (¶¶ 8, 58-59), included a contingent $100 million bonus in backlog despite not achieving necessary milestones to earn it (¶ 9), refused to remove $50 million from backlog for two $25 million oncology contracts that were cancelled in early 2021 (¶ 77), included awards in backlog for projects underway for 6-18 months that were cancelled by customers (¶ 67), and maintained $850-$950 million of reimbursable expenses in backlog that Syneos knew it would never collect. ¶¶ 92, 94." (SAC ¶ 143.) |
| "At each quarter throughout the Class Period, Defendants reported Syneos's performance metrics, including its backlog, new business awards, and book-to-bill ratio.  These statements (described below in §V.D.1-5.) were materially false and misleading when made as Defendants knew or recklessly disregarded that because the Company was struggling to attract and win new business, Defendants did not and could not achieve performance metrics consistent with a growing and healthy CRO.  As a result, top executives, including Defendants, began looking for ways to prop up the Company's performance metrics and results consistent with a growing and healthy CRO.  Defendants were desperate to prop up Syneos's stock price and buy themselves enough time so that Defendants and the Company's private equity sponsors could unload billions of dollars of Syneos stock before they had to reveal the Company's problems to the market." (SAC ¶ 145.) |
| "Defendants' statements regarding Syneos's Q3 2020 performance metrics detailed above (¶¶ 146-149, 151-152) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:<br><br>153(a) The Company's reported backlog, net new business awards, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric.  Defendants (i) included new business awards in backlog before contracts were signed or where a 'written commitment' for an award was either not in place or was too vague or indefinite to be reliably added to backlog, (ii) included new or increased awards and reimbursable expenses in backlog before change orders were agreed upon by sponsors, (iii) manipulated costs to increase reported backlog, (iv) failed to remove cancelled and uncollectable awards from backlog, and (v) contrary to its stated 'New Business Awards and Backlog' methodology, Syneos inflated its backlog and performance metrics by including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking.  ¶¶ 71-91.  By Q3 2020, Defendants had artificially inflated Syneos's reported backlog by as much as $210 million by including in backlog revenue the Company knew it would never collect from GSK.  Indeed, after signing an FPO contract with GSK in late 2019, Syneos booked $300 million in backlog each year knowing that Syneos was just one of the providers on the contract that had generated no more than $20 million in annual revenue for Syneos from the contract.  ¶¶ 9, 58-59; |

| UNSOURCED ALLEGATIONS |
|---|
| 153(b) By Q3 2020, Defendants had artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. Defendants also manipulated estimated costs to alter the percentage-of-completion target, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog. ¶¶ 71-91;<br><br>153(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and<br><br>153 (d) As a result of the above manipulations, Syneos's net new business was overstated by at least $210 million and the actual book-to-bill ratio was approximately 0.95x, not the reported 1.20x." (SAC ¶ 153.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q3 2020 Form 10-Q (¶¶ 147, 150), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. By choosing to report the Company's performance metrics and the New Business Awards and Backlog methodology in the Q3 2020 Release and Q3 2020 Form 10-Q, Defendants were duty bound under Item 303 to disclose the known trends or uncertainties regarding the clinical segment's sales and manipulations of backlog and performance metrics. As explained above, in Syneos's Q3 2020 Release and Q3 2020 Form 10-Q (¶¶147-149), Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses to hit percentage-of-completion targets without removing costs from backlog, and reported false clinical backlog, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. See ¶¶ 71-91." (SAC ¶ 154.) |
| "Defendants also omitted from Syneos's Q3 2020 Form 10-Q that the Company's clinical segment was plagued by long-standing quality, technological, and cultural problems that was causing clients to cancel in droves and refuse to re-sign. During the Class Period, the Company's Clinical Solutions business was neither healthy nor strong nor growing because clients were pulling significant amounts of business away from Syneos. The Company's technology shortcomings were hurting business because Syneos was not investing in the necessary infrastructure to maintain pace with its competitors and offer products and services demanded by its customers. The Company suffered from a toxic workplace environment that made it impossible for Syneos to retain top employees and to adequately train employees for and staff vital functions. The technology failures and workplace turmoil combined ensured that |

