UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs,

vs.

SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, PAUL COLVIN, and JASON MEGGS,

        Defendants.

---

Civil Action No. 1:23-cv-08848-AS

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................................1

II.   LEGAL STANDARD .........................................................................................................5

III.  ARGUMENT.......................................................................................................................6

      A.    Defendants' Materially Misleading Statements and Omissions Are Actionable ...........6

            1.    The SAC Adequately Alleges Falsity and Provides a Categorical and
                  Temporal Roadmap Detailing Defendants' Actionable Misstatements............6

            2.    The SAC Sets Forth Sufficient Facts Which Provide an Adequate
                  Basis to Believe Defendants' Statements are False ..............................................7

            3.    Internal Syneos Documents Also Support Plaintiffs' Securities Fraud
                  Allegations..........................................................................................................9

            4.    Defendants' Statements Are Not Forward-Looking .......................................10

            5.    Statements Defendants Identify as Puffery or Corporate Optimism
                  Are Actionable..................................................................................................11

            6.    Defendants' Statements Are Not Protected by Risk Warnings ......................12

            7.    Defendants Did Not "Promptly" Disclose the Fraud, and Their
                  Admissions Further Support Scienter and Falsity............................................13

            8.    The SAC Adequately Pleads Defendants' False Statement Issued in
                  Violation of Item 303 of Regulation S-K ...........................................................15

      B.    Plaintiffs Allege a Cogent and Compelling Inference of Scienter ...............................16

            1.    Defendants Were Aware of and Involved in the Fraudulent Scheme
                  and They Knew Their Public Statements Were False .....................................16

            2.    Defendants' Own Statements, Senior Roles, the Magnitude of the
                  Fraud, and the Core Nature of the Clinical Business All Buttress
                  Plaintiffs' Scienter Allegations.............................................................................18

            3.    Defendants' Insider Trading Supports Scienter ...............................................19

IV.   CONCLUSION ..................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ........................................................................................................6

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...............................................................................15

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ..........................................................................................12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......................................................................................................11

*In re BHP Biliton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017) ............................................................................................12

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ........................................................................ 16, 18

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..........................................................................................17

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .......................................................................... 19, 20

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009) ..........................................................................................20

*Kempen Int'l Funds v. Syneos Health, Inc.*,
2024 WL 1805011 (S.D.N.Y. Apr. 25, 2024) .................................................................................4

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ..........................................................................................................6

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) .....................................................................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .........................................................................................................................5

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014) ........................................................................................................13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ...................................................................................................18

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ........................................................................................*passim*

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).........................................................................18

*Ollila v. Babcock & Wilson Enters., Inc.*,
    2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...............................................................10

*In re Pareteum Sec. Litig.*,
    2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)............................................................18

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)................................................................ 4, 7, 8

*Rothman v. Gregor*,
    220 F.3d 81 (2d. Cir. 2000) .......................................................................................19

*S.E.C. v. Life Partners Holdings, Inc.*,
    41 F. Supp. 3d 550 (W.D. Tex. 2013) ......................................................................20

*S.E.C. v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013).......................................................................10

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................18

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*,
    2024 WL 1898512 (S.D.N.Y. May 1, 2024)........................................................15, 16, 17, 18

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ......................................................................................6, 19

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)........................................................................14

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019)........................................................................20

*Sjunde AP-Fonden v. General Electric Company*,
    2024 WL 2124504 (S.D.N.Y. May 10, 2024) ............................................................15

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) ........................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................6, 19

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2017 WL 3328543 (C.D. Cal. Aug. 4, 2017).............................................................10

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022)................................................................12

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................19

*In re Vivendi S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .............................................................................13

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b) ..................................................................................................................5
    §78u-4 ..................................................................................................................7

Federal Rules of Civil Procedure
    Rule 9(b) ..............................................................................................................6
    Rule 12(b)(6) .......................................................................................................6

17 C.F.R.
    §229.303(b)(2)(ii) .............................................................................................15
    §240.10b-5(b) ......................................................................................................5

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF Nos. 58-60) ("Motion" or "MTD"). [1]

## I.    INTRODUCTION

The SAC's cogent and compelling allegations demonstrate that Defendants successfully orchestrated a scheme to falsely portray to investors that Syneos's business was booming.  Although Defendants refuse to acknowledge the facts detailed in the SAC, they purposefully hid the truth from investors so that insiders could personally profit by selling all or nearly all of their Syneos shares at inflated prices before the true state of affairs was revealed to the market.  Defendants failed to disclose that the INC Research Holdings, Inc. and inVentiv Health merger that created Syneos had been a disaster.  ¶63. By 2020, the combined Company was plagued by known, but undisclosed, quality, technological, cultural, and operational problems such that Syneos was unable to compete for new business or retain renewal customers who were aware of Syneos's quality and service failures.  ¶¶54-70.  Defendants knew that Syneos's quality issues and data limitations were having a devastating and undisclosed impact on its clinical business which was experiencing negative growth.  ¶¶57-63, 67-69.

To mask this negative growth, Defendants issued false and misleading statements that the Company had successfully emerged from the COVID-19 pandemic and told investors that the Company's workforce, culture, capabilities to run clinical trials, and successful engagement with its customers were driving Syneos's strong growth.  Defendants also falsely inflated backlog and net new business awards which allowed Syneos to report book-to-bill ratios of 1.2x to 1.4x in 2020 and 2021. Defendants then leveraged this key metric to falsely inform investors that new business was growing at a rate 20-40% higher than collected revenue.

