UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), <br><br> Plaintiffs, <br><br> -against- <br><br> SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, JASON MEGGS, and PAUL COLVIN, <br><br> Defendants. | 23-cv-8848 (AS) <br><br> ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Syneos Health, Inc. is a biopharmaceutical solutions company that works with pharmaceutical companies to test new products and bring them to market. Plaintiffs allege that Syneos and its executives misrepresented the company's post-pandemic recovery and fudged key performance metrics, violating Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5.

The Court dismissed the first amended complaint on April 25, 2024, holding that plaintiffs had failed to plead their claims with particularity. Instead, they engaged in prohibited "puzzle pleading" that prevented the Court from "meaningfully evaluat[ing] whether [d]efendants' statements were plausibly false or misleading or whether there is a strong inference that they acted with scienter." *Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL 1805011, at *1–2 (S.D.N.Y. Apr. 25, 2024). The complaint left the Court "to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." *Id*. at *2. The Court noted that "[r]elying on the Court to apply four pages of less-than-specific facts to many paragraphs of supposedly misleading statements 'does not comport with [the Second Circuit's] exhortation that plaintiffs "must demonstrate with specificity why and how" each statement is materially false or misleading.'" *Id*. (alteration in original) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012), which itself quoted *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

The problem could not be "easily overlooked" because "[t]he class period cover[ed] several years, defendants, mergers, and financial filings," and the "company's performance—and what [d]efendants knew about it—was changing all the time." *Id*. (noting that "[p]laintiffs' approach flattens th[e] timeline"). While the Court gave plaintiffs leave to amend, it emphasized that an amendment "must identify (1) specific statements (usually not more than a few sentences), (2) contrary facts at the time of each statement, and (3) facts raising an inference of [d]efendants' scienter with respect to (2)." *Id.* Furthermore, the Court instructed plaintiffs to "organize their complaint in the way that a court would analyze it, with headings for each category of allegedly false or misleading statements." *Id.*

In the second amended complaint (SAC), plaintiffs didn't come close to addressing these issues. Because the Court is giving plaintiffs one final chance to amend, and because apparently its prior instructions weren't clear enough, here's even more specific guidance on at least some of the problems:

*First*, the complaint doesn't address each statement on its own terms, explaining why that statement was false or misleading when made and why defendants knew or should have known that. Instead, the complaint continues to block quote multiple statements at a time, highlighting numerous lines in each. *See, e.g.,* Dkt. 57 ¶¶ 100–05; ¶¶ 108–12, 114–19; ¶¶ 122–27, 130–33, 136–42; ¶¶ 146-52, 158, 160–64, 168–72, 176–81, 185–92; ¶¶ 198–206, 211–17, 219, 229, 230–31. These statements aren't all the same, but because the complaint doesn't address each statement separately, the Court is asked to deconstruct the complaint to figure out which parts of which statements are potentially actionable. Plaintiffs' throw-everything-at-the-wall approach is inconsistent with the PSLRA's particularity requirements. Any amended complaint should address each statement individually. Given that the complaint currently includes over a hundred allegedly misleading or materially false statements, constructing an amended complaint that passes muster may require leaving certain statements on the cutting-room floor and focusing on a more specific set (for instance, ten of the statements plaintiffs believe are the most damning). For each statement, plaintiffs must have a good faith belief, consistent with counsel's Rule 11 obligations, that the statements were specific enough to engender reliance; aren't opinions, puffery, or protected forward-looking statements; were false or misleading at the time they were made; and as to which the PSLRA's particularity requirements regarding falsity and scienter are satisfied.

*Second*, the complaint addresses falsity and scienter as to each grouping of disparate allegations in a sprawling multi-page and multi-part paragraph. In each iteration, the paragraph doesn't engage with the substance of any specific statement, but instead trades in generalities while citing back to the same blocks of paragraphs in the complaint's 43-page background section. *See id.* ¶ 106; ¶¶ 113, 120; ¶¶ 128, 134, 143; ¶¶ 153, 165, 173, 182, 193; ¶¶ 208, 220, 233. Plaintiffs' approach is inadequate where, as is the case here, the challenged statements are "not only varied but . . . broad and multifaceted and, at times, complex." *Plymouth Cty. Retirement Ass'n v. Array Tech., Inc.*, 2023 WL 3569068, at *9 (S.D.N.Y. May 19, 2023). Further, there are substantive issues with plaintiffs' cut-and-paste falsity and scienter allegations:

