UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, PAUL COLVIN, and JASON MEGGS,<br><br>Defendants. | Civil Action No. 1:23-cv-08848-AS<br><br>THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


Page

I. SUMMARY OF THE FRAUD ....................1

A. Defendants Falsely Stated that the Company Had a Competitive Advantage Because of Its Innovative and Integrated Product Offering that Was Resonating with Customers ....................4

B. Defendants Violated the Company's Stated Backlog Methodology to Falsely Portray the Company as Healthy and Growing ....................8

C. Defendants Reported False and Misleading Performance Metrics, Including Backlog, New Business Awards, and Book-to-Bill Ratios ....................10

II. JURISDICTION AND VENUE ....................13

III. PARTIES ....................14

A. Lead Plaintiffs ....................14

B. Defendants ....................15

IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................21

A. Defendants Made Materially False and Misleading Statements that the Company's Innovative Product Was Resonating with Customers and Gave Syneos a Competitive Advantage ....................22

1. Statement No. 1: Defendants Made Actionable Misstatements and Omissions Regarding the Company's SMID and Large Pharma Customers ....................22

2. Statement No. 2: Defendants Made Actionable Misstatements and Omissions About the Strength and Growth of the SMID and Large Pharma Segments ....................27

3. Statement No. 3: Defendants Made Actionable Misstatements and Omissions About Syneos's "Competitive Advantage" ....................28

4. Statement No. 4: Defendants Made Actionable Misstatements and Omissions Concerning Syneos's "Trusted Process" and "Extraordinary Value" ....................30

5. Statement No. 5: Defendants Made Actionable Misstatements and Omissions About the Synteract Acquisition ....................31

6. Statement No. 6: Defendants Made Actionable Misstatements and Omissions About Syneos's Backlog and Oncology Awards ....................33

7. Statement No. 7: Defendants Made Actionable Misstatements and Omissions About Syneos's "Integrated Capabilities" and Strategy ..........33

8. Statement No. 8: Defendants Made Actionable Misstatements and Omissions About the Company's Strategy and the Product Offerings Powering Growth....................................................................38

9. Statement No. 9: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Backlog Growth and SMID Business ...............................................................................................41

10. Statement No. 10: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Large Pharma and Oncology Growth.......................................................................................43

11. Statement No. 11: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Success with Large Pharma and SMID Clients ........................................................................45

B. Defendants Made Materially False and Misleading Statements About the Manner in Which the Company Accounted for Backlog and Reported Its Performance Metrics.................................................................................46

1. Statement No. 12: Defendants Made Actionable Misstatements and Omissions Concerning Syneos's "New Business Awards and Backlog" Methodology........................................................................46

2. Statement No. 13: Defendants Made Actionable Misstatements and Omissions About Compliance with the Company's "New Business Awards and Backlog" Methodology ........................................50

C. Defendants Made Materially False and Misleading Statements Regarding the Company's Reported Performance Metrics...............................................51

1. Statement No. 14: Defendants Reported False and Misleading Backlog and Performance Metrics for Q4 and Year End 2020 .................52

2. Statement No. 15: Defendants Reported False and Misleading Backlog and Performance Metrics for Q1 2021 .......................................56

3. Statement No. 16: Defendants Reported False and Misleading Backlog and Performance Metrics for Q2 2021 .......................................58

4. Statement No. 17: Defendants Reported False and Misleading Backlog and Performance Metrics for Q3 2021 .......................................62

V. AFTER LIQUIDATING THEIR SYNEOS HOLDINGS, DEFENDANTS' SCHEME SLOWLY UNRAVELS ....................65

A. Syneos's Backlog Remained Inflated as Defendants Slowly Revealed the Truth....................65

B. Statement No. 18: Defendants Made Actionable Misstatements and Omissions During the Company's April 29, 2022 Conference Call ....................69

C. Defendants Reveal the Truth About Syneos's Inability to Compete and Its Inflated Backlog....................70

VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER....................76

VII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ....................100

VIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE....................101

IX. LOSS CAUSATION/ECONOMIC LOSS ....................103

X. CLASS ACTION ALLEGATIONS ....................110

XI. PRAYER FOR RELIEF ....................116

XII. JURY DEMAND....................117

Kempen International Funds (Kempen International Funds - MercLin Global Equity) ("KIF – MercLin Global Equity"), Kempen International Funds (Kempen International Funds - MercLin Patrimonium) ("KIF – MercLin Patrimonium"), and MercLin Institutional Fund (MercLin Institutional Equity Fund DBI-RDT) ("MercLin DBI-RDT") (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, their counsel and their independent investigation.[1]

## I. SUMMARY OF THE FRAUD

1. Lead Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons

[1] This investigation included, but was not limited to, a review and analysis of: (i) Syneos Health, Inc.'s ("Syneos" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Syneos's public conference calls and presentations; (iii) Syneos's press releases and media, and research reports regarding Syneos; (iv) pricing and volume data for Syneos's common stock; (v) interviews with former Syneos employees who were at the Company during the Class Period, including Senior Project Manager(s), Manager(s), Project Director(s), Associate Director(s), Director(s), Senior Director(s), Vice President(s), Senior Vice President(s), and Business Unit Chief Financial Officer(s) ("CFO") in the following groups or departments: Synteract, Change Management, Finance, Clinical Services, Client Services, Commercial Sales, Early Phase Clinical Operations, Project Management, Project Financial Management, Corporate Strategy, Clinical Development, Oncology, Neuroscience, Customer Insights, Global Deal Structuring, Quality Assurance, Partnership Optimization, Clinical Pricing, and Operations; (vi) internal Syneos documents; and (vii) other publicly available material and data identified herein. Counsel's investigation is ongoing, and many of the facts supporting the allegations contained herein are known only to the Defendants named herein or are exclusively within their custody and control. Lead Plaintiffs believe and are informed by their interviews with former Syneos employees that substantial additional evidentiary support exists for the allegations set forth herein and will be confirmed after a reasonable opportunity for discovery.

or entities (the "Class") who purchased or otherwise acquired the publicly traded common stock of Syneos between September 9, 2020 and November 3, 2022, inclusive (the "Class Period").

2. Syneos is a biopharmaceutical solutions organization providing contract research and commercial services to help biopharmaceutical companies test and develop their products. Syneos arose from the 2018 merger of INC Research Holdings, Inc. ("INC Research") and inVentiv Health, Inc. ("inVentiv Health") and grew through a number of successive acquisitions. The Company marketed itself as an integrated "end-to-end" biopharmaceutical solutions provider, with services that spanned from early-phase clinical trials in its Clinical Solutions division ("Clinical Solutions segment" or "clinical segment") through the commercialization of a product in its Commercial Solutions business unit.

3. The problem was that the merger to form Syneos was a disaster. Syneos's quality problems detrimentally affected its ability to win new business from its small to medium clients ("SMID") and with its large clients, some of the world's largest pharmaceutical companies (hereinafter referred to as "large pharma"). In July 2019, in an email to investment bank Jefferies, Syneos acknowledged that its business was not sustainable, with the intent to find a buyer for the Company or take it private. Between 2017 and 2019, at least two of its large pharma clients, Bristol Myers Squibb and GlaxoSmithKline ("GSK") – who typically hired Syneos using functional service provider ("FSP") agreements – refused to give the Company new awards until they were satisfied that devastating clinical issues, quality problems, and service failures were addressed.[2]

[2] FSP contracts focus on outsourcing specific functions like data management or site monitoring. Within an FSP award, multiple contract research organizations ("CRO") are typically assigned or awarded portions of a study or clinical trial based on a specific function. Full-Service Outsourcing or "FSO" contracts involve a CRO managing an entire study.

4. All of these problems were well-known inside the Company at the highest level as senior executives including Defendants Alistair Macdonald, Jason Meggs, Michelle Keefe and Paul Colvin attended monthly executive leadership team ("ELT") meetings during which the corporate quality department kept them well-informed regarding the quality problems threatening Syneos's relationships with its customers. During the ELT meetings, Defendants learned that: (i) quality issues were reported late at Syneos and were not communicated in a timely fashion to the Company's clients; (ii) Syneos's audit inspections and root cause analyses had not been effective in correcting the recurring quality issues; and (iii) quality was not embedded in the day-to-day execution at the Company. The Company's quality issues had a devastating impact on its ability to win and obtain new and repeat business its 15 largest customers and its bread and butter SMID customers alike.

5. As a result of the devastating operational problems, the Company's private equity sponsors, TH Lee and Advent, and Defendants were desperate to convince the market that Syneos had escaped the COVID-19 pandemic unscathed so that they could exit their personal investment and dump billions of dollars' worth of Syneos stock at high prices.

6. To achieve this, Defendants issued false and misleading statements and made material omissions by telling investors that Syneos's advanced technology, superior workforce, and strong corporate culture gave it competitive advantages which uniquely positioned the Company to successfully compete for and win new business. §IV.A.

7. In addition, Defendants issued false statements and omitted material information they were obligated to disclose regarding the methodology Syneos used to accrue new business to the Company's backlog. §IV.B. Lastly, because securities analysts and investors were hyper-focused on whether Syneos was actually growing its clinical trials business, Defendants made false and misleading statements and made material omissions regarding Syneos's performance metrics, such

that Syneos was able to report multiple quarters of strong book-to-bill ratios over 1.0x for the Clinical Solutions segment which was designed to give investors the false impression that Syneos's business was booming when in fact exactly the opposite was true.[3] §IV.C. Unfortunately for investors, the rosy story of Syneos's resurgence was a lie.

### A. Defendants Falsely Stated that the Company Had a Competitive Advantage Because of Its Innovative and Integrated Product Offering that Was Resonating with Customers

8. To deceive investors and falsely convince them that Syneos was winning new business, Defendants lied that Syneos had an innovative product that was resonating with customers of all sizes and that the Company had a competitive advantage. For example, on September 9, 2020, when the Class Period begins, during an investor conference, Defendants Macdonald and Meggs discussed a slide which highlighted Syneos's "three consecutive quarters of greater than 1.40x Clinical book-to-bill," its "Leadership Position in High-Growth SMID/Biotech" and that the Company was "Successfully Penetrating Large Pharma." And on December 8, 2020, during the Company's Analyst and Investor Day, Defendant Meggs stated that "Our model, people, and culture are our competitive advantage."

9. Defendants' statements during the Class Period that Syneos's technology was a competitive advantage were blatantly false when made because in truth, the Company operated at a severe disadvantage. For example:

- Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed, by 2021, the Company had 11 separate accounts receivable systems and nine separate accounts payable systems. This made the process for customers to pay their bills or be invoiced a logistical nightmare.

---

[3] The book-to-bill ratio evaluates a CRO's ability to replenish its backlog with new business by comparing net new business generated in the period to revenue recognized in the period. A ratio of greater than 1.0 signifies backlog growth and a ratio below 1.0 signifies backlog contraction.

- The Clinical Trial Management Systems used at Syneos were generic and did not allow for any client customization.

- Syneos simply lagged its peers in providing remote and decentralized clinical capabilities, such as certain data visualization and statistical modeling capabilities, and the Company struggled to catch up to its peers in the new business environment.

- The Company lacked a centralized network for communicating via email between its worldwide locations, and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.

- Syneos lacked an integrated client portal, a basic feature other CROs offered to their clients so they could access their clinical trial data and performance metrics instantaneously.

- Defendants were well-aware of the lack of a client portal and the other system deficiencies that prevented any client customization. Defendant Macdonald was the executive sponsor of a portal initiative and only in the first fiscal quarter ("Q1") 2022, as Macdonald was stepping down as Chief Executive Officer ("CEO"), did Syneos launch "Clinical Reimagined" an initiative to develop a portal. By the end of the Class Period, however, the Company still had not launched an integrated client portal.

10. In addition to the technology gaps and lack of investment in infrastructure, Syneos's operations were critically impaired by the Company's inability to generate quality useable data on a timely basis for its clinical trial customers. Syneos's quality problems included:

- The Company was plagued by a toxic work culture because of workforce reductions, leadership, operation changes, and labor force turmoil.

- Senior management at Syneos, including Defendant Meggs and his direct report Bekki Brown, created a bullying workplace culture combined with a lack of training so that new hires were "thrown to the wolves" and given "zero guidance."

- The toxic workplace culture exacerbated the Company's horrible turnover throughout the Clinical segment, which then snowballed into more problems such as delays in responding to customers, data quality issues, and a loss of business. As a result, Syneos was unable to generate quality useable data for its clinical trial customers.

- Customers complained that manual reports (because the Company did not have a client portal) received after long delays from Syneos had to be redone. Customers also complained that their projects lacked adequate staffing to conduct clinical trials and as a result Syneos lost customers in droves and ruined its reputation.

11. In 2021, Defendants continued to issue false and misleading statements and made material omissions regarding Syneos's clinical trial capabilities and that the Company was having success with SMID and large pharma customers alike. For example, on January 13, 2021, during the JP Morgan Conference, Defendant Macdonald told investors that "The employees from Synteract have been fantastic. They've settled in very quickly, and we're seeing good performance from them from day 1. . . We have enhanced our SMID position with the acquisition of Synteract." Yet, following completion of the Synteract acquisition in December 2020 – an acquisition that was to enhance Syneos's position across the SMID category, particularly in oncology, rare and orphan diseases, neuroscience, dermatology, and pediatrics – Syneos struggled to integrate Synteract and Syneos hemorrhaged Synteract employees who refused to work for the Company. The acquisition did not enhance the Company's position with SMID customers who refused to sign with Syneos because of technological deficiencies. And immediately after the acquisition closed in December 2020, former Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal, a standard in the industry.

12. Later in 2021, Defendants continued to tell investors that Syneos's business was booming with its SMID and large pharma customers. For example, Defendant Macdonald stated on September 15, 2021, at the Baird Industry Conference that "we have a very good SMID mix in the business, and we continue to have that" and "we have really good backlog growth in clinical from top 20." Defendants knew or recklessly disregarded that Syneos's strategy was not resonating with its customers, and that its operations were critically impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture.

13. Indeed in 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a hold on all of its work with Syneos. In early 2021, AstraZeneca stopped using Syneos entirely. Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data, and Syneos's relationship with GSK, with which it had signed a new agreement in late 2019, was strained to the point that Syneos could only obtain less than 10% of the FSP work it had contracted to provide beginning in 2020.

14. A January 2021 ELT presentation reviewed backlog targets for Syneos's 15 largest clients and made clear that the Company forecasted zero growth for Syneos's 15 largest accounts and forecasted a 14.4% decline excluding hundreds of millions of dollars in award value from the uncollectable GSK contract. Because the Company was hundreds of millions of dollars short of its awards target for 2021, as shown in the January 2021 ELT presentation, Defendants included $235 million in clinical award value for GSK in the 2021 backlog and increased that amount to $280 in 2021.[4] Across all top 50 accounts, constituting approximately 60% of Syneos's Clinical segment business, even with the $235 million GSK addition to backlog, the Company expected a decline in awards of -0.2% for its clinical and commercial segments and -2.7% for its clinical segment, which was the core of its business, despite telling investors and the market that Syneos's business was growing.

[4] Based on their investigation, counsel was informed that Syneos included $300 million per year from the GSK contract. Lead Plaintiffs were informed that Syneos improperly included $280 million of the $300 million in annual award value in backlog beginning in 2020 and continuing through 2021 even though the FSP contract with GSK was only generating $20 million in annual revenue for the Company. Therefore, from GSK alone, the Company's backlog was inflated by $280 million on an annual basis, or $70 million each quarter. The inflation in backlog from the GSK contract was $280 million by the end of fiscal year 2020. For each subsequent quarter during the Class Period, Defendants continued to include in backlog $70 million in award value where collection was not probable. This inflated and uncollectable award value remained in backlog until November 2022 when the Company shocked investors by announcing that Syneos had only achieved $182 million in net new business awards, one-tenth of what the market expected and an 87% year-over-year decline.

15. By the end of 2021, Defendants were still making false and misleading statements and material omissions by telling investors on November 3, 2021, that Syneos's "organic growth was driven by our full-service portfolio, including the continuing ramp-up in our larger pharma relationships, particularly in oncology" and "that we're winning a lot of oncology work." This statement was false because Syneos was not experiencing growth and was not ramping up its large pharma relationships. To the contrary, the Company's antiquated technology offerings left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. As a result, Syneos was unable to successfully compete for new business or retain renewal customers who were aware of Syneos's competitive disadvantages in technology, workforce reductions, labor force turmoil caused by a toxic workplace culture, and quality and service failures.

16. Furthermore, Defendant Macdonald's statement that Syneos was winning oncology work omitted that Syneos had two $25 million oncology contracts canceled earlier in 2021 because of the devastating quality issues plaguing the Company's clinical trial business. Defendants refused to remove those contracts from the Company's backlog despite the urging of the business unit CFO responsible for oncology to eliminate these contract awards.

### B. Defendants Violated the Company's Stated Backlog Methodology to Falsely Portray the Company as Healthy and Growing

17. In each of Syneos's Forms 10-Q and Forms 10-K issued throughout the Class Period, Defendants highlighted the "New Business Awards and Backlog" methodology Syneos used to account for new business. Defendants assured investors that new business was only included in backlog when the award was probable and that only 12 months of long-term FSP contracts would be included in backlog. The methodology also stated that Defendants would continually evaluate backlog

and remove value from backlog from canceled work or from awarded work that was no longer expected to be performed.

18. During the Class Period, on August 9, 2021, Defendant Macdonald also assured investors that Syneos was conservative in accruing awards to backlog stating: "***for FSP services, we only included 12 months of services in our bookings, even though each agreement represented an initial term of at least 3 years***." Again on September 15, 2021, he addressed the methodology, highlighting Syneos's conservative approach" stating: "***We won 3 massive FSPs in Q2. And we booked the first year of each one of them. And most of our competitors booked the whole lot***."

19. Syneos's stated "New Business Awards and Backlog" methodology, and Defendant MacDonald's statements on August 9 and September 15, 2021 were knowingly materially false and misleading when made because Syneos was not complying with its stated methodology. In each quarter during the Class Period, Syneos's backlog was inflated by several hundred million and its new business awards were overstated. To make it appear that Syneos's clinical segment was growing, when it was not, Defendants put tremendous pressure on employees to "find" numbers to fill the gaps and meet the targets. At Syneos, because of the pressure, bullying tactics, and tone from the top, orders to find it were tantamount to instructions to fake it.

20. Syneos violated its own stated policy for booking backlog from enormous contracts with large pharmaceutical companies known as FSP contracts that can have 5-year terms. To "find" the necessary value to fill the backlog hole, in 2020 the Company manipulated and inflated backlog improperly by keeping $280 million in backlog from an FSP contract entered into with GSK in late 2019 even though by end of 2020, Syneos had generated only $20 million in actual revenue from that contract. Based on Syneos's past relationship with GSK, Defendants were well aware that it was not probable that the hundreds of millions of dollars from the GSK contract the Company had in backlog

would generate any more revenue. Despite their knowledge that more revenue was not probable, Defendants nonetheless continued to improperly inflate backlog in 2021 by an additional $70 million per quarter from the GSK contract. Additionally, while Syneos assured investors and the market that it would only book to backlog one year of authorizations, Syneos routinely took three to four years' award value from its FSP agreements.

### C. Defendants Reported False and Misleading Performance Metrics, Including Backlog, New Business Awards, and Book-to-Bill Ratios

21. In addition to making false and misleading statements and material omissions that Syneos had an innovative product that resonated with all customers, a competitive advantage, and had complied with the Company's backlog methodology, Defendants falsely convinced investors that Syneos's business was booming, when in fact, it was not. From December 31, 2020 through November 3, 2022, Defendants falsely and illegally engineered the Company's new business metrics to achieve fictitiously favorable results. Defendants reported materially false and misleading backlog, net new business awards, and book-to-bill ratios by violating Syneos's stated New Business Awards and Backlog methodology. Defendants inflated these metrics by (i) including new business awards in backlog before contracts were signed or where a "written commitment" for an award was either not in place or was too vague or indefinite to be reliably added to backlog; (ii) including new or increased awards and reimbursable expenses in backlog before change orders to increase the contract that were agreed upon by sponsors, (iii) including new business awards in backlog for backdated contracts; (iv) manipulating costs to increase reported backlog; (v) failing to remove canceled and uncollectable awards from backlog; and (vi) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking in the methodology.

