**APPENDIX A**

| UNSOURCED ALLEGATIONS |
|---|
| "The problem was that the merger to form Syneos was a disaster. Syneos's quality problems detrimentally affected its ability to win new business from its small to medium clients ('SMID') and with its large clients, some of the world's largest pharmaceutical companies (hereinafter referred to as 'large pharma') . . . . Between 2017 and 2019, at least two of its large pharma clients, Bristol Myers Squibb and GlaxoSmithKline ('GSK') – who typically hired Syneos using functional service provider ('FSP') agreements – refused to give the Company new awards until they were satisfied that devastating clinical issues, quality problems, and service failures were addressed." (TAC ¶ 3.) |
| "All of these problems were well-known inside the Company at the highest level as senior executives including Defendants Alistair Macdonald, Jason Meggs, Michelle Keefe and Paul Colvin attended monthly executive leadership team ('ELT') meetings during which the corporate quality department kept them well-informed regarding the quality problems threatening Syneos's relationships with its customers. During the ELT meetings, Defendants learned that: (i) quality issues were reported late at Syneos and were not communicated in a timely fashion to the Company's clients; (ii) Syneos's audit inspections and root cause analyses had not been effective in correcting the recurring quality issues; and (iii) quality was not embedded in the day-to-day execution at the Company. The Company's quality issues had a devastating impact on its ability to win and obtain new and repeat business its 15 largest customers and its bread and butter SMID customers alike." (TAC ¶ 4.) |
| "As a result of the devastating operational problems, the Company's private equity sponsors, TH Lee and Advent, and Defendants were desperate to convince the market that Syneos had escaped the COVID-19 pandemic unscathed so that they could exit their personal investment and dump billions of dollars' worth of Syneos stock at high prices." (TAC ¶ 5.) |
| "To achieve this, Defendants issued false and misleading statements and made material omissions by telling investors that Syneos's advanced technology, superior workforce, and strong corporate culture gave it competitive advantages which uniquely positioned the Company to successfully compete for and win new business." (TAC ¶ 6.) |
| "In addition, Defendants issued false statements and omitted material information they were obligated to disclose regarding the methodology Syneos used to accrue new business to the Company's backlog. §IV.B. Lastly, because securities analysts and investors were hyper-focused on whether Syneos was actually growing its clinical trials business, Defendants made false and misleading statements and made material omissions regarding Syneos's performance metrics, such that Syneos was able to report multiple quarters of strong book-to-bill ratios over 1.0x for the Clinical Solutions segment which was designed to give investors the |

| UNSOURCED ALLEGATIONS |
|---|
| false impression that Syneos's business was booming when in fact exactly the opposite was true. §IV.C. Unfortunately for investors, the rosy story of Syneos's resurgence was a lie." (TAC ¶ 7.) |
| "Defendants' statements during the Class Period that Syneos's technology was a competitive advantage were blatantly false when made because in truth, the Company operated at a severe disadvantage. For example:<br>• Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed, by 2021, the Company had 11 separate accounts receivable systems and nine separate accounts payable systems. This made the process for customers to pay their bills or be invoiced a logistical nightmare.<br>• The Clinical Trial Management Systems used at Syneos were generic and did not allow for any client customization.<br>• Syneos simply lagged its peers in providing remote and decentralized clinical capabilities, such as certain data visualization and statistical modeling capabilities, and the Company struggled to catch up to its peers in the new business environment.<br>• The Company lacked a centralized network for communicating via email between its worldwide locations, and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.<br>• Syneos lacked an integrated client portal, a basic feature other CROs offered to their clients so they could access their clinical trial data and performance metrics instantaneously.<br>• Defendants were well-aware of the lack of a client portal and the other system deficiencies that prevented any client customization. Defendant Macdonald was the executive sponsor of a portal initiative and only in the first fiscal quarter ('Q1') 2022, as Macdonald was stepping down as Chief Executive Officer ('CEO'), did Syneos launch 'Clinical Reimagined' an initiative to develop a portal. By the end of the Class Period, however, the Company still had not launched an integrated client portal." (TAC ¶ 9.) |
| "In addition to the technology gaps and lack of investment in infrastructure, Syneos's operations were critically impaired by the Company's inability to generate quality useable data on a timely basis for its clinical trial customers. Syneos's quality problems included:<br>• The Company was plagued by a toxic work culture because of workforce reductions, leadership, operation changes, and labor force turmoil.<br>• Senior management at Syneos, including Defendant Meggs and his direct report Bekki Brown, created a bullying workplace culture combined with a lack of training so that new hires were 'thrown to the wolves' and given 'zero guidance.'<br>• The toxic workplace culture exacerbated the Company's horrible turnover throughout the Clinical segment, which then snowballed into more problems such as delays in responding to customers, data quality issues, and a loss of business. As a result, Syneos was unable to generate quality useable data for its clinical trial customers. |

| UNSOURCED ALLEGATIONS |
|---|
| • Customers complained that manual reports (because the Company did not have a client portal) received after long delays from Syneos had to be redone. Customers also complained that their projects lacked adequate staffing to conduct clinical trials and as a result Syneos lost customers in droves and ruined its reputation." (TAC ¶ 10.) |
| "Yet, following completion of the Synteract acquisition in December 2020 – an acquisition that was to enhance Syneos's position across the SMID category, particularly in oncology, rare and orphan diseases, neuroscience, dermatology, and pediatrics – Syneos struggled to integrate Synteract and Syneos hemorrhaged Synteract employees who refused to work for the Company. The acquisition did not enhance the Company's position with SMID customers who refused to sign with Syneos because of technological deficiencies. And immediately after the acquisition closed in December 2020, former Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal, a standard in the industry." (TAC ¶ 11.) |
| "Defendants knew or recklessly disregarded that Syneos's strategy was not resonating with its customers, and that its operations were critically impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture." (TAC ¶ 12.) |
| "Indeed in 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a hold on all of its work with Syneos. In early 2021, AstraZeneca stopped using Syneos entirely. Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data, and Syneos's relationship with GSK, with which it had signed a new agreement in late 2019, was strained to the point that Syneos could only obtain less than 10% of the FSP work it had contracted to provide beginning in 2020." (TAC ¶ 13.) |
| "Syneos was not experiencing growth and was not ramping up its large pharma relationships. To the contrary, the Company's antiquated technology offerings left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. As a result, Syneos was unable to successfully compete for new business or retain renewal customers who were aware of Syneos's competitive disadvantages in technology, workforce reductions, labor force turmoil caused by a toxic workplace culture, and quality and service failures." (TAC ¶ 15.) |
| "Syneos's stated 'New Business Awards and Backlog' methodology, and Defendant MacDonald's statements on August 9 and September 15, 2021 were knowingly materially false and misleading when made because Syneos was not complying with its stated methodology. In each quarter during the Class Period, Syneos's backlog was inflated by several hundred million and its new business awards were overstated. To make it appear that Syneos's clinical segment was growing, when it was not, Defendants put |

