UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

KEMPEN INTERNATIONAL FUNDS     :     Civil Action No. 1:23-cv-08848-AS
(KEMPEN INTERNATIONAL FUNDS -     :
MERCLIN GLOBAL EQUITY), KEMPEN    :     PLAINTIFFS' MEMORANDUM OF LAW
INTERNATIONAL FUNDS (KEMPEN      :     IN OPPOSITION TO DEFENDANTS'
INTERNATIONAL FUNDS - MERCLIN     :     MOTION TO DISMISS PLAINTIFFS'
PATRIMONIUM), and MERCLIN        :     THIRD AMENDED COMPLAINT
INSTITUTIONAL FUND (MERCLIN      :
INSTITUTIONAL EQUITY FUND DBI-    :
RDT), Individually and on Behalf of All Others :
Similarly Situated,                      :
                                 :
              Plaintiff,       :
                                 :
   vs.                               :
                                 :
SYNEOS HEALTH, INC., ALISTAIR      :
MACDONALD, MICHELLE KEEFE, PAUL   :
COLVIN, and JASON MEGGS,        :
                                 :
             Defendants.     :

—————————————————————— x

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

    A.    Defendants' Scheme to Artificially Inflate Syneos's Stock Price So They
        Could Liquidate Their Holdings ............................................................................1

    B.    Defendants' Knowingly False and Misleading Statements and Omissions
        Used to Inflate the Stock ........................................................................................2

    C.    The Complaint Pleads Motive and Opportunity as Well as Conscious
        Misbehavior or Recklessness, Which Defendants Ignore .....................................4

    D.    The Complaint Alleges Loss Causation ..................................................................5

II.   LEGAL STANDARD ........................................................................................6

III.  ARGUMENT ......................................................................................................6

    A.    Plaintiffs Allege Actionable False and Misleading Statements and
        Omissions ...............................................................................................................6

        1.    Statement No. 1 (¶47) ...............................................................................7

        2.    Statement No. 2 (¶57) ...............................................................................8

        3.    Statement Nos. 3-5 (¶¶62, 67, 71)) .........................................................9

        4.    Statement No. 6 (¶74) .............................................................................11

        5.    Statement Nos. 7-9 (¶¶77, 85, 92) .........................................................12

        6.    Statement No. 10 (¶98) ...........................................................................15

        7.    Statement No. 11 (¶104) .........................................................................16

        8.    Statement Nos. 12-13 (¶(¶107-109, 118-119) ........................................17

        9.    Statement Nos. 14-17 (¶¶123, 134, 141, 150) ........................................20

        10.   Statement No. 18 (¶169) .........................................................................22

    B.    The Complaint Sets Forth Abundant Factual Allegations Demonstrating
        Defendants' Scienter ............................................................................................23

        1.    Defendants' and the Other Insiders' Massive Stock Sales Satisfy
            Scienter ...................................................................................................23

2.    The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ......................................................24

C.    Defendants' Self-Serving Version of the Facts Does Not Defeat Plaintiffs' Cogent and Compelling Falsity and Scienter Allegations .....................................26

D.    The Complaint Establishes Loss Causation............................................................26

IV.    CONCLUSION....................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)......................................................................................19

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)............................................................26

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................................................................8, 11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................22

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ...............................................................................8, 9

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................18, 21

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ..........................................................23

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)......................................................................................26

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................28

*In re Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. 2025)........................................................................5, 23

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................9, 15, 25, 28

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).....................................................................................................6

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)......................................................................................12

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ..............................................................................4, 12

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................7, 11, 23, 26

*Ollila v. Babcock & Wilson Enters., Inc.*,
   2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ........................................................22

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004)..................................................................18

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
   898 F. Supp. 2d 673 (S.D.N.Y. 2012)..................................................................28

*Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...............................................................................4, 6

*S.E.C. v. Life Partners Holdings, Inc.*,
   41 F. Supp. 3d 550 (W.D. Tex. 2013)..................................................................24

*In re Sadia, S.A. Sec. Litig.*,
   643 F. Supp. 2d 521 (S.D.N.Y. 2009)..................................................................19

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)......................................................25

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024).............................................................. *passim*

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................6, 23

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................26

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)................................................ *passim*

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021)..................................................................18

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d. Cir. 1999)..................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................6, 23

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)..................................................................11

iv

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ........................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...................................................................................27, 28

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023)................................................................................22

*Woolgar v. Kingstone*,
   477 F. Supp. 3d 193 (S.D.N.Y.).................................................................................18

*Zornberg v. NAPCO Sec. Techs., Inc.*,
   2025 WL 1093015 (E.D.N.Y. Apr. 11, 2025) .......................................................................24

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
   Rule 12(b)(6).....................................................................................................................6

Plaintiffs submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint (ECF Nos. 71-72) ("Motion" or "Mtn.").[1]

## I.      INTRODUCTION

### A.      Defendants' Scheme to Artificially Inflate Syneos's Stock Price So They Could Liquidate Their Holdings

The Complaint describes in detail how Defendants orchestrated a scheme to falsely portray to investors that Syneos's clinical business was healthy and growing. This was a lie. Defendants knew, but did not disclose, that Syneos was plagued by known, but undisclosed quality, technological, cultural, and operational problems such that Syneos was unable to compete for and win new and renewal business. ¶¶15, 180. And Defendants knew that Syneos's quality issues and data limitations were having a devastating and undisclosed impact on its clinical business which was experiencing negative growth. ¶¶4, 78-82. To mask this negative growth, Defendants told investors that the Company's workforce, culture, capabilities to run clinical trials, and successful engagement with its customers were driving Syneos's strong growth. Defendants also told investors that Syneos's "trusted process" and "integrated product offerings" were "designed to deliver consistent services to our customers on time, on budget and to the required quality standards" and were "powering awards and backlog growth." And Defendants inflated backlog and net new business awards in order to manipulate Syneos's reported book-to-bill ratios—a key metric used by analysts to judge Syneos's health—to falsely convince investors that Syneos's clinical business was booming when exactly the opposite was true.

---

[1]  Citations to the Third Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF No. 67, are "¶__." Defined terms have the meaning set forth in the Complaint. All citations and footnotes omitted and emphasis added unless otherwise noted.

