UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN GLOBAL EQUITY), KEMPEN INTERNATIONAL FUNDS (KEMPEN INTERNATIONAL FUNDS - MERCLIN PATRIMONIUM), and MERCLIN INSTITUTIONAL FUND (MERCLIN INSTITUTIONAL EQUITY FUND DBI-RDT), | 23-cv-8848 (AS) |
| Plaintiffs, | OPINION AND ORDER |
| -against- | |
| SYNEOS HEALTH, INC., ALISTAIR MACDONALD, MICHELLE KEEFE, JASON MEGGS, and PAUL COLVIN, | |
| Defendants. | |

ARUN SUBRAMANIAN, United States District Judge:

This is the Court's third and final motion-to-dismiss opinion in this securities class action. Defendant Syneos Health, Inc. works with pharmaceutical companies to help test new products and bring them to market. Plaintiffs allege that Syneos and its executives manipulated key performance metrics and misrepresented the company's post-pandemic recovery, violating Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5(b). Defendants have moved to dismiss for the third time. For the reasons below, that motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Syneos helps pharmaceutical companies run clinical trials and commercialize their products. Dkt. 67, Third Am. Compl. (TAC) ¶ 2.[1] Its business model depends on constantly winning new business, so it reports a series of financial metrics that, among other things, give securities analysts and investors insight into whether Syneos is growing its clinical trials business. *Id.* ¶ 7. One such metric is "backlog," i.e., how much business is in the pipeline. Another is the "book-to-bill ratio," which measures a company's "ability to replenish its backlog with new business by comparing net new business generated in the period to revenue recognized in the period." *Id.* ¶ 7 n.3. A ratio of

---

[1] The background is drawn from well-pleaded factual allegations in plaintiffs' complaint, which the Court accepts as true for the purposes of this motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

greater than 1.0 signifies backlog growth and a ratio below 1.0 signifies backlog contraction. *Id.* Backlog growth is good for business.

Between September 9, 2020 and November 3, 2022 (the "Class Period"), some of Syneos's business came from large pharmaceutical companies that outsourced data management or site monitoring for their clinical trials. In those "functional service provider" (FSP) agreements, Syneos and usually at least one other contract research organization (CRO) would be assigned particular functions within a larger clinical trial. *Id.* ¶ 3 & n.2. The complaint highlights one such FSP contract, which spanned the Class Period and involved Syneos, another CRO, and large pharmaceutical company GlaxoSmithKline (the "GSK contract"). Even though Syneos was receiving only $20 million per year in FSP work on that contract, defendants allegedly added $300 million per year to its reported backlog, which plaintiffs say violated Syneos's stated methodology for calculating backlog. *Id.* ¶¶ 13, 14 n.4. Plaintiffs also allege that defendants kept two $25 million oncology trials, a $100 million "bonus" award, and $850–$950 million in reimbursable expenses in backlog, all in violation of Syneos's stated backlog methodology.

This, plaintiffs say, wasn't by accident. They claim the four individual defendants[2] inflated Syneos's backlog so that "business would seem like it was booming when in fact exactly the opposite was true." *Id.* ¶ 7. That allowed them to sell their Syneos stock at a premium, which they did. *Id.* ¶¶ 217–37.

But in February 2022, everything started to come crashing down: defendants removed "a massive portion of reimbursable expenses maintained in the Company's backlog that would never be collected" and reported a "shockingly low book-to-bill ratio of 0.34x." *Id.* ¶ 159. One analyst estimated that Syneos removed $850–$950 million in reimbursable expenses from backlog, calculating "that the magnitude of [management]'s overestimation means that Clinical [book-to-bill] has been overstated by ~0.2x since early in the pandemic (5 quarters)." *Id.* ¶ 160. Then, in August and September 2022, Syneos revealed that its clinical business was underperforming, leading to lower-than-expected book-to-bill ratios. *Id.* ¶¶ 270–75. Its stock price dropped about 17% in response to each of those disclosures. *Id.* ¶¶ 175–78. And in November 2022, Syneos announced a book-to-bill ratio of just 0.18x for Q3 2022, which was "a long way away from" the

---

[2] The individual defendants in this case are: Alistair Macdonald, who "served as CEO of Syneos and as a member of Company's Board of Directors" from "October 2016 until April 2022, when he abruptly resigned from both positions," TAC ¶ 37; Michelle Keefe, who served as "President of Commercial Solutions from December 2017 to November 2021," as "President of Medical Affairs beginning in November 2021," and "as a member of the Board and as CEO of Syneos following the resignation of Defendant Macdonald in April 2022," *id.* ¶ 38; Jason Meggs, who "served as CFO of Syneos from February 2018 until his resignation from the Company in March 2023," *id.* ¶ 39; and Paul Colvin, who was "President of Clinical Solutions of Syneos from December 2018 until November 2021," when he "was appointed Chief Business Officer," a role that he held "until June 30, 2022, before his departure from Syneos in August 2022," *id.* ¶ 40.

market's expectation of 1.15x. *Id.* ¶¶ 276, 281. Analysts found defendants' explanation that they were surprised to be "frankly hard to believe" and not "reasonable," given the extent that Syneos's business deteriorated. *Id.* ¶ 281. In response to that news, Syneos's stock price decreased by 46%. *Id.* ¶ 185. Then plaintiffs sued on behalf of themselves and others who purchased Syneos stock during the Class Period.