| UNSOURCED ALLEGATIONS |
|---|
| Syneos could not provide its clients with quality clinical trial data, the most important function in the Clinical Solutions segment responsible for over 75% of the Company's revenue. ¶¶ 54-70." (SAC ¶ 155.) |
| "Defendants further violated Item 303 because they did not disclose the Company's trend to violate the New Business Awards and Backlog methodology set forth in the Q3 2020 Form 10-Q.  The reason was simple: The Company's reported backlog, net new business awards, and book-to-bill ratios were not accurate as Defendants inflated backlog and manipulated Syneos's book-to-bill ratios by (i) including new awards in backlog before contracts were signed or where a purported 'written commitment' for an award was either not in place or was too vague or undefined to be reliably added to backlog, (ii) including new or increased awards in backlog before change orders were agreed upon by sponsors, (iii) underestimating costs to increase reported backlog, (iv) failing to remove cancelled or delayed awards from backlog, and (v) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking. ¶¶ 71-91.  Furthermore, Defendants artificially inflated Syneos's reported backlog by including in backlog reimbursable out-of-pocket expenses, that the Company knew it would never collect.  ¶¶ 81, 85-88.  Defendants failed to disclose the known trend to not properly reduce backlog including reimbursable out-of-pocket expenses as contracts were delayed or cancelled, because doing so would adversely impact the Company's new business awards and book-to-bill ratios. ¶77." (SAC ¶ 156.) |
| "When Defendant Meggs spoke about reimbursable expenses during the Jefferies industry conference, his statements were false and misleading when made.  Syneos was not conservative in its use of reimbursable expenses in backlog.  Rather, reimbursable expenses (also called 'indirect costs' or 'pass-through costs') were used to inflate the backlog.  Indirect costs for a given clinical trial were estimated by Syneos, which were oftentimes inflated and entered directly into the backlog.  If actual costs were lower than the Company's estimates, they should have been removed from backlog.  Syneos was reluctant to remove the inflated indirect costs from the backlog because doing so would have an adverse impact on the reported book-to-bill ratio.  ¶¶ 81, 85-88.  Therefore, Syneos was not conservative in its treatment of backlog as stated by Defendant Meggs." (SAC ¶ 159.) |
| "Defendants' statements concerning Q4 2020 described above (¶¶ 160-164) were materially false and misleading when made. Defendants knew or recklessly disregarded:<br><br>165(a) The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above. ¶¶ 71-91.  By Q4 2020, Defendants had artificially inflated |

| UNSOURCED ALLEGATIONS |
|---|
| Syneos's reported backlog by as much as $280 million by including in backlog award value that the Company knew it would never collect, including from the GSK contract;<br><br>165(b) By Q4 2020, Defendants also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶ 81. Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing Defendants were reluctant to remove those costs from backlog and by Q4 2020 reimbursable expenses were inflated by between $212-$237 million. ¶¶ 85-88;<br><br>165(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and<br><br>165(d) As a result of the above manipulations, Syneos's net new business was overstated by at least $280 million and actual book-to-bill ratio was approximately 1.19x, not the reported 1.52x." (SAC ¶ 165.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's 2020 Form 10-K (¶ 160), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading. As explained above, in Syneos's Q4 2020 Release and 2020 Form 10-K, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. In addition, Defendants violated Item 303 by failing to disclose in the Company's 2020 Form 10-K Syneos's trend to violate its New Business Awards and Backlog methodology." (SAC ¶ 166.) |
| "Defendants' statements detailed above (¶¶ 168-172) were materially false and misleading when made. As Defendants knew or recklessly disregarded: |