---

[1]  All factual allegations are taken from the Second Amended Complaint for Violations of the Federal Securities Laws (the "SAC"), ECF No. 57, and are cited as "¶__" or "¶¶__." Defined terms have the meaning set forth in the SAC. All citations and footnotes are omitted and emphasis is added unless otherwise noted.

Consistent with the Court's instructions, the SAC's refined falsity allegations are properly and separately organized by category, with each section containing particularized facts detailing falsity and Defendants' scienter.  Defendants' alleged false and misleading statements are organized as follows: (1) challenged statements regarding the Company's emergence from COVID-19 (¶¶100-107); (2) challenged statements regarding the Company's workforce, culture, and capabilities to run clinical trials (¶¶108-121); (3) challenged statements regarding the Company's success and engagement with customers (¶¶122-144); (4) challenged statements regarding the Company's reported performance metrics, including backlog, new business awards, the book-to-bill ratio, and reimbursable expenses (¶¶145-195); (5) challenged statements in the Company's prospectus statements (¶196); and (6) challenged statements made as the truth began to be revealed.  ¶¶197-234.  Within each category of alleged false statements, the SAC focuses on each challenged statement (*e.g.*, ¶¶100-106) and then sets forth particularized facts demonstrating contemporaneous falsity and scienter. In fact, after identifying the allegedly false statements, the SAC provides new temporally based allegations, corroborated by multiple sources including business unit CFOs, that explain how Defendants personally orchestrated the manipulation of Syneos's reported performance metrics – backlog, new business awards and book-to-bill ratios. For example, the SAC identifies specific agreements Defendants used to inflate those metrics (¶¶153(a), 165(a), 173(a); 182(a), 193(a), 208(a), 220(a), 233(a)), provides a quarterly timeline by which to measure the increasing inflation in these performance metrics throughout the Class Period ((¶¶153(d), 165(d), 173(d); 182(d), 193(d), 208(d), 220(c), 233(c)), describes former finance department employees' experiences being bullied to manipulate backlog and inflate the Company's performance metrics, and cites documents such as Defendant Colvin's July 2021 "find it" email which blatantly demonstrates Defendants' tactics to inflate Syneos's performance metrics at all costs.  ¶¶78-91, 182(d).

In addition to the categorized false statements, the SAC presents compelling evidence of scienter as the SAC's well-pleaded facts establish Defendants' recklessness or actual knowledge, and

Defendants' motive and opportunity.  Defendants knew that Syneos's clinical business was neither healthy nor growing because a comprehensive review of the clinical business was ongoing in the fall of 2020 as top clients were pulling work from the Company.  ¶¶6-7, 54-70.  And Defendants were warned by high-level managers that their steps to inflate backlog "could amount to fraud," yet they persisted and demanded that employees "find" revenue.  ¶¶78-82, 89-91.

Defendants' motive and opportunity is also set forth in the SAC.  While withholding the truth, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021.  ¶12.  The Individual Defendants and other insiders took full advantage and dumped over $19 million worth of their own Syneos shares during the Class Period at prices artificially inflated by their scheme.  ¶¶13, 276-300, 306-310.  Defendant Macdonald alone sold 142,586 shares for proceeds of more than $11.4 million (¶278) and Thomas Lee Partners and Advent International – Syneos's private equity sponsors and largest shareholders who had representatives on the Company's Board of Directors – unloaded more than $3 billion worth of Syneos stock through a series of five registered public stock offerings and share repurchase agreements.  ¶¶301-305.

At the end of the Class Period, beginning on November 4, 2022, Defendants made stunning admissions regarding Syneos's actual financial results.  ¶¶236-239, 241.  On that day, Syneos revealed the dramatic deterioration of its business and client demand, culminating in an "unprecedented" 87% year-over-year decline in clinical net new business awards – just one-tenth the amount expected by analysts, resulting in a book-to-bill ratio of just 0.18x, which was "a long way away from" the market's expectation of 1.15x.  ¶¶240, 318.  Defendant Keefe admitted that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions, and she subsequently admitted that while they had taken recent "steps . . . to address the post-revenue SMID cohort," they lacked the technological offerings to "be more competitive."  ¶¶236-239, 242-244.

Securities analysts were shocked.  ¶¶240, 318.  One analyst referred to Syneos's abysmally low book-to-bill ratios, stating: "*We've never seen that happen*." ¶240. Another pointedly challenged Defendants' explanation as "*frankly hard to believe*." *Id.*  Investors meanwhile were left holding the bag.  As a result of the revelation of the fraud, Syneos stock plummeted $23 per share, a decline of 77% from its Class Period high.  ¶98.

Despite the SAC's well-pleaded scheme, new factual allegations, and reorganized falsity section (¶¶99-234), Defendants assert nonetheless that Plaintiffs failed to follow the Court's roadmap,[2] claim that the challenged statements are not actionable because Plaintiffs did not plead their sources and their statements amount to puffery, are forward-looking, or are otherwise entitled to safe harbor protection.  These arguments fail.  The reorganized falsity section of the SAC sets forth six categories of false statements and unflattens the timeline by including a quarter-by-quarter analysis of the amount backlog was inflated throughout the Class Period. ¶¶99, 153, 165, 173, 182, 193, 197, 208, 220, 233.