Plaintiffs rely heavily on a few slides from a presentation shown in January 2021 to the Executive Leadership Team, which included the individual defendants. The SAC describes this presentation as "ma[king it] clear that [Syneos] forecasted an approximate 16%–23% decline" and "knew its work with SMID customers was cratering," that "many . . . key accounts were in serious jeopardy," and that "Syneos's quality issues and data limitations were having devastating consequences." Dkt. 57 ¶¶ 58–60, 69. But the complaint does not connect any of these broad conclusions to specific alleged misstatements, nor does it show how the more specific information contained in screenshots of three slides demonstrates the falsity of defendants' statements. It's not even clear from the screenshots (and plaintiffs never explain) what the scope of the presentation was or what the cited numbers mean. Do the slides report on the company's entire business or "one client team that manages . . . just 16 clients," as defendants claim? Dkt. 59 at 13 (emphasis removed). What is "GCS," and what does it mean for a client to be "covered by GCS"? Dkt. 57 ¶ 59. What are the "21–50 20 Accounts," and how does the -23.3% growth rate for the "21–50 20 Accounts" in the clinical and commercial businesses map onto Syneos's SMID clients as a group? *Id.* Were the 456 open corrective and preventive actions for GCS accounts higher than usual? *Id.* ¶ 60. And were the quality issues displayed in the slides for Syneos's large pharma clients also affecting its SMID clients? *Id.* At first glance, much of what the slides show seems alarming: negative growth rates, the need for hundreds of corrective and preventive actions, and a few clients on hold or at risk. But to demonstrate that statements made by defendants were false, plaintiffs need to do more than just show that some issues existed in some parts of the company. They need to explain what specific facts mean and then show why those specific facts contradicted specific statements.

Next, plaintiffs allege that Syneos "manipulated and inflated backlog by including [in backlog] $300 million for" a "contract entered into with [GlaxoSmithKline] in late 2019" even though the contract "generated only $20 million in actual revenue per year." *Id.* ¶ 73. But strangely, elsewhere the SAC describes this as a "$400 million" contract, *id.* ¶ 58, and then a "$600 million" contract, *id.* ¶ 128(d). Plaintiffs never seem to be able to pin down exactly how much the GSK contract promised Syneos. They also reference the GSK contract as a functional service provider (FSP) contract in some parts of the SAC, and then as an "FPO" (an acronym never defined in the SAC) contract in others. *Id.* ¶¶ 73, 153(a). The contract type matters because it describes the scope of Syneos's work, the backlog calculation is different for FSP contracts, and defendants' statements often distinguish between FSP and other contracts. But plaintiffs don't bother to figure out what exactly the GSK contract was. Or maybe there were two GSK contracts? Requiring that plaintiffs explain why each statement was false or misleading and the relevance of the GSK contract to the specific statement made, while taking account of the critiques raised in defendants' briefing, will reveal whether there were truly actionable misstatements made by defendants during the class period.

Finally, plaintiffs make hay about Syneos's handling of reimbursable expenses, which they say were also used to "inflate backlog." *Id.* ¶ 81. It was a shock to the market, the SAC claims, when Syneos disclosed on February 17, 2022 that 36% of the backlog was reimbursable expenses,

including some that would not be collected. *Id.* ¶¶ 92–93. But plaintiffs also suggest in the SAC that it was well-known to analysts and investors that the reported backlog included reimbursable expenses, *id.* ¶ 43, and they don't explain why the percentage of backlog attributed to reimbursable expenses and the magnitude of uncollectible expenses would be surprising. The SAC alleges that defendants "knew they would never collect" some of the reported reimbursable expenses, but how much of the reimbursable expenses? *Id.* ¶ 153(b). And when did defendants know that some portion would be uncollectible? Plaintiffs' fuzzy numbers problem also plagues their analysis of reimbursable expenses: at one point, the SAC claims that "36% of Syneos's backlog was uncollectible reimbursable expenses." *Id.* ¶ 319. The SAC says that defendants announced these expenses to be around $3.8 billion, *id.* ¶ 198, but elsewhere in the SAC plaintiffs say that the uncollectible number was $850–$950 million, *id.* ¶ 92. Quite a disparity. Plaintiffs seem to think that the mere fact of the February 2022 disclosure means that a misstatement was necessarily made at some point, so nothing more is needed to show why statements related to reimbursable expenses were intentionally false. This is inconsistent with the PSLRA's requirements. On falsity and scienter, plaintiffs' amended complaint must account for these issues and take stock of the arguments that defendants have raised in their briefing. Ignoring these arguments will be at the plaintiffs' peril.

## CONCLUSION

The Court would be within its discretion to dismiss the complaint with prejudice. *See Celli v. Cole*, 699 F. App'x 88, 89 (2d Cir. 2017) (concluding that denying leave to amend was appropriate where a plaintiff "refused to follow . . . the District Court's instructions"). But it's unclear whether or not there's a viable case lurking underneath the surface. The complaint's prolixity gets in the way of that determination. Given the Second Circuit's "preference for resolving disputes on the merits" where possible, *Brien v. Kullman Indus.*, 71 F.3d 1073, 1077 (2d Cir. 1995), the Court will provide plaintiffs one final chance to amend. The amended complaint must be filed within 21 days, with any motion to dismiss to be submitted within 21 days of that filing.

For these reasons, the motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate Dkt. 58.

SO ORDERED.

Dated: March 28, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

4