22. For example, by the fourth fiscal quarter ("Q4") and Year-End 2020, Defendants had artificially inflated Syneos's reported backlog by as much as $280 million by including in backlog

award value the Company knew it would never collect from GSK. Indeed, after signing an FSP contract with GSK in late 2019, Syneos booked $280 million in backlog for 2020 knowing that Syneos was just one of the providers on the FSP contract. By the end of 2020, that contract had generated no more than $20 million in annual revenue for Syneos.

23. In addition, Defendants also improperly inflated the Company's backlog by including reimbursable expenses Defendants knew they would never collect. Defendants admitted that Syneos's backlog was overstated by $850-$950 million when they announced the write off of reimbursable expenses on February 17, 2022. This write off equated to an overstatement of Syneos's book-to-bill ratio of 0.2x for the five previous quarters.[5] Based on counsel's investigation, Plaintiffs allege that throughout the Class Period, Defendants used reimbursable expenses as a sort of deceptive slush fund to achieve backlog and book-to-bill targets so that the Company could consistently report strong book-to-bill ratios. Counsel's investigation revealed that Defendants repeatedly refused to remove anything from backlog, including reimbursable expenses they knew they would never collect.

24. While hiding their accounting manipulations and the Company's critical failures in its clinical segment from investors, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021.

25. Defendants and other insiders liquidated their holdings of Syneos common stock at all-time high prices inflated by their scheme. Company insiders – including Defendants Macdonald, Meggs, Keefe, and Colvin – collected $19.2 million dollars in illicit insider trading proceeds on sales executed at artificially inflated prices. ¶¶216-248. The Individual Defendants and virtually every high-level insider with significant Syneos holdings liquidated the bulk of their tradable Syneos

[5] This means that Syneos's backlog was overstated on the basis of just uncollectible reimbursable expenses by the following amounts: $165,800,000 in Q3 2020; $169,908,000 in Q4 2020; $183,700,000 in Q1 2021; $197,325,000 in Q2 2021; and $212,600,000 in Q3 2021. *See* ¶160.

common stock holdings, in stark contrast to their pre-Class Period trading. Syneos's private equity sponsors, TH Lee and Advent, dumped millions of Syneos shares and collected in excess of $3 billion.

26. Through a series of five public stock offerings and Syneos stock repurchases agreements between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37.85 million shares for $3.04 billion in proceeds at prices as high as $81.20 per share. These outsized insider sales occurred in rapid succession over a period of just nine months and allowed TH Lee and Advent to quickly exit their entire equity stakes in the Company.

27. Ultimately, the Company ran out of ways in which to engineer favorable backlog, net new business awards, and book-to-bill ratios. On February 17, 2022, having already taken advantage of Syneos's inflated stock price by dumping the majority of their personal Syneos stock holdings at all-time highs, Defendants announced disappointing financial results for Q4 2021 and reported that approximately $850-$950 million of uncollectible reimbursable expenses had to be written off. A securities analyst with Jefferies concluded that this write-off confirmed that Syneos's previously reported book-to-bill ratios from the five previous quarters were overstated by 0.2x per quarter. Based on this revelation alone, the glowing book-to-bill ratios from 1.2 to 1.5 reported during the Class Period were falsely overstated.[6]

28. Unfortunately, this was just the tip of the iceberg, and while the Company's February 17, 2022 announcement was bad, Defendants failed to fully disclose the magnitude by which they had overstated Syneos's clinical metrics and continued to hide the underlying competitive and service failures plaguing the clinical segment. Thereafter, on April 29, 2022, the same day Syneos reported

[6] After consistently reporting book-to-bill ratios above 1.0x throughout the Class Period, Syneos reported clinical book-to-bill ratios below 1.0x for five of six quarters between Q4 2021 and the first quarter of 2023 ("Q1 2023"), the last quarter before Syneos went private. Indeed, Syneos reported clinical book-to-bill ratios of 0.34x in Q4 2021, 1.22x in Q1 2022, 0.92x in Q2 2022, 0.18x in Q3 2022, 0.46x in Q4 2022, and 0.70x in Q1 2023.

disappointing first quarter of 2022 ("Q1 2022") results and after collecting over $11 million in illicit selling proceeds, Defendant Macdonald abruptly resigned as CEO. Later, on August 2, 2022, Syneos reported second fiscal quarter ("Q2") 2022 financial results announcing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34%.

29. Finally, on November 4, 2022, Syneos reported the drastic deterioration of its business and client demand, culminating in a reported $182 million in clinical net new business awards during the quarter and an "unprecedented" Clinical Solutions book-to-bill ratio of just 0.18x – one-tenth of the expected amount (an 87% year-over-year decline). Defendant Keefe admitted in November 2022 that the Company's operations had been in disarray for at least 18 months because of staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions, and she subsequently admitted that Syneos lacked the technological offerings to "be more competitive." Defendant Keefe's admissions stand in stark contrast to Defendants' Class Period statements that Syneos had a competitive advantage from its technology.

30. Therefore, in 2022, the price of Syneos stock fell from $83.37 on February 16, 2022 to $79.36 on February 17, 2022, from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, and from $47.81 per share on November 3, 2022, to trade below $23.00 per share on November 4, 2022, down more than 77% from the Class Period high, causing Lead Plaintiffs and the other Class members to suffer billions of dollars in losses and economic damages.

## II. JURISDICTION AND VENUE

31. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

32. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

33. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the statements that form the subject of this Complaint were disseminated into this District, Defendants conduct substantial business in this District, the securities that are the subject of this action were traded on The Nasdaq Stock Market LLC (the "NASDAQ") in this District, and several public stock offerings carried out by Defendants as part of the fraudulent scheme alleged herein occurred in this District.[7] Furthermore, the underwriters of these public stock offerings, including Goldman Sachs & Co. LLC, Morgan Stanley, and BofA Securities, are headquartered in this District.

34. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

35. Lead Plaintiff KIF – MercLin Global Equity and Lead Plaintiff KIF – MercLin Patrimonium are a Luxembourg investment company with their respective compartments or sub-funds. Lead Plaintiff MercLin DBI-RDT is a Belgian SICAV with a single compartment or sub-fund. As set forth in their certifications (ECF No. 8-1), Lead Plaintiffs purchased Syneos common stock on

[7] These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 at-the-market ("ATM") public offering of more than 8 million Syneos shares sold to underwriters for the offering at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 ATM public offering of nearly 11 million Syneos shares sold to underwriters for the offering at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price.

the NASDAQ during the Class Period at artificially inflated prices and were damaged by Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

36. Defendant Syneos is a multinational CRO. Syneos maintains offices in this District at 200 Vesey Street, 39th and 40th Floor, New York, NY 10281. At all relevant times throughout the Class Period, the Company's common stock was listed and traded on the NASDAQ, an efficient market, under the ticker symbol "SYNH." As of February 9, 2023, Syneos had over 103 million shares of common stock outstanding.

37. Defendant Alistair Macdonald served as CEO of Syneos and as a member of Company's Board of Directors (the "Board") from October 2016 until April 2022, when he abruptly resigned from both positions. Prior to serving as the Company's CEO, Defendant Macdonald held various positions within Syneos and its predecessor company INC Research, including, *inter alia*, as its President, Chief Operating Officer ("COO"), and President of Clinical Development services.

(a) As CEO of Syneos, Macdonald was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Macdonald also had approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events. Additionally, Macdonald was a member of Syneos's Executive Leadership Team.

(b) As CEO and a member of the Board, Macdonald was responsible for directing Syneos's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Macdonald repeatedly held himself out as

knowledgeable about, and at no time during the Class Period did Macdonald assert that he was not aware of Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Macdonald received over $16 million in total compensation. And, during the Class Period as set forth in ¶¶217-223, Macdonald sold more than 142,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $11 million.

38. Defendant Michelle Keefe has served as a member of the Board and as CEO of Syneos following the resignation of Defendant Macdonald in April 2022. Prior to her appointment as CEO, Keefe served as President of Medical Affairs beginning in November 2021, and as President of Commercial Solutions from December 2017 to November 2021. Keefe was also a member of Syneos's Executive Leadership Team.

(a) As CEO of Syneos, Keefe is the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Keefe also has approval over and was a signatory to Syneos's SEC reporting, submitted certifications pursuant to the SOX affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CEO and President of Medical Affairs and Commercial Solutions, Keefe was responsible for directing Syneos's commercial business and business development, the Syneos One program, the Company's public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Keefe repeatedly held herself out as knowledgeable about, and at no time during the Class Period did Keefe assert that she was not aware

of Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Keefe received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶¶230-234, Keefe sold more than 18,000 shares of her Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of nearly $1.4 million.

39. Defendant Jason Meggs served as CFO of Syneos from February 2018 until his resignation from the Company in March 2023. Prior to his role as CFO, Defendant Meggs served as Executive Vice President and CFO of Syneos's Commercial Solutions Segment. Defendant Meggs also previously served as Executive Vice President of Oncology at Syneos from January 2017 to August 2017, and as Senior Vice President of Business Finance with the Company from 2014 to 2016. According to a January 9, 2023 press release, Meggs was an "'integral member of the Executive Leadership Team'" during the Class Period.

(a) As Syneos's CFO, Meggs was the Company's senior-most financial officer, responsible for overseeing its financial, accounting, audit, treasury, and tax functions and the development and implementation of internal financial controls. Meggs also signed Syneos's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CFO, Meggs was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Meggs repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Meggs assert that he was not aware

of Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Meggs received over $5 million in total compensation. And, during the Class Period as set forth in ¶¶224-229, Meggs sold more than 39,000 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $3 million.

40. Defendant Paul Colvin served as President of Clinical Solutions of Syneos from December 2018 until November 2021. In November 2021, Colvin was appointed Chief Business Officer ("CBO") of Syneos, a role that he served until June 30, 2022, before his departure from Syneos in August 2022. Colvin also served on Syneos's Executive Leadership Team.

(a) As Syneos's CBO, Colvin was responsible for driving the growth strategy for Syneos Health. According to the Company's website, Colvin "[led] the company's Customer Engagement and Business/Market Development portfolio across the enterprise; [l]everage[d] the corporate strategy to create and institutionalize innovative solutions for customers and ensure[d] the voice of the customer is at the center of Syneos Health across the product development and commercialization continuum." As President, Clinical Solutions, Colvin was responsible for "driving growth and performance for the Company's industry-leading Clinical Solutions capabilities," delivering models for conducting clinical trials, "driv[ing] therapeutic alignment," "driving deep customer relationships" and driving "customer network/roster."

(b) As CBO and President of Clinical Solutions, Colvin was responsible for directing all of Syneos's financial aspects related to the Company's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Colvin repeatedly held himself out as knowledgeable about, and at no time during the Class

Period did Colvin assert that he was not aware of Syneos's clinical segment, including the clinical segment's backlog, net new business, book-to-bill metrics, business prospects, and operational results.

(c) In 2020 and 2021, Colvin received over $4.5 million in total compensation. And, during the Class Period as set forth in ¶¶235-237, Colvin sold nearly 8,500 shares of his Syneos stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $630,000.

41. The individuals identified above in ¶¶37-40 are collectively referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "Defendants."

42. Each of the Individual Defendants, because of his or her respective senior position within the Company, possessed the power and authority to control the contents of Syneos's quarterly and annual reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Throughout the Class Period (and for Defendants Macdonald and Colvin, until their separation from the Company), each of the Individual Defendants, as senior executive officers of Syneos, was directly involved in the management and day-to-day operations of the Company at the highest levels; as further detailed herein; was privy to confidential and proprietary information concerning Syneos and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws. *See, e.g.*, ¶¶191-215.

43. Each of the Individual Defendants had access to non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

44. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

45. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS[8]

46. Throughout the Class Period, Defendants made materially false and misleading statements to falsely convince investors that Syneos's backlog and new business awards were growing when exactly the opposite was true. As part of their scheme to portray the Company as healthy and growing, Defendants made material misrepresentations and omitted material information concerning: (1) Syneos's capabilities to run clinical trials and engagement with customers of all sizes in its Clinical Solutions segment; (2) how Defendants accounted for new business awards and other backlog adjustments; and (3) Syneos's reported performance metrics including backlog, new business awards, book-to-bill ratios, and reimbursable expenses for the Clinical Solutions segment.

[8] Lead Plaintiffs allege that the statements emphasized in ***bold/italics*** within §§IV and V were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.

### A. Defendants Made Materially False and Misleading Statements that the Company's Innovative Product Was Resonating with Customers and Gave Syneos a Competitive Advantage

#### 1. Statement No. 1: Defendants Made Actionable Misstatements and Omissions Regarding the Company's SMID and Large Pharma Customers

47. As the Class Period starts on September 9, 2020, Defendants Macdonald and Meggs presented at the Baird Industry Conference. As part of their presentation, Defendants Macdonald and Meggs used slides to highlight that Syneos was achieving clinical book-to-bill greater than 1.40x and was "***Positioned for Accelerated Revenue and Margin Growth***: Syneos Health Investment Highlights," had a "***Leadership Position in High-Growth SMID/Biotech***," and was "***Successfully Penetrating Large Pharma***."



**Positioned for Accelerated Revenue and Margin Growth**

Syneos Health Investment Highlights

| | |
|---|---|
| *Clinical Bookings Momentum Driving Visibility into Growth* | ▪ Three consecutive quarters of greater than 1.40x Clinical book-to-bill<br>▪ **14.8% ending backlog growth** as of June 30, 2020<br>▪ Three consecutive quarters of greater than 10% year-over-year net awards growth |
| *Commercial Capabilities Drive Differentiation & Growth* | ▪ Syneos One represents the only end to end solution in the market. **Awarded $1.4B of estimated potential value**<br>▪ **Two long-term partnership wins** and Syneos One® momentum to drive future acceleration of revenue growth<br>▪ Commercial capabilities influence Clinical business we are winning |
| *Leadership Position in High-Growth SMID / Biotech* | ▪ Strong SMID franchise with long history of leadership within CRO space<br>▪ Commercial penetration into SMID customers rapidly gaining traction<br>▪ **>10% total revenue growth YTD 2020 within SMID customer base** |
| *Successfully Penetrating Large Pharma* | ▪ Secured **three strategic Clinical partnerships with Top 30 Pharma** in 2018 and 2019<br>▪ FSP360 combining with Full Service to deliver large scale hybrid services<br>▪ Top 20 Clinical backlog mix accelerated to nearly 30% as of June 30, driving high visibility into future growth |
| *Strong Financial Performance and Margin Accretion* | ▪ Organic revenue growth in FY 2019 outpaced market growth **in both segments**<br>▪ **30–50 bps annual margin expansion from $100M – $125M of *ForwardBound* savings** including operating leverage<br>▪ **Targeting 2.5x – 3.0x net leverage** by the end of 2021 with significant covenant cushion |



48. Defendants' statements on September 9, 2020, were materially false and misleading when made because Defendants claimed that Syneos had a "***Leadership Position in High-Growth SMID/Biotech***" and was "***Successfully Penetrating Large Pharma***," despite knowing that the

Company's clinical operations were impaired by deficient and subpar technology capabilities and offerings, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture.

49. Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. Therefore, Syneos's statements omitted material information that the Company was not a leader in the SMID space and was struggling to service large pharma. Indeed, the Company failed to invest in technology infrastructure, rendering its service offerings and technological capabilities inferior to its competitors.

50. Syneos failed to invest in the very technology needed to conduct clinical trials, collect usable data from those trials, and provide that data to its customers. Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities. In short, the Company failed to adapt to changing business demands and lacked the necessary tools including robust data management systems. The Clinical Trial Management System used at Syneos was InForm and Clinical Ink, which were generic systems that did not allow for any client customization. Therefore, the Data Management and Biostatistics groups had to track and provide data to clients in Excel which were subject to enormous delays and errors. The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems.

51. Incredibly, Syneos also lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business. Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials. Such a portal was a basic feature other CROs offered to their clients. Without a portal, Syneos was forced to manually create reports on generic spreadsheets and then email them to clients. Instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal clients could access remotely. Defendants were well aware how important a client portal was to Syneos's future success. In fact, one of the Company's critical initiatives during the Class Period was technology, and the implementation of a portal was the primary focus. Defendant Macdonald was the executive sponsor of the portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos finally launch "Clinical Reimagined," the initiative to develop a portal. By the end of the Class Period, however, the Company had still not launched an integrated client portal.

52. Defendants were also aware that Syneos failed to invest in technology infrastructure following the inVentiv and INC Research merger which formed the Company in 2018. For example, Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed by 2021, the Company had 11 separate accounts receivable systems and nine accounts payable systems. This made invoicing and paying bills for customers a logistical nightmare. Similarly, the Company had no centralized network for communicating via email between its worldwide locations. As a result, Syneos's rapid acquisitional corporate growth and increased complexity left the Company unable to timely respond to its clients'

needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups.

53. In addition to the technology gaps, lack of investment in infrastructure, and competitive disadvantages, Syneos failed to disclose that, contrary to Defendants' statements that the Company was "***Positioned for Accelerated . . . Growth***," its operations were critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture. Syneos maintained and perpetuated a bullying workplace which contributed to high turnover among the Project Managers responsible for clinical trials, which then resulted in staff not being assigned to projects long enough so that they did not have adequate training or familiarity with the project or its customers.

54. Syneos's workplace turmoil and toxic culture came from the top, as poor management and the lack of training and support led to further turnover across the board, including Project Managers and Clinical Research Associates ("CRA"). Former President of Clinical Solutions Defendant Colvin and former Director of Business Development, Bekki Brown, had created serious workplace and culture issues within the Company leading to a huge turnover of Project Managers ("PMs") who were responsible for clinical trials within the Clinical Solutions segment. The PMs were in turn responsible for supervising data analysts and CRAs, and the lack of support, toxic culture, and turnover among PMs led to high turnover among the analysts and CRAs. Even as Syneos brought on otherwise qualified people, they were "thrown to the wolves" as soon as they started working at the Company, were not trained, and were given "zero guidance." They were, however, still expected to meet deadlines and forced to work extreme hours to make up for the loss of experienced talent. Syneos was unable to retain analysts because the bullying culture and the lack of training and support led to horrible turnover across the board, including PMs and CRAs. These issues snowballed, resulting in

(i) a detrimental lack of continuity among the clinical trial employees critical to producing quality data, (ii) delays in responding to clients in a timely fashion, and (iii) an inability to generate useful and accurate data for its customers' clinical trials, all of which led to a loss of business. Customers of all sizes complained that their projects lacked adequate staffing and caused huge delays in obtaining data and even a response from Syneos.

55. Syneos was also not "***Successfully Penetrating Large Pharma***" and was not "***Positioned for Accelerated . . . Growth***" as, predictably, Syneos's critical technological shortcomings such as the lack of a client portal, lack of tools to conduct clinical trials, inadequate staffing and high turnover, delays in responding to clients in a timely fashion, inability to generate useful and accurate data for its customers' clinical trials, and the toxic work environment prevented the Company from producing quality clinical trial data, led to overwhelming quality problems. These issues hindered Syneos's ability to win new business, caused would-be repeat customers to be reluctant to work with Syneos on future engagements, and even caused existing customers to delay and cancel. Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues. For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone.

56. Defendants' statements on September 9, 2020, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 2. Statement No. 2: Defendants Made Actionable Misstatements and Omissions About the Strength and Growth of the SMID and Large Pharma Segments

57. During the Company's December 8, 2020 Analyst and Investor Day conference, Defendants Macdonald, Colvin, Keefe, and Meggs addressed investors and analysts and highlighted the Company's success with large pharma and SMID. Colvin celebrated the Company's clinical backlog growth, strong pipeline, and legacy strength with SMID customers, stating:

> ***We have year-over-year clinical backlog growth of over 30% for the top 50 pharma customers as of the end of third quarter. . . . While we're growing our share in large pharma, our legacy strength is in the small to midsized, or SMID, segment where we continue to enjoy an overweighted position relative to our total market share***.

58. Defendant Colvin's statements on December 8, 2020, were materially false and misleading when made as Syneos failed to disclose that its strategy was not resonating with its clinical customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. In truth, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and, therefore, negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors. Furthermore, the undisclosed, long-standing quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work. For example, Syneos lacked a client portal, which was industry standard and a basic feature other CROs offered to their clients. The lack of a client portal caused customer frustration, internal inefficiencies, and ultimately caused a loss of business.