| UNSOURCED ALLEGATIONS |
|---|
| tremendous pressure on employees to 'find' numbers to fill the gaps and meet the targets. At Syneos, because of the pressure, bullying tactics, and tone from the top, orders to find it were tantamount to instructions to fake it." (TAC ¶ 19.) |
| "Syneos violated its own stated policy for booking backlog from enormous contracts with large pharmaceutical companies known as FSP contracts that can have 5-year terms. To 'find' the necessary value to fill the backlog hole, in 2020 the Company manipulated and inflated backlog improperly by keeping $280 million in backlog from an FSP contract entered into with GSK in late 2019 even though by end of 2020, Syneos had generated only $20 million in actual revenue from that contract. Based on Syneos's past relationship with GSK, Defendants were well aware that it was not probable that the hundreds of millions of dollars from the GSK contract the Company had in backlog would generate any more revenue. Despite their knowledge that more revenue was not probable, Defendants nonetheless continued to improperly inflate backlog in 2021 by an additional $70 million per quarter from the GSK contract. Additionally, while Syneos assured investors and the market that it would only book to backlog one year of authorizations, Syneos routinely took three to four years' award value from its FSP agreements." (TAC ¶ 20.) |
| "In addition to making false and misleading statements and material omissions that Syneos had an innovative product that resonated with all customers, a competitive advantage, and had complied with the Company's backlog methodology, Defendants falsely convinced investors that Syneos's business was booming, when in fact, it was not. From December 31, 2020 through November 3, 2022, Defendants falsely and illegally engineered the Company's new business metrics to achieve fictitiously favorable results. Defendants reported materially false and misleading backlog, net new business awards, and book-to-bill ratios by violating Syneos's stated New Business Awards and Backlog methodology. Defendants inflated these metrics by (i) including new business awards in backlog before contracts were signed or where a 'written commitment' for an award was either not in place or was too vague or indefinite to be reliably added to backlog; (ii) including new or increased awards and reimbursable expenses in backlog before change orders to increase the contract that were agreed upon by sponsors, … (iv) manipulating costs to increase reported backlog; … and (vi) including in backlog three to four years of business value for FSP awards, rather than the 12 months of value Syneos represented it was taking in the methodology." (TAC ¶ 21.) |
| "For example, by the fourth fiscal quarter ('Q4') and Year-End 2020, Defendants had artificially inflated Syneos's reported backlog by as much as $280 million by including in backlog award value the Company knew it would never collect from GSK. Indeed, after signing an FSP contract with GSK in late 2019, Syneos booked $280 million in backlog for 2020 knowing that Syneos was just one of the providers on the FSP contract. By the end of 2020, that contract had generated no more than $20 million in annual revenue for Syneos." (TAC ¶ 22.) |

| UNSOURCED ALLEGATIONS |
|---|
| "In addition, Defendants also improperly inflated the Company's backlog by including reimbursable expenses Defendants knew they would never collect. Defendants admitted that Syneos's backlog was overstated by $850-$950 million when they announced the write off of reimbursable expenses on February 17, 2022. This write off equated to an overstatement of Syneos's book-to-bill ratio of 0.2x for the five previous quarters. Based on counsel's investigation, Plaintiffs allege that throughout the Class Period, Defendants used reimbursable expenses as a sort of deceptive slush fund to achieve backlog and book-to-bill targets so that the Company could consistently report strong book-to-bill ratios. Counsel's investigation revealed that Defendants repeatedly refused to remove anything from backlog, including reimbursable expenses they knew they would never collect." (TAC ¶ 23.) |
| "While hiding their accounting manipulations and the Company's critical failures in its clinical segment from investors, Defendants caused the price of Syneos stock to soar, reaching all-time highs of more than $100 per share by December 2021." (TAC ¶ 24.) |
| "Ultimately, the Company ran out of ways in which to engineer favorable backlog, net new business awards, and book-to-bill ratios." (TAC ¶ 27.) |
| "Unfortunately, this was just the tip of the iceberg, and while the Company's February 17, 2022 announcement was bad, Defendants failed to fully disclose the magnitude by which they had overstated Syneos's clinical metrics and continued to hide the underlying competitive and service failures plaguing the clinical segment." (TAC ¶ 28.) |
| "Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading." (TAC ¶ 43.) |
| "Throughout the Class Period, Defendants made materially false and misleading statements to falsely convince investors that Syneos's backlog and new business awards were growing when exactly the opposite was true." (TAC ¶ 46.) |
| "Defendants' statements on September 9, 2020, were materially false and misleading when made because Defendants claimed that Syneos had a '*Leadership Position in High-Growth SMID/Biotech*' and was '*Successfully Penetrating Large Pharma*,' despite knowing that the Company's clinical operations were impaired by deficient and subpar technology capabilities and offerings, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture." (TAC ¶ 48.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. Therefore, Syneos's statements omitted material information that the Company was not a leader in the SMID space and was struggling to service large pharma. Indeed, the Company failed to invest in technology infrastructure, rendering its service offerings and technological capabilities inferior to its competitors." (TAC ¶ 49.) |
| "Syneos failed to invest in the very technology needed to conduct clinical trials, collect usable data from those trials, and provide that data to its customers. Syneos lacked the necessary tools possessed by its competitors to successfully run remote and decentralized trials, such as certain data visualization and statistical modeling capabilities. In short, the Company failed to adapt to changing business demands and lacked the necessary tools including robust data management systems. The Clinical Trial Management System used at Syneos was InForm and Clinical Ink, which were generic systems that did not allow for any client customization. Therefore, the Data Management and Biostatistics groups had to track and provide data to clients in Excel which were subject to enormous delays and errors. The increased prevalence of remote monitoring and decentralized clinical trials during the pandemic had exposed and highlighted these problems." (TAC ¶ 50.) |
| "Incredibly, Syneos also lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business. Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials. Such a portal was a basic feature other CROs offered to their clients. Without a portal, Syneos was forced to manually create reports on generic spreadsheets and then email them to clients. Instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal clients could access remotely. Defendants were well aware how important a client portal was to Syneos's future success. In fact, one of the Company's critical initiatives during the Class Period was technology, and the implementation of a portal was the primary focus. Defendant Macdonald was the executive sponsor of the portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos finally launch 'Clinical Reimagined,' the initiative to develop a portal. By the end of the Class Period, however, the Company had still not launched an integrated client portal." (TAC ¶ 51.) |
| "Defendants were also aware that Syneos failed to invest in technology infrastructure following the inVentiv and INC Research merger which formed the Company in 2018. For example, Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed by 2021, the Company had 11 separate accounts |