The Court should reject Defendants' attempt to offer their own innocuous and false version of the fraud and their assertion that they promptly disclosed it. Mtn. at 6-8. Defendants claim they promptly made disclosures in February 2022 when they realized Syneos's reimbursable expenses were inflated and claim to have been "surprised" by the bad developments regarding new orders, which they claim to have promptly disclosed in November 2022. Mtn. at 8, 15. Their version of events, however, is contradicted by the Complaint and requires the Court to ignore the well-pleaded scheme set forth in the Complaint:  Realizing that the INC Research Holdings, Inc./inVentiv Health merger that created Syneos had been a disaster and that the Company was plagued by severe operational and technological failures hindering Syneos's ability to compete, Defendants inflated the Company's backlog and new business awards so Syneos could report healthy (but false) book-to-bill ratios of 1.2-1.4x in 2020 and 2021 to drive up Syneos' stock price. This allowed Syneos insiders to collectively dump more than $3 billion in Syneos stock, nearly all of their Syneos shares at prices artificially inflated by their fraud.  And far from making prompt disclosure, Defendants concealed known operational turmoil and inflated the Company's performance metrics so that insiders could sell their shares, and only after the sales were complete did they then gradually disclose problems they knew had existed for years.  Immediately after Syneos disclosed the $850-$950 million write-off of backlog, Defendant Macdonald abruptly left the Company after selling over $13 million in Syneos stock.

### B.    Defendants' Knowingly False and Misleading Statements and Omissions Used to Inflate the Stock

Leaving over 80 statements from the Second Amended Complaint for Violations of the Federal Securities Laws (the "SAC," ECF No. 57) "on the cutting room floor," the Complaint identifies 18 misstatements and omissions concerning Syneos's (i) success with SMID and large

pharma customers;[2] (ii) claimed competitive advantages powering the Company's clinical growth, including its "trusted process," "metrics-driven, repeatable methodology," "differentiated product development strategy," and "integrated product offerings;"[3] (iii) integration of the Synteract acquisition and claimed enhancement of its SMID position;[4] (iv) the treatment of oncology awards;[5] (v) stated "New Business Awards and Backlog" methodology and its "conservative" adherence to that methodology;[6] and (vi) quarterly performance metrics reported in Syneos's Forms 10-Q and 8-K during the Class Period.[7] The 18 false statements alleged in the Complaint are focused and limited to just a few sentences, and the Complaint sets forth particularized facts for each statement that demonstrate with specificity why and how each statement was false or misleading when made. For example, ¶77 sets forth the false statement that Syneos was "further penetrating large pharma, enhancing our SMID leadership position" and "we continue to gain share and remain focused on high-quality execution." Immediately thereafter, ¶¶78-83 detail how Defendants knew Syneos was actually expecting a decline in growth for the Company's top 15 overall customers and that serious unremedied quality problems were threatening Syneos's customer relationships.[8]

---

[2] Statement Nos. 1-2, 9-11; ¶¶47, 57, 92, 98, 104.

[3] Statement Nos. 3-4, 7-8, 18; ¶¶62, 67, 77, 85, 169.

[4] Statement No. 5; ¶71.

[5] Statement No. 6; ¶74.

[6] Statement Nos. 12-13; ¶¶107-109, 118-119.

[7] Statement Nos. 14-17; ¶¶123, 134, 141, 150.

[8] Defendants assert that Plaintiffs "duplicate largely the same allegations…in purporting to explain why different statements on different topics…were false." Mtn. at 9. The statements Defendants cite, however, detail their manipulation of performance metrics which logically have similar explanations of falsity. *E.g.*, ¶¶138, 147, 154, 165. "[A]llegations concerning activity in one

In refining their allegations, Plaintiffs address the Court's instructions and (i) connect the findings highlighted in the January 2021 ELT presentation—meant to "sound the alarm"—with specific alleged misstatements, demonstrating the falsity of Defendants' statements (¶¶77-82); (ii) clarify the GlaxoSmithKline ("GSK") FSP contract, describing the nature of the contract and explaining how Defendants' treatment of the contact and recognition of their entire annual award value was improper and violated the Company's methodology (¶¶14, 20); (iii) describe how following the $850-$950 million backlog write-down of reimbursable expenses on February 17, 2022, Jefferies calculated that Syneos's "Clinical B2B ha[d] been overstated by ~0.2x" in each of the five quarters preceding the announcement (¶¶23, 127, 160, 267); and (iv) identify how Defendants inflated backlog and manipulated reported performance metrics by identifying specific contracts and awards explaining how and why Syneos was not entitled to certain award value, and tracking how these specific manipulations impacted the Company's reported performance metrics each quarter.  ¶¶112-115, 142-147.

### C.      The Complaint Pleads Motive and Opportunity as Well as Conscious Misbehavior or Recklessness, Which Defendants Ignore

In addition to alleging scienter through massive insider stock sales—which alone is sufficient, the Complaint alleges particularized facts showing Defendants' knowledge or deliberate recklessness.  *See*, *e.g.*, ¶¶51-52 (alleging Defendants were "aware" of technology shortcomings); ¶¶63-64 (alleging Defendants' knowledge of technology and culture problems); ¶¶78-79 (Defendants were directly informed of quality problems); ¶¶90, 144 (same, adding that Colvin instructed employees to "find" more award value, which they understood to mean "fake" it).

---

period can support an inference of similar circumstances in [another]."  *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)

Seeking to dismiss a case Plaintiffs have not pleaded, Defendants claim fantastically that the Complaint makes "no effort whatsoever to plead scienter" and they ignore numerous compelling facts that evidence their conscious disregard and direct knowledge.  Mtn. at 9.  These untouched allegations include that Defendants (i) no later than January 2021, had direct knowledge that the serious quality and operational problems plaguing Syneos's clinical business were hindering its ability to compete and had jeopardized Syneos's relationship with many of its key accounts; (ii) held themselves out as knowledgeable about Syneos's backlog and confirmed that they had visibility into the clinical segment's performance metrics (¶¶111-116, 198, 200-205); and (iii) violated the Company's "New Business Awards and Backlog" methodology, inflated backlog, and manipulated Syneos's performance metrics.[9]  ¶¶107-116.  Defendants urge the Court to also ignore the Complaint's "Additional Indicia of Scienter" which alleges Defendants' motive and opportunity, core operations, and other particularized facts supporting a strong inference Defendants had the motive and opportunity to commit fraud, as well as strong circumstantial evidence of their conscious misbehavior or recklessness.[10]  ¶¶189-257.

### D.    The Complaint Alleges Loss Causation

The Complaint also establishes loss causation.  On February 17, 2022, Defendants reported a shockingly low book-to-bill ratio of 0.34x and wrote off a massive portion of reimbursable expenses maintained in the Company's backlog that would never be collected.  ¶159.  The Jefferies analyst estimated that Syneos removed $850-$950 million in reimbursable expenses, calculating

---

[9]  For example, Defendants ignore allegations that the oncology group CFO's superiors overruled him and refused to remove cancelled award value from backlog.  ¶¶115.

[10]  This Court has sustained other complaints asserting the same claims that relied on "additional" allegations of scienter.  *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686 at *9-10 (S.D.N.Y. 2025); *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300 (S.D.N.Y. 2024).