## PROCEDURAL HISTORY

Plaintiffs have tried and failed to plead their case multiple times. Last time, the Court dismissed the second amended complaint with leave to amend. The Court made clear that for their third amended complaint (TAC) to survive, plaintiffs would need to address each allegedly false statement "on its own terms, explaining why that statement was false or misleading when made and why defendants knew or should have known that." *Kempen Int'l Funds v. Syneos Health, Inc.*, 2025 WL 949576, at *1 (S.D.N.Y. Mar. 28, 2025). For some of the challenged statements, plaintiffs have done that.

## LEGAL STANDARDS

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id.* at 305 (cleaned up). As usual, the Court accepts the complaint's well-pleaded allegations as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). But the allegations of fraud must be pleaded with particularity. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

For the misleading-statement element, under Federal Rule of Civil Procedure 9(b) the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305; *see also* 15 U.S.C. § 78u-4(b)(1)–(2). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege that the statements were misleading. *Blanford*, 794 F.3d at 304, 307.

On scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

3

**DISCUSSION**

"To state a claim under Section 10(b) and Rule 10b-5[(b)], a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022). Defendants say plaintiffs have failed to allege elements one, two, and six. Because plaintiffs have successfully pleaded all three challenged elements as to several of the alleged misstatements, their Section 10(b) and Rule 10b-5 claims survive as to those misstatements (Count I). Defendants make no independent argument as to plaintiffs' Section 20(a) claim, so that claim survives as well as to those misstatements (Count II).

I.    **Plaintiffs have alleged some misstatements**

   A.  **Plaintiffs have alleged with particularity that Syneos, Macdonald, Meggs, and Keefe made false or misleading statements about Syneos's backlog in its quarterly and annual public filings (Statements 12–17)**

Plaintiffs have alleged with particularity that quarterly and annual reports Syneos filed during the Class Period contained actionably false or misleading statements related to backlog. *See Blanford*, 794 F.3d at 305 (outlining four requirements to plead a misleading statement); *see also* 15 U.S.C. § 78u-4(b)(1)–(2).

*First*, plaintiffs have specified the statements they contend were fraudulent. They point to language in Syneos's "New Business Awards and Backlog" methodology, which was "repeated verbatim" in every quarterly and annual report filed with the SEC during the Class Period. TAC ¶ 107 n.11. In that methodology, Syneos explained that new business is added to backlog only if "collection of the award value is probable," and that for "functional service provider [FSP] offerings, a maximum of 12 months of services are included in the award value." *Id.* ¶ 107. Plaintiffs also point to the dollar amount of backlog that Syneos included in those reports.

*Second*, they have identified the speakers: senior executives Macdonald, Meggs, and Keefe, who signed the reports. *Id.* ¶¶ 37–39.[3]

*Third*, plaintiffs have stated where and when the statements were made, namely each of Syneos's quarterly and annual reports during the class period: "(i) Q3 2020 Form 10-Q, filed Oct. 29, 2020; (ii) 2020 Form 10-K, filed Feb. 18, 2021; (iii) Q1 2021 Form 10-Q, filed Apr. 29, 2021; (iv) Q2 2021 Form 10-Q, filed Aug. 9, 2021; (v) Q3 2021 Form 10-Q, filed Nov. 3, 2021; (vi) 2021 Form 10-K, filed Feb. 17, 2022; (vii) Q1 2022 Form 10-Q, filed Apr. 29, 2022; and (viii) Q2 2022 Form 10-Q, filed Aug. 2, 2022." *Id.* ¶ 107 n.11.

---

[3] Plaintiffs don't allege that Colvin signed the reports or made any actionable statement related to backlog, so Count I against him is dismissed (i.e., the Section 10(b) and Rule 10b-5(b) claims). *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011).

*Fourth*, they have explained why the statements were fraudulent. As discussed above, plaintiffs allege that defendants, in connection with Syneos's multi-year FSP contract with GSK, added $70 million to backlog every quarter during the Class Period even though collection of that $70 million was improbable every time. Plaintiffs also allege that defendants kept that money in Syneos's stated backlog throughout the multi-year Class Period, beyond the maximum of 12 months for FSP contracts in backlog. As a result, plaintiffs say, the amount of backlog Syneos reported in those filings was materially false or misleading because it was "crucial to understanding Syneos's business and assessing whether the Company was healthy and growing," but it was inflated by hundreds of millions of dollars relative to what it would have been had Syneos complied with its stated methodology. *Id.* ¶ 122.