| **UNSOURCED ALLEGATIONS** |
|---|
| 173(a) The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above. ¶¶ 71-91. By Q1 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $400 million by including in backlog revenue that the Company knew it would never collect, including $350 million from the GSK contract. ¶¶ 9, 58-59. And although two $25 million oncology contracts were cancelled in Q1 2021, Defendants insisted on maintaining the $50 million award value of those contracts in backlog. ¶ 77; <br><br> 173(b) By Q1 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶ 81. Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by Q1 2021 reimbursable expenses were inflated by between $425-$474 million. ¶¶ 85-88; <br><br> 173(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and <br><br> 173(d) As a result of the above manipulations, Syneos's net new business was overstated by at least $400 million and actual book-to-bill ratio was approximately 0.87x, not the reported 1.30x." (SAC ¶ 173.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q1 2021 Form 10-Q (¶ 168), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading. As explained above, in Syneos's Q1 2021 Release and Q1 2021 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical |

| UNSOURCED ALLEGATIONS |
|---|
| Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q1 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology." (SAC ¶ 174.) |

"Defendants' statements regarding Q2 2021 detailed above (¶¶ 176-181) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:

182(a) The Company's reported backlog, net new business metrics, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above.  ¶¶ 71-91.  For instance, Syneos inflated its backlog and performance metrics by including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking.  ¶ 73.  This tactic belies the Company's stated methodology and Macdonald's statement that 'for FSP services, we only included 12 months of services in our bookings.' ¶ 181.  By Q2 2021, Defendants had artificially inflated Syneos's reported backlog by as much as $470 million by including in backlog award value that the Company knew it would never collect, including $420 million from the GSK contract and $50 million from the two cancelled oncology contracts.  ¶¶ 9, 58, 59, 77;

182(b) By Q2 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect.  ¶ 81.  Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by Q2 2021, reimbursable expenses were inflated by between $637-$711 million.  (¶¶ 85-88);

182(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.  And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog;

182(d) Syneos's Q2 2021 was a disaster and the Company inflated its performance metrics including backlog and thereby the all-important book-to-bill ratio by bullying employees in the finance department to manipulate backlog and inflate the Company's performance metrics. . . . Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to 'find' revenue was tantamount to an instruction to fake it.  Defendant Colvin's instruction in his July 10, 2021 email came at the end of a long process the finance

| UNSOURCED ALLEGATIONS |
|---|
| department completed which Defendants routinely used to pressure Syneos employees to manipulate backlog and inflate revenue each and every quarter during the Class Period.  As explained above, employees in the finance department were astonished by the blatant nature of Defendant Colvin's instructions to 'find it.'" ¶¶ 78-80; and<br><br>182(e) As a result of the above manipulations, Syneos's net new business was overstated by at least $470 million and the book-to-bill ratio was approximately 0.97x, not the reported 1.45x."  (SAC ¶ 182.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q2 2021 Form 10-Q (¶ 176), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q2 2021 Release and Q2 2021 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q2 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology."  (SAC ¶ 183.) |
| "Defendants' statements in Q3 2021 detailed above (¶¶ 185-192) were materially false and misleading when made.  As Defendants knew or recklessly disregarded:<br><br>193(a) The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above at ¶¶ 71-91.  For instance, contrary to Defendant Macdonald's assurance that 'we also still have that conservative approach around FSPs . . . we booked the first year . . . our competitors book the whole lot' (¶ 185), in truth, Defendants routinely included three to four years of award value in backlog rather than the 12 months of value Syneos represented it was taking.  (¶ 73).  Indeed, after signing an FSP contract with GSK in late 2019, Defendants booked $300 million in backlog each year knowing that Syneos was just one of the providers on the contract which had generated no more than $20 million in annual revenue for Syneos from the contract.  ¶¶ 9, 58, 59.  And although two $25 million oncology contracts were cancelled in Q1 2021, Defendants insisted on maintaining the award value of those contracts in backlog.  ¶ 77.  Further, Defendants also improperly included a contingent $100 million bonus award in the Company's backlog even though the Clinical team failed to achieve the first milestone required in the first year of the contract.  ¶ 9.  As such, by Q3 2021, Defendants had artificially |