Plaintiffs are not required to plead sources where a complaint sets forth detailed facts which "'provide an adequate basis for believing that the defendants' statements were false.'"  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004).  In addition, Defendants' puffery and forward-looking arguments also fail because the challenged statements concerning backlog and other performance metrics were historical in nature and were used to convince investors that Syneos's business was growing when the opposite was true.  Similarly, Defendants cannot issue an effective warning that Syneos's backlog might be affected or inaccurate are not effective when Defendants knew at the time they issued these warnings that the Company's performance metrics were overstated.

Defendants' challenges to scienter fare no better.  Defendants argue that Plaintiffs fail to plead compelling evidence of recklessness because there are no misstatements before year-end 2021 (MTD

---

[2]  *Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL 1805011, *2 (S.D.N.Y. Apr. 25, 2024).

at 5-6). Defendants' argument makes little sense given the SAC's thorough quarter-by-quarter analysis explaining how Syneos's backlog, book-to-bill ratios, and new business awards figures were false and delineating how the level of inflation changed.  ¶¶153, 165, 173, 182, 193, 208, 220, 233.  Defendants also assert that the January 2021 ELT presentation is mischaracterized (MTD at 12-13) and the July 2021 "find it" email is immaterial (MTD at 13), but they ignore that the SAC is replete with evidence that Defendants were aware of the performance metric manipulations[3] (*e.g.*, ¶¶78-80, 84, 89-91) and that Defendant Colvin himself issued the July 2021 "find it" email.  Defendants only challenge to new facts in the SAC explaining how Defendant Colvin sent the July 2021 email at the end of a long process Defendants used to bully finance department employees to manipulate backlog and inflate the Company's performance metrics is that Plaintiffs do not provide their sources.  ¶¶78-91, 182(d).  Defendants refuse to address these allegations because they belie Defendants' assertion that Plaintiffs fail to tie knowledge of the manipulations to Defendants.  MTD at 17, 19-20.

Defendants' MTD the SAC should be denied.

## II.    LEGAL STANDARD

To state a claim for securities fraud under §10(b) of the Exchange Act and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

---

[3] *See e.g.*, ¶¶6-7, 58-60 (all Individual Defendants were part of the ELT and warned in January 2021 that Syneos' largest clients had stopped new business); ¶¶84, 270 (Keefe was present on weekly calls regarding tracking to target revenue); ¶¶271-73 (describing Meggs' and Colvin's involvement in weekly sales calls and monthly finance meetings, organized by therapeutic area, and their efforts to manipulate backlog and prematurely recognize revenue).

On a Rule 12(b)(6) motion, courts must "'consider the complaint in its entirety'" and "'accept all factual allegations in the complaint as true.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10 (2007). Courts must also "'draw[] all reasonable inferences in favor of plaintiffs.'" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001). "'[F]act-specific question[s] cannot be resolved on the pleadings.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "do not require the pleading of detailed evidentiary matter in securities litigation." *Scholastic*, 252 F.3d at 72. Rather, an "alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).

## III.   ARGUMENT

### A.   Defendants' Materially Misleading Statements and Omissions Are Actionable

To state the circumstances of fraud with particularity, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). Plaintiffs have done so here. *See generally* Pls.' App. A.

### 1.   The SAC Adequately Alleges Falsity and Provides a Categorical and Temporal Roadmap Detailing Defendants' Actionable Misstatements

The SAC alleges in detail how Defendants, throughout the Class Period, engaged in a scheme to falsely portray Syneos's business as healthy and growing. Defendants falsely stated that Syneos had emerged from the pandemic stronger than ever, and that business was booming. ¶¶100-107. Defendants also falsely assured investors that the Company's "model, people, and culture are our competitive advantage" (¶112), and that the Company's "capabilities to bring technology and new service lines, new capabilities to customer delivery, to project designs . . . really helps us resonate in

the market." ¶¶108-121. The SAC further describes how these "model, people, and culture" statements were false because Syneos, for example, "could not produce quality clinical trial data" (¶113(a)) and Syneos was plagued by "staffing shortages and inability to retain critical clinical trial employees." ¶113(b). Additionally, Defendants falsely described the Company's relationship with its large pharma and SMID customers. ¶¶122-144. The SAC also alleges in detail how Defendants repeatedly and intentionally violated their explicit "New Business Awards and Backlog" methodology and reported false performance metrics, detailing the extent to which Defendants increased the inflation in the backlog during each successive quarter throughout the Class Period. ¶¶145-195. In addition, the SAC explains how these false statements were incorporated in the Company's prospectus statements issued throughout the Class Period. ¶196. In each category of challenged statements, Plaintiffs specify the statements they contend are fraudulent, describe who spoke each statement, identify when and where each statement was made, and describe with particularity why those statements were false.