59. And by the fall of 2020, when the Class Period began, many of the Company's key accounts were in serious jeopardy because of the Company's inability to produce quality clinical trial data. In 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a

hold on all of its work with Syneos. Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data. And Syneos's relationship with GSK, with which it had signed a new multi-year FSP agreement in late 2019, was strained to the point that Syneos could only obtain less than 10% of the total award value provided in GSK's contract.

60. Moreover, the Company was not achieving "***year-over-year clinical backlog growth of over 30% for the top 50 pharma customers***" because its business was not sustainable. In fact, by November 2020, Syneos privately forecasted negative growth across its top accounts and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company.

61. Defendants' statements on December 8, 2020, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 3. Statement No. 3: Defendants Made Actionable Misstatements and Omissions About Syneos's "Competitive Advantage"

62. During the December 8, 2020 Analyst and Investor Day conference, Defendant Meggs also emphasized the Company's "backlog, pipelines, and customer relationships," and claimed that "***Our model, people, and culture are our competitive advantage***."

63. Defendant Meggs' December 8, 2020, statement was materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. In fact, Syneos's "model, people, and culture" were not competitive advantages and the Company's strategy was not resonating with its customers because the Company's customers demanded far more technologically advanced product capabilities than Syneos could offer. Furthermore, the Company was unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across the full suite of promised product and service

offerings. The Company had failed to invest in technological infrastructure and its product offerings lagged its competitors. For example:

- Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed, by 2021, the Company had 11 separate accounts receivable systems and nine separate accounts payable systems. This made the process for customers to pay their bills or be invoiced a logistical nightmare.

- The Clinical Trial Management Systems used at Syneos were generic and did not allow for any client customization.

- Syneos simply lagged its peers in providing remote and decentralized clinical capabilities, such as certain data visualization and statistical modeling capabilities, and the Company struggled to catch up to its peers in the new business environment.

- The Company lacked a centralized network for communicating via email between its worldwide locations and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.

- Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials, which was standard in the industry.

- Defendants were well-aware of the lack of a client portal and the other system deficiencies that prevented any client customization. Defendant Macdonald was the executive sponsor of a portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos launch "Clinical Reimagined" an initiative to develop a portal. By the end of the Class Period, however, the Company still had not launched an integrated client portal.

64. Similarly, Syneos's "people" and "culture" were not competitive advantages because the Company was plagued by a toxic workplace culture, labor force turmoil, and a critical lack of training caused by the bullying workplace culture created by Defendant Meggs and his direct report Bekki Brown. The toxic workplace culture snowballed into more problems such as delays in responding to customers, data quality issues, and a loss of business. Customers of all sizes complained that their projects lacked adequate staffing and caused huge delays in obtaining data and even a response from Syneos. As a result, Syneos was unable to generate quality useable data on a timely basis for its clinical trial customers.

65. As a result of these problems, the Company was unable to produce quality clinical trial data and suffered from overwhelming quality problems that caused existing customers to cancel projects that had been in the pipeline for 6-18 months and made it difficult for the Company to win new or repeat business.

66. Defendants' statements on December 8, 2020, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

#### 4. Statement No. 4: Defendants Made Actionable Misstatements and Omissions Concerning Syneos's "Trusted Process" and "Extraordinary Value"

67. Defendant Macdonald also spoke during the December 8, 2020, Analyst and Investor Day conference and stated:

> And finally, ***the trusted process strengthens our world-class delivery***. It is our ***metrics-driven, repeatable methodology designed to deliver consistent services to our customers on time, on budget and to the required quality standards***. Since its launch, ***the Syneos Health trusted process has provided extraordinary value to the organization and most importantly, to our customers***.

68. Macdonald's statement on December 8, 2020, was false and misleading when made because the Company's "trusted process" was not ***"deliver[ing] consistent services to our customers on time, on budget and to the required quality standards***" and was not providing "***extraordinary value to the organization and most importantly, to our customers***." Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System used at Syneos did not

allow for any client customization; (iii) the Company lacked a centralized network for communicating via email between its worldwide locations; and (iv) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials.

69. Syneos was not delivering to its customers on time, on budget, or to the required standards. Customers of all sizes complained that their projects lacked adequate staffing and that they were unable to obtain data in a timely fashion or even get a response from Syneos. Indeed, Syneos's clinical trial business was plagued by (i) a detrimental lack of continuity among the clinical trial employees critical to producing quality data, (ii) delays in responding to clients in a timely fashion, and (iii) an inability to generate useful and accurate data for its customers' clinical trials, all of which undermined any trust in Syneos's process and led to a loss of business. Indeed, without a portal, Syneos had to manually create reports on generic spreadsheets and then email them to clients. And instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal. Clients also complained that the manual reports received from Syneos, instead of accessing the data via a portal, needed to be redone.

70. Defendants' statements on December 8, 2020, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

#### 5. Statement No. 5: Defendants Made Actionable Misstatements and Omissions About the Synteract Acquisition

71. Throughout 2021, Defendants continued to highlight the Company's success with its "large pharma" and core SMID customers and told investors that their recent Synteract acquisition had enhanced the Company's SMID position. For example, during the JP Morgan 39th Annual

Healthcare Virtual Conference held on January 13, 2021, Defendant Macdonald reported a 30% year-on-year backlog growth in the Top 50 accounts, and stated:

> ***The employees from Synteract have been fantastic. They've settled in very quickly, and we're seeing good performance from them from day 1. . . .***
>
> * * *
>
> ***We have enhanced our SMID position with the acquisition of Synteract. As I said before, we already have the leading position in that space. We are very keen on that space. We see it as a great growth driver for the future.***

72. Defendants' statements on January 13, 2021, were false and misleading when made and omitted material information Defendants were required to disclose. Immediately from the day the acquisition closed, Synteract started hemorrhaging employees who had no interest in working for a large CRO of Syneos's size. And many of Synteract's customers were unhappy with the Syneos acquisition, with some customers voicing their unhappiness with the deal prior to closing. In fact, following completion of the Synteract acquisition in December 2020 – an acquisition that was to enhance Syneos's position across the SMID category, particularly in oncology, rare and orphan diseases, neuroscience, dermatology, and pediatrics – Syneos struggled to integrate Synteract and the acquisition did not "***enhance [Syneos's] SMID position***." Syneos was unable to leverage Synteract's position across the SMID category as Syneos was disadvantaged by its significant technology gaps, lack of investment in infrastructure, critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture. Former Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal, a standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously.

73. Defendants' statements on January 13, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 6. Statement No. 6: Defendants Made Actionable Misstatements and Omissions About Syneos's Backlog and Oncology Awards

74. On April 29, 2021, during a conference call with investors to discuss the Company's Q1 2021 financial results, Defendant Macdonald addressed an analyst who questioned what impact "reprioritizations or cancellations" were having on backlog and net bookings and stated:

> Yes, it's a couple of customers on the larger side, ***one in oncology with reprioritized***– well, I think some of them are a delay in the delivery of the – of that program. ***So actually just pushes a couple of projects out of our awards window. So rather than starting within the next 12 months, they're pushing further back, so we have to take them out due to our bookings policy***. So they will come back in at a later stage in 2021 as awards . . . .

75. Defendant Macdonald's statement on April 29, 2021, about the oncology awards and the "***reprioritized***" treatment given to the award was false and misleading because Defendants did not push back or remove the oncology awards from backlog. Rather, when the two large oncology clinical trials worth $25 million each were canceled in early 2021 and business unit CFO Mike Donovan tried to have these trials removed from the backlog, he was overruled by his superiors as Defendants were concerned that removing the canceled awards from backlog would decrease the Company's book-to-bill ratio.

76. Defendants' statements on April 29, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 7. Statement No. 7: Defendants Made Actionable Misstatements and Omissions About Syneos's "Integrated Capabilities" and Strategy

77. On April 29, 2021, during a conference call with investors to discuss the Company's Q1 2021 financial results, Defendant Macdonald stated:

> ***We continue to deliver on our Value Creation Plan by further penetrating large pharma, enhancing our SMID leadership position*** and accelerating our Syneos One and full-service commercial offerings. We believe our global scale, integrated capabilities and unique product development strategy positions us well in this

environment as ***we continue to gain share and remain focused on high-quality execution***.

78. Defendant Macdonald's April 29, 2021, statements were false and misleading when made because by November 2020, Syneos privately forecasted negative growth across its top accounts and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company. The results of that review – and the serious problems facing the Company – were presented to and reviewed by Syneos's ELT on January 28, 2021, of which Defendants Macdonald, Meggs, Keefe, and Colvin were members. In its review, the Company identified the problems plaguing its Clinical Solutions segment, examined their impact on the Company's revenue and growth rate, made several key findings and recommendations, listed the areas for change, and examined the Company's progress in addressing these issues against its plan of action adopted in late 2020.

79. During the January 28, 2021 ELT meeting, a presentation titled ELT Strategy Review Meeting was given which laid out in dollars the Company's actual gross awards for fiscal year 2020 and the awards projected for fiscal year 2021, broken down by its engagement with the Top 20 and Top 21-50 accounts in the industry (as defined by prior year total research and development spend), with separate sub-entries for the Company's biggest pharma clients, such as AbbVie, Amgen, AstraZeneca, Eli Lilly, GSK, and Pfizer. According to the presentation – which was meant to sound the alarm that the Company's relationships with large pharma were in serious jeopardy – the Company knew its work with its clinical customers was cratering. The ELT presentation evidences a decline in awards in 2021 for the Company's top 15 overall customers, which represented approximately 60% of the Company's clinical business. The ELT presentation demonstrates that, even with the hundreds of millions of dollars in improperly booked award value from the GSK contract the Company knew it

would never collect, clinical business for the Company's Top 15 account, declined by 2.7%. And without the GSK award value, clinical growth would decline by 14.4%.[9]

## GCS FY21 Gross Awards Targets

| Client | FY20 Actuals ($M) | | | FY 21 Budget ($M) | | | Growth Rates (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | FY21 vs FY20 (%) | | | 19 - 21 |
| | TOTAL | Clinical | Commercial | Total | Clinical | Commercial | Total | Clinical | Commercial | CAGR (%) |
| Abbvie | 189.0 | 158.0 | 31.0 | 163.4 | 140.0 | 23.4 | -13.5% | -11.4% | -24.5% | 7.9% |
| Amgen Inc. | 48.2 | 2.4 | 45.8 | 71.2 | 12.0 | 59.2 | 47.7% | 400.0% | 29.3% | 17.5% |
| AstraZeneca | 28.0 | 23.7 | 4.3 | 18.5 | 15.0 | 3.5 | -34.1% | -36.7% | -19.7% | -23.4% |
| Celgene + BMS | 560.8 | 536.2 | 24.6 | 508.5 | 475.0 | 33.5 | -9.3% | -11.4% | 36.2% | 1.3% |
| Eli Lilly and Co. | 174.7 | 118.7 | 56.0 | 118.2 | 60.0 | 58.2 | -32.3% | -49.5% | 3.9% | 44.3% |
| GlaxoSmithKline (w/ Tesaro) | 206.3 | 72.4 | 133.9 | 402.1 | 235.0 | 167.1 | 94.9% | 224.6% | 24.8% | 46.6% |
| Johnson & Johnson | 194.8 | 10.3 | 184.5 | 223.2 | 35.0 | 188.2 | 14.6% | 239.8% | 2.0% | 25.8% |
| Novartis AG | 85.0 | 52.7 | 32.3 | 99.6 | 70.0 | 29.6 | 17.1% | 32.8% | -8.5% | 11.8% |
| Pfizer Inc. | 314.7 | 293.2 | 21.5 | 275.6 | 250.0 | 25.6 | -12.4% | -14.7% | 19.1% | 30.9% |
| Regeneron | 58.2 | 46.9 | 11.3 | 86.7 | 80.0 | 6.7 | 49.0% | 70.6% | -40.7% | 309.2% |
| Roche | 104.4 | 93.1 | 11.3 | 115.8 | 105.0 | 10.8 | 10.9% | 12.8% | -4.7% | 11.8% |
| **Top 20 Accounts** (11 covered by GCS) | **1,964.1** | **1,407.6** | **556.5** | **2,082.7** | **1,477.0** | **605.7** | **6.0%** | **4.9%** | **8.8%** | **20.2%** |
| Alkermes | 51.2 | 50.9 | 0.3 | 50.3 | 50.0 | 0.3 | -1.8% | -1.8% | -12.7% | 14.2% |
| Daiichi Sankyo | 291.8 | 283.7 | 8.1 | 247.7 | 240.0 | 7.7 | -15.1% | -15.4% | -4.9% | -7.4% |
| Otsuka | 131.1 | 129.2 | 1.9 | 71.0 | 70.0 | 1.0 | -45.8% | -45.8% | -47.4% | -38.8% |
| Incyte | 131.6 | 131.0 | 0.6 | 95.5 | 95.0 | 0.5 | -27.4% | -27.5% | -10.5% | -13.2% |
| **21 -50 20 Accounts** (4 covered by GCS) | **605.7** | **594.8** | **10.9** | **464.5** | **455.0** | **9.5** | **-23.3%** | **-23.5%** | **-12.8%** | **-15.1%** |
| Intercept (SMID Top 250) | 17.6 | 9.8 | 7.8 | 33.9 | 25.0 | 8.9 | 92.8% | 155.1% | 14.5% | -15.1% |
| **Actuals / Budget Target** | **2,587.4** | **2,012.2** | **575.2** | **2,581.1** | **1,957.0** | **624.1** | **-0.2%** | **-2.7%** | **8.5%** | **10.0%** |

Syneos. Health

© 2020 All rights reserved | For Syneos Health® us

80. And the devastating details revealed during the January 2021 ELT meeting demonstrate that Defendant Macdonald's statements that Syneos offered a unique product development strategy and high-quality execution were false and misleading when made because the Company offered neither. Indeed, during the ELT meeting, the corporate quality department and Global Client Services group presented an Executive Summary and informed Defendants that serious quality problems were threatening Syneos's relationships with its customers and those problems had remained unremedied:

---

[9] Without the $235 million in GSK award value in the 2021 clinical budget, total clinical awards would decline by $290 million from 2020 to 2021 which equals a 14.4% decline.

(i) quality issues were reported late at Syneos and were not communicated in a timely fashion to the Company's clients; (ii) Syneos's audit inspections and root cause analyses had not been effective in correcting the recurring quality issues; and (iii) quality was not embedded in the day-to-day execution at the Company. At the account level, as of December 1, 2020, the Company's Global Client Services accounts for the Company's Top 15 customers had 456 open "CAPAs," also known as "Corrective and Preventive Actions." "14 out of [the top] 16 accounts have overdue actions" and "10 [of the top 16] accounts have critical actions overdue." As a result, Defendants were aware that many of the Company's key accounts were in serious jeopardy and several others had already stopped awarding new business to Syneos.




81. In a subsequent "Key Findings" slide, the corporate quality department and Global Client Solutions group provided a detailed breakdown of the 456 open CAPAs, which revealed that three of Syneos's biggest customers – AbbVie, AstraZeneca, and Regeneron – had placed the

Company on some form of "hold," meaning that it was not able to receive any new clinical business, and Eli Lilly's business was "at risk." As to AstraZeneca, Syneos's biometric submission to the European Medical Agency ("EMA") had "failed to include data." Syneos's four largest clients alone were collectively responsible for nearly $500 million of awards to Syneos in 2020, while the 14 accounts with overdue actions represented more than a billion dollars of awards in 2020.

82. To make matters worse, the same "Key Findings" slide noted, as to Syneos's largest customer: "Pfizer quality data is currently maintained in the Pfizer quality system. The data here in Syneos system is not the source of truth." Pfizer became so concerned with the quality of Syneos's services that it needed to provide oversight on the clinical work it had previously awarded to Syneos, and Pfizer appointed directors from their own company to oversee Syneos's work.

## Key Findings

Open, Overdue and Critical CAPAs by Account and by BU

Total Open

456

### ACCOUNT-LEVEL

| GCS Accounts | Total Open | Total Open (Critical) | Total Over due | Total Overdue (Critical) |
|---|---|---|---|---|
| AbbVie (Soft Hold)^ | 56 | 11 | 13 | 2 |
| Alkermes | 20 | 6 | 7 | 5 |
| Amgen | | | | |
| AstraZeneca (Hold)^^ | 3 | | 3 | |
| BMS | 21 | 1 | 8 | 1 |
| Daiichi Sankyo | 10 | | 7 | |
| GSK | 46 | | 5 | |
| Incyte | 5 | 3 | 3 | 2 |
| Intercept | 66 | 9 | 24 | 5 |
| J&J | 3 | | 1 | |
| Lilly (At Risk)* | 36 | 11 | 15 | 4 |
| Novartis | | | | |
| Otsuka | 20 | 11 | 9 | 4 |
| Pfizer* | 89 | 4 | 17 | 2 |
| Regeneron (Soft Hold)*** | 49 | 10 | 15 | 2 |
| Roche | 32 | 15 | 4 | 3 |
| Grand Total | 456 | 81 | 131 | 30 |

### BU-LEVEL

| BU | Total Open | Total Open (Critical) | Total Overdue | Total Overdue (Critical) |
|---|---|---|---|---|
| CNS | 40 | 15 | 11 | 6 |
| General Medicine | 129 | 25 | 51 | 11 |
| Oncology | 80 | 6 | 21 | 3 |
| SSU | 5 | | 2 | |
| CDS | 27 | 16 | 7 | 5 |
| Early Phase | 15 | | 5 | |
| RWLP | 19 | 11 | 6 | |
| BMS BU | 14 | 1 | 2 | 1 |
| Pfizer BU** | 88 | 4 | 16 | 2 |
| BT | 4 | | 1 | |
| Corporate Services | 13 | 2 | 7 | 1 |
| Global Ops - CAPSS | 22 | 1 | 2 | 1 |
| Grand Total | 456 | 81 | 131 | 30 |

- **Pfizer** quality data is currently maintained in the Pfizer quality system. The data here in Syneos system is not the source of truth.
- ^**AbbVie** Recurring audit findings in Clinical and RWLP Call center finding related to Inappropriate Disclosure
- ^^**AZ** Biometrics issue (submission to EMA failed to include data)
- ****Lilly** Multiple eCOA issues in Dermira program

© 2020 All rights reserved | For Syneos

83. Defendant's additional statement that Syneos was "***enhancing our SMID leadership position***" was false and misleading because Syneos had struggled to integrate Synteract, had hemorrhaged Synteract employees who refused to work for Syneos, and the acquisition did not enhance the Company's position with their SMID customers, many of whom refused to sign with Syneos because of technological deficiencies, including the lack of a client portal. Indeed, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal, Syneos lost 30%-40% of Synteract customers, with some customers voicing their unhappiness prior to closing.

84. Defendants' statements on April 29, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels because of Defendants' material misstatements and omissions.

#### 8. Statement No. 8: Defendants Made Actionable Misstatements and Omissions About the Company's Strategy and the Product Offerings Powering Growth

85. During an August 9, 2021, conference call with analysts and investors, Defendants Macdonald, Meggs, Keefe, and Colvin discussed the Company's performance during Q2 2021. Defendant MacDonald began the call by highlighting "another strong quarter of results, which ***demonstrate that our differentiated product development strategy continues to resonate in the market***," and further stated that "***our integrated product offerings powered strong awards and backlog growth for both segments***."

86. Defendant Macdonald's statements were false and misleading when made. As Defendant Keefe admitted in November 2022, the Company's operations had been in disarray for at least 18 months and Syneos lacked the technological offerings to "be more competitive." Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce

outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had impacted negatively on the Company's ability to win repeat business from existing SMID customers.[10]

87. In fact, the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. The Company's toxic work environment, lack of guidance and training, and bullying atmosphere – fostered by Colvin and Brown – also contributed to high employee turnover and resulting workforce shortages. Such shortages made it impossible for the Company to have clinical trial employee continuity critical to producing quality data. All customers, including large pharma and SMID, complained that workforce shortages caused customers to experience huge delays in obtaining data and even a response from Syneos.

88. In addition, and contrary to Defendants' statement that "***our integrated product offerings powered strong awards and backlog growth for both segments***," Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System Syneos used did not allow for any client customization; (iii) the Company lacked a centralized network for

[10] As Keefe admitted after the Class Period and Defendants knew, certainly before Q1 2022 when Defendants initiated Clinical Reimagined, Syneos's clinical segment had suffered because it was unable to provide its customers with what they wanted: "an efficient and effective delivery model supported by . . . technology enhancement[s]."

communicating between its worldwide locations; (iv) Syneos lagged its peers in providing remote and decentralized clinical capabilities, such as data visualization and statistical modeling; and (v) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials.