| UNSOURCED ALLEGATIONS |
|---|
| receivable systems and nine accounts payable systems. This made invoicing and paying bills for customers a logistical nightmare. Similarly, the Company had no centralized network for communicating via email between its worldwide locations. As a result, Syneos's rapid acquisitional corporate growth and increased complexity left the Company unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups." (TAC ¶ 52.) |
| "In addition to the technology gaps, lack of investment in infrastructure, and competitive disadvantages, Syneos failed to disclose that, contrary to Defendants' statements that the Company was '***Positioned for Accelerated . . . Growth***,' its operations were critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture. Syneos maintained and perpetuated a bullying workplace which contributed to high turnover among the Project Managers responsible for clinical trials, which then resulted in staff not being assigned to projects long enough so that they did not have adequate training or familiarity with the project or its customers." (TAC ¶ 53.) |
| "Syneos's workplace turmoil and toxic culture came from the top, as poor management and the lack of training and support led to further turnover across the board, including Project Managers and Clinical Research Associates ('CRA'). Former President of Clinical Solutions Defendant Colvin and former Director of Business Development, Bekki Brown, had created serious workplace and culture issues within the Company leading to a huge turnover of Project Managers ('PMs') who were responsible for clinical trials within the Clinical Solutions segment. The PMs were in turn responsible for supervising data analysts and CRAs, and the lack of support, toxic culture, and turnover among PMs led to high turnover among the analysts and CRAs. Even as Syneos brought on otherwise qualified people, they were 'thrown to the wolves' as soon as they started working at the Company, were not trained, and were given 'zero guidance.' They were, however, still expected to meet deadlines and forced to work extreme hours to make up for the loss of experienced talent. Syneos was unable to retain analysts because the bullying culture and the lack of training and support led to horrible turnover across the board, including PMs and CRAs. These issues snowballed, resulting in (i) a detrimental lack of continuity among the clinical trial employees critical to producing quality data, (ii) delays in responding to clients in a timely fashion, and (iii) an inability to generate useful and accurate data for its customers' clinical trials, all of which led to a loss of business. Customers of all sizes complained that their projects lacked adequate staffing and caused huge delays in obtaining data and even a response from Syneos." (TAC ¶ 54.) |
| "Syneos was also not '***Successfully Penetrating Large Pharma***' and was not '***Positioned for Accelerated . . . Growth***' as, predictably, Syneos's critical technological shortcomings such as the lack of a client portal, lack of tools to conduct clinical trials, inadequate staffing and high turnover, delays in responding to clients in a timely fashion, inability to generate useful and accurate data for its customers' clinical trials, and the toxic work environment prevented the Company from producing quality clinical trial |

| UNSOURCED ALLEGATIONS |
|---|
| data, led to overwhelming quality problems. These issues hindered Syneos's ability to win new business, caused would-be repeat customers to be reluctant to work with Syneos on future engagements, and even caused existing customers to delay and cancel. Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues. For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone." (TAC ¶ 55.) |
| "Defendant Colvin's statements on December 8, 2020, were materially false and misleading when made as Syneos failed to disclose that its strategy was not resonating with its clinical customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. In truth, Syneos's inability to deliver the clinical and project management services demanded by its clients adversely impacted the Company's ability to market its clinical trial services to all customers and, therefore, negatively impacted its pipeline of potential new awards and its backlog of awards reported to investors. Furthermore, the undisclosed, long-standing quality, technological, and cultural problems plaguing the Company caused clients to cancel in droves and to refuse to re-sign with Syneos for more work. For example, Syneos lacked a client portal, which was industry standard and a basic feature other CROs offered to their clients. The lack of a client portal caused customer frustration, internal inefficiencies, and ultimately caused a loss of business." (TAC ¶ 58.) |
| "And by the fall of 2020, when the Class Period began, many of the Company's key accounts were in serious jeopardy because of the Company's inability to produce quality clinical trial data. In 2020, AstraZeneca was so frustrated with Syneos's quality and data problems that it put a hold on all of its work with Syneos. Syneos also had enormous problems supplying Pfizer (its largest client) with accurate data. And Syneos's relationship with GSK, with which it had signed a new multi-year FSP agreement in late 2019, was strained to the point that Syneos could only obtain less than 10% of the total award value provided in GSK's contract." (TAC ¶ 59.) |
| "Moreover, the Company was not achieving '*year-over-year clinical backlog growth of over 30% for the top 50 pharma customers*' because its business was not sustainable. In fact, by November 2020, Syneos privately forecasted negative growth across its top accounts and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company." (TAC ¶ 60.) |
| "Defendant Meggs' December 8, 2020, statement was materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. In fact, Syneos's 'model, people, and culture' were not competitive |