"that the magnitude of mgt's overestimation means that Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)." ¶160. Later, on November 4, 2022, Syneos announced a dramatic deterioration of its business, resulting in a book-to-bill ratio of just 0.18x, which was "a long way away from" the market's expectation of 1.15x. ¶¶276, 281. Analysts found Defendants' sentiment that they were "surprised" to be "frankly hard to believe," and not "reasonable," especially considering the magnitude by which Syneos's business deteriorated. ¶281. Defendants' alternative explanation for the fraud is not plausible.

Defendants' Motion should be denied.

## II.    LEGAL STANDARD

To state a claim for securities fraud, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

On a Rule 12(b)(6) motion, "courts must consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308-310 (2007). Courts must also "draw[] all reasonable inferences in favor of plaintiffs." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001).

## III.   ARGUMENT

### A.    Plaintiffs Allege Actionable False and Misleading Statements and Omissions

A complaint adequately pleads falsity when it: (i) specifies the allegedly false statement; (ii) identifies the speaker; (iii) states where and when the statement was made; and (iv) explains why the statement was false. *Blanford*, 794 F.3d at 305. Falsity may be established by allegations

of contemporaneous facts inconsistent with the alleged statements.  *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

Here, the Complaint provides a temporal roadmap alleging how Defendants engaged in a scheme to falsely portray Syneos's business as healthy and growing to artificially inflate the price of Syneos's common stock.  The Complaint identifies each false statements, alleges when and who issued each statement, and provides contemporaneous facts showing why each statement was false at the time it was made.  *See generally* Pls.' App'x. A.  The Complaint then sets forth Defendants' scienter.

### 1.    Statement No. 1 (¶47)

On September 9, 2020, Defendants Macdonald and Meggs addressed investors and highlighted that Syneos was "Positioned for Accelerated Revenue and Margin Growth: Syneos Health Investment Highlights," had a "Leadership Position in High-Growth SMID/Biotech," and was "Successfully Penetrating Large Pharma."  ¶47.  The Complaint immediately explains that these statements were false because Syneos was unable to compete with its peers, was not positioned for growth, and any leadership position it had was eroding, as (i) Syneos never had a centralized network (¶52), (ii) Syneos's Clinical Trial Management Systems were generic and did not allow for any client customization (¶50); (iii) Syneos lagged its peers in providing remote and decentralized clinical capabilities, and lacked certain data visualization and statistical modeling capabilities (*Id.*); and (iv) Syneos did not offer its customers an integrated client portal to allow clients to access their clinical trial data and performance metrics, which was standard in the industry. ¶51. The Complaint also explains that Defendants knew Syneos lacked basic technological tools demanded by its clients, offered by all large CROs, and necessary to be competitive in the market because Macdonald was the executive sponsor of Syneos's portal initiative. ¶¶51, 196; *see also* ¶¶191-197.

The Court should reject Defendants' claim that these statements are not false and are classic puffery. These statements conflict with the truth as it existed at the time the statements were made and, like their other similar statements "'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors,'" are material and not puffery. *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018); *see Dentsply*, 732 F. Supp. at 316 (sustaining statements that "we've been able to make everything we need to make," and "we're very comfortable that we're going to be able to deliver what our customers need"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (statements made to "reassure ... investors" not puffery).

### 2.    Statement No. 2 (¶57)

On December 8, 2020, Defendant Colvin highlighted the Company's "year-over-year clinical backlog growth ... for the top 50 pharma customers," explaining that "we're growing our share in large pharma, our legacy strength is in the small to midsized, or SMID, segment where we continue to enjoy an overweighted position relative to our total market share." ¶57. This statement was false because, *e.g.*, Syneos was not experiencing growth in large pharma and those accounts were in serious jeopardy as Syneos was unable to produce quality and accurate clinical trial data. ¶¶58-60. The Complaint also pleads strong indicia of Defendants' scienter because by November 2020, Syneos forecasted negative growth across its top accounts and many of the Company's key accounts were in jeopardy as some put holds on or otherwise restricted their work with Syneos. ¶¶59-60; *see also* ¶193.

Cherry-picking a portion of Statement No. 2, Defendants contend this statement is not actionable because Plaintiffs allege only that the "business was not sustainable."[11]    This is

---

[11] Unlike in *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), Plaintiffs have not "admit[ted] that [Syneos's] reported earnings figures were accurate" and

incorrect.  By November 2020, as Defendants assured investors that "we're growing our share in large pharma," Syneos forecasted negative growth across its top accounts.  ¶60.  Assuring investors that you are growing your business with your largest pharma customers forecasting negative growth from those accounts, which are contemporaneously in jeopardy renders this statement false.  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010).

### 3.    Statement Nos. 3-5 (¶¶62, 67, 71)

On December 8, 2020, Meggs stated that "Our model, people, and culture are our competitive advantage." ¶62 (Statement No. 3).  The Complaint alleges falsity as the Company's "model" was not competitive because the Company's customers demanded far more technologically advanced product capabilities than Syneos could offer.  ¶¶63, 65.  Indeed, Syneos never had a centralized network, its Clinical Trial Management Systems were generic and did not allow for customization, it lagged its peers in providing remote and decentralized clinical capabilities, its offerings lacked certain data visualization and statistical modeling capabilities, and Syneos did not offer its customers an integrated client portal to allow them to remotely access their data and performance metrics for their clinical trials, which was standard in the industry.  ¶63. Syneos's "people" and "culture" were also not competitive advantages because the Company was plagued by a toxic workplace culture, labor force turmoil, and a critical lack of training, which led to delays in responding to customers, data quality issues, and ultimately a loss of business.  ¶¶63-64.  And the Complaint details how Defendants were well-aware that Syneos's model was not competitive because Macdonald was the executive sponsor of the portal initiative that was never

---

"literally true," nor have they alleged that Syneos reported "unmanipulated corporate earnings." *Id*. at 35, 38.  The Complaint alleges the opposite, that Syneos manipulated its backlog, reported false performance metrics, and privately forecasted negative growth in its clinical business.  ¶¶60, 123-156.

launched by the end of the Class Period. ¶63.  The Complaint further alleges Defendants' scienter that Syneos's "people" and "culture" were not competitive advantages because Meggs and his direct report Bekki Brown created and fostered a toxic bullying workplace culture which snowballed into delays, quality problems and a loss of customers.  ¶¶64-65, 181, 196; *see also* ¶¶191-197.  *See Dentsply*, 732 F. Supp. 3d at 321 ("improper tone at the top and poor internal controls support an inference of scienter.").

On December 8, 2020, Macdonald discussed the Company's "trusted process," explaining how it is a "metrics-driven, repeatable methodology designed to deliver consistent services to our customers on time, on budget and to the required quality standards." ¶67 (Statement No. 4). Macdonald further stated that the "trusted process has provided extraordinary value ... to our customers." *Id*.  The Complaint alleges falsity because Syneos failed to invest in its technological infrastructure and suffered huge competitive disadvantages.  ¶68.  Syneos also did not deliver quality clinical data on time, on budget, or to the required standards.  ¶69.  The Complaint further alleges that Defendants knew their statements were false or were reckless because of their attendance at monthly ELT meetings, high ranking positions, and because Macdonald was in charge of the program to develop a client portal.  ¶69; *see also* ¶¶191-197.