Defendants make a few arguments in response. All fall short. *First*, they call out the complaint's "wildly inconsistent descriptions" of Syneos's multi-year contract with GSK. Mot. 11. They say the complaint "now admits that the multi-year contract totaled just $300 million in value" but still says "the entire $300 million (minus $20 million of revenue actually received) was included in Syneos' backlog in 2020" and an "*additional* $70 million was added to backlog in each quarter of 2021, . . . putting its backlog value at $490 million or $560 million in 2021." Mot. 11 (citing TAC ¶¶ 114, 136, 165, 168). They say "none of that makes sense," especially since an internal Syneos presentation from January 2021 says that GSK "produced *total* awards of $72.4 million in 2020," Mot. 11, and was projected to produce only $235 million in clinical awards in 2021 (far from the $560 million plaintiffs say was improperly included in backlog by the end of that year), Reply 3 n.1. And they say plaintiffs' claim that GSK "refused to give the Company new awards" in 2019 is contradicted by plaintiffs' claim that they signed the contract in "late 2019." Mot. 11 (quoting TAC ¶¶ 3, 13).

That does seem confusing. But defendants make no attempt to set the record straight by explaining what the real story with the GSK contract was. They certainly are entitled to stay mum at this juncture, given that their motion focuses solely on plaintiffs' complaint, and not what the evidence in discovery will show, but it leaves the Court with only what the complaint presents. And on closer inspection, it tells a different (consistent) story. "Syneos was awarded involvement in a $300 million *annual* multi-year contract with GSK," TAC ¶ 114 (emphasis added). Of that $300 million each year, collection was probable for only $20 million. *Id.* ¶ 136. So Syneos's backlog was inflated by $280 million per year related to the GSK contract. *Id.* Because Syneos added backlog "progressively," including "a quarter at a time as we go," *id.* ¶ 119, $280 million per year of inflated backlog would come out to $70 million per quarter.

And plaintiffs allege that Syneos kept all of that in backlog until November 2022, so it makes sense that the numbers would increase over time: under plaintiffs' theory, what was $280 million in uncollectible backlog (related to the GSK contract) in 2020 became $490 million by the end of Q3 2021 and $560 million by the end of 2021. *Id.* ¶¶ 14 n.4, 20, 165, 168. While the complaint is far from a model of clarity, the math adds up (i.e., an extra $70 million in uncollectible backlog per quarter).

Plus, Syneos's January 2021 internal presentation listing $72.4 million of actual awards from GSK across all contracts in 2020 doesn't contradict plaintiffs' claim that Syneos received only $20 million in 2020 from the GSK contract at issue here. (The remaining $280 million presumably went to the other CRO on the contract.) And the same internal presentation's projection that Syneos would receive only $235 million in total clinical awards from GSK in 2021 is consistent with plaintiffs' allegations that defendants inflated Syneos's backlog in public filings later that year (leading to $560 million attributable to the GSK contract that should have been excluded). In other words, it is reasonable to infer that Syneos was more truthful in its internal presentations than it was in its public filings. Discovery may show that this is all bunk. But at this stage, the Court views the complaint's allegations in the light most favorable to plaintiffs, and defendants' arguments don't undermine those allegations now.

And as to the timing of the GSK contract, plaintiffs claim they entered into a contract in 2019 that began in 2020, so it wouldn't be a "new award" from GSK attributable to 2019. *See id.* ¶ 13 (explaining that Syneos's relationship with GSK, with which it had signed a new agreement in late 2019, was strained to the point that Syneos could only obtain less than 10% of the FSP work it had contracted to provide *beginning in 2020*" (emphasis added)). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," *Blanford*, 794 F.3d at 307, those "contradictions" aren't contradictions.

*Second*, defendants claim that the complaint "*does not at all challenge* any statement about Syneos' backlog in 2022, so the reference to what supposedly occurred in 2022 is irrelevant." Mot. 14. That's incorrect. As discussed above, the complaint challenges alleged misstatements about Syneos's methodology for calculating backlog throughout the Class Period, including in an annual report filed on February 17, 2022 and quarterly reports filed on April 29 and August 2, 2022. TAC ¶ 107 n.11.