| UNSOURCED ALLEGATIONS |
|---|
| inflated Syneos's reported backlog by as much as $640 million by including in backlog revenue that the Company knew it would never collect;<br><br>193(b) By Q3 2021, Defendants had also artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶ 81. Defendants manipulated estimated costs to alter percentage-of-completion targets, but in order to continue to portray Syneos's backlog as healthy and growing they never removed those costs from backlog and by the end of Q3 2021 reimbursable expenses were inflated by between $850-$950 million (¶¶ 85-88);<br><br>193(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and<br><br>193(d) As a result of the above manipulations, Syneos's net new business was overstated by at least $640 million and the actual book-to-bill ratio was approximately 0.69x, not the reported 1.30x." (SAC ¶ 193.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q3 2021 Form 10-Q (¶ 186), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §V.D.1.b., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading. As explained above, in Syneos's Q3 2021 Release and Q3 2021 Form 10-Q Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. In addition, Defendants violated Item 303 by failing to disclose in the Company's Q3 2021 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology." (SAC ¶ 194.) |
| "Having inflated backlog, manipulated the Company's performance metrics, and falsely portrayed Syneos as healthy and growing for almost two years while Defendants and other insiders liquidated more than 38 million shares of Syneos common stock for proceeds |

| UNSOURCED ALLEGATIONS |
|---|
| of more \$3.19 billion, and with Macdonald soon to be exiting the Company, Defendants' scheme slowly began to unravel as the effects of their long-running manipulations were revealed." (SAC ¶ 197.) |
| "Defendants knew or recklessly disregarded:<br><br>208(a) The Company's reported backlog, net new business metrics, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations descried (*sic*) above at ¶¶ 71-91. By Q4 2021, Defendants had artificially inflated Syneos's reported backlog by as much as \$710 million by including in backlog revenue that the Company knew it would never collect, including \$560 million from the GSK contract, \$50 million from the two cancelled oncology contracts, and the contingent \$100 million milestone bonus;<br><br>208(b) By Q4 2021, Defendants had artificially inflated Syneos's reported backlog by including reimbursable out-of-pocket expenses Defendants knew they would never collect. ¶ 81. And when Defendants removed approximately \$850-\$900 million in reimbursable expenses from backlog, revealing that they had carried that amount on backlog knowing it would never be collected, they falsely told investors that the removal was primarily caused by a change of business, the exact excuse provided to investors in October 2020 when Syneos erased approximately \$170 million in reimbursable expenses from backlog due to the same change in business as Syneos emerged from the pandemic. ¶ 46;<br><br>208(c) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and<br><br>208(d) As a result of the above manipulations, Syneos's net new business was overstated by at least \$710 and its actual book-to-bill ratio was approximately -0.33x, not the reported 0.34x." (SAC ¶ 208.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's 2021 Form 10-K (¶¶ 201-203), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends |

| UNSOURCED ALLEGATIONS |
|---|
| affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q4 2021 Release and 2021 Form 10-K, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions division, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's 2021 Form 10-K Syneos's trend to violate its New Business Awards and Backlog methodology."  (SAC ¶ 209.) |
| "Over the next several months, Defendants continued to hide the fact that they had and were continuing to manipulate the Company's clinical backlog and performance metrics.  And while Syneos had removed $850-$950 billion in zero-margin, reimbursable expenses from backlog in Q4 2021, Syneos's backlog, including its non-reimbursable clinical backlog, remained inflated."  (SAC ¶ 210.) |
| "Defendants' statements on April 29, 2022 (¶¶ 211-217) and June 8, 2022 (¶ 219) were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading.  As Defendants knew or recklessly disregarded:<br><br>220(a) The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above at ¶¶ 71-91.  By Q1 2022, Defendants had artificially inflated Syneos's reported backlog by as much as $780 million by including in backlog revenue that the Company knew it would never collect, including $630 million from the GSK contract, $50 million from the two cancelled oncology contracts, and the contingent $100 million milestone bonus.  ¶¶ 9, 58, 59;<br><br>220(b) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments.  These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized.  And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and |