### 2. The SAC Sets Forth Sufficient Facts Which Provide an Adequate Basis to Believe Defendants' Statements are False

Defendants assert that the Court should disregard Plaintiffs' detailed allegations and complain that Plaintiffs have failed to plead their sources. MTD at 1, 10-14. However, "neither Second Circuit precedent nor the language of the PSLRA requires plaintiffs to reveal anonymous sources at the pleading stage," and courts have remarked that "requiring plaintiffs to identify the sources of their factual allegations would, in effect, compel them to plead evidence in their complaint, thereby undoing the principle of notice pleading that underlies the Federal Rules of Civil Procedure." *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 477-79 (S.D.N.Y. 2004). Indeed, the Second Circuit has confirmed that the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need

only plead with particularity *sufficient* facts to support those beliefs." *Novak*, 216 F.3d at 313-14 (emphasis in original).

Under the Second Circuit's *Novak* decision, "the court looks to whether the factual allegations, considered in the whole, 'provide an adequate basis for believing that the defendants' statements were false,' without adding the requirement that the complaint identify the source of the factual allegations," which "recognizes . . . that requiring disclosure of sources in all securities fraud complaints is too restrictive a response to the PSLRA's particularity requirement." *See Philip*, 383 F. Supp. 2d at 479.

Here, while arguing that the SAC provides little or no detail to substantiate its allegations, Defendants blatantly ignore numerous facts that corroborate Plaintiffs' allegations. For example, many of the challenged sources are identified or cited in the allegations. *See, e.g.*, ¶¶6, 7, 57, 60, 69, 106, 113, 128, 327-328 (referencing particularized ELT discussion at ¶¶54-70). Others are excerpts of allegations, the full context of which provides corroboration. *Compare, e.g.*, ¶114 *with* Def. App. A at 14 (challenging the introductory sentence ¶114 and omitting context). In fact, the SAC sets forth voluminous details about the ELT committee and presentations including: what they knew and when (¶¶57-60, 69); particularized support for allegations concerning the Company's engagement with customers and inability to compete for and win new business (¶¶54-70); the mechanisms by which Defendants, each and every quarter throughout the Class Period, took steps to inflate the Company's backlog and manipulate the reported performance metrics[4] (¶¶73-83, 85-87); and an explanation how these manipulations violated the Company's backlog methodology. ¶¶150, 153, 158-159.

---

[4] These methods included (i) accelerating FSP value in violation of the Company's stated "New Business Awards and Backlog" methodology (*e.g.*, ¶182(a), *see also* ¶73), (ii) booking uncollectable value (*e.g.*, ¶182(a), *see also* ¶¶9, 58-59, 77), (iii) manipulating reimbursable out-of-pocket expenses and percentage of completion targets (*e.g.*, ¶182(b), *see also* ¶¶81, 85-88), (iv) manipulating accruals (*e.g.*, ¶182(c)), and (v) Defendants' directives to "find" more value even after the business units and finance department had completed a "weeks-long process" to confirm monthly and quarterly results. (*e.g.*, ¶182(d), *see also* ¶80).

Further, the allegations describing how backlog inflation increased in each successive quarter are supported by well-pleaded facts. For example, the SAC describes specific methods Defendants used to inflate backlog and manipulate the performance metrics (¶¶73-83, 85-87) and identifies the business value from specific agreements improperly included into backlog. *See*, *e.g.*, ¶¶9, 56, 58 ($300 million included from FSP agreement with GSK); ¶¶9, 76 ($100 million "performance" bonus included where Syneos missed the very first performance milestone); and ¶77 (two cancelled $25 million oncology projects included and maintained in backlog). Based on this information, the SAC specifies the amount of inflation Defendants had improperly included in backlog as of each quarter which provides an evolving temporal timeline that details how and to what extent Defendants improperly inflated backlog and manipulated its book-to-bill ratio. *See, e.g.*, ¶¶153(a), (d); 165(a), (d); 173(a), (d); 182(a), (d); 193(a), (d); 208(a), (d); 220(a), (c); 233(a), (c). And the ELT presentation confirms that Defendants expected negative year-over-year growth rates, not the positive growth Defendants reported. *E.g.*, ¶¶57-59. Accordingly, what Defendants characterize as "wildly inconsistent" is in fact a detailed description of how and to what extent Defendants had improperly inflated backlog, new business awards, and the book-to-bill ratio. *See, e.g.*, ¶¶264-275.

### 3. Internal Syneos Documents Also Support Plaintiffs' Securities Fraud Allegations

Rather than grapple with Plaintiffs' actual allegations, Defendants either mischaracterize the SAC's well-pleaded allegations or in other instances ignore them outright. For example, while Defendants claim Plaintiffs "mischaracterize" the January 2021 ELT presentation, slides from which are embedded in the SAC, Defendants fail to address the portions of the presentation which confirm that Defendants knew of the myriad customer and operational issues affecting their clinical business. Defendants never address that their ELT presentation informed them that: (i) Syneos's top customers had already pulled new business; (ii) 14 customers (out of Syneos's 16 top accounts), representing more than a billion dollars of awards in 2020, were in jeopardy; and (iii) Syneos's new business awards

were neither growing nor healthy, but were expected to decline, including by more than 23% in its SMID business. ¶¶6, 58-60.