89. These operational and technological failures led to a massive loss of business and caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel. Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues. For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone.

90. Syneos's quality problems and technological shortcomings, as highlighted to Defendants prior to and during the January 2021 ELT presentation, resulted in a cancellation of awards. Desperate to hit financial targets and make up for lost business, Defendant Colvin pressured business units and finance professionals to change project progress targets and cost estimates to prematurely generate additional awards and hit targets. After a comprehensive review of the Company's financials, on July 10, 2021, Defendant Colvin sent an email to all business unit CFOs stating all business units were "still a long way off target," outlined specific "targets as improvement," and directed them to "work with your CFOs" to hit said targets. Colvin asked the employees to find more than $12 million in additional award value, instructing them to "find it" over the weekend "to finalize the forecast by eod Monday." Business unit CFOs, Senior Directors of Project Finance

Management, Associate Directors of Finance, and others in the Company's finance department understood that Colvin's direction to "find" value was tantamount to an instruction to fake it.

91. Defendants' statements on August 9, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

#### 9. Statement No. 9: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Backlog Growth and SMID Business

92. On September 15, 2021, Defendant Macdonald attended an industry conference hosted by Robert W. Baird & Co., Inc., and addressed questions about "Second quarter bookings" in the Company's clinical segment. Defendant Macdonald stated: "***we have a very good SMID mix in the business, and we continue to have that. Despite the fact we have really good backlog growth in clinical from top 20. Those are going to be the drivers as we move into 2022 and 2023***."

93. Defendant Macdonald's statements on September 15, 2021, were false and misleading when made and omitted material information, as Defendants knew or recklessly disregarded that Syneos's strategy was not resonating with its customers and its clinical operations were impaired by deficiencies in its technology and product offerings, the Company was plagued by workforce reductions and labor force turmoil caused by a toxic work place culture. Defendant Keefe admitted in November 2022 that the Company's operations had been in disarray for at least 18 months and that Syneos lacked the technological offerings to "be more competitive." Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business.

94. In addition, Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System used at Syneos did not allow for any client customization; (iii) the Company lacked a centralized network for communicating via email between its worldwide locations; and (iv) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials.

95. Because of these shortcomings, the Company lagged its competitors and it was not enhancing its position with its SMID and large pharma customers. Syneos struggled to integrate Synteract and immediately after its acquisition, the Company started hemorrhaging Synteract employees and customers who did not want to work with a large CRO. And, within 6-12 months of the deal, Syneos lost 30%-40% of Synteract customers. Syneos's relationship with its large pharma customers also suffered as the declining awards foreseen during the January 2021 ELT meeting played out during 2021. As a result, deals that were in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to Syneos's quality issues. Early in 2021, AstraZeneca stopped using Syneos altogether.

96. By the second half of 2021, Defendants took their bullying tactics to new heights. Experiencing the downward pressure on the Company's clinical business and growth because of the quality and data issues discussed during the January 2021 ELT meeting, Defendants were desperate to hit award targets despite the lost business. Defendant Colvin pressured business units and finance

professionals to change project progress targets and cost estimates to prematurely generate additional awards and hit targets. After a comprehensive review of the Company's financials, on July 10, 2021, Defendant Colvin sent an email to all business unit CFOs stating all business units were "still a long way off target," outlined specific "targets as improvement," and directed them to "work with your CFOs" to hit said targets. Colvin asked the employees to find more than $12 million in additional award value.

97. Defendants' statements on September 15, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

#### 10. Statement No. 10: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Large Pharma and Oncology Growth

98. Later in 2021, Defendants continued to make false and misleading statements and material omissions regarding the Company's purported superior technology, enhanced processes, and abilities to conduct clinical trials. For example, on November 3, 2021, Syneos held a conference call hosted by Defendants Macdonald, Meggs, Keefe, and Colvin to discuss the Company's financial results for the third quarter of 2021 (the "Q3 2021 Earnings Call"). Defendant Macdonald "report[ed] another quarter of strong results, demonstrating the enthusiastic customer response to our differentiated product development strategy and our continued market momentum." Defendant Macdonald further highlighted the Company's strong clinical growth in the quarter, particularly with oncology, stating:

> ***Our organic growth was driven*** by our full-service portfolio, including ***the continuing ramp-up in our larger pharma relationships, particularly in oncology as they gain full scale and efficiency***.

Defendant Macdonald addressed a question from Citi analyst Patrick Donnelly concerning the "visibility" and "confidence level" the Company had with respect to 2022:

> ***We mentioned that we're winning a lot of oncology work. Obviously, that sets up for a long view of the pipe of the backlog, so you got a lot more visibility with that.***

99. Defendants' statements on November 3, 2021, were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. Syneos was not experiencing growth and was not ramping up its large pharma relationship and Defendants omitted to disclose that they had lost two large $25 million oncology clinical trials that were canceled earlier in 2021.

100. In November 2022, Defendant Keefe admitted that the Company's operations had been in disarray for at least 18 months and that Syneos lacked the technological offerings to "be more competitive." Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business. As Keefe admitted, Syneos's clinical segment had suffered because it was unable to provide its customers with what they wanted: "an efficient and effective delivery model supported by . . . technology enhancement[s]." For example, Syneos failed to invest in its technological infrastructure and was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings and efficiently work across its various product and service groups; never had a centralized network; used a Clinical Trial Management System that did not allow for any client customization; lacked a centralized network for communicating via email between its worldwide locations; and lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials.

101. Syneos's relationship with its large pharma customers also suffered as the declining awards foreseen during the January 2021 ELT meeting played out during 2021. As a result, deals that

were in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to Syneos's quality issues. And early in 2021, AstraZeneca stopped using Syneos altogether.

102. By the second half of 2021, Defendants took their bullying tactics to new heights. Desperate to hit financial targets and make up for lost business, Defendant Colvin pressured business units and finance professionals to "find" awards to make targets.

103. Defendants' statements on November 3, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 11. Statement No. 11: Defendants Made Actionable Misstatements and Omissions Concerning the Company's Success with Large Pharma and SMID Clients

104. On January 12, 2022, Defendant Macdonald presented at the JP Morgan 40th Annual Healthcare Conference and stated:

> ***We're executing against the value-creation plan, driving that long-term growth, using that penetration of large pharma, the success we've had in SMID, continuing to drive that, continuing to drive operational efficiency*** through things like . . . the automation that we bring, et cetera. And then ***innovative – investment in innovative areas, capitalizing the work that we do, bringing new capabilities, bringing new differentiation to our model and to our customers to continue delivering on that high growth***.

105. Defendants' statements on January 12, 2022, were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. Syneos did not differentiate itself from its competitors, its strategy was not resonating with its customers, and the Company was operating at severe competitive disadvantages because it did not possess state-of-the-art software to customize clinical trial data for its customers or even provide customers with a client portal. As Defendant Keefe admitted in November 2022, the Company's operations had been in disarray for at least 18 months and that Syneos had lacked the technological

offerings to "be more competitive." Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business. For example:

- The Clinical Trial Management Systems used at Syneos were generic systems that did not allow for any client customization.
- Syneos simply lagged its peers in providing remote clinical capabilities and struggled to catch up to its peers in the new business environment.
- The Company lacked a centralized network for communicating via email between its worldwide locations and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.
- Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials, a standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously, and it was a basic feature other CROs offered to their clients.

106. Defendants' statements on January 12, 2022, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**B. Defendants Made Materially False and Misleading Statements About the Manner in Which the Company Accounted for Backlog and Reported Its Performance Metrics**

**1. Statement No. 12: Defendants Made Actionable Misstatements and Omissions Concerning Syneos's "New Business Awards and Backlog" Methodology**

107. In each of Syneos's Forms 10-Q and Form 10-K issued throughout the Class Period,[11] Defendants highlighted the "New Business Awards and Backlog" methodology Syneos used to

[11] Defendants' false and misleading New Business Awards and Backlog methodology was repeated verbatim throughout the Class Period in each of Syneos's Forms 10-Q and Forms 10-K: (i) Q3 2020 Form 10-Q, filed Oct. 29, 2020; (ii) 2020 Form 10-K, filed Feb. 18, 2021; (iii) Q1 2021 Form 10-Q,

recognize and account for when Syneos "add[s] new business awards to backlog when [the Company's] enter into a contract or when [it] receive[s] a written commitment from the customer selecting [Syneos] as a service provider." Among other criteria, Syneos explained that new business is added to backlog only when:

- collection of the ***award value is probable***;
- the project or projects are expected to commence within a certain period of time from the end of the quarter in which the award was granted;
- project contingencies such as the outcome of other clinical trials, funding approvals, or other events, are not anticipated to prevent the project or projects from commencing in accordance with the expected timeline;
- the customer has entered or intends to enter into a comprehensive contract as soon as practicable; and
- for awards related to deployment solutions and ***functional service provider*** offerings, a ***maximum of 12 months*** of services are included in the award value.

108. Syneos's methodology also explained that they "***continually evaluate our backlog to determine if any of the previously awarded work is no longer expected to be performed, regardless of whether we have received formal cancellation notice from the customer***" and if "***any previously awarded work is no longer probable of being performed, we remove the value from our backlog based on the risk of cancellation***."

109. In the same methodology, the Company further assured investors that in evaluating and updating backlog, "***Our backlog also reflects any cancellation or adjustment activity related to these awards***."

filed Apr. 29, 2021; (iv) Q2 2021 Form 10-Q, filed Aug. 9, 2021; (v) Q3 2021 Form 10-Q, filed Nov. 3, 2021; (vi) 2021 Form 10-K, filed Feb. 17, 2022; (vii) Q1 2022 Form 10-Q, filed Apr. 29, 2022; and (viii) Q2 2022 Form 10-Q, filed Aug. 2, 2022.

110. Syneos's stated "New Business Awards and Backlog" methodology was knowingly materially false and misleading when made, because Syneos was not complying with the methodology and Defendants omitted to disclose that they were actively and artificially manipulating Syneos's reported backlog and manipulated its book-to-bill ratio and net new business metric.

111. Contrary to Syneos's methodology, which permits the addition of "new business awards to backlog" only "when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider," Defendants included new business awards in backlog before contracts were signed or where a "written commitment" for an award was either not in place or was too vague or indefinite to be reliably added to backlog.

112. Contrary to Syneos's stated backlog methodology, Defendants also included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors. Defendants treated change orders – which would add to the total award value and increase backlog, and as such required separate written agreement and sign-off by the sponsor – as finalized without a customer's signature. Defendants further inflated backlog by including change orders even when customers had not agreed to or signed a change order. For example, Syneos would treat a $2 million change order as finalized and added that amount to backlog even before a customer was aware of the increase to the contract and without a customer's signature or approval. Defendants also violated the stated methodology by backdating contracts to recognize award value before the Company was otherwise permitted to do so and manipulated costs to increase reported backlog, both in order to inflate reported backlog. As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to make sure the award value was placed in backlog for the previous quarter.

113. And contrary to the methodology's requirements that "collection of the award value is probable" before new business awards are added to backlog, Syneos included in backlog a $100 million milestone award, while knowing that the bonus would never be collected. Syneos had entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years, and the total award value was in the hundreds of millions of dollars. Those contracts provided that Syneos could earn a $100 million bonus if certain milestones were met on time during the contract. Even though Syneos missed the very first milestone in the first of those clinical trials, Defendants included the entire $100 million milestone bonus in backlog.

114. Similarly, after Syneos was awarded involvement in a $300 million annual multi-year contract with GSK in late 2019, along with another CRO partner, Defendants included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year.

115. Contrary to the methodology's requirement that "***we continually evaluate our backlog to determine if any of the previously awarded work is no longer expected to be performed, regardless of whether we have received formal cancellation notice from the customer***" and that "***Our backlog also reflects any cancellation or adjustment activity related to these awards***," Defendants failed to remove canceled and uncollectable awards from backlog. When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog. Indeed, after two large oncology clinical trials worth $25 million each were canceled in early 2021, Oncology Business Unit CFO Mike Donovan tried to have the award value for these trials removed from the backlog, but he was overruled by his superiors. A Senior Director in Project Financial Management observed that the refusal to remove the canceled oncology awards was out of concern about the negative impact it would have on the Company's reported book-to-bill ratio. And

Bekki Brown, President of Clinical Development, who oversaw clinical trials, argued with Project Managers about removing amounts as trivial as $5,000 from backlog or reversing small amounts of award value.

116. And contrary to the methodology's restriction that award value on FSP contracts is limited to a "***maximum of twelve months***," Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

117. Defendants' statements concerning Syneos's "New Business Awards and Backlog" methodology, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 2. Statement No. 13: Defendants Made Actionable Misstatements and Omissions About Compliance with the Company's "New Business Awards and Backlog" Methodology

118. During the Class Period, Defendants repeatedly assured investors that they were complying with the Company's stated backlog methodology and, if anything, they were conservative in how and when business awards were included in backlog. For example, on August 9, 2021, Defendant Macdonald, Meggs, Keefe, and Colvin hosted a conference call to discuss the Company's Q2 2021 financial results and performance metrics during which Defendant Macdonald described the Company's adherence to Syneos's backlog methodology. Defendant Macdonald explained that Syneos included only 12 months of an FSP contract in Syneos's bookings, stating:

> Under our awards policy for FSP services, ***we only included 12 months of services in our bookings***, even though each agreement represented an initial term of at least 3 years. The remainder provides further fuel for growth in addition to our reported backlog.

119. And on September 15, 2021, during the Baird Global Healthcare Conference, Defendant Macdonald again addressed the methodology, highlighting Syneos's "conservative approach" as compared to its competitors' approach.

> And then when we look at book-to-bill, I mean I appreciate your comments about bookings, but ***we also still have that conservative approach around FSPs. We won 3 massive FSPs in Q2. And we booked the first year of each one of them. And most of our competitors booked the whole lot.***
>
> * * *
>
> So we have a ***different approach***. We feel ***it's the right approach to do it more progressively. We add a quarter at a time as we go***. And we take that slow and steady approach.

120. Defendants' statements concerning the Company's "conservative" adherence to its "New Business Awards and Backlog" methodology were knowingly materially false and misleading when made because Syneos was not complying with its methodology and Defendants omitted to disclose that they were adding to backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking as part of its purported "conservative approach" and as required by the backlog methodology.

121. Defendants' statements assuring investors of its conservative compliance with Company's "New Business Awards and Backlog" methodology were false and misleading when made and had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels because of Defendants' material misstatements and omissions.

## C. Defendants Made Materially False and Misleading Statements Regarding the Company's Reported Performance Metrics

122. In each quarterly and annual report filed during the Class Period – Q3 2020 through Q2 2022 – Syneos reported its backlog and performance metrics, including its new business awards and book-to-bill ratio. These metrics were crucial to understanding Syneos's business and assessing whether the Company was healthy and growing. At the time they reported the Company's financial

and operational results each quarter, however, Defendants knew or recklessly disregarded that Syneos's backlog and performance metrics were false and misleading because they had violated the Company's "New Business Awards and Backlog" methodology in order to inflate backlog and manipulated its book-to-bill ratio and net new business metric to create the false impression that the clinical segment was healthy and growing.

### 1. Statement No. 14: Defendants Reported False and Misleading Backlog and Performance Metrics for Q4 and Year End 2020

123. On February 18, 2021, Syneos filed its annual Form 10-K, announcing the Company's financial results and performance metrics for the fourth quarter and year ended December 31, 2020 ("2020 Form 10-K"), which was signed by Defendants Macdonald and Meggs. In connection with the 2020 Form 10-K, Syneos filed its Form 8-K, which reported the same backlog and performance metrics that were reported in the 2020 Form 10-K:

| Q4 and FY 2020 ($m)[12] | | | | | | |
|---|---|---|---|---|---|---|
| Backlog | Clinical Backlog | Clinical Net New Business (Q) | Clinical Net New Business (TTM) | Clinical Book-to-Bill Ratio (Q) | Clinical Book-to-Bill Ratio (TTM) | Clinical Backlog Growth (YOY) |
| $10,951.1 | $10,239.5 | $1,299.3 | $4,698.7 | 1.52x | 1.42x | 24.6% |

124. Defendants' reported backlog and performance metrics for Q4 and full year 2020 were materially false and misleading. As described in §IV.B., Defendants violated its stated "New Business Awards and Backlog" methodology by adding new business awards or maintaining business awards in backlog (i) before contracts were signed and without written commitments, (ii) when collection of the award value was not probable, (iii) where contracts and business awards had been canceled, and (iv) where the amount added or maintained in backlog exceeded the maximum of 12 months of

[12] Each of the metrics in the chart was reported in the Q4 2020 Release. The 2020 Form 10-K reported backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

services included in the award value on FSP contracts. And by doing so, Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric.

125. Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors. Defendants treated change orders – which would add to the total award value and increase backlog and, as such, required separate written agreement and sign-off by the sponsor – as finalized without a customer's signature. For example, Syneos repeatedly and throughout the Class Period, would treat, *e.g.*, a $2 million change order as finalized and added to backlog even before a customer was aware of the increase to the contract and without a customer signature or approval.

126. As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to ensure that the finance team could capture award value and add it to backlog for the previous quarter.

127. Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as "accruals," where cost targets and reimbursable expenses were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, at the end of each month the accruals were reversed, and costs re-entered so that backlog remained unchanged despite recognizing revenue from

the backlog. Stated simply, Defendants lowered estimated costs which allowed the Company to achieve percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach the percentage-of-completion targets were never removed (reduced) from the backlog in order to continue to portray Syneos's backlog as healthy and growing. Having already recognized revenue on the basis of lower cost estimates, Defendants knew that they would never realize and collect on these reimbursable (zero-margin) out-of-pocket expenses that Defendants were maintaining in backlog.

128. When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog. For example, Bekki Brown, President of Clinical Development, who oversaw clinical trials, was a big culprit of inflating the backlog and argued with Project Managers about removing amounts as small as $5,000 from backlog or reversing small amounts of award value.

129. And contrary to the Company's requirement that award value on FSP contracts is limited to a "***maximum of twelve months***," as well as Defendants' assurances that they were "conservative" in abiding by the requirement, Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

130. In addition, after Syneos was awarded involvement in a $300 million annual multi-year contract with GSK in late 2019, along with another CRO partner, Defendants included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year and it never being probable that award value in excess of the $20 million was collectible. As a result, by the end of 2020, Syneos's reported backlog was inflated by as much as $280 million by including in backlog the full award value of the GSK contract.

131. As a result of the above manipulations, including (i) the $280 million of uncollectible and improbable annual award value from the GSK contract maintained in backlog for the full year 2020, of which $70 million was booked as new business in Q4 2020, and (ii) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's "Clinical B2B ha[d] been overstated by ~0.2x," in each of the five quarters preceding the February 17, 2022 announcement, Syneos's (i) reported backlog for Q4 2020 and full year 2020 was inflated by at least $615 million, (ii) net new business was overstated by $239 million for Q4 2020 and by at least $615 million for full year 2020, and (iii) actual book-to-bill ratio for Q4 2020 was approximately 1.24x, not the reported 1.52x, and for full year 2020 was 1.23x, instead of the reported 1.42x.[13]

132. Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q4 2020 performance metrics that backlog was overstated by at least $615 million and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q4 2020 would need to be written down.

133. Defendants' false and misleading backlog and performance metrics, reported on February 18, 2021, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

[13] The calculations correcting Defendants' inflated backlog and overstated performance metrics are derived using the specific award values known to have been improperly included and maintained in backlog, as well as the overstatements to uncollectable reimbursable expenses Defendants knew they would have to write down, as calculated by Jefferies after the February 17, 2022, write-down. ¶160.

### 2. Statement No. 15: Defendants Reported False and Misleading Backlog and Performance Metrics for Q1 2021

134. On April 29, 2021, Syneos filed its quarterly report on Form 8-K announcing its financial results for the quarter ended March 31, 2021 (the "Q1 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. In connection with the Q1 2021 Form 10-Q, Syneos filed its Form 8-K, which reported the same backlog and performance metrics that were reported in the Q1 2021 Form 10-Q:

| Q1 2021 ($m)[14] | | | | | | |
|---|---|---|---|---|---|---|
| **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $11,218.0 | $10,509.9 | $1,215.5 | $4,720.1 | 1.30x | 1.39x | 22.5% |

135. Defendants' reported backlog performance metrics for Q1 2021 were materially false and misleading. As described in §IV.B., Defendants violated its stated "New Business Awards and Backlog" methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric. For example, as Defendants did in reporting false and misleading backlog and performance metrics in Q4 and FY 2020, they also did the following in Q1 2021:

- Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.
- As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to ensure that the finance team could capture award value and add it to backlog for the previous quarter.
- Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach

[14] Each of the metrics in the chart was reported in the Q1 2021 Release. The Q1 2020 Form 10-Q reported backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing.

- Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

136. While Defendants had already inflated backlog by improperly including $280 million in award value from the GSK contract ($300 million FSP contract less the $20 million award value where collection was probable), Syneos continued to recognize and include award value for the full amount of the GSK contract, despite knowing that collection on $280 million was not probable. Consistent with Defendant Macdonald's description of how Syneos accounts for and includes award value for FSP contracts – a "***progressive***" and "***slow and steady approach***," where "***We add a quarter at a time as we go***," Syneos recognized an additional $70 million in award value in Q1 2021 where collection was not probable, representing the annual improbable award value on a quarterly basis. Indeed, as calculated by Jefferies following the Company's February 2022 $850-$950 million backlog write-down of reimbursable expenses, Syneos's "Clinical B2B ha[d] been overstated by ~0.2x," in each quarter during the Class Period.

137. In addition, when contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog. For example, two large oncology clinical trials worth $25 million each were canceled in early 2021. When business unit CFO Mike Donovan tried to have these trials removed from the backlog, he was overruled by his superiors. They were concerned that removing the canceled awards from the backlog would decrease the Company's book-to-bill ratio.

138. As a result of the above manipulations, including (i) the $280 million of uncollectible and improbable annual award value maintained in backlog from the GSK contract for the full year

2020; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q1 2021; (iii) award value maintained in backlog where contracts had been canceled, such as from the two canceled $25 million oncology contracts; and (iv) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's "Clinical B2B ha[d] been overstated by ~0.2x," in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $919 million, its net new business for the quarter was overstated by more than $303 million, and actual book-to-bill ratio was approximately 0.97x, not the reported 1.30x.

139. Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q1 2021 performance metrics that backlog was overstated by at least $919 million and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q1 2021 would need to be written down.

140. Defendants' backlog and performance metrics reported on April 29, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

#### 3. Statement No. 16: Defendants Reported False and Misleading Backlog and Performance Metrics for Q2 2021

141. On August 9, 2021, Syneos filed its quarterly report on Form 10-Q announcing its financial results for the quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. In connection with the Q2 2021 Form 10-Q, Syneos filed its Form 8-K, which reported the same backlog and performance metrics that were reported in the Q2 2021 Form 10-Q:

| Q2 2021 ($m)[15] | | | | | | |
|---|---|---|---|---|---|---|
| **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $11,685.3 | $10,966.9 | $1,436.2 | $4,971.5 | 1.45x | 1.37x | 21.5% |

142. Defendants' reported backlog and performance metrics for Q2 2021 were materially false and misleading when made. As described in §IV.B., Defendants violated its stated "New Business Awards and Backlog" methodology in order to inflate backlog and manipulate the Company's book-to-bill ratio and net new business metric.

143. In addition, Defendants exerted pressure and bullied employees in the finance department to manipulate backlog and inflate the Company's performance metrics. For example, in Q2 2021, Defendant Colvin, who was the head of the clinical business, sent an email to all business unit CFOs on Saturday, July 10, 2021, ten days after the close of the quarter, admonished all business units that they were "still a long way off target," outlined specific "targets as improvement," directed them to "work with your CFOs" to hit "the following targets as improvements to where we were end of [yesterday]" and find more than $12 million in additional value, instructing them to work with your CFOs to "find it" over the weekend "to finalize the forecast by eod Monday."

| | |
|---|---|
| "Company A" | $2 million |
| "Company B" | $1 million |
| Central Nervous System ("CNS") | $2 million |
| Oncology | $2 million |
| Gen MED | $2 million |
| Synteract | $500,000 |
| Tara Fitzgerald, President, Clinical Development | $1 million |
| Maria Fotiu, Exec, V.P., Decentralized Solutions | $1 million |
| Nick Kenny, Chief Science Officer | $1 million |

[15] Each of the metrics in the chart was reported in the Q2 2021 Release. The Q2 2021 Form 10-Q reported backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

144. Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to "find" value was tantamount to an instruction to fake it.

145. In addition, Syneos's backlog continued to be inflated as Syneos maintained the entirety of the annual GSK award value in backlog each year despite never converting more than $20 million in award value into revenue during any year and it never being probable that award value in excess of the $20 million was collectible. As a result, Syneos's reported backlog was inflated by as much as $280 million at the end of 2020 and, based on Macdonald's "progressive" and "slow and steady approach," where "We add a quarter at a time as we go," Syneos improperly included in backlog an additional $70 million in uncollectable award value from GSK in Q1 2021. In Q2 2020, Syneos recognized and included an additional $70 million for the maintained uncollectible award value in backlog each year from GSK despite never receiving more than $20 million in contract revenue during any year. As a result, by Q1 2021 and throughout 2021, Syneos's backlog was inflated by at least $280 million.

146. And as Defendants did in reporting false and misleading backlog and performance metrics in Q1 2021, they also did the following in Q2 2021:

- Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.
- As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to ensure that the finance team could capture award value and add it to backlog for the previous quarter.
- Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog.

- When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.

- Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

147. As a result of the above manipulations, including (i) $350 million of improbable and uncollectible award value from the GSK contract maintained in backlog from full year 2020 and Q1 2021; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q2 2021; (iii) award value maintained in backlog where contracts had been canceled, such as from $50 million in award value from the two oncology trials canceled in early 2021; and (iv) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's "Clinical B2B ha[d] been overstated by ~0.2x," in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $1.18 billion, its net new business for the quarter was overstated by more than $267 million, and actual book-to-bill ratio was approximately 1.18x, not the reported 1.45x.

148. Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q2 2021 performance metrics that backlog was overstated by at least $1.18 billion and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q2 2021 would need to be written down.

149. Defendants' backlog and performance metrics reported on August 9, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### 4. Statement No. 17: Defendants Reported False and Misleading Backlog and Performance Metrics for Q3 2021

150. On November 3, 2021, Syneos filed its quarterly report on Form 10-Q announcing its financial results for the quarter ended September 20, 2021 (the "Q3 2021 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. In connection with the Q3 2021 Form 10-Q, Syneos filed its Form 8-K, which reported the same backlog and performance metrics that were reported in the Q3 2021 Form 10-Q:

| Q3 2021 ($m)[16] | | | | | | |
|---|---|---|---|---|---|---|
| **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $12,014.2 | $11,281.4 | $1,353.8 | $5,322.2 | 1.30x | 1.39x | 22.3% |

151. Defendants' reported backlog and performance metrics for Q3 2021 were materially false and misleading when made. As described in §V.B, Defendants violated its stated "New Business Awards and Backlog" methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric.

152. For example, as Defendants did in reporting false and misleading backlog and performance metrics in Q2 2021, they also did the following for Q3 2021:

- Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.
- As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to ensure that the finance team could capture award value and add it to backlog for the previous quarter.

---

[16] Each of the metrics in the chart was reported in the Q3 2021 Release. The Q3 2021 Form 10-Q reported backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

- Syneos included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year and it never being probable that award value in excess of the $20 million was collectible. As a result, Syneos's reported backlog was inflated by as much as $280 million from 2020 and, based on Macdonald's "progressive" and "slow and steady approach," where "We add a quarter at a time as we go," was further inflated by an additional $140 million from Q1 and Q2 2021. In Q3 2021, Syneos improperly recorded as net new business an additional $70 million in uncollectable award value from GSK in Q3 2021 and maintained that amount in backlog through the end of the Class Period.

- Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing.

- When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.

- Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

153. In addition, Defendants also failed to remove canceled and uncollectable awards from backlog. For example, as observed by a Senior Director of Project Financial Management during the Class Period, Syneos included in backlog a $100 million milestone award, while knowing that the bonus would never be collected. Syneos had entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years and the total award value was in the hundreds of millions of dollars. Those contracts provided that Syneos could earn a $100 million bonus if certain milestones were met on time during the course of the contract. Even though Syneos missed the very first milestone in the first of those clinical trials, Defendants included the entire $100 million milestone bonus in backlog. A Senior Director in Project Financial Management observed that the refusal to remove the canceled oncology awards was out of concern about the negative impact it would have on the Company's reported book-to-bill ratio.

154. As a result of the above manipulations, including (i) $420 million of improbable and uncollectible award value from the GSK contract maintained in backlog from full year 2020 and Q1-Q2 2021; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q3 2021; (iii) award value maintained in backlog where contracts had been canceled, such as from $50 million in award value from the two oncology trials canceled in early 2021; (iv) $100 million in award value maintained in backlog from the unearned milestone bonus; and (v) the inflation to backlog and net new business overstatement as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's "Clinical B2B ha[d] been overstated by ~0.2x," in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $1.569 billion, its net new business for the quarter was overstated by more than $382 million, and actual book-to-bill ratio was approximately 0.94x, not the reported 1.3x.

155. Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q3 2021 performance metrics that backlog was overstated by at least $1.569 billion and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q3 2021 would need to be written down.

156. Defendants' backlog and performance metrics reported on November 3, 2021, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

## V. AFTER LIQUIDATING THEIR SYNEOS HOLDINGS, DEFENDANTS' SCHEME SLOWLY UNRAVELS

### A. Syneos's Backlog Remained Inflated as Defendants Slowly Revealed the Truth

157. Having inflated backlog, manipulated the Company's performance metrics, and falsely portrayed Syneos as healthy and growing for almost two years while Defendants and other insiders liquidated more than 38 million shares of Syneos common stock for proceeds of more $3.19 billion, and with Macdonald soon to be exiting the Company, Defendants' scheme slowly began to unravel as the effects of their long-running manipulations were revealed.

158. On February 17, 2022, Syneos filed its Form 8-K for the fourth quarter and full year results for 2021, followed by its 2021 annual report on Form 10-K ("2021 Form 10-K"), which was signed by Defendants Macdonald and Meggs. These filings reported the Company's financial results, backlog and performance metrics for the fourth quarter and full year and, for the first time, reported backlog with and without reimbursable expenses:

| **Q4 and FY 2021 ($m) (*including* reimbursable expenses)**[17] | | | | | | |
|---|---|---|---|---|---|---|
| **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $11,427.6 | $10,567.3 | $357.1 | $4,362.6 | 0.34x | 1.09x | 2.9% |
| **Q4 and FY 2021 ($m) (*excluding* reimbursable expenses)** | | | | | | |
| **Backlog** | **Clinical Backlog** | **Clinical Net New Business (Q)** | **Clinical Net New Business (TTM)** | **Clinical Book-to-Bill Ratio (Q)** | **Clinical Book-to-Bill Ratio (TTM)** | **Clinical Backlog Growth (YOY)** |
| $7,459.6 | $6,771.7 | $895.5 | $3,579.5 | 1.26x | 1.34x | 15.4% |

159. The Company's financial and operational results for Q4 and full year 2021 were deeply disappointing and despite Defendants' prior claims that reimbursable revenues would undergo "strong

[17] Each of the metrics in the chart was reported in the Q4 2021 Release. The 2021 Form 10-K reported backlog, clinical backlog, clinical net new business (TTM), and clinical backlog growth (all figures including reimbursable expenses).

growth" and "accelerat[e]," Syneos revealed that reimbursable revenues would in fact likely never recover to pre-pandemic levels. More surprising, Defendants reported a shockingly low book-to-bill ratio of 0.34x, revealing that a massive portion of reimbursable expenses maintained in the Company's backlog would never be collected and were removed.

160. Jefferies estimated that Syneos removed $850-$950 million in pass-through revenue, recognizing "that the magnitude of mgt's overestimation means that Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)." The large write-off indicated that the Company's previously reported backlog was inflated by nearly $1 billion. Speaking to investors about the write-down, Defendants stated that the post-pandemic shift in service delivery, with more remote work, would "have a lasting impact on our revenue profile."

161. Syneos also told investors that it "adjusted" its "expectations for reimbursable expenses, which impacted our total book-to-bill, net awards and backlog metrics." Including reimbursable expenses, the Company reported $357.1 million in net new business awards in Q4 2021 – a stunning decline of close to $1 billion from the previous quarter.

162. On this news, the price of Syneos common stock fell from $83.37 per share on February 16, 2022, to $79.36 per share on February 17, 2022, a decline of more than $4 per share, or nearly 5%, on above-average trading volume of approximately 1.8 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

163. Defendants continued to hide the pervasive technological and quality problems that had plagued Syneos's clinical business throughout the Class Period leading to a loss of business and customer defections and Defendant Macdonald emphasized that the Company's "[s]trong fundamentals and execution across our business, combined with innovative, integrated clinical and

commercial capabilities enabled by data and technology, drove robust earnings and cash flow growth in the fourth quarter and full year 2021." Macdonald continued, "The market for our services remains strong, driven in part by customer adoption of our unique product development strategy, new drug approvals and biotech funding."

164. Defendant Meggs gave the same excuse Defendants used for the Company's October 2020 pandemic-related $170 million adjustment of reimbursable expenses – that the adjustments and anticipated reduction in reimbursable expenses were "driven by lower travel expenses and an increased mix of remote site visits" – and downplayed the significance of the erosion in Syneos's reimbursable expenses And Macdonald similarly reassured investors that "[t]he demand environment remains healthy, both in terms of macro market dynamics and robust new business pipelines across our organization." Macdonald continued: "Importantly, we remain confident in our expectations for low double-digit clinical revenue growth for 2022, excluding the impact of reimbursable expenses, along with continued margin expansion."

165. Indeed, Defendants' reported backlog remained inflated because, as described in §IV.B., Defendants had violated its stated "New Business Awards and Backlog" methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric, and the Company's backlog remained inflated. And as a result of the above manipulations, including the addition of (i) $490 million from improbable and uncollectible award value from the GSK contract maintained in backlog from 2020 and Q1-Q3 2021; (ii) the uncollectible $70 million in award value from the GSK contract for Q4 2021, (iii) award value maintained in backlog where contracts had been canceled, such as from the two canceled $25 million oncology contracts; and (iv) $100 million in award value from the unearned milestone bonus, Syneos's backlog was inflated by at least $710

million, its net new business was overstated by more than $70 million, and actual book-to-bill ratio was approximately 0.28x, not the reported 0.34x.

166. After this disclosure, four of Syneos's top executives left the Company. Defendant Macdonald, who served for about six years as the Company's CEO, abruptly announced his retirement in April 2022. Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline. Four months later, in August 2022, Defendant Colvin, President of the troubled Clinical Solutions segment, also left. In January 2023, Syneos announced a "Chief Financial Officer Transition," through which Defendant Meggs would leave the Company. Defendant Keefe, who temporarily succeeded Macdonald as CEO, departed the Company in October 2023.

167. Over the next several months, Defendants continued to hide the fact that they had and were continuing to manipulate the Company's clinical backlog and performance metrics. On April 29, 2022, Syneos filed its Form 8-K for the first quarter of 2022 (the "Q1 2022 Release"), followed by its 2022 quarterly report on Form 10-Q ("Q1 2022 Form 10-Q"), which was signed by Defendants Macdonald and Meggs. These filings reported the Company's financial results, backlog and performance metrics for the fourth quarter and full year and highlighted that Syneos had an ending backlog of $11,634.1 million as of March 31, 2022, consisting of $10,772.3 million for Clinical Solutions, representing growth of 2.5% and 3.7%, respectively, compared to the same period in 2021.

168. While Syneos had removed $850-$950 billion in reimbursable (zero-margin) expenses from backlog in Q4 2021, Syneos's reported backlog, including its non-reimbursable clinical backlog, remained inflated and remained inflated through the end of the Class Period. Indeed, as a result of the above manipulations, including (i) $560 million from two years of improbable and uncollectible award value from the GSK contract maintained in backlog from 2020 and 2021, (ii) award value maintained in backlog where contracts had been canceled, such as from the two canceled $25 million oncology

contracts; and (iii) $100 million in award value from the unearned milestone bonus, Syneos's backlog remained inflated by at least $710 million.

### B. Statement No. 18: Defendants Made Actionable Misstatements and Omissions During the Company's April 29, 2022 Conference Call

169. On April 29, 2022, Defendants held a conference call for investors to discuss the Company's Q1 2022 results. Defendants Macdonald, Meggs, and Keefe participated in the call, along with Michael Lee Brooks, Syneos's new Global Head Clinical Development Solutions. During the call, which would be Macdonald's last as CEO, Brooks discussed the clinical group and the drivers for the clinical group's success:

> ***[O]ne of our other differentiators, this year, we've been really focusing in on customer, customer, customer, customer, being exceptional in delivery and quality and simplifying our operating model***.

170. Defendants' statements during the April 29, 2022 conference call were false and misleading and omitted to disclose material facts necessary to make the statements not misleading. Syneos's operating model was not resonating with its customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture.

171. In addition, while Defendants described "***one of our other differentiators***" as having "***been really focusing in on customer, customer, customer, customer, being exceptional in delivery and quality and simplifying our operating model***," the truth was that the Company was unable to provide service to the level their customers required and Syneos lacked the technological infrastructure to be competitive. In fact, as Defendant Keefe admitted in November 2022, the Company's operations had been in disarray for at least 18 months and the Syneos lacked the technological offerings to "be more competitive."

172. Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business.

173. Defendants' statements on April 29, 2022, which were false and misleading when made, had a direct effect on the price of Syneos stock, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### C. Defendants Reveal the Truth About Syneos's Inability to Compete and Its Inflated Backlog

174. On August 2, 2022, Syneos filed a release on Form 8-K announcing its financial results for the quarter ended June 30, 2022 (the "Q2 2022 Release"). The Q2 2022 Release revealed substantial additional deterioration in the Company's business, disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34% including reimbursable expenses and 15% excluding reimbursable expenses, reflecting book-to-bill ratios of 0.94x and 1.29x, respectively. The Q2 2022 Release also revealed that Syneos would not achieve even its lowered expectations for reimbursable revenues for the year, causing the Company to slash expected 2022 revenues by $185 million at the midpoint.

175. On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, ***a decline of nearly $14 per share***, or ***over 17%***, on above-average trading volume of 3.2 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues.

176. Then, on September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses.

177. That same day, on September 13, 2022, Defendants Keefe and Meggs attended and addressed investors and analysts at the Baird 2022 Global Healthcare Conference. During the conference, Defendants Keefe downplayed the delays in near-term awards and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were delaying contract awards.

178. On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volumes of approximately 1.7 million shares traded on September 12 and 2 million shares traded on September 14. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues.

179. Finally, on November 4, 2022, Syneos released its financial results for the quarter ended September 30, 2022 (the "Q3 2022 Earnings Release"), revealing that Syneos's book-to-bill ratios had plummeted far below even the reduced figures provided in September 2022. Specifically, Defendants reported that the Company's Clinical Solutions segment had achieved net new business awards of just $182 million including reimbursable expenses – ***a startling year-over-year decline of 86.5%*** – and a book-to-bill ratio of just 0.18x for the quarter, which was just one-tenth of the expected new business growth. And the Company's Clinical Solutions backlog plummeted 13.6% year-over-

year to just $9.747 billion including reimbursable expenses, or by 2.5% year-over-year to $6.44 billion excluding reimbursable expenses. Syneos also slashed its anticipated 2022 revenues by $160 million.

180. On November 4, 2022, Defendants hosted a conference call with securities analysts to discuss the devastating results for Q3 2022 reported by the Company. Although Defendants were, throughout the Class Period, aware of the undisclosed turmoil wreaking havoc on Syneos's operations and financial performance, Defendants finally disclosed to investors that underlying demand issues that were "specific to Syneos" caused the Company's win rate to plummet. Defendant Keefe revealed for the first time that "a number of leadership and organizational changes within strategic business development over the last 18 months" caused Syneos's operations to experience undisclosed turmoil. As a result, Defendant Keefe admitted that not only had the Company's win rate declined but also that Syneos was unable to convert its bloated backlog to revenue because existing customers had delayed decisions to retain Syneos. Even worse, Defendant Keefe revealed that the Company's request for proposal ("RFP") process had slowed significantly and that existing customers for whom Syneos had already completed work were unwilling to re-sign with the Company.