| UNSOURCED ALLEGATIONS |
|---|
| advantages and the Company's strategy was not resonating with its customers because the Company's customers demanded far more technologically advanced product capabilities than Syneos could offer. Furthermore, the Company was unable to timely respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across the full suite of promised product and service offerings. The Company had failed to invest in technological infrastructure and its product offerings lagged its competitors. For example:<br>• Syneos never had a centralized network to combine the accounting systems of inVentiv, INC Research, and other acquired companies. Indeed, by 2021, the Company had 11 separate accounts receivable systems and nine separate accounts payable systems. This made the process for customers to pay their bills or be invoiced a logistical nightmare.<br>• The Clinical Trial Management Systems used at Syneos were generic and did not allow for any client customization.<br>• Syneos simply lagged its peers in providing remote and decentralized clinical capabilities, such as certain data visualization and statistical modeling capabilities, and the Company struggled to catch up to its peers in the new business environment.<br>• The Company lacked a centralized network for communicating via email between its worldwide locations and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.<br>• Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials, which was standard in the industry.<br>• Defendants were well-aware of the lack of a client portal and the other system deficiencies that prevented any client customization. Defendant Macdonald was the executive sponsor of a portal initiative and only in Q1 2022, as Macdonald was stepping down as CEO, did Syneos launch 'Clinical Reimagined' an initiative to develop a portal. By the end of the Class Period, however, the Company still had not launched an integrated client portal." (TAC ¶ 63.) |
| "Similarly, Syneos's 'people' and 'culture' were not competitive advantages because the Company was plagued by a toxic workplace culture, labor force turmoil, and a critical lack of training caused by the bullying workplace culture created by Defendant Meggs and his direct report Bekki Brown. The toxic workplace culture snowballed into more problems such as delays in responding to customers, data quality issues, and a loss of business. Customers of all sizes complained that their projects lacked adequate staffing and caused huge delays in obtaining data and even a response from Syneos. As a result, Syneos was unable to generate quality useable data on a timely basis for its clinical trial customers." (TAC ¶ 64.) |
| "As a result of these problems, the Company was unable to produce quality clinical trial data and suffered from overwhelming quality problems that caused existing customers to cancel projects that had been in the pipeline for 6-18 months and made it difficult for the Company to win new or repeat business." (TAC ¶ 65.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Macdonald's statement on December 8, 2020, was false and misleading when made because the Company's 'trusted process' was not '***deliver[ing] consistent services to our customers on time, on budget and to the required quality standards***' and was not providing '***extraordinary value to the organization and most importantly, to our customers***.' Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System used at Syneos did not allow for any client customization; (iii) the Company lacked a centralized network for communicating via email between its worldwide locations; and (iv) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials." (TAC ¶ 68.) |
| "Syneos was not delivering to its customers on time, on budget, or to the required standards. Customers of all sizes complained that their projects lacked adequate staffing and that they were unable to obtain data in a timely fashion or even get a response from Syneos. Indeed, Syneos's clinical trial business was plagued by (i) a detrimental lack of continuity among the clinical trial employees critical to producing quality data, (ii) delays in responding to clients in a timely fashion, and (iii) an inability to generate useful and accurate data for its customers' clinical trials, all of which undermined any trust in Syneos's process and led to a loss of business. Indeed, without a portal, Syneos had to manually create reports on generic spreadsheets and then email them to clients. And instead of providing clients with instant access in real time to their vital clinical trial data, clients would be subject to delays of multiple days or even weeks to get access to data that other CRO competitors provided instantaneously via an online portal. Clients also complained that the manual reports received from Syneos, instead of accessing the data via a portal, needed to be redone." (TAC ¶ 69.) |
| "Defendants' statements on January 13, 2021, were false and misleading when made and omitted material information Defendants were required to disclose. Immediately from the day the acquisition closed, Synteract started hemorrhaging employees who had no interest in working for a large CRO of Syneos's size. And many of Synteract's customers were unhappy with the Syneos acquisition, with some customers voicing their unhappiness with the deal prior to closing. In fact, following completion of the Synteract acquisition in December 2020 – an acquisition that was to enhance Syneos's position across the SMID category, particularly in oncology, rare and orphan diseases, neuroscience, dermatology, and pediatrics – Syneos struggled to integrate Synteract and the acquisition did not '***enhance [Syneos's] SMID position***.' Syneos was unable to leverage Synteract's position across the SMID category as Syneos was disadvantaged by its significant technology gaps, lack of investment in infrastructure, critically impaired by workforce reductions, leadership and operational changes, labor force turmoil, and a toxic culture. Former |

| **UNSOURCED ALLEGATIONS** |
|---|
| Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal, a standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously." (TAC ¶ 72.) |
| "Defendant Macdonald's April 29, 2021, statements were false and misleading when made because by November 2020, Syneos privately forecasted negative growth across its top accounts and had already begun a comprehensive review of its Clinical Solutions segment to determine why its clients were pulling work from the Company." (TAC ¶ 78.) |
| "Defendant's additional statement that Syneos was '*enhancing our SMID leadership position*' was false and misleading because Syneos had struggled to integrate Synteract, had hemorrhaged Synteract employees who refused to work for Syneos, and the acquisition did not enhance the Company's position with their SMID customers, many of whom refused to sign with Syneos because of technological deficiencies, including the lack of a client portal. Indeed, many of Synteract's customers were unhappy with the Syneos acquisition and within 6-12 months of the deal, Syneos lost 30%-40% of Synteract customers, with some customers voicing their unhappiness prior to closing." (TAC ¶ 83.) |
| "Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had impacted negatively on the Company's ability to win repeat business from existing SMID customers." (TAC ¶ 86.) |
| "In fact, the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture. The Company's toxic work environment, lack of guidance and training, and bullying atmosphere – fostered by Colvin and Brown – also contributed to high employee turnover and resulting workforce shortages. Such shortages made it impossible for the Company to have clinical trial employee continuity critical to producing quality data. All customers, including large pharma and SMID, complained that workforce shortages caused customers to experience huge delays in obtaining data and even a response from Syneos." (TAC ¶ 87.) |
| "In addition, and contrary to Defendants' statement that '*our integrated product offerings powered strong awards and backlog growth for both segments*,' Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System Syneos used |

| UNSOURCED ALLEGATIONS |
| --- |
| did not allow for any client customization; (iii) the Company lacked a centralized network for communicating between its worldwide locations; (iv) Syneos lagged its peers in providing remote and decentralized clinical capabilities, such as data visualization and statistical modeling; and (v) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials." (TAC ¶ 88.) |
| "These operational and technological failures led to a massive loss of business and caused would-be repeat customers to be reluctant to work with Syneos on future engagements and even caused existing customers to delay and cancel. Deals that were already in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to quality issues. For instance, pharmaceutical clients indicated they would not re-sign with Syneos because the Company did not have a client portal and was plagued by data quality problems. Clients further complained that the manual reports received from Syneos instead of accessing the data via a portal had to be redone." (TAC ¶ 89.) |
| "Syneos's quality problems and technological shortcomings, as highlighted to Defendants prior to and during the January 2021 ELT presentation, resulted in a cancellation of awards.… Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood that Colvin's direction to "find" value was tantamount to an instruction to fake it" (TAC ¶ 90.) |
| "Defendant Macdonald's statements on September 15, 2021, were false and misleading when made and omitted material information, as Defendants knew or recklessly disregarded that Syneos's strategy was not resonating with its customers and its clinical operations were impaired by deficiencies in its technology and product offerings, the Company was plagued by workforce reductions and labor force turmoil caused by a toxic work place culture.…Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business." (TAC ¶ 93.) |
| "In addition, Syneos's rapid acquisitional corporate growth and antiquated clinical trial product offering left the Company unable to meet its clients' requirements to have the latest technology available to access and evaluate their clinical trial data. The Company failed to invest in its technological infrastructure and therefore was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings, and efficiently work across its various product and service groups. For example, (i) Syneos never had a centralized network; (ii) the Clinical Trial Management System used at Syneos did not allow for any client customization; (iii) the Company lacked a centralized network for communicating via email between its worldwide locations; and |