On January 13, 2021, Syneos reported a 30% year-on-year backlog growth in the Top 50 accounts and Macdonald highlighted the "fantastic" performance of employees from the recently-acquired Synteract and stated that the Synteract acquisition has enhanced the Company's SMID position.  ¶71 (Statement No. 5).  The Complaint alleges falsity because, immediately from the day the acquisition closed, Synteract hemorrhaged employees who had no interest in working for Syneos.  ¶72. Many of Synteract's customers were also unhappy with the Syneos acquisition, and voiced their concerns with the deal prior to closing.  Syneos was unable to leverage Synteract's

10

position across the SMID category as Syneos was disadvantaged by its significant technology gaps, lack of investment in infrastructure, workforce reductions, leadership and operational changes, labor force turmoil, and a toxic workplace culture. And Defendants knew or were reckless in not knowing that their statements concerning the Synteract acquisition and its effect on the Company's SMID position were false because former Synteract CEO Steve Powell expressed shock as he learned that Syneos lacked a client portal. ¶¶72, 196; *see also* ¶¶191-197, 200.

Defendants challenge Statement Nos. 3-5 as inactionable puffery. Defendants are wrong. First, "a statement that may be puffery in one context is not puffery where it reassures investors as to specific risks." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022); *see also Novak*, 216 F.3d at 315 (statements that defendants' inventory was "'in good shape'" and "'under control'" were not puffery because "they allegedly knew that the contrary was true"). Second, Defendants repeatedly used statements such as "trusted process" and "designed to deliver consistent services to our customers on time, on budget and to the required quality standards" to differentiate Syneos from its competitors and assure investors of the Company's continued growth and "competitive advantage." *See* ¶¶62, 67. Such statements, "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors," are material and not puffery. *Signet*, 2018 WL 6167889, at *11.[12]

### 4. Statement No. 6 (¶74)

On April 29, 2021, in response to an analyst who questioned what impact "reprioritizations or cancellations" were having on backlog and net bookings, Macdonald stated, "a couple of customers on the larger side," "one in oncology" were delayed "so we have to take them out due

---

[12] *See Dentsply*, 732 F. Supp. 3d 300, 316 (sustaining statement that "we're very comfortable that we're going to be able to deliver what our customers need"); *Banco Bradesco*, 277 F. Supp. 3d at 660 (statements made to "reassure … investors" not puffery).

to our bookings policy" and "they will come back in at a later stage in 2021 as awards...." ¶74. The Complaint explains this statement was misleading because Defendants did not remove the two large oncology clinical trials worth $25 million each that were canceled in early 2021. Oncology business unit CFO Mike Donovan tried to have these trials removed from the backlog but was overruled by his superiors as Defendants were concerned that removing the canceled awards from backlog would decrease the Company's book-to-bill ratio. ¶75.

Defendants claim that Defendants could have been talking about different oncology projects, and that the size of the cancelled awards is immaterial. Even if the cancelled awards are not the contracts Macdonald was referencing, he had a duty to also disclose the cancelled awards since the impression he gave investors was that no oncology awards were cancelled.[13] *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth.").

### 5. Statement Nos. 7-9 (¶¶77, 85, 92)

On April 29, 2021, Macdonald stated that "[w]e continue to deliver on our Value Creation Plan by further penetrating large pharma, enhancing our SMID leadership position ... our global scale, integrated capabilities and unique product development strategy positions us well in this environment as we continue to gain share and remain focused on high-quality execution." ¶77 (Statement No. 7). Macdonald's statement was false because, *e.g.*, (i) Syneos was not "further penetrating large pharma"; and (ii) Defendants knew that the Company's "integrated capabilities and unique product development strategy" was not positioning the Company to gain share, as a

---

[13] Plaintiffs need not connect the cancelled awards with exacting precision, especially where falsity does not depend on such precision. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) ("As this court has reminded litigants, '[e]ven with the heightened pleading standard … we do not require the pleading of detailed evidentiary matter in securities litigation.'").

January 28, 2021 ELT presentation, made directly to Defendants memorialized serious unremedied quality problems threatening Syneos's relationships with its customers, some of which had already stopped awarding new business to Syneos. ¶¶78-82. And following the Synteract acquisition, the Company was not "enhancing our SMID leadership position" because Syneos had struggled to integrate Synteract, hemorrhaged Synteract employees who refused to work for Syneos, and many SMID customers refused to sign with Syneos. Indeed, within 6-12 months of the deal, Syneos lost 30%-40% of Synteract customers. ¶83. The Complaint then alleges scienter by discussing in detail how the January 2021 ELT presentation directly informed Defendants of the serious unremedied quality problems that were jeopardizing the Company's relationships with its large pharma clients. ¶¶78-83, 196; *see also* ¶¶191-197. In addition, the Complaint alleges Macdonald's actual knowledge that his statement concerning the Company's "integrated capabilities and unique product development strategy" was false because he was the executive sponsor of a portal initiative that was never launched by the end of the Class Period. ¶83. *See* ¶¶9, 196.

On August 9, 2021, MacDonald highlighted "another strong quarter of results, which demonstrate that our differentiated product development strategy continues to resonate in the market," and further stated that "our integrated product offerings powered strong awards and backlog growth for both segments." ¶85 (Statement No. 8). The Complaint sets forth falsity by pointing to Defendant Keefe's November 2022 admissions that the Company's operations had been in disarray for at least 18 months and Syneos lacked the technological offerings to "be more competitive." ¶¶86. The Complaint's falsity allegations include that throughout this 18-month period, the Company's unremedied and pervasive quality problems damaged the Company's reputation with its SMID customers and negatively impacted the Company's ability to win new and repeat business from those customers. ¶¶86-90.

The Complaint immediately alleges scienter by detailing how the January 2021 ELT presentation directly informed Defendants and "raised the alarm" of the serious unremedied quality problems plaguing the Company.  ¶¶88-90, 191-197.  Scienter is further alleged because the toxic culture and extreme pressure exerted by Colvin and others to hit targets and generate additional award value, undermined Defendants' rosy statements that Syneos's strong results were powered by its "differentiated product development strategy" and "our integrated product offerings."  ¶¶87, 90.  *See Dentsply*, 732 F. Supp. 3d at 321.