*Third*, defendants say "Syneos' judgment as to whether or to what extent something qualifies as backlog is an opinion that is not alleged to have been actionably misleading." Mot. 21. They also say they clarified that "backlog and net new business awards might not be consistent indicators of future revenue." Reply 7 n.3. But certain parts of the backlog methodology don't allow for subjectivity. And even if backlog isn't always indicative of future revenue, defendants were still obligated to report numbers in compliance with their stated methodology, which plaintiffs were entitled to rely on. As discussed above, Syneos's methodology—repeated verbatim in every quarterly and annual report to the SEC and general public throughout the Class Period—states that an award may be added to backlog "provided that . . . collection of the award value is probable." TAC ¶ 107; Dkt. 72-4 at 7. And it states that for "functional service provider [FSP] offerings, a maximum of twelve months of services are included in the award value." *Id.* The methodology doesn't say "if Syneos executives *think* collection of the award is probable" or that a maximum of twelve months of services is included "unless Syneos executives decide otherwise." And here, plaintiffs allege that for more than 12 months (i.e., throughout the Class Period), Syneos added $70 million per quarter to backlog related to the GSK contract even though collection was not probable for any of it. *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 531–32 (S.D.N.Y.

2009) (statements "were fraudulent because they failed to reveal that the Company had . . . violat[ed] . . . its internal hedging policy").

*Fourth*, defendants argue that plaintiffs fail to show that their confidential sources "would have been in a position to know the facts relayed" about the GSK contract. Reply 4 (quoting *Gross v. AT&T Inc.*, 2021 WL 9803956, at *6 n.14 (S.D.N.Y. Sept. 27, 2021)); *accord* Mot. 13–14. But the complaint relies on "interviews with former Syneos employees who were at the Company during the Class Period," including at least 27 managers, directors, and business unit CFOs. TAC at 1 n.1. At least one of those confidential sources—which included the business unit CFOs of the Finance, Clinical Development, Clinical Pricing, Project Financial Management, and Commercial Sales departments—would have been in a position to know the details behind the GSK contract and how much of it Syneos included in backlog. That's a "sufficient general description of the personal sources of the plaintiffs' beliefs," which is what the PSLRA requires. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

And to the extent defendants argue that plaintiffs' core allegations about the GSK contract remain "wholly unattributed" and "unconnected to any . . . Syneos public statement," Reply 4, they're wrong. As discussed above, the allegations are specific, linked to Syneos's quarterly and annual statements, and it is reasonable to attribute them to the confidential sources who would have been in a position to know those details. "Because the [c]omplaint states with particularity the statements it alleges are misleading and the reasons why these statements are fraudulent," it "adequately alleges false statements of material fact." *Blanford*, 794 F.3d at 307.

Zooming out, plaintiffs claim there are other examples of defendants inflating Syneos's backlog in violation of its methodology. They say that defendants maintained in backlog 1) two $25 million oncology trials after they were canceled in early 2021, even though Syneos's CFO tried to have those trials removed from backlog, 2) a $100 million milestone contingent "bonus" award from an agreement to conduct eight clinical trials, even though Syneos missed the very first milestone and thus became ineligible for the bonus, and 3) $850–$950 million of reimbursable expenses, at least some of which didn't qualify under the backlog methodology. TAC ¶¶ 23, 27, 75, 113, 115, 126–28, 137, 153, 207, 267.

But various details related to those allegations remain hazy. When did Syneos include the $100 million milestone-contingent award in backlog, and when did it miss the first milestone? Which reports still included the $25 million oncology trials after they were canceled? What portion of the $850–$950 million of reimbursable expenses that Syneos eventually wrote off in February 2022 were included in violation of the backlog methodology, and why?[4]

Because plaintiffs have alleged with particularity that Syneos's quarterly and annual reports throughout the Class Period were actionably false or misleading as to its backlog methodology and

---

[4] The methodology states that once an award is properly included in backlog, Syneos "will remove the value[s]" if it "determine[s] that any previously awarded work is no longer probable of being performed," so plaintiffs may need to show that Syneos made such a determination. Dkt. 72-4 at 7.

calculations, if plaintiffs can fill in the hazy details above through discovery, they may be able to show that the magnitude of those alleged misstatements stretched beyond just the GSK contract. That is, at this stage, the statements in the annual and quarterly reports are actionable, and plaintiffs *may* be able to extend these other alleged backlog inflations to those statements with evidence uncovered in discovery.

### B. The remaining statements aren't actionable (Statements 1–11 and 18)

The remaining statements plaintiffs identify are in a different category. They're much broader and vaguer. For these statements, plaintiffs flunk the heightened pleading standards applicable in this context.

Plaintiffs identify various alleged false or misleading statements regarding Syneos's 1) "success with SMID and large pharma customers," 2) "claimed competitive advantages powering the Company's clinical growth, including its 'trusted process,' 'metrics-driven, repeatable methodology,' 'differentiated product development strategy,' and 'integrated product offerings,'" and 3) its "integration of the Synteract acquisition and claimed enhancement of its SMID position." Opp. 2–3 (describing Statements 1–5, 7–11, and 18). Those statements are too general to be relied on, classic puffery, vague expressions of corporate optimism, or protected forward-looking statements. Or they still aren't false or misleading even after accepting plaintiffs' allegations as true. So they aren't actionable.