| UNSOURCED ALLEGATIONS |
|---|
| 220(c) As a result of the above manipulations, Syneos's net new business was overstated by at least $780 million and its book-to-bill ratio was approximately 0.45x, not the reported 1.22x." (SAC ¶ 220.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q1 2022 Form 10-Q (¶ 213), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties. As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading. As explained above, in Syneos's Q1 2022 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards. In addition, Defendants violated Item 303 by failing to disclose in the Company's Q1 2022 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology." (SAC ¶ 221.) |
| "Defendants' statements on August 2, 2022 (¶ 229) and September 13, 2022 (¶¶ 230-231) were materially false and/or misleading when made and omitted to disclose material facts necessary to make the statements made not misleading. As Defendants knew or recklessly disregarded: <br><br> 233(a) The Company's reported backlog, net new business metric, book-to-bill ratios, and statements describing Syneos's New Business Awards and Backlog methodology were not accurate as Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric using the manipulations described above. ¶¶ 71-91. By Q2 2022, Defendants had artificially inflated Syneos's reported backlog by as much as $850 million by including in backlog revenue that the Company knew it would never collect, including $700 million from the GSK contract, $50 million from two cancelled oncology contracts, and the contingent $100 million performance bonus Syneos would never collect. ¶¶ 9, 58-59, 77; <br><br> 233(b) Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, backlog remained unchanged despite recognizing revenue from the backlog; and |

| **UNSOURCED ALLEGATIONS** |
|---|
| 233(c) As a result of the above manipulations, Syneos's net new business was overstated by at least $850 million and its book-to-bill ratio was approximately 0.095x, not the reported 0.92x." (SAC ¶ 233.) |
| "By issuing false and misleading statements and omitting material information they were obligated to disclose in Syneos's Q2 2022 Form 10-Q (¶¶ 225-227), Defendants violated Item 303 of Regulation S-K which required them to disclose known trends and uncertainties.  As described above in §§V.D.1.b. and V.D.4.a., Defendants violated Item 303 of Regulation S-K by failing to disclose known trends affecting the Company's ability to market its clinical trial services that rendered their statements misleading.  As explained above, in Syneos's Q2 2022 Form 10-Q, Defendants made false and misleading statements and omissions and failed to disclose Syneos's trend that at the end of each month and each quarter, Defendants manipulated backlog and performance metrics by altering reimbursable expenses, altered reimbursable costs to hit percentage-of-completion targets without removing costs from backlog, and reported false backlog for the Clinical Solutions segment, Clinical Solutions and Company-wide book-to-bill ratios, and the Clinical Solutions and Company-wide net new business awards.  In addition, Defendants violated Item 303 by failing to disclose in the Company's Q2 2022 Form 10-Q Syneos's trend to violate its New Business Awards and Backlog methodology." (SAC ¶ 234.) |
| "Defendant Keefe further admitted what insiders at the Company had known since before the beginning of the Class Period: that the longstanding and pervasive quality problems plaguing the Syneos's ability to deliver on its clinical operation model to produce outstanding clinical trials data damaged the Company's reputation with its hallmark SMID customers." (SAC ¶ 237.) |
| "Defendants Macdonald, Meggs, Keefe, and Colvin – the most senior members of the Executive Leadership Team – were present at monthly ELT Meetings during which Syneos's inability to provide quality services and utilize critical technological tools, and clinical workforce turnover issues, were discussed.  The purpose of these meetings was to plan, facilitate, and review the status of the Company's strategic initiatives. … Defendants knew that Syneos was at risk of losing other clients due to its inability to deliver the clinical monitoring and project management services it promised to provide.  Aware of these issues as early as November 2020, the Company had already identified its quality control problems and developed a plan of action in an effort to stem the flow of business elsewhere. ¶¶57-60.  And despite this plan, Defendants knew they were projecting negative year-over-year growth in fiscal year 2021 for Syneos's Clinical Solutions segment." (SAC ¶ 249.) |
| "Additionally, Macdonald, Meggs, and Colvin were told by other Syneos executives that dissatisfied clients had stopped awarding Syneos new business as a reaction to the Company's severe quality issues preventing Syneos from delivering accurate clinical trial data on time and in a useful format.  See ¶¶ 67, 69.  The Senior Vice President of Corporate Quality made Macdonald and Colvin aware of these issues." (SAC ¶ 250.) |