Although they do not question the authenticity of the presentation, Defendants argue with the significance of the presentation's reference to a negative 23.5% growth rate, arguing that it concerns "just four clients." MTD at 19. But the January 2021 presentation assigns the -23.5% growth rate to its SMID "20 Accounts." ¶59. Similarly, Defendants' assertion that Colvin's "find it" email is immaterial is wrong. Indeed, Colvin's "find it" email further corroborates the SAC's allegations that Syneos made up shortfalls that were "a long way off target" only through manipulation and last minute financial engineering. *See*, *e.g.*, ¶¶78-80. In any event, at the motion to dismiss stage, Plaintiffs' plausible interpretation of the document controls. *See S.E.C. v. Syron*, 934 F. Supp. 2d 609, 627 n.4 (S.D.N.Y. 2013) ("[T]he court may not choose among plausible interpretations of . . . documents – if a trier of fact could agree with plaintiffs' interpretation . . . the motion to dismiss must be denied."); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017) (because "Plaintiff's reading . . . [was] plausible, at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation . . . is correct").

### 4.    Defendants' Statements Are Not Forward-Looking

Defendants assert that "*[m]ost*" of the challenged statements are immune from liability as they are forward-looking. MTD at 15-17. Defendants are wrong.

Defendants ignore the voluminous detailed allegations regarding Defendants' statements of present and historical fact. For example, Defendants challenge backlog, net new business awards, and book-to-bill ratios as "forward-looking" yet ignore that Defendants consistently emphasized these historical performance metrics when they announced the Company's prior period financial and operational results. Current and historical operational and financial metrics such as backlog are decidedly not "forward-looking." *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *5

(W.D.N.C. Feb. 8, 2018) (statements that company had a "strong backlog" were actionable and "out of the safe harbor entirely"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 990 (9th Cir. 2008) (statements concerning backlog were not forward-looking because they described how much work the company has under contract right now). Indeed, Defendants' commentary on the Company's financial and operational results and the then-current state of the business are similarly not "forward-looking." *See* ECF No. 59-3 ("Defs.' App. B") at 2, 6-7 (challenging, *e.g.*, ¶146 (Q3 statement reporting "Backlog growth as of the end of Q2 at 14.8%"); ¶151 ("we closed Q3 with solid net new business awards"); ¶101 ("**we had a strong quarter** across our operating and financial metrics, including . . . **backlog growth**"); ¶178 ("Clinical and Commercial . . . **delivered** another quarter of strong awards, **powering record backlog levels**"); and ¶188 ("Our . . . teams again achieved double-digit growth fueled by strong demand . . . as demonstrated by our robust awards and backlog.")). Defendants' argument that the challenged statements are forward-looking and thus inactionable should be rejected.

### 5.     Statements Defendants Identify as Puffery or Corporate Optimism Are Actionable

Defendants assert that certain of their misstatements are inactionable "puffery." MTD at 16-17. However, Defendants largely ignore the context of each statement. For example, Defendants contend that the emphasized portion of the following statement is corporate optimism while ignoring the specific statements that "**we exceeded the midpoint of our guidance across all financial metrics**" and "**achiev[ed] double-digit growth year-over-year**":

> "During the second quarter we exceeded the midpoint of our guidance across all financial metrics, with both Clinical and Commercial achieving double-digit growth year-over-year as we continue to emerge from the COVID-19 pandemic . . . . **Both segments delivered another quarter of strong awards, powering record backlog levels and fueling our robust growth expectations over the balance of 2021.**

¶178. Other cherry-picked excerpts Defendants contend are corporate optimism or "puffery" are not puffery at all. *E.g.*, ¶132 ("**given our record backlog** . . . we expect to fuel strong growth in both

- 11 -

segment . . ."); ¶188 ("Our Clinical . . . teams *again achieved double-digit growth . . . as demonstrated by our robust awards and backlog*.").[5]

Further, Defendants' contention that cherry-picked excerpts (¶¶104, 217) are puffery ignores the fact that context is important. "[A] statement that may be puffery in one context is not puffery where it reassures investors as to specific risks." *Turquoise Hill*, 625 F. Supp. 3d at 223. *See also Novak*, 216 F.3d at 315 (statements that defendants' inventory was "'in good shape'" and "'under control'" were not puffery because "they allegedly knew that the contrary was true"). For example, Defendants' statements about its model, people, and culture when evaluated in context were intended to reassure investors about Syneos's ability to compete based on value and differentiated the Company from its competitors. *See* ¶111 (emphasizing that Syneos's "culture" was a "key differentiator" that would drive "customer success"); ¶112 ("Our model, people, and culture are our competitive advantage."). Such statements are not puffery. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (statements made to "reassure . . . investors" not puffery); *In re BHP Biliton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (statements made to reassure the public "about matters particularly important to the company and investors . . . may become material to investors," and cannot constitute puffery). *See also* Pls.' App. B.

### 6.    Defendants' Statements Are Not Protected by Risk Warnings

Instead of addressing the well-pleaded allegations in the SAC, Defendants offer their own version of the facts and claim that "the Company repeatedly emphasized the uncertainty of its backlog projections." MTD at 3-4 (Exs. 3 at 30; 10 at 35; 15 at 28; 20 at 29; 24 at 30; 28 at 36; 33 at 27; 36 at

---

[5] Moreover, the fact that many of the challenged statements were made directly to securities analysts support their materiality. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022). *See, e.g.*, ¶¶116, 137, 152, 217. Such statements "take on an entirely different meaning altogether" and become "representation[s] that a 'reasonable investor could rely on . . . as reflective of the true state of affairs.'" *Turquoise Hill*, 625 F. Supp. 3d at 223.