181. Defendant Keefe further admitted what insiders at the Company had known since before the beginning of the Class Period: that the longstanding and pervasive quality problems plaguing Syneos's ability to deliver on its clinical operation model to produce outstanding clinical trials data damaged the Company's reputation with its hallmark SMID customers. Defendant Keefe admitted that these problems had negatively impacted the Company's ability to win repeat business. Defendant Keefe further admitted that the Company's book-to-bill ratio was one-tenth the size from a year prior. As to customer delays, Defendant Keefe also admitted that the Company did not have visibility as to when those delays could be repaired.

182. Continuing, Defendant Keefe also confirmed that – contrary to their prior assurances that Syneos was a technology leader, the Company had failed to timely implement a technology-enhanced delivery model that its customers demanded. Specifically, Keefe stated that Syneos's "SMID customers are clear that they want Syneos . . . to deliver therapeutic insights, but with enhanced agility," and to that end Syneos was "working to reduce the complexity of our full-service operating model [and] streamline our organization and processes" to provide "an efficient and effective delivery model supported by . . . technology enhancement[s]." However, as Keefe "put it plainly, it has been more extensive and taken longer than we expected" and "[a]s a result, we did not evolve our business development capabilities to fully leverage our integrated solutions or effectively engage our customers within the current competitive environment." Keefe added that Syneos was still "strengthening our approach . . . to design the best delivery strategy for each customer opportunity, enabled by technology and shared insights." Michael Brooks, Syneos's Chief Development Officer, added that Syneos was "removing redundancies and layers within the organization that . . . historically had gotten in the way of exceptional delivery."

183. Keefe further clarified that poor results and lower revenue were not just caused by delays in decisions but were driven by a "reduction in awards from post revenue SMID" as well as "a reduction in our normal ***repeat*** business awards" which "were down probably somewhere between 30% and 50%." Keefe explained that the loss of existing awards and repeat business were caused by Syneos's lack of agility and failure to "***integrat[e] all the great capabilities we've developed and acquired over the last 12 to 18 months, consistently into our good defenses and our relationships with those customers***."

184. Analysts were shocked and justifiably skeptical of Defendants' purported explanations. One analyst, referring to Syneos's dreadfully low book-to-bill ratios, challenged: "***We've never seen***

***that happen***." Another complained: "I don't even know where to start with this," stating that management's dubious claim that Syneos was not experiencing significant cancellations was "***frankly hard to believe*** . . . given that ***pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected*** . . . ***it just doesn't feel reasonable***." Analysts continued to react negatively in subsequent written reports. For example, Barclays called Syneos's disclosures "very disappointing," citing a "miss across the board" and Mizuho stated the results were "worse than expected."

185. On this news, the price of Syneos common stock fell from $47.81 per share on November 3, 2022, to $25.70 per share on November 4, 2022, a decline of more than $22 per share, or 46%, on abnormally high trading volumes of 7.4 million shares traded.

186. Then, on December 1, 2022, Defendant Keefe presented at the Evercore ISI HealthCONx Conference and made further post-Class Period admissions regarding the undisclosed turmoil that affected Syneos's operations throughout the Class Period. During that conference, Defendant Keefe answered numerous questions from Evercore securities analyst Elizabeth Anderson and provided information about the problems at Syneos. Contrary to Defendants' Class Period statements that "***Our model, people, and culture are our competitive advantage***," Defendant Keefe admitted that Syneos had been plagued by its failure to deliver quality clinical trials and had lost its ability to engage with its hallmark SMID customers because of leadership and organizational changes that severed the ties between leadership and business development. As a result, its win rate with these customers plummeted. In addition, due to ongoing quality problems and the resulting reputational damage, Defendant Keefe admitted that existing customer decision delays skyrocketed, stating "we had a ***significantly lower win rate*** on the opportunities with the post-revenue SMID customers that

were decided in Q3. And then we did have decision delays that were 3x to 4x higher than we experienced in Q2, primarily with the ***post-revenue SMID customers***."

187. Keefe also admitted that, contrary to Defendants' earlier Class Period statements that the Company's "capabilities to bring technology . . . to project designs" "really helps us resonate in the market," Syneos had needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Keefe stated that "Clinical Reimagined" was one of the Company's "steps in place to address the post-revenue SMID cohort." However, Keefe stated "it's taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace." Keefe further stated that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market." In response to a question concerning the Company's "sudden reduction in . . . win rate," Keefe deflected and lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was "on the right track to be competitive," after the "roll[] out" of the "new model," *i.e.*, Clinical Reimagined. Keefe reiterated this sentiment later in the call, commenting that she felt like a "broken record," stating "Clinical Reimagined is really on the right track to help us be more competitive for sure."

188. Further still, on February 16, 2023, COO Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these new capabilities, which Syneos had lacked throughout the Class Period, allowed clients to "g[e]t a really good benefit from now having good data visualization, seeing into the projects and being able to see the modeling out of various new things, like site activations, enrollment and data." The same day, Keefe admitted that the Company was in the process of

"transforming our clinical operating model" to "clos[e] competitive gaps," stating that "[f]oundational to these improvements have been investment and accelerated development of clinical development tools and data applications, ranging from statistical modeling for site performance and enrollment to use of AI machine learning to better detect risks and issues." In response to a question from Eric Coldwell, an analyst at Baird, concerning "obvious signs of share loss," Keefe stated that "we understand the position we're in, and we know we have to improve our RFP volume. We have to improve our win rates . . . we need to convert the more high-value opportunities. So we know those are the things we need to do, to stay competitive in the marketplace."

## VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

189. As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that their statements and the public documents and statements issued in the Company's name were materially false and misleading, and they knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws.

190. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that their positive representations were false and misleading and omitted such information. As a result, each Defendant was responsible for the accuracy of Syneos's corporate statements and is therefore responsible and liable for the misrepresentations in and omission from such statements.

191. ***Defendants Were Aware of Information Contradicting Their Statements to Investors***. The Individual Defendants served as the Company's CEO (initially Macdonald, and thereafter Keefe), CFO (Meggs), or as President of Syneos's Clinical Solutions segment (Colvin). Because of their high-

ranking positions with the Company, they were responsible for, and remained well-informed of, issues critical to the Company's success, including the Company's critical performance metrics.

192. The Individual Defendants were each provided with statements and other information alleged herein to be false and misleading or omitted material information prior to its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected, as follows:

193. Defendants Macdonald, Meggs, Keefe, and Colvin – the most senior members of the Executive Leadership Team – were present at monthly ELT Meetings during which Syneos's inability to provide quality services and utilize critical technological tools, and clinical workforce turnover issues, were discussed. The purpose of these meetings was to plan, facilitate, and review the status of the Company's strategic initiatives. For example, the Individual Defendants attended a January 28, 2021 ELT Strategy Review Meeting where they were provided with and discussed a presentation belying the accuracy of their public statements about the health of Syneos's Clinical Solutions segment. The purpose of the January 2021 ELT presentation was to show how future awards from Syneos's 15 largest customers were at jeopardy because of quality problems ravaging the Company's customer relationships. Among other things, the presentation indicated that by the end of 2020 and into 2021, numerous clients had put Syneos business awards on "hold" and Syneos was unable to secure new business until it addressed its lack of a "quality culture," cured its "delivery failures," and "earned back trust." That presentation also spelled out in black and white that quality at Syneos was a disaster because the same issues were recurring and could not be remedied. Through their participation in the ELT meetings, Defendants knew that: (i) quality issues were reported late at Syneos and were not communicated in a timely fashion to the Company's clients; (ii) Syneos's audit inspections and root cause analyses were not effective in correcting the recurring quality issues; and (iii) quality was not embedded in the day-to-day execution at Syneos.

194. Additionally, Macdonald, Meggs, and Colvin were told by other Syneos executives that dissatisfied clients had stopped awarding Syneos new business as a reaction to the Company's severe quality issues preventing Syneos from delivering accurate clinical trial data on time and in a useful format.

195. Also, as explained above, after the Class Period, Defendant Keefe and other Company executives admitted that they had known of the undisclosed problems that were causing a loss of new and repeat clinical business for at least 18 months and that the issues persisted throughout the Class Period.

196. On December 1, 2022, Defendant Keefe further admitted that Syneos had known that it needed to "improv[e]" its technological offerings in order to "be more competitive." Indeed, Defendant Keefe stated that the corporate initiative to upgrade Syneos's technology offering to customers, including a client portal critical to customers, was still not in place after the Class Period. Keefe stated: "Clinical Reimagined," one of the Company's recent "steps in place to address the post-revenue SMID cohort" had "taken longer than I like and longer than I think anybody who's probably listening to me right now would like," adding that "we're continuing to just stay focused on improving this so that we can be more competitive in the marketplace." As noted, "Clinical Reimagined" was the program to bring a modern client portal to Syneos. Keefe further conceded that "we haven't consistently integrated some of our technology and some of our acquisitions as holistically as we can," adding that "we didn't . . . leverage our whole breadth of capabilities to be competitive in a very competitive market." In response to a concern about the Company's "sudden reduction in . . . win rate," Keefe lamented that she "can't change the past," and "can only correct for the future," noting that Syneos was only now "on the right track to be competitive," following the "roll[] out" of the "new model," *i.e.*, the recently-implemented Clinical Reimagined.

197. On February 16, 2023, COO Michael Brooks admitted that the Company had suffered from "competitive gaps in things, like data visualization tools and some of our statistical modeling tools," adding that these capabilities, which Syneos lacked throughout the Class Period, would allow clients to "g[e]t a really good benefit from now having good data visualization, seeing into the projects, and being able to see the modeling out of various new things, like site activations, enrollment and data."

198. ***Defendants' Public Statements Confirm that They Had Visibility into the Performance of Syneos's Clinical Solutions Segment***. Syneos's problems impacted on the most important issues facing the Company and were the focus of senior Syneos management, including the Individual Defendants.

199. The Individual Defendants each confirmed that they had a clear view of the demand for Syneos's Clinical Solutions services, and the performance of this segment, in conference calls with investors during the Class Period. For example, on a November 3, 2021 earnings call, an analyst for Citigroup asked Defendants Macdonald and Meggs to talk about the "visibility" into the Company's revenue pipeline. Macdonald responded by saying that he had "good" visibility into the backlog coming through clinical "the whole year," and then went on to discuss how "strong" the Company's pipeline was due to the number of RFP discussions with customers and the amount of work "coming [the Company's] way."

200. Consistent with statements confirming their familiarity with the clinical solutions business, the Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding Syneos's competitive position, client demand environment, contract execution, employee retention and performance, and the integration of Syneos's various acquisitions and diverse product teams. On industry and earnings conference calls during the Class Period, the Individual Defendants

made numerous statements demonstrating their involvement in and knowledge of the same. During almost every conference call Syneos hosted or attended during the Class Period, Macdonald, Meggs, Keefe, and/or Colvin spoke to investors about Syneos's sales activity and the various performance metrics such as backlog, net new business awards, bookings, book-to-bill ratios, and the conservative manner in which Syneos supposedly only booked one year of FSP contract revenue into backlog, and how each of these performance metrics contributed to Syneos's financial results.

201. Defendant Macdonald spoke frequently about the demand for Syneos's Clinical Solutions services and the Company's critical performance metrics. For example: (i) on September 9, 2020, Macdonald stated Syneos's "net awards growth driving at 10% year-over-year growth . . . puts us in a very strong position," the Company was enjoying "pent-up demand," and Syneos's "position in [the] market is growing and strengthening. The strategy that we have seems to be resonating very strongly with customers across all sectors"; (ii) on October 29, 2020, Macdonald stated Syneos's "[g]ross awards remain very strong, including a record quarter of awards from our small-to mid-sized customer segment," and "Our Clinical pipeline remains robust across customer segments, fueled by double-digit growth in SMID RFP flow year-to-date, including a record third quarter"; and (iii) on April 29, 2021, Macdonald pointed to the "continued recovery in reimbursable expenses," as an example of the Company's "continued recover[y] from the impacts of COVID-19." Macdonald also signed SOX certifications in the Company's Forms 10-Q and 10-K filed with the SEC from the start of the Class Period through April 2022, in which he attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and that he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.

202. Defendant Meggs, Syneos's CFO, also spoke frequently about the demand for Syneos's clinical services and the critical performance metrics throughout the Class Period. For example: (i) on October 29, 2020, Meggs stated "we had a strong quarter across our operating and financial metrics, including gross awards, backlog growth, profitability and cash flow;" (ii) also on October 29, 2020, Meggs addressed securities analysts' concerns about COVID's impact on Syneos's reimbursable expenses and book-to-bill ratio, stating: "When you think about the backlog and the adjustment in clinical, we – if you just take out the backlog adjustment, our book-to-bill in the quarter in clinical would have been north of 1.4, again"; and (iii) in November 2020 Meggs highlighted the "record" customer order flows and pipeline. In December 2020, Meggs further discussed clinical's "backlog, pipelines, and customers relationships," and described how the Company's "model, people, and culture" are Syneos's "competitive advantages." Meggs also signed SOX certifications for each Form 10-Q and 10-K filed by Syneos during the Class Period, in which he attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and he had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to him.

203. Defendant Keefe was a senior member of the ELT throughout the Class Period and held a number of senior positions, including CEO from April 2022 to October 2023. Keefe spoke frequently about the Company's critical performance metrics and the demand for Syneos's clinical services. For example, on August 2, 2022, Keefe stated "market demand is healthy, and our pipeline of opportunities remains comparable to 2021. Specific to our clinical SMID portfolio, our total pipeline of opportunities is up double digits compared to 2021, and we had record net awards during Q4 '21 and Q1 '22." Additionally, Keefe signed SOX certifications in Syneos's Q2 2022 Form 10-Q

in which she attested that the information presented to investors "fairly present[s] in all material respects [Syneos's] financial condition [and] results of operations," and she had designed and tested the effectiveness of disclosure controls and internal controls over financial reporting to ensure that material information relating to the Company was made known to her.

204. Defendant Colvin, President of Clinical Solutions until September 2022, also spoke frequently about the Company's critical performance metrics and the demand for Syneos's clinical services. For example, on December 8, 2020, Colvin stated "We have year-over-year clinical backlog growth of over 30% for the top 50 pharma customers as of the end of third quarter" and "we're growing our share in large pharma."

205. In light of Defendants' positive statements about Syneos to the market on topics that were material to Syneos investors, it was incumbent on Defendants Macdonald, Meggs, Keefe, and Colvin to ensure they understood the true and full facts concerning the topics on which they spoke. Either they possessed the knowledge of the Clinical Solutions segment they claimed to have, in which case they knew their statements were false, misleading, or omitted material information, or they lacked the knowledge they claimed to have, in which case their conduct was severely reckless. Indeed, in order to speak so knowledgeably regarding the demand for Syneos's clinical services, backlog, new business awards, and book-to-bill ratios, and to respond to investors and analysts' interest about such topics, Defendants had to receive updates and briefings on the status and progress of the Company's performance metrics and perform their own due diligence, by attending ELT and other senior management meetings and presentations, reading internal analyses and research reports, and otherwise preparing for conference and earnings calls.

206. ***The Alleged Fraud Relates to Syneos's Core Business, Its Ability to Compete for and Win New Business, and Its Critical Performance and Backlog Metrics***. Syneos primarily provides

contract research and commercial services to pharmaceutical and biotechnology companies that require clinical drug and medical device development and commercialization services. In its annual reports, Syneos describes its "Principal Business" as the provision of end-to-end biopharmaceutical outsourcing solutions through two segments: Clinical Solutions and Commercial Solutions. The fraud alleged herein directly concerns the operational results and financial health of its Clinical Solutions segment, which, according to the Company's SEC filings, generates the vast majority of the Company's revenues. Indeed, for the year ended December 31, 2020, Syneos derived 75% of its revenue ($3.31 billion), and for the year ended December 31, 2021, Syneos derived 77% ($4.01 billion) of its revenue from its Clinical Solutions segment. Moreover, the Company's Clinical Solutions business helps drive revenue on the Commercial Solutions side, as the Company is able to carry its relationships from its clinical programs over and into commercial sales. Thus, the Individual Defendants knew, or were deliberately reckless in not knowing, about the true nature and performance of the Clinical Solutions segment's operational results and financial health.

207. ***The Individual Defendants Knew that Backlog Had Been Inflated and Reported Performance Metrics Were Manipulated***. To hide the Company's crippling operational deficiencies, the Individual Defendants knowingly manipulated Syneos's reported performance metrics to falsely portray the Company's clinical business as healthy and growing. For example:

- Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by customers.

- As observed by an Associate Director of Finance during the Class Period, on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to ensure that the finance team could capture award value and add it to backlog for the previous quarter.

- Syneos maintained uncollectible award value in backlog each year from GSK despite never receiving more than $20 million in contract revenue during any year. As a result, by Q1 2021 and throughout 2021, Syneos's backlog was inflated by at least $280 million. And, based on Macdonald's "progressive" and "slow and steady approach," where "We add a quarter at a time as we go," Syneos improperly included in backlog

an additional $70 million in uncollectable award value from GSK throughout the Class Period.

- Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing. Having already recognized revenue on the basis of lower cost estimates, Defendants knew that they would never realize and collect on these reimbursable (zero-margin) out-of-pocket expenses that Defendants were maintaining in backlog.

- Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking.

- Defendants failed to remove canceled and uncollectable awards from backlog. For example, as observed by a Senior Director of Project Financial Management during the Class Period, Syneos included in backlog a $100 million milestone award, while knowing that the bonus would never be collected. Syneos had entered into a large agreement with a big pharma company to conduct eight clinical trials over a number of years and the total award value was in the hundreds of millions of dollars. Those contracts provided that Syneos could earn a $100 million bonus if certain milestones were met on time during the course of the contract. Even though Syneos missed the very first milestone in the first of those clinical trials, Defendants included the entire $100 million milestone bonus in backlog. A Senior Director in Project Financial Management observed that the refusal to remove the canceled oncology awards was out of concern about the negative impact it would have on the Company's reported book-to-bill ratio.

- After two large oncology clinical trials worth $25 million each were canceled in early 2021, Defendants retained the award value in backlog to inflate the Company's performance metrics. And, when the business unit CFO Mike Donovan tried to have these trials removed from the backlog, he was overruled by his superiors, who were concerned that removing the canceled awards from backlog would decrease the Company's book-to-bill ratio.

208. Syneos was reluctant to remove the inflated reimbursable costs from backlog because doing so would adversely impact the Company's book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President of Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions),

and Michael Donovan (Business Unit CFO) were involved in and/or aware of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on book-to-bill ratio. After the month-end close, these individuals and the business unit CFOs met with Defendant Meggs to present the consolidated financials. Fillman, Moore, and Donovan discussed these practices and the impact this would have on the Company, and Donovan warned that these practices could amount to fraud. To accommodate these practices, Syneos had a practice by which it would extend the month-end close until the numbers had reached certain pre-determined amounts.

209. For example, in Q3 2022, Syneos directed one Project Director, through email, to add additional monitoring visits on the calendar for a study, which would generate additional reimbursable revenue for Syneos because the Company is paid when a Clinical Research Associate goes to a site. The Project Director objected to adding visits to the calendar because there was no need to do any more visits for the study. However, she was told to set up the visits anyway because Syneos was scrambling to generate more revenue around this time.

210. The Defendants' manipulation of reimbursable expenses and backlog was not a secret within Syneos. For example, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking-to-target metric. The Executive Vice President of Operations, the Head of Commercial, Defendant Keefe, the Head of Sales, and all of the sales representatives participated in these Monday calls. Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations and the entire sales organization knew where the Company was in terms of tracking to target. In each quarter during the Class Period, Syneos backlog was inflated by several hundred million and its new business awards were overstated. Regardless of the size of the gap to their target, Syneos always made it up.

211. Directives to find additional value were often delivered during meetings with executives to discuss clinical segment financials, organized by therapeutic area (with additional meetings for large clients like Pfizer and Bristol Myers Squibb), and accompanied by pressure from Defendant Colvin and Brown to change targets and cost estimates to hit performance metrics and prematurely generate revenue without affecting backlog. These meetings were held monthly and led by Bekki Brown, the Executive Vice President of Operations, and attended by Kaitlyn Stadiem and Victoria Moore, who reported directly to Defendant Meggs. Defendant Colvin personally attended several of these meetings.