| UNSOURCED ALLEGATIONS |
|---|
| (iv) Syneos lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials." (TAC ¶ 94.) |
| "Because of these shortcomings, the Company lagged its competitors and it was not enhancing its position with its SMID and large pharma customers. Syneos struggled to integrate Synteract and immediately after its acquisition, the Company started hemorrhaging Synteract employees and customers who did not want to work with a large CRO. And, within 6-12 months of the deal, Syneos lost 30%-40% of Synteract customers. Syneos's relationship with its large pharma customers also suffered as the declining awards foreseen during the January 2021 ELT meeting played out during 2021. As a result, deals that were in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to Syneos's quality issues. Early in 2021, AstraZeneca stopped using Syneos altogether." (TAC ¶ 95.) |
| "Defendants' statements on November 3, 2021, were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. Syneos was not experiencing growth and was not ramping up its large pharma relationship …" (TAC ¶ 99.) |
| "Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business.…For example, Syneos failed to invest in its technological infrastructure and was unable to respond to its clients' needs, provide effective service across its full suite of promised product offerings and efficiently work across its various product and service groups; never had a centralized network; used a Clinical Trial Management System that did not allow for any client customization; lacked a centralized network for communicating via email between its worldwide locations; and lacked an integrated client portal to allow clients to access their data and performance metrics for their clinical trials. " (TAC ¶ 100.) |
| "Syneos's relationship with its large pharma customers also suffered as the declining awards foreseen during the January 2021 ELT meeting played out during 2021. As a result, deals that were in the pipeline for 6-18 months started to be lost to other CROs because dissatisfied clients pulled their deals in reaction to Syneos's quality issues. And early in 2021, AstraZeneca stopped using Syneos altogether." (TAC ¶ 101.) |
| "Defendants' statements on January 12, 2022, were materially false and misleading when made and omitted to disclose material facts necessary to make the statements not misleading. Syneos did not differentiate itself from its competitors, its strategy was not resonating with its customers, and the Company was operating at severe competitive disadvantages because it did not possess state- |

| UNSOURCED ALLEGATIONS |
|---|
| of-the-art software to customize clinical trial data for its customers or even provide customers with a client portal. … Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business. For example:<br>• The Clinical Trial Management Systems used at Syneos were generic systems that did not allow for any client customization.<br>• Syneos simply lagged its peers in providing remote clinical capabilities and struggled to catch up to its peers in the new business environment.<br>• The Company lacked a centralized network for communicating via email between its worldwide locations and lacked basic internet access tools demanded by its clients and offered by all large CROs with which Syneos competed for new business.<br>• Syneos did not offer its customers an integrated client portal to allow clients to access their data and performance metrics for their clinical trials, a standard in the industry for clients to get answers to questions about their clinical trials and access their data instantaneously, and it was a basic feature other CROs offered to their clients." (TAC ¶ 105.) |
| "Syneos's stated 'New Business Awards and Backlog' methodology was knowingly materially false and misleading when made, because Syneos was not complying with the methodology and Defendants omitted to disclose that they were actively and artificially manipulating Syneos's reported backlog and manipulated its book-to-bill ratio and net new business metric." (TAC ¶ 110.) |
| "Contrary to Syneos's methodology, which permits the addition of 'new business awards to backlog' only 'when we enter into a contract or when we receive a written commitment from the customer selecting us as a service provider,' Defendants included new business awards in backlog before contracts were signed or where a 'written commitment' for an award was either not in place or was too vague or indefinite to be reliably added to backlog." (TAC ¶ 111.) |
| "Contrary to Syneos's stated backlog methodology, Defendants also included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors. Defendants treated change orders – which would add to the total award value and increase backlog, and as such required separate written agreement and sign-off by the sponsor – as finalized without a customer's signature. Defendants further inflated backlog by including change orders even when customers had not agreed to or signed a change order. For example, Syneos would treat a $2 million change order as finalized and added that amount to backlog even before a customer was aware of the increase to the contract and without a customer's signature or approval. … " (TAC ¶ 112.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Similarly, after Syneos was awarded involvement in a $300 million annual multi-year contract with GSK in late 2019, along with another CRO partner, Defendants included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year." (TAC ¶ 114.) |
| " … And Bekki Brown, President of Clinical Development, who oversaw clinical trials, argued with Project Managers about removing amounts as trivial as $5,000 from backlog or reversing small amounts of award value." (TAC ¶ 115.) |
| "And contrary to the methodology's restriction that award value on FSP contracts is limited to a '*maximum of twelve months*,' Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking." (TAC ¶ 116.) |
| "Defendants' statements concerning the Company's 'conservative' adherence to its 'New Business Awards and Backlog' methodology were knowingly materially false and misleading when made because Syneos was not complying with its methodology and Defendants omitted to disclose that they were adding to backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking as part of its purported 'conservative approach' and as required by the backlog methodology." (TAC ¶ 120.) |
| "At the time they reported the Company's financial and operational results each quarter, however, Defendants knew or recklessly disregarded that Syneos's backlog and performance metrics were false and misleading because they had violated the Company's 'New Business Awards and Backlog' methodology in order to inflate backlog and manipulated its book-to-bill ratio and net new business metric to create the false impression that the clinical segment was healthy and growing." (TAC ¶ 122.) |
| "Defendants' reported backlog and performance metrics for Q4 and full year 2020 were materially false and misleading. As described in §IV.B., Defendants violated its stated "New Business Awards and Backlog" methodology by adding new business awards or maintaining business awards in backlog (i) before contracts were signed and without written commitments, (ii) when collection of the award value was not probable, … and (iv) where the amount added or maintained in backlog exceeded the maximum of 12 months of services included in the award value on FSP contracts. And by doing so, Defendants inflated backlog and manipulated its book-to-bill ratio and net new business metric." (TAC ¶ 124.) |
| "Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors. Defendants treated change orders – which would add to the total award value and increase backlog and, as such, required separate written agreement and sign-off by the sponsor – as finalized without a customer's signature. For example, |