On September 15, 2021, Macdonald discussed "second quarter bookings" in the Company's clinical segment, stating "we have a very good SMID mix in the business, and we continue to have that ... we have really good backlog growth in clinical from top 20.  Those are going to be the drivers as we move into 2022 and 2023."  ¶92 (Statement No. 9).  The Complaint sets forth falsity and scienter for this statement by alleging that Defendants knew that Syneos's strategy was not resonating with its customers and its clinical operations were impaired by deficiencies in its technology and product offerings, and plagued by workforce reductions, labor force turmoil, and unremedied quality problems impacting large pharma customers.  Keefe acknowledged in November 2022 that the Company's operations had been in disarray for at least 18 months and Syneos lacked the technological offerings to "be more competitive."  ¶92.

Defendants argue that Statement Nos. 7-9 are puffery, vague expressions of corporate optimism, and are not supported by the findings in the ELT report or Keefe's November 2022 admissions.  Defendants are wrong.  Defendants' statements were "made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors." These statements were material to investors and are not puffery.  *Signet*, 2018 WL 6167889, at *11.

14

Further, Keefe's November 2022 admissions acknowledged that Syneos had been unable to effectively compete and that the Company "did not evolve our business development capabilities to fully leverage our integrated solutions or effectively engage our customers within the current competitive environment" and the Company "didn't ... leverage our whole breadth of capabilities to be competitive in a very competitive market."  ¶¶186-188.  These admissions by Keefe contradict and indicate the falsity of Macdonald's statement on August 9, 2021, that Syneos's "differentiated product development strategy continues to resonate in the market" and "our integrated product offerings powered strong awards and backlog growth for both segments." ¶85.  These issues were known to Defendants during the Class Period because Syneos's quality department raised them during the January 2021 ELT meeting (¶¶78-83), they are corroborated by the experiences of former Syneos employees (¶¶49-52, 55, 58-60, 63, 69, 72), and they render Defendants' statements knowingly false when made.

### 6.    Statement No. 10 (¶98)

On November 10, 2021, Macdonald highlighted Syneos's "organic growth … driven by … the continuing ramp-up in our larger pharma relationships, particularly in oncology."  ¶98.  The Complaint alleges falsity because, in addition to having just lost two $25 million oncology trials early that year, Defendants failed to disclose that the reported "organic growth" and "continuing ramp-up in our large pharma" was not occurring.  *See Freudenberg*, 712 F. Supp. 2d at 191 ("'Organic growth' was actionable because it was represented by Defendants to be the focus of E*TRADE's business.").  Indeed, Syneos was not experiencing growth and was not ramping up its large pharma relationships.  ¶¶15, 100.  In fact, Syneos was then experiencing a loss of business because the clinical segment's longstanding and pervasive quality problems negatively impacted the Company's ability to win new and repeat business.  ¶¶100-101.  The Complaint sets forth Defendants' scienter based on Keefe's November 2022 admissions, and Defendants were informed

15

during the January 2021 ELT meeting that as a result of the Company's unresolved quality problems, the Company's clinical business was forecasted to decline. *Id*.

Defendants argue that this statement is not false because Plaintiffs do not allege Syneos was not winning any oncology work in 2021, and that isolated portions of the alleged misstatement (taken out of context) are puffery. Defendants are wrong. This statement is false because Defendants, who chose to highlight oncology as a driver of "organic growth," failed to disclose the loss of the oncology awards and the reported "organic growth" and "continuing ramp-up in our large pharma" was not true. These statements, attributing backlog growth to large pharma customers, were made repeatedly to reassure investors "about matters particularly important to the company and investors," and are thus not puffery. *Signet*, 2018 WL 6167889, at *11.

### 7.    Statement No. 11 (¶104)

On January 12, 2022, Macdonald discussed Syneos's "value-creation plan," explaining how the Company was "driving that long-term growth, using that penetration of large pharma, the success we've had in SMID, continuing to drive that, continuing to drive operational efficiency ... bringing new capabilities, bringing new differentiation to our model and to our customers to continue delivering on that high growth." ¶104. The Complaint explains how this statement, similar to other Defendants repeated, was knowingly false when made because of Syneos's competitive, technology, and infrastructure problems. ¶105. As highlighted by the ELT presentation in January 2021, and known thereafter throughout this 18-month period, the clinical segment's longstanding and pervasive quality problems were jeopardizing the Company's large pharma clients, damaging Syneos's reputation, and negatively impacting the Company's ability to win new and repeat business. ¶¶78-83. The Complaint also details how Defendants knew their statements were false via the January 2021 ELT presentation and Keefe's November 2022 admissions. ¶105.

16

Defendants claim that Statement No. 11 is not shown to be false and is too general to be relied upon.  First, this statement is false because Defendants knew that the Company was competitively disadvantaged and was plagued by unresolved quality problems.  And again, because Defendants chose to emphasize the Company's success with large pharma customers, differentiated model, and operational efficiencies, Syneos "put the topic at issue such that the Court cannot say that, as a matter of law, investors would not find certain representations material." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020) (cleaned up).

### 8.  Statement Nos. 12-13 (¶¶107-109, 118-119)

In each of Syneos's Forms 10-Q and Form 10-K issued throughout the Class Period, Defendants detailed the "New Business Awards and Backlog" methodology describing how the Company identified and included business awards in backlog.  ¶¶107-109.  Defendants then assured investors of their "conservative" adherence to this methodology.  ¶¶118-119.  The Complaint explains why the methodology and Defendants' assurances of compliance with the methodology were false because Defendants were actively and artificially manipulating Syneos's reported backlog to manipulate the Company's book-to-bill ratio and net new business metrics. ¶¶110-117, 121.  Indeed, the Complaint documents the extent to which Defendants increased the inflation in the backlog during each successive quarter throughout the Class Period.  ¶¶131-132, 138-139, 147-148, 154-155.  Following each statement, the Complaint describes how Defendants knew or should have known that Syneos was not complying with its stated methodology by identifying specific awards, describing how and why Syneos was not entitled to certain award value,[14] and providing detailed accounts of manipulation.  *See* ¶112 (Associate Director of Finance

---

[14]  *See*, *e.g.*, ¶114 (detailing how Syneos improperly booked into backlog the entire annual award value from a $300 million per year, multi-year contract with GSK in late 2019 despite never receiving more than $20 million in contract revenue during any year); ¶113 (maintaining in

observed "on multiple occasions with increasing frequency in 2021 and 2022, management allowed the backdating of contracts signed after the end of the quarter to make sure the award value was placed in backlog for the previous quarter."); ¶115 (two $25 million oncology awards cancelled in early 2021 maintained in backlog, over objection by Oncology Business Unit CFO).

In response, Defendants argue that the methodology was more of a suggestion requiring the exercise of judgment, that the Complaint's allegations are supported by unnamed sources,[15] and the allegations do not plead specific amounts or exact timing.  Defendants also claim that compliance with the methodology is a nonactionable opinion.  These arguments are not credible.[16] The Complaint details with particularity how Defendants violated the methodology and inflated the Company's performance metrics and the temporal impact of the manipulations.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 162 (S.D.N.Y. 2008) ("a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and

---

backlog $100 million in award value from progress bonus despite failing to satisfy very first progress milestone).