The Court agrees with and incorporates defendants' arguments rejecting those statements, Mot. 16–20, 22; Reply 5–7, so it need not go one by one. But to take a characteristic example, plaintiffs say the statements that Syneos was "positioned for accelerated revenue and margin growth" and was "successfully penetrating large pharma" were false because Syneos lacked an integrated client portal, had generic trial management systems, and lacked certain visualization and statistical modeling capabilities. Opp. 7. Those statements are classic puffery that's "categorically incapable of being 'false' or 'misleading' because by their very nature no reasonable investor would rely on them." *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at *3 (S.D.N.Y. Oct. 9, 2024) (statements "that a company is 'well positioned,' or that a year was 'successful' are . . . puffery"); *see In re Paysafe f/k/a Foley Trasimene Acquisition Corp. II Sec. Litig.*, 2025 WL 1003322, at *23 (S.D.N.Y. Mar. 31, 2025) (statements that the company had "[s]ignificant growth opportunities," had "significant long-term growth potential," was "positioned in the highest growth vertical markets," and was "a global leader" were not actionable).

Plaintiffs respond that this and other puffery is actionable because the statements were intended to "reassure" investors about particular risks. Opp. 8, 11, 14, 16; *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("While certain statements, viewed in isolation, may be mere puffery, when the statements are made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.") (quotations omitted)). Here, as defendants correctly note, the complaint doesn't allege that these statements were made repeatedly in response to direct questions to "reassure" anyone of anything. And even if those statements weren't puffery, plaintiffs don't

connect the dots to plausibly explain why, for instance, the lack of a client portal or statistical modeling systems could prove that Syneos wasn't "successfully penetrating large pharma." So Statements 1–5, 7–11, and 18 are out.

Statement 6, which relates to the allegedly canceled oncology trials, isn't actionable due to lack of sufficient particularity about when those awards were canceled and when Syneos's CFO "tried to have these trials removed from the backlog." TAC ¶ 75. But after discovery, plaintiffs may be able to link any backlog inflation from those trials to the quarterly and annual reports detailed above, which are actionable. *See supra* § I.A.

## II.    Plaintiffs have pleaded a strong inference of scienter as to the actionable statements

To plead a "strong inference" of scienter under the PSLRA, plaintiffs must allege particularized "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The inquiry is holistic; courts must consider "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021).

### A.  Motive and opportunity

"In order to raise a strong inference of scienter through motive and opportunity to defraud, [p]laintiffs must allege that [Syneos] or its officers benefitted in some concrete and personal way from the purported fraud." *IBEW*, 553 F.3d at 198 (internal quotation omitted). "The 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.*

Plaintiffs can show motive through showing that defendants' stock sales were "unusual" or "suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). To assess that, courts look to "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772–73 (S.D.N.Y. 2019).

Those factors support a strong inference of scienter here. Plaintiffs allege that defendants sold the lion's share of their Syneos stock to capitalize on its inflated value during the Class Period, and they did so in quantities that far exceeded their previous trading to reap profits that far exceeded their annual salaries. They squeezed those sales in before the corrective disclosures, but during or after their actionable statements. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d. Cir. 1999) (finding "inference of bad faith and scienter" where defendant and "several other insiders unloaded large positions" (internal quotations omitted)); *Zornberg v. NAPCO Sec. Techs.,*

*Inc.*, 778 F. Supp. 3d 516, 526 (E.D.N.Y. 2025) (stock sales are unusual or suspicious if made "at a time or in an amount that suggests the seller is maximizing personal benefit from inside information; and [if] trading was dramatically out of line with prior trading practices." (internal quotations omitted)).

Indeed, plaintiffs say that during the Class Period, Keefe sold nearly all of her shares, TAC ¶¶ 230–34, Macdonald sold 53% of his shares, *id.* ¶¶ 217–23, and Meggs sold 80% of his shares, *id.* ¶¶ 224–29.[5] That was out of line with their prior trading practices: During the two years immediately preceding the Class Period, Macdonald "collected trading proceeds of $3.94 million from sales of Syneos common stock—meaning that Macdonald's $11.44 million in Class Period proceeds tripled," and those profits "represent more than 5.6 times as much as Macdonald earned in salary during this time." *Id.* ¶¶ 220, 223. Meggs and Keefe also made more from stock sales than they did from their salary during the same time period. *Id.* ¶¶ 229 (2.78x salary for Meggs), 234 (1.28x salary for Keefe); *see also id.* ¶¶ 244–48 (detailing other insiders' suspicious trading during the Class Period). Nearly all of these sales happened before September 4, 2021, a few months before Syneos made its first alleged corrective disclosure. And many occurred while Syneos's "share price was at all-time highs." *Id.* ¶ 248.