| UNSOURCED ALLEGATIONS |
|---|
| "To hide the Company's crippling operational deficiencies and continuing to falsely portray Syneos's clinical business as growing and healthy, the Individual Defendants knowingly reported manipulated reimbursable out-out-pocket expenses and backlog metrics." (SAC ¶ 264.) |
| "First, the Individual Defendants directed FSP contract values to be included in backlog despite the Company's stated methodology allowing only 12 months of award value from those contracts to be added to backlog. In addition, Syneos was taking authorizations from projects that never came to fruition and kept award value in backlog from cancelled contracts. And as Syneos needed to "grow" the backlog in subsequent months or quarters, they would continue to pull in additional future award value from increasingly distant periods. This practice of taking authorizations from far out into the future – which Defendants were aware of – allowed the Company to pull future award value into the current backlog at the end of each quarter to improperly inflate backlog, new business awards, the book-to-bill ratio, and projected revenue."  (SAC ¶ 265.) |
| "Second, the Individual Defendants directed or were complicit in retaining businesses awards in backlog after awards were cancelled or when collection of the business award value was not probable. For example, in late 2019, GSK signed an FSP agreement with Syneos where the Company had partnered with another clinical research organization. For this particular deal, Syneos booked the entire $300 million worth of award value in backlog each year even though Syneos never received more than $20 million per year in actual work.  ¶¶ 9, 73. When two large oncology clinical trials were cancelled in early 2021, the CFO of the oncology business unit tried to have these awards removed from the backlog. But higher-ups refused, due to the negative impact the removal would have on the Company's backlog and book-to-bill ratio. ¶ 77. In similar fashion, Syneos booked to backlog an enormous bonus that Syneos was unlikely to collect. During the Class Period, Syneos entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years. The entire value of these contracts was hundreds of millions of dollars, and if Syneos achieved certain milestones on time in all of the clinical trials then Syneos could receive a $100 million bonus. Syneos missed the very first milestone in the first clinical trial but included and maintained the entire contingent $100 million bonus in backlog. ¶ 76." (SAC ¶ 266.) |
| "Defendants also inflated backlog by increasing the award value by including change orders, even though the customer had not agreed to or signed on to the change order. Nevertheless, Syneos would, e.g., treat a $2 million change order as finalized without a customer signature and not only would the additional $2 million be added to backlog but Defendants would maintain existing percentage of completion metrics; if the previous contract was for $10 million and 80% of costs had been incurred, Syneos would maintain the 80% completion milestone and apply it to the 'new' $12 million contract."  (SAC ¶ 267.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Third, the Individual Defendants directed or were complicit in the manipulation and overstatement of reimbursable out-of-pocket expenses. For example, if Syneos estimated $2 million in reimbursable costs on a given clinical trial but generated only $1 million in reimbursable revenue, then the other $1 million should be removed from backlog; this is revenue that will never be realized. Syneos was reluctant to remove the inflated reimbursable costs from backlog because doing so would adversely impact the Company's book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO) were involved in and/or aware of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on book-to-bill ratio. After the month-end close, these individuals and the business unit CFOs met with Defendant Meggs to present the consolidated financials. Fillman, Moore, and Donovan discussed these practices and the impact this would have on the Company, and Donovan warned that these practices could amount to fraud. To accommodate these practices, Syneos had a practice by which it would extend the month-end close until the numbers had reached certain pre-determined amounts." (SAC ¶ 268.) |
| "Defendants' manipulation of reimbursable expenses and backlog was not a secret within Syneos. For example, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking to target metric. The Executive Vice President of Operations, the Head of Commercial, Defendant Keefe, the Head of Sales, and all of the sales representatives participated in these Monday calls. Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations and the entire sales organization knew where the Company was in terms of tracking to target. In each of the quarters from at least January 2020 through May 2022, there was always a shortfall of at least a couple hundred-million-dollars – often between $400 and $500 million – to make their revenue target. Regardless of the size of the gap, Syneos always made it up." (SAC ¶ 270.) |
| "Directives to find additional revenue were often delivered during meetings with executives to discuss clinical segment financials, organized by therapeutic area (with additional meetings for large clients like Pfizer and Bristol Myers Squibb), and accompanied by pressure from Defendant Colvin and Brown to change targets and cost estimates to hit performance metrics and prematurely generate revenue without affecting backlog. These meetings were held monthly and led by Becki Brown, the Executive Vice President of Operations, and attended by Kaitlyn Stadiem and Victoria Moore, who reported directly to Defendant Meggs. Defendant Colvin personally attended several of these meetings." (SAC ¶ 271.) |
| "At these meetings, the finance team was told how much they were off target and how much revenue they needed to 'find.' Bekki Brown directed members of project teams to change estimates to completion on clinical trials in order to recognize revenue earlier. These revenue totals were then consolidated and presented to Defendant Meggs. Even though the revenue numbers had already been reviewed and approved at many levels, including a review by the project financial analysts and managers, and even though the month |