27). Defendants are wrong. Any purported "warnings" that accompanied Defendants' misstatements concerning the conversion of backlog into revenue are insufficient to shield them from liability. Defendants' ostensible cautionary language was insufficiently meaningful for several reasons. The purported "warning" followed the specific backlog methodology that Defendants repeatedly violated throughout the Class Period in manipulating its performance metrics and inflating its backlog. *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("'Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'"); *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (forward-looking statements are not protected if "'made with actual knowledge'" of falsity).

This Court should also reject Defendants' suggestion that they informed investors that "reductions in reimbursable expenses were negatively impacting its revenues." MTD at 4-5. Defendants again try to change the narrative and insert their own version of the facts.[6] As alleged in the SAC, Defendants were telling investors there was "no question" reimbursable expense revenue would "come back up to some extent," which is alleged to be a false statement because they knew reimbursable expenses in backlog were inflated. ¶47.

### 7.    Defendants Did Not "Promptly" Disclose the Fraud, and Their Admissions Further Support Scienter and Falsity

This Court should also reject Defendants' attempt to offer their own innocuous version of the disclosure of the fraud. Rather than "promptly" report bad developments in 2022 (MTD at 6-8), Defendants did the exactly opposite. Defendants concealed known operational turmoil and inflated the Company's performance metrics so that insiders could sell their shares at inflated prices in 2020

---

[6] Defendants' repeat of their argument that "Syneos grew revenues" in 2021 (MTD at 2) continues to miss the point. Plaintiffs do not allege that Syneos's revenue numbers themselves were misstated; instead they allege that Defendants made false disclosures about how much business the Company had under contract at that time, which was used by investors and analysts to measure the Company's performance and evaluate the health and growth of the business.

and 2021.  Then, in 2022, Defendants gradually disclosed problems they knew had existed for years through a series of partial disclosures, starting with the reimbursable expenses write-off in February 2022.  ¶¶92-93, 197-206.  And ultimately, with less than 3 weeks remaining in 3Q 2022, Defendants pre-announced earnings that were wildly different than the actual results reported in November 2022.  While Defendants claim they were "'*surprise[d]*'" by the negative developments, securities analysts found this sentiment to be "*frankly hard to believe*," and not "*reasonable*," especially considering the magnitude by which Syneos's business deteriorated.  ¶318.  Indeed, one analyst reported that the Company's reported figures in November 2022 "*strain[ed] credulity*."  ¶318.  Aware of the operational failures and having inflated backlog and manipulated the performance metrics each month and quarter throughout the Class Period (*e.g.,* ¶¶264-275), Defendants' claim that they "promptly" disclosed the truth is simply not plausible.

Defendants' further suggestion that there is nothing to be gleaned from their admissions also fails. MTD at 14.  After revealing an "unprecedented" decline in new business awards *nearly 90% below* market expectations and a *14% reduction* in backlog (¶235), Syneos admitted that structural and operational problems had plagued the clinical business since the beginning of the Class Period, resulting in an inability to be competitive and win business.  *See* ¶¶236-239, 242-244.  Defendants' knowledge of these adverse facts throughout the Class Period is corroborated by the experiences of former Syneos employees (¶¶61-68, 71-91) and is entirely consistent with the substance of Defendants' monthly ELT meetings and the January 2021 ELT presentation.  ¶¶6-7, 57-60, 69.  Moreover, Defendants' admissions are directly contrary to statements highlighting the Company's workforce, culture, technology, capabilities to run clinical trials (¶¶108-112), and statements praising the Company's success and engagement with customers.  ¶¶122-127, 130-133.

Defendants' contention that Plaintiffs have "reverse engineer[ed]" a fraud (MTD at 14) similarly fails.  Plaintiffs are not "pleading fraud based on changed circumstances that were unforeseen

- 14 -

by defendants at the time they made their statements." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007).  The adverse facts and circumstances finally revealed after Class Period (¶¶235-244) had existed throughout the Class Period and Defendants were "responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309.  *Compare* ¶244 (admission that Syneos's deficient technology had resulted in "competitive gaps") *with* ¶¶60-63 (January 2021 ELT Presentation and witness observations detailing that Syneos's technology failures had existed *during* the Class Period).  Therefore, Defendants "hindsight" argument fails.  *See San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *9 (S.D.N.Y. May 1, 2024) (post-class period statements supported scienter); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (post-class period statements and witness "observations" supported securities fraud claims, rejecting Defendants' argument that the allegations were "grounded in hindsight").

### 8.    The SAC Adequately Pleads Defendants' False Statement Issued in Violation of Item 303 of Regulation S-K

To plead Item 303 claims, *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024) requires that plaintiffs tie the disclosure obligation to Defendants' misstatement or "half-truth." *See Macquarie*, 601 U.S. at 266 ("private parties remain free to bring claims based on Item 303 violations that create misleading half-truths.").  The SAC conforms with *Macquarie*'s by tying Defendants' Item 303 violations with their affirmative false and misleading statements, including the false performance metrics that violate the Company's stated methodology for calculating backlog.  ¶¶166, 174, 183, 194, 209, 221, 234.  For example, the SAC alleges that Defendants violated Syneos's internal backlog methodology that was reported in every Form 10-Q and 10-Ks and Defendants failed to disclose the known trend that the Company's backlog had been inflated and performance metrics had been manipulated in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii).  *See, e.g.*, ¶154 (identifying false statements in Syneos's Form 10-Q (at ¶¶147-149) that violate Item 303's disclosure obligation); *Sjunde AP-Fonden v. General Electric Company*, 2024 WL 2124504, at *1 (S.D.N.Y. May 10,

- 15 -

2024) (sustaining Item 303 claims where "the gravamen of Plaintiffs' claims is that 'Defendants' Item 303 omissions rendered GE's Class Period financial disclosures' . . . 'materially misleading.'"). Nothing more is required.