212. At these meetings, the finance team was told how much they were off target and how much value they needed to "find." Bekki Brown directed members of project teams to change estimates to completion on clinical trials in order to recognize revenue earlier. These revenue totals were then consolidated and presented to Defendant Meggs. Even though the revenue numbers had already been reviewed and approved at many levels, including a review by the project financial analysts and managers, and even though the month or quarter should have already closed, Brown would then issue directives to find more revenue in various ways to increase revenues for the quarter or year. Efforts to manipulate backlog and prematurely recognize revenue occurred during the Class Period.

213. Other times the directives were handed down through calls or emails. For example, in one email to all business unit CFOs, sent on July 10, 2021, Defendant Colvin, who was the head of the clinical business, indicated that Syneos was "still a long way off target," outlined specific "targets as improvement," and directed them to "work with your CFOs" to hit said targets. When Defendant Meggs was brought certain figures indicating a shortfall, he simply said "No" until he received the numbers he wanted.

214. Numerous high-level managers, including business unit CFOs, voiced objections to these efforts to manipulate backlog, expedite revenue recognition, and change cost estimates and ultimately left the Company because they felt they could not justify these practices. For example, between September 2020 and April 2022, one Senior Director sent emails expressing her discomfort with the Company's numbers. The same Senior Director also noted her discomfort with certain financials in SOX certifications (which were signed by Defendants Macdonald, Keefe, and Meggs). Ultimately, this Senior Director, under duress, had to agree to numbers with which he or she was uncomfortable.

215. One business unit CFO similarly resisted signing off or certifying month-end numbers for his business unit and warned superiors many times against how the Company was recognizing revenue and recording backlog and predicted that it could not be sustained. This CFO had one-on-one discussions with the Clinical CFO, Jennifer Fillman, who reported to Defendant Meggs and the Business Unit CFO, Victoria Moore, in which the CFO warned Fillman and Moore that the Company's practices could amount to fraud.

216. ***The Individual Defendants and Other Insiders Capitalized on Syneos's Inflated Stock Price to Unload Billions of Dollars' Worth of Syneos Stock***. The Individual Defendants and Company insiders also had the motive and opportunity to commit fraud.[18] While the price of Syneos common stock was artificially inflated, Company insiders, including each of the Individual Defendants and Syneos's largest shareholders and private equity sponsors, Thomas Lee Partners and Advent International, collectively dumped more than $3 billion in Syneos stock at prices artificially inflated by the fraud alleged herein – a sudden and dramatic contrast to their pre-Class Period trading practices.

---

[18] Jon Olefson also served on Syneos's Executive Leadership Team. During the Class Period, he sold 13,440 shares of Syneos common stock at inflated prices for proceeds of $1,068,648.

217. ***Defendant Macdonald Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Macdonald entered the Class Period with 171,506 shares of Syneos common stock available to trade and the right to acquire tens of thousands of additional shares at prices substantially below then-current market prices by way of restricted stock units ("RSUs"). According to the Company's April 16, 2020 Proxy Statement, Macdonald reported beneficial ownership over 185,973 shares of Syneos common stock as of March 30, 2020. Between March 30, 2020, and the start of the Class Period, Macdonald reduced his position by 14,467 shares.

218. Thereafter, during the Class Period, Defendant Macdonald sold more than 142,000 of his personal Syneos shares at prices as high as $89.90 per share, for proceeds in excess of $11.4 million. These sales were highly suspicious in timing and amount and out of line with his prior trading practices. In particular, between January 2019 and August 2020, Macdonald slightly increased his holdings of shares in the Company.

219. Defendant Macdonald's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Alistair Macdonald | 12/22/2020 | 1,200 | $70.02 | $84,024 |
| Alistair Macdonald | 12/23/2020 | 300 | $70.52 | $21,156 |
| Alistair Macdonald | 2/1/2021 | 13,044 | $75.17 | $980,517 |
| Alistair Macdonald | 2/1/2021 | 51,175 | $75.84 | $3,881,112 |
| Alistair Macdonald | 2/2/2021 | 278 | $77.11 | $21,437 |
| Alistair Macdonald | 4/1/2021 | 13,720 | $77.61 | $1,064,809 |
| Alistair Macdonald | 4/1/2021 | 673 | $76.11 | $51,222 |
| Alistair Macdonald | 4/1/2021 | 3,005 | $77.92 | $234,150 |
| Alistair Macdonald | 4/9/2021 | 14,039 | $80.00 | $1,123,120 |
| Alistair Macdonald | 6/1/2021 | 4,889 | $88.20 | $431,210 |
| Alistair Macdonald | 8/2/2021 | 4,710 | $89.90 | $423,429 |
| Alistair Macdonald | 8/3/2021 | 7,032 | $88.49 | $622,262 |
| Alistair Macdonald | 8/3/2021 | 28,521 | $87.83 | $2,504,999 |
| **Total** | | **142,586** | | **$11,443,447** |

220. Defendant Macdonald's trading during the Class Period varied dramatically from his pre-Class Period trading history. In the two years before the Class Period, Macdonald collected trading proceeds of $3.94 million from sales of Syneos common stock – meaning that Macdonald's $11.44 million in Class Period proceeds tripled during the comparable pre-Class Period.

221. Moreover, virtually all of Defendant Macdonald's sales during the Class Period were executed pursuant to a 10b5-1 trading plan that was created and strategically amended to take advantage of the Company's inflated stock price and his material non-public information. On November 30, 2020, two months into the Class Period (and only six months after adopting his previous trading plan), Macdonald adopted a new trading plan. Over the course of the following nine months, Macdonald dramatically accelerated the liquidation of his position, selling 142,586 shares of Syneos common stock for $11.44 million in proceeds.

222. By the time he was done, Macdonald had liquidated at least 53% of his holdings of Syneos common stock.[19] Then, suddenly on April 29, 2022, after selling $11.44 million in stock and before truth was revealed regarding Syneos's actual operational metrics, Defendant Macdonald abruptly announced his resignation as CEO. Macdonald's sale of his Syneos stock stopped just a few months before Syneos revealed to the market that revenue would likely not recover to pre-pandemic levels and that the Company had eliminated $850-$950 million in uncollectible, pass-through revenues.

223. As CEO, Defendant Macdonald earned $909,255 and $1,114,884 in salary in 2020 and 2021, respectively, for a total of $2,024,139. Thus, Macdonald's insider sales proceeds ($11.4 million) represent more than 5.6 times as much as Macdonald earned in salary during this time.

[19] Ownership figures alleged herein are drawn from available holdings reported by the Company in its April 16, 2020 Proxy Statement and subsequently filed Forms 4, which report insiders' purchases and sales of a Company's equity securities.

224. ***Defendant Meggs Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Meggs entered the Class Period with 35,278 shares of Syneos common stock available to trade, and the right to acquire 16,918 additional shares at prices substantially below then-current market prices by way of RSUs.

225. During the Class Period, Defendant Meggs sold significant amounts of his tradeable shares of Syneos common stock. He sold nearly 40,000 shares, for $3.2 million in gross proceeds while he was in possession of material, non-public information regarding the truth about Syneos's financial and operational health.

226. Defendant Meggs's insider sales of his shares of Syneos common stock during the Class Period are shown in the table below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Jason Meggs | 11/24/2020 | 1,938 | $67.00 | $129,846 |
| Jason Meggs | 11/27/2020 | 4,062 | $67.00 | $272,154 |
| Jason Meggs | 1/6/2021 | 5,552 | $72.00 | $399,744 |
| Jason Meggs | 4/15/2021 | 6,000 | $84.00 | $504,000 |
| Jason Meggs | 6/30/2021 | 4,668 | $90.00 | $420,120 |
| Jason Meggs | 7/6/2021 | 660 | $90.00 | $59,400 |
| Jason Meggs | 9/3/2021 | 9,223 | $95.00 | $876,185 |
| Jason Meggs | 7/18/2022 | 7,500 | $72.81 | $546,075 |
| **Total** | | **39,603** | | **$3,207,524** |

227. Defendant Meggs's trading activity in the two-year period before the Class Period stands in stark contrast to his trading during the Class Period. In the comparable pre-Class Period, Meggs aggressively ***increased*** his position in Syneos by purchasing 7,205 shares (at a cost of $282,794) on the open market. However, during the Class Period, Meggs aggressively ***decreased*** his position, dumping more than $3.2 million worth of Syneos's common stock.

228. Further, Defendant Meggs's sales were often on the heels of the adoption of new or amended trading plans. In the 18-month period during which he liquidated nearly his entire Syneos position through a series of eight sales, Meggs adopted at least four 10b5-1 trading plans. In one

instance, Meggs adopted a new plan on February 26, 2021 – weeks after attending the January 2021 ELT meeting – and over the next two months sold 6,000 shares for proceeds of $504,000. One month later, Meggs adopted another plan and within six weeks had sold another block of Syneos shares for proceeds of $420,000. Over the following 10 weeks, Meggs sold almost 10,000 additional shares for proceeds of $935,000. By the time he stopped selling, Meggs had liquidated 80% of his Syneos stock holdings.

229. Defendant Meggs's proceeds from the Class Period sale of his Syneos stock ($3.2 million) represented 2.78 times as much as his earned salary during the same time. In his role as CFO, Meggs earned $600,000 and $549,836 in salary in 2021 and 2020, respectively, for a total of $1,149,836.

230. ***Defendant Keefe Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Keefe entered the Class Period with 10,986 tradeable shares of Syneos common stock and the right to acquire an additional 10,425 shares at prices substantially below the then-current market price by way of RSUs.

231. During the Class Period, Defendant Keefe also sold significant amounts of her Syneos shares, as reflected below:

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Michelle Keefe | 11/17/2020 | 800 | $62.65 | $50,120 |
| Michelle Keefe | 11/18/2020 | 856 | $65.00 | $55,640 |
| Michelle Keefe | 1/25/2021 | 4,000 | $75.68 | $302,720 |
| Michelle Keefe | 3/31/2021 | 2,000 | $78.00 | $156,000 |
| Michelle Keefe | 4/15/2021 | 2,736 | $82.00 | $224,352 |
| Michelle Keefe | 7/18/2021 | 8,333 | $72.81 | $606,726 |
| **Total** | | **18,725** | | **$1,395,558** |

232. Defendant Keefe's trading behavior in the two-year period before the Class Period stands in stark contrast to her trading during the Class Period. In the comparable pre-Class Period,

Keefe sold 4,000 shares for proceeds of $238,665. During the Class Period, Keefe sold nearly $1.4 million worth of Syneos's stock – nearly a six-fold increase.

233. Like Defendant Meggs, Defendant Keefe frequently adopted new 10b5-1 trading plans during the Class Period and followed each new plan with substantial stock sales. During the two-year Class Period, Keefe adopted or amended her trading plans at least four times. For example, following adoption of a plan on November 24, 2020, Keefe unloaded 4,000 shares for $302,720 in proceeds. One month later, Keefe adopted a new plan, followed by the sale of 4,736 shares for proceeds of $380,352. Her largest sale of stock during the Class Period – 8,333 shares for $606,726 in proceeds – occurred one month after the adoption of the fourth plan. By the time she was done, Keefe had liquidated nearly all of her holdings of Syneos common stock.

234. As the Company President, Defendant Keefe earned $567,000 in 2021 and $522,270 in 2020, for a total of $1,089,270. The proceeds from Defendant Keefe's sales of her Syneos stock represented 1.28 times what she earned in salary during that same time period.

235. ***Defendant Colvin Sold Syneos Shares at Prices Inflated by the Alleged Fraud***. Defendant Colvin became the President of Clinical Solutions at Syneos in December 2018 and then Chief Business Officer shortly afterwards. As CBO, he was responsible for driving Syneos's global growth strategy across the clinical to commercial continuum. During the Class Period, Defendant Colvin sold 8,486 shares of Syneos common stock for $634,922 in proceeds – all or virtually all of the Syneos common stock he held entering the Class Period. Defendant Colvin did not have any open market purchases of Syneos common stock during the Class Period.

| Defendant | Trade Date | Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Paul Colvin | 02/01/2021 | 8,486 | $74.82 | $634,922 |
| **Total** | | **8,486** | | **$634,922** |

236. Defendant Colvin's trading was a complete reversal from his pre-Class Period trading activity, when he was ***acquiring*** shares. Notably, Colvin did not have a single open market sale of Syneos shares in the two-year period leading up to the Class Period.

237. The illicit trading proceeds realized by all the Individual Defendants from their Class Period stock sales during the Class Period were significant relative to their ordinary compensation.

238. ***High-Level Syneos Insiders Dumped Billions of Dollars' Worth of Syneos Shares at Prices Inflated by the Alleged Fraud***. The Individual Defendants were not the only insiders dumping their Syneos stock before the true nature of the Company's operational and financial condition became known to the market; other insiders, in a departure from their previous trading histories, were selling significant amounts of Syneos stock.

239. In May 2010, TH Lee had acquired inVentiv for $1.1 billion, one of Syneos's predecessor companies. Thereafter, Advent purchased a 50% stake in inVentiv in 2016. Since then, the TH Lee and Advent had near-continuous Board representation at Syneos until they liquidated their Syneos holdings through a series of offerings at artificially inflated prices. TH Lee representatives, Joshua Nelson and Todd Abbrecht, served on the Syneos Board of Directors from before the Class Period until June 2021 and October 2022, respectively. Similarly, Advent representatives, John Maldonado and Thomas Allen, served on the Syneos Board of Directors from before the Class Period until June 2021 and November 2021, respectively.

240. Moreover, TH Lee and Advent emphasize the active involvement they have in the management of the companies in which they invest. As members of Syneos's Board, TH Lee and Advent helped shape Syneos's operations and communicated with Company executives, including Macdonald, Meggs, and Keefe, on a frequent basis. According to TH Lee's website, "During its

partnership with THL, Syneos was able to build an end-to-end suite of services through M&A, upgrade its sales effectiveness and improve operational efficiency."

241. Through a series of five offerings between September 2020 and June 2021, TH Lee and Advent collectively sold at least 37,851,676 shares for proceeds of $3.04 billion at prices as high as $81.20 per share. These outsized insider sales occurred in rapid succession over a period of just nine months, through a series of five public stock offerings, and Syneos stock repurchase agreements, enabling Thomas Lee Partners and Advent International to exit their equity stakes in the Company. These offerings included: (i) a September 2020 public offering of 7 million Syneos shares at $59.75 per share, including over 506,000 shares sold directly to the Company in the offering; (ii) a December 2020 public offering of 6 million Syneos shares at $61.90 per share; (iii) a March 2021 public offering of over 8 million Syneos shares at $74.95 per share and a private offering of 600,000 shares sold directly to the Company at the public offering price; (iv) a May 2021 ATM public offering of more than 8 million Syneos shares sold at $81.04 per share and a private offering of 400,000 shares sold directly to the Company at the public offering price; and (v) a June 2021 ATM public offering of nearly 11 million Syneos shares sold at $81.20 per share and a private offering of 500,000 shares sold directly to the Company at the public offering price. Unusually, in support of this scheme the Company purchased more than 2 million shares directly from the selling stockholders in the offerings, thereby providing additional artificial price support to Syneos stock. Capitalizing on this artificial inflation, the Individual Defendants dumped over $16 million worth of Syneos shares at artificially inflated prices during the Class Period, including $11.4 million sold by Macdonald alone.

242. The proceeds generated by these sales collectively, and the proceeds from the June 2021 sale individually, were far in excess of the proceeds collected by TH Lee and Advent in the two-year period leading up to the Class Period, during which TH Lee collected proceeds of $213,034,642.

Advent did not have any sales in the comparable period before the Class Period began. Neither TH Lee nor Advent made any purchases of Syneos common stock during the Class Period. Thus, their trading patterns changed significantly during the Class Period.

243. As reflected in the chart below, Defendants Macdonald's, Meggs's, Keefe's and Colvin's, and the high-level Company founders TH Lee's and Advent's, who both had continuous Board of Director positions at Syneos, stock sales were perfectly timed to take advantage of the period during which Syneos's stock was artificially inflated and approaching all-time highs due to Defendants' misstatements.




244. In addition to these sales by former members of Syneos's Board of Directors and Company sponsors, at least three other Syneos executives collectively sold 20,134 shares of Syneos common stock for roughly $1.49 million in proceeds.

245. Michael L. Brooks served as the Company's Chief Development Officer and Global Head of Clinical Development from July 2021 to April 2022. In April 2022, he was elevated to COO.

In these roles, he was responsible for overseeing the Company's operations, realizing strategy execution across the Company's clinical to commercial solutions divisions, and leading the Company's customer engagement and market development portfolio. During the Class Period, Brooks sold 4,692 shares of Syneos common stock for $361,242 in proceeds. Brooks did not have any open market purchases of Syneos common stock during this period.

246. Linda A. Harty was a Director at Syneos from March 2017 to February 2023. Entering the Class Period, Harty had a balance of 11,432 shares of Syneos common stock and the right to acquire another 2,803 additional shares by way of RSUs. During the Class Period, she sold 11,432 shares of Syneos for proceeds of $959,058 – virtually all of the Syneos common stock she held. Harty did not have any open-market purchases of Syneos common stock during this period. Harty did not sell any stock in the two-year period leading up to the Class Period.

247. Donna Kralowetz was the Company's Senior Vice President of Finance and Chief Accounting Officer, and was designated as the Company's principal accounting officer in January 2021. She joined the Company in May 2019 as Vice President. During the Class Period, Kralowetz sold 3,652 shares of Syneos stock for $300,398 in proceeds. Kralowetz did not have any open market purchases of Syneos common stock during this period, and the stock she sold comprised more than half of her holdings.

248. As with the Individual Defendants, these individuals' trades were made pursuant to trading plans that were adopted (or amended) during the Class Period, and their sales often occurred just weeks after the plan was adopted. Also, as with the Individual Defendants, their timing of these individuals' stock sales was impeccable, with their sales occurring while the share price was at all-time highs and before the big drop in share price following the release of Syneos's second quarter financial results in early August 2022.

249. ***The Individual Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Compensation and Bonus Awards***. The Individual Defendants were financially motivated to misrepresent the Company's financial performance and maintain Syneos's inflated stock price. As a product of Defendants' misrepresentations, the Individual Defendants collectively received over $30 million in compensation in 2020-2021, which was heavily weighted on stock awards and other incentive compensation, such as bonuses.

250. According to the Company's proxy statements issued during the Class Period, the main elements of Syneos's executive compensation package consisted of: (1) a base salary; (2) cash incentive awards; and (3) long-term incentive compensation, *i.e.*, stock awards. The long-term incentive granted the Individual Defendants stock options, including performance-based restricted stock units ("PRSUs") and time-based RSUs. PRSUs granted in 2019-2021 were calculated based on the achievement of certain financial metrics over a three-year period, including Adjusted Earnings per Share (for each individual year) and Return on Invested Capital (for the entire three-year period).

251. Further highlighting the link between Company performance and executive compensation, with respect to long-term compensation, the Company's 2022 Proxy Statement noted that "2021 target award values were somewhat increased from the prior year to recognize the preservation of stockholder value throughout the pandemic during 2020." Syneos's cash incentive awards were similarly based on the Company's financial performance, as discussed below. Accordingly, the Individual Defendants' compensation was heavily dependent on Syneos's financial performance.

252. Indeed, according to the Company's proxy statements, Syneos's "incentive compensation opportunity" was "weighted more heavily than base salary. Accordingly, "***a significant portion of our executives' compensation is at risk***." To illustrate this point, Defendant Macdonald

earned about $2 million in salary in 2020-2021, yet he received annual stock awards and other incentive compensation totaling nearly $14 million during the same time period, comprising 86% of his total compensation. Defendant Meggs similarly earned approximately $1.1 million in salary in 2020-2021, yet he received stock awards and other incentive compensation totaling nearly $4 million during the same time period, or 77% of his total compensation. Defendants Meggs and Colvin saw 75% of their compensation in 2020-2021 tied to stock and incentives.