| UNSOURCED ALLEGATIONS |
|---|
| Syneos repeatedly and throughout the Class Period, would treat, *e.g.*, a $2 million change order as finalized and added to backlog even before a customer was aware of the increase to the contract and without a customer signature or approval." (TAC ¶ 125.) |
| "Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants put tremendous pressure on employees to hit targets, and when the exerted pressure and demands did not generate the results Defendants required, senior management including Kaitlyn Stadiem conducted what were known as 'accruals,' where cost targets and reimbursable expenses were manipulated to accelerate percentage-of-completion payments. These accruals, done outside the normal finance and accounting systems in a separate set of books, were then sent to accounting so that additional revenue could be recognized. And because the accruals and adjustments were not done at the business unit level and were conducted through separate systems, at the end of each month the accruals were reversed, and costs re-entered so that backlog remained unchanged despite recognizing revenue from the backlog. Stated simply, Defendants lowered estimated costs which allowed the Company to achieve percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach the percentage-of-completion targets were never removed (reduced) from the backlog in order to continue to portray Syneos's backlog as healthy and growing. Having already recognized revenue on the basis of lower cost estimates, Defendants knew that they would never realize and collect on these reimbursable (zero-margin) out-of-pocket expenses that Defendants were maintaining in backlog." (TAC ¶ 127.) |
| "When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog. For example, Bekki Brown, President of Clinical Development, who oversaw clinical trials, was a big culprit of inflating the backlog and argued with Project Managers about removing amounts as small as $5,000 from backlog or reversing small amounts of award value." (TAC ¶ 128.) |
| "And contrary to the Company's requirement that award value on FSP contracts is limited to a '*maximum of twelve months*,' as well as Defendants' assurances that they were 'conservative' in abiding by the requirement, Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking." (TAC ¶ 129.) |
| "In addition, after Syneos was awarded involvement in a $300 million annual multi-year contract with GSK in late 2019, along with another CRO partner, Defendants included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year and it never being probable that award value in excess of the $20 million was |

| UNSOURCED ALLEGATIONS |
|---|
| collectible. As a result, by the end of 2020, Syneos's reported backlog was inflated by as much as $280 million by including in backlog the full award value of the GSK contract."  (TAC ¶ 130.) |
| "As a result of the above manipulations, including (i) the $280 million of uncollectible and improbable annual award value from the GSK contract maintained in backlog for the full year 2020, of which $70 million was booked as new business in Q4 2020, and (ii) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's 'Clinical B2B ha[d] been overstated by ~0.2x,' in each of the five quarters preceding the February 17, 2022 announcement, Syneos's (i) reported backlog for Q4 2020 and full year 2020 was inflated by at least $615 million, (ii) net new business was overstated by $239 million for Q4 2020 and by at least $615 million for full year 2020, and (iii) actual book-to-bill ratio for Q4 2020 was approximately 1.24x, not the reported 1.52x, and for full year 2020 was 1.23x, instead of the reported 1.42x."  (TAC ¶ 131.) |
| "Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q4 2020 performance metrics that backlog was overstated by at least $615 million and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q4 2020 would need to be written down."  (TAC ¶ 132.) |
| "Defendants' reported backlog performance metrics for Q1 2021 were materially false and misleading. As described in §IV.B., Defendants violated its stated 'New Business Awards and Backlog' methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric. For example, as Defendants did in reporting false and misleading backlog and performance metrics in Q4 and FY 2020, they also did the following in Q1 2021:<br>• Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.<br>• …<br>• Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing.<br>• Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking."  (TAC ¶ 135.) |

| UNSOURCED ALLEGATIONS |
|---|
| "While Defendants had already inflated backlog by improperly including $280 million in award value from the GSK contract ($300 million FSP contract less the $20 million award value where collection was probable), Syneos continued to recognize and include award value for the full amount of the GSK contract, despite knowing that collection on $280 million was not probable. Consistent with Defendant Macdonald's description of how Syneos accounts for and includes award value for FSP contracts – a '*progressive*' and '*slow and steady approach*,' where '*We add a quarter at a time as we go*,' Syneos recognized an additional $70 million in award value in Q1 2021 where collection was not probable, representing the annual improbable award value on a quarterly basis." (TAC ¶ 136.) |
| "As a result of the above manipulations, including (i) the $280 million of uncollectible and improbable annual award value maintained in backlog from the GSK contract for the full year 2020; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q1 2021; … and (iv) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's 'Clinical B2B ha[d] been overstated by ~0.2x,' in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $919 million, its net new business for the quarter was overstated by more than $303 million, and actual book-to-bill ratio was approximately 0.97x, not the reported 1.30x." (TAC ¶ 138.) |
| "Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q1 2021 performance metrics that backlog was overstated by at least $919 million and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q1 2021 would need to be written down." (TAC ¶ 139.) |
| "Defendants' reported backlog and performance metrics for Q2 2021 were materially false and misleading when made. As described in §IV.B., Defendants violated its stated 'New Business Awards and Backlog' methodology in order to inflate backlog and manipulate the Company's book-to-bill ratio and net new business metric." (TAC ¶ 142.) |
| "Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department understood exactly that Colvin's direction to 'find' value was tantamount to an instruction to fake it." (TAC ¶ 144.) |
| "In addition, Syneos's backlog continued to be inflated as Syneos maintained the entirety of the annual GSK award value in backlog each year despite never converting more than $20 million in award value into revenue during any year and it never being probable |

| UNSOURCED ALLEGATIONS |
|---|
| that award value in excess of the $20 million was collectible. As a result, Syneos's reported backlog was inflated by as much as $280 million at the end of 2020 and, based on Macdonald's 'progressive' and 'slow and steady approach,' where 'We add a quarter at a time as we go,' Syneos improperly included in backlog an additional $70 million in uncollectable award value from GSK in Q1 2021. In Q2 2020, Syneos recognized and included an additional $70 million for the maintained uncollectible award value in backlog each year from GSK despite never receiving more than $20 million in contract revenue during any year. As a result, by Q1 2021 and throughout 2021, Syneos's backlog was inflated by at least $280 million."  (TAC ¶ 145.) |
| "And as Defendants did in reporting false and misleading backlog and performance metrics in Q1 2021, they also did the following in Q2 2021:<br>• Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.<br>• …<br>• Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog.<br>• When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.<br>• Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking."  (TAC ¶ 146.) |
| "As a result of the above manipulations, including (i) $350 million of improbable and uncollectible award value from the GSK contract maintained in backlog from full year 2020 and Q1 2021; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q2 2021; … and (iv) the inflation of backlog and net new business as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's 'Clinical B2B ha[d] been overstated by ~0.2x,' in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $1.18 billion, its net new business for the quarter was overstated by more than $267 million, and actual book-to-bill ratio was approximately 1.18x, not the reported 1.45x."  (TAC ¶ 147.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q2 2021 performance metrics that backlog was overstated by at least $1.18 billion and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q2 2021 would need to be written down."  (TAC ¶ 148.) |
| "Defendants' reported backlog and performance metrics for Q3 2021 were materially false and misleading when made. As described in §V.B, Defendants violated its stated 'New Business Awards and Backlog' methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric."  (TAC ¶ 151.) |
| "For example, as Defendants did in reporting false and misleading backlog and performance metrics in Q2 2021, they also did the following for Q3 2021:<ul><li>Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by sponsors.</li><li>…</li><li>Syneos included the entirety of the GSK award value in backlog each year despite never receiving more than $20 million in contract revenue during any year and it never being probable that award value in excess of the $20 million was collectible. As a result, Syneos's reported backlog was inflated by as much as $280 million from 2020 and, based on Macdonald's 'progressive' and 'slow and steady approach,' where 'We add a quarter at a time as we go,' was further inflated by an additional $140 million from Q1 and Q2 2021. In Q3 2021, Syneos improperly recorded as net new business an additional $70 million in uncollectable award value from GSK in Q3 2021 and maintained that amount in backlog through the end of the Class Period.</li><li>Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing.</li><li>When contracts were terminated or when collection of the business award value was not probable, Syneos refused to remove these amounts from backlog.</li><li>Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking."  (TAC ¶ 152.)</li></ul> |