[15]  Plaintiffs are not required to plead sources where a complaint sets forth detailed facts which "'provide an adequate basis for believing that the defendants' statements were false.'"  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004); *see also Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 545 F. Supp. 3d 120, 141 (S.D.N.Y. 2021) (sustaining claim "based on one account of a single, unidentified source," noting that the Second Circuit "'rejects any notion that confidential sources must be named as a general matter'").

[16]  Defendants cite *Woolgar v. Kingstone*, 477 F. Supp. 3d 193 (S.D.N.Y.), but in *Woolgar* the complaint was "devoid of allegations … even plausibly suggesting" Defendants did not believe their loss reserves to be false with plaintiff placing "substantial weight" on the mere fact that reserves were subsequently increased.  *Id.* at 224-226.  Here, Defendants knew backlog had been inflated and Syneos executives were warned the practices "could amount to fraud."  ¶¶207-215. Furthermore, the magnitude of Defendants' fraud compared to that in *Woolgar* (over $1 billion here, as compared to $11 million) and the harsh reaction of securities analysts are further evidence the misstatements were not innocently made.  *Woolgar*, 477 F. Supp. 3d at 226; ¶¶254-256.

reasonable notice to defendants of the claim and the grounds upon which it is based.").[17]  For example, the Complaint sets forth how Defendants improperly included, maintained, or otherwise accounted for (i) the entirety of the GSK contract, despite not being entitled to more than $20 million in annual award value (*e.g.*, ¶¶14, 20, 114, 145); (ii) award value from the two $25 million oncology trials canceled in early 2021, despite the efforts of business unit CFO Mike Donovan to have these trials removed from the backlog, but was overruled (¶¶75, 115, 137); (iii) a $100 million milestone contingent "bonus" award from an agreement to conduct eight clinical trials, where Syneos missed the very first milestone and thus was ineligible for the bonus (¶¶113, 153, 207); and (iv) the inflation to backlog as calculated by Jefferies following the Company's $850-$950 million backlog write-down of reimbursable expenses announced on February 17, 2022. ¶¶23, 27, 126-128, 267.

Moreover, neither the stated methodology nor the statements confirming Syneos's "conservative" adherence to that methodology are protected opinions. *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 531-32 (S.D.N.Y. 2009) (statements "were fraudulent because they failed to reveal that the Company had ... violat[ed] ... its internal hedging policy").  Indeed, the methodology Syneos used to account for new business awards and backlog was "expressed in a formal statement such as an S.E.C. filing" throughout the Class Period and it is not an opinion. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).[18]  Defendants'

---

[17]  For this reason, Defendants' argument that the Complaint lacks detail supporting the award "backdating" fails. ¶112 (explaining that Defendants backdated awards to include award value in previous quarters and to inflate backlog).

[18]  The methodology does not allow for subjectivity, providing several requirements that must be satisfied before an award can be included in backlog.  *Signet*, 2018 WL 6167889, at *11 (statements regarding the company's conservative practices actionable).  Even if an opinion, the Complaint alleges "the speaker did not hold the belief she professed" or that "the supporting fact

19

retort that the methodology permits awards to be included in backlog without a written contract is misleading because even in such circumstances, there must be some "written commitment", and Defendants ignored this requirement and added awards to backlog with no commitment at all. ¶107. Defendants' assertion that Plaintiffs do not challenge backlog statements in 2022 (Mtn. at 14) is incorrect. The Complaint alleges statements made in 2022 describing Syneos's "New Business Awards and Backlog" methodology were false and that Syneos's backlog remained inflated in 2022. ¶107 n.11; ¶165.

### 9.    Statement Nos. 14-17 (¶¶123, 134, 141, 150)

During the Class Period, Syneos reported various performance metrics, including backlog, net new business awards, and book-to-bill ratio. ¶¶123, 134, 141, 150. These metrics, reported in the Company's SEC filings, were crucial to understanding Syneos's business and assessing whether the Company was healthy and growing. At the time they were reported, however, Defendants knew that Syneos's performance metrics were false because they had violated the Company's "New Business Awards and Backlog" methodology in order to inflate backlog and manipulate its book-to-bill ratio and net new business metric to create the false impression that the clinical segment was healthy and growing. Here, Plaintiffs identify the metrics alleged to be false (¶¶123, 134, 141, 150) and detail with particularity how, and the extent to which those metrics were inflated at each successive quarter throughout the Class Period (¶¶131-132, 138-139, 147-148, 154-155), going a step further calculating what the true metrics should have been absent Defendants' manipulation. *Id.*

---

she supplied was untrue." *Id.*, at *12; *see, e.g.*, ¶115 (overruling business unit CFO to maintain cancelled oncology awards in backlog).

Notably, Plaintiffs explain the different components of these calculations, including uncollectible award value from: (i) the GSK contract (*e.g.*, ¶¶14, 20, 114, 145); (ii) two $25 million oncology trials canceled in early 2021, despite the efforts of business unit CFO Mike Donovan who tried to have these trials removed from the backlog, but was overruled (¶¶75, 115, 137); (iii) the $100 million milestone "bonus" award from an agreement to conduct eight clinical trials, where Syneos missed the very first milestone and was ineligible for the bonus (¶¶113, 153, 207); and (iv) inflated reimbursable expenses. ¶¶23, 27, 126-128, 267.[19] Such detailed allegations are in addition to Defendants' admissions that backlog had been inflated. ¶¶179-184. Indeed, such exacting detail exceeds what is needed to plead falsity. *See Bristol Myers*, 586 F. Supp. 2d 148, 162 (falsity need not be pleaded "with absolute precision"). Furthermore, the Complaint includes allegations regarding Defendants' scienter for the backlog manipulations. ¶¶115, 120, 126-128, 144, 146, 152-153, 207-257.

Defendants assert that these allegations lack particularity, do not explain how violating the methodology caused inflated performance metrics at any moment in time, and that adherence to the methodology, as reflected in the performance metrics, is just an opinion. Defendants, however, ignore the Complaint's detailed allegations how Defendants repeatedly and intentionally violated the "New Business Awards and Backlog" methodology and reported false performance metrics. ¶¶207-215. Defendants also ignore that the Complaint identifies specific awards and contracts added or maintained in backlog in violation of the methodology, details the extent to which these manipulations inflated backlog during each successive quarter throughout the Class Period, and

---

[19] The Complaint confirms the GSK contract's value ($300 million annually) and type (FSP). ¶¶14, 20. Defendants' inclusion in backlog of reimbursable expenses *inflated* backlog. *See* ¶¶23, 125, 127. And Defendants knew at the time these figures were added to backlog that they were inflated and would need to be removed. Plaintiffs have also removed any discrepancies with respect to the amount of reimbursable expenses that need to be removed. ¶¶158-162.

calculates the extent of the inflation. ¶¶131-132, 138-139, 147-148, 154-155. Backlog is a current and historical operational and financial metric, not an opinion. S*ee Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *5-6 (W.D.N.C. Feb. 8, 2018) (statements that company had a "strong backlog" were actionable); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 990 (9th Cir. 2008) (backlog statements were actionable because they described how much work the company has under contract right now).