Defendants respond with five arguments, but all fail. *First*, they say that all but one sale occurred prior to September 4, 2021, "when Syneos' business was indisputably exceeding expectations and before any plausible misstatement of fact could have been made." Mot. 23. But as discussed above, plaintiffs have alleged several actionable statements that would have inflated Syneos's stock price before that date.

*Second*, defendants say that if they were "motivated by a desire to 'cash out,' they would have sold their shares after, not before, they made statements allegedly propping up Syneos' share price." Mot. 23. It's true that defendants continued to make actionable statements after September 2021, but that doesn't change the analysis given these facts. Here, as in *Stevelman*, "some of the sales occurred after the representations were made, several officers made large sales, and a motive for inflation of the stock price can be inferred from these sales." 174 F.3d at 86. And "the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud." *Id.*

*Third*, defendants claim that plaintiffs "paint a misleading picture" by focusing on stock sales and not stock acquisitions. Mot. 23. They say that none of the defendants sold a significant percentage of their stock during the Class Period, and that two defendants increased their stock holdings during the Class Period. But it turns out that an overwhelming percentage of those stock "acquisitions" came from the automatic vesting of restricted stock units. Mot. Appx. C. "In other words, [defendants] got new shares for free." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL

---

[5] To be clear, these numbers appear to exclude new shares that defendants received over the Class Period primarily pursuant to the automatic vesting of restricted stock units. *See* Reply 8; Mot. Appx. C. But for the reasons discussed below, that doesn't change the scienter analysis.

456745, at *6 (S.D.N.Y. Feb. 5, 2024). That doesn't negate the inference of scienter, given that defendants *passively* received stock but *actively* sold it, much more than they had before.

*Fourth*, defendants say their trades were conducted pursuant to non-discretionary 10b5-1 plans (i.e., plans that provide a predetermined process for selling company stock), so they're not suspicious. 10b5-1 plans may not be suspicious as a general matter, but here they were. Plaintiffs allege that three of the four individual defendants changed their 10b5-1 plans *during the Class Period* so that they could sell *more* of their stock. TAC ¶¶ 221 (Macdonald), 228 (Meggs), 233 (Keefe). That supports a strong inference of scienter.

*Finally*, defendants highlight that their stock sales weren't clustered at the end of the Class Period, "when insiders theoretically would have rushed to cash out before the fraud was revealed," but instead almost all occurred during its first 12 months. Mot. 24 (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444–45 (S.D.N.Y. 2005)). But those 12 months ended shortly before the first alleged corrective disclosure in February 2022. Defendants don't need to capitalize on every actionable statement to support a strong inference of scienter. *Cf. Sec. Exch. Comm'n v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) ("[A] reasonably smart fellow . . . would want to sell at an opportune, but perhaps not *the most* opportune, time, if only to avoid more suspicion than his behavior was already bound to attract." (emphasis in original)).

And there is no dispute that the individual defendants, who were executives at Syneos, had the opportunity to defraud. *Van Dongen v. Cninsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer.").

In sum, plaintiffs have alleged facts showing defendants' motive and opportunity to sell their Syneos stock at prices inflated by their alleged fraud. Those unusual and suspicious stock sales during the Class Period support a strong inference of scienter.

## B. Conscious misbehavior and recklessness

Under this prong, a strong inference of scienter may arise when the defendants "engaged in deliberately illegal behavior, knew facts or had access to information suggesting that their public statements were not accurate, or failed to check information they had a duty to monitor." *IBEW*, 553 F.3d at 199 (cleaned up).

Plaintiffs' allegations support an inference of defendants' conscious misbehavior or recklessness related to Syneos's backlog calculations. As to Macdonald, plaintiffs highlight a statement he made on a November 3, 2021 earnings call in response to an analyst question about "the visibility to set up your confidence level," given that "[i]t sounds like you guys are pretty confident going into next year." Dkt. 72-16 at 8; *see* TAC ¶ 199. Macdonald said Syneos had "good kind of backlog visibility through the whole year with both the—backlog that's coming through from clinical, we mentioned, we're winning a lot of oncology work. Obviously, that sets up for a long view of the pipeline of the backlog. So you get a lot more visibility with that." Dkt. 72-16 at 8. That is, Macdonald spoke about Syneos's backlog coming from its clinical division,

11

and the "specificity of [his] statements . . . is strong circumstantial evidence that [he was] receiving some form of specific information on [that topic]." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012); *see also Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269–70 (3d Cir. 2009) (citing similar statements in response to analyst questions). If, on the other hand, Macdonald didn't monitor the "backlog that's coming through from clinical" but made definitive statements as if he did, he still might have been reckless. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319 (S.D.N.Y. 2024) (making the same point).