| UNSOURCED ALLEGATIONS |
|---|
| or quarter should have already closed, Brown would then issue directives to find more revenue in various ways to increase revenues for the quarter or year.  Efforts to manipulate backlog and prematurely recognize revenue occurred every month from the start of the class period until at least April 2022." (SAC ¶ 272.) |
| "When Defendant Meggs was brought certain figures indicating a shortfall, he simply said 'No' until he received the numbers he wanted." (SAC ¶ 273.) |
| "As set forth above, the Company withheld Item 303 disclosures from investors throughout the Class Period, including that Syneos lacked the ability to deliver quality clinical services and generate useful and accurate data from its clinical trials, was severely impaired by quality and performance issues that in turn adversely impacted the Company's ability to deliver on the contractual obligations required under agreements with its customers, and lacked the tools and technological resources to compete for and secure new post-revenue or renewal business."  (SAC ¶ 326.) |
| "Further, Syneos failed to fully integrate recent acquisitions and its various product teams and had been unable to respond with agility to its clients' needs, all of which impaired the Company's ability to provide comprehensive or effective customer engagement across its product portfolio and led to Syneos losing post-revenue business and renewal business from existing customers.  ¶¶ 56-69."  (SAC ¶ 329.) |
| "These poor-quality trends and technological deficiencies, which Defendants failed to disclose, prevented Syneos from competing for new post-revenue and renewal business and had impact of Syneos's win rate and backlog metrics.  In fact, as was discussed at monthly ELT Meetings, the ongoing trends, events, or uncertainties concerning these accounts were reasonably likely to have – and were in fact then having – a material effect on the Company's financial condition, operational situation, and results of operations."  (SAC ¶ 330.) |
| "In addition, and as discussed above, while the internal technological and competitive trends at Syneos were having a materially negative impact on the Company's backlog and operational situation, Syneos was routinely engaging in monthly and quarterly activities to inflate its backlog metrics and mask declining win rates and backlog metrics (¶¶ 71-91), a trend, event, or uncertainty that was known to Syneos and was reasonably likely to have material effects on the Company's financial condition or results of operations."  (SAC ¶ 331.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Syneos who knew that the forward-looking statement was false."  (SAC ¶ 335.) |
| "During the Class Period, as detailed herein, Defendants schemed to deceive investors and the market, and engaged in a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on members of the Class who purchased Syneos stock by misrepresenting and omitting material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios."  (SAC ¶ 340.) |
| "Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business."  (SAC ¶ 357.) |