### B.    Plaintiffs Allege a Cogent and Compelling Inference of Scienter

Scienter may be established by showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *13 (S.D.N.Y. Mar. 29, 2024). The inquiry is holistic; courts must consider "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." *Id.* Here, both prongs are satisfied.

#### 1.    Defendants Were Aware of and Involved in the Fraudulent Scheme and They Knew Their Public Statements Were False

Securities fraud claims suffice to state a claim when Plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Dentsply*, 2024 WL 1898512, at *6 (*citing Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020)).  Plaintiffs have done so here.

Defendants knew or were reckless in not knowing that Syneos's clinical business was neither heathy nor growing.  Indeed, by the beginning of the Class Period, Defendants were aware that Syneos was having major problems with its top clinical customers.  Defendants knew that two large pharma clients (Bristol Myers and GSK) had previously refused to provide new business to Syneos and the Company had serious problems with its largest client, Pfizer, because of quality and data problems. *See*, *e.g.*, ¶¶56-60, ¶128(c) and (d), ¶¶249-250.  Each Defendant was a member of the ELT and attended monthly ELT meetings, including a January 2021 ELT meeting during which Defendants were specifically warned that three large clients had put Syneos's business awards on "hold," and nearly all of the rest of its top accounts (worth $1 billion annually) were in jeopardy.  They were also informed

that Syneos was unable to secure new business until it addressed its lack of a "*quality culture*," cured its "*delivery failures*," and "*earned back trust*." ¶¶6, 69, 327.  As such, while Defendants were telling investors that, *e.g.*, Syneos had "*a record pipe in the SMID [and] record sales in the SMID for Q3*" (¶125) and "*we're growing our share in large pharma*" (¶127), they were acutely aware that their statements were false.

The SAC also sets forth detailed allegations explaining how Defendants and other senior executives "bull[ied], "demanded" and "pressured" the business units and finance professionals to manipulate the Company's performance metrics and create the appearance of revenue generating projects.  ¶¶71-91; *see also, e.g.*, ¶80 (discussing Colvin's directives to "find" revenue after the Q2 2021 had closed); ¶¶271-73 (discussing Meggs' and Colvin's involvement in weekly sales calls and monthly finance meetings, organized by therapeutic area).  The Company's entire sales organization reported on and received weekly email updates on each unit's tracking to financial targets, and Keefe and Colvin personally participated in sales calls and finance meetings during which efforts to manipulate backlog and prematurely recognize revenue were discussed.  *See Dentsply*, 2024 WL 1898512 at *8 (defendant attended meetings where the defects were discussed); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) (conversations and attendance at meetings show "access to and actual knowledge of facts").  Defendants handed down their directives to manipulate performance metrics during these meetings "every quarter during the Class period."  ¶¶71, 78.  In addition to these damaging allegations, the SAC also identifies specific instances where Defendants successfully inflated backlog.[7]  With these allegations, the SAC demonstrates Defendants' severe recklessness, if not actual

---

[7]  *See, e.g.*, ¶73 ($300 million booked into revenue annually from an FSP agreement with GSK even though Syneos was ever only able to generate $20 million in annual revenue); ¶76 ($100 million "performance bonus improperly booked into backlog); ¶77 (two cancelled $25 million oncology projects included and maintained in backlog).

knowledge. *See Dentsply*, 2024 WL 1898512, at *11 (strong inference of scienter where defendants' "direct reports executed the scheme.").

### 2. Defendants' Own Statements, Senior Roles, the Magnitude of the Fraud, and the Core Nature of the Clinical Business All Buttress Plaintiffs' Scienter Allegations

Defendants' own statements, their senior roles within the Company, the magnitude of the fraud, and the core nature of the clinical solutions business further buttress Plaintiffs' scienter allegations. As in *Dentsply*, "Defendants' own statements suggest that they had access to – and reviewed – [contrary] information." 2024 WL 1898512, at *9.[8] Defendants Macdonald and Meggs, for example, spoke about their "good" "visibility" into the Company's pipeline. ¶¶255-62. *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (upholding scienter allegations where defendants told investors that they had "'visibility in the inventories'").