253. The table below summarizes Defendants Macdonald, Meggs, Keefe, and Colvin's total compensation for 2020-2021.

| **Individual Defendants' Compensation 2020-2021** | | | | | |
|---|---|---|---|---|---|
| **Name** | **Salary** | **Bonus**[20] | **Stock Awards** | **All Other Compensation** | **Total** |
| Macdonald | $2,024,139 | $636,000 | $13,208,054 | $273,270 | $16,141,463 |
| Meggs | $1,149,836 | $210,000 | $3,738,184 | $17,072 | $5,115,092 |
| Keefe | $1,089,270 | $198,450 | $3,211,828 | $21,511 | $4,521,059 |
| Colvin | $1,089,270 | $198,450 | $3,211,828 | $22,109 | $4,521,657 |

254. ***The Sheer Magnitude of the Loss in Syneos's Pipeline Supports a Strong Inference of Scienter***. Syneos's November 2022 disclosure that its bookings had plunged year-over-year, driven by a lack of demand in its Clinical Solutions business, further supports a strong inference of scienter. To put this drop in perspective, Syneos reported net new business awards of $1.3 billion in the third quarter of the previous year and $995 million in 2020 – both of which were quarters affected by the restrictions put in place during the COVID pandemic. Thus, Syneos's $182 million in clinical net new

[20] This includes discretionary bonuses equivalent to 50% of Syneos's Management Incentive Plan ("MIP") targets for each executive. The MIP provides for the payment of cash bonuses dependent upon achievement of predetermined corporate financial performance targets. According to the Company's 2021 Proxy Statement, for the fiscal year 2020, "[w]hile performance on our financial metrics fell below threshold [*i.e.*, the MIP target], the Compensation and Management Development Committee rewarded management's solid and steady response to the COVID-19 pandemic. This result also provided alignment with stockholder gains during the year."

business awards reported for Q3 2022 represented a drop of $1.1 billion (or 87%) from the previous year.

255. Given the massive plunge of new business awards, the inference can be drawn that Syneos's quality and turnover problems in its Clinical Solutions business that led to these events existed, and were known by Defendants, during the Class Period.

256. This inference is bolstered by commentary from securities analysts after the truth was revealed. For example, during the Company's November 4, 2022 earnings call, a Baird analyst stated that the Company's explanation for its financial performance was "***frankly hard to believe*** . . . given that pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected. So I mean, can you really say cancellations were 3%, 4%, 5% of backlog, something like that? I mean, ***it just doesn't feel reasonable***." Baird published an analyst report the same day stating that "Bookings [were] Far Below [the] Lowest End of Bad Preannounce, Bracing for Impact." The report further stated that "***Some of these numbers strain credulity***." Evercore ISI issued a report on November 4, 2022, stating that: "Post today's print, we are stepping to the sidelines. While we never like to downgrade post a print like this, ***we remain broadly flummoxed by the trajectory of the business and how much it shifted during the month of September***." William Blair issued a report on November 7, 2022, commenting on the Company's "***Unprecedented Decline in Clinical Bookings***," stating "the company's clinical book-to-bill ratio under ASC 606 (including pass-through items) was an unprecedentedly low 0.18 times, a long way away from our 1.15 times target. Clinical net new business awards were $182.2 million in the quarter, representing a ***drastic year-over-year decline*** of 87% and coming in $984 million below our target." Barclays issued a report stating that it had "[n]ever seen bookings come in at 0.3x (ex-reimburse)" adding that "[w]e do not know what happens to growth when you book 1/10th

of the business you have been doing, and if mgmt's implied 4Q guide of down 6% at the midpoint is enough." In another report issued on November 4, 2022, Barclays stated "[t]he biggest concern among investors is going to be Clinical bookings, as ***we have not seen a number this low since 2015*** when the business was INC Research and this level of bookings was growing 25%." In a report issued November 6, 2022, Barclays stated "The biggest question from investors and ourselves was, '***what happened***?'" Looking back on the Company's disastrous announcement, Baird published a report on May 2, 2023, stating that "3Q22's Clinical net book-to-bill of 0.18x (and 0.46x in 4Q22) ***signal an extended operational turnaround is needed for the segment***."

257. The abrupt departures of four of the most senior Syneos executives, including Defendants Macdonald, Meggs, Keefe, and Colvin, also provide an inference of scienter. After the February 17, 2022 disclosure, Defendant Macdonald, who served for about six years as the Company's CEO, abruptly retired in April 2022. Macdonald's departure came six months before the Company disclosed that it had lost 86% of its clinical segment pipeline. Four months later, in August 2022, Defendant Colvin, head of the disastrous Clinical Solutions segment, also left. In January 2023, Syneos announced a "Chief Financial Officer Transition," through which Defendant Meggs would exit the Company.[21] Defendant Keefe, who succeeded Macdonald as CEO departed the Company in October 2023.

## VII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

258. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

[21] On January 9, 2023, Evercore ISI published a report stating Meggs's departure "is not surprising given the operational and financial troubles [Syneos] has seen over the past year."

To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

259. Defendants are also liable for any alleged false or misleading forward-looking statements because, at the time each forward-looking statement was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Syneos who knew that the forward-looking statement was false. None of the historic or present tense statements Defendants made was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as it was not stated to be such assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts Defendants made expressly related to or stated to be dependent on those historic or present tense statements when made.

## VIII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

260. Lead Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine. At all times during the Class Period, the market for Syneos common stock was efficient for the following reasons, among others:

- Syneos common stock met the listing requirements, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
- According to the Company's Form 10-K for the fiscal year ended December 31, 2022, Syneos had over 103 million shares outstanding as of February 9, 2023;
- As a regulated issuer, Syneos filed periodic public reports with the SEC;
- Syneos regularly and publicly communicated with investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public

disclosures, such as through the internet and communications with the financial press and other similar reporting services;

- Syneos was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

- Unexpected material news about Syneos was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

261. As a result of the foregoing, the market for Syneos common stock promptly digested current information regarding Syneos from all publicly available sources and reflected such information in the price of Syneos common stock. Under these circumstances, all purchasers of Syneos common stock during the Class Period suffered similar injury through their purchase of Syneos common stock at artificially inflated prices and the presumption of reliance applies. The material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Syneos stock, and without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and other members of the Class purchased or acquired Syneos stock between the time Defendants misrepresented and/or failed to disclose material facts about the overstated backlog and the Company's qualitative, technological, and competitive disadvantages, integration issues, and inability to satisfy contractual obligations, at the time the true facts were disclosed. Accordingly, Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Syneos common stock and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

262. Lead Plaintiffs and the Class are also entitled to a presumption of reliance under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon, in significant part, omissions of material fact for which there was a duty to disclose.

## IX. LOSS CAUSATION/ECONOMIC LOSS

263. Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the true nature of the Company's business, operations, and reported performance metrics. §IV.A-C. Defendants engaged in a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on members of the Class who purchased Syneos stock by misrepresenting and omitting material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. §IV.B, C.

264. Defendants' false and misleading statements and omissions, identified herein at §IV, had the intended effect and caused Syneos's stock to trade at artificially inflated levels throughout the Class Period.

265. And when Defendants' misrepresentations and omissions were disclosed or otherwise revealed to the market, beginning on February 17, 2022, and further revealed in successive disclosures on August 1, 2022, September 13, 2022, and November 4, 2022, Syneos's stock price declined significantly, as the prior inflation was removed from the price of the Company's common stock. As a result of their purchases of Syneos common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

266. For example, when Syneos announced disappointing financial results for Q4 and full year 2021 on February 17, 2022, the Company reported a shockingly low book-to-bill ratio of ***0.34x***, in part due to the write-off of $850-$950 million in reimbursable expenses that were uncollectable. This apparent write-down indicated that the Company's previously reported backlog had been inflated by nearly $1 billion.

267. Securities analysts were shocked by the Company's large write-down of reimbursable expenses. For example, Jefferies stated "apparently, mgt still had too much pass-through assumption

in backlog and is stripping more out," leading to a "very poor . . . result." Jefferies estimated that Syneos wrote off ***$850-$950 million*** in reimbursable (zero-margin) award value that had been included in backlog, explaining "that the magnitude of mgt's overestimation means that ***Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)***." William Blair stated that the Company's clinical book-to-bill ratio "was a ***surprisingly low*** 0.34 times, as a result of a ***significant backlog adjustment*** taken in the quarter," adding that "***making two adjustments to backlog in two years will not help the stock***," in comparison to "peers."

268. On this news, the price of Syneos common stock fell from $83.37 per share on February 16, 2022, to $79.36 per share on February 17, 2022, a decline of more than $4 per share, or nearly 5%, on above-average trading volume of approximately 1.8 million shares traded.

269. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues and the true nature of Syneos's backlog.

270. On August 2, 2022, Syneos revealed a substantial deterioration in the Company's business, disclosing that net new business awards within Syneos's Clinical Solutions segment had declined by roughly 34% including reimbursable expenses and 15% excluding reimbursable expenses, reflecting book-to-bill ratios of 0.94x and 1.29x, respectively. In addition, the Company revealed that Syneos would not achieve even its lowered expectations for reimbursable revenues for the year, causing the Company to slash expected 2022 revenues by $185 million at the midpoint.

271. Analysts reacted negatively to the Company's disclosures. Guggenheim stated that the Company's poor clinical book-to-bill ratio of 0.92x "could suggest that the company is losing share." Jefferies stated that the Company's "Weak Clinical [book-to-bill] Hints [at] Cancellations." William Blair commented on the Company's "disappointing" clinical book-to-bill ratio of 0.92x, which

prompted "concerns about . . . the company's competitive momentum at present," highlighting that they are "***less confident in Syneos's ability to consistently and reliably execute in its clinical business***."

272. On this news, the price of Syneos common stock fell from $79.14 per share on August 1, 2022, to $65.20 per share on August 2, 2022, a decline of nearly $14 per share, or over 17%, on above-average trading volume of 3.2 million shares traded. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make false and misleading statements and conceal the full truth regarding the Company's underlying operational issues.

273. On September 13, 2022, Syneos filed a current report on Form 8-K revealing that the Company expected to announce a book-to-bill ratio in its Clinical Solutions segment for the trailing 12 months ending September 30, 2022, in the range of 1.05x to 1.15x, excluding reimbursable expenses. During an industry conference held later that day, Defendant Keefe continued to hide the internal problems plaguing the clinical segment and attributed the lower-than-expected book-to-bill ratios to macroeconomic factors and to Syneos's above-average exposure to SMID clients who were just delaying contract awards.

274. Once again, analysts were surprised by these disclosures and reacted negatively. For example, Barclays stated that Syneos's "weak[]" book-to-bill ratio was "Driven by SMID RFP Declines." Guggenheim stated the book-to-bill ratio was "clearly a disappointing figure and a significant slowdown compared to prior quarters." The analyst further stated that one of Syneos's competitors "did not suggest things have deteriorated further in 3Q, ***which is clearly what happened***" to Syneos. In a September 15, 2022 report reflecting on the Company's performance during the Class Period, Baird stated that Syneos investors were "[s]eeking consistency." Baird stated that there "have been many speed bumps," for Syneos investors, noting "***there are frequently items that catch***

***investors off-guard***. Recent examples of this include ***significant 3Q22 net awards cautioning*** [*i.e.*, the Company's September 13, 2022, disclosures], and large passthrough backlog adjustments in 3Q20 and 4Q21."

275. On this news, the price of Syneos common stock fell from $63.37 per share on September 12, 2022, to $52.68 per share on September 14, 2022, a two-day decline of $10.69 per share, or nearly 17%, on above-average trading volume. However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make false and misleading statements and conceal the full truth regarding the Company's underlying operational issues.

276. Finally, on November 4, 2022, Syneos released its Q3 2022 Earnings Release, revealing that Syneos's book-to-bill ratios had plummeted far below even the reduced figures provided in September 2022. Specifically, Defendants reported that the Company's Clinical Solutions segment had achieved net new business awards of just $182 million including reimbursable expenses – a startling year-over-year decline of 86.5% – and a book-to-bill ratio of just 0.18x for the quarter, which was just one-tenth of the expected new business growth. And the Company's Clinical Solutions backlog plummeted 13.6% year-over-year to just $9.747 billion including reimbursable expenses, or by 2.5% year-over-year to $6.44 billion excluding reimbursable expenses. Syneos also slashed its anticipated 2022 revenues by $160 million.

277. On November 4, 2022, Defendants hosted a conference call with analysts and investors to discuss the Company's Q3 2022 results. Defendants, who were aware of the undisclosed turmoil wreaking havoc on Syneos's operations and performance throughout the Class Period, disclosed to investors that underlying demand issues that were "specific to Syneos" caused the Company's win rate to plummet. And Defendant Keefe revealed for the first time that "a number of leadership and organizational changes within strategic business development over the last 18 months" caused

Syneos's operations to experience undisclosed turmoil. As a result, Defendant Keefe admitted that not only had the Company's win rate declined but also that Syneos was unable to convert its bloated backlog to revenue because existing customers had delayed decisions to retain Syneos. Even worse, Defendant Keefe revealed that the Company's RFP process had slowed significantly and that existing customers for whom Syneos had already completed work were unwilling to re-sign with the Company.

278. Defendant Keefe further admitted what Defendants had long known: that the longstanding and pervasive quality problems plaguing Syneos's ability to deliver on its clinical model to produce outstanding clinical trials data had damaged the Company's reputation with its hallmark SMID customers, that these problems had negatively impacted the Company's ability to win repeat business, and that the Company's book-to-bill ratio was one-tenth the size from a year prior.

279. Continuing, Defendant Keefe also confirmed that – contrary to their prior assurances that Syneos was a technology leader, the Company had failed to timely implement a technology-enhanced delivery model that its customers demanded. Specifically, Keefe stated that Syneos's "SMID customers are clear that they want Syneos . . . to deliver therapeutic insights, but with enhanced agility," and to that end Syneos was "working to reduce the complexity of our full-service operating model [and] streamline our organization and processes" to provide "an efficient and effective delivery model supported by . . . technology enhancement[s]." However, as Keefe "put it plainly, it has been more extensive and taken longer than we expected" and "[a]s a result, we did not evolve our business development capabilities to fully leverage our integrated solutions or effectively engage our customers within the current competitive environment." Keefe added that Syneos was still "strengthening our approach . . . to design the best delivery strategy for each customer opportunity, enabled by technology and shared insights." Michael Brooks, Syneos's Chief Development Officer, added that Syneos was

"removing redundancies and layers within the organization that . . . historically had gotten in the way of exceptional delivery."

280. Keefe further clarified that poor results and lower revenue were not just caused by delays in decisions but were driven by a "reduction in awards from post revenue SMID" as well as "a reduction in our normal ***repeat*** business awards" which "were down probably somewhere between 30% and 50%." Keefe explained that the loss of existing awards and repeat business were caused by Syneos's lack of agility and failure to "***integrat[e] all the great capabilities we've developed and acquired over the last 12 to 18 months, consistently into our good defenses and our relationships with those customers***."

281. Analysts were shocked and justifiably skeptical of Defendants' purported explanations. One analyst, referring to Syneos's dreadfully low book-to-bill ratios, challenged: "***We've never seen that happen***." Another complained: "I don't even know where to start with this," stating that management's dubious claim that Syneos was not experiencing significant cancellations was "***frankly hard to believe*** . . . given that ***pass-through bookings were negative and overall bookings were basically 1/10 of what you would expect over the last few quarters or what we should have expected*** . . . ***it just doesn't feel reasonable***." Baird published an analyst report the same day, stating that "Bookings [were] Far Below [the] Lowest End of Bad Preannounce, Bracing for Impact." The report further stated that "***Some of these numbers strain credulity***." Evercore ISI issued a report on November 4, 2022, stating: "Post today's print, we are stepping to the sidelines. While we never like to downgrade post a print like this, ***we remain broadly flummoxed by the trajectory of the business and how much it shifted during the month of September***." William Blair issued a report on November 7, 2022, commenting on the Company's "***Unprecedented Decline in Clinical Bookings***," stating "the company's clinical book-to-bill ratio under ASC 606 (including pass-through items) was

an unprecedentedly low 0.18 times, a long way away from our 1.15 times target. Clinical net new business awards were $182.2 million in the quarter, representing a ***drastic year-over-year decline*** of 87% and coming in $984 million below our target."

282. Barclays issued a report stating that it had "[n]ever seen bookings come in at 0.3x (ex-reimburse)" adding that "[w]e do not know what happens to growth when you book 1/10th of the business you have been doing, and if mgmt's implied 4Q guide of down 6% at the midpoint is enough." In another report issued on November 4, 2022, Barclays stated "[t]he biggest concern among investors is going to be Clinical bookings, as ***we have not seen a number this low since 2015*** when the business was INC Research and this level of bookings was growing 25%." In a report issued November 6, 2022, Barclays stated, "The biggest question from investors and ourselves was, '***what happened***?'" Analysts from Mizuho stated the results were "worse than expected."

283. Looking back on the Company's disastrous announcement, Baird published a report on May 2, 2023, stating "3Q22's Clinical net book-to-bill of 0.18x (and 0.46x in 4Q22) ***signal an extended operational turnaround is needed for the segment***." A May 2023 article written by Cain Brothers noted that other CROs "have been able to achieve positive (>1.0x) book-to-bill metrics over the last 12 months, suggesting that Syneos specific factors are at play in their booking and revenue declines."

284. On this news, the price of Syneos common stock fell from $47.81 per share on November 3, 2022, to $25.70 per share on November 4, 2022, a decline of more than $22 per share, or 46%, on abnormally high trading volumes of 7.4 million shares traded.

285. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Syneos's stock. It also was foreseeable to Defendants that the revelation of the truth concerning the Company's backlog, including

that the Company was plagued by impaired business development capabilities, acute qualitative and competitive disadvantages, integration issues, backlog and expense manipulations, and inability to meet customer needs would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## X. CLASS ACTION ALLEGATIONS

286. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the publicly-traded common stock of Syneos during the period between September 9, 2020 and November 3, 2022, inclusive. Excluded from the Class are (i) Defendants and members of their families, (ii) any person who was an officer, director, or control person of Syneos during the Class Period, (iii) any trust, corporation, or other entity in which any Defendant has or had a controlling interest; (iv) Syneos's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

287. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Syneos common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Millions of Syneos shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Syneos or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

288. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts, omissions, and common scheme to defraud as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts.

(c) Whether, and to what extent, the market price of Syneos common stock was artificially inflated during the Class Period because of the material misstatements alleged herein.

(d) Whether Defendants acted with the requisite level of scienter; and

(e) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

289. Lead Plaintiffs' claims are typical of those of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

290. Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are experienced in securities and class action litigation.

291. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

292. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated by the SEC thereunder (17 C.F.R. §240.10b-5).

293. During the Class Period, Syneos, through its officers, management, and agents, including Macdonald, Keefe, Meggs, and Colvin made, disseminated, approved, or were responsible for the statements specified in §§IV and V, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

294. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

295. Defendants and the Company's officers, management, and agents, directly and indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 in that they, by the use of means and instrumentalities of interstate commerce, the mail, and/or the facilities of a national securities exchange:

(a) employed devices, schemes, and artifices to defraud;

(b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Syneos common stock during the Class Period.

296. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

297. Defendants and the Company's officers, management, and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Syneos common stock during the Class Period.

298. Syneos is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

299. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business.

300. The allegations above establish a strong inference that Syneos, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about: (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business. By concealing these material facts from investors, Syneos's share price was artificially inflated during the Class Period.

301. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business, thus artificially inflating the price of Syneos's common stock.

302. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Syneos common stock. Lead Plaintiffs and the Class would not have purchased Syneos common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

303. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

304. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

305. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of §20(a) of the Exchange Act. 15 U.S.C. §78t(a). During their tenures as officers and/or directors of Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. Accordingly, Defendants are liable pursuant to §20(a) of the Exchange Act.

306. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operation and the performance of its Clinical Solutions segment, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about Syneos, Defendants Macdonald, Keefe, Meggs, and Colvin had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendants Macdonald, Keefe, and Meggs participated in interviews and conference calls with investors and analysts, and/or

prepared and approved the Company's public statements, SEC filings, and press releases, described herein at §§IV and V, alleged by Lead Plaintiffs to be misleading.

307. In particular, the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular conduct, statements, and omissions giving rise to the securities violations as alleged herein and exercised the same. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

308. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Syneos common stock during the Class Period.

## XI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other and further relief as the Court may deem just and proper.

## XII. JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: April 18, 2025

s/ Henry Rosen
HENRY ROSEN

Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven M. Jodlowski (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
Tel.: (619) 923-3939
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
hfarah@dicellolevitt.com

Greg G. Gutzler
Jarett Sena
**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, New York 10017
Tel.: (646) 933-1000
ggutzler@dicellolevitt.com
jsena@dicellolevitt.com

Adam J. Levitt
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
801 17th Street, NW, Suite 430
Washington, DC 20006
Tel.: (202) 975-2288
rpierce@dicellolevitt.com

***Lead Counsel for Lead Plaintiffs and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 18, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Henry Rosen
HENRY ROSEN

**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
Telephone: (619) 963-2406
Email: hrosen@dicellolevitt.com