-20-

| UNSOURCED ALLEGATIONS |
|---|
| "As a result of the above manipulations, including (i) $420 million of improbable and uncollectible award value from the GSK contract maintained in backlog from full year 2020 and Q1-Q2 2021; (ii) the uncollectible $70 million in award value from the GSK contract, on a quarterly basis, added to backlog as new business in Q3 2021; … and (v) the inflation to backlog and net new business overstatement as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022, where Syneos's 'Clinical B2B ha[d] been overstated by ~0.2x,' in each of the five quarters preceding the February 17, 2022 announcement, Syneos's backlog was inflated by at least $1.569 billion, its net new business for the quarter was overstated by more than $382 million, and actual book-to-bill ratio was approximately 0.94x, not the reported 1.3x." (TAC ¶ 154.) |
| "Having violated the Company's New Business Awards and Backlog methodology, Defendants knew at the time they released Syneos's reported Q3 2021 performance metrics that backlog was overstated by at least $1.569 billion and further knew at the time that the uncollectible reimbursable expenses and award value they had improperly included in Q3 2021 would need to be written down." (TAC ¶ 155.) |
| "Having inflated backlog, manipulated the Company's performance metrics, and falsely portrayed Syneos as healthy and growing for almost two years while Defendants and other insiders liquidated more than 38 million shares of Syneos common stock for proceeds of more $3.19 billion, and with Macdonald soon to be exiting the Company, Defendants' scheme slowly began to unravel as the effects of their long-running manipulations were revealed." (TAC ¶ 157.) |
| "However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues." (TAC ¶ 162.) |
| "Defendants continued to hide the pervasive technological and quality problems that had plagued Syneos's clinical business throughout the Class Period leading to a loss of business and customer defections…" (TAC ¶ 163.) |
| "Indeed, Defendants' reported backlog remained inflated because, as described in §IV.B., Defendants had violated its stated 'New Business Awards and Backlog' methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric, and the Company's backlog remained inflated. And as a result of the above manipulations, including the addition of (i) $490 million from improbable and uncollectible award value from the GSK contract maintained in backlog from 2020 and Q1-Q3 2021; (ii) the uncollectible $70 million in award value from the GSK contract for Q4 2021, … Syneos's backlog was inflated by at least |

| UNSOURCED ALLEGATIONS |
|---|
| $710 million, its net new business was overstated by more than $70 million, and actual book-to-bill ratio was approximately 0.28x, not the reported 0.34x." (TAC ¶ 165.) |
| "Over the next several months, Defendants continued to hide the fact that they had and were continuing to manipulate the Company's clinical backlog and performance metrics. …" (TAC ¶ 167.) |
| "While Syneos had removed $850-$950 billion in reimbursable (zero-margin) expenses from backlog in Q4 2021, Syneos's reported backlog, including its non-reimbursable clinical backlog, remained inflated and remained inflated through the end of the Class Period. Indeed, as a result of the above manipulations, including (i) $560 million from two years of improbable and uncollectible award value from the GSK contract maintained in backlog from 2020 and 2021, … Syneos's backlog remained inflated by at least $710 million." (TAC ¶ 168.) |
| "Defendants' statements during the April 29, 2022 conference call were false and misleading and omitted to disclose material facts necessary to make the statements not misleading. Syneos's operating model was not resonating with its customers because the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture." (TAC ¶ 170.) |
| "In addition, while Defendants described '*one of our other differentiators*' as having '*been really focusing in on customer, customer, customer, customer, being exceptional in delivery and quality and simplifying our operating model*,' the truth was that the Company was unable to provide service to the level their customers required and Syneos lacked the technological infrastructure to be competitive." (TAC ¶ 171.) |
| "Further, Defendants knew throughout this 18-month period that the clinical segment's longstanding and pervasive quality problems plaguing its ability to deliver on its clinical operation model to produce outstanding clinical trials data had damaged the Company's reputation with its SMID customers and these problems had negatively impacted the Company's ability to win repeat business and retain post revenue business." (TAC ¶ 172.) |
| "… However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues." (TAC ¶ 175.) |

| UNSOURCED ALLEGATIONS |
|---|
| "… However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make material misstatements and to conceal the full truth regarding the Company's underlying operational issues." (TAC ¶ 178.) |
| "Defendant Keefe further admitted what insiders at the Company had known since before the beginning of the Class Period: that the longstanding and pervasive quality problems plaguing Syneos's ability to deliver on its clinical operation model to produce outstanding clinical trials data damaged the Company's reputation with its hallmark SMID customers. …" (TAC ¶ 181.) |
| "As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that their statements and the public documents and statements issued in the Company's name were materially false and misleading, and they knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws." (TAC ¶ 189.) |
| "Defendants Macdonald, Meggs, Keefe, and Colvin – the most senior members of the Executive Leadership Team – were present at monthly ELT Meetings during which Syneos's inability to provide quality services and utilize critical technological tools, and clinical workforce turnover issues, were discussed. The purpose of these meetings was to plan, facilitate, and review the status of the Company's strategic initiatives. … Through their participation in the ELT meetings, Defendants knew that: (i) quality issues were reported late at Syneos and were not communicated in a timely fashion to the Company's clients; (ii) Syneos's audit inspections and root cause analyses were not effective in correcting the recurring quality issues; and (iii) quality was not embedded in the day-to-day execution at Syneos." (TAC ¶ 193.) |
| "Additionally, Macdonald, Meggs, and Colvin were told by other Syneos executives that dissatisfied clients had stopped awarding Syneos new business as a reaction to the Company's severe quality issues preventing Syneos from delivering accurate clinical trial data on time and in a useful format." (TAC ¶ 194.) |
| "*The Individual Defendants Knew that Backlog Had Been Inflated and Reported Performance Metrics Were Manipulated*. To hide the Company's crippling operational deficiencies, the Individual Defendants knowingly manipulated Syneos's reported performance metrics to falsely portray the Company's clinical business as healthy and growing. For example:<ul><li>Defendants included new or increased award value and reimbursable expenses on awards in backlog before change orders were agreed upon by customers.</li><li>…</li><li>Syneos maintained uncollectible award value in backlog each year from GSK despite never receiving more than $20 million in contract revenue during any year. As a result, by Q1 2021 and throughout 2021, Syneos's backlog was inflated by at least</li></ul> |