### 10.    Statement No. 18 (¶169)

On April 29, 2022, Michael Lee Brooks, Syneos's new Global Head Clinical Development Solutions, highlighted Syneos's "differentiators," stating that "this year, we've been really focusing in on customer, customer, customer, customer, being exceptional in delivery and quality and simplifying our operating model." ¶169. The Complaint alleges falsity because, as with similar statements, the Company's operations were impaired by competitive disadvantages in technology, workforce reductions, leadership and operational changes, and labor force turmoil caused by a toxic culture, and Syneos lacked the technological offerings to "be more competitive." ¶¶170-172. The Complaint details how Defendants knew their statements were false by alleging Keefe's November 2022 admissions and the clinical segment's known longstanding and pervasive quality problems. *Id.*

Again, Defendants contend this is puffery. Mtn. at 22. And again, Defendants are wrong. Syneos's statement regarding its great customer relationships, like Defendants' other similar statements, was repeatedly emphasized as being important to investors and is actionable. *Signet*, 2018 WL 6167889, at *11; *see also Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023) (rejecting argument that "misleading representations regarding customer retention are nonactionable opinions, puffery, and forward-looking statements").

22

**B.      The Complaint Sets Forth Abundant Factual Allegations
         Demonstrating Defendants' Scienter**

Scienter may be established by showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Estee Lauder*, 2025 WL 965686, at *8. "The inquiry is holistic; courts must consider 'the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity.'" *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *13 (S.D.N.Y. Mar. 29, 2024) (citing *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021)). Here, the Complaint (i) alleges motive and opportunity, and (ii) sets forth strong evidence of Defendants' conscious misbehavior or recklessness, both as to specific alleged false statements and as applicable to their scheme as a whole.

**1.      Defendants' and the Other Insiders' Massive Stock Sales
         Satisfy Scienter**

The Complaint establishes motive and opportunity by alleging Defendants' stock sales that were unusual in both timing and amount. ¶¶216-237. *See Tellabs*, 551 U.S. 308, 325. This alone shows scienter. *See Novak*, 216 F.3d at 307-308. The suspicious sales by other non-defendant insiders further supports a strong inference of scienter. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d. Cir. 1999) (finding "'inference of bad faith and scienter'" where defendant and "several other insiders unloaded large positions"); *Scholastic*, 252 F.3d at 75 ("'number of insiders selling'" relevant to scienter).

Defendants' claim that their frenzied $16 million in stock sales over an eight-month period were not "significant" and that the timing of the sales were not suspicious strains credulity. Mtn. at 23-24. During the Class Period, Keefe and Colvin sold all or nearly all of their shares (¶¶230-237), Macdonald sold 53% of his shares (¶¶217-223), and Meggs sold 80% of his shares (¶¶224-229). Sales of this magnitude alone support an inference of scienter. *See Stevelman*, 174 F.3d at

23

85 (selling approx. 40% of holdings establishes motive); *Zornberg v. NAPCO Sec. Techs., Inc.*, 2025 WL 1093015, at *4 (E.D.N.Y. Apr. 11, 2025) (stock sales are unusual or suspicious if made "'at a time or in an amount that suggests the seller is maximizing personal benefit from inside information;' and [if] trading was 'dramatically out of line with prior trading practices.'").  And that Defendants' sales may have missed the peak of inflation does not negate their motive.  *Cf. S.E.C. v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) ("a reasonably smart fellow ... would want to sell at an opportune, but perhaps not *the most* opportune, time, if only to avoid more suspicion than his behavior was already bound to attract.") (emphasis in original).

Defendants mischaracterize other insiders as irrelevant third parties.  Mtn. at 24 n.6. Neither TH Lee and Advent nor the other Syneos insiders were "third parties."  Rather, TH Lee and Advent had "near continuous Board representation at Syneos" through control over four Board seats.  ¶¶239-240.  The other individual insiders include Syneos's Chief Development Officer and Global Head of Clinical Development (Brooks), a Director (Harty), and Senior Vice President of Finance and Chief Accounting Office (Kralowetz).  ¶¶245-247.  And these insiders sold all or nearly all of their Syneos holdings at artificially inflated prices on the public market and through a series of five Syneos-sponsored public stock offerings and stock repurchase agreements during the Class Period, generating proceeds of over $3 billion.  ¶¶241-247.  Given their timing and amounts, these sales further support an inference of scienter.

### 2.    The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

In addition to alleging that Defendants had direct knowledge that their statements were false (¶¶78-83, 191-197, 207-215), the Complaint alleges strong circumstantial evidence of conscious misbehavior or recklessness based on Defendants' own assurances, their senior roles

within the Company, the magnitude of the fraud, and the core nature of the clinical solutions business.  ¶¶198-206, 254-257.

Macdonald and Meggs, for example, spoke about their "good" "visibility" into the Company's pipeline.  ¶¶255-262.  *See Dentsply*, 2024 WL 1898512, at *9 ("Defendants' own statements suggest that they had access to – and reviewed – [contrary] information."); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (scienter found where defendants stated they had "'visibility in the inventories'").  And Keefe and Colvin personally participated in sales calls and finance meetings during which efforts to manipulate backlog and prematurely recognize revenue were discussed.  *See Freudenberg*, 712 F. Supp. 2d at 198 (conversations and attendance at meetings show "access to and actual knowledge of facts").  Defendants handed down directives to manipulate performance metrics during these meetings "every quarter during the Class Period."  ¶¶71, 78.  *See Dentsply*, 2024 WL 1898512, at *11 (strong inference of scienter where defendants' "direct reports executed the scheme.").  In addition, the Complaint also identifies specific instances where Defendants violated their methodology, inflated backlog, and manipulated performance metrics.  ¶¶14, 20, 22-23, 27, 113.  And the magnitude of the alleged fraud and abrupt departures of four of Syneos's most senior executives that began as the truth was being revealed (¶257), together with the fact the fraudulent scheme centered on the Company's core clinical business, further support the strong inference of scienter. [20]

---

[20]  ¶206. The magnitude of the alleged fraud is startling by any measure: bookings were one-tenth of expectations, an almost $1 billion miss.  ¶¶23, 254-256.  *Dentsply*, 2024 WL 1898512, at *8 ("core-operations doctrine and the magnitude of the" fraud contributed to an inference of scienter where company adjusted its accounts by 3% to 24%).