Next, as to Meggs, plaintiffs allege that several people who reported to him discussed backlog manipulations and "the impact this would have on the Company," and one of them "warned that these practices could amount to fraud." TAC ¶ 208. Plaintiffs also allege that "[w]hen Defendant Meggs was brought certain figures indicating a shortfall, he simply said 'No' until he received the numbers he wanted." *Id.* ¶ 213.

And regarding Keefe, plaintiffs say she participated in weekly Monday calls during which sales representatives reported their numbers, so she would have known (or had a duty to know) about the backlog manipulation. *Id.* ¶ 210.

As a more general matter, plaintiffs allege that "[n]umerous high-level managers, including business unit CFOs, voiced objections to these efforts to manipulate backlog, expedite revenue recognition, and change cost estimates and ultimately left the Company because they felt they could not justify these practices." *Id.* ¶ 214. They also state that "[o]ne business unit CFO similarly resisted signing off or certifying month-end numbers for his business unit and warned superiors many times against how the Company was recognizing revenue and recording backlog and predicted that it could not be sustained." *Id.* ¶ 215. And they say that an Associate Director of Finance observed that "management allowed the backdating of contracts signed after the end of the quarter to make sure the award value was placed in backlog for the previous quarter," on "multiple occasions with increasing frequency in 2021 and 2022." *Id.* ¶ 112. Courts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter. *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 290 (S.D.N.Y. 2020); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) (collecting cases); *In re Eletrobras Sec. Litig*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (collecting cases).

Moreover, plaintiffs highlight suspicious circumstances surrounding the "abrupt departures of four of the most senior Syneos executives, including Defendants Macdonald, Meggs, Keefe, and Colvin." TAC ¶ 257. Two months after the first alleged corrective disclosure, Macdonald retired in April 2022. That was after six years of serving as Syneos CEO, and six months before Syneos "disclosed that it had lost 86% of its clinical segment pipeline." *Id.* In August 2022, Colvin left. And in January 2023, "Syneos announced a 'Chief Financial Officer Transition,' through which Defendant Meggs would exit the Company." *Id.* Finally, Keefe, who succeeded Macdonald as CEO, departed the Company in October 2023. *Id.* Given that plaintiffs make "factual allegations linking the executives' resignation[s] to the alleged fraud," those departures support an inference

of scienter. *See Africa v. Jianpu Tech. Inc.*, 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023) (citation omitted). All these allegations, taken in context, raise viable inferences about scienter.

Defendants counter that plaintiffs' allegations don't describe any misstatements, much less misstatements that were reported to anyone responsible for the challenged statements. Mot. 26. To be sure, some of the allegations don't directly implicate backlog or identify specific awards in backlog. But they support the narrative that Syneos regularly manipulated its financial metrics, and they constitute circumstantial evidence that defendants either directed, knew, or were reckless in not knowing that backlog was inflated in Syneos's quarterly and annual reports, in violation of its stated methodology.

Defendants also assert that "the mere fact that some of the Individual Defendants left the Company (TAC ¶257)—over the course of a year and a half—likewise does not give rise to an inference of scienter because, '[i]n reality, there are any number of reasons that an executive might resign, most of which are not related to fraud.'" Mot. 27 (quoting *BISYS*, 397 F. Supp. 2d at 446–47). But plaintiffs don't rely on the mere fact of some defendants' departure; they highlight the *suspicious timing* of *every* individual defendant's departure.

Separately, defendants emphasize that "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." Mot. 26–27 (quoting *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015)). True enough. But plaintiffs' allegations rely on more than defendants' corporate positions: As discussed above, they identify individual defendants' specific statements they made or heard that suggest conscious misbehavior or recklessness.

Defendants also claim that they were "surprise[d]" by Syneos's disappointing results. Mot. 15. But analysts found defendants' explanation to be "frankly hard to believe" and not "reasonable," given the extent that Syneos's business deteriorated. TAC ¶ 281. That suggests defendants may have known about those issues, or were reckless in not knowing.

Finally, defendants don't dispute that if plaintiffs succeed in establishing scienter for any of the individual defendants, they can do the same for Syneos. "Courts in this district generally conclude that the scienter of 'management level' employees can be attributed to the corporation." *Speakes v. Taro*, 2018 WL 4572987, at *9 (S.D.N.Y Sept. 24, 2018). Defendants haven't made any argument as to why that shouldn't be the case here, especially given that Macdonald, Meggs, and Keefe all signed quarterly or annual reports during the Class Period.