Moreover, the magnitude of the alleged fraud, in conjunction with the fact that the fraudulent scheme centered on the Company's core clinical business, provides further support for a strong inference of scienter. *See, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (statements about company's "'primary profit engine' . . . moves the needle in Plaintiffs' favor"). The magnitude of the alleged fraud here is startling by any measure: bookings were **one-tenth** of the market expectations, a near $1 billion miss. ¶¶20, 97, 237. *Dentsply*, 2024 WL

---

[8] *See CarLotz*, 2024 WL 1348749 at *15 (defendants' statements suggested they had contemporaneous access to information about the company's inventory). If, on the other hand, Defendants did not know these facts but spoke as if they did, they were deliberately reckless in persistently speaking about them. *Novak*, 216 F.3d at 309. Indeed, Defendants repeatedly engaged in depth with investors and analysts on these issues. ¶¶256-261. *See also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (summary order) (scienter alleged where, among other allegations, "inventory levels . . . w[ere] key to measuring Celestica's financial performance and w[ere] a subject about which investors and analysts often inquired").

1898512, at *8 ("core-operations doctrine and the magnitude of the" fraud contributed to an inference of scienter where company adjusted its accounts by 3% to 24%).[9]

### 3.      Defendants' Insider Trading Supports Scienter

Plaintiffs also plead motive and opportunity which is sufficient to show scienter. *See Tellabs*, 551 U.S. at 325.[10] Motive is generally shown when – as alleged here – corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit. *Novak*, 216 F.3d at 307-08. Defendants' sales here were unusual in both timing and amount.

Defendants' claim that their frenzied $16 million in stock sales over an eight-month period were not "significant" strains credulity. Opp. at 18. From the beginning of the Class Period until July 2022, the Individual Defendants sold 209,000 shares reaping $16.7 million in proceeds. ¶¶277-300. Keefe and Colvin sold all or nearly all of their shares (¶¶294, 297); Macdonald sold 53% of his shares (¶282); and Meggs sold 80% of his shares (¶288). Sales of this magnitude support an inference of scienter. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (selling approx. 40% of holdings sufficient to establish motive). Moreover, the illicit trading was not isolated to a single defendant – every single defendant (and at least one other senior insider (Olefson) with access to the adverse information) engaged in rampant selling. ¶¶276-310. *See also George v. China Auto. Sys., Inc.*, 2012 WL 3205062 at *10 (S.D.N.Y. Aug. 8, 2012) (four of seven defendants sold 50% of holdings and two of the remaining three defendants sold over 25% of their shares was indicative of scienter).[11]

---

[9] The abrupt departures of four senior executives further supports a strong inference of scienter. *See, e.g.*, ¶319; *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) ("timing" of "resignations, in relation to the magnitude of corrections" of financial statements "also can be a strong inference of scienter") (collecting cases).

[10] *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed . . .").

[11] Defendants' claim that they "increased their holdings" is based on including their **unvested** RSU grants comprised of restricted, zero-dollar stock grants that did not vest until after the Class Period

Defendants' trading during the Class Period varied dramatically from their pre-Class Period trading. Meggs and Colvin completely shifted from increasing their positions to heavily selling their holdings. ¶¶280, 287, 293, 298. Macdonald's sales tripled (¶280), while Keefe's sales increased six-fold. ¶297. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) ("'the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information'").[12]

Defendants' argument that their sales were made pursuant to 10b-5 plans is misplaced. MTD at 18-19. "Where (as here) 10b5-1 trading plans are entered into during the class period, they 'are not a cognizable defense to scienter allegations on a motion to dismiss.'" *China Auto.*, 2012 WL 3205062, at *9. Here, Defendants Macdonald, Meggs, and Keefe all began selling just weeks after amending their trading plans. ¶¶279-281, 286-288, 292-294.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant any portion of the motion, Plaintiffs respectfully request leave to amend. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415-16 (S.D.N.Y. 2019).

DATED:  July 12, 2024

s/ Henry Rosen
HENRY ROSEN

---

ended. Only shares available for sale are probative of scienter; one cannot sell shares they do not yet possess. *Rothman v. Gregor*, 220 F.3d 81, 94 (2d. Cir. 2000) (only "'[t]aking into account [defendant's] vested options'"). Similarly, Defendants cannot brush aside the massive $3 billion in insider selling by other Syneos insiders. ¶¶276, 301-309. *See Stevelman*, 174 F.3d at 85 (finding "'inference of bad faith and scienter'" where defendant and "several other insiders unloaded large positions"); *see also Scholastic*, 252 F.3d 63 at 75 ("'number of insiders selling'" is relevant to scienter).

[12] Defendants also argue that because they did not dump their shares at the Class Period high there is no motive. Regardless of whether they felt they left money on the table the magnitude and timing of their Class Period sales supports a strong inference of scienter. ¶¶283, 290, 295, 299. *Cf. S.E.C. v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) ("a reasonably smart fellow . . . would want to sell at an opportune, but perhaps not the most opportune, time, if only to avoid more suspicion than his behavior was already bound to attract.").

Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven Jodlowski (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
4747 Executive Drive, Second Floor
San Diego, CA  92121
Tel.:  619-923-3939
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
hfarah@dicellolevitt.com

Jarett Sena
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY  10017
Tel.:  646-933-1000
jsena@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
Tel.:  312-214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
1101 17th Street, NW, Suite 1000
Washington, DC  20036
Tel.:  202-975-2288
rpierce@dicellolevitt.com

*Counsel for Lead Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 12, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<u>S/ HENRY ROSEN</u>
HENRY ROSEN

DiCELLO LEVITT LLP
4747 Executive Dr., Suite 240
San Diego, CA  92121
Telephone: 619/963-2406
E-mail: hrosen@dicellolevitt.com

- 1 -