| UNSOURCED ALLEGATIONS |
|---|
| $280 million. And, based on Macdonald's 'progressive' and 'slow and steady approach,' where 'We add a quarter at a time as we go,' Syneos improperly included in backlog Period.<br>• Defendants manipulated reimbursable (zero-margin) costs, both in order to inflate reported backlog and also to manipulate the timing of the Company's revenue recognition. Defendants lowered estimated costs which allowed the Company to reach percentage-of-completion targets and prematurely recognize revenue. However, the same costs that were reduced to reach percentage-of-completion targets were never removed (reduced) from backlog so Defendants could continue to portray Syneos's backlog as healthy and growing. Having already recognized revenue on the basis of lower cost estimates, Defendants knew that they would never realize and collect on these reimbursable (zero-margin) out-of-pocket expenses that Defendants were maintaining in backlog.<br>• Syneos inflated its backlog and performance metrics by including in backlog three to four years of award value for FSP awards, rather than the 12 months of value Syneos represented it was taking. …"  (TAC ¶ 207.) |
| "Syneos was reluctant to remove the inflated reimbursable costs from backlog because doing so would adversely impact the Company's book-to-bill ratio. Bekki Brown (President of Clinical Development), Kaitlyn Stadiem (Vice President of Business Finance), Jennifer Fillman (Clinical Solutions CFO), Victoria Moore (Vice President of Business Finance, Clinical Solutions), and Michael Donovan (Business Unit CFO) were involved in and/or aware of the reluctance to remove the inflated reimbursable expenses from backlog and the impact on book-to-bill ratio. After the month-end close, these individuals and the business unit CFOs met with Defendant Meggs to present the consolidated financials. Fillman, Moore, and Donovan discussed these practices and the impact this would have on the Company, and Donovan warned that these practices could amount to fraud. To accommodate these practices, Syneos had a practice by which it would extend the month-end close until the numbers had reached certain pre-determined amounts."  (TAC ¶ 208.) |
| "The Defendants' manipulation of reimbursable expenses and backlog was not a secret within Syneos. For example, the entire Syneos sales organization reported their numbers on a weekly basis, received weekly email updates on their tracking to target, and had weekly Monday sales calls that analyzed their tracking-to-target metric. The Executive Vice President of Operations, the Head of Commercial, Defendant Keefe, the Head of Sales, and all of the sales representatives participated in these Monday calls. Executive Vice President of Sales Operations Management Jonathan Boykin was in charge of reporting the numbers to the Head of Sales and Operations and the entire sales organization knew where the Company was in terms of tracking to target. In each quarter during the Class Period, Syneos backlog was inflated by several hundred million and its new business awards were overstated. Regardless of the size of the gap to their target, Syneos always made it up."  (TAC ¶ 210.) |

| UNSOURCED ALLEGATIONS |
|---|
| "Directives to find additional value were often delivered during meetings with executives to discuss clinical segment financials, organized by therapeutic area (with additional meetings for large clients like Pfizer and Bristol Myers Squibb), and accompanied by pressure from Defendant Colvin and Brown to change targets and cost estimates to hit performance metrics and prematurely generate revenue without affecting backlog. These meetings were held monthly and led by Bekki Brown, the Executive Vice President of Operations, and attended by Kaitlyn Stadiem and Victoria Moore, who reported directly to Defendant Meggs. Defendant Colvin personally attended several of these meetings." (TAC ¶ 211.) |
| "At these meetings, the finance team was told how much they were off target and how much value they needed to 'find.' Bekki Brown directed members of project teams to change estimates to completion on clinical trials in order to recognize revenue earlier. These revenue totals were then consolidated and presented to Defendant Meggs. Even though the revenue numbers had already been reviewed and approved at many levels, including a review by the project financial analysts and managers, and even though the month or quarter should have already closed, Brown would then issue directives to find more revenue in various ways to increase revenues for the quarter or year. Efforts to manipulate backlog and prematurely recognize revenue occurred during the Class Period." (TAC ¶ 212.) |
| "… When Defendant Meggs was brought certain figures indicating a shortfall, he simply said 'No' until he received the numbers he wanted." (TAC ¶ 213.) |
| "Lead Plaintiffs incorporate by reference the allegations set forth above. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the true nature of the Company's business, operations, and reported performance metrics. §IV.A-C. Defendants engaged in a course of conduct that artificially inflated the price of Syneos common stock and operated as a fraud or deceit on members of the Class who purchased Syneos stock by misrepresenting and omitting material information about the true nature of the Company's backlog, net new business awards, and book-to-bill ratios. §IV.B, C." (TAC ¶ 263.) |
| "However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to conceal the full truth regarding the Company's underlying operational issues and the true nature of Syneos's backlog." (TAC ¶ 269.) |
| "… However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make false and misleading statements and conceal the full truth regarding the Company's underlying operational issues." (TAC ¶ 272.) |

| UNSOURCED ALLEGATIONS |
|---|
| "… However, the price of Syneos common stock continued to be artificially inflated as Defendants continued to make false and misleading statements and conceal the full truth regarding the Company's underlying operational issues."  (TAC ¶ 275.) |
| "Defendant Keefe further admitted what Defendants had long known: that the longstanding and pervasive quality problems plaguing Syneos's ability to deliver on its clinical model to produce outstanding clinical trials data had damaged the Company's reputation with its hallmark SMID customers, that these problems had negatively impacted the Company's ability to win repeat business, and that the Company's book-to-bill ratio was one-tenth the size from a year prior."  (TAC ¶ 278.) |
| "Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the true nature of (i) the Company's backlog, net new business awards, and book-to-bill ratios; (ii) Syneos's quality, technology, data, and turnover problems; and (iii) the Company's inability to retain and compete for and secure new and renewal business."  (TAC ¶ 299.) |