25

**C.      Defendants' Self-Serving Version of the Facts Does Not Defeat
Plaintiffs' Cogent and Compelling Falsity and Scienter Allegations**

Defendants' attempt to offer their own innocuous version of the disclosure of the fraud. But Defendants' claim that they were "'surprise[d]'" is not credible.  Mtn. at 8, 15.  Indeed, securities analysts found this sentiment to be "frankly hard to believe," and not "reasonable," especially considering the magnitude by which Syneos's business deteriorated.  ¶¶281-283.

Defendants' contention that Plaintiffs have "reverse engineer[ed]" a fraud (Mtn. at 15) similarly fails.  Plaintiffs are not "pleading fraud based on changed circumstances that were unforeseen by defendants at the time they made their statements."  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007).  Rather, Defendants knew that the adverse facts and circumstances they revealed after the Class Period existed throughout, and Defendants were "responsible for revealing those material facts reasonably available to them."  *Novak*, 216 F.3d at 309.  *Compare* ¶188 (admission that Syneos's deficient technology had resulted in "competitive gaps"), *with* ¶¶49-52, 55, 58-60, 63, 72, 78-83 (January 2021 ELT Presentation and witness observations detailing that Syneos's technology failures had existed during the Class Period). Therefore, Defendants "hindsight" argument fails.  *See Dentsply*, 2024 WL 1898512, at *9 (post-class period statements supported scienter); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16, 20 (S.D.N.Y. Nov. 18, 2019) (same, and rejecting Defendants' "hindsight" argument).

**D.      The Complaint Establishes Loss Causation**

"To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).  "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations."  *Dentsply*, 732 F. Supp.

3d at 323 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 187 (2d Cir. 2015)).  "[L]oss causation can be pleaded by alleging that either (1) 'the market reacted negatively to a corrective disclosure of the fraud,' or (2) 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'"  *Dentsply*, 732 F. Supp. 3d at 323 (quoting *Barclays*, 750 F.3d at 232-233).  The Complaint here satisfies both standards, alleging corrective disclosures and a foreseeable loss caused by the materialization of the risk concealed by the fraud.  ¶¶265-284.

Over the course of four loss-causing events, beginning on February 17, 2022, and continuing through November 4, 2022, the truth about Defendants' prior misrepresentations and omissions was revealed.  First, on February 17, 2022, Syneos wrote off $850 to $950 million in reimbursable expenses, which indicated "Clinical B2B has been overstated by ~0.2x since early in the pandemic (5 quarters)."  ¶160.  This disclosure is directly tied to the allegations that Defendants were overstating backlog by including inflated reimbursable expenses.  ¶¶127, 268. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("it is enough that the loss caused by the alleged fraud results from the 'relevant truth ... leak[ing] out.'") (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  Second, on August 1 and September 13, 2022, Syneos revealed that its clinical business was underperforming, contrary to Defendants' prior positive statements, leading to lower-than-expected book-to-bill ratios.  ¶¶270-275.  Third, on November 4, 2022, Defendants revealed a shockingly low book-to-bill ratio of just 0.18x, far below even the reduced figures provided in September 2022, and reported that the Company's Clinical Solutions segment had achieved net new business awards of just $182 million including reimbursable expenses—a startling year-over-year decline of 86.5%.  Defendants further revealed that underlying demand issues "specific to Syneos" caused Syneos's win rate to plummet.  *Dentsply*, 732 F. Supp. 3d 300,

27

325 (loss causation established where earnings reports "plausibly linked" "to the risks concealed by the fraud."). On each of these dates, the price of Syneos's stock declined between 5% and 17%, with the loss in November exceeding 45%.[21] ¶284.

Defendants assert that these events must explicitly reveal "what Plaintiffs contend was misstated or omitted previously." Mtn. at 28. "[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202. For this reason, Defendants' reliance on the lack of a restatement is entirely misplaced.[22] *Vivendi*, 838 F.3d at 261-262. To require otherwise "would have the effect of insulating companies from securities-fraud liability whenever the thing concealed in a material misstatement never ripens from a mere risk to an out-and-out disaster—unless a specific corrective disclosure issues."

Defendants' additional argument that their November 4, 2022 disclosure was just a decline in new business awards should also be rejected. The November 2022 miss was close to $1 billion, and Defendants themselves linked Syneos's disappointing performance to staffing challenges, leadership changes, execution mishaps, and the inability to effectively integrate recent acquisitions. This disclosure is also directly tied to the alleged false statements and allegation that Defendants were overstating backlog. ¶¶180-183, 186-188.

---

[21] Defendants cite *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 686 (S.D.N.Y. 2012), but in *Elixir*, the disclosures came after the stock price had already reached its low and the disclosures were not public so there was no price impact. *Id.* Here, each disclosure was public and the Company's stock price reacted swiftly and immediately to the adverse news. ¶¶30, 284.

[22] Defendants repeatedly focus on revenues when Plaintiffs do not allege that Syneos's revenue numbers themselves were misstated; instead they allege that Defendants described and reported false backlog and performance metrics, which investors and analysts used to measure the Company's performance and evaluate its health and growth.

The Complaint establishes loss causation.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated:  May 30, 2025

*s/ Henry Rosen*

HENRY ROSEN

Henry Rosen (admitted *pro hac vice*)
Brian O. O'Mara (admitted *pro hac vice*)
Steven M. Jodlowski (admitted *pro hac vice*)
Hani Y. Farah (admitted *pro hac vice*)
**DiCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA  92121
Tel.: (619) 923-3939
hrosen@dicellolevitt.com
briano@dicellolevitt.com
stevej@dicellolevitt.com
hfarah@dicellolevitt.com

Greg G. Gutzler
Jarett Sena
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY  10017
Tel.: (646) 933-1000
ggutzler@dicellolevitt.com
jsena@dicellolevitt.com

Adam J. Levitt
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com

Roxana Pierce (admitted *pro hac vice*)
**DiCELLO LEVITT LLP**
801 17th Street, NW, Suite 430
Washington, DC  20006
Tel.: (202) 975-2288
rpierce@dicellolevitt.com

***Lead Counsel for Lead Plaintiffs and the Proposed Class***

29

## S.D.N.Y. LOCAL CIVIL RULE 7.1(c) WORD COUNT CERTIFICATION

I hereby certify pursuant to Southern District of New York Local Civil Rule 7.1(c) that the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Amended Complaint was prepared on a computer using Microsoft Word. The total number of words in the brief is 8,706 words, inclusive of point headings and footnotes and exclusive of pages containing the caption, table of contents, table of authorities, signature blocks, and any required certificates.

s/ Henry Rosen
HENRY ROSEN

**DiCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
Telephone: (619) 963-2406
Email: hrosen@dicellolevitt.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 30, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Henry Rosen
HENRY ROSEN

**DɪCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California  92121
Telephone: (619) 963-2406
Email: hrosen@dicellolevitt.com