***

Zooming out, defendants nitpick each aspect of plaintiffs' allegations regarding motive, conscious disregard, and recklessness, but they don't tie together a convincing alternative narrative of these allegations. The breadth of suspicious behavior alleged with particularity—from stock sales to a culture of fudging performance metrics, directed by some of the executives responsible for the challenged statements, and with pushback from some of their direct reports—is enough to warrant further review. So for the reasons discussed above, and having considered the allegations

13

in their totality, the Court holds that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### III.    Plaintiffs have pleaded loss causation for the actionable statements

 "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quotation omitted). "Plaintiffs' burden is not a heavy one. The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Dentsply*, 732 F. Supp. 3d at 323 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). But "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quotation omitted). "Ultimately, loss causation can be pleaded by alleging that either (1) 'the market reacted negatively to a corrective disclosure of the fraud,' or (2) 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Dentsply*, 732 F. Supp. 3d at 323 (quoting *Carpenters Pension Tr. Fund*, 750 F.3d at 232–33).

Plaintiffs allege four loss-causing events that fit the corrective disclosure category. All four are announcements of surprising, even "frankly hard to believe," decreases in Syneos's backlog, new business awards, or book-to-bill ratio. Defendants say that the alleged corrective disclosures "merely reported on new events" and didn't reveal any prior misstatement. Mot. 28. That's possible. But it's also plausible that Syneos inflated its backlog in violation of its stated methodology, which inflated its book-to-bill ratio, misstated its new business awards, and caused Syneos stock to trade at artificially inflated levels, which the disclosures corrected. (As discussed above, new business awards are incorporated into backlog, and the book-to-bill ratio is calculated based on backlog.)

Next, defendants specifically challenge the February 2022 disclosure, from which one analyst estimated that Syneos removed $850–$950 million in reimbursable expenses from backlog and calculated "that the magnitude of [management]'s overestimation means that Clinical [book-to-bill] has been overstated by ~0.2x since early in the pandemic (5 quarters)." *Id.* ¶ 160. Defendants say that "the reduction of a projection" regarding reimbursable expenses in backlog "does not reveal any falsity in the prior projection." Mot. 28. But it is also plausible that defendants did not remove those reimbursable expenses from backlog until long after they knew that the work was no longer "probable of being performed." Dkt. 72-4 at 7. That would violate Syneos's backlog methodology. And getting down to brass tacks, plaintiffs' argument is that a correction to backlog of that magnitude at least plausibly relates to the prior reporting of inflated backlog in Syneos's quarterly and annual reports, which at this stage are actionable. Discovery will show if plaintiffs can draw the necessary connection.

Finally, defendants say, plaintiffs don't even assert "that the contracts allegedly included improperly in backlog were reversed." Mot. 28. But as to the GSK contract, plaintiffs allege that the "inflated and uncollectable award value remained in backlog until [the] November 2022" disclosure. TAC ¶ 14 n.4. And on that November 2022 earnings call, Keefe said the poor results were driven in part by "a reduction in our normal repeat business awards," which could plausibly refer to the GSK contract and others like it. *Id.* ¶ 280.

## IV.    Plaintiffs' § 20(a) claim survives

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78t(a)). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

Defendants argue only that "[h]aving failed to plead a primary violation, Plaintiffs have failed to plead control person liability under Section 20(a)." Mot. 8 n.3 (citing *ATSI Commc'ns, Inc.*, 493 F.3d at 108). But as discussed above, plaintiffs have stated a § 10(b) violation, so their § 20(a) claim may also proceed against Macdonald, Meggs, and Keefe. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 274 (S.D.N.Y. 2023).

The Section 20(a) claim against Colvin also survives because plaintiffs allege he "had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading." TAC ¶ 306. Defendants don't dispute that. Plaintiffs have also plausibly alleged that Colvin "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108. They say that Colvin, after the close of Q2 2021, asked employees to "find" more than $12 million in additional award value over the weekend and "to finalize the forecast by eod Monday." *Id.* ¶ 90. According to "Business unit CFOs, Senior Directors of Project Finance Management, Associate Directors of Finance, and others in the Company's finance department," "Colvin's direction to 'find' value was tantamount to an instruction to fake it." *Id.* And plaintiffs allege that Colvin pressured employees to "change targets and cost estimates to hit performance metrics and prematurely generate revenue without affecting backlog." *Id.* ¶ 211. Plus, like the other individual defendants, Colvin sold "all or virtually all of the Syneos common stock he held entering the Class Period" and "did not have any open market purchases of Syneos common stock during the Class Period." *Id.* ¶ 235. Those allegations are sufficient to state a Section 20(a) claim against Colvin.

## CONCLUSION

For these reasons, the motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion to dismiss Count I is denied as to all defendants except for Colvin. The motion to dismiss

Count II is denied as to all individual defendants. The stay on discovery is lifted. The parties should meet and confer and, on or before April 22, 2026, jointly propose a case management plan addressing a schedule for discovery, class certification, and summary judgment.

The Clerk of Court is respectfully directed to terminate Dkt. 70.

SO ORDERED.

Dated: March 31, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge